**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|   |   |   |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| SHERIDAN HOLDING COMPANY II, LLC, *et al.*,[1] | § | Case No. 19-35198 (MI) |
|  | § |  |
| Debtors. | § | (Joint Administration Requested) |
|  | § |  |

**DECLARATION OF LISA A. STEWART, EXECUTIVE**
**CHAIRMAN, PRESIDENT, CHIEF INVESTMENT OFFICER, AND**
**CHIEF EXECUTIVE OFFICER OF SHERIDAN HOLDING COMPANY II, LLC,**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Lisa A. Stewart, hereby declare under penalty of perjury:

1.      I serve as the Executive Chairman, President, Chief Investment Officer, and Chief Executive Officer of Sheridan Holding Company II, LLC ("Holdco II") and certain of its affiliate debtors and debtors in possession (each of the debtors, the "Debtors" or "Sheridan II," and, together with their non-Debtor affiliates, are referred to as the "Sheridan Group").  I have served as President and Chief Executive Officer and/or Executive Chairman and Chief Investment Officer since the Sheridan Group's founding in 2006.  I oversee the Sheridan Group's day-to-day operations, including the implementation of the Sheridan Group's strategy.

2.      Prior to founding the Sheridan Group, I served as an Executive Vice President of El Paso Corporation ("El Paso") and President of El Paso E&P and other non-regulated businesses. Prior to my time at El Paso, I spent 20 years at Apache Corporation, leaving in 2004 as Executive

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Sheridan Holding Company II, LLC (7040); Sheridan Investment Partners II GP, LLC (8298); Sheridan Investment Partners II, L.P. (9405); Sheridan Production Partners II, LLC (8034); Sheridan Production Partners II-A, L.P. (8813); Sheridan Production Partners II-B, L.P. (9232); Sheridan Production Partners II-M, L.P. (9084); SPP II-B GP, LLC (8554); and SPP II-M GP, LLC (0488).  The location of the Debtors' service address is:  1360 Post Oak Blvd., Suite 2500, Houston, Texas 77056.

Vice President with responsibility for reservoir engineering, business development, land, environmental, health and safety, and corporate purchasing.  I hold a Bachelor's of Science in Petroleum Engineering from the University of Tulsa where I am a member of the College of Engineering and Natural Sciences Hall of Fame.  I am also a member of the Society of Petroleum Engineers.

3.     To effectuate a restructuring, on the date hereof (the "Petition Date"), the Debtors filed their voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Southern District of Texas (the "Court").  To minimize the adverse effects on their businesses, the Debtors have filed motions and pleadings seeking various types of "first day" relief (collectively, the "First Day Motions").  I submit this declaration to assist the Court and parties in interest in understanding the circumstances compelling the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and First Day Motions filed contemporaneously herewith.

4.     I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  Except as otherwise indicated herein, all facts set forth in this declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and their advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  I am authorized to submit this declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

**Preliminary Statement**

5.     The Debtors commenced these chapter 11 cases to implement this restructuring through a prepackaged plan of reorganization (the "Plan"), a copy of which has been filed contemporaneously herewith.  The Plan reduces the Debtors' prepetition debt by approximately $900 million, deleverages their balance sheet, and provides crucial additional liquidity.  The Plan leaves trade creditors unimpaired and has the support of holders of approximately 99% of the Debtors' secured debt and holders of approximately 96% of their subordinated debt, who have documented their support for the restructuring and these chapter 11 cases through a restructuring support agreement (the "RSA").  The RSA is attached hereto as **Exhibit C**.  A debtor-in-possession financing facility will address the Debtors' immediate liquidity needs by providing $100 million in aggregate financing and the consensual use of cash collateral.

6.     The Debtors are an oil and natural gas investment fund with a principal focus on acquiring and exploiting a balanced portfolio of working interests in mature producing properties in onshore basins in the United States.  Since the Debtors were established in 2010, they have focused on a strategy of acquiring and enhancing the value of mature producing oil and gas properties primarily from large independent operators.  The Debtors' strategy includes the application of cost-effective reinvestments, operational improvements, and enhanced recovery programs to the acquired assets.  The downturn and continued weakness in the commodities markets, however, has hindered the Debtors' ability to implement their strategy.  For the year ending December 31, 2018, the Debtors' hedged EBITDA was $78.5 million.

7.     As of the Petition Date, the Debtors have approximately $1.1 billion of funded debt, consisting of the following facilities of Sheridan Production Partners II-A, L.P. ("SPP II-A"), Sheridan Production Partners II-M, L.P. ("SPP II-M"), and Sheridan Investment Partners II, L.P. ("SIP II," and together with SPP II-A and SPP II-M, the "Sheridan II Borrowers"):

- three first-lien revolving credit facilities with approximately $66 million in aggregate principal outstanding (the "Sheridan II Revolving Credit Facilities");

- three first-lien term loan facilities with approximately $543.1 million in aggregate principal outstanding, which share an equal lien with the Sheridan II Revolving Credit Facilities (the "Sheridan II Term Loan Facilities"); and

- three unsecured subordinated credit facilities with approximately $495.4 million in aggregate principal outstanding (the "Sheridan II Subordinated Term Loan Facilities").

The Debtors used funds from the Sheridan II Revolving Credit Facilities and the Sheridan II Term Loan Facilities, together with equity commitments from limited partners (the "Limited Partners"), to acquire oil and gas producing properties located in Texas, New Mexico, and Wyoming. The Sheridan II Subordinated Term Loan Facilities, along with funds generated from certain hedging agreements, as described herein, were used to pay down a substantial portion of the Debtors' senior indebtedness.

8.     The Debtors are part of the broader Sheridan Group, which was established in 2006 by a seasoned team of oil and gas executives with Warburg Pincus LLC ("Warburg Pincus"), a private equity firm, as the co-sponsor. Headquartered in Houston, Texas, Sheridan II comprises the second of three series of private-placement investment funds managed by Sheridan Production Partners Manager, LLC ("Manager"). Of the three series of funds, only Sheridan II has commenced chapter 11 cases. Sheridan II itself consists of three sub-funds, each intended for a different type of investor: taxable entities; tax-exempt entities; and members of Warburg Pincus and the Sheridan Group management team.

9.     Non-Debtor affiliate, Sheridan Production Company, LLC ("SPC"), a subsidiary of Manager, serves as the contract operator of the Debtors' properties. In that capacity, SPC performs all services with respect to the operation of the Debtors' properties, including but not limited to, drilling, testing, completion and operation of the wells operated by the Debtors, and procurement of drilling rigs, equipment, supplies, and other services as may be necessary for the operation and

supervision of the contractors and vendors providing such equipment and services. SPC is the counterparty to office leases, as well as certain contracts, licenses, surface use agreements, easements and other agreements used in operation of the Debtors' properties.

10.     Over the past years, the Debtors have taken steps to avoid a chapter 11 filing, even while many other oil and gas companies have pursued in-court restructurings. To stave off an impending liquidity crisis, the Debtors took a proactive approach to the market challenges facing the oil and gas industry. This included comprehensive efforts to discontinue distributions to the Limited Partners, decrease senior debt levels, and decrease lease operating expenses and general and administrative expenses while controlling capital expenditures. Additionally, the Sheridan Group sought to mitigate risk associated with commodity price volatility by engaging in commodity hedging designed to protect revenue in the face of at-times wildly fluctuating oil and gas prices.

11.     In March 2017, the Debtors, with the assistance of their investment banker, Evercore Group L.L.C. ("Evercore"), and at the request of the Senior Secured Lenders, began contacting potential investors regarding an investment opportunity in Sheridan II. Based on the market's positive views of the Debtors' potential, in 2017, the Debtors raised approximately $455 million, $391 million of which consisted of new capital, through the Sheridan II Subordinated Term Loan Facilities. As a condition of the Sheridan II Subordinated Term Loan Facilities, in October 2017, the Limited Partners funded a recall of 50% of all previous distributions made to the Limited Partners, approximately $64 million in the aggregate.

12.     Before the Petition Date, the Debtors obtained waivers of certain financial covenants under their secured credit facilities. The Debtors' efforts ultimately did not provide a long-term solution to their liquidity crisis. Despite owning and operating a valuable portfolio of oil and gas properties, and although the Debtors are not currently required to make cash payments

on the interest of the Sheridan II Subordinated Term Loan Facilities, at currently depressed commodity prices, the Debtors cannot continue to service the interest obligations on their approximately $1.1 billion in funded debt.  As detailed below, the Debtors' current debt load is unsustainable, particularly when compared to that of their competitors.  A substantial balance sheet deleveraging is necessary to allow the Debtors to withstand the current commodity price volatility and to continue to maximize the value of their oil and gas properties.

13.     Recognizing the need for a long-term solution, in late 2018 and early 2019 respectively, the Debtors retained Kirkland & Ellis LLP and Evercore to explore strategic alternatives, including a comprehensive restructuring.  More recently, the Debtors retained AlixPartners, LLP as restructuring advisor.  Beginning in early 2019, the Debtors entered into comprehensive restructuring negotiations with the lenders under the Sheridan II Term Loan Facilities (the "Sheridan II Term Lenders"), the lenders under the Sheridan II Revolving Credit Facilities (the "Sheridan II Revolving Lenders" and, together with the Sheridan II Term Lenders, the "Senior Secured Lenders") and the lenders under the Sheridan II Subordinated Term Loan Facilities (the "Sheridan II Subordinated Term Lenders" and, together with the Senior Secured Lenders, the "Lenders").  Each of these groups organized and retained advisors to facilitate due diligence and negotiations.

14.     Over the course of six months leading up to the Petition Date, the Debtors and Lenders engaged in hard-fought, good-faith negotiations around the terms of the Plan.  These efforts culminated on September 9, 2019, with the execution of the RSA among the Debtors and holders of approximately 90% of the principal amount of the Sheridan II Revolving Credit Facilities, holders of 100% of the principal amount of the Sheridan II Term Loan Facilities, and holders of approximately 96% of the principal amount of the Sheridan II Term Subordinated Loan Facilities.  As a result of these efforts, the Debtors have commenced these cases with a Plan that

enjoys overwhelming stakeholder support: 94% of Sheridan II Revolving Lenders, 99% of Sheridan II Term Lenders and 99% of Sheridan II Subordinated Term Lenders have already submitted votes in favor of the Plan. The Plan contemplated by the RSA eliminates approximately $900 million of the Debtors' funded debt in all circumstances and provides the Debtors with $50 million in new-money debtor-in-possession financing through a delayed draw term loan facility.

15.     To ensure the restructuring transactions maximize value for all stakeholders, the Plan also includes a sale "toggle" feature, allowing for a potential sale to a third party supported by a majority of the Senior Secured Lenders that are party to the RSA and accomplished through the Plan. The Debtors, with the assistance of their advisors, and at the request of the Senior Secured Lenders, commenced an exhaustive marketing process for a going-concern sale in connection with a potential Asset Sale Restructuring (as defined below). In May 2019, the Debtors and their advisors distributed a teaser to approximately 900 potential buyers and since then have corresponded with approximately 100 of those parties, entered into 49 confidentiality agreements, granted data room access to 45 participants and hosted 18 in-person data room presentations, and engaged in substantial due diligence Q&A via telephone and writing. During the week of July 15, 2019, the Debtors received 8 bids following expiration of the first-round bid deadline. The Debtors are continuing negotiations with these bidders in an effort to achieve the highest and best offer for their assets at a price supported by their Senior Secured Lenders.

16.     With a fully solicited Plan in hand supported by virtually all holders of the Debtors' funded debt, it is imperative that the Debtors proceed swiftly to confirmation of the Plan and emergence from these chapter 11 cases. A prolonged stay in chapter 11 is unnecessary and would only result in significant incremental administrative costs. Additionally, any delays in the chapter 11 process could frustrate the ongoing marketing process and the Debtors' ability to close a

value-maximizing sale.  Accordingly, the Debtors have filed a scheduling motion to be heard at the first-day hearing which requests the following dates, subject to Court availability:

| Event | Proposed Date |
|---|---|
| Confirmation and Disclosure Statement Objection Deadline | October 15, 2019 |
| Reply Deadline | October 16, 2019 |
| Combined Confirmation and Disclosure Statement Hearing | October 17, 2019 |

17.     The RSA sets forth a clear pathway to emergence.  The Debtors believe the transactions embodied in the Plan will leave the reorganized enterprise with a considerably diminished debt load and, when combined with the Debtors' new business plan, well-positioned to compete in the upstream market, including by pursuing business transactions that may become achievable due to the Debtors' right-sized balance sheet.

18.     To familiarize the Court with the Debtors' businesses, this declaration has been organized into five sections.  The *first* provides background information on the Debtors' businesses and operations.  The *second* offers detailed information on the Debtors' capital structure.  The *third* describes detailed information on the Debtors' corporate structure and their intercompany transactions.  The *fourth* details the events leading to the filing of these chapter 11 cases and the Debtors' prepetition restructuring efforts, including the relevant terms of the Debtors' Restructuring Support Agreement.  The *fifth*, together with **Exhibit A**, summarizes the relief requested in, and the legal and factual basis supporting, the First Day Motions.

<u>Discussion</u>

## I.      Background of the Debtors' Businesses and Operations.

### A.      The Sheridan Group's History.

19.     Manager was established in 2006 with the long-term plan of creating a premier oil and gas operating company.  Since its inception, Manager has raised $4.6 billion in equity capital commitments across its three series of funds, primarily from institutional investors, to acquire a

balanced portfolio of oil and gas properties, operate them for a specified period of time, and divest of the assets with a substantial return on their original investment.  Manager's first series of funds ("Sheridan I") was formed in 2007 and raised approximately $1.3 billion in equity commitments. Following the successful implementation of Sheridan I's acquisition strategy, Manager raised its second series of funds, Sheridan II, in 2010.  Sheridan II raised equity commitments of $1.8 billion. Sheridan II was founded on the same principles as Sheridan I and has continued the Sheridan Group's strategy of employing a combination of equity commitments and debt financing to purchase oil and gas producing assets.  Following Sheridan II's initial success, Manager raised a third series of funds ("Sheridan III"), which raised a total of approximately $1.5 billion in equity commitments.  Many of the Limited Partners that invested in Sheridan III were long-time investors who had previously invested in Sheridan I and Sheridan II.  To date, the three series of Sheridan funds have collectively completed nine major acquisitions for an aggregate purchase price of $5.7 billion.

20.     The Debtors consist solely of entities that comprise—and which operate as a part of—Sheridan II.  Following their inception in 2010, the Debtors completed four major asset acquisitions, calling $1.8 billion of capital from their Limited Partners to fund acquisition costs, operations, management fees and other expenses.  During the lifetime of the Debtors, $783 million has been reinvested to enhance and maintain production from the acquired properties.  As a result of these investments, the Debtors own interests in oil and gas properties in two basins:  the Central Basin Platform of the Permian Basin, located in West Texas and New Mexico, and the Powder River Basin in eastern Wyoming.  The majority of these wells are operated by SPC.

**B.      Sheridan II's Businesses.**

**1.      Asset Acquisitions.**

21.      Sheridan II's business strategy is to invest in oil and gas properties, seeking to build value through capital reinvestment, operational improvements, and enhanced recovery, while focusing on cost control.  The Debtors primarily conduct their exploration and production ("E&P") activities through Sheridan Holding Company II, LLC, which holds legal title to working interests in oil and gas properties for the benefit of SPP II-A and SPP II-M, and SPC, which operates the properties.  Through oil and gas leases entered into with mineral rights owners, Holdco II holds the right to drill, rework, operate, produce and maintain oil and gas wells.  The Debtors' produced hydrocarbons are typically either sold at the wellhead or transported by pipeline or truck for processing and/or sale to purchasers.  After receipt of proceeds, SPC, on behalf of the Debtors, distributes funds to various working interest holders, royalty interest holders, taxing authorities, and other parties with an interest in production.  The remaining proceeds are retained as operating revenues and are utilized for payment of operating expenses, reinvestment in the assets or debt service.

22.      Since the Debtors' inception, the Debtors have executed four major acquisitions across two basins, with the bulk of the Debtors' oil and gas assets purchased in early 2013 as part of an acquisition from SandRidge Energy, Inc. ("SandRidge") of assets located in the Central Basin Platform of the Permian Basin.  The map below depicts the assets currently held by the Debtors:

23.     The Debtors presently operate in the following basins:

- ***Permian Basin Central Basin Platform***.  The Permian Basin is one of the largest and most prolific oil and natural gas producing basins in the United States, extending over West Texas and into southeast New Mexico.  The Permian Basin is characterized by oil and natural gas fields with long production histories and multiple producing formations.  The majority of the Debtors' producing wells in the Permian Basin are mature vertical oil wells that also produce high-Btu casinghead gas with significant natural gas liquids ("NGLs") content.  Additionally, the Debtors have drilled and completed 43 horizontal wells in the San Andres formation in the Tex-Mex and Goldsmith fields.

**Sheridan II Assets**



The Debtors' assets are yield-oriented, long-lived oil assets on shallow natural declines with strong operating margins.  There is already significant infrastructure in place and the Debtors own approximately 100,000 net acres held by production.

- ***Powder River Basin***.  The Powder River Basin is located in northeastern Wyoming.  The Debtors own a non-operating working interest in several large waterflood units in Campbell County, Wyoming, which produce from the Sussex and Parkman formations.  The Debtors' assets are yield-oriented, long-lived oil assets on shallow natural declines with strong operating margins.  There is already significant infrastructure in place and the Debtors own approximately 10,000 net acres held by production.

The Debtors' oil and gas producing assets have been acquired through four major transactions.

Descriptions of each of those transactions are below:

- ***Juno Energy Acquisition***.  On March 29, 2011, Holdco II and other members of the Sheridan Group executed a definitive agreement to purchase from Juno Operating Company, LLC ("Juno") certain oil and natural gas properties in the Permian Basin for $310 million.  The transaction became effective on May 1, 2011, and closed on April 29, 2011.  Holdco II, joined by other members of the Sheridan Group, also executed a definitive agreement on April 8, 2011, to purchase from Three Rivers Acquisition LLC additional working interests in the Juno properties for $18 million, also with an effective date of May 1, 2011, and a closing date of April 29, 2011.  The acquired properties consist primarily of two waterflood units located in Crosby and Lubbock Counties, Texas.  As of May 1, 2011, combined production of the two acquisitions was approximately 1,150 barrels equivalent per day, virtually all of which was oil.  Holdco II acquired an undivided 1/3 interest in the properties, for which it paid $112.6 million, constituting 1/3 of the combined adjusted purchase price for the assets.  The remaining 2/3 interest was purchased

11

by other members of the Sheridan Group on behalf of the Manager's first series of funds ("Sheridan Fund I").

- **El Paso E&P Acquisition.** On August 4, 2011, Holdco II and other members of the Sheridan Group executed a definitive agreement to purchase certain oil and natural gas properties in the Powder River Basin from El Paso E&P Company, L.P. ("El Paso") for $356 million. The transaction became effective on July 1, 2011, and closed in September 2011. The acquired properties include several large waterflood units in Campbell County, Wyoming. As of the effective date, there were 175 active wells on the property producing approximately 1,560 barrels equivalent per day, virtually all of which was oil. Holdco II acquired an undivided 1/3 interest in the properties, for which it paid $118.5 million, constituting 1/3 of the adjusted purchase price for the assets. The remaining 2/3 interest was purchased by other members of the Sheridan Group on behalf of Sheridan Fund I.

- **Noble Energy Inc. Acquisition.** On July 23, 2012, Holdco II acquired from Noble Energy, Inc. ("Noble") certain oil and natural gas properties in the Permian Basin for an adjusted purchase price of approximately $307.7 million. The transaction had an effective date of April 1, 2012, and closed in August 2012. The acquired properties included Noble's interest in approximately 250 producing wells located across approximately 11,000 net acres. As of the effective date, the net daily production of those assets was over 1,500 barrels of oil equivalent per day consisting of more than 90 percent crude oil and NGLs. The properties had been predominantly operated by Noble, and Holdco II succeeded Noble as operator.

- **SandRidge Energy, Inc. Acquisition.** On December 19, 2012, the Debtors announced the purchase of certain assets from SandRidge Energy, Inc. ("SandRidge") located in Texas and New Mexico on the Central Basin Platform of the Permian Basin for a total amount of $2.6 billion. The transaction became effective on January 1, 2013, and closed in February 2013. The assets included over 2,500 producing wellbores spread over multiple, large fields. Production was oil-weighted, primarily from vertical wells completed in established, conventional formations. The acquisition included proved reserves of approximately 107.3 MMboe. The properties had been predominantly operated by SandRidge, and Holdco II succeeded SandRidge as operator.

    **2.    Current Operations.**

24.    As of June 30, 2019, Sheridan II owned interests in approximately 2,111 gross producing wells, a substantial majority of which are operated by Holdco II through SPC as its contract operator.

| Location | Oil (BOPD) | Gas (MCFD) | Total (BOE) | Well Count |
|---|---|---|---|---|
| Permian District | 7,107 | 21,014 | 10,609 | 1,991 |
| Rocky Mountain District | 374 | 0 | 374 | 120 |
| **Total Amount Held by Sheridan II** | 7,481 | 21,014 | 10,983 | 2,111 |

25.     As noted, the Debtors primarily conduct their business operations in the "upstream" sector, meaning their operations consist of E&P operations for the capture and sale of oil and natural gas.  Their E&P operations produce from domestic, onshore hydrocarbon basins through oil and natural gas leases entered into with mineral rights owners in the regions in which the Debtors conduct business.  Certain of the Debtors hold working interests in oil and gas properties that give them the right to drill and maintain wells in the applicable geographic areas.

26.     SPC, as the entity contracted by the Debtors to operate their assets, conducts the day-to-day business of drilling, reworking, operating, producing, and maintaining the Debtors' oil and natural gas wells.  In that capacity, SPC employs personnel and contracts with third parties to provide goods and services necessary to operate the Debtors' properties.  The Debtors cover the expenses associated with those operations.  To the extent subject to a joint operating agreement, unit agreement, pooling order, or similar agreement, any other owners of working interests in the oil and gas properties advance or reimburse SPC for their proportionate share of the cost of the operations.  Debtors' produced hydrocarbons are typically either sold at the wellhead or transported by pipeline or truck for processing and/or sale to purchasers.  After receipt of proceeds, SPC—when acting as operator—distributes funds to various working interest owners, royalty interest owners, taxing authorities, and other parties with an interest in production.

27.     In instances where the Debtors own undivided interests in oil and natural gas leases but do not act as operator, a third-party will serve as the operator of the properties.  As non-operators, the Debtors may either elect to take their share of production in kind or have the operator of the property market their share of production on their behalf.  Where the operator markets production on behalf of the Debtors, the operator distributes proceeds of such sale to the Debtors.  In addition, the operator invoices the Debtors for their share of operating expenses and capital investment.  The Debtors' non-operated interests are material but constitute a minority of

the Debtors' business, accounting for approximately 4.8 percent of the Debtors' total estimated proved reserves as of June 30, 2019.

**II.     Debtors' Prepetition Corporate and Capital Structure.**

28.     Limited Partners investing in Sheridan II invested in one of three Debtor entities: SPP II-A, Sheridan Production Partners II-B, L.P. ("SPP II-B"), and SPP II-M.  SPP II-A and SPP II-M acquired working interests in oil and gas properties; SPP-B purchased net profits overriding royalty interests carved out of SPP II-M's working interest.  SPP II-A and SPP II-M incurred loans to finance a portion of the costs of their acquisitions.  SPP II-B is not a borrower and has no debt.  However, SPP II-B sold preferred equity to SIP II, the proceeds of which were utilized to fund a portion of the purchase price paid by SPP II-B for the net profits overriding royalty interests purchased from SPP II-M.  SIP II procured loans to finance the purchase price paid for the preferred equity.  SIP II, SPP II-M, and SPP II-A are each borrowers under separate reserve-based, term loan, and subordinated term loan facilities.

29.     As of the Petition Date, the Sheridan II Borrowers have approximately $1.1 billion of outstanding principal on their funded debt obligations.  This consists of $66 million under the Sheridan II Revolving Credit Facilities, $543.1 million under the Sheridan II Term Loan Facilities, and $495.5 million under the Sheridan II Subordinated Term Loan Facilities.  The Debtors' aggregate debt load is depicted in the table below.

| Funded Debt | Origination Date | Maturity | Outstanding Principal Amount as of the Petition Date |
|---|---|---|---|
| Secured Debt | | | |
| Sheridan II Revolving Credit Facilities | February 2013 | June 2020 | $66 million |
| Sheridan II Term Loan Facilities | December 2013 | December 2020 | $543.1 million |
| **Total Secured Debt** | | | $609.1 million |

| Funded Debt | Origination Date | Maturity | Outstanding Principal Amount as of the Petition Date |
|---|---|---|---|
| Unsecured Debt | | | |
| Sheridan II Subordinated Term Loan Facilities | October 2017 | October 2022 | $495.5 million |
| Total Funded Debt | | | $1,104.6 million |

30.     The following table depicts the current distribution of the Debtors' debt load across SIP II, SPP II-A, and SPP II-M:

| | Sheridan II Revolving Credit Facilities | | Sheridan II Term Loan Facilities | | Sheridan II Subordinated Term Loan Facilities | |
|---|---|---|---|---|---|---|
| | *Outstanding Principal* | *Maturity* | *Outstanding Principal* | *Maturity* | *Outstanding Principal* | *Maturity* |
| *SIP II* | $55.4 million | 6/4/20 | $456.0 million | 12/16/20 | $416.0 million | 10/6/22 |
| *SPP II-A* | $7.7 million | 6/4/20 | $63.4 million | 12/16/20 | $57.9 million | 10/6/22 |
| *SPP II-M* | $2.9 million | 6/4/20 | $23.7 million | 12/16/20 | $21.6 million | 10/6/22 |
| *Total Commitments* | $66 million | | $543.1 million | | $495.5 million | |

**A.      Secured Debt Obligations.**

**1.      The Sheridan II Revolving Credit Facilities.**

31.     SIP II, SPP II-M, and SPP II-A, as borrowers, and Bank of America, N.A. ("Bank of America"), as administrative agent and collateral agent, and the lenders party thereto are each party to one of three credit agreements dated as of October 6, 2010 (as such have been amended, amended and restated, or otherwise modified from time to time prior to the Petition Date, collectively, the "Sheridan II RBL Credit Agreements").  The Sheridan II RBL Credit Agreements allow SIP II to access $55.4 million in revolving credit commitments, SPP II-M to access $7.7 million in revolving credit commitments, and SPP II-A to access $2.9 million in revolving credit commitments.  The obligations under the Sheridan II Revolving Credit Facilities are secured by first-priority liens in substantially all of the Sheridan II Borrowers' assets, including, among other things, equity pledges in the borrower's assets, mortgages, and security interests in the oil

and gas assets and control agreements on bank accounts.  As of the Petition Date, in the aggregate, approximately $66.0 million remains outstanding under the Sheridan II Revolving Credit Facilities, leaving no availability for additional borrowings.  The maturity date on each of the Sheridan II Revolving Credit Facilities is June 4, 2020.

### 2.    The Sheridan II Term Loan Facilities.

32.    SIP II, SPP II-M, and SPP II-A, as borrowers, and Bank of America, as administrative agent and collateral agent, and the lenders party thereto are each party to one of three credit agreements dated as of December 16, 2013 (as have been amended, amended and restated, or otherwise modified from time to time prior to the Petition Date, collectively, the "Secured Term Loan Agreements") to provide three Sheridan II Term Loan Facilities.  The Sheridan II Secured Term Loan Agreements provide for $456.0 million in term loan commitments to SIP II, $23.7 million in term loan commitments to SPP II-M, and $63.4 million in term loan commitments to SPP II-A.  The Sheridan II Term Loan Facilities share substantially the same collateral package and are *pari passu* with the Sheridan II Revolving Credit Facilities.  The maturity date for the Sheridan II Term Loan Facilities is December 16, 2020.  As of the Petition Date, approximately $543.1 million in aggregate principal amount remained outstanding under the Sheridan II Term Loan Facilities.

### B.    Unsecured Debt Obligations:   The Sheridan II Subordinated Term Loan Facilities.

33.    SIP II, SPP II-M, and SPP II-A, as borrowers, Wilmington Trust, N.A., as administrative agent, and the lenders party thereto are each party to term loan credit agreements dated as of October 6, 2017 (as have been amended, amended and restated, or otherwise modified from time to time prior to the Petition Date, collectively, the "Subordinated Term Loan Agreements").   The Subordinated Term Loan Agreements provide for the Sheridan II Subordinated Term Loan Facilities.  The Sheridan II Subordinated Term Loan Agreements provide

16

for $413.7 million in subordinated term loan commitments to SIP II, $21.5 million in subordinated term loan commitments to SPP II-M, and $57.6 million in term loan commitments to SPP II-A. Pursuant to the Subordination Agreements (as defined below), the Sheridan II Subordinated Term Loan Facilities are payment subordinated to the Sheridan II Revolving Credit Facilities and the Sheridan II Term Loan Facilities.  The maturity date for the Sheridan II Subordinated Term Loan Facilities is October 6, 2022.  As of the Petition Date, in the aggregate, approximately $495.4 million in aggregate principal amount remained outstanding under the Sheridan II Subordinated Term Loan Facilities.  The original loan amount was for $391 million with an original interest rate of 13.5% PIK.  To date, the accrued PIK interest amounts to approximately $122.9 million with a current interest rate of 17% PIK.

C.      The Subordination Agreements.

34.      The administrative and collateral agents under the Sheridan II RBL Credit Agreements, the Secured Term Loan Agreements, and the Subordinated Term Loan Agreements entered into three separate subordination agreements dated October 6, 2017, with respect to each of the aforementioned SIP II, SPP II-M, and SPP II-A credit facilities (collectively, the "Subordination Agreements").  The Subordination Agreements set forth the agreements between the respective agents under each of the Sheridan II Revolving Credit Facilities, the Sheridan II Term Loan Facilities, and the Sheridan II Subordinated Term Loan Facilities with respect to the rights and remedies of the various Lenders under each respective facility.  Entry into the Subordination Agreements was a condition for entry into amendments to the Sheridan II RBL Credit Agreements and Secured Term Loan Agreements to allow the Sheridan II Borrowers to obtain access to the Sheridan II Subordinated Term Loan Facilities.  The Subordination Agreements provide that the obligations of SIP II, SPP II-M, and SPP II-A, respectively, under the Sheridan II Subordinated Term Loan Facilities are payment subordinated to the obligations of such

entity under the respective silo of the Sheridan II Revolving Credit Facilities and the Sheridan II Term Loan Facilities.  Further, the Subordination Agreements provide that if an agent or Sheridan II Subordinated Term Lender receives payment in contravention of the priorities set forth in the Subordination Agreements, the respective agent or lender is required to turn over such payment to the collateral agent for the Sheridan II Revolving Lenders and the Sheridan II Term Lenders.

       **D.**     **Hedging Obligations.**

35.      SPP II-A, SPP II-B, and SPP II-M maintain a portfolio of hedging arrangements in an effort to protect revenues from commodity price downturns.  These hedging arrangements involve entering into commodity-price derivative contracts with third-party financial institutions (the "Prepetition Hedging Arrangements").  All of the counterparties to the Prepetition Hedging Arrangements are also Sheridan II Revolving Lenders.  The Prepetition Hedging Arrangements currently consist primarily of oil and natural gas swaps and collars.  As of the Petition Date, the obligations under the Prepetition Hedging Arrangements were equal in priority to the obligations under, and secured by equal liens in the collateral under, the Sheridan II Revolving Credit Facilities.  The Prepetition Hedging Arrangements have helped the Debtors stave off this in-court restructuring for years.  Because of hedged positions in place near $90/Bbl when the commodity price deteriorated in late 2014, the Debtors were able to sustain their businesses for several years while simultaneously repaying a substantial portion of their debt through 2016.

36.      Historically, SPP II-A, SPP II-B, and SPP II-M hedged over 80% of forecasted production at the time of acquisition.  Additional hedges were placed as the acquisition hedges rolled off, at then current prices on smaller volumes.  By removing some measure of commodity price volatility, the hedge portfolio helped mitigate the effects of a sustained decline in commodity prices but, conversely, prevented the Debtors from benefitting fully from recent rises in commodity prices.  As of the Petition Date, approximately 55% of the Debtors' average projected production

was hedged through 2019, and the Debtors' hedging portfolio had a negative fair market value to the Debtors of approximately $6 million.

## III.  Debtors' Corporate Structure and Intercompany Transactions.

37.     The chart below depicts the Debtors' current corporate structure, which is also attached hereto as **Exhibit B**:

**Sheridan II Corporate Structure**



38.     The Debtors' corporate structure was designed to accommodate the different needs of a diverse group of investors.  The Debtors' oil and gas assets are held by Holdco II, which holds bare legal title to the assets for the benefit of SPP II-M and SPP II-A.  SPP II-M, SPP II-A, and SPP II-B are the fund-level entities through which the Limited Partners have invested in Sheridan II.  The Limited Partners who contributed to SPP II-A generally consist of taxable entities, and the Limited Partners who contributed to SPP II-B generally consist of tax-exempt entities.  The Limited Partners who contributed to SPP II-M generally consist of current and former executives, directors, principals, and investment professionals of the Manager and its non-debtor affiliate, SPC, as well as members of Warburg Pincus.  Use of separate investment vehicles in this manner

is typical amongst private funds similar to the Debtors because tax-exempt and taxable investors operate under different tax rules, laws, and regulations.  Due to this structure, SPP II-B is not a borrower and has no debt.  However, SPP II-B sold preferred equity to SIP II, the proceeds of which were utilized to fund a portion of the purchase price paid by SPP II-B for a net profits overriding royalty interest purchased from SPP II-M.  SIP II incurred loans to finance the purchase price paid for the preferred equity.

## IV.    Events Leading to the Chapter 11 Filing.

### A.    Market and Industry-Specific Challenges.

39.    Oil and natural gas prices have declined substantially since June 2014, when West Texas Intermediate ("WTI") crude oil sold for as high as $107.26 per barrel, before dropping to as low as $26 per barrel in January 2016.  WTI crude oil prices remain at approximately $54.85 per barrel as of the Petition Date.  Prices realized by the Debtors for crude oil produced and sold in the Permian Basin have been further depressed since 2018 due to "price differentials"—the difference in price received for sales of oil in the Permian Basin as compared to sales at the Cushing, Oklahoma sales hub or sales of sour crude oil.  The differentials are largely attributable to take-away capacity constraints caused by increases in supply exceeding available transportation infrastructure.  During 2018, Permian Basin crude oil at times sold at discounts relative to sales at the Cushing, Oklahoma hub of $16 per barrel or more.  Price differentials have narrowed as additional take-away capacity has come online, but crude oil still sells in the Permian Basin at a discount relative to Cushing prices.

40.    Similarly, the Henry Hub natural gas spot market price fell from a peak of $5.39 per million British thermal units ("MMBtu") in January 2014 to $1.73 per MMBtu by March 2016, and remains at approximately $2.62 per MMBtu as of the Petition Date.  In 2019, natural gas prices

at the Waha hub in West Texas have at times been negative, meaning that the Debtors have at times either had to shut in production or pay purchasers to take the Debtors' natural gas.

41.     The difficulties faced by the Debtors are consistent with those faced industry wide. Historically, the markets for oil, natural gas, and NGLs have been volatile, and they likely will continue to be volatile, especially given current geopolitical and economic conditions. Among the factors causing such volatility are the domestic and foreign supply of oil and natural gas, the ability of OPEC members to comply with the agreed upon production cuts, social unrest and political instability, particularly in major oil and natural gas producing regions outside the United States, and the levels and growth of domestic and global economic activity. In particular, the U.S. "Shale Revolution"—the implementation of horizontal drilling and hydraulic fracking techniques to unlock oil and natural gas from previously non-producible shale formations—has resulted in a dramatic increase in U.S. crude oil and natural gas production, greatly increasing supplies at a time of uncertain demand. Although prices have recovered somewhat from their lows at the beginning of 2016, they still remain 30%–40% below the sustained higher price environment seen from 2011 through 2014.

*Decline of Oil and Gas Prices Over Time*

**WTI Crude Oil Closing Prices**          **Natural Gas Henry Hub Closing Prices**



42.     These market conditions have affected oil and gas companies at every level of the industry around the world. Although all companies in the oil and gas industry have been affected at some level, independent oil and gas companies such as Sheridan II have been especially hard

hit, as their revenues primarily are generated from the sale of unrefined oil, natural gas, and NGLs. Hundreds of oil and gas companies have filed for chapter 11 since the beginning of 2015, including Sanchez Energy, Halcon Resources, Legacy Reserves, White Star Petroleum, Vanguard Natural Resources, Inc., Rex Energy Corporation, EV Energy Partners, LP, Fieldwood Energy LLC, Stone Energy Corporation, Parker Drilling Company, Gastar Exploration, Inc., EXCO Resources, Inc., Bonanza Creek Energy, Inc., Memorial Production Partners LP, Seadrill Limited, and Cobalt International Energy, Inc.  Numerous other oil and gas companies have defaulted on their debt obligations, negotiated amendments or covenant relief with creditors to avoid defaulting, or effectuated out-of-court restructurings.  The current volatility in the commodity markets has made it especially difficult for some companies to execute on any viable out-of-court restructuring alternatives.

**B.    Financial Responses and the 2017 Subordinated Term Loan.**

43.    The Debtors were not immune to these macroeconomic forces.  From the beginning of the downturn, the Debtors took steps to reduce expenditures.  These efforts included various other measures to reduce Debtors' costs of salaries and benefits, information and technology, tax, legal, engineering, and audit expenses, occupancy and insurance expenses, and other general and administrative costs.  These steps included reductions in force in February 2016 and January 2019 and, in October 2018, a move to less expensive office space.

44.    As depicted below, these efforts have resulted in significant savings for the Debtors.

**Sheridan II Cost Savings**

|  | 2018 | 2019 (estimated) | Savings |
|---|---|---|---|
| Salaries and benefits | $11,819 | $8,837 | ($2,982) |
| Information technology | 2,168 | 1,997 | (171) |
| Tax/legal/engineering/audit | 1,461 | 1,161 | (300) |
| Occupancy | 1,093 | 680 | (413) |
| Insurance | 255 | 246 | (9) |
| Other | 411 | 493 | 82 |
| **G&A, gross** | **$17,207** | **$13,414** | **($3,793)** |
| Overhead recovery | (2,244) | (2,070) | 174 |
| **G&A, net** | **$14,963** | **$11,344** | **($3,619)** |

45. Additionally, the Debtors made certain organizational changes to streamline operations and implemented various measures to reduce lease operating expense.

46. The Debtors' hedging portfolio also played an integral role in their efforts to stave off bankruptcy. From 2014 through 2017, the average strike price of the Debtors' hedging agreements was between $92 and $75 per barrel. These "in-the-money" hedging arrangements provided substantial revenue support to the Debtors, who received approximately $500 million in cash related to this positive hedging activity. The Debtors used almost all of these funds to pay down a substantial portion of the Sheridan II Revolving Credit Facilities and the Secured Term Loan Agreements. Since 2017, the Debtors maintained their hedging practices at prevailing market prices with an average strike price of $52–$54. Due to the high percentage of the Debtors' production that is hedged, the Debtors have not fully benefited from upswings in market pricing occurring in late 2018 and early 2019.

47. The Debtors recognized that cost savings and hedging alone would not insulate them from the depressed commodities market, so the Sheridan II Borrowers turned to the capital markets. In March 2017, the Debtors and Evercore began contacting investors regarding either a preferred equity or junior debt investment in Sheridan II. Through Evercore, the Debtors contacted over 50 potential investors regarding the investment opportunity. The Debtors and Evercore subsequently facilitated a fulsome diligence process, populating a dataroom with over

23

200 documents, conducting numerous management presentations for interested Lenders, and responding to over 140 follow-up diligence requests.

48.     Following this diligence process, on October 6, 2017, the Debtors entered into the Sheridan II Subordinated Term Loan Facilities, and simultaneously SPP II-A, SPP II-B, and SPP II-M recalled $64 million in previous distributions from the Limited Partners.  The proceeds of the debt financing, the equity raise, and the funds generated from the hedging portfolio were used to pay down approximately $450 million of the Sheridan II Revolving Credit Facilities. Simultaneously with the pay down of those facilities, the Sheridan II Borrowers extended the maturity of the Sheridan II Revolving Credit Facilities to June 2020 and obtained a borrowing base redetermination holiday until March 2019.

49.     Although this transaction brought the Sheridan II Borrowers temporary reprieve, they were still burdened with a significant debt load and their liquidity situation did not improve. The Debtors' debt to EBITDA ratio is depicted below, as compared to other small-cap E&P companies' ratios.  For the year 2019, the Debtors estimate that their total debt to EBITDA ratio will be approximately 21.1x, approximately 9.5 times the median for an entity with their market capitalization.



50.     Although oil prices improved during the first three-quarters of 2018, with WTI ultimately reaching a high of $74.96 in October 2018, over the next two months prices retreated

significantly, giving back much of the gains since 2016.  Furthermore, the West Texas Sour ("WTS") differential hit a low in September of 2018 at $16.21/Bbl significantly worse than the historical average for the posting.  Approximately 95% of the Debtors' assets are subject to either WTS or Midland-Cushing basis differentials.  The Debtors have also experienced substantial natural gas margin pressure from the differential shock created by midstream takeaway capacity issues in the Permian Basin.  As a result of these factors, combined with the Debtors' inability to take advantage of increased spot prices due to their hedging portfolio, the liquidity of the Debtors has continued to deteriorate throughout 2018 to the present.

51.    As a result, as the second anniversary of the execution of the Sheridan II Subordinated Term Loan Facilities approached, the performance of the Debtors' assets, when combined with the recent commodity price and differential volatility, made meeting the Debtors' obligations challenging, if not impossible.

**C.    Governance and Appointment of Special Committees.**

52.    The Debtors are managed and operated by Manager, which in turn acts at the direction of an eight member investment committee (the "Investment Committee"), comprised of Lisa Stewart, as Executive Chairman, two members appointed by Warburg Pincus, four independent directors, and one additional member of the Sheridan Group's management.  The Investment Committee is responsible for making investment decisions for all entities included in Sheridan II.

53.    In connection with their restructuring efforts, the Investment Committee established special committees of disinterested directors at certain of the Debtors to determine and decide potential conflicts matters between the Debtors, on the one hand, and Manager, SPC, Warburg Pincus, Limited Partners, and entities which make up Sheridan I, on the other.  To that end, on January 29, 2019, the Investment Committee established a special committee at each of

25

SPP II-A, SPP II-B, SPP-M, and SIP II (collectively, the "Fund II Special Committees") and appointed two disinterested directors, Alan J. Carr and Jonathan F. Foster, to serve on the Fund II Special Committees (collectively, the "Special Committee Members").  Quinn Emanuel Urquhart & Sullivan, LLP has been retained as independent counsel, and Opportune LLP has been retained as an independent financial advisor, with both acting at the Special Committee Members' sole direction to assist in the discharge of their duties.

54.     The Special Committee Members and their professionals acting at their sole direction have commenced an independent investigation (which remains ongoing as of the Petition Date) into interested party issues in connection with a potential sale, restructuring, reorganization, or other recapitalization transactions and related financings.  The Special Committee Members may also conduct inquires or investigations relating to any conflicts matters as the Fund II Special Committees deem necessary in its business judgment.  Specifically, the duties of the Special Committee Members include evaluating a restructuring transaction, approving or terminating the Restructuring Transactions, participating in consultation with management and advisors, and if necessary, authorizing approval of a restructuring.  The Debtors expect that the Special Committee Members will be in a position to make a final recommendation whether the releases contemplated by the Plan are appropriate in advance of the Debtors' proposed confirmation hearing.

### D.     Discussions with Creditors.

55.     Beginning in late 2018, the Debtors organized and commenced comprehensive restructuring negotiations with creditors, including the agent under the Sheridan II Revolving Credit Facilities and Sheridan II Term Loan Facilities, the steering committees of the Sheridan II Revolving Lenders and the Sheridan II Term Lenders, and the Sheridan II Subordinated Term Lenders.  Substantive discussions with the Senior Secured Lenders centered around both the terms of a comprehensive restructuring transaction as well as avoiding a potential default under the

Sheridan II Revolving Credit Facilities and Sheridan II Term Loan Facilities.  As of December 31, 2018, the Debtors were out of compliance with the current ratio covenant under the Sheridan II Revolving Credit Facilities and the Sheridan II Term Loan Facilities.  To avoid an event of default, on March 29, 2019, the SPP II-M, SPP II-A and SIP II entered into waiver agreements with the Lenders under the Sheridan II Revolving Credit Facilities and Sheridan II Term Loan Credit Agreements to waive this non-compliance until May 31, 2019 (the "2019 Waivers").  The 2019 Waivers provided the Debtors with runway to continue negotiating the terms of a comprehensive restructuring with the holders of their funded debt.

56.     Specifically, the Debtors initiated discussions with the advisors to the Sheridan II Revolving Lenders, the Sheridan II Term Lenders, and the Sheridan II Subordinated Term Lenders and began facilitating a substantial due diligence process.  These discussions focused on the full equitization of the Sheridan II Subordinated Term Loan Facilities and the allocation of the New Common Stock between the Sheridan II Term Loan Facilities, the Sheridan II Revolving Credit Facilities, and the Sheridan II Subordinated Term Loan Facilities.  In the time leading up to solicitation, the Debtors and their advisors engaged in a substantial due diligence process with the Sheridan II Subordinated Term Loan Lenders to facilitate a consensual deal.

57.     The Debtors also provided updates regarding the Debtors' financial condition to, and engaged in extensive negotiations with, the Sheridan II Subordinated Term Lenders leading up to the Petition Date.  Beginning in February 2019, the Debtors encouraged the Sheridan II Subordinated Term Lenders to make a new-money restructuring proposal.  Throughout the process, the Debtors were transparent that, absent a significant new money investment, it would be necessary to equitize a meaningful portion of the funded debt obligations through and including a significant amount of the Sheridan II Term Loan Facilities and the Sheridan II Revolving Credit Facilities.

58.     On May 14, 2019, the Sheridan II Subordinated Term Lenders submitted a proposal contemplating a new-money investment on terms that were not acceptable to the steering committees of both the Sheridan II Revolving Lenders and the Sheridan II Term Lenders. Subsequently, the Debtors, Senior Secured Lenders, and Sheridan II Subordinated Term Lenders exchanged proposals with materially similar terms to those under the Plan but with differing positions on the allocation of consideration between the Senior Secured Lenders and the Sheridan II Subordinated Term Lenders.   Ultimately, in the weeks leading up to the Petition Date, the Debtors, Senior Secured Lenders, and Sheridan II Subordinated Term Loan Lenders reached an agreement as incorporated in the RSA and reflected in the Plan.

### E.     Marketing Efforts.

59.     In parallel with their efforts to negotiate a consensual equitization, the Debtors, with the assistance of Evercore, commenced a comprehensive marketing process for a going-concern sale.  The Debtors and Evercore ultimately contacted approximately 900 potential investors from a diverse group of potential buyers seeking bids for all or substantially all of the Debtors' assets. On July 16, 2019, the Debtors received eight bids following expiration of the first-round bid deadline.  The Debtors are continuing negotiations with these bidders in an effort to achieve the highest and best offer for their assets at a price supported by their Senior Secured Lenders.  The Debtors will seek to continue the sale process throughout these chapter 11 cases.  Accordingly, the Plan includes a sale "toggle" feature allowing for a potential Asset Sale Restructuring if supported by a majority of the Senior Secured Lenders and accomplished through the Plan.

### F.     Restructuring Support Agreement.

60.     In the period leading up to the Petition Date, the Debtors provided Lenders' advisors and principals substantial due diligence, and the parties held numerous meetings and telephone conferences among both advisors and principals over months of hard-fought, arms'

length negotiations.  As a result of these efforts, on September 9, 2019, the Debtors and the consenting lenders agreed to the terms of the RSA.  The RSA contemplates a prepackaged plan of reorganization that will implement a massive deleveraging of the Debtors' balance sheet.

61.     The RSA contemplates that the Restructuring Transactions will involve the equitization of the vast majority of the Sheridan II secured and unsecured debt (the "Equitization Restructuring"), unless the Debtors, with the consent of a specified threshold of the Senior Secured Lenders, agree to sell all or substantially all their assets to a third-party purchaser pursuant to the Plan (the "Asset Sale Restructuring").  If the restructuring is consummated through the Equitization Restructuring, the Debtors' corporate structure will be streamlined under a single holding company, New Sheridan, owned by the current Lenders, which holding company, either directly or through one of its subsidiaries, will acquire all of the assets of the Debtors.  Whether confirmed and consummated through the debt-for-equity transaction or a sale transaction, the Plan will resolve these chapter 11 cases, will cut off the expense of bankruptcy, and will permit the Debtors to distribute value to their stakeholders in a timely manner.

62.     With the RSA in hand, the Debtors completed solicitation of the prepackaged Plan prior to the Petition Date.

63.     The RSA contemplates, and the Plan reflects, the following stakeholder recoveries:

- Holders of Administrative Claims and Other Priority Claims will receive payment in full in cash;

- Holders of Allowed DIP Claims will receive either:

  - if the DIP Lender holds an Allowed New Money DIP Claim: (i) in an Equitization Restructuring, a Pro-Rata share of Tranche A of the First-Out/Second-Out Exit Facility; or (ii) in an Asset Sale Restructuring, payment in full in cash; and

  - if the DIP Lender holds an Allowed Roll-Up DIP Claim: (i) in an Equitization Restructuring, a Pro-Rata share of Tranche B of the First-Out/Second-Out Exit Facility; or (ii) in an Asset Sale Restructuring, payment in full in cash;

- Sheridan II Revolving Lenders and Sheridan II Term Lenders will receive either: (i) in an Equitization Restructuring, their ratable share of (a) Tranche C of the Last-Out Exit Facility and (b) 95% of the New Common Stock; or (ii) in an Asset Sale Restructuring, their ratable share of the sale proceeds up to the allowed amount of their claims, less the sale proceeds given to junior stakeholders;

- Sheridan II Subordinated Term Lenders, other than the Applicable Affiliates (as defined in the Plan), will receive either:

  - (i) in an Equitization Restructuring, their ratable share of (a) 5% of the New Common Stock; or (ii) in an Asset Sale Restructuring, their ratable share of $9,000,000 of the sale proceeds; and

- General Unsecured Claims will be Reinstated or otherwise receive payment in full in cash.

64.     The Debtors also maintain a broad "fiduciary out" under the RSA.  Specifically, Section 7.03(a) of the RSA provides, in part, that nothing will require the Debtors to take any action or to refrain from taking any action with respect to the restructuring transactions to the extent taking or failing to take such action would be inconsistent with applicable law or their fiduciary obligations under applicable law.  Moreover, Section 7.03(b) of the RSA permits the Debtors to, among other things, participate in, consider, respond to, and facilitate discussions of potential unsolicited alternative restructuring proposals.

65.     The RSA requires that the Debtors proceed in accordance with the RSA milestones, including securing confirmation of the Plan by November 14, 2019, within 60 days after the Petition Date.  In light of the Debtors' extensive prepetition marketing efforts, the timeline from the anticipated Petition Date to the confirmation hearing provides more than sufficient time to administer these Chapter 11 Cases in a manner that gives all parties in interest a full and fair opportunity to participate in the process.  As discussed above, the Debtors have filed a scheduling motion to be heard at the first day hearing requesting a confirmation hearing on October 17, 2019.  On September 9, 2019, the Special Committee Members and Investment Committee approved the Debtors' entry into the RSA.

G.     **Proposed DIP Financing.**

66.     The Sheridan II Borrowers have also secured debtor-in-possession financing facilities from certain of their current Sheridan II Revolving Lenders and the Sheridan II Term Lenders (the "DIP Facility"), as further described in the Debtors' debtor-in-possession financing motion, filed concurrently with this declaration.  The DIP Facility terms provide for approximately $100 million in aggregate financing and the consensual use of cash collateral.  These funds will be used to administer these chapter 11 cases and for operating, working capital, and other general corporate purposes, such as paying fees, costs, and expenses incurred in connection with these transactions.

67.     I, together with other members of Debtors' management and their advisors, have analyzed the Debtors' cash flow and determined that the company would not have sufficient liquidity for their operations and these chapter 11 cases without the DIP Facility.  The DIP Facility provides the Debtors and their creditor constituencies with postpetition financing on the best available terms, allows the Debtors to continue operating their businesses and operations on a postpetition basis, and halts the further accrual of interest under the Sheridan II Borrowers' various prepetition debt instruments.  As such, and as detailed further in other declarations in support for the DIP Facility, the Debtors believe that these restructuring transactions are in the best interest of their stakeholders and the estates.

V.     **First Day Motions.**

68.     Contemporaneously herewith, the Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, and expedite a swift and smooth restructuring of the Debtors' balance sheet.  I have reviewed each of the First Day Motions.  I believe that the relief requested in the First Day Motions is necessary to allow the

Debtors to operate with minimal disruption during the pendency of these chapter 11 cases. A description of the relief requested and the facts supporting each of the First Day Motions is detailed in **Exhibit A**.

<div align="center">

[*Remainder of page intentionally left blank*]

</div>

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  September 15, 2019                    */s/ Lisa A. Stewart*
_____
                                              Lisa A. Stewart
                                              Executive Chairman and Chief Investment Officer

**<u>Exhibit A</u>**

**Evidentiary Support for First Day Motions**

<u>**Administrative and Procedural Motions**</u>[1]

I.   **Debtors' <u>Emergency</u> Motion for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases ("<u>Joint Administration Motion</u>").**

1.   Pursuant to the Joint Administration Motion, the Debtors request entry of an order directing procedural consolidation and joint administration of these chapter 11 cases. Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest. Many of the motions, hearings, and orders in these chapter 11 cases will affect each of the Debtor entities. The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections. Joint administration also will allow the Office of the United States Trustee for the Southern District of Texas and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency. Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Joint Administration Motion should be approved by the Court.

II.   **Debtors' <u>Emergency</u> Application for Entry of an Order Authorizing the Employment and Retention of Prime Clerk LLC as Claims, Noticing, and Solicitation Agent ("<u>Claims and Noticing Agent Application</u>").**

2.   Pursuant to the Claims and Noticing Agent Application, the Debtors seek entry of an order appointing Prime Clerk LLC as the Claims and Noticing Agent for the Debtors in their chapter 11 cases to: (a) serve as the noticing agent to mail notices to the estates' creditors, equity security holders, and other parties in interest; (b) provide computerized claims, objection, solicitation, and balloting-related services; and (c) provide expertise, consultation, and assistance

---

[1]   Capitalized terms used but not defined herein have the meanings ascribed to them in the applicable First Day Motion.

in claim and ballot processing and other administrative services with respect to these chapter 11 cases.

3.     I believe that the appointment of Prime Clerk will provide the most effective and efficient means of ensuring creditors receive sufficient notice and have their claims adjudicated properly.   Further, Prime Clerk will relieve the Debtors and/or the Clerk's Office of the administrative burden of noticing, administering claims, and soliciting and tabulating votes.   The appointment of Prime Clerk is in the best interests of both the Debtors' estates and their creditors. Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Claims and Noticing Agent Application should be approved by the Court.

**III.    Debtors' <u>Emergency</u> Motion for Entry of an Order Authorizing the Debtors to File a Consolidated List of Creditors and a Consolidated List of the 50 Largest Unsecured Creditors.**

4.     Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an order authorizing the Debtors to file a consolidated creditor matrix and list of the 50 largest general unsecured creditors in lieu of submitting separate mailing matrices and creditor lists for each Debtor.

5.     I believe that permitting the Debtors to maintain a single consolidated list of creditors, in lieu of filing a separate creditor matrix for each Debtor, will maximize the value of the Debtors' estates and is in the interests of all of the Debtors' stakeholders.   The preparation of separate lists of creditors for each Debtor would be expensive, time consuming, and administratively burdensome.   Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Creditor Matrix Motion should be approved by the Court.

**IV.    Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Establishing a Plan and Disclosure Statement Objection Deadline and Related Procedures, (III) Approving the Solicitation Procedures, (IV) Approving the Combined Notice, and (V) Waiving the Requirements that the U.S. Trustee Convene a Meeting of Creditors and the Debtors File Schedules and SOFAs ("<u>Scheduling Motion</u>").**

6.      Pursuant to the Scheduling Motion, the Debtors request entry of an order: (a) scheduling a Combined Hearing on confirmation of the Debtors' Plan and the adequacy of the Debtors' Disclosure Statement; (b) establishing the Objection Deadline for filing objections to the adequacy of the Disclosure Statement and confirmation of the Plan and approving related procedures; (c) approving the Solicitation Procedures regarding votes to accept or reject the Plan; (d) approving the form and manner of the Combined Notice, which provides notice of commencement of these chapter 11 cases and the Combined Hearing; (e) conditionally (i) directing that the U.S. Trustee not convene a Creditors' Meeting under section 341(e) of the Bankruptcy Code, provided that the Plan is confirmed within seventy-five (75) days of the Petition Date, and (ii) waiving the requirement that the Debtors file statements of financial affairs and schedules of assets and liabilities, provided that the Plan is confirmed within seventy-five (75) days of the Petition Date; and (f) allowing the notice period for the Disclosure Statement and Combined Hearing to run simultaneously.

7.      In connection with the foregoing, the Debtors request that the Court approve the following Confirmation Schedule:

| Event | Date |
|---|---|
| Voting Record Date | August 13, 2019 |
| Solicitation Commencement Date | September 4, 2019 |
| Voting Deadline | September 11, 2019 |
| Petition Date | September 15, 2019 |
| Publication Deadline | September 20, 2019, *or as soon as reasonably practicable thereafter* |

4

| Event | Date |
|-------|------|
| Objection Deadline | October 15, 2019 |
| Reply Deadline | October 16, 2019 |
| Combined Hearing | October 17, 2019 |

8.     The Debtors commenced solicitation of votes on the Plan prior to the Petition Date, on September 4, 2019.   On the Solicitation Commencement Date, the Debtors' Claims and Noticing Agent mailed, or caused to be delivered, to Holders of Claims in Voting Classes entitled to vote to accept or reject the Plan as of August 13, 2019, Solicitation Packages including (a) the Disclosure Statement (including all exhibits) and (b) a customized paper ballot.  The Debtors will also mail, or cause to be delivered, to Holders or potential Holders of Claims or Interests in the non-voting Classes, the Opt-Out Form, which (a) informs recipients of their status as Holders or potential Holders of Claims or Interests in non-voting Classes, (b) provides the full text of the releases, exculpation, and injunction provisions set forth in the Plan, (c) includes a form by which Holders could elect to opt out of the Third-Party Release included in the Plan by checking a prominently featured and clearly labeled box, and (d) encloses a postage prepaid, return-addressed envelope in which Holders can return their Opt-Out Form to the Claims and Noticing Agent. Additionally, certain Holders of Claims and Interests were not provided a Solicitation Package because such Holders are: (a) unimpaired under, and conclusively presumed to accept, the Plan; or (b) impaired, entitled to receive no distribution on account of such claims or interests under the Plan, and deemed to reject the Plan.

9.     The Scheduling Motion also seeks approval of the Combined Notice, which will be served upon the Debtors' creditor matrix and all Holders of Claims and Interests of record.  The Combined Notice will:  (a) provide notice of the commencement of these chapter 11 cases; (b) provide a brief summary of the Plan; (c) disclose the date and time of the Combined Hearing;

(d) disclose the date and time of the Objection Deadline and the procedures for objecting to the Disclosure Statement and the Plan; and (e) provide the record date for receiving distributions under the Plan.

10.     I believe that the relief requested in the Scheduling Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.   Specifically, the Confirmation Schedule reflects milestones that were heavily negotiated as part of the RSA and a key inducement factor for creditors' support of these chapter 11 cases.  I believe that the proposed Confirmation Schedule provides ample time for any interested party to participate in these chapter 11 cases and will preserve significant value for the Debtors' estates and their stakeholders, as more fully set forth in the Scheduling Motion.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Scheduling Motion.

**Operational Motions**

**V.     Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees ("Taxes Motion").**

11.     Pursuant to the Taxes Motion, although the Debtors believe that they are substantially current with respect to their payment of Taxes and Fees, the Debtors seek authority pursuant to the Taxes Motion to (directly or through SPC) make payments where:  (a) Taxes and Fees accrue or are incurred postpetition; (b) Taxes and Fees accrued or were incurred prepetition but were not paid prepetition or were paid in an amount less than actually owed; (c) Taxes and Fees paid prepetition by SPC on behalf of the Debtors were lost or otherwise not received in full by any of the Authorities; or (d) Taxes and Fees incurred for prepetition periods may become due after the commencement of these chapter 11 cases.  The Debtors (directly or through SPC) collect,

withhold, and incur sales, use, income, franchise, withholding, severance, fuel, and property taxes, as well as other business, environmental, and regulatory fees in the ordinary course of business.

12.     Non-Debtor affiliate SPC performs administrative duties associated with the Taxes and Fees on behalf of the Debtors, which duties include remitting the Taxes and Fees to various federal, state, and local governments, including taxing and licensing authorities.  The Debtors advance payments to, or reimburse SPC through, intercompany transactions.  The Debtors estimate that approximately $5.7 million in Taxes and Fees relating to the prepetition period will become due and owing to the Authorities after the Petition Date.  SPC, on behalf of the Debtors, pays the Taxes and Fees to the Authorities on a periodic basis, remitting them semi-weekly, monthly, quarterly, semi-annually, or annually, depending on the nature and incurrence of a particular Tax or Fee.

13.     I believe that failing to pay the Taxes and Fees could materially disrupt the Debtors' business operations.  The Authorities could initiate audits, suspend operations, file liens, or seek to lift the automatic stay, which would unnecessarily divert the Debtors' attention from the reorganization process.  Further, unpaid Taxes and Fees may result in penalties, the accrual of interest, or both, which could negatively affect the Debtors' business.  Finally, the U.S. Trustee requires that debtors pay all tax obligations arising after the Petition Date in full when due.

14.     In light of the foregoing, I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business during these chapter 11 cases without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Taxes Motion should be approved.

VI.   **Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Continue to Operate their Cash Management System, (II) Honor Certain Prepetition Obligations Related Thereto, (III) Maintain Existing Business Forms, and (IV) Perform Intercompany Transactions ("<u>Cash Management Motion</u>").**

15.    Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders authorizing the Debtors (directly or through SPC) to (a) continue to operate their Cash Management System, (b) honor certain prepetition obligations related thereto, (c) maintain existing Business Forms in the ordinary course of business, and (d) continue to perform the Intercompany Transactions consistent with historical practice.

16.    In the ordinary course of business, the Debtors and certain of their non-Debtor affiliates operate a complex cash management system (the "<u>Cash Management System</u>").  The Debtors use the Cash Management System to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting.   The Cash Management System is specifically tailored to meet the operating needs of the Debtors and their non-Debtor affiliates by enabling participants to effectively and centrally control and monitor corporate funds, reduce administrative expenses by facilitating the movement of funds, and enhance the development of accurate account balances and related information.  The Debtors maintain daily oversight of the Cash Management System to implement cash management controls for entering, processing, and releasing funds, including in connection with Intercompany Transactions.  Additionally, the Debtors' corporate accounting department regularly reconciles the Debtors' books and records to ensure that all transactions are accounted for properly.

A.    **Cash Collection and Distribution.**

17.    Non-Debtor affiliate, SPC, maintains three Depository Accounts at Wells Fargo and Debtor, Sheridan Holding Company II, LLC, maintains the HoldCo II Depository Account at Wells Fargo.  The HoldCo II Depository Account and the three Depository Accounts collect

revenue generated by the Debtors' and their non-Debtor affiliates' operating activities, including oil and gas sales, royalty receipts, and joint interest billing reimbursements.  Incoming funds generated by the Debtors' oil and gas sales and royalty receipts are deposited directly into one of three Depository Accounts.  In contrast, the Debtors' joint interest billing reimbursements are deposited into a single JIB Depository Account maintained by SPC.

18.     As promptly as practicable, but in no event later than three business days after SPC receives reconciliation documentation, funds contained in the Depository Accounts maintained by SPC are transferred to the HoldCo II Depository Account.  The HoldCo II Depository Account serves as the Debtors' centralized main operating account to which receipts are deposited and from which disbursements are made throughout the Cash Management System as necessary.  SPC  also maintains a Master Operating Account funded from the Holdco II Depository Account and concentration accounts held by non-Debtor affiliates.  No more than three days before the applicable payment becomes due, HoldCo II transfers funds from the HoldCo II Depository Account to the Master Operating Account to fund the Debtors' indirect expenses including payroll, regulatory and accounts payable wires, fleet card expenses, and transportation and entertainment card expenses.  To the extent that the Debtors do not transfer sufficient funds to cover their allocable portion of indirect expenses being paid from the Master Operating Account, the Debtors reimburse SPC by transferring funds from the HoldCo II Depository Account to the Master Operating Account on a weekly basis.

B.     **Intercompany Transactions.**

19.     The Debtors have historically, in the ordinary course of business, engaged in routine Intercompany Transactions with each other and certain of their non-Debtor affiliates, resulting in Intercompany Claims.  The Intercompany Transactions have historically included

payments and expense reimbursements related to general and administrative expenses, employee compensation, hedge payments, debt payments, and fund transfers related to the acquisition or divestiture of assets. SPC, pursuant to the Amended and Restated Sheridan Omnibus Cash Management and Agency Agreement, acts as payment agent and makes cash transactions on behalf of the Debtors from the SPC Fund II Account and the SPC Accounts. SPC, pursuant to the Contract Operating Agreement, also performs all services with respect to the operation of the Debtors' properties. The Debtors also advance payments to or reimburse Manager and SPC for certain general and administrative expenses paid by Manager on behalf of the Debtors in connection with Manager's administration of the Debtors' assets.

20.     As a result of the foregoing, Intercompany Transactions between the Debtors and SPC, and the Debtors and Manager, are an essential component of the Debtors' operations. More specifically, the Debtors engage in Intercompany Transactions to, among other things, complete transactions with administrative ease, facilitate operations on a daily basis, fund necessary capital expenditures, and advance payments to, or reimburse Manager and SPC for certain general and administrative expenses accrued by Manager and SPC in connection with the management of the Debtors' assets. At any given time, as a result of the Intercompany Transactions, there may be claims owing by one Debtor to another Debtor or between a Debtor and non-Debtor affiliate. The Debtors closely track all fund transfers in their respective accounting systems and, therefore, can ascertain, trace, and account for all Intercompany Transactions.

21.     The Intercompany Transactions are trackable, and the Debtors intend to account for all postpetition Intercompany Transactions in accordance with pre-bankruptcy practice and procedures. Any interruption of the Intercompany Transactions—including failure to advance payments to, or reimburse non-Debtor affiliates Manager and SPC for Intercompany Claims

related to the Debtors—would severely disrupt the Debtors' operations and result in great harm to the Debtors' estates and their stakeholders.  In particular, Manager and SPC have no other source of funds to operate the Debtors' business or make payments on the Debtors behalf.  Failure to reimburse Manager and SPC for Intercompany Claims payable to them would result in such entities lacking sufficient funds to pay employees and vendors and otherwise operate the Debtors' business on a go-forward basis.

### C.      Bank Accounts.

22.      As of the Petition Date, the Cash Management System includes a total of 13 Bank Accounts.  The Bank Accounts can be separated into four categories:  (a) five Debtor Accounts; (b) six SPC Accounts; (c) one SPC Fund II Account; and (d) one Manager Account.  Each of the Bank Accounts, other than the Manager Account, reside at Wells Fargo Bank, N.A. and the Manager Account resides at Bank of America, N.A..

23.      I understand that in 2018, the Debtors and their non-Debtor affiliates paid approximately $198,000 in Bank Fees to the Cash Management Banks to maintain the aforementioned Bank Accounts, which are generally debited directly from the Bank Accounts on a monthly basis.  The Debtors and their non-Debtor affiliates paid Bank Fees in the amount of $195,000 to Wells Fargo in 2018 and $111,000 so far in 2019.  The Debtors and their non-Debtor affiliates paid Bank Fees in the amount of $3,000 to Bank of America in 2018 and $3,000 so far in 2019.  The Debtors estimate that they do not owe Wells Fargo or Bank of America any Bank Fees as of the Petition Date.

### D.      Credit Card Programs.

24.      As part of the Cash Management System, SPC provides certain employees with Credit Cards such as fleet and fuel cards, office expense cards, and travel and entertainment cards.

Under the Debtors' Credit Card Programs, the fleet and fuel cards and the office expense cards are issued by Comerica, and the travel and entertainment cards are issued by American Express. The employees use the Credit Cards for approved, legitimate and documented business expenses and supplies incurred on behalf of the Debtors in the ordinary course of business. Comerica and American Express debit funds from the Master Operating Account on a monthly basis for costs incurred through use of the Credit Cards. In addition, the Debtors and their non-Debtor affiliates pay service fees of approximately $6,000 annually in the aggregate for the use of the Credit Cards issued under the Credit Card Program.

25.     I believe that the continuation of the Debtors' Cash Management System is essential to the Debtors' business. Requiring the Debtors to implement changes to the Cash Management System during these chapter 11 cases would be expensive, burdensome, and unnecessarily disruptive to the Debtors' operations. The Cash Management System also provides the Debtors with the ability to quickly create status reports on the location and amount of funds, which, in turn, allows management to track and control such funds, ensure cash availability, and reduce administrative costs through a centralized method of coordinating the collection and movement of funds.

26.     I believe any disruption of the Cash Management System could have a severe and adverse effect on the Debtors' restructuring efforts. Indeed, requiring the Debtors to adopt a new cash management system could adversely affect the Debtors' ability to maximize value. Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Cash Management Motion should be approved by the Court.

**VII.   Debtors' <u>Emergency</u> Motion for Entry of an Order Authorizing (I) Payment of Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (II) Continuance of Employee Benefits Programs ("<u>Wages Motion</u>").**

27.     Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders authorizing the Debtors (directly or through SPC) to pay certain prepetition wages, salaries, and other compensation and reimbursable employee expenses in the ordinary course of business, and continue employee benefits programs, including the Debtors' historical non-insider severance program, in the ordinary course of business, including payment of certain prepetition obligations related thereto.

28.     Non-Debtor affiliate, SPC, employs approximately 423 employees on account of the Debtors and affiliated non-Debtor entities.   Approximately 263 of these employees are employed on account of the Debtors and perform a wide variety of functions critical to the Debtors' day-to-day operations.   All of the Employees are full-time.   Approximately 117 Employees are paid on an hourly basis, and approximately 146 Employees earn a salary.   Approximately 148 of these Employees divide their time between two or more of the separate investment funds managed by SPC.   The Employees are not represented by a collective bargaining unit.

29.     In addition to the Employees, SPC also periodically retains specialized individuals as independent contractors to complete discrete projects on behalf of the Debtors.   At this time, SPC retains approximately 8 Independent Contractors on behalf of the Debtors and these Independent Contractors are an important and cost-effective supplement to the efforts of the Employees.

30.     The Employees and Independent Contractors perform a wide variety of functions critical to the Debtors' operations.   In many instances, these individuals are highly trained and have an essential working knowledge of the Debtors' business that cannot be easily replaced.

13

Without the continued, uninterrupted services of their Employees and Independent Contractors, the Debtors' reorganization efforts will be threatened.

31.     The Debtors employ a number of non-insider incentive programs to drive performance among their Employees, including the Annual Bonus Program, and the Quarterly Incentive Program (each as described herein, and collectively, the "Non-Insider Employee Incentive Programs").[2]

32.     Under the Annual Bonus Program, the Debtors use defined metrics to determine company performance (the "Company Metrics").  The Debtors also determine annual goals (the "Target") for each level of Employee to assess individual Employee contributions.  Each Employee's Target is then considered in connection with the Company Metrics to determine each Employee's bonus under the Annual Bonus Program.  The Company Metrics are largely determinative in calculating bonuses under the Annual Bonus Program, and such bonuses are paid in cash in the month of March.

33.     It is my understanding that the Annual Bonus Program is integral to the operation of the Debtors' businesses.  In particular, the Annual Bonus Program aligns Employees' interests with those of the Debtors by linking payments under the Annual Bonus Program to performance and overall efficiency of the Debtors' operations.  As of the Petition Date, the Debtors estimate that there are no accrued but unpaid obligations owed to Employees on account of the Annual Bonus Program.

---

[2]     The relief sought under this Motion with respect to the Non-Insider Employee Incentive Programs does not include the payment of any obligation to an "insider" (as that term is defined in section 101(31) of the Bankruptcy Code, the "Insiders").  The Debtors will seek separate authority with respect to such parties (if necessary) and reserve all rights with respect to the "insider" status of such parties.

34.     Currently, 75 Employees are eligible to participate in the Quarterly Incentive Program.  Under the program, the Debtors, in their sole discretion, annually determine a set of quarterly performance metrics (the "Performance Metrics").  The Performance Metrics are used to determine a target payment for Employees (the "QIP Target") and the maximum incentive payments (the "Maximum Incentive Payments") for each Employee under the Quarterly Incentive Program.  The Maximum Incentive Payments for Employees range from 50% to 150% of the QIP Target.  Awards under the Quarterly Incentive Program are calculated and paid in cash quarterly, up to the Maximum Incentive Payment for each Employee, based on the Debtors' performance as measured against the Performance Metrics.

35.     It is my understanding that the Quarterly Incentive Program is integral to the operation of the Debtors' business.  In particular, the Quarterly Incentive Program aligns Employees' interests with those of the Debtors generally by linking payments under the Quarterly Incentive Program to performance and overall efficiency of the Debtors' operations.

36.     The Debtors last paid approximately $530,000 on account of the Quarterly Incentive Program on July 1, 2019.  The Debtors do not currently have any obligations to any Employees outstanding on account of the Quarterly Incentive Program.  With respect to the remainder of 2019, if each Employee receives his or her Maximum Incentive Payment, the Debtors will distribute approximately $900,000 on account of the Quarterly Incentive Program.  The Debtors request authority to honor obligations (directly or through SPC) arising under the Quarterly Incentive Program in the ordinary course of business during the pendency of these chapter 11 cases.

37.     I understand that, as of the Petition Date, there is approximately $50,000 in accrued but unpaid obligations owed to Independent Contractors, and approximately $15,000 of accrued

15

but unpaid reimbursable expenses for expenses incurred in the scope of their duties by certain Employees and members of the investment committee.

38.     I believe a significant portion of the value of the Debtors' businesses is tied to their workforce, which cannot be replaced without significant efforts—which efforts may not be successful given the overhang of these chapter 11 cases.  Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario.  I therefore believe payment of the prepetition obligations with respect to the Employee Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their businesses in these chapter 11 cases.

**VIII.  Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Scheduling a Final Hearing, (F) Modifying the Automatic Stay, and (G) Granting Related Relief ("DIP Motion").**

39.     Pursuant to the DIP Motion, the Debtors seek entry of interim and final orders: (a) authorizing the Debtors to obtain the DIP Facility, pursuant to the terms and conditions of the DIP Credit Agreement; (b) authorizing the Debtors to use Prepetition Collateral (including cash collateral) and the proceeds of the DIP Facility, in accordance with the DIP Orders and DIP Documents; (c) granting DIP Superpriority Claims with respect to the DIP Facility; (d) approving the form of adequate protection to be granted to the Prepetition Secured Parties; modifying the automatic stay to the extent necessary to effectuate the terms and conditions of the DIP Orders; (e) scheduling the Final Hearing; and (g) granting related relief.

40.     The DIP Facility, in an aggregate amount of approximately $100 million, consists of two tranches:   (a) $50 million of delayed draw new money term loans, with $28 million

available upon entry of the Interim Order and the remaining $22 million upon entry of the Final Order; and (b) subject to entry of the Final Order, a $50 million roll up of prepetition loans held by the DIP Lenders.  Crucially, the DIP Facility will provide the Debtors with sufficient liquidity for, among other things, general working capital purposes and funding the administration of these chapter 11 cases, in each case, in accordance with the Budget agreed upon by the Debtors, the DIP Agent, and the Required DIP Lenders.

41.     The Debtors were able to obtain the terms of the DIP Financing and the RSA based on many months of hard fought, arm's-length negotiations with their key stakeholders, which resulted in the fully-consensual transaction embodied in the Plan and the RSA.  The terms of this transaction are dependent on approval of this DIP Facility.  Moreover, as further described in the Matican Declaration, the Debtors are unable to obtain financing on more favorable terms than the DIP Financing from other sources.  The DIP Financing is the result of robust marketing and negotiating processes led by the Debtors' investment banker, Evercore Group L.L.C ("Evercore"). In this case, obtaining access to postpetition financing was difficult because substantially all of the Debtors' assets are encumbered by valid and perfected first-priority liens.  In order to avoid a protracted and expensive priming fight, the Debtors would need either to (a) obtain consent of the Sheridan II Revolving Lenders and Sheridan II Term Lenders or (b) locate a third-party lender willing to provide postpetition financing on a junior or unsecured basis.  Because neither option was available, and in the exercise of their business judgment, the Debtors negotiated extensively with the steering committees of the Sheridan II Revolving Lenders and Sheridan II Term Lenders for access to critical and necessary postpetition financing in the form of the DIP Financing. Crucially, the Debtors' business model is predicated upon their ability to maximize the value of their oil and gas assets, bring them to market, and utilize the proceeds in their business operations.

The DIP Financing provides for the orderly continuation of the Debtors' operations and preserves their going concern value by permitting them to regularly convert the prepetition collateral into Cash Collateral for use in business operations.

42.     In light of their constrained liquidity position, the Debtors, with the assistance of their advisors, Evercore and AlixPartners, undertook an analysis of how much postpetition financing would be required to operate the business and pay administrative costs during these chapter 11 cases.   While the current market conditions are challenging, the Debtors have a fundamentally strong asset base and experienced management team.   Thus, I believe that time and an appropriate amount of additional funding will permit the Debtors to complete a restructuring transaction that will enable them to successfully reorganize.

43.     As part of Evercore and AlixPartners's evaluation of the Debtors' liquidity position and financing needs, Evercore and AlixPartners worked closely with the Debtors' management team and other advisors to evaluate the Debtors' liquidity and cash needs and develop cash flow forecasts, which take into account anticipated cash receipts and disbursements during the projected period, and considered a number of other factors, including the expense of preparation for a potential chapter 11 filing, potential acceleration of demands on available liquidity following the commencement of these chapter 11 cases, potential working capital contraction, the fees and interest expenses associated with the proposed DIP Facility, professional fees, and required ordinary course operational expenses.   Based upon these forecasts and discussions with the Debtors' management team and other advisors, I do not believe it would be possible to administer the Debtors' chapter 11 estates on a "cash collateral" basis.   Indeed, as of the Petition Date, the Debtors' unrestricted cash balance is $950,000.   Without DIP financing, the Debtors' operations will come grinding to a halt.

44.     Prior to the Petition Date, the Debtors, in consultation with AlixPartners, reviewed and analyzed their projected cash needs and prepared projections (as updated from time to time in accordance with the terms of the DIP Facility, the "Budget") of postpetition cash needs of the Debtors' businesses in the initial 13 weeks of these chapter 11 cases.  Based on discussions with the Debtors' management and other advisors, I believe that the Budget and their projections provide an accurate reflection of their funding requirements over the identified period, respectively, and are reasonable and appropriate under the circumstances.  The Budget contains line items for categories of cash flows anticipated to be received or disbursed during this period. The Budget and longer term monthly forecasts were utilized to determine the amount of postpetition financing required to administer these chapter 11 cases.  In addition, I have reviewed relief requested in the various First Day Motions and I believe that the Budget properly accounts for the amounts necessary to fulfill such obligations.

45.     I believe the DIP Facility is critical to the Debtors' ability to administer these chapter 11 cases, and provides the Debtors with sufficient liquidity to continue operations in the ordinary course and pursue the restructuring contemplated by the Debtors' prepackaged Plan and the RSA without creating value-destructive "priming" litigation at the outset of these chapter 11 cases.  Without the proposed DIP Facility, I do not believe that the Debtors will have the liquidity to operate their enterprise and continue paying their debts as they come due.  As a result, the Debtors and their advisors determined that obtaining sufficient financing at the start of these chapter 11 cases is crucial to the Debtors' success in these chapter 11 cases and to avoid diminishing the value of the Debtors' estates.  Specifically, the Debtors, with the assistance of their advisors, determined that they will require incremental liquidity of approximately $50 million to satisfy payroll, pay suppliers, meet overhead, pay expenses pursuant to joint operating agreements

for properties operated by the Debtors, satisfy joint interest billings for properties where the Debtors are a non-operating working interest holder, and make any other payments that are essential for the continued management, operation, and preservation of the business.

46.     Approval of the DIP Facility is in the best interests of the Debtors and their stakeholders and provides the Debtors with sufficient liquidity to administer these chapter 11 cases and emerge with a significantly deleveraged balance sheet.  The DIP Facility provides sufficient incremental liquidity for the Debtors to satisfy their various expenses when due, which the Debtors would not otherwise be able to satisfy and would jeopardize their continued operation.

**IX.    Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders Authorizing the Debtors to Pay Prepetition Trade Claims in the Ordinary Course of Business ("<u>All Trade Motion</u>").**

47.     Pursuant to the All Trade Motion, the Debtors seek entry of interim and final orders: (a) authorizing, but not directing, the Debtors to pay (or direct SPC to pay) Trade Claims of the Creditors (each as defined below) on account of payments of Trade Claims to the Creditors in the ordinary course of business, in an amount up to $6.4 million on an interim basis and all amounts upon entry of the Final Order; and (b) granting related relief.

48.     I understand that certain general unsecured creditors and creditors whose Trade Claims may give rise to liens under certain state and federal laws, that are not Debtors or "affiliates" (as such term is defined in section 101(2) of the Bankruptcy Code) of the Debtors (collectively, the "<u>Creditors</u>") provide the Debtors, or SPC on behalf of the Debtors, with goods and services in the ordinary course of business, including, among other things, materials, equipment, or supplies used in the drilling, operating, or maintenance of oil and gas property and other basic business necessities for the operation of the Debtors' businesses.  I further understand that, SPC, on behalf of the Debtors, incurs numerous fixed, liquidated, and undisputed payment

obligations to the Creditors in the ordinary course of business that aggregated to approximately $77 million for the twelve months preceding the Petition Date.

49.     The following table contains descriptions of the allowed prepetition claims (collectively, the "Trade Claims"), and the Debtors' estimate of the net amounts of the Trade Claims accrued as of the Petition Date, and, of those amounts, the net amounts that are due in the ordinary course of business within 30 days of the Petition Date.

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 30 Days |
|---|---|---|---|
| Lease Operating Expenses | Lease operating expenses on account of their working interests in the oil and gas leases and on behalf of the non-operating working interest owners | $3,500,000[3] | $1,700,000 |
| Capital Expenditures | Capital improvements, and facilities maintenance | $7,300,000 | $3,600,000 |
| Utilities | Electricity, gas, water and sewer, waste disposal | $600,000 | $100,000 |
| G&A Expenses | Litigation Accrual, Legal firms and services, general operations and human resources services, labor relations and recuritng services, accounting, audit, tax, and other financial services | $1,200,000 | $600,000 |
| **Total** | | **$12,600,000** | **$6,000,000** |

50.     I believe that the relief requested in the All Trade Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to

---

[3]     As described below, approximately $530,000 million will be reimbursed by owners of non-operating working interests, $270,000 million of which is related to amounts to be paid during the interim period.

continue to operate their business in chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the All Trade Motion should be approved.

## X. Debtors' **Emergency** Motion for Entry of an Order Authorizing Mineral Payments and Working Interest Disbursements ("**Royalty Payment Motion**").

51.     Pursuant to the Royalty Payment Motion, the Debtors seek entry of an order authorizing the Debtors (directly or through SPC) to pay or apply, any and all amounts owed to Mineral Payees and Working Interest Holders in the ordinary course of business, whether such obligations were incurred prepetition or will be incurred postpetition.

### A.     Mineral Payments.

52.     Non-Debtor affiliate, SPC, serves as the contract operator for the properties in which the Debtors' maintain a Working Interest. The Debtors have Working Interests in approximately 2,026 oil and gas wells, which are generally subject to Interest Burdens. Failure to make Mineral Payments on account of the Interest Burdens would have a severe negative effect on the Debtors and their interests in the Oil and Gas Properties. I understand that the failure to pay Mineral Payments under various Oil and Gas Leases, intercompany net profits agreements, or state statutory frameworks could expose the Debtors to such enforcement actions and could result in actions seeking the forfeiture, cancellation, or termination of Oil and Gas Leases.

53.     The Mineral Payments are subject to variation due to many factors such as specific terms of underlying agreements, changes in ownership, and changes in the amount or type of minerals captured. These payments are indirectly remitted by the Debtors to Mineral Payees throughout the course of a given month. As a result of the time required to market and sell the production and the significant accounting process required each month to accurately disburse the resulting proceeds, Mineral Payments generally are made between 30 and 90 days after production of the underlying oil and gas.

54.     I understand that, as of the Petition Date, there are approximately $23 million in Mineral Payments, which amount includes "suspended funds" due and owing but otherwise unpayable, that are due to be paid over approximately 90 days following the Petition Date.

**B.      Working Interest Disbursements.**

55.     Generally, the Debtors indirectly make Working Interest Disbursements between 30 and 90 days after production of the underlying oil and gas.  In the ordinary course of business, on behalf of the Debtors, SPC sets-off Working Interest Disbursements owed to certain Working Interest Holders against the *pro rata* portion of Joint Interest Billings owed by such holders.

56.     I understand that the failure to pay Working Interest Disbursements could result in a material adverse effect on the Debtors and their interests in the Oil and Gas Properties.  Failure to pay Working Interest Disbursements could expose the Debtors to statutory enforcement mechanisms under various state statutory frameworks.  Moreover, Non-Op Working Interest holders often have additional remedies pursuant to mutual agreements.  Such remedies can include the grant of a security interest in production to secure amounts owed by the Operator, the right to remove the Operator, the right to suspend rights in the Contract Area, and the right to interest on amounts owed.

57.     Working Interest Disbursements typically are not uniform and are not entirely predictable on a month-to-month basis, however, I understand that, as of the Petition Date, the Debtors have approximately $8 million of Working Interest Disbursements outstanding.  Of the amount currently outstanding, a portion will be set-off in the ordinary course of business against Joint Interest Billings indirectly owed to the Debtors by third parties.

58.     I believe that failure to pay the Mineral Payments and Working Interest Disbursements could result in a material adverse effect on the Debtors and their interests in oil and

gas properties.  As a result, I believe payment of the Working Interest Disbursements and Mineral Payments in the ordinary course of business is in the best interests of the Debtors, their estates, and their creditors.

[*Remainder of page intentionally left blank*]

## Exhibit B

**Corporate Organizational Structure**





# SHERIDAN

| Sheridan II | | | |
|---|---|---|---|
| Total Debt: $1,104,585,507.87 | | | |
| | Revolver (Secured) | Term Loan (Secured) | Subordinated Loan |
| | Outstanding Principal | Outstanding Principal | Outstanding Principal |
| SIP II | $55,418,345.61 | $456,036,949.73 | $415,998,879.88 |
| II-A | $7,709,122.44 | $63,438,010.99 | $57,868,454.52 |
| II-M | $2,875,069.24 | $23,658,912.80 | $21,581,762.66 |
| | Total outstanding: $66,002,537.29 | Total Outstanding: $543,133,873.52 | Total Outstanding: $495,449,097.06 |

**Notes**
1. Sheridan SMG, LLC ownership with respect to its Series II

Fund II



# **Exhibit C**

**Restructuring Support Agreement**

*EXECUTION VERSION*

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED IN THIS AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES TO THIS AGREEMENT.

## *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules attached to this agreement in accordance with Section 14.02, this "**Agreement**") is made and entered into as of September 9, 2019 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) through (v) of this preamble, collectively, the "**Parties**"):[1]

i.  Sheridan Production Partners II-A, L.P. ("**SPP II-A**"), a limited partnership organized under the Laws of Delaware; Sheridan Investment Partners II, L.P. ("**SIP II**"), a limited partnership organized under the Laws of Delaware; Sheridan Production Partners II-B, L.P. ("**SPP II-B**"), a limited partnership organized under the Laws of Delaware; Sheridan Production Partners II-M, L.P. ("**SPP II-M**"), a limited partnership organized under the Laws of Delaware; Sheridan Holding Company II, LLC, a limited liability company organized under the Laws of Delaware ("**HoldCo**"); and each of the other Entities identified as Company Parties on their signature pages that have executed and delivered counterpart signature pages to this Agreement to counsel to either of the Senior Secured Agents and counsel to the Consenting Sheridan II Subordinated Term Lenders (the Entities in this clause (i), collectively, the "**Company Parties**");

ii.  Sheridan Production Partners Manager, LLC, a Delaware limited liability company ("**Manager**");

iii.  Sheridan ICM, LLC, a Delaware limited liability company ("**ICM**"); Sheridan SMG, LLC, a Delaware limited liability company ("**SMG**"); Sheridan Production Company, LLC, a Delaware limited liability company ("**SPC**"); Warburg Pincus, LLC ("**Warburg**"); and WPS Production Partners II, LLC ("**WPS**" and, the Entities in this clause (iii), collectively, the "**Manager Affiliates**");

iv.  the undersigned holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, Sheridan II RBL Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer

---

[1]  Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

Agreement to counsel to the Company Parties (the Entities in this clause (iv), collectively, the "**Consenting Sheridan II Revolving Lenders**"); and

v.    the undersigned holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, Sheridan II Term Loan Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (v), collectively, the "**Consenting Sheridan II Term Lenders**"); and

vi.    the undersigned holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, Sheridan II Subordinated Term Loan Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (vi), collectively, the "**Consenting Sheridan II Subordinated Lenders**" and, together with the other entities in clauses (iv) through (vi), the "**Consenting Lenders**").

## *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Stakeholders have in good faith and at arm's length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the following documents (the "**Restructuring Transactions**"):

- the proposed chapter 11 plan of reorganization, substantially in the form attached as **Exhibit A** to this Agreement (the "**Plan**");

- the term sheet setting forth the terms and conditions of a $100 million debtor in possession financing facility attached as **Exhibit B** to this Agreement (the "**DIP Term Sheet**"); and

- the term sheet setting forth the terms and conditions of the exit financing facilities, attached as **Exhibit A** to the Plan (the "**Exit Facility Term Sheet**").

**WHEREAS**, the Company Parties intend to implement the Restructuring Transactions by commencing voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the "**Chapter 11 Cases**") and consummating the Plan; and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained in this Agreement, and for other valuable consideration, the receipt and sufficiency of which are acknowledged, each Party, intending to be legally bound by this Agreement, agrees as follows:

### *AGREEMENT*

**Section 1.**     ***Definitions and Interpretation.***

1.01.   <u>Definitions</u>.  The following terms shall have the following definitions:

"**<u>Ad Hoc Group</u>**" means those certain funds or accounts managed, advised, or sub-advised by Pantheon Ventures (US) LP and HarbourVest Partners L.P. that hold Sheridan II Subordinated Term Loan Claims.

"**<u>Affiliate</u>**" means, with respect to any specified Entity, any other Entity directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Entity.  For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by," and "under common control with"), as used with respect to any Entity, shall mean the possession, directly or indirectly, of the right or power to direct or cause the direction of the management or policies of such Entity, whether through the ownership of voting securities, by agreement, or otherwise.

"**<u>Agents</u>**" means the Senior Secured Agents and any administrative agent or similar Entity under any of the Sheridan II Subordinated Term Loan Credit Agreements including any successors thereto.

"**<u>Agreement</u>**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules attached to this Agreement in accordance with Section 14.02.

"**<u>Agreement Effective Date</u>**" means the date on which the conditions set forth in Section 2 have been satisfied or waived in accordance with this Agreement.

"**<u>Agreement Effective Period</u>**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**<u>Alternative Restructuring Proposal</u>**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that in each case is an alternative to one or more of the Restructuring Transactions; it being understood and agreed that the ongoing marketing process in respect of the Asset Sale Restructuring (as defined in the Plan) or soliciting any inquiry, proposal, offer, bid, term sheet, discussion, or agreement pursuant to such marketing process shall not constitute an Alternative Restructuring Proposal.

"**Amended Hedging Agreement**" means the amended Hedging Contracts, if any, to be entered into by the Company and holders of Hedging Claims on the Plan Effective Date, the form of which shall be included in the Plan Supplement.

"**Asset Purchase Agreement**" means one or more asset purchase agreements pursuant to which the Asset Sale is consummated.

"**Asset Sale**" means the sale or sales of substantially all of the Debtors' assets under the Plan, the terms of which shall be acceptable to the Debtors and the Required Consenting Senior Secured Lenders.

"**Asset Sale Election Notice**" means a notice filed with the Plan Supplement indicating that the Debtors and the Required Consenting Senior Secured Lenders have elected to pursue the Asset Sale.

"**Avoidance Actions**" means any and all actual or potential avoidance, recovery, subordination, or other Claims, causes of action, or remedies that may be brought by or on behalf of the Company Parties, their estates, or other parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, causes of action, or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court presiding over the Chapter 11 Cases, which shall be the United States Bankruptcy Court for the Southern District of Texas.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Cause of Action**" means any Claim, cause of action, Avoidance Action (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Company Parties), controversy, demand, right, action, indemnity, suit, obligation, liability, damage, judgment, account, defense, offset, power, and privilege of any kind or character whatsoever, whether known, unknown, contingent or noncontingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, in contract or in tort, in law or in equity, or pursuant to any other theory of law.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

4

"**Chosen Court**" means, (a) before one or more Company Parties commences Chapter 11 Cases, federal courts or state courts located in the City of New York, New York and, (b) after commencement of such proceeding, in the Bankruptcy Court with jurisdiction over such proceeding.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Collateral Agent**" means Bank of America, N.A., solely in its capacities as Collateral Agent under the Sheridan II RBL Credit Agreements and the Sheridan II Term Loan Credit Agreements.

"**Company Claims/Interests**" means any Claim against, or Equity Interest in, a Company Party, including the Sheridan II RBL Claims, Sheridan II Term Loan Claims, DIP Claims, Sheridan II Subordinated Term Loan Claims, and Hedging Claims.

"**Company Parties**" has the meaning set forth in the recitals to this Agreement.

"**Company Releasing Party**" means each of the Company Parties and, to the maximum extent permitted by Law, each of the Company Parties, on behalf of their respective Affiliates and Related Parties.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation Order**" means the confirmation order with respect to the Plan.

"**Consenting Lender Fees and Expenses**" means the reasonable and documented fees and expenses accrued since the inception of their respective engagements related to the implementation of the Restructuring Transaction and not previously paid by, or on behalf of, the Company Parties of: (i) (a) Davis Polk & Wardwell LLP, as counsel to Bank of America, N.A. in its capacity as administrative agent under the Sheridan II Term Loan Credit Agreements, (b) any local counsel to Bank of America, N.A. in its capacity as administrative agent under the Sheridan II Term Loan Credit Agreements, and (c) Houlihan Lokey Capital, Inc., as financial advisor to Davis Polk & Wardwell LLP in connection with its representation of the Bank of America, N.A. in its capacity as administrative agent under the Sheridan II Term Loan Credit Agreements, (ii) (a) Vinson & Elkins LLP, as counsel to Bank of America, N.A. in its capacity as administrative agent under the Sheridan II RBL Credit Agreements, and (b) any local counsel to Bank of America, N.A. in its capacity as administrative agent under the Sheridan II RBL Credit Agreements, and (c) Houlihan Lokey Capital, Inc., as financial advisor to Vinson & Elkins LLP in connection with its representation of the Bank of America, N.A. in its capacity as administrative agent under the Sheridan II RBL Credit Agreements, (iii) (a) Weil Gotshal & Manges, LLP, as counsel to the Ad Hoc Group and (b) PJT Partners, LP, as investment banker to Weil Gotshal & Manges, LLP in connection with its representation of the Ad Hoc Group, in each case of (a) and (b) up to an

5

aggregate amount not to exceed $2,000,000, and (iv) any consultants or other professionals retained by the Davis Polk & Wardwell LLP, Vinson & Elkins LLP, and the Senior Secured Agents in connection with the Company Parties or the Restructuring Transactions with the consent of the Company Parties (not to be unreasonably withheld), in each case, in accordance with the engagement letters of such consultant or professional signed by the Company Parties, including, without limitation, any success, back-end, or restructuring fees contemplated therein (which such fees are deemed reasonable hereunder), and in each case, without further order of, or application to, the Bankruptcy Court by such consultant or professionals.  Notwithstanding anything to the contrary in this Agreement or the Plan, no fees and expenses of the type specified in the foregoing clause (iii) shall be paid or required to be paid by the Company Parties or the Reorganized Debtors in excess of the amount specified therein.

"**Consenting Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Senior Secured Lenders**" means the Consenting Sheridan II Revolving Lenders and the Consenting Sheridan II Term Lenders.

"**Consenting Sheridan II Revolving Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Sheridan II Subordinated Term Lender Consent Right**" means the right of the Required Consenting Sheridan II Subordinated Term Lenders to consent to or approve Definitive Documents or actions, as applicable, which right shall apply solely to the extent such Definitive Documents or actions, as applicable, (a) adversely affect any of the rights or benefits granted to or received by, or proposed to be granted to or received by, the Consenting Sheridan II Subordinated Term Lenders pursuant to this Agreement or the Plan, (b) affect the releases in favor of the Consenting Sheridan II Subordinated Term Lenders provided, or proposed to be provided, under any Definitive Document, or (c) modify any obligation the Consenting Sheridan II Subordinated Term Lenders may have pursuant to this Agreement or the Plan; *provided, however*, that any New Organizational Documents shall be reasonably acceptable to the Required Consenting Sheridan II Subordinated Term Lenders with respect to any customary minority protections.

"**Consenting Sheridan II Subordinated Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Sheridan II Term Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Stakeholder Releasing Party**" means, each of, and in each case in its capacity as such: (a) each Consenting Stakeholder; (b) each Agent; (c) to the maximum extent permitted by Law, each current and former Affiliate of each Entity in clause (a) through the following clause (d); and (d) to the maximum extent permitted by Law, each Related Party of each Entity in clause (a) through this clause (d).

6

"**Consenting Stakeholders**" means each of the Consenting Lenders and each of the Manager Parties.

"**Debtor**" means each of the Company Parties in its capacity as a debtor in its respective Chapter 11 Case.

"**Definitive Documents**" means all of the definitive documents implementing the Restructuring Transactions, including those set forth in Section 3.

"**DIP Agent**" means Bank of America, N.A., in its capacity as administrative agent under the DIP Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Credit Agreement.

"**DIP Claims**" means any Claim on account of the DIP Facility Documents.

"**DIP Credit Agreement**" means that certain debtor-in-possession credit agreement by and among certain Company Parties, the DIP Agent, and Consenting Sheridan II Revolving Lenders and Consenting Sheridan II Term Lenders that are lenders party thereto, consistent with the terms and conditions of the DIP Term Sheet and this Agreement and as approved by the Financing Order.

"**DIP Facility**" means the new superpriority secured term loans to be made by certain holders of Sheridan II RBL Claims and Sheridan II Term Loan Claims in accordance with the DIP Facility Credit Agreement.

"**DIP Facility Documents**" means the DIP Facility Credit Agreement and any other documentation necessary to effectuate the incurrence of the DIP Facility.

"**DIP Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan.

"**Enforcement Action**" means any action of any kind, except as necessary to file and defend any Company Claims/Interests in conjunction with the Chapter 11 Cases, to (a) exercise or enforce any right under any guarantee or any right in respect of any "Lien" as defined in the Sheridan II RBL Credit Agreements and Sheridan II Term Loan Credit Agreements (including, for the avoidance of doubt, any security interest granted under any of the Sheridan II RBL Credit Agreements and the Sheridan II Term Loan Credit Agreements), in each case granted in relation to (or given in support of) all or any part of any Company Claims/Interests or (b) sue, claim or institute or continue legal proceedings against any Company Party or any Manager Party.

"**Entity**" means any person, individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization, governmental body or any agency or political subdivision of any governmental body, or any other entity, whether acting in an individual, fiduciary, or other capacity.

7

"**Equity Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, general or limited partnership interests, limited liability company interests, and any other equity, ownership, or profits interests and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into or based on the value of such shares (or any class thereof) of, common stock, preferred stock, general or limited partnership interests, limited liability company interests, or other equity, ownership, or profits interests (in each case whether or not arising under or in connection with any employment agreement).

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Exit Facilities**" means the new senior secured term loans to be made by certain holders of Sheridan II RBL Claims and Sheridan II Term Loan Claims in accordance with the Exit Facility Credit Agreements.

"**Exit Facility Credit Agreement**" means the credit agreements governing the Exit Facility, which shall be consistent with the Exit Facility Term Sheet.

"**Exit Facility Documents**" means the Exit Facility Credit Agreements and any other documentation necessary to effectuate the incurrence of the Exit Facility.

"**Exit Facility Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Financing Order**" means, as applicable, the interim and final orders of the Bankruptcy Court setting forth the terms of debtor-in-possession financing and use of cash collateral, which shall be consistent with the DIP Term Sheet.

"**First Day Pleadings**" means the first-day pleadings that the Company Parties determine are necessary or desirable to file, and which are reasonably acceptable in form and substance to the Required Consenting Senior Secured Lenders.

"**Governing Body**" means the board of directors, board of managers, manager, general partner, investment committee, special committee, or such similar governing body of an Entity. As of the Execution Date, the Governing Body of each Company Party is the investment committee of Manager and, when acting within the authority delegated to them by the investment committee, the special committees of SPP II-A, SPP II-B, SPP II-M, and SIP II, respectively.

"**Hedging Claims**" means any Claim on account of any Hedging Contract.

"**Hedging Contract**" means any futures contract, forward contract, swap contract, derivative contract, hedging contract, or other like instrument with a Company Party.

"**Joinder**" means a joinder to this Agreement substantially in the form attached to this Agreement as **Exhibit D**.

8

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Manager**" has the meaning set forth in the Preamble to this Agreement.

"**Manager Affiliates**" has the meaning set forth in the Preamble to this Agreement.

"**Manager Parties**" means Manager and each of the Manager Affiliates.

"**Milestones**" means the milestones set forth in Section 4.

"**New Board**" means the board of directors or board of managers of New Sheridan.

"**New Common Stock**" means the new common stock of New Sheridan issued on the Plan Effective Date.

"**New Money DIP Claims**" means any Claim on account of the New Money DIP Loans.

"**New Money DIP Loans**" means the $50,000,000 of new money term loans extended to the Debtors pursuant to the DIP Facility Documents and the Financing Order.

"**New Sheridan**" means the newly-formed corporation that will be the ultimate parent of the Reorganized Debtors and the issuer of the New Common Stock under the Plan.

"**New Organizational Documents**" means the documents providing for corporate governance of New Sheridan and the other Reorganized Debtors, including charters, bylaws, operating agreements, or other organizational documents or shareholders' agreements, as applicable, which shall be consistent with section 1123(a)(6) of the Bankruptcy Code (as applicable).

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 8.01.

"**Person**" means any natural person, corporation, limited liability company, professional association, limited partnership, general partnership, joint stock company, joint venture, association, company, trust, bank, trust company, land trust, business trust or other organization, whether or not a legal entity, and any governmental authority.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

9

"**Plan**" has the meaning set forth in the preamble to this Agreement.

"**Plan Effective Date**" means the occurrence of the effective date of the Plan according to its terms.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Company Parties with the Bankruptcy Court.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Related Party**" means, each of, and in each case in its capacity as such, current and former directors, managers, officers, investment committee members, special committee members, members of any Governing Body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.

"**Released Company Parties**" means, each of, and in each case in its capacity as such: (a) each Company Party; (b) each current and former Affiliate of each Entity in clause (a) through the following clause (c); and (c) each Related Party of each Entity in clause (a) through this clause (c).

"**Released Claim**" means, with respect to any Releasing Party, any Claim, or Cause of Action that is released by such Releasing Party under Section 13 of this Agreement.

"**Released Parties**" means each Released Company Party and each Released Stakeholder Party.

"**Released Stakeholder Parties**" means, each of, and in each case in its capacity as such: (a) each Consenting Stakeholder; (b) each Agent; (c) each current and former Affiliate of each Entity in clause (a) through the following clause (d); and (d) each Related Party of each Entity in clause (a) through this clause (d).

"**Releases**" means the releases contained in Section 13 of this Agreement.

10

"**<u>Releasing Parties</u>**" means, collectively, each Company Releasing Party and each Consenting Stakeholder Releasing Party.

"**<u>Reorganized Debtors</u>**" means, collectively, a Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Plan Effective Date.  For purposes of this Agreement, New Sheridan shall be deemed to be a Reorganized Debtor.

"**<u>Required Consenting Senior Secured Lenders</u>**" means each of the Required Consenting Sheridan II Revolving Lenders and Required Consenting Sheridan II Term Lenders.

"**<u>Required Consenting Stakeholders</u>**" means each of the Required Consenting Senior Secured Lenders, Required Consenting Sheridan II Subordinated Term Lenders and Manager Parties.

"**<u>Required Consenting Sheridan II Revolving Lenders</u>**" means, as of the relevant date, Consenting Sheridan II Revolving Lenders holding greater than 50% of the aggregate outstanding principal amount of the Sheridan II RBL Claims that are held by all Consenting Lenders.

"**<u>Required Consenting Sheridan II Subordinated Term Lenders</u>**" means, as of the relevant date, Consenting Sheridan II Subordinated Term Lenders holding greater than 50% of the aggregate outstanding principal amount of the Sheridan II Subordinated Term Loan Claims that are held by all Consenting Lenders in the Ad Hoc Group.

"**<u>Required Consenting Sheridan II Term Lenders</u>**" means, as of the relevant date, Consenting Sheridan II Term Lenders holding greater than 50% of the aggregate outstanding principal amount of the Sheridan II Term Loan Claims that are held by all Consenting Lenders.

"**<u>Restricted Period</u>**" means the period commencing as of the date each Consenting Stakeholder, as applicable, executes this Agreement until the Termination Date, as to such Consenting Stakeholder.

"**<u>Restructuring Transactions</u>**" has the meaning set forth in the recitals to this Agreement.

"**<u>Rules</u>**" means Rule 501(a)(1), (2), (3), and (7) of Regulation D under the Securities Act.

"**<u>Sale Order</u>**" means any order approving any transfer or sale of a Debtor's assets if separate from the Confirmation Order.

"**<u>Securities Act</u>**" means the Securities Act of 1933, as amended.

"**<u>Senior Secured Agents</u>**" means the DIP Agent and any administrative agent, collateral agent, or similar Entity under any of the Sheridan II RBL Credit Agreements and Sheridan II Term Loan Credit Agreements, including any successors thereto.

11

"**Services Agreement**" means either a new management agreement (if any) or a customary transition services agreement (if any), in each case by and among Reorganized Debtors and Manager, which shall be either (a) in a form included in the Plan Supplement and reasonably acceptable to Manager and the Required Consenting Senior Secured Lenders or (b) if not included in the Plan Supplement, as reasonably agreed between Manager and the New Board.

"**Sheridan**" has the meaning set forth in the Preamble to this Agreement.

"**Sheridan II RBL Claims**" means any Claim on account of the Sheridan II RBL Facilities.

"**Sheridan II RBL Credit Agreements**" means collectively, each of the following, as amended, restated, supplemented or otherwise modified from time to time:

(a)    that certain amended and restated credit agreement dated as of February 26, 2013 among SIP II as borrower, Bank of America, N.A., as administrative agent and collateral agent (together with any successor administrative or collateral agent), and the other lenders party thereto, as amended (the facility thereunder, the "**SIP II RBL Facility**");

(b)    that certain amended and restated credit agreement dated as of February 26, 2013 among SPP II-A as borrower, Bank of America, N.A., as administrative agent and collateral agent (together with any successor administrative or collateral agent), and the other lenders party thereto, as amended (the facility thereunder, the "**SPP II-A RBL Facility**"); and

(c)    that certain amended and restated credit agreement dated as of February 26, 2013 among SPP II-M as borrower, Bank of America, N.A., as administrative agent and collateral agent (together with any successor administrative or collateral agent), and the other lenders party thereto, as amended (the facility thereunder, the "**SPP II-M RBL Facility**" and, collectively with the SIP II RBL Facility and the SPP II-A RBL Facility, the "**Sheridan II RBL Facilities**").

"**Sheridan II RBL Forbearance Agreements**" means, collectively, the Extension of Forbearance and Limited Waiver agreements dated as of September 3, 2019, among certain of the Company Parties, the lender parties thereto, and Bank of America, N.A. as LC issuer, administrative agent, and collateral agent, as amended, restated, supplemented, or otherwise modified from time to time.

"**Sheridan II Subordinated Term Loan Claims**" means any Claim on account of the Sheridan II Subordinated Term Loans.

"**Sheridan II Subordinated Term Loan Credit Agreements**" means each of the following, as amended, restated, supplemented or otherwise modified from time to time:

(a)    that certain subordinated unsecured term loan credit agreement dated as of October 6, 2017 among SIP II as borrower, Wilmington Trust, N.A., as administrative agent, and the lenders party thereto (the facility thereunder, "**SIP II Subordinated Term Loan Facility**");

(b)      that certain subordinated unsecured term loan credit agreement dated as of October 6, 2017 among SPP II-A as borrower, Wilmington Trust, N.A., as administrative agent, and the lenders party thereto (the facility thereunder, the "**SPP II-A Subordinated Term Loan Facility**");

that certain subordinated unsecured term loan credit agreement dated as of October 6, 2017 among SPP II-M as borrower, Wilmington Trust, N.A., as administrative agent, and the lenders party thereto (the facility thereunder, "**SPP II-M Subordinated Term Loan Facility**" and, collectively with the SIP II Subordinated Term Loan Facility and the SPP II-A Subordinated Term Facility the "**Sheridan II Subordinated Term Loan Facilities**").

"**Sheridan II Term Loan Claims**" means any Claim on account of the Sheridan II Term Loan Facilities.

"**Sheridan II Term Loan Credit Agreements**" means collectively, each of the following, as amended, restated, supplemented or otherwise modified from time to time:

(a)      that certain amended and restated senior secured term loan credit agreement dated as of December 16, 2013 among SIP II as borrower, Bank of America, N.A., as administrative agent (together with any successor administrative agent), and the other lenders party thereto (the facility thereunder, the "**SIP II Term Loan Facility**");

(b)      that certain amended and restated senior secured term loan credit agreement dated as of December 16, 2013 among Sheridan Production Partners II-A, L.P., as borrower, Bank of America, N.A., as administrative agent (together with any successor administrative agent), and the other lenders party thereto (the facility thereunder, the "**SPP II-A Term Loan Facility**"); and

(c)      that certain amended and restated senior secured term loan credit agreement dated as of December 16, 2013 among SPP II-M as borrower, Bank of America, N.A., as administrative agent (together with any successor administrative agent), and the other lenders party thereto (the facility thereunder, the "**SPP II-M Term Loan Facility**" and, collectively with the SIP II Term Loan Facility and the SPP II-A Term Loan Facility, the "**Sheridan II Term Loan Facilities**").

"**Sheridan II Term Loan Limited Waivers**" means, collectively, the Seventh Amendment to the Third Amendment and Limited Waivers, dated as of September 3, 2019, among certain of the Company Parties, the lender parties thereto, and Bank of America, N.A. as administrative agent and collateral agent, as amended, restated, supplemented, or otherwise modified from time to time.

"**SIP II**" has the meaning set forth in the preamble to this Agreement.

"**Solicitation Materials**" means all solicitation materials in respect of the Plan.

"**SPP II-A**" has the meaning set forth in the preamble to this Agreement.

13

"**SPP II-B**" has the meaning set forth in the preamble to this Agreement.

"**SPP II-M**" has the meaning set forth in the preamble to this Agreement.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 11.01, 11.02, 11.03, 11.04, 11.05, or 11.06.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate, or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales, or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached to this Agreement as **Exhibit C**.

1.02.    <u>Interpretation</u>.  For purposes of this Agreement:

(a)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neutral gender shall include the masculine, feminine, and the neutral gender;

(b)    capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)    unless otherwise specified, any reference in this Agreement to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)    unless otherwise specified, any reference in this Agreement to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; notwithstanding the foregoing, any capitalized terms in this Agreement that are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date of this Agreement;

(e)    unless otherwise specified, all references in this Agreement to "Sections" are references to Sections of this Agreement;

(f)    the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

14

(g)     captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)     references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws; and

(i)     the use of "include" or "including" is without limitation, whether stated or not.

**Section 2.     *Effectiveness of this Agreement.*** This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)     each of the Company Parties, the Manager, and each of the Manager Affiliates shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties, each of the Senior Secured Agents, and the Consenting Sheridan II Subordinated Term Lenders; and

(b)     the following shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties, each of the Senior Secured Agents, and the Consenting Sheridan II Subordinated Term Lenders:

(i)     holders of more than two thirds of the aggregate outstanding principal amount of the Sheridan II RBL Claims;

(ii)     holders of more than two thirds of the aggregate outstanding principal amount of the Sheridan II Term Loan Claims; and

(iii)     holders of more than two thirds of the aggregate outstanding principal amount of the Sheridan II Subordinated Term Loan Claims; and

(c)     the Company Parties shall have paid all Consenting Lender Fees and Expenses that are due and payable as of the Agreement Effective Date; *provided, however,* that the Company Parties shall have received an invoice for such Consenting Lender Fees and Expenses at least three (3) Business Days prior to the Agreement Effective Date.

**Section 3.     *Definitive Documents.***

3.01.    The Definitive Documents governing the Restructuring Transactions shall include the following: (A) the Plan (and all exhibits, ballots, solicitation procedures, and other documents and instruments related thereto), including any "Definitive Documentation" as defined therein and not explicitly so defined herein; (B) the Confirmation Order; (C) the Financing Order, the DIP Facility Documents; (D) the Disclosure Statement; (E) the order of the Bankruptcy Court

15

approving the Disclosure Statement and the other Solicitation Materials; (F) the First Day Pleadings and all orders sought pursuant thereto; (G) the Plan Supplement; (H) any and all documentation required to implement, issue, and distribute the New Common Stock; (I) the Services Agreement; (J) the Exit Facility Documents; and (K) all documents related to the Asset Sale including, without limitation, the Asset Purchase Agreement, the Asset Sale Election Notice and the Sale Order.

3.02.   The Definitive Documents that are not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter, or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants not inconsistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 12. Further, the Definitive Documents that are not executed or in a form attached to this Agreement as of the Execution Date, and any amendments thereto, shall be in form and substance reasonably acceptable to (a) the Company Parties, (b) the Required Consenting Senior Secured Lenders, and (c) solely to the extent required under the Consenting Sheridan II Subordinated Term Lender Consent Right, the Required Consenting Sheridan II Subordinated Term Lenders. Notwithstanding anything herein to the contrary, the DIP Facility Documents, the Financing Order, the Plan (including any amendment thereto), any substantive documents related to the Asset Sale including, without limitation, the Asset Purchase Agreement, the Asset Sale Election Notice and the Sale Order, and the New Organizational Documents shall, in each case, be acceptable to the Required Consenting Senior Secured Lenders.

**Section 4.**     *Milestones.*   The following Milestones shall apply to this Agreement unless extended or waived in writing by the Company Parties and the Required Consenting Lenders:

(a)     no later than September 9, 2019, the Company Parties shall commence solicitation of votes on the Plan;

(b)     no later than September 15, 2019, the Petition Date shall have occurred;

(c)     no later than September 18, 2019 the Financing Order shall have been entered on an interim basis;

(d)     no later than October  17, 2019 the Financing Order shall have been entered on a final basis;

(e)     no later than November 14, 2019, the Bankruptcy Court shall have entered the Confirmation Order and an order approving the Disclosure Statement; and

(f)     no later than December 17, 2019, the Plan Effective Date shall have occurred.

16

**Section 5.**     *Commitments of the Consenting Lenders.*

5.01.   <u>Affirmative Commitments</u>.   During the Agreement Effective Period, each Consenting Lender severally, and not jointly, agrees in respect of all of its Company Claims/Interests to:

(a)     support the Restructuring Transactions and vote and exercise any powers or rights available to it (including in any creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(b)     give any notice, order, instruction, or direction to the applicable Agents necessary to give effect to the Restructuring Transactions;

(c)     negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are not inconsistent with this Agreement to which it is required to be a party or to which it has consent right pursuant to Section 3.02; and

(d)     negotiate in good faith any appropriate additional or alternative provisions or agreements to address any legal, financial, or structural impediment that may arise that would prevent, hinder, impede, delay, or are necessary to effectuate the consummation of the Restructuring Transactions.

5.02.   <u>Negative Commitments</u>.   During the Agreement Effective Period, each Consenting Lender severally, and not jointly, agrees in respect of all of its Company Claims/Interests that it shall not, directly or indirectly, and shall not direct any other Entity to:

(a)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)     propose, file, support, or vote for any Alternative Restructuring Proposal;

(c)     file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is materially inconsistent with this Agreement or the Plan;

(d)     take (directly or indirectly), or direct any Agent to take, any Enforcement Actions or exercise any right or remedy for the enforcement, collection, or recovery of any of the Company Claims/Interests including rights or remedies arising from or asserting or bringing any claims under or with respect to the Sheridan II RBL Facilities, Sheridan II Term Loan Facilities, the Sheridan II Subordinated Term Loan Facilities, or Hedging Claims;

(e)     initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Restructuring Transactions

17

contemplated in this Agreement against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement; or

(f)      object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code.

5.03.    <u>Commitments with Respect to Chapter 11 Cases</u>.

(a)      During the Agreement Effective Period, each Consenting Lender that is entitled to vote to accept or reject the Plan pursuant to its terms, severally, and not jointly, agrees that it shall, subject to receipt by such Consenting Lender, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials:

(i)      vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii)      to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election;

(iii)      not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (a)(i) and (ii) above;

(iv)      not directly or indirectly, through any Person, seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing, or prosecution of any Alternative Restructuring Proposal or object to or take any other action that would reasonably be expected to prevent, interfere with, delay, or impede the solicitation, approval of the Disclosure Statement, or the confirmation and consummation of the Plan and the Restructuring Transactions; *provided* that nothing in this Section 5.03(a)(iv) shall affect any rights of the Consenting Lenders set forth in 7.03(b); and

(v)      support and take all actions reasonably requested by the Company Parties to facilitate the solicitation, approval of the Disclosure Statement, and confirmation and consummation of the Plan within the timeframes contemplated by this Agreement.

(b)      During the Agreement Effective Period, each Consenting Lender, in respect of each of its Company Claims/Interests, severally, and not jointly, will support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is not inconsistent with this Agreement.

18

5.04.   Forbearance Agreements.

(a)      Each Consenting Sheridan II Revolving Lender, by signing this Agreement, agrees to extend the Forbearance Period and Limited Waiver Period (each as defined in each of the Sheridan II RBL Forbearance Agreements) through the earlier of September 15, 2019 and the Petition Date.

(b) Each Consenting Sheridan II Term Lender, by signing this Agreement, agrees to extend the Limited Waiver Period (as defined in each of the Sheridan II Term Loan Limited Waivers) through the earlier of September 15, 2019 and the Petition Date.

(c)      Notwithstanding anything herein to the contrary, all parties' respective rights under the Sheridan II RBL Forbearance Agreements and the Sheridan II Term Loan Limited Waivers are reserved.

5.05.   Hedging Contracts.  To the extent any Consenting Lender holds Hedging Contracts, during the Agreement Effective Period, such Consenting Lender agrees to not take any action to exercise remedies with respect to the Hedging Contracts unless otherwise agreed by the Company Parties and such Consenting Lender.

5.06.   Additional Provisions Regarding the Consenting Lenders' Commitments. Notwithstanding anything contained in this Agreement, nothing in this Agreement shall:

(a)      be construed to prohibit any Consenting Lender from appearing as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and are not for the purpose of delaying, interfering, impeding, or taking any other action to delay, interfere or impede, directly or indirectly, the Restructuring Transactions;

(b)      affect the ability of any Consenting Lender to consult with any other Consenting Stakeholder, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee);

(c)      impair or waive the rights of any Consenting Lender to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions;

(d)      prevent any Consenting Lender from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement; or

(e)      obligate a Consenting Lender to deliver a vote to support the Plan or prohibit a Consenting Lender from withdrawing such vote, in each case from and after the Termination Date (other than a Termination Date as a result of the occurrence of the Plan Effective Date); it being understood that upon the Termination Date as to a Consenting Lender (other than a Termination Date as a result of the occurrence of the Plan Effective Date), such Consenting Lender's vote shall

19

automatically be deemed void *ab initio* and such Consenting Lender shall have a reasonable opportunity to cast a vote.

**Section 6.**     *Commitments of the Manager Parties*.

6.01.   <u>Affirmative Commitments</u>.  During the Agreement Effective Period, each of the Manager Parties severally, and not jointly, agrees to:

(a)     support the Restructuring Transactions and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(b)     negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are not inconsistent with this Agreement to which it is required to be a party; and

(c)     negotiate in good faith any appropriate additional or alternative provisions or agreements to address any legal, financial, or structural impediment that may arise that would prevent, hinder, impede, delay, or are necessary to effectuate the consummation of the Restructuring Transactions.

6.02.   <u>Negative Commitments.</u> During the Agreement Effective Period, each of Manager Parties severally, and not jointly, agrees that it shall not, directly or indirectly, and shall not direct any other Entity to:

(a)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)     propose, file, support, or vote for any Alternative Restructuring Proposal;

(c)     file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is materially inconsistent with this Agreement or the Plan;

(d)     initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Restructuring Transactions contemplated in this Agreement against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement; or

(e)     object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code.

6.03.   <u>Commitments with Respect to Chapter 11 Cases.</u>  During the Agreement Effective Period, each of the Manager Parties severally, and not jointly, agrees that it shall, for the duration of the Agreement Effective Period, shall:

(a)     if solicited, timely vote or cause to be voted its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot or ballots on a timely basis following the commencement of the solicitation;

(b)     not change or withdraw (or cause or direct to be changed or withdrawn) any such vote described in clause (a) above or release described in clause (c) below;

(c)     agree to provide, and to not opt out of or object to, the releases set forth in the Plan against each Released Party;

(d)     if solicited, timely vote (or cause to be voted) its Company Claims/Interests against any Alternative Restructuring Proposal;

(e)     not directly or indirectly, through any Person, seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing, or prosecution of any Alternative Restructuring Proposal or object to or take any other action that would reasonably be expected to prevent, interfere with, delay, or impede the solicitation, approval of the Disclosure Statement, or the confirmation and consummation of the Plan and the Restructuring Transactions; and

(f)     support and take all actions necessary or reasonably requested by the Company Parties to facilitate the solicitation, approval of the Disclosure Statement, and confirmation and consummation of the Plan within the timeframes contemplated by this Agreement.

6.04.   <u>Additional Provisions Regarding the Manager Parties' Commitments.</u>

(a)     Notwithstanding anything contained in this Agreement, nothing in this Agreement shall:

(i)     impair or waive the rights of any Manager Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions;

(ii)    affect the ability of any Manager Party to consult with any Consenting Stakeholder, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee);

21

(iii)     restrict any representative or Governing Body of any Company Party, or any Manager Party in its capacity as manager or operator of any Company Party, from exercising its rights under Sections 7.03 or 11.03(b) of this Agreement or causing a Company Party or the Governing Body of a Company Party to exercise its rights under such provisions;

(iv)     restrict any Manager Party in its capacity as the manager or operator of fund Entities other than the Company Parties; or

(v)     prevent any Manager Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

(b)     Notwithstanding anything to the contrary in this Agreement, in no event shall a Manager Party be liable for money damages for any breach of this Agreement, and any remedy by any Party against a Manager party for any breach of this Agreement shall be limited to specific performance pursuant to Section 14.14; *provided*, *however*, that in no event shall a Manager Party be liable to any other Manager Party for any breach of this Agreement, whether for money damages, specific performance, or otherwise.  In the event of a breach by any Manager Party of any representation, warranty, covenant, or other provision of this Agreement that gives rise to a termination right under Section 11.01, then, upon notice to the Parties prior to the Plan Effective Date in accordance with Section 14.10, the Releases by and in favor of such Manager Party shall be fully revoked and deemed null and void.

**Section 7.     *Commitments of the Company Parties.***

7.01.  <u>Affirmative Commitments</u>.   Except as set forth in Section 7.03, during the Agreement Effective Period, each of the Company Parties agrees to:

(a)     support and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement;

(b)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated in this Agreement, support and take all steps reasonably necessary and desirable to address any such impediment;

(c)     use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring Transactions;

(d)     negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(e)     (i) provide counsel for the Consenting Lenders a reasonable opportunity (which, to the extent reasonably practicable, shall be no less than two (2) Business Days) to review draft copies of all pleadings, motions, and proposed orders (including without limitation the First Day

22

Pleadings and all "second day" motions) that affect or may affect the Consenting Lenders and, (ii) provide a reasonable opportunity (which, to the extent reasonably practicable, shall be no less than two (2) Business Days) to counsel to the Senior Secured Agents and the Consenting Sheridan II Subordinated Term Lenders to review draft copies of other documents that the Company Parties intend to file with the Bankruptcy Court if such a filing affects or may affect any Consenting Lender, as applicable;

(f)       actively oppose and object to the efforts of any person seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions (including, if applicable, the filing of timely filed objections or written responses) to the extent such opposition or objection is reasonably necessary or desirable to facilitate implementation of the Restructuring Transactions;

(g)       consult and negotiate in good faith with the Consenting Stakeholders and their advisors regarding the execution of Definitive Documents and the implementation of the Restructuring Transactions;

(h)       upon reasonable request of the Consenting Lenders, inform the advisors to the Consenting Lenders as to: (i) the material business and financial (including liquidity) performance of the Company Parties; (ii) the status and progress of the Restructuring Transactions, including progress in relation to the negotiations of the Definitive Documents; and (iii) the status of obtaining any necessary or desirable authorizations (including any consents) from each Consenting Lender, any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body or any stock exchange;

(i)       inform counsel to the Senior Secured Agents and the Consenting Sheridan II Subordinated Term Lenders as soon as reasonably practicable after becoming aware of: (i) any matter or circumstance which they know, or believe is likely, to be a material impediment to the implementation or consummation of the Restructuring Transactions; (ii) any notice of any commencement of any material involuntary insolvency proceedings, legal suit for payment of debt or securement of security from or by any person in respect of any Company Party; (iii) a breach of this Agreement (including a breach by any Company Party); and (iv) any representation or statement made or deemed to be made by them under this Agreement which is or proves to have been incorrect or misleading in any material respect when made or deemed to be made;

(j)       use commercially reasonable efforts to maintain their good standing under the Laws of the state or other jurisdiction in which they are incorporated or organized;

(k)       use commercially reasonable efforts to seek additional support for the Restructuring from their other material stakeholders to the extent reasonably prudent and, to the extent the Company Parties receive any Joinders or Transfer Agreements, to notify the Consenting Lenders of such Joinders and Transfer Agreements; and

(l)      file the Asset Sale Election Notice if requested by the Required Consenting Senior Secured Lenders in accordance with the Plan.

7.02.    <u>Negative Commitments</u>.  Except as set forth in Section 7.03, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)      take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions described in, this Agreement or the Plan;

(c)      file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is materially inconsistent with this Agreement, the Plan or the Definitive Documents;

(d)      modify any Definitive Document, in whole or in part, in a manner that is inconsistent with this Agreement; or

(e) (i) operate its business outside the ordinary course, taking into account the Restructuring Transactions, without the consent of the Required Consenting Senior Secured Lenders or (ii) transfer any asset or right of the Company Parties or any asset or right used in the business of the Company Parties to any person or entity outside the ordinary course of business without the consent of the Required Consenting Senior Secured Lenders;

(f) take, or fail to take, any action that would cause a change to the tax status of any Company Party; or

(g) engage in any material merger, consolidation, disposition, acquisition, investment, dividend, incurrence of indebtedness or other similar transaction outside of the ordinary course of business other than the transactions contemplated herein.

7.03.    <u>Additional Provisions Regarding Company Parties' Commitments</u>.

(a)      Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the Governing Body of a Company Party to take or refrain from taking any action with respect to the Restructuring Transaction (including terminating this Agreement under <u>Section 11</u>) to the extent such person or persons determines, based on the advice of counsel, that taking or refraining from taking such action, as applicable, that would be inconsistent with applicable Law or its fiduciary obligations under applicable Law.  The Company Parties shall give prompt written notice to the Consenting Stakeholders of any determination made in accordance with this Section 7.03(a).  This Section 7.03(a) shall not impede any Party's right to

24

terminate this Agreement pursuant to Section 11, including, for the avoidance of doubt, the Consenting Lenders' rights to terminate in accordance with Section 11.01.

(b)      Notwithstanding anything to the contrary in this Agreement, upon receipt of an unsolicited Alternative Restructuring Proposal, each Company Party and their respective directors, managers, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives (including any Governing Body members) shall have the rights to:  (i) consider, respond to, and facilitate such Alternative Restructuring Proposal; (ii) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity in connection with such proposal; (iii) maintain or continue discussions or negotiations with respect to such Alternative Restructuring Proposal; (iv) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiations of such Alternative Restructuring Proposal; and (v) enter into or continue discussions or negotiations with holders of Company claims/Interests (including any Consenting Stakeholder) regarding the Restructuring Transactions or such Alternative Restructuring Proposal; *provided* that if any Company Party, receives an unsolicited Alternative Restructuring Proposal, then such Company Party shall (A) within one business day of receiving such proposal, notify counsel to the Senior Secured Agents and the Consenting Sheridan II Subordinated Term Lenders of the receipt of such proposal; (B) provide counsel to the Senior Secured Agents and the Consenting Sheridan II Subordinated Term Lenders with regular updates as to the status and progress of such Alternative Restructuring Proposal; and (C) use commercially reasonable efforts to respond promptly to reasonable information requests and questions from counsel to the Senior Secured Agents and Consenting Sheridan II Subordinated Term Lenders relating to such Alternative Restructuring Proposal.

(c)      Nothing in this Agreement shall: (i) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the implementation of the Restructuring Transactions; (ii) affect the ability of any Company Party to consult with any Consenting Stakeholder or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee); or (iii) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 8.**      *Transfer of Company Claims/Interests.*

8.01.   During the Restricted Period, no Consenting Stakeholder shall Transfer any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)      the transferee is either (i) a qualified institutional buyer as defined in Rule 144A under the Securities Act, (ii) a non-U.S. person in an offshore transaction as defined in Regulation S under the Securities Act, (iii) an institutional accredited investor (as defined in the Rules), and

Case 19-35198   Document 4   Filed in TXSB on 09/15/19   Page 86 of 177

in each case executes and delivers to the applicable Agent and counsel to the Company Parties, at or before the time of the proposed Transfer, a fully executed Transfer Agreement; or

(b)     the transferee is a Consenting Stakeholder and the transferee provides notice of such Transfer (including the amount and type of Company Claim/Interest Transferred) to counsel to the Company Parties at or before the time of the proposed Transfer.

8.02.   Upon compliance with the requirements of Section 8.01, the transferor of any Company Claims/Interests shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests.  Any Transfer in violation of Section 8.01 shall be void *ab initio*.

8.03.   This Agreement shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Company Claims/Interests.   Notwithstanding the foregoing, (a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to any of the Senior Secured Agents and Consenting Sheridan II Subordinated Term Lenders) and (b) such Consenting Stakeholder must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to the Company Parties within five (5) Business Days of such acquisition.

8.04.   This Section 8 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Company Claims/Interests.   Notwithstanding anything to the contrary in this Agreement, if a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

8.05.   Notwithstanding Section 8.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if (a) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (b) the transferee otherwise is a Permitted Transferee under Section 8.01; and (c) the Transfer otherwise is permitted under Section 8.01.  If a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title, or interests in Company Claims/Interests that the Qualified Marketmaker acquires from

a holder of the Company Claims/Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee.

8.06.   Notwithstanding anything to the contrary in this Section 8, the restrictions on Transfer set forth in this Section 8 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 9.**   ***Representations and Warranties of Consenting Lenders.***  Each Consenting Lender severally, and not jointly, represents and warrants that, as of the date such Consenting Lender executes and delivers this Agreement and as of the Plan Effective Date:

(a)   it is the beneficial or record owner of the aggregate principal amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests other than those reflected in, such Consenting Lender's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 8);

(b)   it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims/Interests;

(c)   such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Lender's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)   solely with respect to holders of Company Claims/Interests, (i) it is either (A) a qualified institutional buyer as defined in the provisions of Rule 144A promulgated under the Securities Act, (B) not a U.S. person (as defined in Regulation S under the Securities Act), or (C) an institutional accredited investor (as defined in the Rules under the Securities Act), and in each case is able to bear the risk of its investment in the Company Claims/Interests, and (ii) any securities acquired by the Consenting Stakeholder in connection with the Restructuring Transactions (A) will have been acquired for investment for its own account and not with a view to distribution or resale in violation of the Securities Act and (B) will not have been registered under the Securities Act or under the "blue sky" laws of any jurisdiction and may be resold or transferred only if registered pursuant to the provisions of the Securities Act (or if eligible, pursuant to the provisions of Rule 144 promulgated under the Securities Act or pursuant to another available exemption from the registration requirements of the Securities Act); and

(e)   it has the full power to vote, approve changes to, and transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law.

**Section 10.**   *Mutual Representations and Warranties*.   Each Party hereto, represents and warrants that, as of the date such Party executes and delivers this Agreement and as of the Plan Effective Date:

(a)   it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)   except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by any other Entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)   the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association, or other constitutional documents;

(d)   except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(e)   except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement; and

(f)   to the extent a Party is a Released Party, such Party has not assigned, conveyed, sold, hypothecated or otherwise transferred all, any part of or any interest in any Cause of Action that would be a Released Claim hereunder.

**Section 11.**   *Termination Events*.

11.01.   <u>Required Consenting Senior Secured Lender Termination Events</u>.  The Required Consenting Senior Secured Lenders may terminate this Agreement solely as to the Consenting Sheridan Senior Secured Lenders upon prior written notice to all Parties in accordance with Section 14.10 of this Agreement upon the occurrence of any of the following events:

(a)   the breach in any material respect by a Company Party, Manager Party, or Consenting Sheridan II Subordinated Term Lender of any of the representations, warranties, or covenants of such Company Party, such Manager Party, or such Consenting Sheridan II Subordinated Term Lender as applicable, set forth in this Agreement that would have, or could reasonably be expected to have, an adverse effect on the Restructuring Transaction, which breach

28

remains uncured for five (5) Business Days after such terminating Required Consenting Senior Secured Lenders transmit a written notice in accordance with Section 14.10 of this Agreement detailing any such breach;

(b)     any of the Company Parties files or otherwise makes public any of the Definitive Documents (including any modification or amendments thereto) (i) in a form that is materially inconsistent with this Agreement and (ii) without the consent of the applicable Required Consenting Senior Secured Lenders in accordance with this Agreement, which occurrence remains uncured (to the extent curable) for five (5) Business Days after such terminating Consenting Lender transmits a written notice in accordance with Section 14.10;

(c)     the Company Parties (i) withdraw the Plan, (ii) publicly announce their intention not to support the Restructuring Transactions, or (iii) publicly announce, or execute a definitive written agreement with respect to an Alternative Restructuring Proposal;

(d)     any of the Company Parties (i) files any motion seeking to avoid, disallow, subordinate, or recharacterize any Sheridan II RBL Claims, Sheridan II Term Loan Claims, or Sheridan II Subordinated Term Loan Claims, lien, or interest held by any Consenting Lender arising under or relating to the Sheridan II RBL Credit Agreements, Sheridan II Term Loan Credit Agreements, or Sheridan II Subordinated Term Loan Credit Agreements or (ii) shall have supported any application, adversary proceeding, or cause of action referred to in the immediately preceding clause (i) filed by a third party, or consents to the standing of any such third party to bring such application, adversary proceeding, or cause of action;

(e)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling, judgment or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) either (1) such ruling, judgment or order has been issued at the request of any of the Company Parties in contravention of any obligations set forth in this Agreement or (2) remains in effect for ten (10) Business Days after such terminating Consenting Lenders transmit a written notice in accordance with Section 14.10 of this Agreement detailing any such issuance; notwithstanding the foregoing, this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(f)     the Bankruptcy Court enters an order denying confirmation of the Plan and such order remains in effect for ten (10) Business Days after entry of such order;

(g)     the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Senior Secured Lenders), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, (iii) dismissing one

29

or more of the Chapter 11 Cases of a Company Party, (iv) terminating exclusivity under Section 1121 of the Bankruptcy Code, or (v) rejecting this Agreement; or

(h)     if any Company Party (i) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, receivership, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect, except as contemplated by this Agreement, (ii) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described in the preceding subsection (i), (iii) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator or similar official with respect to any Company Party or for a substantial part of such Company Party's assets, (iv) makes a general assignment or arrangement for the benefit of creditors, or (v) takes any corporate action for the purpose of authorizing any of the foregoing;

(i)     the termination of this Agreement by the Required Consenting Sheridan II Subordinated Term Lenders pursuant to Section 11.02; or

(j)     the failure to meet a Milestone, which has not been waived or extended in a manner consistent with this Agreement, unless such failure is the result of any act, omission, or delay on the part of the terminating Consenting Stakeholder in violation of its obligations under this Agreement.

11.02.   Required Consenting Sheridan II Subordinated Term Lender Termination Events. The Required Consenting Sheridan II Subordinated Term Lenders may terminate this Agreement solely as to the Consenting Sheridan II Subordinated Term Lenders by delivery to the Company Parties and the Senior Secured Agents of a written notice in accordance with Section 14.10 of this Agreement upon the occurrence of the following events:

(a)     the breach in any material respect by a Company Party, a Manager Party, or a Consenting Senior Secured Lender of any of the representations, warranties, or covenants of such Company Party, such Manager Party, or such Consenting Senior Secured Lender as applicable, set forth in this Agreement that would have, or could reasonably be expected to have, an adverse effect on the Consenting Sheridan II Subordinated Term Lenders, which breach remains uncured for five (5) Business Days after such terminating Required Consenting Sheridan II Subordinated Term Lenders transmit a written notice in accordance with Section 14.10 of this Agreement detailing any such breach;

(b)     the Company Parties (i) withdraw the Plan, (ii) publicly announce their intention not to support the Restructuring Transactions, or (iii) publicly announce, or execute a definitive written agreement with respect to an Alternative Restructuring Proposal;

(c)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling, judgment or order that (i)

30

enjoins the consummation of a material portion of the Restructuring Transactions and (ii) either (1) such ruling, judgment or order has been issued at the request of any of the Company Parties in contravention of any obligations set forth in this Agreement or (2) remains in effect for ten (10) Business Days after such terminating Consenting Sheridan II Subordinated Term Lenders transmit a written notice in accordance with Section 14.10 of this Agreement detailing any such issuance; notwithstanding the foregoing, this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(d)      any of the Company Parties (i) files any motion seeking to avoid, disallow, subordinate, or recharacterize any Sheridan II Subordinated Term Loan Claim or any interest held by any Consenting Lender arising under or relating to the Sheridan II Subordinated Term Loan Credit Agreements or (ii) shall have supported any application, adversary proceeding, or cause of action referred to in the immediately preceding clause (i) filed by a third party, or consents to the standing of any such third party to bring such application, adversary proceeding, or cause of action;

(e)      the Bankruptcy Court enters an order denying confirmation of the Plan and such order remains in effect for ten (10) Business Days after entry of such order;

(f)      if any Company Party (i) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, receivership, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect, except as contemplated by this Agreement, (ii) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described in the preceding subsection (i), (iii) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator or similar official with respect to any Company Party or for a substantial part of such Company Party's assets, (iv) makes a general assignment or arrangement for the benefit of creditors, or (v) takes any corporate action for the purpose of authorizing any of the foregoing;

(g)      the termination of this Agreement by the Required Consenting Senior Secured Lenders pursuant to Section 11.01; or

(h)      the failure to meet a Milestone, which has not been waived or extended in a manner consistent with this Agreement, unless such failure is the result of any act, omission, or delay on the part of the terminating Consenting Stakeholder in violation of its obligations under this Agreement.

11.03.  <u>Company Party Termination Events.</u>  Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 14.10 of this Agreement upon the occurrence of any of the following events:

(a)      the breach in any material respect by one or more of the Consenting Lenders of any of the representations, warranties, or covenants of the Consenting Lenders set forth in this

31

Agreement that would have, or could reasonably be expected to have, an adverse effect on the Restructuring Transaction, which breach remains uncured for five (5) Business Days after such terminating Company Party transmits a written notice in accordance with Section 14.10 of this Agreement detailing any such breach, but only if the non-breaching Consenting Lenders hold less than two thirds of the Sheridan II RBL Claims, Sheridan II Term Loan Claims, and Sheridan II Subordinated Term Loan Claims, calculated separately;

(b)        the Governing Body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(c)        the Bankruptcy Court enters an order denying confirmation of the Plan and such order remains in effect for ten (10) Business Days after entry of such order; or

(d)        the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for ten (10) Business Days after such terminating Company Party transmits a written notice in accordance with Section 14.10 of this Agreement detailing any such issuance; notwithstanding the foregoing, this termination right shall not apply to or be exercised by any Company Party if any Company Party or Manager Party sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement.

11.04.    <u>Manager Entity Termination Events.</u>    This Agreement may be terminated by a Manager Party in respect of such Manager Party by the delivery to the Company Parties of a written notice in accordance with Section 14.10 of this Agreement upon the occurrence of the following events:

(a)        the breach in any material respect by a Company Party or Consenting Lender of any of the representations, warranties, or covenants of the Company Parties or Consenting Lender, as applicable, set forth in this Agreement that (i) adversely affects the treatment, right or obligations under this Agreement or the Plan of any Manager Parties and (ii) remains uncured for five (5) Business Days after such terminating Manager Parties transmit a written notice in accordance with Section 14.10 of this Agreement detailing any such breach; or

(b)        the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling, judgment or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) either (1) such ruling, judgment or order has been issued at the request of any of the Company Parties in contravention of any obligations set forth in this Agreement or (2) remains in effect for five (5) Business Days after such terminating Manager Parties transmit a written notice in accordance with Section 14.10 of this Agreement detailing any such issuance; notwithstanding the foregoing, this

32

termination right may not be exercised by any Manager Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement.

11.05.  <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following:  (a) the Required Consenting Stakeholders; and (b) each Company Party.

11.06.  <u>Automatic Termination</u>.  This Agreement shall terminate automatically without any further required action or notice immediately after the Plan Effective Date.

11.07.  <u>Effect of Termination.</u>  After the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or Causes of Action that otherwise would have been subject to the Releases, subject to Section 14.21 herein.  Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise.  Notwithstanding the foregoing, any Consenting Stakeholder withdrawing or changing its vote pursuant to this Section 11.07 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with the terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing in this Agreement is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder, and (b) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Stakeholder.  No purported termination of this Agreement shall be effective under this Section 11.07 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Sections 11.03(b) or 11.05.  Nothing in this Section 11.07 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 11.03(b) or affect any Party's rights under Section 14.21.

**Section 12.**      *Amendments and Waivers*.

(a)      This Agreement, including the form of Plan attached hereto, may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 12.

(b)      This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in writing signed by: (i) each Company Party, (ii) the Required Consenting Sheridan II Revolving Lenders, (iii) the Required Consenting Sheridan II Term Lenders, (iv) the Required Consenting Sheridan II Subordinated Term Lenders, and (v) each Manager Party; *provided* that in the case of the Required Consenting Sheridan II Revolving Lenders, the Required Consenting Sheridan II Term Lenders, and the Manager Parties, consent shall not be unreasonably withheld to any modification, amendment, waiver, or supplement that does not adversely affect their rights, unless otherwise specified in this agreement; and *provided*, *further* that in the case of the Required Consenting Sheridan II Subordinated Term Lenders, (x) consent shall be required solely to the extent required under the Consenting Sheridan II Subordinated Term Lender Consent Right and (y) any Milestone may be extended by up to 30 days with the consent of only the Company Parties and the Required Consenting Senior Secured Lenders. Notwithstanding the foregoing, if the proposed modification, amendment, waiver, or supplement has a material, disproportionate, and adverse effect on any of the Company Claims/Interests held by a Consenting Stakeholder, then the consent of each such affected Consenting Stakeholder shall also be required to effectuate such modification, amendment, waiver, or supplement.

(c)      Any proposed modification, amendment, waiver, or supplement that does not comply with this Section 12 shall be ineffective and void *ab initio*.

(d)      The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power, or remedy by such Party preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power, or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 13.**      *Mutual Releases*.

13.01.   Releases.

(a)      Releases by the Company Releasing Parties. Except as expressly set forth in this Agreement, effective on (i) the Agreement Effective Date and (ii) the Plan Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever

34

released and discharged by the Company Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of, the foregoing Entities, from any and all Causes of Action, including any derivative claims asserted on behalf of the Company Releasing Parties, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Company Releasing Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Equity Interest in, a Company Releasing party, based on or relating to, or in any manner arising from, in whole or in part, the Company Parties, their capital structure, the assertion or enforcement of rights and remedies against the Company Parties' out-of-court restructuring efforts, intercompany transactions between or among a Company Party and another Company Party, the formulation, preparation, dissemination, negotiation, or filing of this Agreement, the Definitive Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with this Agreement or the Definitive Documents, the pursuit of consummation, the administration and implementation of the Restructuring Transaction, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Company Parties taking place on or before, in respect of the forgoing clause (i), the Agreement Effective Date and, in respect of the forgoing clause (ii), the Plan Effective Date.

(b)      Releases by the Consenting Stakeholder Releasing Parties.  Except as expressly set forth in this Agreement, effective on (i) the Agreement Effective Date and (ii) the Plan Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Consenting Stakeholder Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Company Parties, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Company Parties, their capital structure, the assertion or enforcement of rights and remedies against the Company Parties' out-of-court restructuring efforts, intercompany transactions between or among a Company Party and another Company Party, the formulation, preparation, dissemination, negotiation, or filing of this Agreement, the Definitive Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with this Agreement or the Definitive Documents, the pursuit of consummation, the administration and implementation of the Restructuring Transaction, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Company Parties taking place on or before, in respect of the foregoing clause (i), the Agreement Effective Date and, in respect of the foregoing clause (ii), the Plan Effective Date.

35

13.02.  No Additional Representations and Warranties.  Each of the Parties agrees and acknowledges that, except as expressly provided in this Agreement and the Definitive Documents, no other Party, in any capacity, has warranted or otherwise made any representations concerning any Released Claim (including any representation or warranty concerning the existence, non-existence, validity, or invalidity of any Released Claim).  Notwithstanding the foregoing, nothing contained in this Agreement is intended to impair or otherwise derogate from any of the representations, warranties, or covenants expressly set forth in this Agreement or any of the Definitive Documents.

13.03.  Release of Unknown Claims.  Each of the Releasing Parties in each of the Releases contained in this Agreement expressly acknowledges that although ordinarily a general release may not extend to Released Claims which the Releasing Party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, they have carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or claims.  Without limiting the generality of the foregoing, each Releasing Party expressly waives and relinquishes any and all rights such Party may have or conferred upon it under any federal, state, or local statute, rule, regulation, or principle of common law or equity which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of providing the Release or which may in any way limit the effect or scope of the Releases with respect to Released Claims which such Party did not know or suspect to exist in such Party's favor at the time of providing the Release, which in each case if known by it may have materially affected its settlement with any Released Party including any rights under Section 1542 of the California Civil Code or any analogous applicable state or federal law or regulation.  Each of the Releasing Parties expressly acknowledges that the Releases and covenants not to sue contained in this Agreement are effective regardless of whether those released matters or Released Claims are presently known or unknown, suspected or unsuspected, or foreseen or unforeseen.

To the extent that the foregoing releases are releases to which Section 1542 of the California Civil Code or similar provisions of other applicable law applies, it is the intention of the Parties that the foregoing releases shall be effective as a bar to any and all Claims of whatsoever character, nature and kind, known or unknown, suspected or unsuspected specified in this Agreement. In furtherance of this intention, the Parties expressly waive any and all rights and benefits conferred upon them by the provisions of Section 1542 of the California Civil Code or similar provisions of applicable law, which are as follows:

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."**

36

The Parties acknowledge that the foregoing waiver of the provisions of Section 1542 of the California Civil Code was bargained for separately. Thus, notwithstanding the provisions of Section 1542 of the California Civil Code, and for the purpose of implementing a full and complete release and discharge of the Parties, and each of them, each Party expressly acknowledges that this Agreement is intended to include in its effect without limitation all of the claims, causes of action and liabilities which the Parties, and each of them do not know or suspect to exist in their favor at the time of execution of this Agreement, and this Agreement contemplates extinguishment of all such claims, causes of action and liabilities.

13.04.   <u>Turnover of Subsequently Recovered Assets</u>.  In the event that any Releasing Party (including any successor or assignee thereof and including through any third party, trustee, debtor in possession, creditor, estate, creditors' committee, or similar Entity) is successful in pursuing or receives, directly or indirectly, any funds, property, or other value on account of any Claim, Cause of Action, or litigation against any Released Party that was released pursuant to the Release, such Releasing Party (i) shall not commingle any such recovery with any of its other assets and (ii) agrees that it shall promptly turnover and assign any such recoveries to, and hold them in trust for, such Released Party.  In the event that any Releasing Party (including any successor or assignee thereof and including through any third party, trustee, debtor in possession, creditor, estate, creditors' committee, or similar Entity) recovers any funds, property, or other value pursuant to the Subordination Agreements (as defined in the Plan) solely on account of any Claim, Cause of Action, or litigation against any Released Party that was released pursuant to the Release (or would have been released pursuant to the Release if the party bringing such claim were a Releasing Party), such Releasing Party (x) shall not commingle any such recovery with any of its other assets and (y) agrees that it shall, subject to the proviso below, promptly turn over and assign any such recoveries to, and hold them in trust for such Released Party; *provided, however*, that, (A) this shall not apply to any such funds, property, or other value recovered on account of any policies of insurance in which the Reorganized Debtors have an interest or that provide or may provide coverage for the Reorganized Debtors, or any other source other than (i) funds of the Released Party or (ii) funds from a third party to whom the Released Party has a legal or contractual obligation to reimburse such funds and (B) to the extent the Reorganized Debtors are required to indemnify the Released Party or otherwise make out-of-pocket payments on account thereof, such Releasing Party shall hold such recoveries in trust and turnover such recoveries to the Reorganized Debtors (as defined in the Plan); *provided further*, *however*, that any such recoveries shall first be reduced by any reasonable and documented fees and expenses of the Releasing Parties or the Reorganized Debtors (as applicable), including attorney's fees, in connection with the foregoing; *provided*, *further*, *however*, that any distributions made pursuant to the Plan, including any proceeds related thereto, shall not be subject to the Subordination Agreements.  For the avoidance of doubt, any and all rights, claims, Causes of Action, payments, or distributions arising from, related to, or made on account of the New Common Stock shall not be subject to the Subordination Agreements.

13.05.   <u>Certain Limitations on Releases.</u>  For the avoidance of doubt, nothing in this Agreement and the Releases contained in this Section 13 shall or shall be deemed to result in the

waiving or limiting by (a) the Company Parties, the Manager Parties, or any officer, director, member of any Governing Body, or employee thereof of (i) any indemnification against any Company Party, any Manager Party, any of their insurance carriers, or any other Entity, (ii) any rights as beneficiaries of any insurance policies, (iii) wages, salaries, compensation, or benefits, (iv) intercompany claims, or (v) any Equity Interests in any Company Party, Manager Party, or any other Entity; (b) the Consenting Lenders or the Agents of any "Obligations" under and as defined in each of the Sheridan II RBL Credit Agreements, the Sheridan II Term Loan Credit Agreements, the Sheridan II Subordinated Term Loan Credit Agreements, or any other financing document (except as may be expressly amended or modified by the Plan and the Exit Facility Credit Agreements, or any other financing document under and as defined therein); (c) any party of any obligations related to customary banking products, banking services or other financial accommodations (except as may be expressly amended or modified by the Plan and the Exit Facility Credit Agreements, or any other financing document under and as defined therein); and (d) any party of any post-Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, the Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facility Documents, or any Claim or obligation arising under the Plan.

13.06.   <u>Covenant Not to Sue</u>.  Each of the Releasing Parties hereby further agrees and covenants not to, and shall not, commence or prosecute, or assist or otherwise aid any other Entity in the commencement or prosecution of, whether directly, derivatively or otherwise, any Released Claims.

**Section 14.**   *Miscellaneous.*

14.01.   <u>Acknowledgement</u>.  Notwithstanding any other provision of this Agreement, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

14.02.   <u>Exhibits Incorporated by Reference; Conflicts</u>.  Each of the exhibits, annexes, signatures pages, and schedules attached to this Agreement is expressly incorporated and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules attached to this Agreement) and the exhibits, annexes, and schedules attached to this Agreement, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

14.03.   <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters specified in this Agreement, as may be reasonably appropriate or necessary, or as may be required

by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

14.04.  <u>Complete Agreement</u>.  Except as otherwise explicitly provided in this Agreement, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter of this Agreement and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.  The Parties acknowledge and agree that they are not relying on any representations or warranties other than as set forth in this Agreement.

14.05.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN THE CHOSEN STATE, WITHOUT GIVING EFFECT TO ITS CONFLICT OF LAWS PRINCIPLES.  Each Party to this Agreement agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Chosen Court; provided that nothing in this Agreement shall prevent the Company Parties from commencing the Chapter 11 Cases in the Bankruptcy Court.  Solely in connection with claims arising under this Agreement, each Party to this Agreement:  (a) irrevocably submits to the exclusive jurisdiction of the Chosen Court; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Court; and (c) waives any objection that the Chosen Court is an inconvenient forum or does not have jurisdiction over any Party to this Agreement.

14.06.  <u>TRIAL BY JURY WAIVER</u>.  EACH PARTY TO THIS AGREEMENT IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

14.07.  <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each Person executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

14.08.  <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders, and in the enforcement or interpretation of this Agreement, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion of this Agreement, shall not be effective in regard to the interpretation of this Agreement.  The Company Parties and the Consenting Stakeholders were

39

each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

14.09.   <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third-party beneficiaries under this Agreement, and, except as set forth in Section 8, the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other Entity.

14.10.   <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)      if to a Company Party, to:

c/o Sheridan Production Company, LLC
1360 Post Oak Blvd., Suite 2500
Houston, Texas 77056
Attention:  Cheryl S. Phillips, Vice President and General Counsel
E-mail address:  cheryl.phillips@sheridanproduction.com

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Joshua Sussberg and Steven Serajeddini
E-mail address:  joshua.sussberg@kirkland.com and
steven.serajeddini@kirkland.com

-and-

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois 60654
Attention:  Spencer Winters
E-mail address:  spencer.winters@kirkland.com

(b)      if to a Consenting Sheridan I Revolving Lender, to:

Vinson & Elkins LLP
2001 Ross Avenue, Suite 3900
Dallas, TX 75201-2975
Attn.:  William L. Wallander and Erec Winandy

40

(c)        if to a Consenting Sheridan I Term Lender, to:

        Davis Polk & Wardwell LLP
        450 Lexington Avenue,
        New York, New York 10017
        Attn.:  Damian S. Schaible, Nate Sokol, and Stephen D. Piraino

(d)        if to a Consenting Sheridan I Subordinated Term Lender, to:

        Weil, Gotshal & Manges LLP
        767 5th Avenue
        New York, New York 10153
        Attn: Matt Barr and Gabriel A. Morgan


(e)        if to a Manager Affiliate, to:

        Sheridan Production Company, LLC
        1360 Post Oak Blvd., Suite 2500
        Houston, Texas 77056
        Attention:  Cheryl S. Phillips, Vice President and General Counsel
        E-mail address:  cheryl.phillips@sheridanproduction.com

        and

        Warburg Pincus LLC
        450 Lexington Avenue
        New York, NY  10017
        Attention:  Harsha Marti
        E-mail address:  harsha.marti@warburgpincus.com

        and

        Willkie Farr & Gallagher LLP
        787 Seventh Avenue
        New York, NY 10019
        Attention: Brian Lennon
        E-mail address: blennon@willkie.com

(f)        if to Manager, to:

        Sheridan Production Company, LLC
        1360 Post Oak Blvd., Suite 2500

Houston, Texas 77056
Attention:  Cheryl S. Phillips, Vice President and General Counsel
E-mail address:  cheryl.phillips@sheridanproduction.com

Any notice given by delivery, mail, or courier shall be effective when received.

14.11.  <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Stakeholder confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.  Each Consenting Stakeholder acknowledges and agrees that it is not relying on any representations or warranties other than as set forth in this Agreement.

14.12.  <u>Enforceability of Agreement</u>.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

14.13.  <u>Admissibility.</u>  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating to this Agreement shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

14.14.  <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

14.15.  <u>Several, Not Joint, Claims</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

14.16.  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

14.17.  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

42

14.18.  Capacities of Consenting Stakeholders.  Each Consenting Stakeholder has entered into this agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

14.19.  Email Consents.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3, Section 11, Section 12, or otherwise, including a written approval by the Company Parties, the Required Consenting Senior Secured Lenders, the Required Consenting Sheridan II Subordinated Term Lenders, or the Manager Parties, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to, as applicable,  the Company Parties, Manager Parties, each of the Senior Secured Agents, and the Consenting Sheridan II Subordinated Term Lenders, submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

14.20.  Fees and Expenses. Regardless of whether the Restructuring Transactions are or have been consummated, and subject to the terms of and solely to the extent authorized in the Financing Order and the Plan, the Company Parties shall promptly pay in cash all Consenting Lender Fees and Expenses; *provided*, *however*, that concurrently with the Agreement Effective Date, the Company Parties shall pay all Consenting Lender Fees and Expenses incurred at any time prior to the Agreement Effective Date not previously paid by the Company Parties.

14.21.  Survival.  Notwithstanding (a) any Transfer of any Company Claims/Interests in accordance with Section 8 or (b) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 11.07, Section 13, Section 14, and the Confidentiality Agreements shall survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof. Notwithstanding the foregoing, the Parties acknowledge and agree that (x) if this Agreement is terminated pursuant to either Section 11.03 or 11.05, Section 13 shall not survive such termination, and any and all Releases shall be fully revoked and deemed null and void and of no force and effect, and (y) if this Agreement is terminated pursuant to Section 11.01, 11.02 or 11.04, Section 13 shall survive such termination, except that any and all Releases received and granted by the Consenting Sheridan II Senior Secured Lenders (in case of a termination under Section 11.01), Consenting Sheridan II Subordinated Lenders (in the case of a termination under Section 11.02) or a Manager Party (in the case of a termination under Section 11.04) shall be fully revoked and deemed null and void and of no force and effect.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

43

**Company Parties' Signature Page to
the Restructuring Support Agreement**

SHERIDAN INVESTMENT PARTNERS II, L.P.
SHERIDAN PRODUCTION PARTNERS II-A, L.P.
SHERIDAN PRODUCTION PARTNERS II-B, L.P.
SHERIDAN PRODUCTION PARTNERS II-M, L.P.
SHERIDAN HOLDING COMPANY II, LLC
SHERIDAN INVESTMENT PARTNERS II GP, LLC
SHERIDAN PRODUCTION PARTNERS II, LLC
SPP II-B GP, LLC
SPP II-M GP, LLC

By: _____

Name: Lisa A. Stewart

Authorized Signatory

**Manager and Manager Affiliates' Signature Page to
the Restructuring Support Agreement**

SHERIDAN PRODUCTION PARTNERS MANAGER, LLC

By: _____
Name:  Lisa A. Stewart
Authorized Signatory

SHERIDAN ICM, LLC
By: _____
Name:  Lisa A. Stewart
Authorized Signatory

SHERIDAN PRODUCTION COMPANY, LLC

By: _____
Name:  Lisa A. Stewart
Authorized Signatory

SHERIDAN SMG, LLC

By: _____
Name:  Lisa A. Stewart
Authorized Signatory

WARBURG PINCUS, LLC

By: _____
Name:
Authorized Signatory

WPS PRODUCTION PARTNERS II, LLC

By: _____
Name:
Authorized Signatory

**Manager and Manager Affiliates' Signature Page to
the Restructuring Support Agreement**

SHERIDAN PRODUCTION PARTNERS MANAGER, LLC

By:_____
Name:
Authorized Signatory

SHERIDAN ICM, LLC
By:_____
Name:
Authorized Signatory

SHERIDAN PRODUCTION COMPANY, LLC

By:_____
Name:
Authorized Signatory

SHERIDAN SMG, LLC

By:_____
Name:
Authorized Signatory

WARBURG PINCUS, LLC

By:_____
Name:  Robert B. Knauss
Authorized Signatory

WPS PRODUCTION PARTNERS II, LLC

By:_____
Name:  Robert B. Knauss
Authorized Signatory

**Consenting Stakeholder Signature Page to**
**the Restructuring Support Agreement**

**Bank of America N.A.,** ("**Bank**") solely in respect of GBAM Special Assets Group ("**Group**")
and not any other desk, unit, group, division, or affiliate of Bank, as a New Lender.

For the avoidance of doubt, and notwithstanding anything to the contrary contained in this
Agreement, the term "Consenting Lender" and "Consenting Stakeholder" shall not include any
distinct business unit of Bank other than the Group unless such other business unit is or becomes
a party to this Agreement.

Name:  Kevin M. Behan
Title:  Managing Director

Address: NY1-050-10-02
50 ROCKEFELLER PLAZA, NY, NY 10020-1605

E-mail address(es): KEVIN.M.BEHAN@BOFA.COM

Agreed to and acknowledged by the Company Parties:

Name: Lisa A. Stewart
Title: Executive Chairman and Chief Executive Officer

**Consenting Stakeholder Signature Page to**
**the Restructuring Support Agreement**

**ABN AMRO CAPITAL USA LLC**

Name:        H. Diogo
Title:

Name:    Francis Bullard, Jr.
Title:    Director.

Address: 100 Park Avenue, 17th Floor, New York, NY 10017

E-mail address(es): hugo.diogo@abnamro.com

**Consenting Stakeholder Signature Page to**
**the Restructuring Support Agreement**

**[Banc of America Credit Products Inc. ("BACP"), solely in respect of its Global Credit and**

**Special Situations group and not any other unit, group, division or affiliate of BACP]**

*Cassie Goodnight*

Name: Cassie Goodnight
Title:   Vice President


Address: 214 N TRYON ST, CHARLOTTE, NC, 28255


E-mail address(es): bas.infomanager@bankofamerica.com

**Consenting Stakeholder Signature Page to**
**the Restructuring Support Agreement**

## CONSENTING STAKEHOLDER

Black Diamond Credit Strategies Master Fund, Ltd.
By:  Black Diamond Credit Strategies Fund Adviser, L.L.C.,
Its Investment Manager

Name: Stephen H. Deckoff
Title: Managing Principal

Address:        1 Sound Shore Dr, Suite 200, Greenwich, CT 06830


E-mail address(es):    rehrlich@bdcm.com
                       tpisiewicz@bdcm.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**BMO HARRIS FINANCING, INC.**

Name: Melissa Guzmann
Title: Director


Address: 700 Louisiana St, Suite 2100, Houston, TX 77002


E-mail address(es): melissa.guzmann@bmo.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**THE BANK OF NOVA SCOTIA, HOUSTON BRANCH**

Name: Terry Donovan
Title: Managing Director


Address: 711 Louisiana St. Suite 1400, Houston, Texas, 77002, USA.


E-mail address(es): terry.donovan@scotiabank.com

**Consenting Stakeholder Signature Page to**
**the Restructuring Support Agreement**

**CADENCE BANK, N.A.**

Name: Eric Broussard
Title:  Executive Vice President

Address: 2800 Post Oak Blvd. Suite 3400, Houston, TX 77056

E-mail address: eric.broussard@cadencebank.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**CITIBANK, N.A.**

Name: Jeff Ard
Title: Vice President

Address: 811 Main Street, Suite 4000, Houston, TX 77002

E-mail address(es): jeff.ard@citi.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**COMERICA BANK**

Name: Sarah R. Miller
Title:   Vice President

Address: 3551 Hamlin Road, MC 7356, Auburn Hills, MI 48326

E-mail address(es):

#92233722v13

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**CAPITAL ONE, NATIONAL ASSOCIATION**

*[signature]*

Name: Michael P. Robinson
Title: Vice President

Address: 201 St. Charles Avenue, 18th Floor
        New Orleans, LA 70170

E-mail address(es): michael.robinson@capitalone.com

**Consenting Stakeholder Signature Page to**
**the Restructuring Support Agreement**

**CROSS OCEAN USSS FUND I (A) LP**
As a Lender

By **CROSS OCEAN PARTNERS MANAGEMENT LP**
Its Investment Manager



Name: Nicholas Renwick
Title: Authorized Signatory

Consenting Stakeholder that have traded but have not yet closed and/or received assignment at the date of this signature.

**CROSS OCEAN USSS SIF I LP**
As a Lender

By **CROSS OCEAN PARTNERS MANAGEMENT LP**
Its Investment Manager

Name: Nicholas Renwick
Title: Authorized Signatory

* Only includes claims for loans that have received assignment.  There may be additional term loan claims held by the
Consenting Stakeholder that have traded but have not yet closed and/or received assignment at the date of this signature.

**T-VI CO-ES LP**
As a Lender

By **CROSS OCEAN PARTNERS MANAGEMENT LP**
Its Investment Manager

Name: Nicholas Renwick
Title: Authorized Signatory

██████████████████████████████████

\* Only includes claims for loans that have received assignment.  There may be additional term loan claims held by the
Consenting Stakeholder that have traded but have not yet closed and/or received assignment at the date of this signature.

Notice information for all Cross Ocean Partners Management LP affiliated Lenders:

Address:      Cross Ocean Partners
              c/o David Alexander
              20 Horseneck Lane
              Greenwich, CT  06830

E-mail address(es):
da@crossoceanpartners.com
legal@crossoceanpartners.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**Eaton Vance Floating Rate Portfolio**
By: Boston Management and Research
as Investment Advisor

Name:
Title:

Michael B. Botthof

Vice President

Address: 2 International Place Boston MA 02110

E-mail address(es): rpeepgass@eatonvance.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

EATON VANCE INSTITUTIONAL SENIOR LOAN FUND
BY: EATON VANCE MANAGEMENT
AS INVESTMENT ADVISOR

Name:
Michael B. Botthof

Title:
Vice President

Address: 2 International Place Boston MA 02110

E-mail address(es): rpeepgass@eatonvance.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**SENIOR DEBT PORTFOLIO**
By: Boston Management and Research
as Investment Advisor

Name:                    Michael B. Botthof
Title:                    Vice President

Address: 2 International Place Boston MA 02110

E-mail address(es): rpeepgass@eatonvance.com

**Consenting Stakeholder Signature Page to the Restructuring Support Agreement**

EATON VANCE
LIMITED DURATION INCOME FUND
BY: EATON VANCE MANAGEMENT
AS INVESTMENT ADVISOR

Name:          *Michael B. Botthof*
Title:          Michael B. Botthof
               Vice President

Address: 2 International Place Boston MA 02110

E-mail address(es): rpeepgass@eatonvance.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

Eaton Vance CLO 2015-1 Ltd.
By: Eaton Vance Management
Portfolio Manager

Name:     Michael B. Botthof
Title:        Vice President

Address: 2 International Place Boston MA 02110

E-mail address(es): rpeepgass@eatonvance.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

Eaton Vance CLO 2014-1R, Ltd.
By: Eaton Vance Management
As Investment Advisor

Name: Michael B. Botthof
Title: Vice President

Address: 2 International Place Boston MA 02110

E-mail address(es): rpeepgass@eatonvance.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

EATON VANCE FLOATING-RATE
INCOME TRUST
BY: EATON VANCE MANAGEMENT
AS INVESTMENT ADVISOR

Name:
Title:

Michael B. Botthof
Vice President

Address: 2 International Place Boston MA 02110


E-mail address(es): rpeepgass@eatonvance.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

Brighthouse Funds Trust I -
Brighthouse/Eaton Vance Floating Rate Portfolio
By: Eaton Vance Management as Investment Sub-Advisor

Name:      Michael B. Botthof
Title:        Vice President

Address: 2 International Place Boston MA 02110


E-mail address(es): rpeepgass@eatonvance.com

**Consenting Stakeholder Signature Page to**
**the Restructuring Support Agreement**

EATON VANCE SENIOR
FLOATING-RATE TRUST
BY: EATON VANCE MANAGEMENT
AS INVESTMENT ADVISOR

Name:
Title:

Michael B. Botthof
Vice President

Address: 2 International Place Boston MA 02110

E-mail address(es): rpeepgass@eatonvance.com

Eaton Vance International
(Cayman Islands) Floating-Rate
Income Portfolio
By: Eaton Vance Management as
Investment Advisor

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

Name: _____
       Michael B. Botthof
Title: 
       Vice President

Address: 2 International Place Boston MA 02110


E-mail address(es): rpeepgass@eatonvance.com

**Consenting Stakeholder Signature Page to the Restructuring Support Agreement**

**Eaton Vance Short Duration Diversified Income Fund**
By: Eaton Vance Management
As Investment Advisor

Name:  *michael B. Batthof*
Title:        Michael B. Botthof
                Vice President

Address: 2 International Place Boston MA 02110

E-mail address(es): rpeepgass@eatonvance.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**Eaton Vance VT Floating-Rate Income Fund**
By: Eaton Vance Management
as Investment Advisor

Name:   *Michael B. Botthof*
Title:      Michael B. Botthof
              Vice President

Address: 2 International Place Boston MA 02110

E-mail address(es): rpeepgass@eatonvance.com

Error! Unknown document property name.

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

EATON VANCE SENIOR INCOME TRUST
BY: EATON VANCE MANAGEMENT
AS INVESTMENT ADVISOR

Name:
Title:

Michael B. Botthof
Vice President

Address: 2 International Place Boston MA 02110

E-mail address(es): rpeepgass@eatonvance.com

**Consenting Stakeholder Signature Page to**
**the Restructuring Support Agreement**

Eaton Vance CLO 2013-1 LTD.
By: Eaton Vance Management
Portfolio Manager

Name: Michael B. Botthof
Title: Vice President

Address: 2 International Place Boston MA 02110

E-mail address(es): rpeepgass@eatonvance.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

AGF FLOATING RATE INCOME FUND
BY: EATON VANCE MANAGEMENT
AS PORTFOLIO MANAGER

*Michael B. Botthof*

Name:        Michael B. Botthof
Title:        Vice President

Address: 2 International Place Boston MA 02110


E-mail address(es): rpeepgass@eatonvance.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**Eaton Vance Floating-Rate
Income Plus Fund**
By: Eaton Vance Management
as Investment Advisor

Name:        Michael B. Botthof
Title:          Vice President

Address: 2 International Place Boston MA 02110


E-mail address(es): rpeepgass@eatonvance.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**FIFTH THIRD BANK**

Name:  David R. Garcia
Title:  Vice President

Address:  222 S. Riverside Plaza, Chicago, IL 60606

E-mail address(es):  david.garcia@53.com

Classification: Internal Use

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**Hayfin Kingsland IX, Ltd.**
By: Hayfin Capital Management LLC as Manager

Name: Katherine Kim
Title: Authorized Signatory

 Address:  485 Madison Avenue, 24th Floor, New York, NY 10022
E-mail address(es): matthew.musicaro@hayfin.com; ops-ny@hayfin.com

**Consenting Stakeholder Signature Page to**
**the Restructuring Support Agreement**

**Hayfin Kingsland VIII, Ltd.**

Name: Katherine Kim
Title: Authorized Signatory

Address:  485 Madison Avenue, 24th Floor, New York, NY 10022
E-mail address(es): matthew.musicaro@hayfin.com; ops-ny@hayfin.com

#92233722v13

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**THE HUNTINGTON NATIONAL BANK**



Name:   Rob Mace
Title:   Senior Vice President


Address:   **The Huntington National Bank**
7 Easton Oval
EA4C20
Columbus, OH 43219



E-mail address(es):  Robert.Mace@huntington.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**IBERIABANK**



Name: Moni Collins
Title: SVP- Energy Lending


Address: 11 Greenway Plaza 27th Floor Houston, TX 77046


E-mail address(es): Moni.collins@iberiabank.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**ING CAPITAL LLC**


Name: Juli Bieser                          Name: Charles Hall
Title:  Managing Director                  Title:   Managing Director



Address:   1111 Bagby Street, Suite 2650, Houston, TX 77002



E-mail address(es):   juli.bieser@ing.com | charles.hall@ing.com



**Consenting Stakeholder Signature Page to**
**the Restructuring Support Agreement**

Invesco Oppenheimer Master Loan Fund

Name: Kathleen Schmitz
Title: Authorized Signatory


Address: 6803 S Tucson Way, Centennial, CO 80112


E-mail address(es): rchavez@ofiglobal.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

Invesco Oppenheimer Senior Floating Rate Plus Fund

Name: Kathleen Schmitz
Title: Authorized Signatory

Address: 6803 S Tucson Way, Centennial, CO 80112

E-mail address(es): rchavez@ofiglobal.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

Invesco Oppenheimer Senior Floating Rate Fund

Name: Kathleen Schmitz
Title: Authorized Signatory

Address: 6803 S Tucson Way, Centennial, CO 80112

E-mail address(es): rchavez@ofiglobal.com

**Consenting Stakeholder Signature Page to**
**the Restructuring Support Agreement**

Invesco Oppenheimer Fundamental Alternatives Fund

Name: Kathleen Schmitz
Title: Authorized Signatory

Address: 6803 S Tucson Way, Centennial, CO 80112

E-mail address(es): rchavez@ofiglobal.com

**Consenting Stakeholder Signature Page to**
**the Restructuring Support Agreement**

## J.H. LANE PARTNERS MASTER FUND, LP



Name: Haskel Ginsberg
Title: CFO

Address:

126 East 56th Street, Suite 1620, New York, NY 10022

E-mail address(es):

hginsberg@jhlanepartners.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**VENTURE XIII CLO, Limited**
By: its Investment Advisor
 MJX Venture Management LLC



By: _____
Name: John Calaba
Title: Managing Director


Address: 12 E 49th Street, 38th Floor, New York,
NY 10017


E-mail                              address(es):
credit@mjxam.com/Currentdeals@mjxam.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**VENTURE XIV CLO, Limited**
By: its investment advisor
 MJX Venture Management LLC


By: _____
Name: John Calaba
Title: Managing Director


Address: 12 E 49th Street, 38th Floor, New York,
NY 10017


E-mail                                  address(es):
credit@mjxam.com/Currentdeals@mjxam.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**VENTURE XVI CLO, Limited**
By: its investment advisor
 MJX Venture Management II LLC


By: _____
Name: John Calaba
Title: Managing Director


Address: 12 E 49th Street, 38th Floor, New York,
NY 10017


E-mail                                    address(es):
credit@mjxam.com/Currentdeals@mjxam.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**CROWN POINT CLO II LTD.**
as Lender,

By: Pretium Credit Management, LLC
as Collateral Manager

Name: Paul Arzoujan
Title: Authorized Signatory

Address: 810 7th Avenue, 24th Floor, New York, NY 10019

E-mail address(es): parzouian@pretium.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**CROWN POINT CLO 5 LTD.**
as Lender,

By: Pretium Credit Management, LLC
as Collateral Manager

Name: Paul Arzouian
Title: Authorized Signatory

Address: 810 7th Avenue, 24th Floor, New York, NY 10019

E-mail address(es): parzouian@pretium.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**ROYAL BANK OF CANADA**

Name: Leslie P. Vowell
Title:   Authorized Signatory


Address: 200 Vesey Street, 12th Floor, N.Y., N.Y 10281


E-mail address(es):   les.vowell@rbccm.com
                      Angela.becker@rbc.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**REGIONS BANK**

Name:   Lynn Johnston
Title:   Sr. Vice President


Address:   1717 McKinney Ave.
              Suite 1100
              Dallas, Texas 75202

E-mail address(es):   lynn.johnston@regions.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**BLUE CROSS OF IDAHO HEALTH SERVICE, INC.**
  By: Seix Investment Advisors LLC, as Investment Manager


_____

Name: George Goudelias
Title: Managing Director


Address: 1 Maynard Drive, Suite 3200, Park Ridge NJ, 07656


E-mail address: bankloans@seixadvisors.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**CITY NATIONAL ROCHDALE FIXED INCOME OPPORTUNITIES FUND**
By: Seix Investment Advisors LLC, as Subadvisor

Name: George Goudelias
Title: Managing Director

Address: 1 Maynard Drive, Suite 3200, Park Ridge NJ, 07656

E-mail address: bankloans@seixadvisors.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**MOUNTAIN VIEW CLO 2013-1 LTD.**
By: Seix Investment Advisors LLC, as Collateral Manager


Name: George Goudelias
Title: Managing Director


Address: 1 Maynard Drive, Suite 3200, Park Ridge NJ, 07656


E-mail address: bankloans@seixadvisors.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**VIRTUS SEIX FLOATING RATE HIGH INCOME FUND**
By: Seix Investment Advisors LLC, as Subadvisor

Name: George Goudelias
Title: Managing Director

Address: 1 Maynard Drive, Suite 3200, Park Ridge NJ, 07656

E-mail address: bankloans@seixadvisors.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

## SOUTHPAW CREDIT OPPORTUNITY MASTER FUND LP



Name:       Kevin Wyman, Managing
Title:       Member of General Partner -
                Southpaw GP LLC

Address: c/o Southpaw Asset Management LP
2 West Greenwich Office Park, 1st Floor
Greenwich, CT 06831

E-mail address(es): operations@southpawasset.com; mandersen@southpawasset.com

**Consenting Stakeholder Signature Page to**
**the Restructuring Support Agreement**

TICP CLO I-2, Ltd.

By: TICP CLO I Management, LLC, its Collateral Manager, as a lender

Name: Daniel Wanek
Title: Vice President

Address: 2100 McKinney Ste 1500, Dallas, TX 75201

E-mail address(es): TICPOps@tpg.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

TICP CLO II-2, Ltd.

By: TICP CLO II Management, LLC, its Collateral Manager, as a lender

Name: Daniel Wanek
Title: Vice President

Address: 2100 McKinney Ste 1500, Dallas, TX 75201

E-mail address(es): TICPOps@tpg.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**UBS AG, STAMFORD BRANCH**

Name: Darlene Arias
Title: Director
Address: 600 Washington Blvd, Stamford, CT 06901
E-mail address(es):
Primary Settlements @ubs.com

**UBS AG, STAMFORD BRANCH**

Name: Nima Gandhi
Title: Associate Director
Address: 600 Washington Blvd, Stamford, CT 06901
E-mail address(es):
Primary Settlements@ubs.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**VIRTUS PARTNERS, INC.**

Name: David G. Hanley
Title: Senior Vice President


Address: One Financial Plaza, Hartford, CT 06103


E-mail address: Nicole.Chomick@virtus.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**Venture XVII CLO Limited**
BY: its investment advisor, MJX Asset
Management, LLC


By: _____
Name: John Calaba
Title: Managing Director


Address: 12 E 49th Street, 38th Floor, New York,
NY 10017


E-mail                               address(es):
credit@mjxam.com/Currentdeals@mjxam.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**WELLS FARGO BANK N.A.,**

Name: Brett Steele
Title:   Director

Address: 1000 Louisiana St, 9th Floor, Houston, TX 77002

E-mail address(es): brett.a.steele@wellsfargo.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**ZIONS BANCORPORATION, N.A. DBA AMEGY BANK**

Brad Ellis
Senior Vice President


Address:  1717 West Loop South; 23rd Floor
              Houston TX 77027
              ATTN:  Sam Trail

E-mail address(es):  samuel.trail@amegybank.com

                            ken.batson@amegybank.com

                            brian.duncan@amegybank.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**INDUSTRIAL AND COMMERCIAL BANK OF CHINA LIMITED, NEW YORK
BRANCH**

_____

Name:
Title:

Address: 725 5th Avenue, 20th Floor, New York, New York 10022

E-mail address(es): Joao.Carlos@us.icbc.com.cn; yanmei.wei@us.icbc.com.cn; amanat.yousaf@us.icbc.com.cn

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

## CONSENTING SHERIDAN II SUBORDINATED LENDERS:

**HARBOURVEST REAL ASSETS FUND III L.P.,** as a Lender

By:  HarbourVest Real Assets III Associates L.P.
       Its General Partner

By:  HarbourVest Real Assets III Associates LLC
       Its General Partner

By:  HarbourVest Partners LLC
       Its Managing Member

_____
Name: Michael Dean
Title:   Managing Director


**HARBOURVEST REAL ASSETS – ENERGY FUND II L.P. ,** as a Lender

By:  HarbourVest Real Assets II Associates L.P.
       Its General Partner

By:  HarbourVest Real Assets II Associates LLC
       Its General Partner

By:  HarbourVest Partners LLC
       Its Managing Member

_____
Name: Michael Dean
Title:   Managing Director

**HARBOURVEST SECONDARY 2017 PRIVATE EQUITY PARTNERS L.P. ,** as a Lender

By:  HarbourVest 2017 Associates L.P.
      Its General Partner

By:  HarbourVest GP LLC
      Its General Partner

By:  HarbourVest Partners LLC
      Its Managing Member

Name: Michael Dean
Title:   Managing Director


Address:  One Financial Center
              Boston, MA 02111

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**CONSENTING SHERIDAN II SUBORDINATED LENDERS:**

**ASGA GLOBAL INFRASTRUCTURE L.P.**

**PANTHEON/VA NRP, LP**

**PANTHEON ACCESS SECONDARY PROGRAM, L.P. – SERIES 21**

**PANTHEON GLOBAL REAL ASSETS GT FUND, L.P.**

**PANTHEON GLOBAL REAL ASSETS HO FUND, L.P.**

**PANTHEON GLOBAL SECONDARY FUND V, L.P.**

**PANTHEON INTERNATIONAL, PLC**

**PANTHEON MULTI-STRATEGY SECONDARY PROGRAM 2014, L.P. – GLOBAL SERIES**

**PANTHEON REAL ASSETS OPPORTUNITIES FUND, L.P.**

Name: Evan G. Corley
Title:  Managing Director

Address:  Transamerica Center
                600 Montgomery Street, 23rd Floor
                San Francisco, CA  94111

E-mail address:  evan.corley@pantheon.com

## EXHIBIT A

**Plan to Be Filed Later**

**<u>EXHIBIT B</u>**

**DIP Term Sheet**

# EXHIBIT B

## DIP Term Sheet

| Size | $100 million debtor-in-possession financing facility (the "**DIP Facility**"), consisting of two tranches: |
|---|---|
| | • $50 million delayed draw new money term loans (the "**New Money Term Loans**"), with $28 million available upon entry of the interim order and $22 million on entry of the final order. |
| | • $50 million roll up of prepetition Sheridan II Revolving Loans and Sheridan II Term Loans held by those lenders that participate in the DIP ("**Roll-Up Term Loans**" and together with the New Money Term Loans, the "**DIP Loans**"). |
| **Agent** | Bank of America, N.A. (the "**DIP Agent**"). |
| **Lenders** | Consenting Sheridan II Revolving Lenders and Consenting Sheridan II Term Lenders that agree to provide the DIP Facility (the "**DIP Lenders**"). |
| **Security** | Superpriority priming security interest on unencumbered assets and current collateral under the existing credit documents (currently 95% of proved PV-9) (excluding any avoidance actions, but including the proceeds thereof (subject to entry of the final order)), subject to the carve-out. |
| **Maturity** | 6 months. |
| **Rate** | New Money Term Loans: L + 700 per annum<br><br>Roll-Up Term Loans: L + 700 per annum |
| **Fees** | 200 bps commitment/structuring fee.<br><br>100 bps unused line fee.<br><br>Customary arranger and agency fees to be mutually agreed. |
| **Mandatory Prepayments** | Customary for DIP facilities of this type. No call protection. |
| **Milestones** | Usual and customary milestones, including interim and final DIP orders and filing of the disclosure statement. |
| **Negative Covenants** | Usual and customary negative covenants |

| | |
|---|---|
| **Budget Compliance** | • Budget variance covenant, tested every two weeks (beginning with the second full week after the Petition Date) with respect to the immediately preceding four week period (or, if such four week period has not elapsed since the Petition Date, the cumulative period since the Petition Date) then-ended against the Approved Budget (as defined below), covering (i) payroll, benefit and G&A disbursements (in the aggregate), subject to the greater of a 15% or $300,000 variance, (ii) operating disbursements (in the aggregate and excluding royalty payments), subject to a 15% variance, and (iii) capital expenditures, subject to the greater of a 15% or $300,000 variance.<br><br>• "**Budget**" means, a rolling 13-week operating budget and cash flow forecast delivered on or prior to the Petition Date and every four weeks after the Petition Date, setting forth, among other things, the Debtors' projected receipts, operating disbursements (including payroll and benefits, G&A, and royalty payments), non-operating disbursements (including capital expenditures, debt service and professional fees), and net cash flow, during such 13-week period (i) initially, covering the period commencing on or about the Petition Date and (ii) thereafter, commencing on the first day of each four-week period thereafter.  Any updates to the Budget delivered after the Petition Date shall be reasonably acceptable to the DIP Lenders holding a majority of the DIP Loans and outstanding commitments (the "**Required DIP Lenders**") (including any changes made in any such updated Budget with respect to any periods that were included in a previously delivered Budget; *provided* that a separate explanation in reasonable detail of such changes shall be provided to the Lenders), it being understood that if the Required DIP Lenders have not objected to an updated Budget within 10 days after delivery thereof, the updated Budget shall be deemed to be approved (each such approved Budget, the "**Approved Budget**"). |
| **Production Forecast and Monthly Covenant** | • A forecast (the "**Production Volumes Forecast**") to be delivered with the initial Budget, setting forth, on a monthly basis through the maturity date of the DIP Facility, forecasted total production volumes (which shall include a breakdown of projected operated volumes versus projected non-operated volumes).<br><br>• Actual total production volumes will be reported and tested on a monthly basis on the Friday of the first full week following the end of each calendar month (beginning with the calendar month in which the Petition Date occurs) and shall be subject to a 15% permitted variance. |
| **Mid-Month Production Covenant** | Preliminary field estimates of operated production volumes for the first fifteen days of each calendar month will be reported and tested against the Production Volumes Forecast on a mid-month basis on the fifth business day following such fifteen day period and shall be subject to a 20% variance. |

2

Error! Unknown document property name.

| | |
|---|---|
| **Permitted Accounts** | Obligors will not, directly or indirectly, hold or otherwise maintain any of its cash, cash equivalents, bank deposits or investments other than at a deposit account, commodity account or securities account held and otherwise maintained by it in its own name that is subject to a control agreement in favor of the DIP Agent (other than cash and cash equivalents attributable to the operation of the Sheridan II entities temporarily held in a deposit account of Sheridan Production Company, LLC ("**SPC**") for the sole purpose of funding payroll and disbursements to unaffiliated third parties in the ordinary course of business in accordance with the Approved Budget (subject to permitted variances) and for which SPC has previously or simultaneously issued checks or initiated wires or ACH transfers or has scheduled imminent disbursements within three business days). Any Sheridan II cash receipts received by a non-Debtor affiliate (consistent with past practices) will be promptly as practicable (but in no event later than three business days after receipt of applicable documentation) reconciled and transmitted to an account of an obligor subject to a control agreement in favor of the DIP Agent. |
| **Disclosure & Reporting** | <ul><li>Requirement for customary and usual information reporting, which shall include weekly conference calls between the Lenders' financial advisors and senior management and monthly conferences call between the Lenders and the DIP Agent, on the one hand, and senior management, on the other, in each case at times to be mutually agreed to discuss the financial condition and operations of the Sheridan II entities.</li><li>Borrower to use commercially reasonable efforts to obtain a rating of the New Money Term Loans by one of Moody's or S&P Global, as determined by the Required DIP Lenders. All fees and expenses incurred in connection with seeking or obtaining such rating are deemed to be permitted in accordance with the Approved Budget (regardless of whether provided for therein) for all purposes.</li></ul> |
| **Assignments** | Usual and customary for debtor-in-possession facilities of this type, including assignments of DIP Loans subject to the consent of the borrower (not to be unreasonably withheld) unless an event of default exists (such consent to be deemed given if no objection is provided within 5 business days) and the DIP Agent; provided that no lender shall have the right to assign all or any portion of its New Money Term Loans or Roll-Up Term Loans (except in the case of assignments to affiliates of the DIP Lender, provided that such affiliates simultaneously execute a Transfer Agreement or Joinder to the RSA) absent a simultaneous assignment of a corresponding proportional amount of Roll-Up Term Loans (in the case of an assignment of New Money Term Loans), New Money Term Loans (in the case of an assignment of Roll-Up Term Loans), Sheridan II Revolving Loans and Sheridan II Term Loans. |

3

## Exhibit C

**Form of Transfer Agreement**

### *TRANSFER AGREEMENT*

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of [●], 2019 (the "**Agreement**"),[1] by and among the Company Parties and the Consenting Stakeholders, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Stakeholder" and a "Consenting Sheridan II Revolving Lender," "Consenting Sheridan II Term Lender," or "Consenting Sheridan II Subordinated Term Lender" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed in this transfer agreement.

Date Executed:

_____
Name:
Title:

Address:

E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| Sheridan II RBL Claims | |
| Sheridan II Term Loan Claims | |
| Sheridan II Subordinated Term Loan Claims | |
| New Money DIP Claims | |

---

[1]    Capitalized terms not used but not otherwise defined in this transfer agreement shall have the meanings ascribed to such terms in the Agreement.

# **EXHIBIT D**

**Form of Joinder**

# *JOINDER*

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of [●], 2019 (the "**Agreement**"),[1] by and among Company Parties and the Consenting Stakeholders and agrees to be bound by the terms and conditions thereof to the extent the other Parties are thereby bound, and shall be deemed a "Consenting Sheridan II Revolving Lender," "Consenting Sheridan II Term Lender," or "Consenting Sheridan II Subordinated Term Lender" under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of this joinder and any further date specified in the Agreement.

Date Executed:

_____

Name:
Title:

Address:

E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| Sheridan II RBL Claims | |
| Sheridan II Term Loan Claims | |
| Sheridan II Subordinated Term Loan Claims | |
| New Money DIP Claims | |

---

[1]    Capitalized terms not used but not otherwise defined in this joinder shall have the meanings ascribed to such terms in the Agreement.