**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| SHERIDAN HOLDING COMPANY II, LLC, *et al.*,[1] | § | Case No. 19-35198 (MI) |
| | § | |
| Debtors. | § | (Joint Administration Requested) |
| | § | |
| | § | Re: Docket No. __ |

**INTERIM ORDER
(A) AUTHORIZING THE DEBTORS TO
OBTAIN POSTPETITION FINANCING, (B) AUTHORIZING
THE DEBTORS TO USE CASH COLLATERAL, (C) GRANTING
LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE
EXPENSE STATUS, (D) GRANTING ADEQUATE PROTECTION TO THE
PREPETITION SECURED PARTIES, (E) SCHEDULING A FINAL HEARING,
(F) MODIFYING THE AUTOMATIC STAY, AND (G) GRANTING RELATED RELIEF**

Upon the motion (the "**DIP Motion**") of Sheridan Investment Partners II, L.P., Sheridan Production Partners II-A, L.P., Sheridan Production Partners II-M, L.P., and Sheridan Holding Company II, LLC (the "**DIP Borrowers**"), Sheridan Investment Partners II GP, LLC, Sheridan Production Partners II, LLC, SPP II-B GP, LLC, and SPP II-M GP, LLC (the "**DIP Guarantors**" and, together with the DIP Borrowers, the "**DIP Loan Parties**"), and each of the DIP Loan Parties' affiliates that are debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned cases (the "**Chapter 11 Cases**") and pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506(c), 507 and 552 of

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sheridan Holding Company II, LLC (7040); Sheridan Investment Partners II GP, LLC (8298); Sheridan Investment Partners II, L.P. (9405); Sheridan Production Partners II, LLC (8034); Sheridan Production Partners II-A, L.P. (8813); Sheridan Production Partners II-B, L.P. (9232); Sheridan Production Partners II-M, L.P. (9084); SPP II-B GP, LLC (8554); and SPP II-M GP, LLC (0488). The location of the Debtors' service address is: 1360 Post Oak Blvd., Suite 2500, Houston, Texas 77056.

title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Local Bankruptcy Rules for the Southern District of Texas (the "**Local Rules**") and the Procedures for Complex Chapter 11 Bankruptcy Cases (the "**Complex Case Rules**") promulgated by the United States Bankruptcy Court for the Southern District of Texas (the "**Court**"), seeking entry of a proposed interim order (the "**Interim Order**") among other things:

(i)      authorizing the DIP Borrowers to obtain postpetition financing ("**DIP Financing**") under a senior secured, superpriority, priming debtor-in-possession credit facility (the "**DIP Facility**" and the loans incurred thereunder, the "**DIP Loans**") pursuant to the terms and conditions of that certain Senior Secured Superpriority Debtor-in-Possession Term Loan Agreement, dated as of September [_____], 2019 (as may be amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms hereof and thereof, the "**DIP Credit Agreement**") consisting of (A) new money term loans (the "**DIP New Money Loans**") in an aggregate principal amount of $50,000,000, and (B) roll-up term loans ("**DIP Roll-Up Loans**") in an aggregate principal amount of $50,000,000, for a total aggregate principal amount of $100,000,000 (the "**Total DIP Commitment**"), solely on the terms and conditions set forth in the DIP Credit Agreement, by and among the DIP Borrowers, as borrowers, the DIP Guarantors, as guarantors, the several banks and other financial institutions or entities from time to time party thereto, as lenders (collectively, the "**DIP Lenders**" and, together with the DIP Agent, the "**DIP Secured Parties**"), and Bank of America, N.A., as administrative and collateral agent (in such capacities, and together with its successors and permitted assigns, the "**DIP Agent**");

(ii)     authorizing the DIP Guarantors to guarantee on a senior secured superpriority basis the DIP Loans and the other DIP Obligations (as defined herein);

(iii)    authorizing the DIP Loan Parties to execute and deliver the DIP Credit Agreement and other documentation, including credit agreements, security agreements, pledge agreements, control agreements, mortgages, guarantees, promissory notes, certificates, instruments, notes, and such other documentation which may be necessary or required to implement the DIP Facility and perform thereunder and/or that may be reasonably requested by the DIP Agent, in each case, as amended, restated,

supplemented, waived and/or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, together with the DIP Credit Agreement, the "**DIP Documents**"), and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith;

(iv)     approving all loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees (including, without limitation, commitment fees, administrative agency fees, costs, expenses and other liabilities), all other obligations (including indemnities and similar obligations, whether contingent or absolute) and all other amounts due or payable under the DIP Documents, (collectively, the "**DIP Obligations**");

(v)     granting to the DIP Agent for the benefit of the DIP Lenders allowed superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations, and valid, enforceable, non-avoidable and automatically perfected liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code, in each case, on all prepetition and postpetition property of the DIP Loan Parties' estates (other than certain excluded property that includes, for the avoidance of doubt, any property of Sheridan Production Partners II-B, L.P. ("**II-B**"), as provided herein or in the DIP Documents (the "**Excluded Assets**")) and all proceeds thereof, including, any Avoidance Actions Proceeds (as defined herein), in each case subject to the Carve Out (as defined herein);

(vi)     authorizing the DIP Loan Parties to, subject to and effective upon the entry of the Final Order (as defined herein), use the DIP Roll-Up Loans to refinance and discharge dollar-for-dollar Prepetition Secured Debt held by the DIP Lenders in the aggregate amount of the DIP New Money Loans (as defined herein);

(vii)     authorizing the Debtors to use proceeds of the DIP Facility, solely in accordance with this Interim Order and the DIP Documents;

(viii)     authorizing the DIP Loan Parties to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become earned, due and payable to the extent provided in, and in accordance with, the DIP Documents;

(ix)     authorizing the Debtors to use the Prepetition Collateral (as defined herein), subject to and pursuant to the terms and conditions set forth in this Interim Order;

(x)     authorizing the Debtors to provide adequate protection to the Prepetition Secured Parties (as defined herein) pursuant to sections 361 and 363(e) of

3

the Bankruptcy Code for any diminution in value of any of their interests in property of the Debtors' estates including the Prepetition Collateral (as defined herein) from and after the Petition Date as a condition to the Debtors' use of Prepetition Collateral securing the obligations under:

(A)     the Senior Secured Term Loan Credit Agreement, dated as of December 16, 2013 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the commencement of the Chapter 11 Cases, the "**II-A Term Loan Agreement**") (together with all related agreements and documents executed by any of the Debtors in connection with the II-A Term Loan Agreement, collectively, the "**II-A Term Loan Documents**") by and among Sheridan Production Partners II-A, L.P., as borrower (in such capacity, the "**II-A Borrower**"), Bank of America, N.A., as administrative and collateral agent (the "**II-A Term Loan Agent**") and the lenders party thereto (the "**II-A Term Loan Lenders**" and, together with the II-A Term Loan Agent, the "**II-A Term Loan Secured Parties**") (the Required Lenders as defined therein referred to herein as the "**Required II-A Term Loan Lenders**");

(B)     the Senior Secured Term Loan Credit Agreement, dated as of December 16, 2013 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the commencement of the Chapter 11 Cases, the "**II-M Term Loan Agreement**") (together with all related agreements and documents executed by any of the Debtors in connection with the II-M Term Loan Agreement, collectively, the "**II-M Term Loan Documents**") by and among Sheridan Production Partners II-M, L.P., as borrower (in such capacity, the "**II-M Borrower**"), Bank of America, N.A., as administrative and collateral agent (the "**II-M Term Loan Agent**") and the lenders party thereto (the "**II-M Term Loan Lenders**" and, together with the II-M Term Loan Agent, the "**II-M Term Loan Secured Parties**") (the Required Lenders as defined therein referred to herein as the "**Required II-M Term Loan Lenders**");

(C)     the Senior Secured Term Loan Credit Agreement, dated as of December 16, 2013 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the commencement of the Chapter 11 Cases, the "**SIP-II Term Loan Agreement**") (together with all related agreements and documents executed by any of the Debtors in connection with the SIP-II Term Loan Agreement, collectively, the "**SIP Term Loan Documents**") (the SIP-II Term Loan Agreement, collectively with the II-A Term Loan Agreement and the II-M Term Loan Agreement, the "**Term Loan Agreements**") by and among Sheridan Investment Partners II, L.P., as borrower (in such capacity, the "**SIP-II Borrower**" and, collectively with the II-A Borrower and the II-M Borrower, the "**Prepetition Borrowers**" and, collectively

4

with Sheridan Holding Company I, LLC and the pledgor parties party to the SIP Term Loan Documents (the "**Term Loan Pledgors**"), the "**Prepetition Obligors**"), Bank of America, N.A., as administrative and collateral agent (the "**SIP-II Term Loan Agent**" and, collectively with the II-A Term Loan Agent and the II-M Term Loan Agent, the "**Term Loan Agents**") and the lenders party thereto (the "**SIP-II Term Loan Lenders**" and, together with the SIP-II Term Loan Agent, the "**SIP-II Term Loan Secured Parties**") (the SIP-II Term Loan Lenders, collectively with the II-A Term Loan Lenders and the II-M Term Loan Lenders, the "**Term Loan Lenders**" and, collectively with the Term Loan Agents, the "**Term Loan Secured Parties**") (the Required Lenders as defined therein referred to herein as the "**Required SIP-II Term Loan Lenders**" and, collectively with the Required II-A Term Loan Lenders and Required II-M Term Loan Lenders, the "**Required Term Loan Lenders**");

(D)     the Amended and Restated Credit Agreement, dated as of February 26, 2013 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the commencement of the Chapter 11 Cases, the "**II-A RBL Agreement**") (together with all related agreements and documents executed by any of the Debtors in connection with the II-A RBL Agreement, collectively, the "**II-A RBL Documents**") by and among the II-A Borrower, as borrower, Bank of America, N.A., as administrative and collateral agent (the "**II-A RBL Agent**") and the lenders party thereto (the "**II-A RBL Lenders**" and, together with the II-A RBL Agent, the "**II-A RBL Secured Parties**") (the Required Lenders as defined therein referred to herein as the "**Required II-A RBL Lenders**");

(E)     the Amended and Restated Credit Agreement, dated as of February 26, 2013 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the commencement of the Chapter 11 Cases, the "**II-M RBL Agreement**") (together with all related agreements and documents executed by any of the Debtors in connection with the II-M RBL Agreement, collectively, the "**II-M RBL Documents**") by and among the II-M Borrower, as borrower, Bank of America, N.A., as administrative and collateral agent (the "**II-M RBL Agent**") and the lenders party thereto (the "**II-M RBL Lenders**" and, together with the II-M RBL Agent, the "**II-M RBL Secured Parties**") (the Required Lenders as defined therein referred to herein as the "**Required II-M RBL Lenders**");

(F)     the Amended and Restated Credit Agreement, dated as of February 26, 2013 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the commencement of the Chapter 11 Cases, the "**SIP-II RBL Agreement**") (together with all related agreements and documents executed by any of

the Debtors in connection with the SIP-II RBL Agreement, collectively, the "**SIP-II RBL Documents**") (the SIP-II RBL Agreement, collectively with the II-A RBL Agreement and the II-M RBL Agreement, the "**RBL Agreements**" and, together with the Term Loan Agreements, the "**Prepetition Debt Documents**") (the pledgor parties party to the SIP-II RBL Documents, together with the Term Loan Pledgors, the "**Prepetition Pledgors**") by and among the SIP-II Borrower, as borrower, Bank of America, N.A., as administrative and collateral agent (the "**SIP-II RBL Agent**" and, collectively with the II-A RBL Agent and the II-M RBL Agent, the "**RBL Agents**" and, collectively with the Term Loan Agents, the "**Prepetition Agents**") and the lenders party thereto (the "**SIP-II RBL Lenders**" and, together with the SIP-II RBL Agent, the "**SIP-II RBL Secured Parties**") (the SIP-II RBL Lenders, collectively with the II-A RBL Lenders and the II-M RBL Lenders, the "**RBL Lenders**" and, collectively with the RBL Agents, the "**RBL Secured Parties**" and, collectively with the Term Loan Secured Parties, the "**Prepetition Secured Parties**") (the Required Lenders as defined therein referred to herein as the "**Required SIP-II RBL Lenders**" and, collectively with the Required II-A RBL Lenders and Required II-M RBL Lenders, the "**Required RBL Lenders**");

(xi)     subject only to the Carve Out (as defined herein) authorizing the Debtors to waive: (a) the Debtors' right to surcharge pursuant to section 506(c) of the Bankruptcy Code the DIP Collateral and, upon entry of the Final Order, the Prepetition Collateral or the Adequate Protection Collateral and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code upon entry of the Final Order;

(xii)    waiving the equitable doctrine of "marshaling" and other, similar doctrines (a) with respect to the DIP Collateral for the benefit of any party other than the DIP Secured Parties and (b) subject to entry of the Final Order with respect to any of the Prepetition Collateral and the Adequate Protection Collateral (as defined herein) (including the Cash Collateral) for the benefit of any party other than the Prepetition Secured Parties;

(xiii)   approving certain stipulations and releases by the Debtors with respect to the Prepetition Debt Documents and the liens and security interests arising therefrom, subject to certain limited challenge rights;

(xiv)    vacating and modifying the automatic stay under section 362 of the Bankruptcy Code (the "**Automatic Stay**") to the extent set forth herein to the extent necessary to permit the Debtors and the Prepetition Secured Parties to implement and effectuate the terms and provisions of this Interim Order, the DIP Documents and the Final Order and to deliver any notices of termination described below and as further set forth herein;

(xv)    waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order and as later applicable, if necessary, the Final Order;

(xvi)    pursuant to Bankruptcy Rule 4001, the Court's holding that an interim hearing on this Motion be held before this Court to consider entry of this Interim Order, authorizing that during the period commencing on the date of this Court's entry of this Interim Order and ending on the earlier of (a) the date this Court enters the Final Order, (b) the date on which the right to use Cash Collateral terminates under the terms of this Interim Order, and (c) the Effective Date (as defined in the Debtors' chapter 11 plan (the "**Plan**")), the Debtors be authorized to use the Cash Collateral; and

(xvii)    scheduling a final hearing (the "**Final Hearing**") to consider final approval of the DIP Facility and use of Cash Collateral pursuant to a proposed final order (the "**Final Order**"), as set forth in the DIP Motion and the DIP Documents filed with this Court.

The Court having considered the DIP Motion and exhibits attached thereto, the *Declaration of Lisa A. Stewart in Support of the Debtors' First Day Motions* (the "**First Day Declaration**"), the *Declaration of Jeremy Matican in Support of the Debtors' Motion Seeking Authorization to Obtain Postpetition Financing and Use Cash Collateral* (the "**DIP Declaration**"), the DIP Documents, and the evidence submitted and arguments made by the Debtors at the interim hearing held on September 16, 2019 (the "**Interim Hearing**"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002 and 4001(b), (c) and (d) and all applicable Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the DIP Motion, and all reservations of rights included therein, having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors and their estates and is essential for the continued operation of the Debtors' businesses and the

preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING BY THE DEBTORS, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[2]

A. *Petition Date*. On September [15], 2019 (the "**Petition Date**") each of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division. On September [16], 2019, this Court entered an order approving the joint administration of the Chapter 11 Cases.

B. *Debtors in Possession*. The Debtors have continued in the management and operation of their business and properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Chapter 11 Cases.

C. *Jurisdiction and Venue*. This Court has core jurisdiction over the Chapter 11 Cases, the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue for the Chapter 11 Cases and the proceedings on the DIP Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[2]   The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

D.     *Committee Formation*.  As of the date hereof, no official committee of unsecured creditors under Section 1102 of the Bankruptcy Code (the "**Committee**") or any other statutory committee has been appointed in the Chapter 11 Cases.

E.     *Notice*.  The Interim Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  Proper, timely, adequate and sufficient notice of the DIP Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and the Complex Case Rules, and no other or further notice of the DIP Motion or the entry of this Interim Order shall be required.

F.     *Cash Collateral*.  All of the Debtors' cash except for cash that is an Excluded Asset, wherever located and held, including cash in deposit accounts, that constitutes or will constitute "cash collateral" of the Prepetition Secured Parties and DIP Parties within the meaning of section 363(a) of the Bankruptcy Code (the "**Cash Collateral**").

G.     *Debtor's Stipulations*.  Subject to the limitations thereon contained in paragraphs 29 and 30 below, the Debtors admit, stipulate and agree that:

(i)     *Prepetition II-A Term Loan Obligations*.  As of the Petition Date: the II-A Borrower was justly and lawfully indebted and liable to the II-A Term Loan Secured Parties, without defense, counterclaim, recoupment or offset of any kind, in the aggregate principal amount of not less than $63,438,010.99 in respect of loans made to the II-A Borrower pursuant to, and in accordance with, the terms of the II-A Term Loan Documents, plus, in each case, accrued and unpaid interest thereon and fees, expenses (including, without limitation, any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the II-A Term Loan Documents), charges, indemnities and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the II-A Term Loan Documents (collectively, the "**II-A Term Loan Obligations**"), whether or not evidenced by any note, agreement, or other instrument, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the II-A Term Loan Obligations.

(ii)     *Prepetition II-M Term Loan Obligations*.  As of the Petition Date: the II-M Borrower was justly and lawfully indebted and liable to the II-M Term Loan Secured Parties, without defense, counterclaim, recoupment or offset of any kind, in the aggregate

principal amount of not less than $23,658,912.80 in respect of loans made to the II-M Borrower pursuant to, and in accordance with, the terms of the II-M Term Loan Documents, plus, in each case, accrued and unpaid interest thereon and fees, expenses (including, without limitation, any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the II-M Term Loan Documents), charges, indemnities and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the II-M Term Loan Documents (collectively, the "**II-M Term Loan Obligations**"), whether or not evidenced by any note, agreement, or other instrument, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the II-M Term Loan Obligations.

(iii)     *Prepetition SIP-II Term Loan Obligations*.  As of the Petition Date: the SIP-II Borrower was justly and lawfully indebted and liable to the SIP-II Term Loan Secured Parties, without defense, counterclaim, recoupment or offset of any kind, in the aggregate principal amount of not less than $456,036,949.73 in respect of loans made to the SIP-II Borrower pursuant to, and in accordance with, the terms of the SIP-II Term Loan Documents, plus, in each case, accrued and unpaid interest thereon and fees, expenses (including, without limitation, any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the SIP-II Term Loan Documents), charges, indemnities and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the SIP-II Term Loan Documents (collectively, the "**SIP-II Term Loan Obligations**" and, collectively with the II-A Term Loan Obligations and II-M Term Loan Obligations, the "**Prepetition Term Loan Obligations**"), whether or not evidenced by any note, agreement, or other instrument, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the SIP-II Term Loan Obligations.

(iv)     *Prepetition II-A RBL Obligations*.  As of the Petition Date: the II-A Borrower was justly and lawfully indebted and liable to the II-A RBL Secured Parties, without defense, counterclaim, recoupment or offset of any kind, in the aggregate principal amount of not less than $7,709,122.44 in respect of loans made to the II-A Borrower pursuant to, and in accordance with, the terms of the II-A RBL Documents, plus, in each case, accrued and unpaid interest thereon and fees, expenses (including, without limitation, any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the II-A RBL Documents), charges, indemnities and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the II-A RBL Documents (collectively, the "**II-A RBL Obligations**"), whether or not evidenced by any note, agreement, or other instrument, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of the II-A RBL Obligations.

(v)     *Prepetition II-M RBL Obligations*.  As of the Petition Date: the II-M Borrower was justly and lawfully indebted and liable to the II-M RBL Secured Parties, without defense, counterclaim, recoupment or offset of any kind, in the aggregate principal amount of not less than $2,875,069.24 in respect of loans made to the II-M

Borrower pursuant to, and in accordance with, the terms of the II-M RBL Documents, plus, in each case, accrued and unpaid interest thereon and fees, expenses (including, without limitation, any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the II-M RBL Documents), charges, indemnities and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the II-M RBL Documents (collectively, the "**II-M RBL Obligations**"), whether or not evidenced by any note, agreement, or other instrument, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the II-M RBL Obligations.

(vi)      *Prepetition SIP-II RBL Obligations*.   As of the Petition Date: the SIP-II Borrower was justly and lawfully indebted and liable to the SIP-II RBL Secured Parties, without defense, counterclaim, recoupment or offset of any kind, in the aggregate principal amount of not less than $55,418,345.61 in respect of loans made to the SIP-II Borrower pursuant to, and in accordance with, the terms of the SIP-II Term RBL, plus, in each case, accrued and unpaid interest thereon and fees, expenses (including, without limitation, any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the SIP-II RBL Documents), charges, indemnities and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the SIP-II RBL Documents (collectively, the "**SIP-II RBL Obligations**" and, collectively with the II-A Term Loan Obligations, II-M Term Loan Obligations, SIP-II Term Loan Obligations, II-A RBL Obligations and II-M RBL Obligations, the "**Prepetition Obligations**"), whether or not evidenced by any note, agreement, or other instrument, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the SIP-II RBL Obligations.

(vii)     *II-A Term Loan Liens and Collateral*.   The II-A Term Loan Obligations are secured by first priority, senior security interests in and liens on (collectively, the "**II-A Term Loan Secured Parties Prepetition Liens**") the Collateral (as defined in the II-A Term Loan Documents and hereinafter referred to as the "**II-A Term Loan Collateral**"), including any identifiable cash proceeds from the sale, lease, conveyance, or other disposition of any II-A Term Loan Collateral in accordance with the terms of the II-A Term Loan Documents.

(viii)    *II-M Term Loan Liens and Collateral*.   The II-M Term Loan Obligations are secured by first priority, senior security interests in and liens on (collectively, the "**II-M Term Loan Secured Parties Prepetition Liens**") the Collateral (as defined in the II-M Term Loan Documents and hereinafter referred to as the "**II-M Term Loan Collateral**"), including any identifiable cash proceeds from the sale, lease, conveyance, or other disposition of any II-M Term Loan Collateral in accordance with the terms of the II-M Term Loan Documents.

(ix)      *SIP-II Term Loan Liens and Collateral*.   The SIP-II Term Loan Obligations are secured by first priority, senior security interests in and liens on (collectively, the "**SIP-II Term Loan Secured Parties Prepetition Liens**") the Collateral (as defined in the SIP-II Term Loan Documents and hereinafter referred to as

the "**SIP-II Term Loan Collateral**"), including any identifiable cash proceeds from the sale, lease, conveyance, or other disposition of any SIP-II Term Loan Collateral in accordance with the terms of the SIP-II Term Loan Documents.

(x)     *II-A RBL Liens and Collateral*.  The II-A RBL Obligations are secured by first priority, senior security interests in and liens on (collectively, the "**II-A RBL Secured Parties Prepetition Liens**") the Collateral (as defined in the II-A RBL Documents and hereinafter referred to as the "**II-A RBL Collateral**" and, together with the II-A Term Loan Collateral, the "**II-A Collateral**"), including any identifiable cash proceeds from the sale, lease, conveyance, or other disposition of any II-A RBL Collateral in accordance with the terms of the II-A RBL Documents.

(xi)     *II-M RBL Liens and Collateral*.  The II-M RBL Obligations are secured by first priority, senior security interests in and liens on (collectively, the "**II-M RBL Secured Parties Prepetition Liens**") the Collateral (as defined in the II-M RBL Documents and hereinafter referred to as the "**II-M RBL Collateral**" and, together with the II-M Term Loan Collateral, the "**II-M Collateral**"), including any identifiable cash proceeds from the sale, lease, conveyance, or other disposition of any II-M RBL Collateral in accordance with the terms of the II-M RBL Documents.

(xii)     *SIP-II RBL Liens and Collateral*.  The SIP-II RBL Obligations are secured by first priority, senior security interests in and liens on (collectively, the "**SIP-II RBL Secured Parties Prepetition Liens**" and, collectively with the II-A Term Loan Secured Parties Prepetition Liens, II-M Term Loan Secured Parties Prepetition Liens, SIP-II Term Loan Secured Parties Prepetition Liens, II-A RBL Secured Parties Prepetition Liens, and II-M RBL Secured Parties Prepetition Liens, the "**Prepetition Liens**") the Collateral (as defined in the SIP-II RBL Documents and hereinafter referred to as the "**SIP-II RBL Collateral**" and, together with the SIP-II Term Loan Collateral, the "**SIP-II Collateral**") (the II-A Collateral, II-M Collateral, and SIP-II Collateral are collectively referred to herein as the "**Prepetition Collateral**"), including any identifiable cash proceeds from the sale, lease, conveyance, or other disposition of any SIP-II RBL Collateral in accordance with the terms of the SIP-II RBL Documents.

(xiii)     *Intercreditor Agreements*.  Pursuant to that certain Amended Intercreditor Agreement, dated as of December 16, 2013, by and among the II-A RBL Agent, II-A Term Loan Agent, and the II-A Borrower, in each case in its respective capacity as such (as amended, restated, supplemented or otherwise modified from time to time prior to the commencement of these Chapter 11 Cases and with all supplements and exhibits thereto, the "**II-A Intercreditor Agreement**"), that certain Amended Intercreditor Agreement, dated as of December 16, 2013, by and among the II-M RBL Agent, II-M Term Loan Agent, and the II-M Borrower, in each case in its respective capacity as such (as amended, restated, supplemented or otherwise modified from time to time prior to the commencement of these Chapter 11 Cases and with all supplements and exhibits thereto, the "**II-M Intercreditor Agreement**"), and that certain Amended Intercreditor Agreement, dated as of December 16, 2013, by and among the SIP-II RBL Agent, SIP-II Term Loan Agent, and the SIP-II Borrower, in each case in its respective capacity as such (as amended, restated, supplemented or otherwise modified from time to time prior to the

12

commencement of these Chapter 11 Cases and with all supplements and exhibits thereto, the "**SIP-II Intercreditor Agreement**" and, collectively with II-A Intercreditor Agreement and the II-M Intercreditor Agreement, the "**Intercreditor Agreements**") and as more particularly stated therein, each Prepetition Lien is *pari passu* and equal in priority with respect to all Prepetition Collateral.

(xiv)   *Validity of Prepetition Obligations*.  The Prepetition Obligations constitute legal, valid, and binding obligations of the respective Prepetition Obligors.  No offsets, recoupments, defenses, or counterclaims to the Prepetition Obligations exist.  No portion of the Prepetition Obligations or any payments made to the Prepetition Secured Parties or applied to or paid on account of the obligations owing under the Prepetition Debt Documents prior to the Petition Date is subject, pursuant to the Bankruptcy Code or other applicable law, to any contest, avoidance, disallowance, disgorgement, impairment, reduction, recharacterization, recovery, subordination (whether equitable, contractual or otherwise), attachment, offset, recoupment, counterclaim, cross-claim, defense, objection, "claim" (as defined in the Bankruptcy Code) of any kind, cause of action, impairment, or any other challenge of any kind.  The Prepetition Debt Documents are valid and enforceable by the applicable Prepetition Secured Parties and Prepetition Agents, for the benefit of the Prepetition Secured Parties against each of the respective Prepetition Obligors party thereto.  The Prepetition Obligations constitute allowed claims against the applicable Prepetition Obligors' estates.  No claim of or cause of action held by the Debtors or their estates exists against any of the Prepetition Secured Parties or their agents (in such capacity), whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance, or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code), or whether arising under or in connection with any of the Prepetition Debt Documents (or the transactions contemplated thereunder), Prepetition Obligations, or Prepetition Liens, including without limitation, any right to assert any disgorgement or recovery.

(xv)   *Validity, Perfection and Priority of Prepetition Liens*.  The Prepetition Liens (a) secure the applicable Prepetition Obligations, (b) are valid, binding, non-avoidable, properly perfected, and enforceable liens on and security interests in the Prepetition Collateral, (c) were granted to, or for the benefit of, the Prepetition Secured Parties for fair consideration and reasonably equivalent value, and (d) are senior in priority over any and all other liens on the Prepetition Collateral and subject and subordinate only to (1) the Carve Out (as defined herein) and (2) valid, properly perfected, and unavoidable liens permitted under the Prepetition Debt Documents, but only to the extent that such liens are permitted by the Prepetition Debt Documents to be senior to the Prepetition Liens (the "**Permitted Liens**" and each, a "**Permitted Lien**"). No portion of the Prepetition Liens are subject, pursuant to the Bankruptcy Code or other applicable law, to any contest, avoidance, disallowance, disgorgement, impairment, reduction, recharacterization, recovery, subordination (whether equitable, contractual or otherwise), attachment, offset, recoupment, counterclaim, cross-claim, defense, objection, "claim" (as defined in the Bankruptcy Code) of any kind, cause of action, impairment, or any other challenge of any kind.

(xvi)   *No Claims or Causes of Action*.   No claim of or cause of action held by the Debtors or their estates exists against any of the Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance, or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code or applicable state law equivalents), or whether arising under or in connection with any of the Prepetition Debt Documents (or the transactions contemplated thereunder), Prepetition Obligations, or Prepetition Liens, including without limitation, any right to assert any disgorgement or recovery.   Each of the Debtors and their estates irrevocably waives, for itself and its subsidiaries and affiliates, any right to challenge or contest in any way the perfection, validation, priority or enforceability of the Prepetition Liens or the validity or enforceability of the Prepetition Obligations and the Prepetition Debt Documents.

(xvii)   *Initial Budget*.   The Initial Budget (as defined herein) is reasonable under the facts and circumstances.

H.   *Findings Regarding the DIP Financing and Use of Cash Collateral*.

(i)   Good and sufficient cause has been shown for the entry of this Interim Order and authorization for the DIP Loan Parties to obtain financing pursuant to the DIP Facility.

(ii)   The Debtors have an immediate and critical need to continue to use Prepetition Collateral and Cash Collateral and for the DIP Loan Parties to obtain the DIP Financing, in each case on an interim basis, in order to permit, among other things, the orderly continuation of the operation of the Debtors' businesses, to maintain business relationships with contract counterparties, vendors, suppliers and customers, to make payroll, to make capital expenditures, satisfy other working capital and operational needs and fund expenses of these chapter 11 cases.   The access of the Debtors to sufficient working capital and liquidity through the use of Cash Collateral and other Prepetition Collateral, incurrence by the DIP Loan Parties of new indebtedness under the DIP Documents and other financial accommodations provided under the DIP Documents are necessary and vital to the preservation and maintenance of the going concern values of the Debtors and to a successful reorganization of the Debtors.

(iii)    The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without the DIP Loan Parties granting to the DIP Secured Parties, subject to the Carve Out, the DIP Liens and the DIP Superpriority Claims (as defined herein) and, subject to the Carve Out, granting and incurring the Adequate Protection Obligations, in each case, under the terms and conditions set forth in this Interim Order and in the DIP Documents.

(iv)    The Debtors continue to collect cash, rents, income, offspring, products, proceeds, and profits generated from the Prepetition Collateral and acquire equipment, inventory and other personal property, all of which constitute Prepetition Collateral under the Prepetition Debt Documents (as applicable).  The property described in the preceding sentence as it relates to the Prepetition Collateral constitutes Prepetition Collateral that is subject to the Prepetition Secured Parties' security interests.

(v)    The Debtors desire to use a portion of such cash, rents, income, offspring, products, proceeds and profits in their business operations that constitute Cash Collateral of the Prepetition Agents under section 363(a) of the Bankruptcy Code.  Certain prepetition rents, income, offspring, products, proceeds, and profits, in existence as of the Petition Date, including balances of funds in the DIP Loan Parties' prepetition and postpetition operating bank accounts, also constitute Cash Collateral.  The property described in the two preceding sentences as it relates to the Prepetition Collateral constitutes Cash Collateral of the Prepetition Agents.

(vi)     Based on the DIP Motion, the First Day Declaration, the DIP Declaration, and the record presented to the Court at the Interim Hearing, the terms of the DIP Financing, the terms of the Adequate Protection Obligations (as defined herein), the terms on which the Debtors may continue to use the Prepetition Collateral pursuant to this Interim Order and the DIP Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration and represent the best financing presently available.

(vii)    The Prepetition Agents on behalf of the Prepetition Secured Parties have consented to the Debtors' use of the Cash Collateral exclusively on and subject to the terms and conditions set forth herein and for the limited duration of such use provided for herein.

(viii)   To the extent such consent is required, the Prepetition Secured Parties have consented or are deemed under the applicable Prepetition Debt Documents to have consented to the Debtors' use of Cash Collateral and the other Prepetition Collateral, and the DIP Loan Parties' entry into the DIP Documents in accordance with and subject to the terms and conditions in this Interim Order and the DIP Documents.

(ix)     The DIP Financing, as well as the terms of the Adequate Protection Obligations and the Adequate Protection Liens (as defined herein), and the use of the Prepetition Collateral (and Cash Collateral) have been negotiated in good faith and at arm's length among the Debtors and the DIP Secured Parties, and all of the DIP Loan Parties' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Financing and the DIP Documents, including, without limitation: all DIP Loans made to and guarantees issued by the DIP Loan Parties pursuant to the DIP Documents and any DIP Obligations shall be deemed to have been extended by the DIP Agent and the DIP Lenders and their respective affiliates in good

16

faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Agent and the DIP Lenders (and the successors and assigns thereof) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(x)    None of the Prepetition Secured Parties control the Debtors or their properties or operations, have authority to determine the manner in which any Debtor's operations are conducted or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from the Prepetition Debt Documents or this Interim Order (including by permitting the Debtors to use the Cash Collateral or in taking any other actions permitted by this Interim Order), and none of the Prepetition Secured Parties or Prepetition Agents (a) has liability to any third party or shall be deemed to be in control of the operation of any of the Debtors or to be acting as a "controlling person," "responsible person," or "owner or operator" with respect to the operation or management of any of the Debtors (as such term, or any similar terms, is used in the Internal Revenue Code, the Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any other federal or state statute) or (b) owes any fiduciary duty to any of the Debtors, their creditors or their estates, or shall constitute or be deemed to constitute a joint venture or partnership with any of the Debtors.

(xi)    The Prepetition Secured Parties have acted in good faith regarding the DIP Financing and the DIP Loan Parties' continued use of the Prepetition Collateral to fund the administration of the Debtors' estates and continued operation of their businesses (including the incurrence and payment of the Adequate Protection Obligations and the granting of Adequate

Protection Liens (as defined herein)), in accordance with the terms hereof. The Prepetition Secured Parties (and the successors and assigns thereof) shall be entitled to the full protection of section 363(m) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(xii)    The Prepetition Secured Parties are entitled to the adequate protection provided in this Interim Order as and to the extent set forth herein pursuant to sections 361, 362, and 363 of the Bankruptcy Code. Based on the DIP Motion and on the record presented to the Court, the terms of the proposed adequate protection provided to the Prepetition Secured Parties in this Interim Order for any diminution in the value of the Prepetition Secured Parties' interests in property of the Debtors' estates including the Prepetition Collateral from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code, including, without limitation, the imposition of the Automatic Stay pursuant to section 362(a) of the Bankruptcy Code, is consistent with and authorized by the Bankruptcy Code and is offered by the Debtors to protect such parties' interests in the Prepetition Collateral in accordance with sections 361, 362, and 363 of the Bankruptcy Code. The adequate protection provided herein and other benefits and privileges contained herein are necessary in order to (a) protect the Prepetition Secured Parties from the diminution of their respective interests in the value of property of the Debtors' estates including the Prepetition Collateral and (b) obtain the foregoing consents and agreements.

(xiii)    Nothing in this Interim Order shall (a) be construed as the affirmative consent by any of the Prepetition Secured Parties for the use of Cash Collateral other than on the terms set forth in this Interim Order and in the context of the DIP Financing authorized by this Interim Order, (b) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether senior or junior) or (c) prejudice,

limit or otherwise impair the rights of any of the Prepetition Secured Parties to seek new, different or additional adequate protection or assert the interests of any of the Prepetition Secured Parties.

(xiv)   Subject to entry of the Final Order and the Carve Out, (a) each of the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and (b) the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to proceeds, product, offspring, or profits with respect to any of the Prepetition Collateral.

(xv)   The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Rules.  Absent granting the relief set forth in this Interim Order, the Debtors' estates will be immediately and irreparably harmed.   Consummation of the DIP Financing and the use of Prepetition Collateral, in accordance with this Interim Order and the DIP Documents are therefore in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties.

I.     *Immediate Entry*.   Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).

Based upon the foregoing findings and conclusions, the DIP Motion and the record before the Court with respect to the DIP Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.     *Motion Granted*.   The relief requested in the DIP Motion is granted on an interim basis in accordance with the terms and conditions set forth in the DIP Documents and this Interim Order.  Any objections to the DIP Motion with respect to the entry of this Interim Order

that have not been withdrawn, waived, resolved, or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits.

     2.    *Authorization of the DIP Financing and the DIP Documents.*

     (a)    The DIP Loan Parties are hereby authorized to borrow money pursuant to the DIP Credit Agreement, and the DIP Guarantors are hereby authorized to guaranty the DIP Loan Parties' DIP Obligations with respect to such borrowings, in each case up to an aggregate new money principal amount equal to $28,000,000 on an interim basis together with applicable interest, protective advances, expenses, fees and other charges payable in connection with the DIP Facility (such borrowings that are actually funded, the "**Initial Loans**") and, subject to entry of the Final Order, $22,000,000 together with applicable interest, protective advances, expenses, fees and other charges payable in connection with the DIP Facility (such borrowings that are actually funded, the "**Delayed Draw Loans**"), subject to any limitations on borrowing under the DIP Documents, which shall be used for all purposes permitted under the DIP Documents, to provide working capital for the DIP Loan Parties and to pay interest, fees and expenses in accordance with this Interim Order and the DIP Documents.

     (b)    In furtherance of the foregoing and without further approval of this Court, each DIP Loan Party is authorized and directed to perform all acts, to make, execute and deliver all instruments, certificates, registrations and agreements and documents (including, without limitation, the execution or recordation of security agreements, mortgages, deeds of trust, control agreements and financing statements), and to pay all fees in connection with or that may be reasonably required, necessary or desirable for the DIP Loan Parties to implement the terms of, performance of their obligations under or effectuate the purposes of and transactions contemplated by this Interim Order or the DIP Financing, including, without limitation:

(i)     the execution and delivery of, and performance under, each of the DIP Documents;

(ii)    the execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case, in such form as the DIP Loan Parties, the DIP Agent and the Required Lenders (as defined in the DIP Credit Agreement) (the "**Required DIP Lenders**") may agree, it being understood that no further approval of this Court shall be required for any authorizations, amendments, waivers, consents or other modifications to and under the DIP Documents (or to and of any fees and other expenses (including attorneys', accountants', appraisers' and financial advisors' fees), amounts, charges, costs, indemnities and other obligations paid in connection therewith) that do not shorten the maturity of the extensions of credit thereunder or increase the aggregate commitments or the rate of interest payable thereunder;

(iii)   the non-refundable payment to the DIP Agent or the DIP Lenders, as the case may be, of all fees, expenses and other amounts payable under the DIP Documents (which fees, expenses and amounts shall be irrevocable, and shall be deemed to have been approved, upon entry of this Interim Order, whether or not such fees, expenses and amounts arose before or after the Petition Date and whether or not the transactions contemplated hereby are consummated, and upon payment thereof, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise) and any amounts due (or that may become due) in respect of the indemnification obligations, in each case referred to in the DIP Documents (and in any separate letter agreements between any or all DIP Loan Parties, on the one hand, and any of the DIP Agent and/or DIP Lenders, on the other, in connection with the DIP Financing) and the costs and expenses as may be due from time to time, including, without limitation, fees and expenses of the professionals retained by any of the DIP Agent or DIP Lenders (including Davis Polk & Wardwell LLP, Vinson & Elkins LLP, Houlihan Lokey, Inc. and such other advisors as permitted under the DIP Documents), in each case, as provided for in the DIP Documents, without the need to file retention motions or fee applications or to provide notice to any party; *provided*, *however*, that nothing herein or in the DIP Documents shall limit the rights of any party in interest to seek payment of any fees and expenses in accordance with the Plan (as defined in the DIP Documents); *provided further*, that the approval of fees payable under this paragraph shall be subject to the requirements for payments of such fees as outlined in paragraph 17 of this Interim Order; and

(iv)    the performance of all other acts necessary, appropriate or desirable under or in connection with the DIP Documents, including the incurrence, granting and perfecting of the DIP Liens and DIP Superpriority Claims.

2.      *Roll-Up Loans*.  Subject to and effective upon the entry of the Final Order, a dollar amount of the Prepetition Secured Debt equal to the dollar amount of the commitments in respect of the DIP New Money Term Loans in effect on the Closing Date of the DIP Facility shall immediately, automatically and irrevocably be deemed to have been converted into DIP Roll-Up Loans and shall be entitled to all the priorities, privileges, rights, and other benefits afforded to the other DIP Obligations under the Final Order and the DIP Documents, in each case subject to the terms and conditions set forth in the Final Order and the DIP Documents.

3.      *DIP Obligations*. Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute valid, binding and non-avoidable obligations of the DIP Loan Parties party thereto, fully enforceable against each DIP Loan Party and its estate in accordance with the terms of the DIP Documents and this Interim Order, and any successors thereto, including any trustee appointed in the Chapter 11 Cases, or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "**Successor Cases**"). Upon execution and delivery of the DIP Documents, the DIP Obligations will include all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the DIP Loan Parties or the other Credit Parties to the DIP Agent or any of the DIP Lenders, in each case, under, or secured by, the DIP Documents or this Interim Order, including all principal, accrued interest, costs, fees, expenses and other amounts under the DIP Documents. The DIP Loan Parties shall be jointly and severally liable for the DIP Obligations. The DIP Obligations shall be due and payable, without notice or demand, and the use of Cash

22

Collateral shall automatically cease on the occurrence of an Event of Default (as defined herein), except as provided in paragraph 29 herein. No obligation, payment, transfer, or grant of collateral or security hereunder or under the DIP Documents (including any DIP Obligation or DIP Liens (as defined herein), and including in connection with any adequate protection provided to the Prepetition Secured Parties hereunder) shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including under sections 502(d), 544 and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

4.      No DIP Lender or DIP Agent shall have any obligation or responsibility to monitor any DIP Loan Party's use of the DIP Financing, and each DIP Lender and the DIP Agent may rely upon each DIP Loan Party's representations that the amount of DIP Financing requested at any time and the use thereof, are in accordance with the requirements of this Interim Order, the DIP Documents, and Bankruptcy Rule 4001(c)(2).

5.      *Carve Out.*

(a)     As used in this Interim Order, the "**Carve Out**" means the sum of: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below), (ii) all reasonable fees and expenses up to $75,000 incurred by a trustee appointed in the Debtors' Chapter 11 Cases under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below), (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees

and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "**Debtor Professionals**") and the Committee (if any) pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined herein), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice, and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $7,500,000 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**"). Any use of Cash Collateral to make payments to Professional Persons shall be deemed, to the extent of such payments, to be a diminution in the value of the interests of the Prepetition Secured Parties in property of the Debtors' estates. For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, the Prepetition Agents and counsel to the Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)    *Carve Out Reserves*. On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Debtors with a copy to counsel to any Committee that may be appointed in these Chapter 11 Cases (the "**Termination Declaration Date**"), the Debtors shall utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees. The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "**Pre-Carve Out Trigger Notice Reserve**") prior to any and all other claims. On the Termination Declaration Date, after funding the Pre-Carve Out Trigger Notice Reserve, the Debtors shall utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap. The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "**Post-Carve Out Trigger Notice Reserve**" and, together with the Pre-Carve Out Trigger Notice Reserve, the "**Carve Out Reserves**") prior to any and all other claims. All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "**Pre-Carve Out Amounts**"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to

24

pay the Agent for the benefit of the Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date. All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "**Post-Carve Out Amounts**"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date. Notwithstanding anything to the contrary in the DIP Documents, or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 4, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 4, prior to making any payments to the DIP Agent or the Prepetition Secured Parties, as applicable. Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Agent and the Prepetition Agents shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Documents. Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute Loans  or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out and (iii) in no way shall the Initial Budget, Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors. For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, the DIP Facility, or the Prepetition Secured Debt, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Obligations, and the 507(b) Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Obligations.

(c)    *Payment of Allowed Professional Fees Prior to the Termination Declaration Date*.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(d)    *No Direct Obligation to Pay Allowed Professional Fees.*  None of the DIP Secured Parties or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional

Person incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Secured Parties or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(e) *Payment of Carve Out On or After the Termination Declaration Date*. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.

6. *DIP Superpriority Claims*. Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the DIP Loan Parties on a joint and several basis (without the need to file any proof of claim) with priority over any and all claims against the DIP Loan Parties, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "**DIP Superpriority Claims**") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the DIP Loan Parties and all proceeds thereof (excluding claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code or applicable state-law equivalents ("**Avoidance Actions**") but, subject to entry of the Final Order, including any proceeds or property recovered, unencumbered or otherwise, from Avoidance Actions, whether

26

by judgment, settlement or otherwise ("**Avoidance Proceeds**")) in accordance with the DIP Documents and this Interim Order, subject only to the liens on such property and the Carve Out. The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise. The DIP Superpriority Claims shall be senior to the 507(b) Claims (as defined herein); *provided* that the DIP Superpriority Claims in respect of the DIP Roll-Up Loans shall be subject and subordinate to the DIP Superpriority Claims in respect of the DIP New Money Loans.

       7.    *DIP Liens*.

       (a)    *DIP Liens*.  As security for the DIP Obligations, effective and perfected upon the date of this Interim Order and without the necessity of the execution, recordation, registration or filing by the DIP Loan Parties of mortgages, deeds of trust, security agreements, control agreements, pledge agreements, financing statements, notation of certificates of title for titled goods or other similar documents, or the possession or control by the DIP Agent of, or over, any Collateral, the following security interests and liens are hereby granted by the DIP Loan Parties to the DIP Agent for its own benefit and the benefit of the DIP Lenders (all Cash Collateral and other property of the DIP Loan Parties identified in clauses (i) through (iv) below being collectively referred to as the "**DIP Collateral**"), subject only to the payment of the Carve Out (all such liens and security interests granted to the DIP Agent, for its benefit and for the benefit of the DIP Lenders, pursuant to this Interim Order and the DIP Documents, the "**DIP Liens**"):

          (i)    *First Priority Liens on Unencumbered Property*.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all tangible and intangible prepetition and postpetition

27

property of the DIP Loan Parties, whether real or personal, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date, is not subject to a valid, perfected and non-avoidable lien, including, without limitation, any and all unencumbered cash of the DIP Loan Parties (whether maintained with the DIP Agent or affiliate of a DIP Loan Party or otherwise) and any investment of such cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, chattel paper, interests in leaseholds, real properties, real property leaseholds, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, capital stock or other equity interests of subsidiaries, wherever located, intercompany loans and notes, servicing rights, swap and hedge proceeds and termination payments, claims and causes of action, tort claims and the proceeds, products, rents and profits, whether arising under section 552(b) of the Bankruptcy Code or otherwise, of all the foregoing, in each case other than (a) the Excluded Assets, but including the proceeds of Excluded Assets that do not otherwise constitute Excluded Assets, and (b) the Avoidance Actions; (the "**Unencumbered DIP Loan Party Property**"); provided that, upon entry of the Final Order, the Avoidance Proceeds shall constitute DIP Collateral

(ii)     *Liens Priming Certain Prepetition Secured Parties' Liens*.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority priming security interest in and lien upon the Prepetition Collateral regardless of where located, regardless whether or not any liens on such assets are voided, avoided, invalidated, lapsed or unperfected, which shall prime in all respects the interests of the Prepetition Secured Parties arising from current and future liens of the Prepetition Secured Parties (including, without limitation, the Adequate Protection Liens granted to the Prepetition Secured Parties) (the "**Primed Liens**"). Notwithstanding anything herein to the contrary, the DIP Liens shall be (a) subject and junior to the Carve Out in all respects, (b) senior in all respects to the Prepetition Liens and (c) senior to the Adequate Protection Liens.

(iii)    *Liens Junior to Certain Other Liens*.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all tangible and intangible prepetition and postpetition property of each DIP Loan Party other than Unencumbered Property and the property subject to the Primed Liens granted by this Interim Order, which shall be junior and subordinate to (a) any valid, perfected and non-avoidable senior liens (other than the Primed Liens) in existence immediately prior to the

28

Petition Date and (b) any such valid and non-avoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code; *provided* that nothing in the foregoing clauses (a) and (b) shall limit the rights of the DIP Secured Parties under the DIP Documents to the extent such liens are not permitted thereunder; and

(iv) *Liens Senior to Certain Other Liens.* The DIP Liens shall be senior to and not be (i) subject or subordinate to or made *pari passu* with (A) any lien or security interest that is avoided and preserved for the benefit of the DIP Loan Parties and their estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in the DIP Documents or in this Interim Order, any liens or security interests arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Loan Parties or (C) any intercompany or affiliate liens of the DIP Loan Parties or security interests of the DIP Loan Parties; or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code granted after the date hereof.

(b)      *Relative Priority of DIP Liens.*  Notwithstanding anything to the contrary herein, the DIP Liens in respect of the DIP Roll-Up Loans shall be pari passu with DIP Liens in respect of the DIP New Money Loans in all respects; *provided* that any proceeds received on account of the DIP Collateral shall be applied first to repayment of the DIP New Money Loans before any DIP Roll-Up Loans.

(c)      *Automatic Effectiveness of Liens.* The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby vacated and modified to permit the DIP Loan parties to grant the liens and security interests in the DIP Agent, the other DIP Secured Parties and the Prepetition Secured Parties, in any such case, contemplated by this Interim Order and the other DIP Documents.

8.      *Protection of DIP Lenders' Rights.*

(a)      So long as there are any DIP Obligations outstanding or the DIP Lenders have any outstanding Commitments (as defined, and used, in the DIP Credit Agreement) (the

"**DIP Commitments**") under the DIP Credit Agreement, unless the DIP Agent and Required DIP Lenders shall agree in writing otherwise, the Prepetition Secured Parties shall: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Secured Debt Documents or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against such DIP Collateral, including in connection with the Prepetition Liens or the Adequate Protection Liens; (ii) be deemed to have consented to any transfer, disposition or sale of, or release of liens on, such DIP Collateral (but not any proceeds of such transfer, disposition or sale to the extent remaining after payment in cash in full of all DIP Obligations and termination of the DIP Commitments), to the extent such transfer, disposition, sale or release is authorized under the DIP Documents; (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in such DIP Collateral unless, solely as to this clause (iii), the DIP Agent or the DIP Lenders file financing statements or other documents to perfect the liens granted pursuant to this Interim Order, or as may be required by applicable state law to continue the perfection of valid and non-avoidable liens or security interests as of the Petition Date and (iv) at the request of the DIP Agent, deliver or cause to be delivered, at the DIP Loan Parties' cost and expense, any termination statements, releases and/or assignments in favor of the DIP Agent or the DIP Lenders or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of liens on any portion of such DIP Collateral subject to any sale or disposition permitted by the DIP Documents and this Interim Order.

(b)     To the extent any Prepetition Secured Party has possession of any Prepetition Collateral or DIP Collateral or has control with respect to any Prepetition Collateral

or DIP Collateral, or has been noted as a secured party on any certificate of title for a titled good constituting Prepetition Collateral or DIP Collateral, then such Prepetition Secured Party shall be deemed to maintain such possession or notation or exercise such control as a gratuitous bailee and/or gratuitous agent for perfection for the benefit of the DIP Agent and the DIP Lenders, and it shall comply with the instructions of the DIP Agent with respect to the exercise of such control.

(c)      The automatic stay provisions of section 362 of the Bankruptcy Code are hereby vacated and modified to permit all transfers contemplated hereunder and to the extent necessary to permit the DIP Secured Parties in respect of any DIP Facility to enforce all of their rights under the applicable DIP Documents and take any or all of the following actions, at the same or different time: (i) immediately upon the occurrence of an Event of Default (as defined in the DIP Credit Agreement) and in each case without further order or application of the Court, declare (A) the termination, reduction or restriction of any further DIP Commitment to the extent any such DIP Commitment remains, (B) all DIP Obligations to be immediately due, owing and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the DIP Loan Parties, notwithstanding anything herein or in any DIP Document to the contrary, and (C) the termination of the applicable DIP Documents as to any future liability or obligation of the DIP Agent and the applicable DIP Lenders (but, for the avoidance of doubt, without affecting any of the DIP Liens or the DIP Obligations); (ii) seek emergency relief from the Automatic Stay on no more than 5 business days' notice to request a further order of the Court permitting the DIP Secured Parties, whether or not the maturity of any of the DIP Obligations shall have been accelerated, to proceed to protect, enforce and exercise all rights and remedies of the DIP Secured Parties under the DIP Documents for such DIP Facility

or applicable law and to exercise all other rights and remedies provided for in the DIP

Documents and under applicable law with respect to the DIP Collateral, including, but not

limited to, by suit in equity, action at law or other appropriate proceeding, whether for the

specific performance of any covenant or agreement contained in any such DIP Document or any

instrument pursuant to which such DIP Obligations are evidenced, and, if such amount shall have

become due, by declaration or otherwise, proceed to enforce the payment thereof or any other

legal or equitable right of any of such DIP Secured Parties; (iii) unless this Court orders

otherwise during the Remedies Notice Period (as defined herein) after a hearing but otherwise

without further order or application of the Court, upon the occurrence of an Event of Default (as

defined in the DIP Credit Agreement) and the giving of five business days' prior written notice

(which shall run concurrently with any notice required to be provided under the DIP Documents)

(the "**Remedies Notice Period**"), via email to counsel to the Debtors and the office of the United

States Trustee for the District of Delaware (the "**U.S. Trustee**"), to  terminate and withdraw

consent to the DIP Loan Parties' continued use of Cash Collateral; and (iv) without further order

or application of the Court, the termination of the RSA (as defined in the DIP Credit Agreement

(the "**RSA**")) in accordance with the terms thereof.

(d)      Solely during the Remedies Notice Period, the DIP Loan Parties shall be

permitted to use Cash Collateral (i) in the ordinary course of business, subject to the Budget in

accordance with the DIP Documents, and (ii) for the funding of the Carve-Out.  During the

Remedies Notice Period, the Debtors, the Committee (if appointed) and/or any party in interest

shall be entitled to seek an emergency hearing with the Court within the Remedies Notice Period

for the sole purpose of contesting whether, in fact, an Event of Default has occurred and is

continuing.  Except as set forth in this Interim Order, the Debtors shall waive their right to seek

relief under the Bankruptcy Code, including, without limitation, under section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights or remedies of the DIP Secured Parties set forth in this Interim Order or the DIP Documents.

(e)     In no event shall any of the DIP Agent, the DIP Lenders and, subject to entry of the Final Order, the Prepetition Secured Parties, be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral.  Further, subject to entry of the Final Order, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the secured claims of the Prepetition Secured Parties.

(f)     No rights, protections or remedies of the DIP Agent or the DIP Lenders granted by the provisions of this Interim Order or the DIP Documents shall be limited, modified or impaired in any way by: (i) any actual or purported withdrawal of the consent of any party to the DIP Loan Parties' authority to continue to use Cash Collateral, (ii) any actual or purported termination of the DIP Loan Parties' authority to continue to use Cash Collateral; or (iii) the terms of any other order or stipulation related to the DIP Loan Parties' continued use of Cash Collateral or the provision of adequate protection to any party.

(g)     Without limiting the provisions and protections of Paragraph 12 above, but subject in all respects to the Carve Out, if at any time prior to the payment in full in accordance with the DIP Documents of all the DIP Obligations (including subsequent to the confirmation of any chapter 11 plan or plans with respect to any of the Debtors), the Debtors' estates, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed shall obtain credit or incur debt pursuant to sections 364(b), 364(c), 364(d), or any other provision of the Bankruptcy Code in violation of this Interim Order or the DIP Documents, then all of the cash proceeds derived from such credit or debt and all Cash Collateral shall

immediately be turned over to the DIP Agent for application to the DIP Obligations until such DIP Obligations are paid in full.

9.        *Use of Cash Collateral*. The DIP Loan Parties are hereby authorized, subject to the terms and conditions of this Interim Order (including compliance with the Budget (as defined herein) in accordance with the DIP Documents) during the period from the Petition Date through and including date of occurrence of an Event of Default, to use the Cash Collateral; *provided* that (x) the Prepetition Secured Parties are granted the adequate protection as hereinafter set forth and (y) except on the terms and conditions of this Interim Order, the Debtors shall be enjoined and prohibited from at any times using the Cash Collateral absent further order of the Court.  For the avoidance of doubt, the DIP Loan Parties are permitted to use Cash Collateral for Prepetition Secured Parties Adequate Protection Payments, as provided herein.

10.        *Adequate Protection of II-A Term Loan Secured Parties*.  The II-A Term Loan Secured Parties are entitled, pursuant to sections 361, 362, 363(e), and 507 of the Bankruptcy Code, to adequate protection of their interests in property of the Debtors' estates including the Prepetition Collateral, pursuant to the II-A Term Loan Documents, to the extent of the diminution in the value of the II-A Term Loan Secured Parties' respective interests in property of the Debtors' estates including the Prepetition Collateral from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code, including the imposition of the Automatic Stay pursuant to section 362 of the Bankruptcy Code (the "**II-A Term Loan Secured Parties Adequate Protection Claims**").  In consideration of the foregoing, the II-A Term Loan Agent for the benefit of the II-A Term Loan Secured Parties, is hereby granted the following (collectively, the "**II-A Term Loan Adequate Protection Obligations**"):

(a)     *II-A Term Loan Debt Adequate Protection Liens*.  The II-A Term Loan Agent, for itself and for the benefit of the other II-A Term Loan Secured Parties, is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), in the amount of the II-A Term Loan Secured Parties Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon all Cash Collateral and all other of the following (all Cash Collateral and property identified in clauses (i) through (v) below being collectively referred to as the "**II-A Term Loan Adequate Protection Collateral**"), subject only to the Carve Out (all such liens and security interests, the "**II-A Term Loan Secured Parties Adequate Protection Liens**"):

    (i)     *Second Priority Liens on DIP Loan Party Unencumbered Property*: Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected second priority senior security interest in and lien upon all DIP Loan Party Unencumbered Property, which lien and security interest shall rank *pari passu* with the other Adequate Protection Liens (as defined herein) on DIP Loan Party Unencumbered Property and shall be subject only to the DIP Liens.

    (ii)    *First Priority Liens on Other Debtor Unencumbered Property*: Pursuant to section 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all tangible and intangible prepetition and postpetition property of the Debtors that are not DIP Loan Parties, whether real or personal, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date, is not subject to a valid, perfected and non-avoidable lien, including, without limitation, any and all unencumbered cash of such Debtors (whether maintained with the DIP Agent, Prepetition Agents, affiliate of such Debtors or otherwise) and any investment of such cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, chattel paper, interests in leaseholds, real properties, real property leaseholds, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual

property, capital stock or other equity interests of subsidiaries, wherever located, intercompany loans and notes, servicing rights, swap and hedge proceeds and termination payments, claims and causes of action, tort claims and the proceeds, products, rents and profits, whether arising under section 552(b) of the Bankruptcy Code or otherwise, of all the foregoing, in each case other than: (a) the Excluded Assets, but including the proceeds of Excluded Assets that do not otherwise constitute Excluded Assets, and (b) the Avoidance Actions (the "**Other Debtor Unencumbered Property**").

(iii)   *Liens Junior to Certain Other Liens*.  Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all tangible and intangible prepetition and postpetition property of each Debtor, whether real or personal and the proceeds, products, rents and profits thereof, whether arising under section 552(b) of the Bankruptcy Code or otherwise, that is subject to any (a) any valid, perfected and non-avoidable senior liens (other than the Primed Liens) in existence immediately prior to the Petition Date and (b) any such valid and non-avoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (any such liens described in the foregoing clauses (a) and (b), the "**Other Permitted Liens**"), which security interest and lien shall be junior and subordinate to any Other Permitted Liens and DIP Liens on such property, and which security interest and lien shall rank *pari passu* with the other Adequate Protection Liens with respect to such collateral.

(iv)    *Liens Senior to Certain Existing Liens*.  Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected non-voidable priming lien on, and security interest in, the Prepetition Collateral, and all products, proceeds, rents and profits thereof, whether arising from section 552(b) of the Bankruptcy Code or otherwise; *provided* that the II-A Term Loan Secured Parties Adequate Protection Liens set forth in this paragraph (iv) shall be junior to Other Permitted Liens and the DIP Liens on such property; *provided, further* that the II-A Term Loan Secured Parties Adequate Protection Liens set forth in this paragraph (iv) on the Prepetition Collateral shall be senior to the Prepetition Liens with respect to such collateral and *pari passu* with each of the Adequate Protection Liens with respect to such collateral.

(v)     *Status of Adequate Protection Liens.* Subject to the Carve Out and except as otherwise provided herein, the II-A Term Loan Secured Parties Adequate Protection Liens shall be senior to an not be (i) subject or subordinate to or made *pari passu* with (A) any lien or security interest that is avoided and preserved for the benefit of the

Debtors and their estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in this Interim Order, any liens or security interests arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors or (C) any intercompany or affiliate liens of the Debtors or security interests of the Debtors; or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code granted after the date hereof.

(b)      *II-A Term Loan Debt Section 507(b) Claims*.  The II-A Term Loan Agent, for itself and for the benefit of the other II-A Term Loan Secured Parties, is hereby granted, subject to the Carve Out, an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the II-A Term Loan Secured Parties Adequate Protection Claims with, except as set forth in this Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**II-A Term Loan Secured Parties 507(b) Claim**"), which administrative claim shall have recourse to and be payable from all prepetition and postpetition property of the Debtors.  The II-A Term Loan Secured Parties 507(b) Claim shall be subject and subordinate only to the Carve Out and the DIP Superpriority Claims and shall rank *pari passu* with the other Prepetition Secured Parties 507(b) Claims (as defined herein).

(c)      *II-A Term Loan Debt Adequate Protection Cash Payments*.  Subject to paragraph 17 of this Interim Order, the II-A Term Loan Agent, for the benefit of the applicable Term Loan Secured Parties, shall receive current payment in cash on the due dates provided in the II-A Term Loan Documents in an amount equal to the sum of all unpaid fees and expenses owing to the II-A Term Loan Agent under the II-A Term Loan Documents (collectively, the "**II-A Term Loan Secured Parties Adequate Protection Payments**").

11.     *Adequate Protection of II-M Term Loan Secured Parties*.  The II-M Term Loan Secured Parties are entitled, pursuant to sections 361, 362, 363(e), and 507 of the Bankruptcy Code, to adequate protection of their interests in property of the Debtors' estates including the Prepetition Collateral pursuant to the II-M Term Loan Documents, to the extent of the diminution in the value of the II-M Term Loan Secured Parties' respective interests in property of the Debtors' estates including the Prepetition Collateral from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code, including the imposition of the Automatic Stay pursuant to section 362 of the Bankruptcy Code (the "**II-M Term Loan Secured Parties Adequate Protection Claims**").  In consideration of the foregoing, the II-M Term Loan Agent for the benefit of the II-M Term Loan Secured Parties, is hereby granted the following (collectively, the "**II-M Term Loan Adequate Protection Obligations**"):

(a)     *II-M Term Loan Debt Adequate Protection Liens*.  The II-M Term Loan Agent, for itself and for the benefit of the other II-M Term Loan Secured Parties, is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), in the amount of the II-M Term Loan Secured Parties Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon all Cash Collateral and all other of the following (all Cash Collateral and property identified in clauses (i) through (v) below being collectively referred to as the "**II-M Term Loan Adequate Protection Collateral**"), subject only to the Carve Out (all such liens and security interests, the "**II-M Term Loan Secured Parties Adequate Protection Liens**"):

(i)     *Second Priority Liens on DIP Loan Party Unencumbered Property*: Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected second priority senior security interest in and lien upon all DIP Loan Party

38

Unencumbered Property, which lien and security interest shall rank *pari passu* with the other Adequate Protection Liens (as defined herein) on DIP Loan Party Unencumbered Property and shall be subject only to the DIP Liens.

(ii)     *First Priority Liens on Other Debtor Unencumbered Property*: Pursuant to section 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all Other Debtor Unencumbered Property, other than: (i) the Excluded Assets, but including the proceeds of Excluded Assets that do not otherwise constitute Excluded Assets, and (ii) the Avoidance Actions.

(iii)     *Liens Junior to Certain Other Liens*.  Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all tangible and intangible prepetition and postpetition property of each Debtor, whether real or personal, and the proceeds, products, rents and profits thereof, whether arising under section 552(b) of the Bankruptcy Code or otherwise, that is subject to any Other Permitted Lien, which security interest and lien shall be junior and subordinate to any Other Permitted Liens and DIP Liens on such property, and which security interest and lien shall rank *pari passu* with the other Adequate Protection Liens with respect to such collateral.

(iv)     *Liens Senior to Certain Existing Liens*.  Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected priming lien on, and security interest in, the Prepetition Collateral, and all products, proceeds, rents and profits thereof, whether arising from section 552(b) of the Bankruptcy Code or otherwise; *provided*, that the II-M Term Loan Secured Parties Adequate Protection Liens set forth in this paragraph (iv) shall be junior to any Other Permitted Liens and the DIP Liens on such property; *provided*, *further* that the II-M Term Loan Secured Parties Adequate Protection Liens set forth in this paragraph (iv) on the Prepetition Collateral shall be senior to the Prepetition Liens with respect to such collateral and *pari passu* with each of the Adequate Protection Liens with respect to such collateral.

(v)     *Status of Adequate Protection Liens.* Subject to the Carve Out and except as otherwise provided herein, the II-M Term Loan Secured Parties Adequate Protection Liens shall be senior to and not be (i) subject or subordinate to or made *pari passu* with (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in this Interim Order, any liens or security interests arising after the Petition Date, including, without

limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors or (C) any intercompany or affiliate liens of the Debtors or security interests of the Debtors; or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code granted after the date hereof.

(b)      *II-M Term Loan Debt Section 507(b) Claims*.  The II-M Term Loan Agent, for itself and for the benefit of the other II-M Term Loan Secured Parties, is hereby granted, subject to the Carve Out, an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the II-M Term Loan Secured Parties Adequate Protection Claims with, except as set forth in this Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**II-M Term Loan Secured Parties 507(b) Claim**"), which administrative claim shall have recourse to and be payable from all prepetition and postpetition property of the Debtors.  The II-M Term Loan Secured Parties 507(b) Claim shall be subject and subordinate only to the Carve Out and the DIP Superpriority Claims and shall rank *pari passu* with the other Prepetition Secured Parties 507(b) Claims.

(c)      *II-M Term Loan Debt Adequate Protection Cash Payments*.  Subject to paragraph 17 of this Interim Order, the II-M Term Loan Agent, for the benefit of the applicable Term Loan Secured Parties, shall receive current payment in cash on the due dates provided in the II-M Term Loan Documents in an amount equal to the sum of all unpaid fees and expenses owing to the II-M Term Loan Agent under the II-M Term Loan Documents (collectively, the "**II-M Term Loan Secured Parties Adequate Protection Payments**").

12.      *Adequate Protection of SIP-II Term Loan Secured Parties*.  The SIP-II Term Loan Secured Parties are entitled, pursuant to sections 361, 362, 363(e), and 507 of the Bankruptcy

Code, to adequate protection of their interests in property of the Debtors' estates including the Prepetition Collateral pursuant to the SIP-II Term Loan Documents, to the extent of the diminution in the value of the SIP-II Term Loan Secured Parties' respective interests in property of the Debtors' estates including the Prepetition Collateral from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code, including the imposition of the Automatic Stay pursuant to section 362 of the Bankruptcy Code (the "**SIP-II Term Loan Secured Parties Adequate Protection Claims**").  In consideration of the foregoing, the SIP-II Term Loan Agent for the benefit of the SIP-II Term Loan Secured Parties, is hereby granted the following (collectively, the "**SIP-II Term Loan Adequate Protection Obligations**"):

(a)    *SIP-II Term Loan Debt Adequate Protection Liens*.  The SIP-II Term Loan Agent, for itself and for the benefit of the other SIP-II Term Loan Secured Parties, is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), in the amount of the SIP-II Term Loan Secured Parties Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon all Cash Collateral and all other of the following (all Cash Collateral and property identified in clauses (i) through (v) below being collectively referred to as the "**SIP-II Term Loan Adequate Protection Collateral**" and, collectively with the II-A Term Loan Adequate Protection Collateral and the II-M Term Loan Adequate Protection Collateral, the "**Term Loan Adequate Protection Collateral**"), subject only to the Carve Out (all such liens and security interests, the "**SIP-II Term Loan Secured Parties Adequate Protection Liens**"):

(i)    *Second Priority Liens on DIP Loan Party Unencumbered Property*: Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected second priority senior security interest in and lien upon all DIP Loan Party

Unencumbered Property, which lien and security interest shall rank *pari passu* with the other Adequate Protection Liens (as defined herein) on DIP Loan Party Unencumbered Property and shall be subject only to the DIP Liens.

(ii) *First Priority Liens on Other Debtor Unencumbered Property*: Pursuant to section 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all Other Debtor Unencumbered Property, other than: (i) the Excluded Assets, but including the proceeds of Excluded Assets that do not otherwise constitute Excluded Assets, and (ii) the Avoidance Actions.

(iii) *Liens Junior to Certain Other Liens*. Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all tangible and intangible prepetition and postpetition property of each Debtor, whether real or personal, and the proceeds, products, rents and profits thereof, whether arising under section 552(b) of the Bankruptcy Code or otherwise, that is subject to any Other Permitted Lien, which security interest and lien shall be junior and subordinate to any Other Permitted Liens and DIP Liens on such property, and which security interest and lien shall rank *pari passu* with the other Adequate Protection Liens with respect to such collateral.

(iv) *Liens Senior to Certain Existing Liens*. Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected priming lien on, and security interest in, the Prepetition Collateral, and all products, proceeds, rents and profits thereof, whether arising from section 552(b) of the Bankruptcy Code or otherwise; *provided*, that the SIP-II Term Loan Secured Parties Adequate Protection Liens set forth in this paragraph (iv) shall be junior to any Other Permitted Liens and the DIP Liens on such property; *provided*, *further* that the SIP-II Term Loan Secured Parties Adequate Protection Liens set forth in this paragraph (iv) on the Prepetition Collateral shall be senior to the Prepetition Liens with respect to such collateral and *pari passu* with each of the Adequate Protection Liens with respect to such collateral

(v) *Status of Adequate Protection Liens.* Subject to the Carve Out and except as otherwise provided herein, the SIP-II Term Loan Secured Parties Adequate Protection Liens shall be senior to and not be (i) subject or subordinate to or made *pari passu* with (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in this Interim Order, any liens or security interests arising after the Petition Date, including, without

limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors or (C) any intercompany or affiliate liens of the Debtors or security interests of the Debtors; or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code granted after the date hereof.   For the avoidance of doubt, the Debtors are permitted to grant the following postpetition liens and security interests: (i) those granted pursuant to this Interim Order, (ii) carriers', mechanics', operators', repairmen's, warehousemen's, or other similar liens arising in the ordinary course of business, (iii) pledges and deposits in connection with workers' compensation, unemployment insurance and other social security legislation, and (iv) deposits to secure the payment of any postpetition statutory obligations and performance bonds.

(b)      *SIP-II Term Loan Debt Section 507(b) Claims*.   The SIP-II Term Loan Agent, for itself and for the benefit of the other SIP-II Term Loan Secured Parties, is hereby granted, subject to the Carve Out, an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the SIP-II Term Loan Secured Parties Adequate Protection Claims with, except as set forth in this Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**SIP-II Term Loan Secured Parties 507(b) Claim**"), which administrative claim shall have recourse to and be payable from all prepetition and postpetition property of the Debtors.   The SIP-II Term Loan Secured Parties 507(b) Claim shall be subject and subordinate only to the Carve Out and the DIP Superpriority Claims and shall rank *pari passu* with the other Prepetition Secured Parties 507(b) Claims.

(c)      *SIP-II Term Loan Debt Adequate Protection Cash Payments*.   Subject to paragraph 17 of this Interim Order, the SIP-II Term Loan Agent, for the benefit of the applicable Term Loan Secured Parties, shall receive current payment in cash on the due dates provided in the SIP-II Term Loan Documents in an amount equal to the sum of all unpaid fees and expenses

owing to the SIP-II Term Loan Agent under the SIP-II Term Loan Documents (collectively, the "**SIP-II Term Loan Secured Parties Adequate Protection Payments**").

13.    *Adequate Protection of II-A RBL Secured Parties*.  The II-A RBL Secured Parties are entitled, pursuant to sections 361, 362, 363(e), and 507 of the Bankruptcy Code, to adequate protection of their interests in property of the Debtors' estates including the Prepetition Collateral pursuant to the II-A RBL Documents, to the extent of the diminution in the value of the II-A RBL Secured Parties' respective interests in property of the Debtors' estates including the Prepetition Collateral from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code, including the imposition of the Automatic Stay pursuant to section 362 of the Bankruptcy Code (the "**II-A RBL Secured Parties Adequate Protection Claims**"). In consideration of the foregoing, the II-A RBL Agent for the benefit of the II-A Term Loan Secured Parties, is hereby granted the following (collectively, the "**II-A RBL Adequate Protection Obligations**"):

(a)    *II-A RBL Debt Adequate Protection Liens*.  The II-A RBL Agent, for itself and for the benefit of the other II-A RBL Secured Parties, is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), in the amount of the II-A RBL Secured Parties Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon Cash Collateral and all other of the following (all Cash Collateral and property identified in clauses (i) through (v) below being collectively referred to as the "**II-A RBL Adequate Protection Collateral**"), subject only to the Carve Out (all such liens and security interests, the "**II-A RBL Secured Parties Adequate Protection Liens**"):

(i)     *Second Priority Liens on DIP Loan Party Unencumbered Property*: Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected second priority senior security interest in and lien upon all DIP Loan Party Unencumbered Property, which lien and security interest shall rank *pari passu* with the other Adequate Protection Liens (as defined herein) on DIP Loan Party Unencumbered Property and shall be subject only to the DIP Liens.

(ii)    *First Priority Liens on Other Debtor Unencumbered Property*: Pursuant to section 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all Other Debtor Unencumbered Property, other than: (i) the Excluded Assets, but including the proceeds of Excluded Assets that do not otherwise constitute Excluded Assets, and (ii) the Avoidance Actions.

(iii)   *Liens Junior to Certain Other Liens*.  Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all tangible and intangible prepetition and postpetition property of each Debtor, whether real or personal, and the proceeds, products, rents and profits thereof, whether arising under section 552(b) of the Bankruptcy Code or otherwise, that is subject to any Other Permitted Lien, which security interest and lien shall be junior and subordinate to any Other Permitted Liens and DIP Liens on such property, and which security interest and lien shall rank *pari passu* with the other Adequate Protection Liens with respect to such collateral.

(iv)    *Liens Senior to Certain Existing Liens*.  Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected priming lien on, and security interest in, the Prepetition Collateral, and all products, proceeds, rents and profits thereof, whether arising from section 552(b) of the Bankruptcy Code or otherwise; *provided*, that the II-A RBL Secured Parties Adequate Protection Liens set forth in this paragraph (iv) shall be junior to any Other Permitted Liens and the DIP Liens on such property; *provided*, *further* that the II-A RBL Secured Parties Adequate Protection Liens set forth in this paragraph (iv) on the Prepetition Collateral shall be senior to the Prepetition Liens with respect to such collateral and *pari passu* with each of the Adequate Protection Liens with respect to such collateral

(v)     *Status of Adequate Protection Liens.* Subject to the Carve Out and except as otherwise provided herein, the II-A RBL Secured Parties Adequate Protection Liens shall be senior to and not be (i) subject or subordinate to or made *pari passu* with (A) any lien or security interest

that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in this Interim Order, any liens or security interests arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors or (C) any intercompany or affiliate liens of the Debtors or security interests of the Debtors; or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code granted after the date hereof. For the avoidance of doubt, the Debtors are permitted to grant the following postpetition liens and security interests: (i) those granted pursuant to this Interim Order, (ii) carriers', mechanics', operators', repairmen's, warehousemen's, or other similar liens arising in the ordinary course of business, (iii) pledges and deposits in connection with workers' compensation, unemployment insurance and other social security legislation, and (iv) deposits to secure the payment of any postpetition statutory obligations and performance bonds.

(b)     *II-A RBL Debt Section 507(b) Claims*. The II-A RBL Agent, for itself and for the benefit of the other II-A RBL Secured Parties, is hereby granted, subject to the Carve Out, an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the II-A RBL Secured Parties Adequate Protection Claims with, except as set forth in this Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**II-A RBL Secured Parties 507(b) Claim**"), which administrative claim shall have recourse to and be payable from all prepetition and postpetition property of the Debtors. The II-A RBL Secured Parties 507(b) Claim shall be subject and subordinate only to the Carve Out and the DIP Superpriority Claims and shall rank *pari passu* with the other Prepetition Secured Parties 507(b) Claims.

(c)     *II-A RBL Debt Adequate Protection Cash Payments*. Subject to paragraph 17 of this Interim Order, the II-A RBL Agent, for the benefit of the applicable II-A RBL Secured

Parties, shall receive current payment in cash on the due dates provided in the II-A RBL Documents in an amount equal to the sum of all unpaid fees and expenses owing to the II-A RBL Agent under the II-A RBL Documents (collectively, the "**II-A RBL Secured Parties Adequate Protection Payments**").

14.     *Adequate Protection of II-M RBL Secured Parties.*   The II-M RBL Secured Parties are entitled, pursuant to sections 361, 362, 363(e), and 507 of the Bankruptcy Code, to adequate protection of their interests in property of the Debtors' estates including the Prepetition Collateral pursuant to the II-M RBL Documents, to the extent of the diminution in the value of the II-M RBL Secured Parties' respective interests in property of the Debtors' estates including the Prepetition Collateral from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code, including the imposition of the Automatic Stay pursuant to section 362 of the Bankruptcy Code (the "**II-M RBL Secured Parties Adequate Protection Claims**"). In consideration of the foregoing, the II-M RBL Agent for the benefit of the II-M Term Loan Secured Parties, is hereby granted the following (collectively, the "**II-M RBL Adequate Protection Obligations**"):

(a)     *II-M RBL Debt Adequate Protection Liens.*   The II-M RBL Agent, for itself and for the benefit of the other II-M RBL Secured Parties, is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), in the amount of the II-M RBL Secured Parties Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon all Cash Collateral and all other of the following (all Cash Collateral and property identified in clauses (i) through (v) below being collectively referred to as the "**II-M RBL Adequate Protection Collateral**"), subject only to the Carve Out

(all such liens and security interests, the "**II-M RBL Secured Parties Adequate Protection Liens**"):

    (i)    *Second Priority Liens on DIP Loan Party Unencumbered Property*: Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected second priority senior security interest in and lien upon all DIP Loan Party Unencumbered Property, which lien and security interest shall rank *pari passu* with the other Adequate Protection Liens (as defined herein) on DIP Loan Party Unencumbered Property and shall be subject only to the DIP Liens.

    (ii)    *First Priority Liens on Other Debtor Unencumbered Property*: Pursuant to section 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all Other Debtor Unencumbered Property, other than: (i) the Excluded Assets, but including the proceeds of Excluded Assets that do not otherwise constitute Excluded Assets, and (ii) the Avoidance Actions.

    (iii)    *Liens Junior to Certain Other Liens*.  Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all tangible and intangible prepetition and postpetition property of each Debtor, whether real or personal, and the proceeds, products, rents and profits thereof, whether arising under section 552(b) of the Bankruptcy Code or otherwise, that is subject to any Other Permitted Lien, which security interest and lien shall be junior and subordinate to any Other Permitted Liens and DIP Liens on such property, and which security interest and lien shall rank *pari passu* with the other Adequate Protection Liens with respect to such collateral.

    (iv)    *Liens Senior to Certain Existing Liens*.  Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected priming lien on, and security interest in, the Prepetition Collateral, and all products, proceeds, rents and profits thereof, whether arising from section 552(b) of the Bankruptcy Code or otherwise; *provided*, that the II-M RBL Secured Parties Adequate Protection Liens set forth in this paragraph (iv) shall be junior to any Other Permitted Liens and the DIP Liens on such property; *provided*, *further* that the II-M RBL Secured Parties Adequate Protection Liens set forth in this paragraph (iv) on the Prepetition Collateral shall be senior to the Prepetition Liens with respect to such collateral and *pari passu* with each of the Adequate Protection Liens with respect to such collateral

(v) *Status of Adequate Protection Liens.* Subject to the Carve Out and except as otherwise provided herein, the II-M RBL Secured Parties Adequate Protection Liens shall be senior to and not be (i) subject or subordinate to or made *pari passu* with (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in this Interim Order, any liens or security interests arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors or (C) any intercompany or affiliate liens of the Debtors or security interests of the Debtors; or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code granted after the date hereof.  For the avoidance of doubt, the Debtors are permitted to grant the following postpetition liens and security interests: (i) those granted pursuant to this Interim Order, (ii) carriers', mechanics', operators', repairmen's, warehousemen's, or other similar liens arising in the ordinary course of business, (iii) pledges and deposits in connection with workers' compensation, unemployment insurance and other social security legislation, and (iv) deposits to secure the payment of any postpetition statutory obligations and performance bonds.

(b) *II-M RBL Debt Section 507(b) Claims.*  The II-M RBL Agent, for itself and for the benefit of the other II-M RBL Secured Parties, is hereby granted, subject to the Carve Out, an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the II-M RBL Secured Parties Adequate Protection Claims with, except as set forth in this Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**II-M RBL Secured Parties 507(b) Claim**"), which administrative claim shall have recourse to and be payable from all prepetition and postpetition property of the Debtors.  The II-M RBL Secured Parties 507(b) Claim shall be subject and subordinate only to the Carve Out and the DIP Superpriority Claims and shall rank *pari passu* with the other Prepetition Secured Parties 507(b) Claims.

49

(c)      *II-M RBL Debt Adequate Protection Cash Payments*.      Subject to paragraph 17 of this Interim Order, the II-M RBL Agent, for the benefit of the applicable II-M RBL Secured Parties, shall receive current payment in cash on the due dates provided in the II-M RBL Documents in an amount equal to the sum of all unpaid fees and expenses owing to the II-M RBL Agent under the II-M RBL Documents (collectively, the "**II-M RBL Secured Parties Adequate Protection Payments**").

15.      *Adequate Protection of SIP-II RBL Secured Parties*.      The SIP-II RBL Secured Parties are entitled, pursuant to sections 361, 362, 363(e), and 507 of the Bankruptcy Code, to adequate protection of their interests in property of the Debtors' estates including the Prepetition Collateral pursuant to the SIP-II RBL Documents, to the extent of the diminution in the value of the SIP-II RBL Secured Parties' respective interests in property of the Debtors' estates from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code, including the imposition of the Automatic Stay pursuant to section 362 of the Bankruptcy Code (the "**SIP-II RBL Secured Parties Adequate Protection Claims**" and, collectively with the II-A Term Loan Secured Parties Adequate Protection Claims, II-M Term Loan Secured Parties Adequate Protection Claims, SIP-II Term Loan Secured Parties Adequate Protection Claims, II-A RBL Secured Parties Adequate Protection Claims, and II-M RBL Secured Parties Adequate Protection Claims, the "**Adequate Protection Claims**").   In consideration of the foregoing, the SIP-II RBL Agent for the benefit of the SIP-II Term Loan Secured Parties, is hereby granted the following (collectively, the "**SIP-II RBL Adequate Protection Obligations**" and, collectively with the II-A Term Loan Secured Parties Adequate Protection Obligations, II-M Term Loan Secured Parties Adequate Protection Obligations, SIP-II Term Loan Secured Parties Adequate Protection

Obligations, II-A RBL Secured Parties Adequate Protection Obligations, and II-M RBL Secured Parties Adequate Protection Obligations, the "**Adequate Protection Obligations**"):

      (a)    *SIP-II RBL Debt Adequate Protection Liens*. The SIP-II RBL Agent, for itself and for the benefit of the other SIP-II RBL Secured Parties, is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), in the amount of the SIP-II RBL Secured Parties Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon all Cash Collateral and all other of the following (all Cash Collateral and property identified in clauses (i) through (v) below being collectively referred to as the "**SIP-II RBL Adequate Protection Collateral**" and, collectively with the II-A RBL Adequate Protection Collateral, the II-M RBL Adequate Protection Collateral and the Term Loan Adequate Protection Collateral, the "**Adequate Protection Collateral**"), subject only to the Carve Out (all such liens and security interests, the SIP-II RBL Secured Parties Adequate Protection Liens and, collectively with the II-A Term Loan Secured Parties Adequate Protection Liens, II-M Term Loan Secured Parties Adequate Protection Liens, SIP-II Term Loan Secured Parties Adequate Protection Liens, II-A RBL Secured Parties Adequate Protection Liens, II-M RBL Secured Parties Adequate Protection Liens, the "**Adequate Protection Liens**"):

      (i)    *Second Priority Liens on DIP Loan Party Unencumbered Property*: Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected second priority senior security interest in and lien upon all DIP Loan Party Unencumbered Property, which lien and security interest shall rank *pari passu* with the other Adequate Protection Liens (as defined herein) on DIP Loan Party Unencumbered Property and shall be subject only to the DIP Liens.

      (ii)    *First Priority Liens on Other Debtor Unencumbered Property*: Pursuant to section 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority

senior security interest in and lien upon all Other Debtor Unencumbered Property, other than: (i) the Excluded Assets, but including the proceeds of Excluded Assets that do not otherwise constitute Excluded Assets, and (ii) the Avoidance Actions.

(iii)     *Liens Junior to Certain Other Liens*.  Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all tangible and intangible prepetition and postpetition property of each Debtor, whether real or personal, and the proceeds, products, rents and profits thereof, whether arising under section 552(b) of the Bankruptcy Code or otherwise, that is subject to any Other Permitted Lien, which security interest and lien shall be junior and subordinate to any Other Permitted Liens and DIP Liens on such property, and which security interest and lien shall rank *pari passu* with the other Adequate Protection Liens with respect to such collateral.

(iv)     *Liens Senior to Certain Existing Liens*.  Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected priming lien on, and security interest in, the Prepetition Collateral, and all products, proceeds, rents and profits thereof, whether arising from section 552(b) of the Bankruptcy Code or otherwise; *provided*, that the SIP-II RBL Secured Parties Adequate Protection Liens set forth in this paragraph (iv) shall be junior to any Other Permitted Liens and the DIP Liens on such property; *provided*, *further* that the SIP-II RBL Secured Parties Adequate Protection Liens set forth in this paragraph (iv) on the Prepetition Collateral shall be senior to the Prepetition Liens with respect to such collateral and *pari passu* with each of the Adequate Protection Liens with respect to such collateral

(v)     *Status of Adequate Protection Liens.* Subject to the Carve Out and except as otherwise provided herein, the SIP-II RBL Secured Parties Adequate Protection Liens shall be senior to and not be (i) subject or subordinate to or made *pari passu* with (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in this Interim Order, any liens or security interests arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors or (C) any intercompany or affiliate liens of the Debtors or security interests of the Debtors; or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code granted after the date hereof.  For the avoidance of doubt, the Debtors are permitted to grant the following postpetition liens and

security interests: (i) those granted pursuant to this Interim Order, (ii) carriers', mechanics', operators', repairmen's, warehousemen's, or other similar liens arising in the ordinary course of business, (iii) pledges and deposits in connection with workers' compensation, unemployment insurance and other social security legislation, and (iv) deposits to secure the payment of any postpetition statutory obligations and performance bonds.

(b)    *SIP-II RBL Debt Section 507(b) Claims.*  The SIP-II RBL Agent, for itself and for the benefit of the other SIP-II RBL Secured Parties, is hereby granted, subject to the Carve Out, an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the SIP-II RBL Secured Parties Adequate Protection Claims with, except as set forth in this Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**SIP-II RBL Secured Parties 507(b) Claim**" and, collectively with the II-A Term Loan Secured Parties 507(b) Claim, II-M Term Loan Secured Parties 507(b) Claim, SIP-II Term Loan Secured Parties 507(b) Claim, II-A RBL Secured Parties 507(b) Claim, and II-M RBL Secured Parties 507(b) Claim, the "**Prepetition Secured Parties 507(b) Claims**"), which administrative claim shall have recourse to and be payable from all prepetition and postpetition property of the Debtors.  The SIP-II RBL Secured Parties 507(b) Claim shall be subject and subordinate only to the Carve Out and the DIP Superpriority Claims and shall rank *pari passu* with the other Prepetition Secured Parties 507(b) Claims.

(c)    *SIP-II RBL Debt Adequate Protection Cash Payments.*  Subject to paragraph 17 of this Interim Order, the SIP-II RBL Agent, for the benefit of the applicable SIP-II RBL Secured Parties, shall receive current payment in cash on the due dates provided in the SIP-II RBL Documents in an amount equal to the sum of all unpaid fees and expenses owing to the SIP-II RBL Agent under the SIP-II RBL Documents (collectively, the "**SIP-II RBL Secured**

**Parties Adequate Protection Payments**" and, collectively with the II-A Term Loan Secured Parties Adequate Protection Payments, II-M Term Loan Secured Parties Adequate Protection Payments, SIP-II Term Loan Secured Parties Adequate Protection Payments, II-M RBL Secured Parties Adequate Protection Payments, and II-A RBL Secured Parties Adequate Protection Payments, the "**Prepetition Secured Parties Adequate Protection Payments**").

      16.    *Other Adequate Protection of Prepetition Secured Parties.*

      (a)    *Prepetition Secured Parties Fees and Expenses.*  Upon entry of this Interim Order, the Debtors are authorized and directed to pay in cash all reasonable and documented out-of-pocket professional fees and expenses payable to the advisors to the Term Loan Agents and the advisors to the RBL Agents, including, without limitation, the fees and expenses of (A) Davis Polk & Wardwell LLP, (B) Vinson & Elkins LLP, (C) Houlihan Lokey, Inc. and (D) special and local counsel in each relevant jurisdiction, and all reasonable and documented out-of-pocket professional fees and expenses payable to the Prepetition Agents that have accrued as of the Petition Date.  The payment of the fees, expenses and disbursements (to the extent incurred after the Petition Date) set forth in this paragraph 16(a) of this Interim Order shall be made within ten (10) days (which time period may be extended by the applicable professional) after the receipt by the Debtors, the U.S. Trustee, and counsel for the Committee (if any) (the "**Review Period**") of invoices therefore without the necessity of filing formal fee applications or compliance with the U.S. Trustee's fee guidelines.  Such invoices provided to the Debtors, the U.S. Trustee, and counsel for the Committee (if any) shall include the number of hours billed by the applicable professional (except for financial advisors compensated on other than an hourly basis) and a summary statement of services provided and the expenses incurred, which may be redacted or modified to the extent necessary to delete any information subject to

the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine. Any objections raised by the Debtors, the U.S. Trustee, or the Committee (if any) with respect to such invoices must be in writing and state with particularity the grounds therefore and must be submitted to the applicable professional so as to be actually received prior to the expiration of the Review Period. Following the Review Period, any such timely received objection will be subject to resolution by the Court to the extent it remains unresolved. Pending such resolution, the undisputed portion of any such invoice will be paid promptly by the Debtors and the applicable parties shall attempt to negotiate a resolution in good faith until the time of such resolution by the Court. Notwithstanding the foregoing, the Debtors are authorized and directed to pay all adequate protection fees and expenses incurred under this paragraph 16(a) of this Interim Order prior to the Petition Date without the need for any applicable professional to first deliver a copy of its invoice or other supporting documentation.

(b)     *Financial Reporting.*  The Debtors shall comply with all reporting requirements and honor all inspection rights set forth in the Prepetition Debt Documents and shall provide such other business or financial information that is reasonably requested by the RBL Agents, the Term Loan Agents, or their respective advisors.

(c)     *Milestones.* Subject only to and effective upon entry of the Final Order, the Prepetition Secured Parties are hereby entitled to the performance by the Debtors of the Milestones (as defined in the DIP Credit Agreement).

17.     *Budget Maintenance and Compliance.*  The Debtors have prepared and delivered to the DIP Agent an initial budget, in form and substance acceptable to the DIP Agent and the

Required DIP Lenders (the "**Initial Budget**"), a copy of which is attached to this Interim Order as **Schedule 1**.  The Initial Budget sets forth, among other things, the Debtors' projected receipts, operating disbursements (including payroll and benefits, general and administrative expenses, and royalty payments), non-operating disbursements (including capital expenditures, debt service and professional fees), and net cash flow, for each calendar week during the period from the Petition Date through and including the end of the thirteenth (13th) calendar week following the Petition Date.  Pursuant to the DIP Credit Agreement, the Debtors shall prepare and deliver a new budget every four weeks after the Petition Date covering the thirteen (13) calendar week period commencing on the first day of each four-week anniversary of the Petition Date, in form and substance reasonably satisfactory to the Required DIP Lenders (the Initial Budget and each subsequent approved budget (a "**Budget**") (including any changes made in any such updated Budget with respect to any periods that were included in a previously delivered Budget; *provided* that a separate explanation in reasonable detail of such changes shall be provided to the DIP Lenders), it being understood that if the Required DIP Lenders have not objected to an updated Budget within ten (10) days after delivery thereof, the updated Budget shall be deemed to be approved.  The Budget is approved on an interim basis.  DIP Collateral, Prepetition Collateral and Cash Collateral under this Interim Order shall only be used by the Debtors in accordance with this Interim Order and consistent with the Budget in accordance with the DIP Documents or as otherwise agreed by the Required DIP Lenders.  As set forth in the DIP Credit Agreement, the Budget may be modified with the written consent of the Debtors and the Required DIP Lenders and such modified Budget shall be filed with the Bankruptcy Court.  None of the Prepetition Secured Parties' or DIP Secured Parties' consent (if any) to, or acknowledgment of, the Budget shall be construed as consent to use of the proceeds of the DIP Collateral, Adequate Protection

Collateral, Prepetition Collateral or Cash Collateral after an Event of Default or Termination Declaration Date, regardless of whether the aggregate funds shown on the Budget have been expended.

18.     Upon payment in full of all DIP Obligations, the Budget shall continue to be updated in accordance with the terms and conditions of the DIP Credit Agreement, except that the approval of the Prepetition Agents shall be substituted for the approval of the DIP Agent and/or the Required DIP Lenders.

19.     *No Marshaling/Application of DIP Proceeds*.  The DIP Secured Parties shall be entitled to apply the payments or proceeds of the DIP Collateral, in accordance with the provisions of the DIP Documents, and in no event shall the DIP Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

20.     *No Marshaling/Application of Proceeds of Prepetition and Adequate Protection Collateral*.  The Prepetition Secured Parties shall be entitled to apply the payments or proceeds of the Prepetition Collateral and Adequate Protection Collateral in accordance with the provisions of the Prepetition Debt Documents, and in no event, upon entry of the Final Order, shall the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral or Adequate Protection Collateral.

21.     *Limitation on Charging Expenses Against Collateral*.  Subject only to and effective upon entry of a Final Order, except to the extent of the Carve Out, with respect to the Prepetition Collateral and Adequate Protection Collateral, and effective upon entry of this Interim Order with respect to the DIP Collateral, no costs or expenses of administration of the

Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral, Prepetition Collateral and Adequate Protection Collateral (including Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent and the Prepetition Agents, as the case may be, that holds a lien on the relevant asset, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Secured Parties or the Prepetition Secured Parties, and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Secured Parties or the Prepetition Secured Parties to any charge, lien, assessment or claim against the Collateral under section 506(c) of the Bankruptcy Code or otherwise.

22.     *Bankruptcy Code Section 552(b)*.  Subject only to and effective upon entry of a Final Order, each of the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to proceeds, products, offspring, or profits of any of the Prepetition Collateral or the Adequate Protection Collateral.

23.     *Reservation of Rights of Prepetition Secured Parties*.  Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court affirms and finds that the adequate protection provided to the Prepetition Secured Parties for any diminution in their respective interests in the property of the Debtors' estates, including their respective interests in the value of the Prepetition Collateral is reasonable and necessary to protect the interests of the Prepetition Secured Parties; *provided* that any Prepetition Secured Party may request further or different adequate protection.

24.     *Perfection of Liens.*

(a)     Without in any way limiting the automatically effective perfection of the DIP Liens and Adequate Protection Liens granted in this Interim Order, the DIP Agent, the RBL Agents, and the Term Loan Agents are hereby authorized, but not required, to file or record (and to execute in the name of the Debtors, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over cash or securities, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Agent, the RBL Agents, and the Term Loan Agents shall, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over any cash or securities, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and on the date of entry of this Interim Order.  Upon the request of any of the DIP Agent, the RBL Agents, and the Term Loan Agents, each of the Debtors, without any further consent of any party, is authorized to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the validation, perfection, preservation and enforcement of the DIP Liens and Adequate Protection Liens.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)     A certified copy of this Interim Order may, in the discretion of the DIP Agent, each acting on its own behalf or as directed by the Required DIP Lenders, be filed with or

recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy of this Interim Order for filing and/or recording, as applicable. The Automatic Stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the DIP Agent to take all actions, as applicable, referenced in this subparagraph (b) and the immediately preceding subparagraph (a).

(c)      To the extent that any Prepetition Secured Party is the secured party under any account control agreements, listed as loss payee or additional insured under any of the DIP Loan Parties' insurance policies or is the secured party under any other agreement, the DIP Agent is also deemed to be the secured party under such account control agreements, loss payee or additional insured under the DIP Loan Parties' insurance policies and the secured party under each such agreement (in any such case with the same priority of liens and claims thereunder relative to the priority of (x) the Prepetition Liens and Adequate Protection Liens and (y) the DIP Liens, as set forth herein), and shall have all rights and powers in each case attendant to that position (including, without limitation, rights of enforcement, but subject in all respects to the terms of this Interim Order), and shall, subject to the terms of this Interim Order, act in that capacity and distribute any proceeds recovered or received in respect of any of the foregoing, first, subject to the Carve Out, to the payment in full of the DIP Obligations, and second, to the payment of the Prepetition Debt. In accordance with the terms of this Interim Order and the other DIP Documents, the Prepetition Agents shall serve as agent for the DIP Agent for purposes of perfecting such DIP Agent's security interests in and liens on all DIP Collateral and Prepetition Collateral that is of a type such that perfection of a security interest therein may be accomplished only by possession or control by a secured party.

25.     *Preservation of Rights Granted Under this Interim Order.*

(a)     Other than the Carve Out and other claims and liens expressly granted by this Interim Order, no claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order to the DIP Secured Parties shall be permitted while any of the DIP Obligations remain outstanding, and, except as otherwise expressly provided in paragraph 5 of this Interim Order, the DIP Liens shall not be: (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code, (ii) subordinated to or made *pari passu* with any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors, (iii) subject or junior to any intercompany or affiliate liens or security interests of the Debtors, or (iv) subordinated to or made *pari passu* with any other lien or security interest.

(b)     It shall constitute an Event of Default and terminate the right of the Debtors to use Cash Collateral if any of the Debtors, without the prior written consent of the applicable Required DIP Lenders, seeks, proposes or supports (whether by way of motion or other pleadings filed with the Court or any other writing executed by any Debtor or by oral argument), or if there is entered or confirmed (in each case, as applicable), or if there occurs:

(i)     a failure of the Debtors to make any payment under this Interim Order to any of the Prepetition Secured Parties when due and such failure is continuing for one (1) business day after the date thereof;

(ii)    a failure of the Debtors to (x) observe or perform any of the material terms or provisions contained in this Interim Order or (y) comply with any covenant or agreement in this Interim Order in any material respect; or

(iii)   any "Event of Default" as defined in the DIP Credit Agreement.

Except as otherwise provided in this Interim Order, any material violation of any of the terms of this Interim Order or any occurrence of an "Event of Default" under and as defined in this Interim Order or the DIP Credit Agreement shall constitute an event of default (each an "**Event of Default**") and upon any such Event of Default, interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Credit Agreement.  Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered:  (i)  the DIP Superpriority Claims and the DIP Liens shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations shall have been indefeasibly paid in full in cash (and that such DIP Superpriority Claims and DIP Liens shall, notwithstanding such dismissal, remain binding on all parties in interest), (ii) the other rights granted by this Interim Order shall not be affected, and (iii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Interim Order.

(c)     If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacatur or stay shall not affect: (i) the validity, priority or enforceability of any DIP Obligations incurred prior to the actual receipt of written notice by the DIP Agent, as applicable, of the effective date of such reversal, modification, vacatur or stay; or (ii) the validity, priority or enforceability of the DIP Liens or Adequate Protection Liens.  Notwithstanding any such reversal, modification, vacatur or stay of any use of Cash Collateral, any DIP Obligations incurred by the DIP Loan Parties to the DIP Secured Parties prior to the actual receipt of written notice by the DIP Agent, of the effective date of such reversal, modification, vacatur or stay shall be governed in all respects by the

original provisions of this Interim Order, and the DIP Secured Parties and the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code and this Interim Order with respect to all uses of Cash Collateral and the DIP Obligations.

(d)     Except as expressly provided in this Interim Order, the DIP Obligations and all other rights and remedies of the DIP Secured Parties and the Prepetition Secured Parties granted by the provisions of this Interim Order shall survive, and shall not be modified, impaired or discharged by: (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7, dismissing any of the Chapter 11 Cases, substantively consolidating any of the cases with another case, terminating the joint administration of these Chapter 11 Cases or by any other act or omission, (ii) the entry of an order approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Documents or pursuant to a separate approval by the Required DIP Lenders), or (iii) the entry of an order confirming a plan of reorganization in any of the Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the DIP Loan Parties have waived any discharge as to any remaining DIP Obligations.  The terms and provisions of this Interim Order and the DIP Documents shall continue in these Chapter 11 Cases, in any Successor Cases if these Chapter 11 Cases cease to be jointly administered and in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, and all other rights and remedies of the DIP Lenders and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall continue in full force and effect until the DIP Obligations and the Prepetition Obligations are indefeasibly paid in full in

cash, as set forth herein and the DIP Documents and the Total DIP Commitment has been terminated.

26.     *Payments Free and Clear*.  Subject to the Carve Out, any and all payments or proceeds remitted to the DIP Agent by, through or on behalf of the DIP Lenders pursuant to the provisions of the Interim Order, Final Order, the DIP Documents or any subsequent order of the Court shall be irrevocable, received free and clear of any claim, charge, assessment or other liability, including without limitation, any such claim or charge arising out of or based on, directly or indirectly, sections 506(c) or 552(b) of the Bankruptcy Code (subject to entry of the Final Order approving the waiver of the Debtors' rights under sections 506(c) and 552(b) of the Bankruptcy Code), whether asserted or assessed by through or on behalf of the Debtors.

27.     *Releases, Covenant Not to Sue, Indemnity*.  Subject to paragraph 28, as of the entry of this Interim Order the Debtors hereby absolutely and unconditionally release and forever discharge and acquit each of the DIP Secured Parties and the Prepetition Secured Parties and their respective subsidiaries, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such (the "**Representatives**" and collectively with the DIP Secured Parties and the Prepetition Secured Parties, the "**Released Parties**"), from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, debts, accounts, contracts, liabilities, responsibilities, disputes, remedies, indebtedness, obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorney's fees, costs, expenses, judgements and causes of action  but excluding funding obligations under the DIP Documents arising after the date of this

Interim Order (collectively, the "**Released Claims**") of any kind, nature or description, whether matured or unmatured, known or unknown, foreseen or unforeseen, liquidated or unliquidated, arising in law or equity, upon contract or tort or under any state or federal or common law or statute or regulation or otherwise, whether or not arising out of or related to (as applicable) the DIP Documents the Prepetition Debt Documents, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the deal reflected thereby, and the obligations and financial obligations made thereunder, in each case that the Debtors at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Interim Order, and further covenant not to sue and to indemnify (in addition to and not in place of any and all other indemnities in favor of the Released Parties) the Released Parties on account of any and all Released Claims. The releases in this paragraph are in addition to and shall not limit any other releases, covenants not to sue, or waivers by the Releasing Parties in favor of the Released Parties.

28.  *Effect of Stipulations on Third Parties*.  The Debtors' stipulations, admissions, agreements and releases contained in this Interim Order, including, without limitation, in paragraph G of the Findings of Fact and Conclusions of Law of this Interim Order, shall be binding upon the Debtors and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors) in all circumstances and for all purposes.  The Debtors' stipulations, admissions, agreements and releases contained in this Interim Order, including, without limitation, in paragraph G of the Findings of Fact and Conclusions of Law of this Interim Order, shall be binding upon all other parties in interest, including, without limitation, any Committee or other statutory or non-

statutory committees appointed or formed in the Chapter 11 Cases and any other person or entity

acting or seeking to act on behalf of the Debtors' estates in all circumstances and for all purposes

unless: (a) such other party in interest with requisite standing (subject in all respects to any

agreement or applicable law that may limit or affect such entity's right or ability to do so), has

timely filed an adversary proceeding or contested matter (subject to the limitations contained

herein, including, *inter alia*, in this paragraph) by no later than (i) the earlier of (x) five (5)

business days prior to the commencement of the hearing to confirm a chapter 11 plan in these

Chapter 11 Cases, (y) 75 calendar days after entry of this Interim Order and (z) solely for any

Committee, 60 calendar days after the appointment of any Committee if appointed within 30

days after the Petition Date, (ii) any such later date as has been agreed to, in writing, by the

Prepetition Agents (with the consent of the Required DIP Lenders) as applicable (the time period

established by the foregoing clauses (i) and (ii), the "**Challenge Period**"), (A) objecting to or

challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition

Obligations or the Prepetition Liens, or (B) otherwise asserting or prosecuting any action for

preferences, fraudulent transfers or conveyances, other avoidance power claims or any other

claims, counterclaims or causes of action, objections, contests or defenses (collectively, the

"**Challenges**") against any of the Prepetition Secured Parties or their Representatives in

connection with matters related to the (i) Prepetition Debt Documents (ii) Prepetition

Obligations, (iii) Prepetition Liens or (iv) Prepetition Collateral, and (b) there is a final non-

appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed

adversary proceeding or contested matter; *provided*, *however*, that any pleadings filed in

connection with any Challenge shall set forth with specificity the basis for such challenge or

claim and any challenges or claims not so specified prior to the expiration of the Challenge

Period shall be deemed forever, waived, released and barred. If no such Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such proceeding then: (a) the Debtors' stipulations, admissions, agreements and releases contained in this Interim Order shall be binding on all parties in interest, including, without limitation, the Committee (if any), (b) the obligations of the Prepetition Obligors under the Prepetition Debt Documents shall constitute allowed claims not subject to defense, claim, counterclaim, recharacterization, subordination, offset or avoidance, for all purposes in the Chapter 11 Cases, and any subsequent chapter 7 case(s), (c) the Prepetition Liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, first-priority security interests and liens, not subject to recharacterization, subordination, avoidance or other defense, and (d) the Prepetition Obligations and the Prepetition Liens shall not be subject to any other or further claim or challenge by the Committee (if any), any non-statutory committees appointed or formed in the Chapter 11 Cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors) and any defenses, claims, causes of action, counterclaims and offsets by the Committee (if any), any non-statutory committees appointed or formed in the Chapter 11 Cases, or any other party acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors), whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition Secured Parties and their Representatives arising out of or relating to the Prepetition Debt Documents shall be deemed forever waived, released and barred. If any such Challenge is

timely filed during the Challenge Period, the stipulations, admissions, agreements and releases contained in this Interim Order, including, without limitation, in paragraph G of the Findings of Fact and Conclusions of Law of this Interim Order, shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on any Committee (if any), and on any other person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of court of competent jurisdiction.  Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including the Committee (if any), standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, Challenges with respect to (i) the Prepetition Debt Documents, (ii) the Prepetition Obligations or (iii) the Prepetition Liens.  For the avoidance of doubt, none of the foregoing challenge provisions set forth in this paragraph shall apply to any DIP Secured Party, in its capacity as such, and in no event shall the DIP Facility, DIP Obligations or DIP Liens be subject to challenge pursuant to this paragraph on avoidance or any other grounds by any party.

29.      *Limitation on Use of Carve Out, DIP Financing Proceeds, and Collateral*. Notwithstanding any other provision of this Interim Order or any other order entered by the Court, no DIP Loans, DIP Collateral, Prepetition Collateral or Adequate Protection Collateral (including Cash Collateral) or any portion of the Carve Out may be used directly or indirectly by any Debtor, any Prepetition Pledgor, any Committee or any other official or unofficial committee appointed in the Chapter 11 Cases, or any trustee appointed in the Chapter 11 Cases or any Successor Case, including any chapter 7 case, or any other person, party or entity, (a) in connection with the investigation, threatened initiation, initiation or prosecution of any claims,

causes of action, adversary proceedings or other litigation (i) against any of the DIP Secured Parties or the Prepetition Secured Parties, or each of the foregoing's respective predecessors in interest, agents, affiliates, representatives, attorney or advisors, or any actions purporting to do the foregoing in respect of the DIP Obligations, the DIP Liens, the Prepetition Obligations, the Prepetition Liens and/or Adequate Protection Obligations granted to the Prepetition Secured Parties under the Interim Order or the Final Order, as applicable, or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset with respect to the DIP Obligations, the Prepetition Obligations, the DIP Liens, the Prepetition Liens and/or the liens, claims, rights, or security interests granted under this Interim Order, the Final Order, the DIP Documents or the Prepetition Debt Documents including, in the case of each (i) and (ii), without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550 or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; (b) to prevent, hinder, or otherwise delay or interfere with the DIP Secured Parties' or the Prepetition Secured Parties', enforcement or realization on the Prepetition Obligations, Prepetition Collateral, DIP Obligations or DIP Collateral, and the liens, claims and rights granted to such parties under this Interim Order or the Final Order, each in accordance with the DIP Documents, the Prepetition Debt Documents or this Interim Order; (c) to seek to modify any of the rights and remedies granted to any of the DIP Secured Parties or Prepetition Secured Parties under this Interim Order, the DIP Documents or the Prepetition Debt Documents, as applicable; (d) to apply to the Court for authority to approve superpriority claims or grant liens (other than liens permitted pursuant to the DIP Documents) or security interests in the DIP Collateral, the Prepetition Collateral the Adequate Protection Collateral, or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Superpriority Claims, Adequate Protection Liens or

Adequate Protection Claims, unless all DIP Obligations and  Prepetition Obligations have been refinanced or paid in full; or (e) to pay or to seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of this Court (including pursuant to any "first day orders," or pursuant to this Interim Order); (ii) pursuant to the Initial Budget and (iii) permitted under the DIP Documents; *provided* that, notwithstanding anything to the contrary herein, the Debtors and the Committee (if any) may use the proceeds of the DIP Loans and/or DIP Collateral to investigate but not to prosecute the claims and liens of the Prepetition Secured Parties and potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties up to an aggregate cap of no more than $50,000.

30.    *Interim Order Governs*.  In the event of any inconsistency between the provisions of this Interim Order, the DIP Documents and any other order entered by this Court, the provisions of this Interim Order shall govern.  Notwithstanding anything to the contrary in any other order entered by this Court, any payment made pursuant to any authorization contained in any other order entered by this Court shall be consistent with and subject to the requirements set forth in this Interim Order, including, without limitation, the approved Initial Budget.

31.    *Limitation of Liability*.  In permitting the use of the DIP Collateral and Prepetition Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order, subject to entry of the Final Order, none of the DIP Secured Parties, Prepetition Secured Parties or the Prepetition Agents shall (i) have any liability to any third party or be deemed to be in control of the operation of any of the DIP Loan Parties or to be acting as a "controlling person," "responsible person," or "owner or operator" with respect to the operation or management of any of the DIP Loan Parties (as such terms, or any similar terms, are used in the Internal Revenue Code, United States Comprehensive Environmental Response, Compensation

and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute) or (ii) owe any fiduciary duty to any of the DIP Loan Parties, their creditors or their estates, or shall constitute or be deemed to constitute a joint venture or partnership with any of the DIP Loan Parties.  Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties, Prepetition Agents or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the DIP Loan Parties and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

32.     *Exculpation*. Nothing in this Interim Order, the DIP Documents, the Prepetition Debt Documents or any other documents related to the transactions contemplated hereby shall in any way be construed or interpreted to impose or allow the imposition upon any DIP Secured Party or Prepetition Secured Party any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their businesses, or in connection with their restructuring efforts.  In addition, (a) the DIP Secured Parties and Prepetition Secured Parties shall not, in any way or manner, be liable or responsible for: (i) the safekeeping of the DIP Collateral, Prepetition Collateral or Adequate Protection Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person, and (b) all risk of loss, damage, or destruction of the DIP Collateral, Prepetition Collateral and Adequate Protection Collateral shall be borne by the Debtors.

33.     *II-B Assets and Claims*.  Notwithstanding anything to the contrary in this Interim Order, in no event shall any security interest or lien in any asset of, or any claim against, II-B be granted or created pursuant to this Interim Order.

34.     *Maintenance of Collateral*.   The DIP Loan Parties shall comply with the covenants contained in the DIP Documents regarding the maintenance and insurance of the DIP Collateral.

35.     *Binding Effect; Successors and Assigns*.   The provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Secured Parties, the Prepetition Secured Parties, the Committee (if any), the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Secured Parties, the Prepetition Secured Parties and the Debtors and their respective successors and assigns; *provided* that none of the DIP Secured Parties or Prepetition Secured Parties shall have any obligation to permit the use of the DIP Collateral or Prepetition Collateral by, or to extend any financing to, any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

36.     *Master Proof of Claim*.   The Prepetition Agents shall not be required to file proofs of claim in the Chapter 11 Cases or any Successor Case in order to assert claims on behalf of itself and the Prepetition Secured Parties for payment of the Prepetition Obligations arising under the Prepetition Debt Documents, nor shall any other Prepetition Secured Party be required to file any proofs of claim in the Chapter 11 Cases or any Successor Case in order to assert claims on behalf of itself for payment of the Prepetition Obligations arising under the Prepetition Debt Documents.   The statements of claim in respect of the Prepetition Obligations set forth in this

Interim Order, together with any evidence accompanying the DIP Motion and presented at the Interim Hearing, are deemed sufficient to and do constitute proofs of claim in respect of such debt and such secured status.  However, in order to facilitate the processing of claims, to ease the burden upon the Court and to reduce an unnecessary expense to the Debtors' estates, each Prepetition Agent and/or other Prepetition Secured Party is authorized, but shall not be obligated, to file in the Debtors' lead chapter 11 case, Case No. 19-35198 (MI), a single, master proof of claim on behalf of the relevant Prepetition Secured Parties on account of any and all of their respective claims arising under the applicable Prepetition Debt Documents and hereunder (each, a "**Master Proof of Claim**") against each of the Debtors.  Upon the filing of a Master Proof of Claim against each of the Debtors, Prepetition Agents and the Prepetition Secured Parties, and each of their respective successors and assigns, shall be deemed to have filed a proof of claim in the amount set forth opposite its name therein in respect of its claims against each of the Debtors of any type or nature whatsoever with respect to the applicable Prepetition Debt Documents, and the claim of each Prepetition Secured Party (and each of its respective successors and assigns), named in a Master Proof of Claim shall be treated as if such entity had filed a separate proof of claim in each of these Chapter 11 Cases.  The Master Proofs of Claim shall not be required to identify whether any Prepetition Secured Party acquired its claim from another party and the identity of any such party or to be amended to reflect a change in the holders of the claims set forth therein or a reallocation among such holders of the claims asserted therein resulting from the transfer of all or any portion of such claims.  The provisions of this paragraph 37 and each Master Proof of Claim are intended solely for the purpose of administrative convenience and shall not affect the right of each Prepetition Secured Party (or its successors in interest) to vote separately on any plan proposed in these Chapter 11 Cases.  The Master Proofs of Claim shall

not be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable Prepetition Secured Parties, which instruments, agreements or other documents will be provided upon written request to counsel to the applicable Prepetition Agent.

37.     *Credit Bidding*.   (a) The DIP Agent shall have the right to credit bid, in accordance with the DIP Documents, up to the full amount of the applicable DIP Obligations in any sale of the DIP Collateral, and (b) the applicable Prepetition Secured Parties shall have the right, consistent with the provisions of the Prepetition Debt Documents, to credit bid up to the full amount of their Prepetition Debt in any sale of the Prepetition Collateral,  in each case of (a) and (b), as provided for in section 363(k) of the Bankruptcy Code, without the need for further Court order authorizing the same and whether any such sale is effectuated through section 363(k) or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

38.     *Effectiveness*.  This Interim Order shall constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062 or 9014 of the Bankruptcy Rules or any Local Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

39.     *Payments Held in Trust*.   Except as expressly permitted in this Interim Order or the DIP Documents, in the event that any person or entity receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds of DIP Collateral

or receives any other payment with respect thereto from any other source prior to payment in full of all DIP Obligations under the DIP Documents and termination of the Commitments in accordance with the DIP Documents, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of Collateral in trust for the benefit of the DIP Agent and the DIP Lenders (as applicable based on the specific asset at issue) and shall immediately turn over such proceeds to the DIP Agent, or as otherwise instructed by this Court, for application in accordance with the DIP Documents and this Interim Order.

40.     *Modification of DIP Documents and Budget*.  The DIP Loan Parties are hereby authorized, without further order of this Court, to enter into agreements with the DIP Secured Parties providing for any consensual non-material modifications to the Budget or the DIP Documents, or of any other modifications to the DIP Documents necessary to conform the terms of the DIP Documents to this Interim Order, in each case consistent with the amendment provisions of the DIP Document.  Notwithstanding the foregoing, updates and supplements to the Budget required to be delivered by the DIP Loan Parties under the DIP Documents shall not be considered material amendments or modifications to the Budget or the DIP Documents.

41.     *Headings*.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

42.     *No Third Party Rights*.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect or incidental beneficiary.

43.     *Bankruptcy Rules*.  The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the DIP Motion.

44. *Necessary Action*. The Debtors, the DIP Secured Parties and Prepetition Secured Parties are authorized to take all such actions as are necessary or appropriate to implement the terms of this Interim Order.

45. *Retention of Jurisdiction*. The Court shall retain jurisdiction to enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

46. *Final Hearing*. The Final Hearing is scheduled for _____, 2019 at _____ __.m. prevailing Central Time before this Court.

47. *Objections*. Any party in interest objecting to the relief sought at the Final Hearing shall file and serve written objections, which objections shall be served upon

(a) counsel to the Debtors, proposed counsel for the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022 (Attention: Joshua Sussberg and Steven Serajeddini, E-mail address: joshua.sussberg@kirkland.com and steven.serajeddini@kirkland.com), Kirkland & Ellis LLP, 300 North LaSalle Street Chicago, Illinois 60654 (Attention: Spencer Winters, E-mail address: spencer.winters@kirkland.com).

(b) counsel to the Term Loan Agents, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017 (Attention: Damian S. Schaible, Nate Sokol, Stephen D. Piraino, E-mail address: damian.schaible@davispolk.com, nate.sokol@davispolk.com, stephen.piraino@davispolk.com);

       (c)      counsel to the RBL Agents, Vinson & Elkins LLP, 2001 Ross Avenue, Suite 3900, Dallas, TX 75201-2975 (Attn.:   William L. Wallander, E-mail address: bwallander@velaw.com);

in each case to allow actual receipt by the foregoing no later than [       ], 2019 at 4:00 p.m., prevailing Central Time.

       48.    The Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing, including, without limitation, notice that the Debtors will seek approval at the Final Hearing of a waiver of rights under sections 506(c) and 552(b) of the Bankruptcy Code) to the parties having been given notice of the Interim Hearing, to any party that has filed a request for notices with this Court and to the Committee after the same has been appointed, or such Committee's counsel, if the same shall have been appointed.

                                  _____

                                  THE HONORABLE MARVIN ISGUR
                                  UNITED STATES BANKRUPTCY JUDGE

**<u>Schedule 1 to Exhibit A</u>**

**Budget**

**Sheridan Fund II - Initial DIP Budget**
*As of 9/13/2019; in $ thousands*

<span style="color:red">DRAFT - SUBJECT TO MATERIAL CHANGE</span>
<span style="color:red">HIGHLY CONFIDENTIAL / FOR DISCUSSION PURPOSES ONLY</span>

*Filing: 9/16*

| Week Ending ==> | 20-Sep-19 | 27-Sep-19 | 04-Oct-19 | 11-Oct-19 | 18-Oct-19 | 25-Oct-19 | 01-Nov-19 | 08-Nov-19 | 15-Nov-19 | 22-Nov-19 | 29-Nov-19 | 06-Dec-19 | 13-Dec-19 | Total 13-Week |
| Forecast Week ==> | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Forecast |
| Actual / Forecast ==> | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts** | | | | | | | | | | | | | | |
| Oil & Gas Receipts | 12,728 | 21 | 276 | - | 11,571 | 18 | 245 | - | - | 12,005 | 455 | - | - | 37,320 |
| JIB Receipts | - | - | 869 | - | - | - | 722 | - | - | - | 840 | - | - | 2,431 |
| Proceeds from Asset Sales | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | 12,728 | 21 | 1,145 | - | 11,571 | 18 | 967 | - | - | 12,005 | 1,295 | - | - | 39,750 |
| | | | | | | | | | | | | | | |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Revenue Checks | - | (4,430) | - | - | - | (4,049) | - | - | - | - | (4,206) | - | - | (12,685) |
| Commodity Hedges | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| LOE/Field Expenses | (977) | (1,623) | (830) | (830) | (332) | (332) | (885) | (305) | (305) | (305) | (1,119) | (303) | (303) | (8,450) |
| Production Taxes | - | (77) | - | - | - | - | (515) | - | - | - | (774) | - | - | (1,366) |
| Payroll/Benefits | - | (1,043) | (93) | (540) | (304) | - | (1,136) | - | (1,290) | - | (1,146) | - | (875) | (6,426) |
| Non-Payroll G&A | (284) | (428) | (175) | (175) | (990) | (105) | (280) | (94) | (94) | (94) | (346) | (101) | (101) | (3,268) |
| Misc & Intercompany | (20) | (745) | (745) | (745) | (745) | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (3,161) |
| **Total Operating Disbursements** | (1,281) | (8,346) | (1,844) | (2,291) | (2,371) | (4,506) | (2,836) | (420) | (1,710) | (420) | (7,611) | (424) | (1,298) | (35,357) |
| | | | | | | | | | | | | | | |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | |
| Capex | (873) | (1,630) | (866) | (866) | (435) | (435) | (745) | (455) | (455) | (455) | (1,125) | (408) | (408) | (9,264) |
| Debt Service | (2,100) | - | (290) | - | - | - | (563) | - | (1,517) | (460) | (1,089) | (1,517) | - | (3,659) |
| Professional Fees | (664) | - | (537) | (700) | (100) | (400) | (160) | (1,517) | (460) | (1,089) | (920) | (1,517) | (460) | (8,124) |
| **Total Non-Operating Disbursements** | (3,637) | (1,630) | (1,693) | (1,566) | (535) | (835) | (1,468) | (1,972) | (915) | (1,544) | (2,661) | (1,925) | (868) | (21,047) |
| | | | | | | | | | | | | | | |
| **Net Cash Flow** | 7,810 | (9,954) | (2,392) | (3,857) | 8,665 | (5,322) | (3,337) | (2,392) | (2,625) | 10,042 | (8,977) | (2,348) | (2,166) | (16,653) |
| | | | | | | | | | | | | | | |
| Beginning Cash Balance | 945 | 36,755 | 26,801 | 24,409 | 20,552 | 29,217 | 23,895 | 42,558 | 40,166 | 37,541 | 47,583 | 38,806 | 36,458 | 945 |
| Net Cash Flow | 7,810 | (9,954) | (2,392) | (3,857) | 8,665 | (5,322) | (3,337) | (2,392) | (2,625) | 10,042 | (8,777) | (2,348) | (2,166) | (16,653) |
| Ending Cash Balance Before DIP Draw | 8,755 | 26,801 | 24,409 | 20,552 | 29,217 | 23,895 | 20,558 | 40,166 | 37,541 | 47,583 | 38,806 | 36,458 | 34,292 | (15,708) |
| DIP Borrowings/Paydowns | 28,000 | - | - | - | - | - | 22,000 | - | - | - | - | - | - | 50,000 |
| Ending Cash Balance | 36,755 | 26,801 | 24,409 | 20,552 | 29,217 | 23,895 | 42,558 | 40,166 | 37,541 | 47,583 | 38,806 | 36,458 | 34,292 | 34,292 |
| Committed Availability | (8,109) | (8,109) | (8,109) | (8,109) | (8,109) | (8,109) | (8,109) | (8,109) | (7,673) | (7,673) | (7,673) | (7,673) | (7,673) | (7,673) |
| **Ending Available Cash Balance** | 28,646 | 18,692 | 16,300 | 12,443 | 21,108 | 15,786 | 34,449 | 32,057 | 29,868 | 39,910 | 31,133 | 28,785 | 26,619 | 26,619 |
| | | | | | | | | | | | | | | |
| **DIP Facility** | | | | | | | | | | | | | | |
| Beginning DIP Loan Balance | - | 78,000 | 78,000 | 78,000 | 78,000 | 78,000 | 78,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | - |
| Pre-Petition Debt Roll-Up | 50,000 | - | - | - | - | - | - | - | - | - | - | - | - | 50,000 |
| DIP Borrowings/Paydowns | 28,000 | - | - | - | - | - | 22,000 | - | - | - | - | - | - | 50,000 |
| **Ending DIP Loan Balance** | 78,000 | 78,000 | 78,000 | 78,000 | 78,000 | 78,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 |
| New Money Drawn | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| DIP Total Facility Size | 78,000 | 78,000 | 78,000 | 78,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 |
| **DIP Availability** | - | - | - | - | 22,000 | 22,000 | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | | | |
| **Total Liquidity** | 28,646 | 18,692 | 16,300 | 12,443 | 43,108 | 37,786 | 34,449 | 32,057 | 29,868 | 39,910 | 31,133 | 28,785 | 26,619 | 26,619 |

**<u>Schedule 2 to Exhibit A</u>**

**DIP Credit Agreement**

*Posting Version*

*Published Deal CUSIP Number*: 82378DAA1
*Published New Money Facility CUSIP Number* : 82378DAB9
*Published Roll-Up Facility CUSIP Number*: 82378DAC7

## SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION TERM LOAN CREDIT AGREEMENT

### dated as of September [●], 2019
### among

### SHERIDAN HOLDING COMPANY II, LLC
### SHERIDAN INVESTMENT PARTNERS II, L.P.,
### SHERIDAN PRODUCTION PARTNERS II-A, L.P.,
### SHERIDAN PRODUCTION PARTNERS II-M, L.P.,
**each as a Borrower and a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,**

### BANK OF AMERICA, N.A.,
### as Administrative Agent,

### BANK OF AMERICA, N.A.,
### as Collateral Agent,

### and

### THE LENDERS PARTY HERETO

_____

### BANK OF AMERICA, N.A.,
### as Sole Lead Arranger

# TABLE OF CONTENTS

PAGE

ARTICLE 1
DEFINITIONS

Section 1.01. *Certain Defined Terms* ........................................................................................2
Section 1.02. *Accounting Terms and Determinations* ................................................................32
Section 1.03. *Other Definitional Provisions and References* .....................................................32
Section 1.04. *LLC Division* .......................................................................................................33
Section 1.05. *Administrative Borrower* ......................................................................................33

ARTICLE 2
THE LOANS

Section 2.01. *Term Loans* ..........................................................................................................34
Section 2.02. *Repayment of Term Loans* ...................................................................................35
Section 2.03. *Mandatory Repayments and Optional Prepayments* ............................................35
Section 2.04. *Interest, Interest Calculations and Certain Fees* .................................................37
Section 2.05. *Notes* ...................................................................................................................40
Section 2.06. *General Provisions Regarding Payment; Loan Account* ......................................40
Section 2.07. *Maximum Interest* ...............................................................................................41
Section 2.08. *Taxes* ...................................................................................................................42
Section 2.09. *Capital Adequacy* ................................................................................................45
Section 2.10. *Mitigation of Obligations* ...................................................................................46
Section 2.11. *Alternate Rate of Interest* ....................................................................................46
Section 2.12. *Defaulting Lenders* .............................................................................................48
Section 2.13. *Priority and Liens* ...............................................................................................49
Section 2.14. *Joint and Several Liability* ..................................................................................49
Section 2.15. *Conversion* ..........................................................................................................50

ARTICLE 3
REPRESENTATIONS AND WARRANTIES

Section 3.01. *Existence and Power* ...........................................................................................51
Section 3.02. *Authorization; No Contravention* ........................................................................51
Section 3.03. *Validity and Enforceability* .................................................................................52
Section 3.04. *Subsidiaries and Investments* ..............................................................................52
Section 3.05. *Financial Information* ..........................................................................................52
Section 3.06. *Litigation* .............................................................................................................52
Section 3.07. *Ownership of Property Generally* .........................................................................53
Section 3.08. *No Default* ...........................................................................................................53
Section 3.09. *Insurance* .............................................................................................................53
Section 3.10. *Investment Company Act* .....................................................................................53
Section 3.11. *Margin Regulations* .............................................................................................53
Section 3.12. *Compliance with Laws; Anti-Terrorism Laws* .....................................................53
Section 3.13. *Taxes/Ad Valorem and Severance Taxes* ..............................................................54

i

Section 3.14.  *Compliance with ERISA*..................................................................54
Section 3.15.  *Compliance with Environmental Laws*...........................................55
Section 3.16.  *[Reserved]*........................................................................................56
Section 3.17.  *Full Disclosure*.................................................................................56
Section 3.18.  *Reserve Reports, Imbalances, Marketing and Other Related Matters* ..................57
Section 3.19.  *Maintenance and Development of Properties*................................58
Section 3.20.  *Accounts*...........................................................................................59
Section 3.21.  *DIP Budget and Production Volumes Forecast*.............................59
Section 3.22.  *Cases; Orders* ..................................................................................59
Section 3.23.  *Beneficial Ownership*......................................................................60
Section 3.24.  *EEA Financial Institutions* .............................................................60

## ARTICLE 4
## AFFIRMATIVE COVENANTS

Section 4.01.  *Financial Statements and Other Reports*......................................60
Section 4.02.  *Payment and Performance of Obligations*....................................65
Section 4.03.  *Maintenance of Existence*...............................................................66
Section 4.04.  *Insurance*..........................................................................................66
Section 4.05.  *Compliance with Laws*.....................................................................67
Section 4.06.  *Inspection of Property, Books and Records*..................................67
Section 4.07.  *Use of Proceeds*...............................................................................68
Section 4.08.  *Hazardous Materials; Remediation*...............................................68
Section 4.09.  *Further Assurances and Collateral Matters*.................................68
Section 4.10.  *Tax Elections*....................................................................................71
Section 4.11.  *USA Patriot Act and Beneficial Ownership*..................................71
Section 4.12.  *Milestones*........................................................................................71
Section 4.13.  *Bankruptcy Related Matters* ..........................................................72
Section 4.14.  *Priority of Liens and Claims*..........................................................73
Section 4.15.  *Title Information*..............................................................................75
Section 4.16.  *Credit Ratings*..................................................................................75
Section 4.17.  *Post-Closing Obligations*................................................................75

## ARTICLE 5
## NEGATIVE COVENANTS

Section 5.01.  *Debt*..................................................................................................75
Section 5.02.  *Liens*.................................................................................................76
Section 5.03.  *Restricted Distributions Payments*...............................................78
Section 5.04.  *Restrictive Agreements*...................................................................78
Section 5.05.  *Consolidations and Mergers*..........................................................79
Section 5.06.  *Asset Dispositions*...........................................................................79
Section 5.07.  *Investments*......................................................................................79
Section 5.08.  *Transactions with Affiliates* ...........................................................80
Section 5.09.  *Swap Contracts*................................................................................81
Section 5.10.  *Take-or-Pay or Other Prepayments*...............................................81
Section 5.11.  *Conduct of Business*........................................................................81
Section 5.12.  *Compliance with Anti-Terrorism Laws*.........................................81

ii

Section 5.13. *[Reserved]* ..................................................................................................82
Section 5.14. *Amendment and Waiver of Preferred Equity Documents* ...........................82
Section 5.15. *Amendments of Organizational Documents, Pre-Petition Financing Documents and Other Documents; Prepayments of Other Debt* ....................82
Section 5.16. *Participation Agreements* ..........................................................................83
Section 5.17. *Permitted Accounts* ....................................................................................83
Section 5.18. *Subsidiaries* ................................................................................................83
Section 5.19. *[Reserved]* ..................................................................................................83
Section 5.20. *Additional Bankruptcy Matters* .................................................................83

## ARTICLE 6
## [RESERVED]

## ARTICLE 7
## FINANCIAL COVENANTS

Section 7.01. *Budget Variance Covenant* .........................................................................84
Section 7.02. *Monthly Covenant* .......................................................................................84
Section 7.03. *Mid-Month Production Covenant* ...............................................................84

## ARTICLE 8
## CONDITIONS

Section 8.01. *Conditions to Closing* .................................................................................84
Section 8.02. *Delayed Draw Borrowings* .........................................................................87

## ARTICLE 9
## EVENTS OF DEFAULT

Section 9.01. *Events of Default* .........................................................................................89
Section 9.02. *Acceleration of Term Loans* ........................................................................95
Section 9.03. *Default Rate of Interest and Suspension of LIBO Rate Options* ...............96
Section 9.04. *Setoff Rights* ................................................................................................96
Section 9.05. *Application of Proceeds* ..............................................................................96

## ARTICLE 10
## EXPENSES AND INDEMNITY

Section 10.01. *Expenses* ....................................................................................................98
Section 10.02. *Indemnity* ...................................................................................................99

## ARTICLE 11
## AGENTS

Section 11.01. *Appointment and Authorization* .................................................................99
Section 11.02. *Agents and Affiliates* ...............................................................................100
Section 11.03. *Action by Agents* ......................................................................................100
Section 11.04. *Consultation with Experts* .......................................................................100
Section 11.05. *Liability of Agents* ...................................................................................101
Section 11.06. *Indemnification* ........................................................................................101

Section 11.07. *Right to Request and Act on Instructions* ............................................................101
Section 11.08. *Credit Decision* ...............................................................................................102
Section 11.09. *Collateral Matters* ..........................................................................................102
Section 11.10. *Agency for Perfection* .....................................................................................102
Section 11.11. *Notice of Default* .............................................................................................103
Section 11.12. *Successor Agent* ...............................................................................................103
Section 11.13. *Disbursements of Term Loans; Payment and Sharing of Payment* ...................104
Section 11.14. *Right to Perform, Preserve and Protect* ...........................................................106
Section 11.15. *Additional Titled Agents* .................................................................................106
Section 11.16. *[Reserved]* .......................................................................................................106
Section 11.17. *Withholding Tax* ...............................................................................................106
Section 11.18. *Lender ERISA Representation* ...........................................................................107

## ARTICLE 12
## MISCELLANEOUS

Section 12.01. *Survival; Release* .............................................................................................108
Section 12.02. *No Waivers* .......................................................................................................108
Section 12.03. *Notices* ..............................................................................................................109
Section 12.04. *Severability* ......................................................................................................110
Section 12.05. *Amendments and Waivers* ................................................................................110
Section 12.06. *Assignments; Participations; Replacement of Lenders* ....................................112
Section 12.07. *Headings* ..........................................................................................................115
Section 12.08. *Confidentiality* ..................................................................................................115
Section 12.09. *Waiver of Consequential and Other Damages* .................................................116
Section 12.10. *Marshaling; Payments Set Aside* .....................................................................117
Section 12.11. *GOVERNING LAW; SUBMISSION TO JURISDICTION* .................................117
Section 12.12. *WAIVER OF JURY TRIAL* ................................................................................117
Section 12.13. *Publication; Advertisement* ..............................................................................118
Section 12.14. *Counterparts; Integration* ................................................................................118
Section 12.15. *No Strict Construction* ......................................................................................119
Section 12.16. *USA PATRIOT Act Notification* .........................................................................119
Section 12.17. *No Fiduciary Duty* ............................................................................................119
Section 12.18. *EXCULPATION PROVISIONS* ..........................................................................120
Section 12.19. *[Reserved]* .......................................................................................................120
Section 12.20. *Acknowledgement and Consent to Bail-In of EEA Financial Institutions* ..........120
Section 12.21. *Waiver of Notices, etc* ......................................................................................121
Section 12.22. *Orders* ..............................................................................................................121
Section 12.23. *Acknowledgement Regarding Any Supported QFCs* .........................................121

## ANNEXES, EXHIBITS AND SCHEDULES

## ANNEXES

Annex A     -     Commitment Annex
Annex B     -     Notice Information
Annex 9.1   -     Certain Statements and Events

**EXHIBITS**

| | | |
|---|---|---|
| Exhibit A | - | Form of Assignment Agreement |
| Exhibit B | - | Form of Compliance Certificate |
| Exhibit C | - | Form of Notice of Borrowing |
| Exhibit D | - | Form of Note |
| Exhibit E | - | Form of Interim Order |
| Exhibit F | - | Exit Facility Term Sheet |

**SCHEDULES**

| | |
|---|---|
| Schedule 1.01(a) | Partnership B Pre-Petition Swap Contracts |
| Schedule 1.01(b) | Roll-Up Schedule |
| Schedule 3.08 | Defaults |
| Schedule 4.17 | Post-Closing Items |
| Schedule 5.07(g) | Existing Investments |

## SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION
## TERM LOAN CREDIT AGREEMENT

This SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION TERM LOAN CREDIT AGREEMENT, dated as of September [●], 2019, among SHERIDAN HOLDING COMPANY II, LLC, a Delaware limited liability company ("**Holdco**"), SHERIDAN INVESTMENT PARTNERS II, L.P., a Delaware limited partnership ("**SIP**"), SHERIDAN PRODUCTION PARTNERS II-A, L.P., a Delaware limited partnership ("**Partnership A**") and SHERIDAN PRODUCTION PARTNERS II-M, L.P., a Delaware limited partnership ("**Partnership M**" and, together with Holdco, SIP and Partnership A, each a "**Borrower**" and collectively, the "**Borrowers**"), each as a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code, the financial institutions or other entities from time to time parties hereto, each as a Lender, BANK OF AMERICA, N.A., as Administrative Agent, and BANK OF AMERICA, N.A., as Collateral Agent.

### RECITALS:

WHEREAS, on September [●], 2019 (the "**Petition Date**"), Borrowers, Partnership B, Partnership B General Partner, Partnership M General Partner, Partnership A General Partner and SIP General Partner (each a "**Debtor**" and collectively, the "**Debtors**") filed voluntary petitions with the Bankruptcy Court initiating their respective cases under Chapter 11 of the Bankruptcy Code (each such case, a "**Case**" and collectively, the "**Cases**") and have continued in the possession of their assets and management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, prior to the Petition Date, financing was provided to Borrowers (other than Holdco) pursuant to that certain (i) Senior Secured Term Loan Credit Agreement, dated as of December 16, 2013 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "**Pre-Petition SIP Term Loan Credit Agreement**"), among SIP, the lenders from time to time party thereto (the "**Pre-Petition SIP Term Lenders**") and Pre-Petition Term Agent, pursuant to which the Pre-Petition SIP Term Lenders extended credit to SIP consisting of Term Loans (as defined in the Pre-Petition SIP Term Loan Credit Agreement), (ii) Senior Secured Term Loan Credit Agreement, dated as of December 16, 2013 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "**Pre-Petition II-A Term Loan Credit Agreement**"), among Partnership A, the lenders from time to time party thereto (the "**Pre-Petition II-A Term Lenders**") and Pre-Petition Term Agent, pursuant to which the Pre-Petition II-A Term Lenders extended credit to Partnership A consisting of Term Loans (as defined in the Pre-Petition II-A Term Loan Credit Agreement) and (iii) Senior Secured Term Loan Credit Agreement, dated as of December 16, 2013 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "**Pre-Petition II-M Term Loan Credit Agreement**"), among Partnership M, the lenders from time to time party thereto (the "**Pre-Petition II-M Term Lenders**") and Pre-Petition Term Agent, pursuant to which the Pre-Petition II-M Term Lenders extended credit to Partnership M consisting of Term Loans (as defined in the Pre-Petition II-M Term Loan Credit Agreement);

WHEREAS, prior to the Petition Date, financing was provided to Borrowers (other than Holdco) pursuant to that certain (i) Amended and Restated Credit Agreement, dated as of February 26, 2013 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "**Pre-Petition SIP RBL Credit Agreement**"), among SIP, the lenders from time to time party thereto (the "**Pre-Petition SIP RBL Lenders**") and Pre-Petition RBL Agent, pursuant to which the Pre-Petition SIP RBL Lenders extended credit to SIP consisting of RBL Loans (as defined in the Pre-Petition SIP RBL Credit Agreement); (ii) Amended and Restated Credit Agreement, dated as of February 26, 2013 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "**Pre-Petition II-A RBL Credit Agreement**"), among Partnership A, the lenders from time to time party thereto (the "**Pre-Petition II-A RBL Lenders**") and Pre-Petition RBL Agent, pursuant to which the Pre-Petition II-A RBL Lenders extended credit to Partnership A consisting of RBL Loans (as defined in the Pre-Petition II-A RBL Credit Agreement) and (iii) Amended and Restated Credit Agreement, dated as of February 26, 2013 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "**Pre-Petition II-M RBL Credit Agreement**"), among Partnership M, the lenders from time to time party thereto (the "**Pre-Petition II-M RBL Lenders**") and Pre-Petition RBL Agent, pursuant to which the Pre-Petition II-M RBL Lenders extended credit to Partnership M consisting of RBL Loans (as defined in the Pre-Petition II-M RBL Credit Agreement);

WHEREAS, Borrowers have requested that Lenders extend, and Lenders have agreed to extend, a delayed draw term loan facility (the "**DIP Facility**") to Borrowers, under which the Lenders have agreed to make available (or be deemed to make available) to Borrowers Term Loans in an aggregate principal amount not exceeding $100,000,000, which will take the form of new-money loans in an aggregate principal amount of $50,000,000 and roll-up loans in an aggregate principal amount of $50,000,000;

WHEREAS, the relative priority of the DIP Facility with respect to the Collateral granted to secure the Obligations shall be as set forth in the Interim Order and the Final Order, in each case upon entry thereof by the Bankruptcy Court; and

WHEREAS, the Lenders are willing, subject to the terms and conditions hereinafter set forth, to make available (or be deemed to make available) the Term Loans to Borrowers, Administrative Agent is willing to serve as Administrative Agent for the Lenders and Collateral Agent is willing to serve as Collateral Agent for the Lender Parties.

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, Borrowers, Lenders, Administrative Agent and Collateral Agent agree as follows:

## ARTICLE 1
## DEFINITIONS

Section 1.01. *Certain Defined Terms*.   The following terms have the following meanings:

"**Acceleration Event**" means the occurrence of an Event of Default (a) in respect of which Administrative Agent has declared all or any portion of the Obligations to be immediately due and payable pursuant to Section 9.02, (b) pursuant to Section 9.01(a) and/or (c) pursuant to Section 9.01(g)  and/or Section 9.01(h).

"**Acceptable Plan of Reorganization**" means a plan of reorganization in form and substance satisfactory to the Required Lenders (and with respect to those provisions thereof that affect the rights and duties of Administrative Agent, to Administrative Agent) in all respects and consented to by the Required Lenders, confirmed by an order (in form and substance reasonably satisfactory to the Required Lenders (and with respect to those provisions thereof that affect the rights and duties of Administrative Agent, to Administrative Agent)) of the Bankruptcy Court under the Cases, (i) containing the terms and conditions as set forth in the RSA, (ii) containing a release in favor of Administrative Agent and the Lenders and their respective affiliates**,** (iii) containing provisions with respect to the settlement or discharge of all claims and other debts and liabilities of the Borrowers, (iv) providing for the Payment in Full, including as a result of the DIP Debt Conversion (and subject to and consistent with the conditions set forth in the Exit Credit Agreement) and (v) such Acceptable Plan of Reorganization shall be in full force and effect and shall not have been modified, altered, amended or otherwise changed or supplemented without the prior written consent of the Required Lenders (and with respect to those provisions thereof that affect the rights and duties of Administrative Agent, Administrative Agent).  For the avoidance of doubt, the Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code, filed on September [●], 2019, shall be deemed an "Acceptable Plan of Reorganization."

"**Additional Titled Agents**" has the meaning set forth in Section 11.15.

"**Administrative Agent**" means BOA in its capacity as administrative agent for itself and for Lenders hereunder, as such capacity is established in, and subject to the provisions of, Article 11, and the successors of BOA in such capacity.

"**Administrative Borrower**" means Holdco (or its successor) or any other Person appointed and authorized by Borrowers pursuant to Section 1.05.

"**Affiliate**" means, with respect to any Person, (a) any Person that directly or indirectly controls such Person and (b) any Person which is controlled by or is under common control with such controlling Person.  As used in this definition, the term "**control**" of a Person means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting Capital Stock, by contract or otherwise.

"**Affiliated Group**" means Borrowers, Partnership B and their respective Subsidiaries.

"**Agent**" means either of Administrative Agent or Collateral Agent; and "**Agents**" means both such Persons, collectively.

"**Agent Fee Letter**" means that certain Agency Fee Letter, dated the date hereof, between Borrowers and Administrative Agent.

3

"**Agent Parties**" has the meaning set forth in Section 12.03(d).

"**Agreement**" means this Senior Secured Superpriority Debtor-in-Possession Term Loan Credit Agreement, dated as of September [●], 2019, as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"**Anti-Terrorism Laws**" means any Laws relating to terrorism or money laundering, including Executive Order No. 13224 (effective September 24, 2001), the USA PATRIOT Act, the Laws comprising or implementing the Bank Secrecy Act, and the Laws administered by OFAC.

"**Applicable Margin**" means the Base Rate Margin or the LIBOR Margin, as the context may require, and "**Applicable Margins**" means the Base Rate Margin and the LIBOR Margin, collectively.

"**Approved Budget**" has the meaning set forth in Section 4.01(r).

"**Approved Fund**" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Asset Disposition**" means, with respect to a Person, any sale, lease, license, transfer, assignment or other consensual disposition by or on behalf of such Person of any asset to any other Person, but excluding (a) dispositions of inventory or obsolete, worn-out or surplus equipment or equipment no longer used or useful in the business of such Person, in each case in the Ordinary Course of Business, (b) dispositions of cash and Cash Equivalents not otherwise prohibited pursuant to the terms of this Agreement, (c) sales, transfers and other dispositions of accounts in connection with the compromise, settlement or collection thereof in the Ordinary Course of Business, (d) the lease, assignment, license, sub-license or sub-lease of any real or personal property in the Ordinary Course of Business to the extent the same does not materially interfere with the business of such Person or any Subsidiary of such Person or (e) any disposition of property or assets by any Borrower to any other Borrower or any disposition of property or assets or issuance of Capital Stock by any Subsidiary that is a Loan Party to any Wholly-Owned Subsidiary that is a Loan Party or to any Borrower.

"**Assignment Agreement**" means an assignment and assumption agreement substantially in the form of Exhibit A, or in the event Administrative Agent institutes a Settlement Service pursuant to Section 12.06(a)(v), such other agreement as may be prescribed by such Settlement Service.

"**Avoidance Action**" has the meaning set forth in the Interim Order (or the Final Order, when applicable).

"**Avoidance Proceeds**" has the meaning set forth in the Interim Order (or the Final Order, when applicable).

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy".

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division, any appellate court having jurisdiction over the Cases from time to time, or any other court having jurisdiction over the Cases from time to time.

"**Base Rate**" means for any day a fluctuating rate per annum equal to the highest of (i) the Federal Funds Rate plus ½ of 1%, (ii) the rate of interest in effect for such day as publicly announced from time to time by BOA as its Prime Rate and (iii) the LIBO Rate plus 1.00%; *provided* that Base Rate shall be deemed to be not less than 2.00%. Prime Rate (the "**Prime Rate**") is a rate set by BOA based upon various factors including BOA's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above or below such announced rate. Any change in such Prime Rate announced by BOA shall take effect at the opening of business on the day specified in the public announcement of such change.

"**Base Rate Loans**" means Loans which accrue interest by reference to the Base Rate, in accordance with the terms of this Agreement.

"**Base Rate Margin**" means, on any date, with respect to the Term Loans and any past due Obligation (other than a LIBOR Loan) related thereto, 6.00% *per annum*.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Benefit Plan**" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code that is subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"**BHC Act Affiliate**" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"**Blocked Person**" means any Person: (a) listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224, (b) owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224, (c) with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law, (d) that commits, threatens or conspires to commit or supports "terrorism" as defined in Executive Order No. 13224 or (e) that is named a

"specially designated national" or "blocked person" on the most current list published by OFAC or other similar list.

"**BOA**" means Bank of America, N.A., and its successors.

"**Borrower**" or "**Borrowers**" has the meaning set forth in the preamble hereto.

"**Borrower Materials**" has the meaning set forth in Section 4.01(p).

"**Borrowing**" means any Loans of the same Type made (or deemed made), converted or continued on the same date and, in the case of LIBOR Loans, as to which a single Interest Period is in effect.

"**Budget Variance Report**" shall mean a variance report in form and detail reasonably satisfactory to the Required Lenders, reconciling the Approved Budget to the actual sources and uses of cash for the Test Period (a) showing, for such periods, actual results for the following items: (i) receipts, (ii) operating disbursements, (iii) payroll and benefit expenses, (iv) G&A expenses, (v) professional fees, (vi) capital expenditures and (vii) net cash flow, (b) noting a line-by-line reconciliation of variances from values set forth for such periods in the relevant Approved Budget and (c) providing an explanation for all material variances, certified by a Responsible Officer of Administrative Borrower.

"**Budget Variance Test Date**" has the meaning set forth in Section 4.01(s).

"**Business Day**" means any day except a Saturday, Sunday or other day on which either the New York Stock Exchange is closed, or on which commercial banks in Houston and New York City are authorized by law to close and, in the case of a Business Day which relates to a LIBOR Loan, any London Banking Day.

"**Capital Lease**" of any Person means any lease of any property by such Person as lessee which would, in accordance with GAAP, be required to be accounted for as a capital lease on the balance sheet of such Person.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"**Carve-Out**" has the meaning set forth in the Interim Order (or the Final Order, when applicable).

"**Case**" or "**Cases**" has the meaning set forth in the recitals hereto.

"**Cash**" means money, currency or a credit balance in any Deposit Account (for the avoidance of doubt, the amount thereof shall be determined in accordance with GAAP).

"**Cash Collateral**" has the meaning set forth in the Interim Order or the Final Order, as applicable.

6

"**Cash Equivalents**" means investments in (a) customary, interest-bearing brokerage accounts eligible in whole or in part for insurance provided by the Securities Investor Protection Corporation, (b) short-term debt securities issued or guaranteed or insured by the U.S. government or any of its agencies and instrumentalities; money market funds (other than mutual funds) investing primarily in securities issued or guaranteed by the U.S. government or any of its agencies and instrumentalities, (c) certificates of deposit or other deposits with banks with an unrestricted surplus of at least $100,000,000 or (d) commercial paper or other obligations maturing within seven (7) days issued by financial institutions or any other issuer which, at the time of purchase, have been assigned one of the three (3) highest investment grade ratings by a nationally recognized statistical rating organization.

"**Casualty Event**" means any loss, casualty or other insured damage to, or any nationalization, taking under power of eminent domain or by condemnation or similar proceeding of, any Oil and Gas Property or any other property of any Loan Party.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980.

"**Closing Date**" means the date on which the conditions set forth in Section 8.01 are satisfied, which is the date of this Agreement.

"**Closing Fee**" has the meaning set forth in Section 2.04(c)(i).

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collateral**" means (i) all property, now existing or hereafter acquired, mortgaged or pledged to, or purported to be subjected to a Lien in favor of, Collateral Agent, for the benefit of the Lender Parties, pursuant to this Agreement and the Security Documents and (ii) all the "Collateral" (or equivalent term) as defined in the Interim Order (and, when entered, the Final Order).

"**Collateral Agent**" means BOA, in its capacity as collateral agent for itself and the other Lender Parties hereunder, as such capacity is established in, and subject to the provisions of, Article 11 and the successors of BOA in such capacity.

"**Commitment**" means, individually or collectively, as the context may require, the Initial Commitment and the Delayed Draw Commitment. The aggregate amount of the Lenders' Commitments on the Closing Date is $50,000,000.

"**Commodity Account**" means any "commodity account" as such term is defined in Article 9 of the UCC and in any event shall include all accounts and sub-accounts relating to any of the foregoing.

"**Commodity Account Control Agreement**" means a control agreement reasonably satisfactory to Collateral Agent executed by the applicable Loan Party, a commodity intermediary holding such Loan Party's assets, including funds and commodity contracts, and Collateral Agent with respect to collection and control of all deposits, commodity contracts and other balances held in a Commodity Account maintained by such Loan Party with such

commodity intermediary, to perfect Collateral Agent's first-priority Lien or otherwise grant control to Collateral Agent on such account as security for the Obligations.

"**Commitment Annex**" means Annex A to this Agreement.

"**Compliance Certificate**" means a certificate of Borrowers, duly executed by a Responsible Officer, appropriately completed and substantially in the form of Exhibit B.

"**Consolidated Subsidiary**" means at any date any Subsidiary of any Borrower or Partnership B the accounts of which would be consolidated with those of such Borrower or Partnership B (or any other Person, as the context may require hereunder) in its consolidated financial statements in accordance with GAAP if such statements were prepared as of such date.

"**Control Agreement**" means a Deposit Account Control Agreement, a Securities Account Control Agreement or a Commodity Account Control Agreement, as the context may require.

"**Controlled Group**" means all members of a group of corporations and all members of a group of trades or businesses (whether or not incorporated) under common control which, together with any Borrower, are treated as a single employer under Section 414(b), (c), (m) or (o) of the Code or Section 4001(b) of ERISA.

"**Conversion Date**" means the date upon which the conditions precedent to effectiveness of the Exit Credit Agreement shall have been satisfied or waived.

"**Covered Entity**" means any of the following: (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

 "**Covered Party**" has the meaning set forth in Section 12.23.

"**Credit Party**" means any of the Loan Parties and Pledgors, whether now existing or hereafter acquired or formed; and "**Credit Parties**" means all such Persons, collectively.

"**Debt**" of a Person means at any date, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (c) all obligations of such Person to pay the deferred purchase price of property or services, except accounts payable to (i) Partnership A General Partner or Manager in respect of Fund Expenses (as defined in the Partnership A Partnership Agreement), (ii) Partnership M General Partner or Manager in respect of Fund Expenses (as defined in the Partnership M Partnership Agreement) and (iii) Partnership B General Partner or Manager in respect of Fund Expenses (as defined in the Partnership B Partnership Agreement), in each case, in amounts solely in accordance with the Approved Budget (subject to permitted variances) and accounts payable to other Persons, in each case arising and payable in the Ordinary Course of Business and either (i) not past due for more than ninety (90) days after the date on which such account payable is due or (ii) subject to a Permitted Contest, (d) all capitalized lease obligations

under any Capital Leases of such Person, (e) all obligations, whether or not contingent, of such Person to reimburse any bank or other Person in respect of a letter of credit, banker's acceptance or similar instrument, (f) all obligations in respect of Capital Stock of such Person for the repurchase or redemption of such Capital Stock otherwise than at the sole option of such Person, (g) all Debt of others to the extent secured by a Lien on any asset of such Person, whether or not such obligation is otherwise an obligation of such Person, (h) all Debt of a partnership for which such Person is liable by agreement or by operation of Law, (i) all obligations with respect to "forward sale" contracts or any other obligation to deliver commodities, goods or services in consideration of one or more advance payments, other than gas balancing arrangements in the Ordinary Course of Business, (j) the undischarged balance of any production payment created by such Person or for the creation of which such Person directly or indirectly received payment (other than any Production Payment as defined in and granted pursuant to the Net Profits Agreement), (k) all obligations of such Person in respect of Swap Contracts, and (l) all Debt of others to the extent Guaranteed by such Person.  Without duplication of any of the foregoing, Debt of Borrowers shall include any and all Term Loans.  For the avoidance of doubt, Debt shall not include any obligations under the Participation Agreements.

"**Debtor**" or "**Debtors**" has the meaning set forth in the preamble hereto.

"**Debtor Relief Laws**" means the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Default**" means any condition or event which with the giving of notice or lapse of time or both would, unless cured or waived, become an Event of Default.

"**Default Right**" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"**Defaulting Lender**" means, subject to Section 2.12(b), any Lender that, as determined by Administrative Agent, (a) has failed to perform any of its funding obligations hereunder, including in respect of its Loans on the Closing Date or within three (3) Business Days of any other date required to be funded hereunder, unless such obligation is the subject of a good faith dispute, (b) has notified Administrative Borrower or Administrative Agent that it does not intend to comply with its funding obligations or has made a public statement to that effect with respect to its funding obligations hereunder or under other agreements in which it commits to extend credit, (c) has failed, within three (3) Business Days after request by Administrative Agent, to confirm in a manner satisfactory to Administrative Agent that it will comply with its funding obligations, (d) has, or has a direct or indirect parent company that has (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or a custodian appointed for it, or (iii) taken any action in furtherance of, or indicated its consent to, approval of or acquiescence in any such proceeding or appointment or (e) has, or has a direct or indirect parent company that has, become the subject of a Bail-In Action; *provided* that a Lender shall not be a Defaulting Lender solely by virtue of the

ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority; *provided, further,* that the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official by a supervisory authority or regulator with respect to a Lender or any direct or indirect parent company of that Lender that directly or indirectly controls such Lender under the Dutch Financial Supervision Act 2007 (as amended from time to time and including any successor legislation) shall not be deemed to result in an event described in (d) hereof.

"**Delayed Draw Borrowing Date**" means the date on which Delayed Draw Loans are made, which shall be the Final Order Entry Date or the date that is not later than three (3) Business Days following such Final Order Entry Date.

"**Delayed Draw Commitment**" means, with respect to each Lender, the commitment of such Lender to make Delayed Draw Loans to Borrowers in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on the Commitment Annex, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.  The aggregate amount of the Lenders' Delayed Draw Commitments on the Closing Date is $22,000,000.

"**Delayed Draw Commitment Termination Date**" means the earlier to occur of (a) the Delayed Draw Borrowing Date and (b) the Termination Date.

"**Delayed Draw Fee**" has the meaning set forth in Section 2.04(c)(ii).

"**Delayed Draw Loans**" has the meaning set forth in  Section 2.01(a).

"**Deposit Account**" means any "deposit account" as such term is defined in Article 9 of the Uniform Commercial Code as in effect in the State of New York or, when the laws of any other jurisdiction govern the perfection or enforcement of any Lien, the Uniform Commercial Code of such jurisdiction and in any event shall include all accounts and sub-accounts relating to any of the foregoing.

"**Deposit Account Control Agreement**" means a control agreement reasonably satisfactory to Collateral Agent executed by the applicable Loan Party, an institution maintaining the applicable Deposit Account and Collateral Agent, to perfect Collateral Agent's first-priority Lien or otherwise grant control to Collateral Agent on such account as security for the Obligations.

"**Designated Individual**" has the meaning set forth in Section 4.10.

"**DIP Budget**" shall mean a rolling 13-week operating budget and cash flow forecast in form and substance reasonably satisfactory to the Required Lenders delivered on or prior to the Petition Date and every four weeks after the Petition Date in accordance with Section 4.01(r), setting forth, among other things, the Debtors' projected receipts, operating disbursements (including payroll and benefit expenses, G&A expenses, royalty payments and commodity hedge payments (it being understood and agreed that such commodity hedge payments will be zero)), non-operating disbursements (including capital expenditures, debt service and professional fees) and net cash flow during such 13-week period (i) initially, covering the period commencing on

or about the Petition Date and (ii) thereafter, covering the period commencing on the first day of each four-week anniversary thereafter.

"**DIP Debt Conversion**" has the meaning set forth in Section 2.15.

"**DIP Facility**" has the meaning set forth in the recitals hereto.

"**Dollar**" and "**$**" mean lawful money of the United States.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Eligible Assignee**" means (a) a Lender (other than a Defaulting Lender), (b) an Affiliate of a Lender (other than a Defaulting Lender), (c) an Approved Fund, and (d) any other Person (other than a natural person) approved by (i) Administrative Agent and (ii) unless an Event of Default has occurred and is continuing, Administrative Borrower (such approval of Administrative Borrower not to be unreasonably withheld or delayed, and shall be deemed provided unless expressly withheld by Administrative Borrower within five (5) Business Days of Administrative Borrower's receipt of any request therefor); *provided* that notwithstanding the foregoing, (A) "Eligible Assignee" shall not include any Borrower or any of such Borrower's Affiliates or Subsidiaries and (B) no proposed assignee intending to assume all or any portion of any Commitment or any Term Loan shall be an Eligible Assignee unless such proposed assignee either already holds a Commitment or Term Loan or has been approved as an Eligible Assignee by Administrative Agent.

"**Environmental Laws**" means any and all Laws relating to the environment or the effect of the environment on human health or to emissions, discharges or releases of pollutants, contaminants, Hazardous Materials or wastes into the environment, including ambient air, surface water, ground water or land, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, Hazardous Materials or wastes or the clean-up or other remediation thereof.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"**ERISA Plan**" means any "employee benefit plan", as such term is defined in Section 3(3) of ERISA (other than a Multiemployer Plan), which any Borrower maintains,

sponsors or contributes to, or, in the case of an employee benefit plan which is subject to Section 412 of the Code or Section 302 or Title IV of ERISA, to which any Borrower or any member of the Controlled Group may have any liability, including any liability by reason of having been a substantial employer within the meaning of Section 4063 of ERISA at any time during the preceding five (5) years, or by reason of being deemed to be a contributing sponsor under Section 4069 of ERISA.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Event of Default**" has the meaning set forth in Section 9.01.

"**Exit Credit Agreement**" means the credit agreement that is entered into on the Conversion Date as contemplated by the terms specified in the Exit Facility Term Sheet and otherwise consistent with the RSA.

"**Exit Facility Term Sheet**" means the term sheet in respect of the Exit Credit Agreement attached hereto as Exhibit F.

"**Extraordinary Receipts**" means an amount equal to (a) any cash payments or proceeds (including Cash Equivalents) received (directly or indirectly) by or on behalf of the Affiliated Group not in the ordinary course of business and not consisting of Net Proceeds in respect of an Asset Disposition and in respect of (i) insurance proceeds in connection with a Casualty Event, (ii) foreign, United States, state or local tax refunds, (iii) pension plan reversions, (iv) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (v) indemnity payments (other than to the extent such indemnity payments are (A) immediately payable to a Person that is not an Affiliate of the Affiliated Group or (B) received by the Affiliated Group as reimbursement for any payment previously made to such Person) and (vi) any purchase price adjustment received in connection with any purchase agreement to the extent not constituting Net Proceeds, *minus* (b) (A) any selling and settlement costs and out-of-pocket expenses (including reasonable broker's fees or commissions and legal fees) and any taxes paid or reasonably estimated to be payable by the Loan Parties (after taking into account any tax credits or deductions actually realized by a Borrower with respect to the transactions described in clause (a) of this definition) in connection with the transactions described in clause (a) of this definition, (B) for purposes of determining Extraordinary Receipts under Section 2.03, any LIBOR breakage expenses incurred by Borrowers under Section 2.04(e) as a result of a mandatory prepayment required by Section 2.03 and (C) in the case of any Casualty Event, the amount of cash proceeds expended in reinvestment or rehabilitation solely to the extent necessary to maintain or establish compliance with regulatory requirements or Environmental Laws.

"**FASB ASC**" means the Financial Accounting Standards Board Accounting Standards Codification.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not

materially more onerous to comply with), and any current or future regulations or official interpretations thereof.

"**Federal Funds Rate**" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; *provided* that (i) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (ii) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100th of 1%) charged to BOA on such day on such transactions as determined by Administrative Agent.

"**Final Order**" means an order of the Bankruptcy Court authorizing and approving on a final basis, among other things, the Term Loans and the Transactions contemplated by this Agreement in the form of the Interim Order (with only such modifications thereto as are necessary to convert the Interim Order to a final order, to authorize and approve the Roll-Up and such other modifications as are satisfactory to Borrowers and the Required Lenders in their respective sole discretion) (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of Borrowers and the Required Lenders in their respective sole discretion) as to which no stay has been entered.

"**Final Order Entry Date**" means the date on which the Final Order is entered by the Bankruptcy Court.

"**Financial Statements**" means the financial statements delivered from time to time pursuant to Section 4.01(a), (b) or (c) of this Agreement or Section 4.1(a) or (b) of the Pre-Petition Secured Credit Agreements, as applicable, and references to the "most recent" Financial Statements of a Person means the Financial Statements of such Person most recently delivered to Administrative Agent at the time in question.

"**Financing Documents**" means this Agreement, any Notes, the Security Documents, the Agent Fee Letter, any other fee letters between Administrative Agent and Borrowers or an Affiliate of any Borrower relating to the transactions contemplated hereby and any subordination or intercreditor agreement pursuant to which any Debt and/or any Liens securing such Debt is subordinated to all or any portion of the Obligations, and all other documents, mortgages, instruments and agreements made by a Borrower or an Affiliate of a Borrower in favor of any Lender Party contemplated herein or thereby, whether heretofore executed, executed concurrently herewith or executed at any time and from time to time hereafter, as any or all of the same may be amended, restated, amended and restated, supplemented, replaced, substituted or otherwise modified from time to time, including all such documents, instruments or agreements entered into in connection with a refinancing of any extensions of credit or other obligations made or incurred in connection therewith (including, for the avoidance of doubt, any one or more successive refinancings).

"**Fiscal Month**" means a fiscal month period of any Borrower or Partnership B, as the case may be.

"**Fiscal Quarter**" means a three-month period of any Borrower or Partnership B, as the case may be, ending on March 31, June 30, September 30 or December 31 of any year.

"**Fiscal Year**" means a fiscal year of any Borrower or Partnership B, as the case may be, ending on December 31 of each calendar year.

"**Flood Insurance Regulation**" shall mean (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statue thereto, (iii) the National Flood Insurance Reform Act of 1994 (amending 42 USC 4001, et seq.), as the same may be amended or recodified from time to time, (iv) the Flood Insurance Reform Act of 2004 and (v) any regulations promulgated under each of the foregoing.

"**Force Majeure**" means acts of God, strikes, lockouts and other industrial disturbances, fires, storms (including hurricanes or hurricane warnings), explosions, failure, breakage or accident to equipment, facilities or lines of pipe, freezing lines of pipes, arrests and restraints of the government, civil disturbances, strikes, acts of the public enemy or terrorist acts, wars or war-like action, floods, inability to obtain fuel, equipment or other critical materials, means or supplies, insurrections, riots, epidemics, landslides, lightning, earthquakes, washouts, confiscation or seizure by any government or public authority, nuclear reaction or radiation, radioactive contamination and any other causes, whether of the kind herein enumerated or otherwise, which are not reasonably in the control of the Person claiming Force Majeure.

"**Foreign Lender**" has the meaning set forth in Section 2.08(d).

"**Fund**" means any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"**Fund II Operating Cash**" means cash and cash equivalents attributable to the operation of the Loan Parties and Partnership B held in the SPC Accounts for the sole purpose of funding payroll and disbursements to unaffiliated third parties in the Ordinary Course of Business in accordance with the Approved Budget (subject to permitted variances) and for which Production Company has previously or simultaneously issued checks or initiated wires or ACH transfers or has scheduled imminent disbursements within three (3) Business Days.

"**GAAP**" means generally accepted accounting principles in the United States as in effect from time to time.

"**General Partner**" means, individually or collectively, as the context may require, the Partnership A General Partner, the Partnership B General Partner and the Partnership M General Partner.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, and any agency, department or Person exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any such government.

"**Guarantee**" by any Person means, without duplication, any obligation, contingent or otherwise, of such Person directly or indirectly guaranteeing any Debt or other obligation of any other Person and, without limiting the generality of the foregoing, any obligation, direct or indirect, contingent or otherwise, of such Person (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation (whether arising by virtue of partnership arrangements, by agreement to keepwell, to purchase assets, goods, securities or services, to take-or-pay, or to maintain solvency, level of income or financial condition or otherwise) or (b) entered into for the purpose or effect of assuring in any other manner the obligee of such Debt or other obligation of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part); *provided* that the term Guarantee shall not include endorsements for collection or deposit in the Ordinary Course of Business.   The term "Guarantee" used as a verb has a corresponding meaning.

"**Guaranty**" means that certain Guaranty, dated as of the date hereof, executed by Guarantors in favor of Administrative Agent, and each other guaranty to be executed and delivered by each guarantor in accordance with Section 4.09(b), in each case as the same may be amended, modified or supplemented from time to time.

"**Guarantors**" shall mean, individually or collectively, as the context may require, each of Partnership B General Partner, Partnership M General Partner, Partnership A General Partner and SIP General Partner.

"**Hazardous Materials**" means (a) any "hazardous substance" as defined in CERCLA, (b) any "hazardous waste" as defined by the Resource Conservation and Recovery Act, (c) asbestos, (d) polychlorinated biphenyls, (e) petroleum, its derivatives, by-products and other hydrocarbons, and (f) any other pollutant, toxic, radioactive, caustic or otherwise hazardous substance regulated under applicable Environmental Laws.

"**Hazardous Materials Contamination**" means contamination (whether now existing or hereafter occurring) of the improvements, buildings, facilities, personalty, soil, groundwater, air or other elements on or of the relevant property by Hazardous Materials, or any derivatives thereof, or on or of any other property as a result of Hazardous Materials, or any derivatives thereof, generated on, emanating from or disposed of in connection with the relevant property.

"**Highest Lawful Rate**" means, with respect to each Lender Party, the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Notes or on other Obligations under laws applicable to such Lender Party which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws allow as of the date hereof.

"**Holdco**" has the meaning set forth in the preamble hereto.

"**Indemnitee**" or "**Indemnitees**" has the meaning set forth in Section 10.02.

"**Information**" has the meaning set forth in Section 12.08.

"**Initial Commitment**" means, with respect to each Lender, the commitment of such Lender to make an Initial Loan to Borrowers in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on the Commitment Annex, as such amount may be adjusted from time to time in accordance with this Agreement.  The aggregate amount of the Lenders' Initial Commitments on the Closing Date is $28,000,000.

"**Initial DIP Budget**" means the DIP Budget delivered on or prior to the Petition Date.

"**Initial Loans**" has the meaning set forth in Section 2.01(a)(i).

"**Intercompany Loan Agreement**" means the Loan Agreement between Partnership B and Partnership M, dated as of September 30, 2010, as the same may be amended, supplemented, restated, replaced, substituted or otherwise modified from time to time (but the foregoing shall not permit any amendment or modification contrary to the provisions of Section 5.15 or Section 9 of Part C of Annex 9.1).

"**Interest Payment Date**" has the meaning set forth in Section 2.04(d)(ii).

"**Interest Period**" means, as to each LIBOR Loan, the period commencing on the date such LIBOR Loan is disbursed or converted to or continued as a LIBOR Loan and ending on the date one month thereafter or, if all applicable Lenders consent thereto, a shorter period, as selected by Administrative Borrower pursuant to Section 2.04(e); *provided* that:

       (i)       any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless, in the case of a LIBOR Loan, such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

       (ii)       any Interest Period pertaining to a LIBOR Loan that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

       (iii)      no Interest Period shall extend beyond the Maturity Date.

"**Interim Order**" means an order of the Bankruptcy Court, in the form set forth in Exhibit E,  authorizing on an interim basis, among other things, the Loans and the Transactions contemplated by this Agreement, with only such modifications as are satisfactory to Borrowers and the Required Lenders in their respective sole discretion.

"**Interim Order Entry Date**" means the date on which the Interim Order is entered by the Bankruptcy Court.

"**Investment**" means any acquisition of or investment in, whether by means of acquiring (whether for cash, property, services, Capital Stock or otherwise) or holding the Debt, Capital Stock or securities of another Person or making capital contributions, loans, deposits or advances or extending credit to, or the Guaranteeing of Debt or obligations of, another Person, including any partnership or joint venture interest in such other Person; *provided* that "Investment" shall

not include any extension of customer or trade credit in the Ordinary Course of Business; *provided*, *further*, that customary indemnification provisions in favor of lessors under operating leases and other Persons under agreements for goods and services in the Ordinary Course of Business will not be construed to be an Investment in such lessor or such Person.

"**Investor**" means Warburg Pincus, LLC, a Delaware limited liability company, and its Affiliate WPS Production Partners II, LLC, a Delaware limited liability company.

"**IRS**" has the meaning set forth in Section 3.14(a).

"**Laws**" means any and all federal, state, local and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, codes, plans, injunctions of any Governmental Authority, permits, concessions, grants and franchises issued by any Governmental Authority, and any guidelines or restrictions of any Governmental Authority having the force of law, in all cases whether now or hereafter in effect.

"**Lender**" means (a) each Person party hereto in its capacity as a lender, (b) each Eligible Assignee that becomes a party hereto pursuant to Section 12.06, and (c) Administrative Agent, to the extent of any Term Loans made by Administrative Agent which have not been settled among Lenders pursuant to Section 11.13, other than, in each case, any such financial institution or other Person that has ceased to be a party hereto pursuant to an Assignment Agreement, and "**Lenders**" means all of the foregoing, other than, in each case, any such financial institution or other Person that has ceased to be a party hereto pursuant to an Assignment Agreement.

"**Lender Party**" means any of the Lenders, Administrative Agent and Collateral Agent; and "**Lender Parties**" means all such Persons, collectively.

"**LIBO Rate**" means:

(i)      for any Interest Period with respect to a LIBOR Loan, the rate per annum equal to the London Interbank Offered Rate ("**LIBOR**") or a successor rate (which rate is approved by Administrative Agent and shall be applied in a manner consistent with market practice; *provided* that to the extent such market practice is not administratively feasible for Administrative Agent, such approved rate shall be applied in a manner as otherwise reasonably determined by Administrative Agent), as published on the applicable Reuters screen page (or such other commercially available source providing such quotations as may be designated by Administrative Agent from time to time) (such rate, the "**LIBO Screen Rate**") at approximately 11:00 a.m., London time, two (2) Business Days prior to the commencement of such Interest Period, for Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period; and

(ii)      for any interest calculation with respect to a Base Rate Loan on any date, the rate per annum equal to LIBOR, at or about 11:00 a.m., London time determined two (2) Business Days prior to such date for Dollar deposits with a term of one month commencing that day;

*provided* that in any event the LIBO Rate shall be deemed to be not less than 1.00% per annum.

"**LIBO Screen Rate**" has the meaning set forth in the definition of "LIBO Rate".

"**LIBOR**" has the meaning set forth in the definition of "**LIBO Rate**".

"**LIBOR Loans**" means any Loans that accrue interest at a rate based on clause (i) of the definition of "LIBO Rate", in accordance with the terms of this Agreement.

"**LIBOR Margin**" means, on any date, with respect to the Term Loans, 7.00% *per annum*.

"**Lien**" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset and any production payments and other priority claims against production.  For the purposes of this Agreement and the other Financing Documents, a Person shall be deemed to own subject to a Lien any asset which it has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, Capital Lease or other title retention agreement relating to such asset.

"**Litigation**" means any action, suit, investigation or proceeding before any court, mediator, arbitrator or Governmental Authority.

"**Loan Account**" has the meaning set forth in Section 2.06(b).

"**Loan Party**" means any of Borrowers, any Subsidiary of any Borrower, Guarantors or any other guarantor of all or any part of the Obligations, in each case, whether now existing or hereafter acquired or formed; and "**Loan Parties**" means all such Persons, collectively.

"**Loan Party Notice**" has the meaning assigned to such term in Section 4.09(b).

"**Loans**" means the Term Loans.

"**London Banking Days**" means any day on which dealings in Dollar deposits are conducted by and between banks in the London interbank Eurodollar market.

"**Losses**" has the meaning set forth in Section 10.02.

"**Manager**" means Sheridan Production Partners Manager, LLC, a Delaware limited liability company, and its Wholly-Owned Subsidiaries.

"**Margin Stock**" has the meaning set forth in Regulation U of the Federal Reserve Board.

"**Material Adverse Effect**" means a material adverse change in, or a material adverse effect upon, any of (a) the condition (financial or otherwise), operations, business or properties of Borrowers, taken as a whole, (other than as a result of the events and conditions related and/or leading up to the commencement of the Case and any defaults under agreements that have no

effect under the terms of the Bankruptcy Code as a result of the commencement of the Cases), (b) the rights and remedies of Administrative Agent or the Lenders under any Financing Document, or the ability of Borrowers, taken as a whole, to perform any of their material obligations under the Financing Documents, or (c) the legality, validity, enforceability of any Financing Document, or the perfection or priority of any security interest or other Lien granted therein with respect to any material Collateral.

"**Materiality Threshold**" means $500,000.

"**Maturity Date**" means [●].[1]

"**Mid-Month Production Volumes Test Date**" means the fifth (5th) Business Day following the first fifteen (15) days of each calendar month.

"**Milestone**" or "**Milestones**" has the meaning set forth in Section 4.12.

"**MNPI**" means information that (i) is material with respect to any Loan Party or any of its securities for purposes of United States federal or state securities laws, (ii) is not publicly available and (iii) is not of the type that would be publicly available if such Loan Party were a public reporting company.

"**Monthly Production Volumes Test Date**" means the Friday of the first full week following the end of each calendar month. For the avoidance of doubt, the first Monthly Production Volumes Test Date shall occur on the first such date after the month in which the Petition Date occurs.

"**Moody's**" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"**Mortgage**" means any Deed of Trust, Mortgage, Line of Credit Mortgage, Assignment, Security Agreement, Fixture Filing and Financing Statement from any Loan Party in favor of Collateral Agent, whether heretofore executed at any time and from time to time hereafter, which shall be substantially in the form satisfactory to Collateral Agent, to be modified as appropriate to conform to applicable state Law and the types of properties to be covered thereby. If deemed appropriate or advisable by Collateral Agent, a Mortgage shall be to a trustee for the benefit of the Lender Parties.

"**Multiemployer Plan**" means a multiemployer plan that is intended to meet the definition set forth in Section 4001(a)(3) of ERISA, to which any Borrower or any member of the Controlled Group may have any liability.

"**Net Proceeds**" means (a) the cash proceeds received in respect of the applicable event, including any cash received in respect of any non-cash proceeds, minus (b) the sum of all reasonable and documented out-of-pocket fees and expenses of the Loan Parties paid to third parties (other than Affiliates) in connection with such event.

---

[1] **NTD**: To be 6 months from the Closing Date.

"**Net Profits Agreement**" means the Net Profits Agreement between Partnership M and Partnership B, dated as of September 30, 2010, as the same may be amended, supplemented, restated or otherwise modified from time to time (but the foregoing shall not permit any amendment, supplement, restatement or modification contrary to the provisions of Section 5.15 or Section 9 of Part C of Annex 9.1).

"**Net Profits Conveyance**" means each conveyance of a Net Profits Interest pursuant to the Net Profits Agreement, as the same may be amended, supplemented, restated or otherwise modified from time to time (but the foregoing shall not permit any amendment, supplement, restatement or modification contrary to the provisions of Section 5.15 or Section 9 of Part C of Annex 9.1).

"**Net Profits Documents**" means the Net Profits Agreement, each Net Profits Conveyance and any Production Payment as defined in and granted pursuant to the terms of the Net Profits Agreement.

"**Net Profits Interest**" means each Net Profits Interest, as defined in and granted pursuant to the terms of the Net Profits Agreement, together with any Production Payment, as defined in and granted pursuant to the terms of the Net Profits Agreement, in respect of any such Net Profits Interest.

"**Net Profits Interest Grantor**" means Partnership M and each of its Subsidiaries that is a grantor of a Net Profits Interest to Partnership B.

"**Net Profits Percentage**" means Partnership B's net profits interest percentage in the Subject Properties pursuant to the terms of the applicable Net Profits Documents.

"**New Money Loans**" means, individually or collectively, as the context may require, the Initial Loans and the Delayed Draw Loans.

"**Note**" has the meaning set forth in Section 2.05.

"**Notice of Borrowing**" means a notice of a Responsible Officer of Administrative Borrower, appropriately completed and substantially in the form of Exhibit C hereto or such other form as may be approved by Administrative Agent (including, subject to Section 12.03(b), any form on an electronic platform or electronic transmission system as shall be approved by Administrative Agent).

"**Obligations**" means all obligations, liabilities and indebtedness (monetary (including post-petition interest, whether or not allowed) or otherwise) of each Credit Party under this Agreement or any other Financing Document, in each case howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due. For the avoidance of doubt, the "Obligations" shall include all Initial Loans, Delayed Draw Loans, Roll-Up Loans and all fees hereunder or under any other Financing Document.

"**OFAC**" means the U.S. Department of Treasury Office of Foreign Assets Control.

"**OFAC Lists**" means, collectively, the Specially Designated Nationals and Blocked Persons List maintained by OFAC pursuant to Executive Order No. 13224, 66 Fed. Reg. 49079 (Sept. 25, 2001) and/or any other list of terrorists or other restricted Persons maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable Executive Orders.

"**Oil and Gas Properties**" means all oil, gas and/or mineral leases, oil, gas or mineral properties, mineral servitudes and/or mineral rights of any kind (including, without limitation, mineral fee interests, lease interests, farm-in rights, overriding royalty and royalty interests, net profits interests, oil payment interests, production payment interests and other types of mineral interests), and all oil and gas production, gathering, treating, storage, processing, and handling assets, whether real, personal or mixed, tangible or intangible.

"**Orders**" means, collectively, the Interim Order and the Final Order.

"**Ordinary Course of Business**" means, in respect of any transaction involving any Person, the ordinary course of such Person's business.

"**Organizational Documents**" means, with respect to any Person other than a natural person, the documents by which such Person was organized (such as a certificate of incorporation, certificate of limited partnership, articles of organization or certificate of formation, and including, without limitation, any certificates of designation for preferred stock or other forms of preferred equity) and which relate to the internal governance of such Person (such as by-laws, a partnership agreement or an operating, limited liability company or members agreement), as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"**Other Connection Taxes**" means, with respect to any Lender Party, Taxes imposed as a result of a present or former connection between such Lender Party and the jurisdiction imposing such Tax (other than connections arising from such Lender Party having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced this Agreement, or sold or assigned an interest in any Term Loan).

"**Participant**" has the meaning set forth in Section 12.06(b).

"**Participation Agreements**" means, collectively, Participation Agreement II-A, Participation Agreement II-M and Participation Agreement SIP.

"**Participation Agreement II-A**" means that certain Distribution Participation Agreement dated as of October 6, 2017, among Partnership A and the Participants (as defined therein) from time to time parties thereto, as the same may be amended, restated, supplemented or otherwise modified from time to time (but the foregoing shall not permit any amendment, supplement, restatement or modification contrary to Section 5.16).

"**Participation Agreement II-M**" means that certain Distribution Participation Agreement dated as of October 6, 2017, among Partnership M and the Participants (as defined therein) from time to time parties thereto, as the same may be amended, restated, supplemented

or otherwise modified from time to time (but the foregoing shall not permit any amendment, supplement, restatement or modification contrary to Section 5.16).

"**Participation Agreement SIP**" means that certain Distribution Participation Agreement dated as of October 6, 2017, among SIP and the Participants (as defined therein) from time to time parties thereto, as the same may be amended, restated, supplemented or otherwise modified from time to time (but the foregoing shall not permit any amendment, supplement, restatement or modification contrary to Section 5.16).

"**Partnership A**" has the meaning set forth in the preamble hereto.

"**Partnership A General Partner**" means Sheridan Production Partners II, LLC, a Delaware limited liability company.

"**Partnership A Partnership Agreement**" means the Amended and Restated Limited Partnership Agreement of Partnership A, dated as of September 30, 2010, as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement.

"**Partnership Agreements**" means, individually or collectively, as the context may require, the Partnership A Partnership Agreement, the Partnership B Partnership Agreement and the Partnership M Partnership Agreement.

"**Partnership B**" means Sheridan Production Partners II-B, L.P., a Delaware limited partnership.

"**Partnership B Controlled Group**" means all members of a group of corporations and all members of a group of trades or businesses (whether or not incorporated) under common control which, together with Partnership B, are treated as a single employer under Section 414(b), (c), (m) or (o) of the Code or Section 4001(b) of ERISA.

"**Partnership B ERISA Plan**" means any "employee benefit plan", as such term is defined in Section 3(3) of ERISA (other than a Partnership B Multiemployer Plan), which Partnership B maintains, sponsors or contributes to, or, in the case of an employee benefit plan which is subject to Section 412 of the Code or Section 302 or Title IV of ERISA, to which Partnership B or any member of the Partnership B Controlled Group may have any liability, including any liability by reason of having been a substantial employer within the meaning of Section 4063 of ERISA at any time during the preceding five (5) years, or by reason of being deemed to be a contributing sponsor under Section 4069 of ERISA.

"**Partnership B Financial Statements**" means the financial statements of Partnership B delivered from time to time pursuant to Sections 4.01(a), 4.01(b) or 4.01(c) or Section 4.1(a) or (b) of the Pre-Petition SIP RBL Credit Agreement and Pre-Petition SIP Term Loan Credit Agreement, as applicable, and references to the "most recent" Partnership B Financial Statements means the Partnership B Financial Statements most recently delivered to Administrative Agent at the time in question.

"**Partnership B General Partner**" means SPP II-B GP, LLC, a Delaware limited liability company.

"**Partnership B Material Adverse Effect**" means a material adverse change in, or a material adverse effect upon, any of (a) the condition (financial or otherwise), operations, business or properties of Partnership B (other than as a result of the events and conditions related and/or leading up to and following the commencement of the Cases or any defaults under agreements that have no effect under the terms of the Bankruptcy Code as a result of the commencement of a proceeding under the Cases), (b) the rights and remedies of Partnership M under, the ability of Partnership B to perform any of its material obligations under, the legality, validity, or enforceability of, or the perfection or priority of any right or interest granted in, the Preferred Equity Annex, any certificate representing the Preferred Interest or any provisions of the Partnership Agreement applicable to the Preferred Interests, or (c) the rights and remedies of Partnership B against any Net Profits Interest Grantor under, or the ability of any Net Profits Interest Grantor to perform any of its material obligations under, or the legality, validity or enforceability against any Net Profits Interest Grantor of, or the perfection or priority of any right or interest granted in, the Net Profits Agreement or any material Net Profits Conveyance.

"**Partnership B Multiemployer Plan**" means a multiemployer plan that is intended to meet the definition set forth in Section 4001(a)(3) of ERISA, to which Partnership B or any member of the Partnership B Controlled Group may have any liability.

"**Partnership B Partnership Agreement**" means the Amended and Restated Limited Partnership Agreement of Partnership B, dated as of September 30, 2010, as the same may be amended, supplemented, restated or otherwise modified from time to time (but the foregoing shall not permit any amendment, supplement, restatement or modification contrary to Section 5.14).

"**Partnership B Pension Plan**" means any Partnership B ERISA Plan that is subject to Section 412 of the Code or Title IV of ERISA.

"**Partnership B Pre-Petition Swap Contracts**" means the Swap Contracts listed on Schedule 1.01(a).

"**Partnership M**" has the meaning set forth in the preamble hereto.

"**Partnership M General Partner**" means SPP II-M GP, LLC, a Delaware limited liability company.

"**Partnership M Partnership Agreement**" means the Amended and Restated Limited Partnership Agreement of Partnership M, dated as of September 30, 2010, as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement.

"**Partnership Representative**" has the meaning set forth in Section 4.10.

"**Payment Account**" means the account specified in <u>Annex B</u> into which all payments by or on behalf of Borrowers to Administrative Agent under the Financing Documents shall be

made, or such other account as Administrative Agent shall from time to time specify by notice to Borrower.

"**Payment in Full**" or "**Paid in Full**" means with respect to any Obligations, the full and complete cash payment thereof (including if applicable, upon the occurrence of the Plan Effective Date, the full and complete payment thereof pursuant to the DIP Debt Conversion), including any interest, fees and other charges accruing during the Cases (whether or not allowed in the proceeding). No Loans shall be deemed to have been paid in full until all Commitments have expired or been terminated and all related loan documents in respect thereof have been terminated.

"**PBGC**" means the Pension Benefit Guaranty Corporation and any Person succeeding to any or all of its functions under ERISA.

"**Pension Plan**" means any ERISA Plan that is subject to Section 412 of the Code or Title IV of ERISA.

"**Permits**" has the meaning set forth in Section 3.01.

"**Permitted Contest**" means a contest maintained in good faith by appropriate action or, if applicable, proceedings promptly instituted and diligently conducted and with respect to which such reserve or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made; *provided* that compliance with the obligation that is the subject of any such proceeding is effectively stayed during such proceeding.

"**Permitted Liens**" means Liens permitted pursuant to Section 5.02.

"**Person**" means any natural person, corporation, limited liability company, professional association, limited partnership, general partnership, joint stock company, joint venture, association, company, trust, bank, trust company, land trust, business trust or other organization, whether or not a legal entity, and any Governmental Authority.

"**Petition Date**" has the meaning set forth in the recitals hereto.

"**Plan Effective Date**" has the meaning set forth in the definition of "Termination Date."

"**Platform**" has the meaning set forth in Section 4.01(p).

"**Pledgors**" means Sheridan SMG LLC, a Delaware limited liability company, Sheridan ICM, LLC, a Delaware limited liability company, WPS Production Partners II LLC, a Delaware limited liability company, and Partnership A General Partner.

"**Preferred Capital**" means, at any time, the Unreturned Series A Preferred Capital Contributions as defined in the Preferred Equity Annex.

"**Preferred Equity Annex**" means the Amended and Restated Annex, dated as of October 6, 2017, to the Partnership B Partnership Agreement, as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time (but the

foregoing shall not permit any amendment, supplement, restatement or modification contrary to the provisions of Section 5.14).

"**Preferred Equity Documents**" means the Partnership B Partnership Agreement, the Preferred Equity Annex and each certificate representing the Preferred Interest.

"**Preferred Interest**" means the Preferred Interest in Partnership B as defined in and granted pursuant to the terms of the Partnership B Partnership Agreement and the Preferred Equity Annex.

"**Pre-Petition II-A RBL Credit Agreement**" has the meaning set forth in the recitals hereto.

"**Pre-Petition II-A RBL Lenders**" has the meaning set forth in the recitals hereto.

"**Pre-Petition II-A Subordinated Loan Agreement**"  means that certain Subordinated Unsecured Term Loan Credit Agreement, dated as of October 6, 2017, among Partnership A, Wilmington Trust, National Association, in its capacity as administrative agent and the lenders party thereto, as may be amended, restated, supplemented or otherwise modified prior to the Petition Date.

"**Pre-Petition II-A Term Lenders**" has the meaning set forth in the recitals hereto.

"**Pre-Petition II-A Term Loan Credit Agreement**" has the meaning set forth in the recitals hereto.

"**Pre-Petition II-M RBL Credit Agreemen**t" has the meaning set forth in the recitals hereto.

"**Pre-Petition II-M RBL Lenders**" has the meaning set forth in the recitals hereto.

"**Pre-Petition II-M Subordinated Loan Agreement**"  means that certain Subordinated Unsecured Term Loan Credit Agreement, dated as of October 6, 2017, among Partnership M, Wilmington Trust, National Association, in its capacity as administrative agent and the lenders party thereto, as may be amended, restated, supplemented or otherwise modified prior to the Petition Date.

"**Pre-Petition II-M Term Lenders**" has the meaning set forth in the recitals hereto.

"**Pre-Petition II-M Term Loan Credit Agreement**" has the meaning set forth in the recitals hereto.

"**Pre-Petition Collateral Agent**" means BOA, in its capacity as collateral agent under each of the Pre-Petition Term Loan Credit Agreements and the Pre-Petition RBL Credit Agreements.

"**Pre-Petition Debt**" means the Pre-Petition Secured Debt and the "Obligations" as defined in each Pre-Petition Subordinated Loan Agreement.

"**Pre-Petition Financing Documents**" means the Pre-Petition Secured Financing Documents and the "Financing Documents" as defined in each Pre-Petition Subordinated Loan Agreement.

"**Pre-Petition RBL Agent**" means BOA, in its capacity as administrative agent under each of the Pre-Petition RBL Credit Agreements.

"**Pre-Petition RBL Credit Agreements**" means, individually or collectively, as the context may require, the Pre-Petition II-A RBL Credit Agreement, the Pre-Petition II-M RBL Credit Agreement and the Pre-Petition SIP RBL Credit Agreement.

"**Pre-Petition RBL Lenders**" means, individually or collectively, as the context may require, the Pre-Petition II-A RBL Lenders, the Pre-Petition II-M RBL Lenders and the Pre-Petition SIP RBL Lenders.

"**Pre-Petition RBL Loans**" means the loans extended pursuant to each the Pre-Petition RBL Credit Agreements.

"**Pre-Petition Secured Credit Agreements**" means, individually or collectively, as the context may require, the Pre-Petition RBL Credit Agreements and the Pre-Petition Term Loan Credit Agreements.

"**Pre-Petition Secured Debt**" means the "Obligations" as defined in each Pre-Petition Secured Credit Agreement.

"**Pre-Petition Secured Financing Documents**" means the "Financing Documents" as defined in each of the Pre-Petition Secured Credit Agreements.

"**Pre-Petition Secured Lender Parties**" means the "Lender Parties" as defined in each of the Pre-Petition Term Loan Credit Agreements and the "Secured Parties" as defined in each of the Pre-Petition RBL Credit Agreements.

"**Pre-Petition SIP RBL Credit Agreemen**t" has the meaning set forth in the recitals hereto.

"**Pre-Petition SIP RBL Lenders**" has the meaning set forth in the recitals hereto.

"**Pre-Petition SIP Subordinated Loan Agreement**"  means that certain Subordinated Unsecured Term Loan Credit Agreement, dated as of October 6, 2017, among SIP, Wilmington Trust, National Association, in its capacity as administrative agent and the lenders party thereto, as may be amended, restated, supplemented or otherwise modified prior to the Petition Date.

"**Pre-Petition SIP Term Lenders**" has the meaning set forth in the recitals hereto.

"**Pre-Petition SIP Term Loan Credit Agreement**" has the meaning set forth in the recitals hereto.

"**Pre-Petition Subordinated Loan Agreements**" means, individually or collectively, as the context may require, the Pre-Petition II-A Subordinated Loan Agreement, the Pre-Petition II-M Subordinated Loan Agreement and the Pre-Petition SIP Subordinated Loan Agreement.

"**Pre-Petition Term Agent**" means BOA, in its capacity as administrative agent under each of the Pre-Petition Term Loan Credit Agreements.

"**Pre-Petition Term Lenders**" means, individually or collectively, as the context may require, the Pre-Petition II-A Term Lenders, the Pre-Petition II-M Term Lenders and the Pre-Petition SIP Term Lenders.

"**Pre-Petition Term Loan Credit Agreements**" means, individually or collectively, as the context may require, the Pre-Petition II-A Term Loan Credit Agreement, the Pre-Petition II-M Term Loan Credit Agreement and the Pre-Petition SIP Term Loan Credit Agreement.

"**Pre-Petition Term Loans**" means the term loans extended pursuant to each the Pre-Petition Term Loan Credit Agreements.

"**Prime Rate**" has the meaning set forth in the definition of "Base Rate".

"**Pro Rata Share**" means with respect to a Lender's obligation to make Term Loans and a Lender's right to receive payments of principal and interest with respect to Term Loans, the Term Loan Percentage of such Lender.

"**Proceeding**" has the meaning set forth in Section 10.02.

"**Production Company**" means Sheridan Production Company, LLC, a Delaware limited liability company.

"**Production Proceeds**" has the meaning set forth in the Pre-Petition Secured Credit Agreements.

"**Production Volumes Forecast**" shall mean a forecast setting forth in form and detail reasonably satisfactory to the Required Lenders, on a monthly basis through the Maturity Date, forecasted total production volumes (which shall include a breakdown of projected operated volumes versus projected non-operated volumes).

"**Proved Reserves**" has the meaning set forth in the SPE Definitions.

"**PTE**" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"**Public Lender**" has the meaning set forth in Section 4.01(p).

"**Push-Out Election**" has the meaning set forth in Section 4.10.

"**QFC**" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"**QFC Credit Support**" has the meaning set forth in Section 12.23.

"**Qualified Purchaser**" has the meaning set forth in Section 2(a)(51) of the Investment Company Act of 1940, as amended, and the rules and regulations promulgated thereunder.

"**Real Estate Asset**" means, at any time of determination, all right, title and interest (fee, leasehold, tenancy, occupancy or otherwise) in and to real property (including, but not limited to, Oil and Gas Properties, Subject Properties, land, buildings, structures, parking areas, fixtures, and other improvements thereon) now or hereafter owned by any Loan Party, including all easements, rights-of-way, and similar rights relating thereto.

"**Register**" has the meaning set forth in Section 12.06(a)(iii).

"**Related Party**" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees and advisors of such Person and of such Person's Affiliates.

"**Remedies Notice Period**" has the meaning set forth in Section 9.02.

"**Reorganization Plan**" means a plan of reorganization or liquidation in any or all of the Cases.

"**Required Lenders**" means, subject to the provisions of Section 2.12, at any time, Lenders holding more than 50% of the sum of the aggregate Commitments of all Lenders at such time and the aggregate principal amount of Term Loans outstanding at such time.

"**Reserve Report**" means a report provided pursuant to Section 4.01(k).

"**Resignation Effective Date**" has the meaning set forth in Section 11.12.

"**Responsible Officer**" means any of the Chief Executive Officer of Manager, the principal financial officer of the Manager or any other officer of the applicable Borrower or Manager designated by or on behalf of such Borrower and reasonably acceptable to Administrative Agent.

"**Restricted Distribution**" means as to any Person (i) any dividend or other distribution (whether in cash, Capital Stock or other property) on any equity interest in such Person, (ii) any payment by such Person on account of (A) the purchase, redemption, retirement, defeasance, surrender, cancellation, termination or acquisition of any Capital Stock in such Person or any claim respecting the purchase or sale of any equity interest in such Person or (B) any option, warrant or other right to acquire any Capital Stock in such Person or (iii) any payment made pursuant to the Participation Agreements.

"**Roll-Up**" has the meaning set forth in Section 2.01(a)(ii).

"**Roll-Up Loan**" has the meaning set forth in Section 2.01(a)(ii). The aggregate principal amount of Roll-Up Loans deemed funded hereunder at any time shall not exceed $50,000,000.

"**Roll-Up Schedule**" has the meaning set forth in Section 2.01(a)(ii) and is attached hereto as Schedule 1.01(b) (as may be updated from time to time by the Administrative Agent in accordance with Section 2.01(a)(ii)).

"**RSA**" means that certain Restructuring Support Agreement, dated as of September [●], 2019, by and among the Credit Parties, the Pre-Petition Term Lenders party thereto, the Pre-Petition RBL Lenders thereto, as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"**RSA Termination Event**" means the termination of the RSA by any party thereto in accordance with Section 11 thereof.

"**S&P**" means Standard & Poor's Financial Services LLC, a subsidiary of S&P Global Inc.

"**Securities Account**" means any "securities account" as such term is defined in Article 8 of the UCC and in any event shall include all accounts and sub-accounts relating to any of the foregoing.

"**Securities Account Control Agreement**" means a control agreement reasonably satisfactory to Collateral Agent executed by the applicable Loan Party, a securities intermediary holding such Loan Party's assets, including funds and securities, or an issuer of Securities, and Collateral Agent with respect to collection and control of all deposits, securities and other balances held in a Securities Account maintained by such Loan Party with such securities intermediary, to perfect Collateral Agent's first-priority Lien or otherwise grant control to Collateral Agent on such account as security for the Obligations.

"**Securitization**" has the meaning set forth in Section 12.08.

"**Security**" means any "security" as such term is defined in Article 8 of the UCC.

"**Security Documents**" means any agreement (including each Guaranty), document or instrument, whether heretofore executed, executed concurrently herewith or executed at any time and from time to time hereafter, pursuant to which one or more Credit Parties or any other Person either (a) Guarantees payment or performance of all or any portion of the Obligations and/or (b) provides, as security for all or any portion of the Obligations, a Lien on any of its assets in favor of Collateral Agent for its own benefit and the benefit of the other Lender Parties, as any or all of the same may be amended, restated, amended and restated, supplemented, replaced, substituted or otherwise modified from time to time, including all such agreements, documents or instruments entered into in connection with a refinancing of any extensions of credit or other obligations guaranteed or secured thereby (including, for the avoidance of doubt, any one or more successive refinancings). The Security Documents shall supplement, and shall not limit, the security interests granted pursuant to the Orders, and in all events shall include the Mortgages.

"**Settlement Service**" has the meaning set forth in Section 12.06(a).

29

"**Sheridan Omnibus Cash Management and Agency Agreement**" means that certain Amended and Restated Sheridan Omnibus Cash Management and Agency Agreement, dated October 17, 2014, among Manager, Production Company and other signatories thereto, as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement.

"**SIP**" has the meaning set forth in the preamble hereto.

"**SIP General Partner**" means Sheridan Investment Partners II GP, LLC, a Delaware limited liability company.

"**Sole Lead Arranger**" means BOA in its capacity as sole lead arranger for the DIP Facility, and the successors of BOA in such capacity.

"**SPC Accounts**" means those certain deposit accounts held at Wells Fargo, N.A. in the name of Production Company as agent for the members of the Affiliated Group and established for the benefit of the Affiliated Group, and into which Fund II Operating Cash may be deposited from time to time in accordance herewith.

"**SPE Definitions**" means the Definitions for Oil and Gas Reserves promulgated by the Society of Petroleum Engineers (or any generally recognized successor) as in effect from time to time.

"**Statutory Reserve Rate**" means, for any day as applied to a LIBOR Loan, a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board of Governors of the Federal Reserve System (or any successor thereto) to which the financial institution then serving as Administrative Agent is subject with respect to Eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board) on such day. Such reserve percentages shall include those imposed pursuant to such Regulation D. LIBOR Loans shall be deemed to constitute Eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"**Subject Properties**" means those Oil and Gas Properties of Partnership M that are burdened by a Net Profits Interest.

"**Subsidiary**" means, with respect to any Person, (a) any corporation or limited liability company of which an aggregate of more than 50% of the outstanding Capital Stock having ordinary voting power to elect a majority of the board of directors (or equivalent governing body) of such corporation or limited liability company (irrespective of whether, at the time, Capital Stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time, directly or indirectly, owned legally or beneficially by such Person or one or more Subsidiaries of such Person, or with respect to which any such Person has the right to vote or designate the vote of more than 50% of

such Capital Stock whether by proxy, agreement, operation of Law or otherwise, and (b) any partnership in which such Person and/or one or more Subsidiaries of such Person is the general partner.  Unless the context otherwise requires, each reference to a Subsidiary shall be a reference to a Subsidiary of any Loan Party.

"**Superpriority Claim**" means any administrative expense claim in the case of any Credit Party that is a Debtor having priority over any and all administrative expenses, diminution claims and all other priority claims against the Credit Parties that are Debtors, subject only to the Carve-Out, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 365, 503(b), 506(c) (subject only to and effective upon entry of the Final Order), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code.

"**Supported QFC**" has the meaning set forth in Section 12.23.

"**Swap Contract**" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement, whether exchange traded, "over-the-counter" or otherwise, involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions.

"**Taxes**" has the meaning set forth in Section 2.08(a).

"**Term Loan Percentage**" means, as to any Lender, the percentage equal to the principal amount of Term Loans of such Lender outstanding on such date *divided* by the aggregate principal amount of Term Loans of all Lenders outstanding on such date.

"**Term Loans**" means the New Money Loans and the Roll-Up Loans, in each case, made (or deemed made) by the Lenders to Borrowers pursuant to Sections 2.01(a)(i) and (ii).

"**Termination Date**" means the earliest of (a) the Maturity Date, (b) the date of acceleration of the Obligations and the termination of the unfunded Commitments with respect to the DIP Facility in accordance with the terms of this Agreement upon and during the continuance of an Event of Default, (c) the effective date of an Acceptable Plan of Reorganization for the Debtors (the "**Plan Effective Date**") or the effective date of any other Reorganization Plan, (d) the date of consummation of a sale of all or substantially all of the Debtors' assets under Section 363 of the Bankruptcy Code and (e) the date that is thirty (30) days after the Petition Date (or such later date as may be agreed by the Required Lenders), unless the Final Order has been entered by the Bankruptcy Court on or prior to such date.

"**Test Period**" means the rolling four-week period most recently ended on the last Friday prior to the delivery of each Budget Variance Report (or, if a four-week period has not elapsed since the Petition Date, the cumulative period since the Petition Date).

"**Title Cure Period**" has the meaning set forth in Section 4.15.

"**Transaction Documents**" means the Net Profits Documents, the Preferred Equity Documents and the Intercompany Loan Agreement.

"**Transactions**" means, collectively, the execution and delivery of this Agreement (including, without limitation, the Roll-Up), the Agent Fee Letter and the transactions contemplated hereby and thereby and the payment of Consenting Lender Fees and Expenses (as defined in the RSA) and fees and expenses of the Borrowers related thereto.

"**Type**", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the LIBO Rate or the Base Rate.

"**UCC**" means the Uniform Commercial Code of the State of New York or of any other state the Laws of which are required to be applied in connection with the perfection of security interests in any Collateral.

"**United States**" means the United States of America.

"**United States Tax Compliance Certificate**" has the meaning set forth in Section 2.08(d)(ii).

"**U.S. Special Resolution Regimes**" has the meaning set forth in Section 12.23.

"**Wholly-Owned Subsidiary**" means, with respect to any Person, any Subsidiary of such Person of which all of the Capital Stock (other than, in the case of a corporation, directors' qualifying shares, to the extent legally required) are directly or indirectly owned and controlled by such Person or one or more Wholly-Owned Subsidiaries of such Person.

"**Write-Down and Conversion Powers**" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02. *Accounting Terms and Determinations*. Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder (including without limitation determinations made pursuant to the exhibits hereto) shall be made, and all financial statements required to be delivered hereunder shall be prepared on a consolidated basis in accordance with GAAP applied on a basis consistent with the most recent audited Financial Statements of any Borrower or audited Partnership B Financial Statements, as the case may be, delivered to Administrative Agent and Lenders.

Section 1.03. *Other Definitional Provisions and References*. References in this Agreement to "Articles", "Sections", "Annexes", "Exhibits" or "Schedules" shall be to Articles, Sections, Annexes, Exhibits or Schedules of or to this Agreement unless otherwise specifically provided. Any term defined herein may be used in the singular or plural. "Include", "includes" and "including" shall be deemed to be followed by "without limitation". Except as otherwise specified or limited herein, references to any Person include the successors of such Person. References "from" or "through" any date mean, unless otherwise specified, "from and

excluding" or "through and including", respectively.   Unless otherwise specified herein, the settlement of all payments and fundings hereunder between or among the parties hereto shall be made in lawful money of the United States and in immediately available funds.   All amounts used for purposes of financial calculations required to be made herein shall be without duplication.   References to any statute or act shall include all related current regulations and amendments and any successor statutes, acts and regulations.   References to any statute or act, without additional reference, shall be deemed to refer to federal statutes and acts of the United States.   References to any agreement, instrument or document shall include all schedules, exhibits, annexes and other attachments thereto.   The term "successor" when used in any Financing Document with respect to each of Collateral Agent or Administrative Agent, also means and includes any Person serving in such capacity by virtue of or under any refinancing (including, for the avoidance of doubt, under any one or more successive refinancing(s)) of any of the extensions of credit or other obligations made or incurred under an agreement under which such agent is appointed to serve in such capacity.   All references in this Agreement (including in Annex 9.1) to the knowledge or best knowledge of Borrowers shall include the knowledge or best knowledge, respectively, of the Chief Executive Officer or principal financial officer of Manager.

Section 1.04.   *LLC Division*.   Any reference herein to a merger, transfer, consolidation, amalgamation, assignment, sale or transfer or disposition or similar term, shall be deemed to apply to a division of or by a limited liability company, or an allocation of assets to a series of a limited liability company (or the unwinding of such a division or allocation), as if it were a merger, transfer, consolidation, amalgamation, assignment, sale or transfer or disposition, or similar term, as applicable, to, of or with a separate Person.   Any division of a limited liability company shall constitute a separate Person hereunder (and each division of any limited liability company that is a Subsidiary, subsidiary, joint venture or any other like term shall also constitute such a Person or entity), and to the extent any covenant in any Financing Document is applicable to such limited liability company immediately prior to such division, such covenant shall apply to any Person resulting from such division immediately after such division.

Section 1.05.   *Administrative Borrower.*   Each Borrower hereby appoints Holdco as the borrowing agent for Borrowers, which appointment shall remain in full force and effect unless and until Administrative Agent and the Lenders shall have received prior written notice signed by all Borrowers that such appointment has been revoked and that another Borrower has been appointed in such capacity.   Each Borrower hereby appoints and authorizes Holdco (or its successor) (i) to provide to Administrative Agent and the Lenders and receive from Administrative Agent and the Lenders all notices with respect to Loans obtained for the benefit of any Borrower and all other notices and instructions under this Agreement and (ii) to take such action as Holdco deems appropriate on behalf of Borrowers and to exercise such other powers as are reasonably incidental thereto to carry out the purposes of this Agreement.   Any reference to any action or notice required or permitted to be taken or given hereunder and under the Financing Documents by the "Borrowers" or "each Borrower" shall be effective if such action is taken, or such notice is delivered, by Administrative Borrower or, as applicable, a Responsible Officer thereof.

# ARTICLE 2
# THE LOANS

Section 2.01.  *Term Loans.*

(a)     *Commitments.*

        (i)     *New Money Loans.*  On the terms and subject to the conditions set forth herein and in the Orders, each Lender severally agrees to (i) following entry of the Interim Order and the satisfaction of the conditions to Borrowing set forth in Section 8.01, make a term loan to Borrowers in a single Borrowing on the Closing Date (the "**Initial Loans**") in an aggregate principal amount requested by Borrowers not to exceed such Lender's Initial Commitment and (ii) following satisfaction of the conditions to Borrowing set forth in Section 8.02, make a term loan to Borrowers in a single Borrowing on the Delayed Draw Borrowing Date (the "**Delayed Draw Loans**") in an aggregate principal amount not to exceed such Lender's Delayed Draw Commitment. Once funded, each Initial Loan and each Delayed Draw Loan shall be a "Loan" and a "Term Loan" for all purposes under this Agreement and the other Financing Documents.

        (ii)     *Roll-Up Loans.* On the terms and conditions set forth herein and subject to the entry of the Final Order, on the Final Order Entry Date, (a) Pre-Petition Term Loans held by Pre-Petition Term Lenders which are also Lenders or Affiliates of Lenders hereunder and (b) Pre-Petition RBL Loans held by Pre-Petition RBL Lenders which are also Lenders or Affiliates of Lenders hereunder shall be automatically substituted and exchanged for (and repaid by) loans hereunder (the "**Roll-Up Loans**"), in a principal amount equal to $1.00 of Pre-Petition Term Loans or Pre-Petition RBL Loans, as applicable, of such Lender (or its Affiliate) for each $1.00 of Commitment held by such Lender (or its Affiliate) on the Closing Date (and such Roll-Up Loans shall be deemed funded on the Final Order Entry Date, and shall constitute and shall be deemed to be Term Loans hereunder) (the foregoing substitution and exchange of Pre-Petition Term Loans and Pre-Petition RBL Loans into Roll-Up Loans shall be defined herein, generally, as the "**Roll-Up**"). The aggregate principal amount of Roll-Up Loans deemed funded hereunder at any time shall not exceed $50,000,000. Furthermore, the parties agree that (i) set forth on a schedule (the "**Roll-Up Schedule**") will be the name of each Lender or Affiliate of a Lender whose Pre-Petition Term Loans or Pre-Petition RBL Loans will be exchanged for (and prepaid by) the Roll-Up Loans on the Final Order Entry Date and the amount of Roll-Up Loans to be received by such Lender or Affiliate of a Lender and (ii) each Affiliate of a Lender that will receive Roll-Up Loans hereunder and that is not already a Lender hereunder at the time thereof must become a Lender hereunder, by executing a joinder to this Agreement in form and substance reasonably satisfactory to Administrative Agent, on or prior to the Final Order Entry Date, in order to receive its portion of the Roll-Up Loans.  Notwithstanding anything to the contrary herein (including Section 12.05) but subject to the restrictions on assignments set forth Section 12.06, the Administrative Agent is authorized in its sole and absolute discretion (without the consent of any other Lender) to update the Roll-Up Schedule from time to time prior to the Final Order Entry Date to reflect properly the substitution and exchange of

34

Prepetition Term Loans and Prepetition RBL Loans with Roll-Up Loans in accordance with this Section 2.01(a)(ii).

(iii)    Amounts borrowed (or deemed borrowed) under Section 2.01(a)(i) and (ii) and paid or prepaid in respect of the Term Loans may not be reborrowed.

(iv)    For the avoidance of doubt, solely with respect to the applicable calculations in determining the Lenders constituting "Required Lenders" hereunder, Initial Loans, Delayed Draw Loans and the Roll-Up Loans shall constitute a single class of Loans and Commitments.

(b)    *Advancing Term Loans*.  Administrative Borrower shall deliver to Administrative Agent a Notice of Borrowing with respect to the proposed borrowing of New Money Loans, such Notice of Borrowing to be delivered no later than 11:00 a.m. (New York City time) (i) two (2) Business Days prior to the proposed borrowing, in the case of Base Rate Loans and (ii) four (4) Business Days prior to the proposed borrowing, in the case of all LIBOR Loans (or, in each case, such shorter period as Administrative Agent is willing to accommodate from time to time).  Once given, except as provided in Section 2.04(e)(iii) or Section 2.11, a Notice of Borrowing shall be irrevocable, and Borrowers shall be bound thereby.

Any failure by a Lender to fund a New Money Loan on the Closing Date or the Delayed Draw Borrowing Date that it is required to make hereunder shall constitute a material breach by such Lender of this Agreement and, until such breach is remedied, such Lender shall be a Defaulting Lender; *provided* that any such replacement of such Defaulting Lender pursuant to Section 12.06 shall not be deemed to constitute a waiver of any of Lenders', Administrative Agent's or Borrowers' rights or remedies against any such Defaulting Lender arising out of or in relation to such failure to fund.

Nothing in this Section 2.01 shall be deemed to relieve any Lender from its obligations to fund its Initial Commitment on the Closing Date and its Delayed Draw Commitment on the Delayed Draw Borrowing Date or to prejudice any rights that Administrative Agent or Borrowers may have against any Lender as a result of any default by such Lender hereunder.

(c)    *Termination of Commitments*.  The Initial Commitment of each Lender shall be automatically and permanently reduced to $0 upon the making of the Initial Loan on the Closing Date. The Delayed Draw Commitment of each Lender shall be automatically reduced (x) by the aggregate principal amount of Delayed Draw Loans made by such Lender pursuant to this Section 2.01 and (y) to $0 on the Delayed Draw Commitment Termination Date.

Section 2.02.  *Repayment of Term Loans*.  Except in connection with the DIP Debt Conversion, each Borrower hereby unconditionally promises to repay in full in cash the outstanding Term Loans (including, for the avoidance of doubt, the Roll-Up Loans) to Administrative Agent,  for the account of each Lender on the Termination Date, together in each case with accrued and unpaid interest on the principal amount to be paid to but excluding the date of such payment and all fees payable under Section 2.04.

Section 2.03.  *Mandatory Repayments and Optional Prepayments*.

(a)    Within three (3) Business Days following the receipt of Net Proceeds by the Affiliated Group or their respective designees on their behalf in respect of any Asset Dispositions in excess of $300,000 in the aggregate for all such Asset Dispositions, Borrower shall apply all of such Net Proceeds towards the prepayment of the Term Loans in the manner specified in Section 2.03(f).

(b)    Within four (4) Business Days following the receipt of Extraordinary Receipts by the Affiliated Group or any of its respective designees on its behalf in excess of $300,000 in the aggregate for all such Extraordinary Receipts, Borrowers shall apply such excess amount of Extraordinary Receipts toward the prepayment of the Term Loans in the manner specified in Section 2.03(f).

(c)    [Reserved.]

(d)    [Reserved.]

(e)    Borrowers may, upon written notice to Administrative Agent, at any time or from time to time voluntarily prepay Loans in whole or in part without premium or penalty; *provided* that (i) such notice must be received by Administrative Agent not later than three (3) Business Days prior to any date of prepayment; (ii) any prepayment of LIBOR Loans shall be in a principal amount equal to (A) $50,000 or (B) any amount that is greater than $50,000 and an integral multiple of $10,000; and (iii) any prepayment of Base Rate Loans shall be in a principal amount equal to (x) $50,000 or (y) any amount that is greater than $50,000 and an integral multiple of $10,000 or, in each case, if less, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment, whether such Loans to be prepaid are LIBOR Loans or Base Rate Loans and, if LIBOR Loans are to be prepaid, the Interest Period(s) of such Loans. Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's Pro Rata Share of such prepayment. If such notice is given by Administrative Borrower, Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.

(f)    Any prepayment of a Loan shall be accompanied by all accrued and unpaid interest on the amount prepaid and, in the case of a prepayment of a LIBOR Loan only, any additional amounts required pursuant to Section 2.04(e)(iv). Subject to the Carve-Out, each prepayment of Loans pursuant to this Section 2.03 shall be applied by Administrative Agent, in accordance with the Orders and, to the extent not in contravention of the Orders: **first**, ratably to the payment of all Obligations constituting fees, costs, indemnities, liabilities, obligations and expenses incurred by or owing to Agents with respect to this Agreement, the other Financing Documents or the Collateral; **second**, ratably to the payment of Obligations constituting fees, costs, indemnities and expenses incurred by or owing to any Lender with respect to this Agreement, the other Financing Documents or the Collateral; **third**, to the payment of Obligations constituting accrued and unpaid interest on the Loans (other than the Roll-Up Loan) ratably to the Lenders (other than Defaulting Lenders) in accordance with their Pro Rata Shares; **fourth**, to the payment of Obligations constituting the principal amount of the Loans (other than the Roll-Up Loans) outstanding ratably to the Lenders  (other than Defaulting Lenders) in accordance with their Pro Rata Shares; **fifth**, to the payment of Obligations constituting accrued and unpaid interest on the

Roll-Up Loans ratably to the Lenders  (other than Defaulting Lenders) in accordance with their Pro Rata Shares; **sixth**, to the payment of Obligations constituting the principal amount of the Roll-Up Loans outstanding ratably to the Lenders (other than Defaulting Lenders) in accordance with their Pro Rata Shares; **seventh**, to the payment of Obligations owing to the Defaulting Lenders ratably in accordance with their Pro Rata Shares; **eighth**, ratably to the payment of remaining Obligations outstanding; **ninth**, ratably to the payment of any superpriority adequate protection claims of the Pre-Petition Lender Parties; and **tenth**, to the payment of the obligations outstanding under the Pre-Petition Secured Debt ratably to the Pre-Petition Secured Lender Parties; *provided, further*, that if more than one LIBOR Loan is outstanding under such tranche, such repayments shall be made to each such LIBOR Loans in order of priority beginning with the LIBOR Loan with the least number of days remaining in the Interest Period applicable thereto and ending with the LIBOR Loan with the most number of days remaining in the Interest Period applicable thereto.  Any balance remaining after giving effect to the applications set forth in this Section 2.03(f) shall be delivered to Borrowers or to whomever may be lawfully entitled to receive such balance or as the Bankruptcy Court may direct.

Section 2.04.   *Interest, Interest Calculations and Certain Fees.*

(a)    *Interest*.

(i)    Depending upon Administrative Borrower's election from time to time, subject to the terms hereof, to have portions of the Loans accrue interest determined by reference to the Base Rate or the LIBO Rate, the Loans and the other Obligations shall bear interest from the date made through repayment (whether by acceleration or otherwise) thereof at the applicable rates set forth below:

(A)    if a Base Rate Loan, or any other past due Obligation other than a LIBOR Loan, then at the sum of the Base Rate plus the Base Rate Margin; and

(B)    if a LIBOR Loan, then at the sum of the LIBO Rate plus the LIBOR Margin.

(ii)    LIBOR Loans comprising a Borrowing shall at all times have the same Interest Period.

(b)    *Agents' Fees.*  Borrowers shall pay the fees and expenses to Administrative Agent as set forth in the Agent Fee Letter, payable in the amounts and at the times specified therein or as so otherwise agreed upon by Borrowers and Administrative Agent in writing.

(c)    *Other Fees.*  Borrowers agree to pay:

(i)    to Administrative Agent for the account of each Lender, a closing fee (the "**Closing Fee**") in an amount equal to 2.00% of the principal amount of such Lender's aggregate Commitment on the Closing Date, payable in cash on the Closing Date, which shall be funded from the Initial Loans made on the Closing Date; and

(ii)    to Administrative Agent for the account of each Lender, a delayed draw fee (the "**Delayed Draw Fee**") in an aggregate amount equal to 1.00% on the average

daily unused amount of the Delayed Draw Commitment of such Lender from and including the Closing Date to but excluding the Delayed Draw Commitment Termination Date. The Delayed Draw Fee shall be payable on the Delayed Draw Borrowing Date. Each of the Closing Fee and the Delayed Draw Fee shall be computed on the basis of a year of 360 days and payable for the actual number of days elapsed (including the first day but excluding the last day).

(d)     *Computation of Interest.*

(i)     *Computation Provisions.* All computations of interest for Base Rate Loans shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed. All computations of interest for LIBOR Loans shall be made on the basis of a 360-day year and actual days elapsed. The date of funding of a Base Rate Loan and the first day of an Interest Period with respect to a LIBOR Loan shall be included in the calculation of interest. The date of payment of a Base Rate Loan and the last day of an Interest Period with respect to a LIBOR Loan shall be excluded from the calculation of interest. If a Loan is repaid on the same day that it is made, one day's interest shall be charged.

(ii)     *Interest Payment Provisions.* Interest on all Base Rate Loans is payable in arrears on the last Business Day of each March, June, September and December of each year and on the maturity of such Loans, whether by acceleration or otherwise. Interest on LIBOR Loans shall be payable on the last day of the applicable Interest Period. In addition, interest on LIBOR Loans is due on the maturity of such Loans, whether by acceleration or otherwise (each applicable date specified in this clause (d)(ii), an "**Interest Payment Date**"). All fees payable hereunder shall be fully earned and paid on the dates due, in immediately available funds, to Administrative Agent. Fees paid shall not be refundable under any circumstances.

(e)     *LIBOR Provisions.*

(i)     *LIBO Rate Election.* Subject to the provisions of Section 2.11 and Section 9.03, Administrative Borrower may request that all or a portion of the Term Loans made (or deemed made) hereunder be LIBOR Loans, that outstanding portions of Term Loans made (or deemed made) hereunder be converted to LIBOR Loans and that all or any portion of a LIBOR Loan be continued as a LIBOR Loan upon expiration of the applicable Interest Period. Any such request will be made by submitting a Notice of Borrowing to Administrative Agent. Once given, and except as provided in clause (ii) or (iii) below, a Notice of Borrowing shall be irrevocable and Borrowers shall be bound thereby. Upon the expiration of an Interest Period, in the absence of a new Notice of Borrowing submitted to Administrative Agent not less than three (3) Business Days prior to the end of such Interest Period, the LIBOR Loan then maturing shall be automatically converted to a Base Rate Loan. There may be no more than three (3) LIBOR Loans outstanding at any one time. Each request for a LIBOR Loan, whether by original issuance, conversion or continuation, shall be in a minimum amount of $500,000 and, if in excess of such amount, in an integral multiple of $100,000 in excess of such amount. Loans which are not requested as LIBOR Loans in accordance with this Section

2.04(e)(i) shall be Base Rate Loans. Administrative Agent shall notify Lenders, by telephonic or electronic notice, of each Notice of Borrowing received by Administrative Agent not less than two (2) Business Days prior to the first day of the Interest Period of the LIBOR Loan requested thereby.

(ii)     *[Reserved].*

(iii)     *Illegality.* Notwithstanding any other provisions hereof, if any Law shall make it unlawful for any Lender to make, fund or maintain LIBOR Loans, such Lender shall promptly give notice of such circumstances to Administrative Agent, Administrative Borrower and the other Lenders. In such an event, (A) the commitment of such Lender to make LIBOR Loans, continue LIBOR Loans as LIBOR Loans or convert Base Rate Loans to LIBOR Loans shall be immediately suspended and (B) such Lender's outstanding LIBOR Loans shall be converted automatically to Base Rate Loans on the last day of the Interest Period thereof or at such earlier time as may be required by Law.

(iv)     *LIBOR Breakage Fee.* Upon (A) any default by any Borrower in making any borrowing of, conversion into or continuation of any LIBOR Loan following the delivery to Administrative Agent of any applicable Notice of Borrowing or (B) any payment of a LIBOR Loan on any day that is not the last day of the Interest Period applicable thereto (regardless of the source of such prepayment and whether voluntary, by acceleration or otherwise), Borrowers shall promptly, upon Administrative Borrower's receipt of the written notice referred to in the last sentence of this paragraph (iv), pay Administrative Agent, for the benefit of the applicable Lender that funded (or was deemed to have funded) any such LIBOR Loan, an amount equal to the amount of any losses, expenses and liabilities (including, without limitation, any actual loss (including interest paid) in connection with the re-employment of such funds) that such Lender may sustain as a result of such default or such payment. A statement of a Lender setting forth in reasonable detail the amount necessary to compensate such Lender as specified in this clause (iv) shall be delivered to Administrative Borrower.

(v)     *Increased Costs.* If, after the Closing Date, the adoption of, or any change in, any Law, or any change in the interpretation, administration or application of any Law by any Governmental Authority, central bank or comparable agency charged with the interpretation, administration or application thereof, or compliance by any Lender with any new request, guideline or directive (whether or not having the force of Law) of any such authority, central bank or comparable agency: (A) shall impose, modify or deem applicable any reserve (including any reserve imposed by the Board of Governors of the Federal Reserve System, or any successor thereto, but excluding any reserve included in the determination of the LIBO Rate pursuant to the provisions of this Agreement), special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by any Lender with respect to its LIBOR Loans, or (B) shall impose on any Lender any other condition affecting its LIBOR Loans, any of its Notes (if any) or its obligation to make LIBOR Loans; and the result of anything described in clauses (A) and (B) above is to increase the cost to (or to impose an additional cost on) such Lender of making or maintaining any

LIBOR Loan, or to reduce the amount of any sum received or receivable by such Lender under this Agreement or under any of its Notes (if any) with respect thereto, then upon demand by such Lender (which demand shall be accompanied by a statement setting forth the basis for such demand and a calculation of the amount thereof in reasonable detail, a copy of which shall be furnished to Administrative Agent and Administrative Borrower), Borrowers shall promptly pay directly to such Lender such additional amount as will compensate such Lender for such increased cost or such reduction, so long as such amounts have accrued on or after the day which is 270 days prior to the date on which such Lender first made demand therefor; *provided* that notwithstanding anything herein to the contrary, (1) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (2) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to have been introduced or adopted after the Closing Date for purposes of this Section 2.04(e)(v), regardless of the date enacted, adopted or issued.

Section 2.05. *Notes.* The Term Loans (including, for the avoidance of doubt, the Roll-Up Loans) held by each Lender shall be evidenced, if so requested by such Lender, by a promissory note substantially in the form of Exhibit D executed by Borrowers (a "**Note**") in the principal amount of such Lender's Term Loan.

Section 2.06. *General Provisions Regarding Payment; Loan Account.*

(a)     All payments to be made by Borrowers under any Financing Document, including payments of principal and interest made hereunder and pursuant to any other Financing Document, and all fees, expenses, indemnities and reimbursements under any Financing Document, shall be made without set-off or counterclaim. If any payment hereunder becomes due and payable on a day other than a Business Day, such payment shall (except as provided in the definition of "Interest Period") be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension (it being understood and agreed that, solely for purposes of calculating financial covenants and computations contained herein and determining compliance therewith, if payment is made, in full, on any such extended due date, such payment shall be deemed to have been paid on the original due date without giving effect to any extension thereto). Any payments received in the Payment Account before 1:00 p.m. (New York City time) on any date shall be deemed received by Administrative Agent on such date, and any payments received in the Payment Account after 1:00 p.m. (New York City time) on any date may, in the reasonable discretion of Administrative Agent, be deemed received by Administrative Agent on the next succeeding Business Day. Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. All payments under each Financing Document shall be made in Dollars.

(b)     Administrative Agent shall maintain a loan account (the "**Loan Account**") on its books to record Loans and other extensions of credit made by Lenders hereunder or under any other Financing Document, and all payments thereon made by Borrowers. All entries in the

Loan Account shall be made in accordance with Administrative Agent's customary accounting practices as in effect from time to time. The balance in the Loan Account, as recorded on Administrative Agent's most recent printout or other written statement, shall be presumptively correct evidence of the amounts due and owing to Administrative Agent by Borrower; *provided* that any failure to so record or any error in so recording shall not limit or otherwise affect Borrowers' duty to pay all amounts owing hereunder or under any other Financing Document.

Section 2.07. *Maximum Interest*.

(a)    It is the intention of the parties hereto that each Lender Party shall conform strictly to usury laws applicable to it. Accordingly, if any of the transactions contemplated hereby or by any of the other Financing Documents would be usurious as to any Lender Party under laws applicable to it (including the laws of the United States of America, the State of New York and the State of Texas and any other jurisdiction whose laws may be mandatorily applicable to such Lender Party notwithstanding the other provisions of this Agreement or any other Financing Document), then, in that event, notwithstanding anything to the contrary herein or in any of the other Financing Documents or any other agreement entered into in connection with or as security for the Notes or otherwise, it is agreed as follows: (i) the aggregate of all consideration which constitutes interest under law applicable to any Lender Party that is contracted for, taken, reserved, charged or received by such Lender Party under any of the Financing Documents or any such agreement or otherwise in connection with the Notes or any of the other Obligations shall under no circumstances exceed the maximum nonusurious amount allowed by such applicable laws, and any excess shall be canceled automatically and if theretofore paid shall be credited by such Lender Party on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by such Lender Party to Borrowers); and (ii) in the event that the maturity of the Notes is accelerated by reason of an election of the holder thereof resulting from any Event of Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, or if any unearned interest shall be payable under any of the Loans or Financing Documents, or if any transaction contemplated by any of the Financing Documents would otherwise be usurious under applicable law, then such consideration that constitutes interest or unearned interest under laws applicable to any Lender Party may never include more than the maximum nonusurious amount allowed by such applicable laws, and excess interest or unearned interest in excess of the maximum amount permitted by such applicable laws, if any, provided for in this Agreement or otherwise shall be canceled automatically as of the date of such acceleration or prepayment or such other event and, if theretofore paid, shall be credited by such Lender Party on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by such Lender Party to Borrowers). All sums paid or agreed to be paid to any Lender Party for the use, forbearance or detention of sums due hereunder or under the Notes or any other Financing Document shall, to the extent permitted by laws applicable to such Lender Party, be amortized, prorated, allocated and spread throughout the stated term of the Loans evidenced by the Notes or until payment in full so that the rate and amount of interest on account of any Loans or other Obligations does not exceed the maximum nonusurious rate or amount, as applicable, allowed by such applicable laws. If at any time and from time to time (i) the amount of interest payable to any Lender Party on any date shall be computed at the Highest Lawful Rate applicable to such Lender Party pursuant to this Section 2.07 and (ii) in respect of any subsequent interest computation period the amount of interest

otherwise payable to such Lender Party would be less than the amount of interest payable to such Lender Party computed at the Highest Lawful Rate applicable to such Lender Party, then the amount of interest payable to such Lender Party in respect of such subsequent interest computation period shall, to the extent permitted by law, continue to be computed at the Highest Lawful Rate applicable to such Lender Party until the total amount of interest payable to such Lender Party shall equal the total amount of interest which would have been payable to such Lender Party if the total amount of interest had been computed without giving effect to this Section 2.07.  To the extent that Chapter 303 of the Texas Finance Code is relevant for the purpose of determining the Highest Lawful Rate applicable to a Lender Party, such Lender Party elects to determine the applicable rate ceiling under such Chapter by the weekly ceiling from time to time in effect.  Chapter 346 of the Texas Finance Code does not apply to any Loan Party's obligations hereunder or under any other Financing Document.

Section 2.08.  *Taxes*.

(a)     All payments of principal and interest on the Loans and all other amounts payable hereunder or under any other Financing Document by any Credit Party shall be made free and clear of and without deduction for any present or future income, excise, stamp, documentary, property or franchise taxes and other taxes, fees, duties, levies, assessments, withholdings or other charges of any nature whatsoever (including interest and penalties thereon) imposed by any taxing authority, excluding any franchise taxes, doing business taxes, net income taxes (including any backup withholding in respect thereof) and any other taxes imposed on or measured by Administrative Agent's or any Lender's net income by the jurisdiction (or any political subdivision thereof) under the Laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located, or with which any such recipient otherwise has a present or former nexus (other than a nexus arising solely from being a party to, receiving any payment or enforcing its rights under, or engaging in any other transaction specifically provided for under, this Agreement or any other Financing Document) (all non-excluded items being called "**Taxes**").  If any withholding or deduction from any payment to be made by Borrowers or Administrative Agent hereunder or under any other Financing Document is required in respect of any Taxes pursuant to any applicable Law, then (i) the applicable Credit Party or Administrative Agent will pay directly to the relevant authority the full amount required to be so withheld or deducted, (ii) the applicable Credit Party (if it is the applicable withholding agent) will promptly forward to Administrative Agent an official receipt or other documentation reasonably satisfactory to Administrative Agent evidencing such payment to such authority, and (iii) the applicable Credit Party will pay (without duplication) to Administrative Agent for the account of Administrative Agent and Lenders such additional amount or amounts as is necessary to ensure that the net amount actually received by Administrative Agent and each Lender will equal the full amount Administrative Agent and such Lender would have received had no such withholding or deduction been required.  If any Taxes are directly asserted against Administrative Agent or any Lender with respect to any payment received or to be received by Administrative Agent or such Lender hereunder or under any other Financing Document, the applicable Credit Party will indemnify Administrative Agent or such Lender, within ten days after demand therefor, for the full amount paid or payable by Administrative Agent or such Lender or required to be withheld or deducted from a payment to Administrative Agent or Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant

Governmental Authority. A certificate as to the amount of such payment or liability by the Credit Parties by a Lender (with a copy to Administrative Agent), or by Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(b)     The Credit Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of Administrative Agent timely reimburse it for the payment of, any present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise in respect of the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, this Agreement, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

(c)     If any Credit Party fails to pay any Taxes when due to the appropriate taxing authority or fails to remit to Administrative Agent, for the account of Administrative Agent and the respective Lenders, the required receipts or other required documentary evidence as provided in the preceding paragraph, Borrowers shall indemnify Administrative Agent and Lenders for any incremental Taxes, interest or penalties that may become payable by Administrative Agent or any Lender as a result of any such failure.

(d)     Each Lender shall, at such times as are reasonably requested by Administrative Borrower or Administrative Agent, provide Administrative Borrower and Administrative Agent with any documentation prescribed by law, or reasonably requested by Administrative Borrower or Administrative Agent, certifying as to any entitlement of such Lender to an exemption from, or reduction in, any withholding Tax with respect to any payments to be made to such Lender under any Financing Document.  Each such Lender shall, whenever a lapse in time or change in circumstances renders such documentation expired, invalid, obsolete or inaccurate, deliver promptly to Administrative Borrower and Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the applicable withholding agent) or promptly notify Administrative Borrower and Administrative Agent of its inability to do so.

Without limiting the generality of the foregoing:

(i)     each Lender that is a United States person (as defined in Section 7701(a)(30) of the Code) shall deliver to Administrative Borrower and Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter when required by law or upon the reasonable request of Administrative Borrower or Administrative Agent) two properly completed and duly signed copies of Internal Revenue Service Form W-9 (or any successor form) certifying that such Lender is exempt from U.S. federal backup withholding; and

(ii)     each Lender that is not a United States person (as defined in Section 7701(a)(30) of the Code) (each such Lender, a "**Foreign Lender**") shall deliver to Administrative Borrower and Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter when required by

law or upon the reasonable request of Administrative Borrower of Administrative Agent) whichever of the following is applicable:

      (A)    two duly completed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E (or any successor forms) claiming eligibility for benefits of an income tax treaty to which the United States of America is a party,

      (B)    two duly completed copies of Internal Revenue Service Form W-8ECI (or any successor forms),

      (C)    in the case of a Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate, in the form approved by Administrative Agent (any such certificate a "**United States Tax Compliance Certificate**"), or any other form approved by Administrative Agent, to the effect that such Lender is not (1) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (2) a "10 percent shareholder" of Borrower within the meaning of Section 881(c)(3)(B) of the Code, or (3) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code, and that no interest payments in connection with the Financing Documents are effectively connected with such Lender's conduct of a U.S. trade or business and (y) two duly completed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E (or any successor forms),

      (D)    to the extent a Lender is not the beneficial owner (for example, where the Lender is a partnership, or where the Lender has granted a participation), Internal Revenue Service Form W-8IMY (or any successor forms) of the Lender, accompanied by a Form W-8ECI, W-8BEN, W-8BEN-E, United States Tax Compliance Certificate, Form W-9, Form W-8IMY (or other successor forms) or any other required information from each beneficial owner, as applicable (*provided* that, if the Lender is a partnership (and not a participating Lender) and one or more beneficial owners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate shall be provided by such Lender on behalf of such beneficial owner(s)), or

      (E)    any other form prescribed by applicable requirements of U.S. federal income tax law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable requirements of law to permit Borrowers and Administrative Agent to determine the withholding or deduction required to be made.

Each Lender shall, from time to time after the initial delivery by such Lender of the forms described above in this Section 2.08(d), whenever a lapse in time or change in such Lender's or the relevant beneficial owner's circumstances renders such forms, certificates or other evidence so delivered expired, invalid, obsolete or inaccurate, promptly (1) deliver to Administrative Borrower and Administrative Agent (in such number of copies as shall be requested by the recipient) renewals, amendments or additional or successor forms, properly completed and duly

executed by such Lender, and beneficial owner, as applicable, together with any other certificate or statement of exemption required in order to confirm or establish such Lender's (or beneficial owner's) status or that such Lender (or beneficial owner) is entitled to an exemption from or reduction in U.S. federal or other withholding tax or (2) notify Administrative Agent and Borrower of its inability to deliver any such forms, certificates or other evidence.

Notwithstanding any other provision of this Section 2.08(d), a Lender shall not be required to deliver any form that such Lender is not legally eligible to deliver and any form required to be delivered by this Section 2.08(d) that was delivered by a Lender at the time such Lender became a party to any of the Pre-Petition Secured Credit Agreements shall be deemed to have been delivered by such Lender on or before the date on which it becomes a party to this Agreement.

(e)     No Credit Party shall be required to pay any amount to any Person under this Section 2.08 with respect to (i) Taxes that are United States federal withholding taxes imposed on amounts payable to such Person pursuant to any Law in effect at the time such person became a party to any of the Pre-Petition Secured Credit Agreements (or, if such person was not a party to any of the Pre-Petition Secured Credit Agreements, becomes a party to this Agreement) or changes its lending office, except to the extent that (A) such Person's assignor (if any) was entitled to additional amounts with respect to such withholding tax immediately prior to the assignment to such Person or (B) such Person was entitled to additional amounts with respect to such withholding tax immediately prior to the change in lending office, (ii) any Taxes imposed by reason of a Lender's failure to comply with the requirements of Section 2.08(d) and (iii) any United States federal withholding Taxes imposed under FATCA.

(f)     A statement of Lender or Administrative Agent setting forth in reasonable detail any amount owed under this Section 2.08 shall be delivered to Administrative Borrower, such statement shall be presumed to be correct absent manifest error and Borrowers shall pay such amount promptly upon receipt thereof.

(g)     If a payment made to a Lender under any Financing Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to Administrative Borrower and Administrative Agent at the time or times prescribed by Law and at such time or times reasonably requested by Borrower or Administrative Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Administrative Borrower or Administrative Agent as may be necessary for Borrowers and Administrative Agent to comply with their obligations under FATCA, to determine whether such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this Section 2.08(g), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Section 2.09.  *Capital Adequacy*.  If any Lender shall reasonably determine that the adoption or taking effect of, or any change in, any applicable Law regarding capital adequacy or liquidity requirements, in each instance, after the Closing Date, or any change after the Closing

Date in the interpretation, administration or application thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation, administration or application thereof, or the compliance by any Lender or any Person controlling such Lender with any request, guideline or directive regarding capital adequacy or liquidity requirements (whether or not having the force of Law) of any such Governmental Authority, central bank or comparable agency adopted or otherwise taking effect after the Closing Date, has or would have the effect of reducing the rate of return on such Lender's or such controlling Person's capital as a consequence of such Lender's obligations hereunder to a level below that which such Lender or such controlling Person could have achieved but for such adoption, taking effect, change, interpretation, administration, application or compliance (taking into consideration such Lender's or such controlling Person's policies with respect to capital adequacy or liquidity requirements), then from time to time, upon demand by such Lender (which demand shall be accompanied by a statement setting forth the basis for such demand and a calculation of the amount thereof in reasonable detail, a copy of which shall be furnished to Administrative Agent), Borrowers shall promptly pay to such Lender such additional amount as will compensate such Lender or such controlling Person for such reduction, so long as such amounts have accrued on or after the day which is 270 days prior to the date on which such Lender first made demand therefor; *provided* that, notwithstanding anything herein to the contrary, (1) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (2) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to have been introduced or adopted after the Closing Date for purposes of this Section 2.09, regardless of the date enacted, adopted or issued.

Section 2.10.  *Mitigation of Obligations*.  If any Lender requests compensation under either Section 2.04(e)(v) or Section 2.09, or requires Borrowers to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.08, then, upon the written request of Administrative Borrower, such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder (subject to the provisions of Section 12.06) to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment **(i)** would eliminate or materially reduce amounts payable pursuant to any such Section, as the case may be, in the future, **(ii)** would not subject such Lender to any unreimbursed cost or expense not covered by the last sentence of this Section 2.10 and **(iii)** would not, in the judgment of such Lender, otherwise be disadvantageous to such Lender. Without limitation of the provisions of Section 10.01, if Administrative Borrower concurs with such designation or assignment, Borrowers shall pay all costs and expenses incurred by any Lender in connection with any such designation or assignment.

Section 2.11.  *Alternate Rate of Interest*.  If prior to the commencement of any Interest Period for a LIBOR Loan:

(a)     the Required Lenders or Administrative Agent determine (which determination shall be conclusive absent manifest error) that;

46

(i)        deposits are not being offered to banks in the London interbank eurodollar market for the applicable amount, currency and Interest Period of such LIBOR Loan;

(ii)        adequate and reasonable means do not exist for ascertaining the LIBO Rate, as applicable, for such Interest Period; or

(iii)        Administrative Agent is advised by the Required Lenders that the LIBO Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such borrowing for such Interest Period;

then Administrative Agent shall promptly give written notice thereof to Administrative Borrower and the Lenders and, until Administrative Agent notifies Administrative Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, which Administrative Agent agrees promptly to do, any request that requests the conversion of any Loan to, or continuation of any Loan as, a LIBOR Loan shall be ineffective and such Loan shall be continued as, or converted to, a Base Rate Loan (in the case of any conversion to a Base Rate Loan, on the last day of the Interest Period applicable thereof).

(b)        If at any time the Required Lenders or Administrative Agent determine (which determination shall be conclusive absent manifest error) that (i) the circumstances set forth in clause (a)(i) and (ii) have arisen and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in clause (a)(i) and (ii) have not arisen but either (w) the supervisor for the administrator of the LIBO Screen Rate has made a public statement that the administrator of the LIBO Screen Rate is insolvent (and there is no successor administrator that will continue publication of the LIBO Screen Rate), (x) the administrator of the LIBO Screen Rate has made a public statement identifying a specific date after which the LIBO Screen Rate will permanently or indefinitely cease to be published by it (and there is no successor administrator that will continue publication of the LIBO Screen Rate), (y) the supervisor for the administrator of the LIBO Screen Rate has made a public statement identifying a specific date (which such date shall be prior to the Maturity Date) after which the LIBO Screen Rate will permanently or indefinitely cease to be published or (z) the supervisor for the administrator of the LIBO Screen Rate or a Governmental Authority having jurisdiction over Administrative Agent has made a public statement identifying a specific date (which such date shall be prior to the Maturity Date) after which the LIBO Screen Rate may no longer be used for determining interest rates for loans, then Administrative Agent (at the direction of, and subject to the consent of, the Required Lenders) and Borrowers shall endeavor to establish an alternate rate of interest to the LIBO Rate in accordance with similar situations in other transactions in which it is serving as administrative agent or otherwise consistent with market practice generally for determining a rate of interest for syndicated loans in the United States at such time, and Administrative Agent, the Required Lenders and Borrowers shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable (but for the avoidance of doubt, such related changes shall not include a reduction of the Applicable Margin and no such consent shall require the payment of any fees by Borrowers).  Until an alternate rate of interest shall be determined in accordance with this clause (b), any request for the conversion of any Loan to, or continuation of any Loan as, a LIBOR Loan shall be ineffective.

Section 2.12.  *Defaulting Lenders*.

(a)    *Adjustments*.    Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i)    *Waivers and Amendments*.  Notwithstanding anything set forth herein to the contrary, a Defaulting Lender shall not have any voting or consent rights under or with respect to any Financing Document or constitute a "Lender" (or be included in the calculation of "Required Lenders" hereunder) for any voting or consent rights under or with respect to any Financing Document except that (x) the Commitment of any Defaulting Lender may not be increased or the Maturity Date for such Defaulting Lender's Term Loans extended without the consent of such Defaulting Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender more adversely than other affected Lenders shall require the consent of such Defaulting Lender.

(ii)    *Reallocation of Payments*.  Any payment of principal, interest, fees or other amounts received by Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article 9 or otherwise, and including any amounts made available to Administrative Agent or any other Lenders by such Defaulting Lender pursuant to Section 9.05), shall be applied at such time or times as may be determined by Administrative Agent as follows: **first**, to the payment of any amounts owing by such Defaulting Lender to Administrative Agent hereunder; **second**, as Borrowers may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as reasonably determined by Administrative Agent; **third**, to the payment of any amounts owing to Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; **fourth**, so long as no Default or Event of Default exists, to the payment of any amounts owing to Borrowers as a result of any judgment of a court of competent jurisdiction obtained by Borrowers against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and **fifth**, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided* that if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share and (y) such Loans were made at a time when the conditions set forth in Section 8.01 or Section 8.02, as applicable, were satisfied or waived, such payment shall be applied solely to pay the Loans of all non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.  For the avoidance of doubt, the reallocation of payments pursuant to this Section 2.12(a)(ii) shall not affect the outstanding principal, interest, fees and other amounts owed by Borrower under any Financing Document.

(b)    *Defaulting Lender Cure.*   If Administrative Borrower and Administrative Agent agree in writing in their sole discretion that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, such Lender will, to the extent applicable, purchase that portion of outstanding Loans of the other Lenders or take such other actions as Administrative Agent may determine to be necessary to cause the Loans to be held by such Lender in accordance with its Commitment as of the Closing Date, whereupon such Lender will cease to be a Defaulting Lender; *provided* that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of Borrower while such Lender was a Defaulting Lender; *provided, further*, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to non-Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from such Lender having been a Defaulting Lender.

Section 2.13.   *Priority and Liens*.   The relative priorities of the Liens described in Section 4.14 with respect to the Collateral shall be as set forth in the Interim Order (and, when entered, the Final Order).   All of the Liens described in Section 4.14 shall be effective and perfected upon entry of the Interim Order without the necessity of the execution or recordation of filings by Borrowers of security agreements, mortgages, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by Administrative Agent of, or over, any Collateral, as set forth in the Interim Order and, when entered, the Final Order; *provided* that for the avoidance of doubt, each such Lien shall be subject to the Carve-Out in all respects.

Section 2.14.   *Joint and Several Liability*.   All Loans, upon funding, shall be deemed to be jointly funded to and received by Borrowers.   Each Borrower is jointly and severally liable under this Agreement for all Obligations, regardless of the manner or amount in which proceeds of Loans are used, allocated, shared or disbursed by or among Borrowers themselves, or the manner in which an Agent and/or any Lender accounts for such Loans on its books and records. Each Borrower shall be liable for all amounts due to Administrative Agent and/or any Lender from Borrowers under this Agreement, regardless of which Borrower actually receives Loans hereunder or the amount of such Loans received or the manner in which such Agent and/or such Lender accounts for such Loans on its books and records.   Each Borrower's Obligations with respect to Loans made to it, and such Borrower's Obligations arising as a result of the joint and several liability of such Borrower hereunder with respect to Loans made to the other Borrowers hereunder shall be separate and distinct obligations, but all such Obligations shall be primary obligations of such Borrower.   Borrowers acknowledge and expressly agree with Agents and each Lender that the joint and several liability of each Borrower is required solely as a condition to, and is given solely as inducement for and in consideration of, credit or accommodations extended or to be extended under the Loan Documents to any or all of the other Borrowers and is not required or given as a condition of Loans to such Borrower.   Each Borrower's Obligations under this Agreement shall, to the fullest extent permitted by law, be unconditional irrespective of (i) the release of any other Borrower or the validity or enforceability, avoidance, or subordination of the Obligations of any other Borrower or of any promissory note or other document evidencing all or any part of the Obligations of any other Borrower, (ii) the absence of any attempt to collect the Obligations from any other Borrower, or any other security therefor, or the absence of any other action to enforce the same, (iii) the waiver, consent, extension,

forbearance, or granting of any indulgence by an Agent and/or any Lender with respect to any provision of any instrument evidencing the Obligations of any other Borrower, or any part thereof, or any other agreement now or hereafter executed by any other Borrower and delivered to an Agent and/or any Lender, (iv) the failure by an Agent and/or any Lender to take any steps to perfect and maintain its security interest in, or to preserve its rights to, any security or collateral for the Obligations of any other Borrower, (v) an Agent's and/or any Lender's election, in any proceeding instituted under the Bankruptcy Code, of the application of Section 1111(b)(2) of the Bankruptcy Code, (vi) any borrowing or grant of a security interest by any other Borrower, as debtor-in-possession under Section 364 of the Bankruptcy Code, (vii) the disallowance of all or any portion of an Agent's and/or any Lender's claim(s) for the repayment of the Obligations of any other Borrower under Section 502 of the Bankruptcy Code, or (viii) any other circumstances which might constitute a legal or equitable discharge or defense of a guarantor or of any other Borrower.  With respect to any Borrower's Obligations arising as a result of the joint and several liability of Borrowers hereunder with respect to Loans made to any of the other Borrowers hereunder, such Borrower waives, until the Obligations shall have been Paid in Full and this Agreement shall have been terminated, any right to enforce any right of subrogation or any remedy which an Agent and/or any Lender now has or may hereafter have against any other Borrower, any endorser or any guarantor of all or any part of the Obligations, and any benefit of, and any right to participate in, any security or collateral given to an Agent and/or any Lender to secure payment of the Obligations or any other liability of any Borrower to an Agent and/or any Lender.  Upon any Event of Default, the Agent may proceed directly and at once, without notice, against any Borrower to collect and recover the full amount, or any portion of the Obligations, without first proceeding against any other Borrower or any other Person, or against any security or collateral for the Obligations.  Each Borrower consents and agrees that the Agents shall be under no obligation to marshal any assets in favor of any Borrower or against or in payment of any or all of the Obligations.

Section 2.15. *Conversion*.   On the Conversion Date, automatically and without any further consent or action required by the Administrative Agent, any Lender, or any other Lender Party, (i) the aggregate principal amount of the Initial Loans and the Delayed Draw Term Loans outstanding as of such date shall be automatically converted on a dollar-for-dollar basis for First-Out New Term Loans (as defined in the Exit Facility Term Sheet) and the aggregate principal amount of Roll-Up Loans shall be automatically converted on a dollar-for-dollar basis for Second-Out New Term Loans (as defined in the Exit Facility Term Sheet) in accordance with the Exit Facility Term Sheet, and such principal amount of such First-Out New Term Loans and Second-Out New Term Loans (other than interest and Obligations which, by the terms of any Financing Document, expressly survive the repayment in full of the Term Loans) shall be deemed fully satisfied by such conversion (the "**DIP Debt Conversion**"), (ii)  Borrowers (or, with respect to Borrowers, the entities assuming the operations and assets of Borrowers in the Acceptable Plan of Reorganization), and each Credit Party (or, with respect to any Credit Party, each entity assuming the operations and assets of such Credit Party that is a Debtor in the Acceptable Plan of Reorganization, to the extent such Person is required under the Exit Facility Term Sheet or the Acceptable Plan of Reorganization to continue to be a obligor thereunder) shall assume all obligations in respect of the Term Loans hereunder that are converted into First-Out New Term Loans and Second-Out New Term Loans and all other monetary obligations in connection therewith, (iii) each Lender hereunder shall be a Lender under the Exit Credit Agreement and (iv) upon Payment in Full, this Agreement shall terminate and be superseded and

replaced in its entirety by the Exit Credit Agreement.  Notwithstanding the foregoing, all obligations of Borrowers and the other Credit Parties to Administrative Agent and the Lenders under this Agreement and any other Financing Document which are expressly stated in this Agreement or such other Financing Document as surviving such agreement's termination shall, as so specified, survive without prejudice and remain in full force and effect.  Each of the Credit Parties, Administrative Agent and the Lenders shall take such actions and execute and deliver such agreements, instruments or other documents as Administrative Agent or the Required Lenders may reasonably request to give effect to the provisions of this Section 2.15 and as are required to complete the schedules to the Exit Credit Agreement or other agreements contemplated thereby; *provided* that any such action by the Administrative Agent or any of the Lenders shall not be a condition precedent to the effectiveness of the Exit Credit Agreement if and to the extent so provided in the Final Order.  Each Lender hereto hereby agrees that, on the Conversion Date, Administrative Agent (in its capacity as Administrative Agent under the Exit Credit Agreement) may execute and deliver the Exit Credit Agreement (and any guaranty contemplated thereby) on its own behalf and on behalf of each Lender. Notwithstanding anything to the contrary herein or in any other Financing Document, the obligations of the non-Debtor Credit Parties shall not be increased or expanded beyond the obligations to pledge the Capital Stock of any Loan Party consistent with terms of the existing Security Documents in connection with the DIP Debt Conversion.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES

To the extent required pursuant to Section 8.01 or Section 8.02, as applicable, and to induce Administrative Agent and Lenders to enter into this Agreement and to make (or be deemed to have made) the Loans and other credit accommodations contemplated hereby, each Borrower hereby represents and warrants to Administrative Agent and each Lender that:

Section 3.01.  *Existence and Power*.  Each Loan Party is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has the same legal name as it appears in such Loan Party's Organizational Documents and an organizational identification number (if any), and has all powers and all governmental licenses, authorizations, registrations, permits, consents and approvals required under all applicable Laws in order to own its assets and to carry on its business as now conducted (collectively, "**Permits**"), except where the failure to have such Permits could not reasonably be expected to have a Material Adverse Effect.  Each Loan Party is qualified to do business as a foreign entity and is in good standing in each jurisdiction in which it is required to be so qualified, except where the failure to be so qualified and in good standing could not reasonably be expected to have a Material Adverse Effect.

Section 3.02.  *Authorization; No Contravention*.  Subject to the entry of the Orders and the terms thereof, the execution, delivery and performance by each Loan Party of the Financing Documents to which it is a party are within its powers, have been duly authorized by all necessary action pursuant to its Organizational Documents, and require no further action by or in respect of, or filing with, any Governmental Authority, and do not violate, conflict with or cause a breach or a default under (a) any of the Organizational Documents of such Loan Party or (b) any Law or any agreement or instrument binding upon such Loan Party, except for such

violations, conflicts, breaches or defaults with respect to this clause (b) as could not reasonably be expected to have a Material Adverse Effect.

Section 3.03.  *Validity and Enforceability.*  Subject to the entry of the Orders and the terms thereof, each of the Financing Documents to which any Loan Party is a party constitutes a valid and binding agreement or instrument of such Loan Party, enforceable against such Loan Party in accordance with its respective terms, except as the enforceability thereof may be limited by bankruptcy, insolvency or other similar laws relating to the enforcement of creditors' rights generally (in each case, other than with respect to the Credit Parties that are Debtors) and by general equitable principles.

Section 3.04.  *Subsidiaries and Investments.*

(a)  The authorized Capital Stock of each Subsidiary is as set forth in the applicable Loan Party Notice. All issued and outstanding Capital Stock of each Subsidiary are duly authorized and validly issued, fully paid and non-assessable and are owned by the Credit Party identified on the applicable Loan Party Notice, free and clear of all Liens other than Permitted Liens under Section 5.2(c), (q) and (r) hereof and those in favor of Collateral Agent under the Security Documents, and such Capital Stock were issued in compliance with all applicable Laws. The identity of the holders of the Capital Stock of each Subsidiary and the percentage of their fully-diluted ownership of the Capital Stock of each Subsidiary is set forth on the applicable Loan Party Notice. No shares of the Capital Stock of any Subsidiary, other than those described above, are issued and outstanding. Except as set forth on the Loan Party Notice, there are no preemptive or other outstanding rights, options, warrants, conversion rights or similar agreements or understandings for the purchase or acquisition from any Loan Party of any Capital Stock of any such entity.

(b)  SIP has no Subsidiaries and has no Investments in any Person other than the Preferred Interests and Cash Equivalents.

Section 3.05.  *Financial Information.*

(a)  The Financial Statements of each of Borrowers for the Fiscal Year ending December 31, 2018, the Fiscal Quarter ending March 31, 2019 and the most recent Financial Statements, fairly present in all material respects, in conformity with GAAP, the consolidated financial position of the applicable Borrower and its Consolidated Subsidiaries as of the date thereof and their consolidated results of operations, changes in stockholders' equity (or comparable calculation) and cash flows for the period reflected therein (subject, in the case of interim or unaudited financial statements to changes resulting from audit and normal year-end adjustments and the absence of footnote disclosures).  As of the date of such Financial Statements, no Loan Party had any material liabilities, contingent or otherwise, including liabilities for taxes, long term leases or forward or long term commitments, which are not properly reflected on such balance sheet in accordance with GAAP as aforesaid.

(b)  Since December 31, 2018, there has been no Material Adverse Effect.

Section 3.06.  *Litigation.*  Except for the Cases, there is no Litigation pending or, to any Borrower's knowledge, threatened against any Loan Party or the subject of which is any property

of any Loan Party, including any action challenging or otherwise pertaining to any Loan Party's title to any property (including any Oil and Gas Property or rights to produce and sell oil and gas therefrom), in each case which could reasonably be expected to have a Material Adverse Effect.

Section 3.07.  *Ownership of Property Generally*.  Each Loan Party is the lawful owner of, has good and defensible title to and is in lawful possession of, or has valid leasehold interests or other rights in, all properties and assets (real or personal, tangible, intangible or mixed), including the ownership of the Preferred Interests, necessary to carry out its business as presently conducted and as presently proposed to be conducted hereafter, free and clear of Liens other than Permitted Liens.  Each Loan Party possesses all licenses, permits, franchises, patents, copyrights, trademarks and trade names, and other intellectual property (or otherwise possesses the right to use such intellectual property without violation of the rights of any other Person) that are necessary to carry out its business as presently conducted and as presently proposed to be conducted hereafter, and no Loan Party is in violation in any material respect of the terms under which it possesses such intellectual property or the right to use such intellectual property except, in each case, where such failure to so possess any such property or such violation could not reasonably be expected to have a Material Adverse Effect.

Section 3.08.  *No Default*.  No Default or Event of Default has occurred and is continuing.  Other than violations arising as a result of the commencement of the Cases and defaults as set forth in Schedule 3.08 and except as otherwise excused by the Bankruptcy Court, no Loan Party is in breach or default under or with respect to any contract, agreement, lease or other instrument to which it is a party or by which its property is bound or affected, which breach or default could reasonably be expected to have a Material Adverse Effect.

Section 3.09.  *Insurance*.

(a)     Borrowers have, and have caused each of their Subsidiaries to have, insurance of the kinds and in such amounts as are customarily carried or maintained by similarly situated companies engaged in similar businesses.  All such insurance is provided by insurers with credit quality customary for insurers of Persons similar to Borrower and engaged in similar businesses.

(b)     Collateral Agent is named as an additional insured, mortgagee and loss payee, as applicable, on each insurance policy required to be maintained pursuant to Section 4.04.

Section 3.10.  *Investment Company Act*.  No Loan Party is an "investment company" or a company "controlled" by an "investment company" or a "subsidiary" of an "investment company", all within the meaning of the Investment Company Act of 1940.

Section 3.11.  *Margin Regulations*.  None of the proceeds from the Loans have been or will be used, directly or indirectly, for the purpose of purchasing or carrying any Margin Stock, for the purpose of reducing or retiring any indebtedness which was originally incurred to purchase or carry any Margin Stock or for any other purpose which might cause any of the Loans to be considered a "purpose credit" within the meaning of Regulation T, U or X of the Federal Reserve Board.

Section 3.12.  *Compliance with Laws; Anti-Terrorism Laws*.

(a)     Each Loan Party is in compliance with the requirements of all applicable Laws, except for such non-compliance as would not reasonably be expected to have a Material Adverse Effect or such compliance is excused by the Bankruptcy Court.

(b)     None of the Loan Parties (i) is in violation of any Anti-Terrorism Law, (ii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti- Terrorism Law, (iii) is a Blocked Person, (iv) is acting or will act for or on behalf of a Blocked Person, (v) is associated with, or will become associated with, a Blocked Person or (vi) is providing, or will provide, material, financial or technical support or other services to or in support of acts of terrorism of a Blocked Person. No Loan Party nor, to the knowledge of any Borrower, any agents of Borrowers or any Subsidiary acting or benefiting in any capacity in connection with the transactions contemplated by this Agreement, (A) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person, or (B) deals in, or otherwise engages in any transaction relating to, any property or interest in property blocked pursuant to Executive Order No. 13224, any similar executive order or other Anti-Terrorism Law.

Section 3.13.   *Taxes/Ad Valorem and Severance Taxes*.

(a)     All material Federal, state and local tax returns, reports and statements required to be filed by or on behalf of each Loan Party have been filed with the appropriate Governmental Authorities in all jurisdictions in which such returns, reports and statements are required to be filed and, except to the extent subject to a Permitted Contest, all material taxes including real property taxes) and other material charges shown thereon to be due and payable in respect thereof have been timely paid prior to the date on which any fine, penalty, interest, late charge or loss may be added thereto for nonpayment thereof.  Except to the extent subject to a Permitted Contest, all material state and local sales and use taxes required to be paid by each Loan Party have been paid.  All material Federal and state returns have been filed by each Loan Party for all periods for which returns were due with respect to employee income tax withholding, social security and unemployment taxes, and, except to the extent subject to a Permitted Contest, the amounts shown thereon to be due and payable have been paid in full or adequate provisions therefor have been made. There is no audit, examination or investigation involving any Loan Party by any taxing authority or any other tax-related administrative or judicial proceeding involving any Loan Party currently pending, being conducted or, to any Borrower's knowledge, proposed or threatened with respect to any material taxes or material tax return of or with respect to any Loan Party.

(b)     Except to the extent subject to a Permitted Contest, each Loan Party has paid and discharged all material ad valorem taxes which are due and payable and are assessed against its Oil and Gas Properties or any part thereof and all material production, severance and other taxes assessed against, or measured by, the production or the value, or proceeds, of the production therefrom.

Section 3.14.   *Compliance with ERISA*.

(a)      Each ERISA Plan (and the related trusts and funding agreements) complies in form and in operation with, has been administered in compliance with, and the terms of each ERISA Plan satisfy, the applicable requirements of ERISA and the Code in all material respects.  Each ERISA Plan which is intended to be qualified under Section 401(a) of the Code is so qualified, and the United States Internal Revenue Service (the "**IRS**") has issued a favorable determination letter (or an application for such letter is currently being processed by the IRS with respect thereto) or an opinion letter (in the case of a prototype plan) with respect to each such ERISA Plan which may be relied on currently.  No Loan Party has incurred liability for any material excise tax under any of Sections 4971 through 5000 of the Code.

(b)      No steps have been taken to terminate any Pension Plan and no contribution failure has occurred with respect to any Pension Plan sufficient to give rise to a Lien under Section 303(k) of ERISA.  No condition exists or event or transaction has occurred with respect to any Pension Plan which could result in the incurrence by any Loan Party of any material liability, fine or penalty.  No Loan Party has incurred liability to the PBGC (other than for current premiums) with respect to any Pension Plan.  All contributions (if any) have been made on a timely basis to any Multiemployer Plan that are required to be made by any Loan Party or any other member of the Controlled Group under the terms of the plan or of any collective bargaining agreement or by applicable Law.  No Loan Party nor any member of the Controlled Group has withdrawn or partially withdrawn from any Multiemployer Plan, incurred any withdrawal liability with respect to any such plan or received notice of any claim or demand for withdrawal liability or partial withdrawal liability from any such plan, and no condition has occurred which, if continued, could result in a withdrawal or partial withdrawal of any Loan Party from any such plan, and no Loan Party nor any member of the Controlled Group has received any notice described in Section 4245(e) of ERISA from any Multiemployer Plan in critical status, that increased contributions may be required to avoid a reduction in plan benefits or the imposition of any excise tax, that any such plan is or has been funded at a rate less than that required under Section 412 of the Code, that any such plan is or may be terminated.

(c)      As of the Closing Date and throughout the term of this Agreement, no Credit Party (excluding WPS Production Partners II, LLC) is using "plan assets" (within the meaning of 29 C.F.R. 2510.3-101, as modified by Section 3(42) of ERISA) in connection with the Loans.

Section 3.15.  *Compliance with Environmental Laws.*  Except in each case as could not reasonably be expected to have a Material Adverse Effect:

(a)      no Hazardous Materials are located on any properties now or previously owned, leased or operated by any Loan Party or have been released into the environment, or deposited, discharged, placed or disposed of at, on, under or near any of such properties in a manner that would require the taking of any action under any applicable Environmental Law and have given rise to, or could reasonably be expected to give rise to, remediation costs and expenses on the part of the Loan Parties. No portion of any such property is being used, or has been used at any previous time, for the disposal, storage, treatment, processing or other handling of Hazardous Materials in violation of any applicable Environmental Law nor is any such property affected by any Hazardous Materials Contamination;

(b)     no Loan Party, nor to any Borrower's knowledge, any other Person, has received any notice, notification, demand, request for information, citation, summons, complaint or order, and no complaint has been filed, no penalty has been assessed and no investigation or review is pending, or to any Borrower's knowledge, threatened by any Governmental Authority or other Person against any Loan Party, or to any Borrower's knowledge, any other Person with respect to any (i) alleged violation by any Loan Party of any applicable Environmental Law, (ii) alleged failure by any Loan Party to have any Permits required in connection with the conduct of its business or to comply with the terms and conditions thereof, (iii) generation, treatment, storage, recycling, transportation or disposal of any Hazardous Materials on any property now or previously owned, leased or operated by any Loan Party or (iv) release of Hazardous Materials on any property now or previously owned, leased or operated by any Loan Party;

(c)     each of the Loan Parties are and have been in compliance with all applicable Environmental Laws and possess and are in compliance with any Permits required thereunder for their current operations;

(d)     to the knowledge of any Borrower, all oral or written notifications of a release of Hazardous Materials required to be filed by or on behalf of any Loan Party under any applicable Environmental Law have been filed or are in the process of being timely filed by or on behalf of the applicable Loan Party;

(e)     no property now owned or leased by any Loan Party and, to the knowledge of any Borrower, no such property previously owned or leased by any Loan Party, to which any Loan Party has, directly or indirectly, transported or arranged for the transportation of any Hazardous Materials, is listed or, to any Borrower's knowledge, proposed for listing, on the National Priorities List promulgated pursuant to CERCLA, or CERCLIS (as defined in CERCLA) or any similar state list or is the subject of Federal, state or local enforcement actions or, to the knowledge of any Borrower, other investigations which may lead to claims against any Loan Party for clean-up costs, remedial work, damage to natural resources or personal injury claims, including, but not limited to, claims under CERCLA;

(f)     there are no underground storage tanks located on any property owned or operated by any Loan Party that are not properly registered or permitted under applicable Environmental Laws; and

(g)     there are no Liens under or pursuant to any applicable Environmental Laws on any real property or other assets owned or leased by any Loan Party, and no actions by any Governmental Authority have been taken or, to the knowledge of any Borrower, are in process which could subject any of such properties or assets to such Liens.

Section 3.16.   *[Reserved]*.

Section 3.17.   *Full Disclosure*.   Other than projections (if any), none of the written information (financial or otherwise), taken as a whole, furnished in connection with the negotiation, execution and delivery of the Financing Documents or pursuant to the terms of any Financing Document by or on behalf of any Loan Party to Administrative Agent or any Lender (as supplemented by other written information so furnished) contained as of the date so furnished

any untrue statement of a material fact or omitted to state as of the date so furnished a material fact necessary to make the statements contained therein not misleading in light of the circumstances under which such statements were made. All projections (if any) furnished to Administrative Agent and Lenders pursuant to the terms of this Agreement by any Loan Party were prepared in good faith based upon assumptions believed by such Loan Party to be reasonable at the time of preparation (it being understood that projections are subject to significant uncertainties and contingencies, that no assurances can be given that any projections will be attained and that any variances from actual results may be material). There are no statements or conclusions in any Reserve Report which, as of the date of such Reserve Report, are based upon or include materially misleading information or fail to take into account material information regarding the matters reported therein, it being understood that projections concerning volumes attributable to the Oil and Gas Properties and production and cost estimates contained in each Reserve Report are necessarily based upon professional opinions, estimates and projections and that Borrowers and the Subsidiaries do not warrant that such opinions, estimates and projections will ultimately prove to have been accurate.  Notwithstanding the foregoing, (i) with respect to the Approved Budget delivered pursuant to Section 4.01(r), each Borrower only makes the representations and warranties set forth in Section 3.21(a) and (ii) with respect to the Production Volumes Forecast delivered pursuant to 4.01(q), each Borrower only makes the representations and warranties set forth in Section 3.21(b).

Section 3.18.  *Reserve Reports, Imbalances, Marketing and Other Related Matters.* Other than as disclosed in the related Reserve Documents, as of the effective date of each Reserve Report with respect to the Oil and Gas Properties reflected in such Reserve Report (and taking into account the Net Profits Interest):

(a)    Except as would not reasonably be expected to have a Material Adverse Effect, the ownership of each Loan Party in such Oil and Gas Properties: (i) entitles such Loan Party to the net interests in production attributable to such Oil and Gas Properties as reflected in such Reserve Report for the periods set forth therein, subject to no Liens other than Permitted Liens, and (ii) does not obligate such Loan Party to bear the costs and expenses relating to the maintenance, development and operations of such Oil and Gas Properties in excess of the working interests of such Oil and Gas Properties as reflected in such Reserve Report for the periods set forth therein except for any increase which is offset by a corresponding proportionate increase in such Loan Party's net revenue interest in such Oil and Gas Properties.

(b)    (i) The material leases, contracts, servitudes and other agreements forming a part of the Oil and Gas Properties of the Loan Parties reflected in such Reserve Report are in full force and effect, (ii) all rents, royalties and other payments due and payable under such leases, contracts, servitudes and other agreements, or under any Permitted Liens, or otherwise attendant to the Loan Party's ownership or operation of any Oil and Gas Properties, have been properly and timely paid in all material respects, and (iii) no Loan Party is in default with respect to its obligations under any such leases, contracts, servitudes and other agreements, or under any Permitted Liens, or otherwise attendant to its ownership or operation of any part of the Oil and Gas Properties reflected in such Reserve Report, where such default could adversely affect in any material respect the ownership or operation of any of its Oil and Gas Properties reflected in such Reserve Report.

(c)    No Loan Party is currently accounting in any material respect for any royalties, or overriding royalties or other payments out of production, on a basis (other than delivery in kind) less favorable to such Loan Party than proceeds received by such Loan Party (calculated at the well) from sale of production (other than in respect to leases that provide for royalty payments to be made on a market value basis), and no Loan Party has any material liability (or alleged liability) to account for the same on any such less favorable basis.

(d)    No material production in respect of such Oil and Gas Property is subject to any agreement for the marketing, sale, processing, transportation or delivery of production in respect thereof (i) whereby payment for production is or can be deferred in the case of oil, in excess of sixty (60) days after delivery, or in the case of gas, in excess of ninety (90) days after delivery, (ii) whereby payments are made to a Loan Party other than in cash (except in connection with gas processing agreements), (iii) with respect to agreements for marketing or sale of production, that cannot be canceled on 120 days' or less notice unless the price for such production is based on a monthly market price index or (iv) under which any Loan Party is having deliveries of production from such Oil and Gas Property curtailed substantially below such property's delivery capacity other than normal course, short-term gas curtailments consistent with past practices caused by mid-stream facility outages, or instances where Loan Party voluntarily curtailed production to avoid generating negative lease level income in the ordinary course of business and consistent with past practices.

(e)    There are no material take or pay or other prepayments (excluding imbalances) which would require a Loan Party to deliver production from any such Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor.

(f)    No such Oil and Gas Property is subject at the present time to any material regulatory refund obligation and, to the best of Loan Party's knowledge, no facts exist which might cause the same to be imposed.

(g)    Except in an aggregate amount not representing more than 1% of a Borrower's Proved Reserves as reflected in such Reserve Report, no Borrower, nor to any Borrower's knowledge any of Borrower's predecessors in title, has, prior to the date hereof, taken in the net aggregate more ("overproduced") production from the lands covered thereby (or pooled or unitized therewith) than the applicable Borrower's ownership interest in such Oil and Gas Properties would entitle it to take. No Oil and Gas Property is subject to a gas balancing arrangement under which one or more third parties may take a portion of the production attributable to such Oil and Gas Property as a result of production having been taken from, or as a result of other actions or inactions with respect to, other properties.

Section 3.19.   *Maintenance and Development of Properties*.   Other than as disclosed in the related Reserve Documents, as of the effective date of each Reserve Report with respect to the Oil and Gas Properties reflected in such Reserve Report:

(a)    Except as could not reasonably be expected to have a Material Adverse Effect, the Oil and Gas Properties (and all properties unitized therewith) are being maintained operated and developed in a good and workmanlike manner, in accordance with prudent industry standards and in conformity with (i) all applicable Laws, (ii) all oil, gas or other mineral leases and other

58

contracts and agreements forming a part of such Oil and Gas Properties and (iii) with any Permitted Liens burdening such Oil and Gas Properties.

(b)     Except as could not reasonably be expected to have a Material Adverse Effect, no Oil and Gas Property reflected in the most recently delivered Reserve Report is subject to having allowable production after the date hereof reduced below the full and regular allowable (including the maximum permissible tolerance) because of any overproduction (whether or not the same was permissible at the time) prior to the date hereof and none of the wells located on any such Oil and Gas Properties (or properties unitized therewith) are or will be deviated from the vertical more than the maximum permitted by applicable Laws, and all of the wells reflected in such Reserve Report are bottomed under and producing from, with the well bores wholly within, the Loan Party's Oil and Gas Properties or subsurface easements (or, in the case of wells located on properties unitized therewith, such unitized properties).

(c)     Each Loan Party has all governmental licenses and permits necessary or to own and, where applicable, operate, the Oil and Gas Property, and no Loan Party has received notice of any violations in respect of any such licenses or permits except where the failure to have any such licenses or permits or such violation could not reasonably be expected to have a Material Adverse Effect.

(d)     Except where the failure to do so could not reasonably be expected to have a Material Adverse Effect: all pipelines, wells, gas processing plants, platforms and other material improvements, fixtures and equipment owned in whole or in part by the Loan Parties that are necessary to conduct normal operations are being maintained in a good and workmanlike manner in accordance with prudent industry standards, and with respect to such of the foregoing which are operated by the Loan Parties, in a manner consistent with the Loan Parties' past practices.

Section 3.20.  *Accounts*.   No Borrower has any Commodity Accounts or Securities Accounts as of the Closing Date.

Section 3.21.  *DIP Budget and Production Volumes Forecast*.

(a)     The Initial DIP Budget, which was delivered to Administrative Agent and the Lenders on or prior to the Closing Date, and each subsequent DIP Budget, was prepared in good faith based upon assumptions Borrowers believed to be reasonable assumptions on the date of delivery of such DIP Budget.

(b)     The Production Volumes Forecast, which was delivered to Administrative Agent and the Lenders on or prior to the Closing Date, was prepared in good faith and based on assumptions Borrowers believed to be reasonable assumptions on the date of delivery of the Production Volumes Forecast.

Section 3.22.  *Cases; Orders*.

(a)     The Cases were commenced on the Petition Date in accordance with applicable Laws and proper notice thereof was given for (i) the motion seeking approval of the Financing Documents, the Interim Order and Final Order, (ii) the hearing for the entry of the Interim Order and (iii) the hearing for the entry of the Final Order (*provided* that notice of the final hearing will

be given as soon as reasonably practicable after such hearing has been scheduled).  The Credit Parties that are Debtors shall give, on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the Interim Order or Final Order, as applicable.

(b)     After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed Superpriority Claims in the Cases having priority over all administrative expense claims and unsecured claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under section 364(c)(l) of the Bankruptcy Code, subject to (i) the Carve-Out and (ii) the priorities set forth in the Interim Order or Final Order, as applicable.

(c)     After the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations will be secured by a valid and perfected Lien on all of the Collateral subject, as to priority, to the Carve-Out, all to the extent set forth in the Interim Order or the Final Order.

(d)     The Interim Order (with respect to the period on and after entry of the Interim Order and prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), vacated, or, without the Required Lenders' consent, modified or amended.  The Credit Parties are in compliance in all material respects with the Orders.

(e)     Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim Order, the Final Order and Section 2.14, as the case may be, upon the Termination Date (whether by acceleration or otherwise), Administrative Agent and Lenders shall be entitled to immediate Payment in Full and to enforce the remedies provided for hereunder or under applicable Laws, without further notice, motion or application to, hearing before, or order from, the Court.

Section 3.23.  *Beneficial Ownership*.  As of the Closing Date, the information included in any Beneficial Ownership Certification (if any) is true and correct in all material respects.

Section 3.24.  *EEA Financial Institutions*.  No Credit Party is an EEA Financial Institution.

## ARTICLE 4
## AFFIRMATIVE COVENANTS

Each Borrower agrees that, until a Payment in Full has occurred:

Section 4.01.  *Financial Statements and Other Reports*.  Borrowers (other than Holdco) will maintain, and will cause each of their respective Subsidiaries to maintain, a system of accounting established and administered in accordance with sound business and accounting

60

practices to permit preparation of financial statements in accordance with GAAP and will provide the information required to be delivered to Administrative Agent and Lenders hereunder, and will deliver to Administrative Agent (to be delivered to the Lenders):

(a)     [reserved];

(b)     within sixty (60) days after the end of each of the first three (3) Fiscal Quarters in each Fiscal Year, commencing with the end of the Fiscal Quarter ending [September 30, 2019], (i) a consolidated balance sheet of each Borrower (other than Holdco) and its Consolidated Subsidiaries as at the end of such Fiscal Quarter and the related consolidated statements of operations, partners' equity and cash flows for the portion of the Fiscal Year ended at the end of such Fiscal Quarter setting forth in each case in comparative form the figures for the corresponding periods of the previous Fiscal Year, all in reasonable detail and certified by a Responsible Officer on behalf of such Borrower as fairly presenting in all material respects the financial condition and results of operations of such Borrower and its Consolidated Subsidiaries and as having been prepared in accordance with GAAP applied on a basis consistent with the audited financial statements of such Borrower and its Consolidated Subsidiaries, subject to changes resulting from audit and normal year-end adjustments and the absence of footnote disclosures and (ii) a balance sheet of Partnership B as at the end of such Fiscal Quarter and the related statements of operations and cash flows for the portion of the Fiscal Year ended at the end of such Fiscal Quarter setting forth in each case in comparative form the figures for the corresponding periods of the previous Fiscal Year, all in reasonable detail and certified by a Responsible Officer on behalf of Partnership B as fairly presenting in all material respects the financial condition and results of operations of Partnership B and as having been prepared in accordance with GAAP applied on a basis consistent with the audited financial statements of Partnership B, subject to changes resulting from audit and normal year-end adjustments and the absence of footnote disclosures;

(c)     [reserved];

(d)     together with each delivery of Financial Statements pursuant to Section 4.01(a) and (b); a Compliance Certificate;;

(e)     promptly upon receipt thereof, copies of all reports submitted to any Loan Parties or Partnership B by independent public accountants in connection with each annual, interim or special audit of the financial statements of any Loan Party made by such accountants, including the comment letter submitted by such accountants to management in connection with any audit;

(f)     promptly upon their becoming available, copies of all press releases and other statements made available generally by any Loan Party or Partnership B concerning material developments in the business of any Loan Party or Partnership B, including pursuant to the terms of any Order of the Bankruptcy Court;

(g)     promptly upon the Chief Executive Officer or principal financial officer of any Borrower or Manager obtaining knowledge (i) of the existence of any Default or Event of Default, (ii) that any notice has been given to any General Partner, Manager, any Borrower or any of its Subsidiaries of a claimed default under any Partnership Agreement or of any Person or

party to the Partnership Agreement having taken any enforcement action with respect to any such claimed default under the Partnership Agreement, (iii) that the holder of any Debt of a Borrower or any of its Subsidiaries in excess of the Materiality Threshold or of any Debt of Partnership B in excess of the Materiality Threshold has given any notice to such Person, or taken any other enforcement action, with respect to a claimed default thereunder, (iv) of any change in any Borrower's or Partnership B's certified accountant, (v) that any Person has given any notice to any Borrower, any Subsidiary or any General Partner with respect to a claimed default under any material contract which could reasonably be expected to have a Material Adverse Effect or a Partnership B Material Adverse Effect, respectively, (vi) of the institution of any Litigation seeking equitable relief or involving an alleged liability of any Loan Party or Partnership B or any adverse determination in any Litigation involving equitable relief or a potential liability of any Loan Party or Partnership B, which, in each case, could reasonably be expected to have a Material Adverse Effect or a Partnership B Material Adverse Effect or (vii) of any casualty loss, damage or destruction of any the Collateral, which loss, damage or destruction diminishes the fair market value of the Collateral, or in the case of Partnership B, the affected Net Profits Interest, by an estimated amount in excess of $250,000, whether or not covered by insurance, notice by a Responsible Officer of Administrative Borrower specifying the nature and period of existence of any such condition or event and what action such Person has taken, is taking or (to the extent determined) proposes to take with respect thereto;

(h)     promptly upon the Chief Executive Officer or principal financial officer of Manager obtaining knowledge of (i) the institution of any steps by any Borrower, any member of the Controlled Group or any other Person to terminate any Pension Plan, (ii) the failure of any Borrower or of any member of the Controlled Group to make a required contribution on a timely basis to any ERISA Plan or to any Multiemployer Plan, (iii) the taking of any action with respect to a Pension Plan which could result in the requirement that a Borrower furnish a bond or other security to the PBGC or such Pension Plan, (iv) the occurrence of a reportable event under Section 4043 of ERISA (for which a reporting requirement is not waived) with respect to any Pension Plan, (v) the occurrence of any event with respect to any ERISA Plan, Pension Plan or Multiemployer Plan which could reasonably be expected to result in the incurrence by any member of the Controlled Group of any material liability, fine or penalty (including any claim or demand for withdrawal liability or partial withdrawal from any Multiemployer Plan), (vi) any material increase in the liability or contingent liability of any Borrower or any other Loan Party with respect to any post-retirement welfare plan benefit or (vii) the receipt by any Borrower or any other Loan Party of any notice described in Section 4245(e) of ERISA from any Multiemployer Plan in critical status, that increased contributions may be required to avoid a reduction in plan benefits or the imposition of an excise tax, that any such plan is or has been funded at a rate less than that required under Section 412 of the Code, that any such plan is or may be terminated, a certificate of a Responsible Officer on behalf of the applicable Borrower specifying the nature and period of existence of any such condition or event, or specifying the notice given or action taken by such holder or Person, and what action the applicable Loan Party has taken, is taking or proposed to take with respect thereto;

(i)     promptly upon any Chief Executive Officer or principal financial officer of Manager obtaining knowledge of any complaint, order, citation, notice or other written communication from any Person delivered to any Borrower, its Subsidiaries or Partnership B with respect to, or if any such officer of Manager or any General Partner becomes aware of

(i) the existence or alleged existence of a violation of any applicable Environmental Law, (ii) any release of any Hazardous Materials into the environment by any Loan Party or from or onto any property of any Loan Party, (iii) the commencement of any cleanup of any Hazardous Materials, (iv) any pending or threatened proceeding for the termination, suspension or non-renewal of any Loan Party's Permit required under any applicable Environmental Law, or (v) any property of any Loan Party that is or will be subject to a Lien imposed pursuant to any applicable Environmental Law, in any case in clauses (i) through (v) which any Borrower reasonably anticipates could result in liability or costs (whether individually or in the aggregate) to any Loan Party or Partnership B in excess of the Materiality Threshold outstanding as of such time, a certificate of a Responsible Officer of Administrative Borrower specifying the nature and period of existence of any such condition or event, or specifying the notice given or action taken by such holder or Person, and what action the applicable Loan Party or Partnership B has taken, is taking or proposes to take with respect thereto;

(j)    promptly upon receipt thereof, (i) copies of any material adverse reports or notices related to any taxes of any Loan Party or Partnership B, and (ii) with respect to any matter that could reasonably be expected to have a Material Adverse Effect or Partnership B Material Adverse Effect copies of any other reports or notices received by any Loan Party or Partnership B, respectively, from any Governmental Authority;

(k)    prior to October 1, 2019, a Reserve Report effective as of the preceding June 30, 2019, audited by an independent petroleum engineer chosen by Borrowers and reasonably acceptable to Administrative Agent, concerning all Oil and Gas Properties owned by any Loan Party and Partnership B and which have attributable to them Proved Reserves, such Reserve Report to be in form and substance reasonably satisfactory to Administrative Agent.  The report shall be delivered together with reports, to any Borrower's knowledge, as to any "over-produced" status in the net aggregate for all such Oil and Gas Properties and Subject Properties, as of June 30, 2019, under applicable gas balancing arrangements;

(l)    [reserved];

(m)    the Loan Parties shall deliver notice to the professional advisors to Administrative Agent and the Lenders of any potential Asset Disposition of any Loan Party to the extent such Loan Party has received a bona fide purchase offer with respect thereto that such Loan Party determines in good faith is reasonably capable of being consummated. After such notice has been provided, the Loan Parties shall deliver with reasonable promptness to the professional advisors to the Administrative Agent and the Administrative Agent copies of all offer letters, term sheets and material agreements in connection with such potential Asset Disposition;

(n)    upon the reasonable request of Administrative Agent from time to time, information as to the insurance carried in respect of the Loan Parties' Oil and Gas Properties;

(o)    with reasonable promptness, such other information and data with respect to any Loan Party and Partnership B as from time to time may be reasonably requested by Administrative Agent;

(p)      Borrower hereby acknowledges that Administrative Agent and/or the Sole Lead Arranger will make available to the Lenders materials and/or information provided by or on behalf of Borrowers hereunder (collectively, "**Borrower Materials**") by posting Borrower Materials on IntraLinks or another similar electronic system (the "Platform") and certain of the Lenders (each, a "**Public Lender**") may have personnel who do not wish to receive MNPI with respect to any Borrower or its Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities.  Each Borrower hereby agrees that (i) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (ii) by marking Borrower Materials "PUBLIC" Borrowers shall be deemed to have authorized Administrative Agent, the Sole Lead Arranger and Lenders to treat such Borrower Materials as not containing any MNPI with respect to any Borrower or its securities for purposes of United States Federal and state securities laws; (iii) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (iv) Administrative Agent and the Sole Lead Arranger shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information"; *provided* that in the case of clause (iv) above, such Borrower Materials shall be treated as set forth in Section 12.08;

(q)      (i) beginning with the calendar month in which the Petition Date occurs, on each Monthly Production Volumes Test Date, a report of actual total production volumes of the Borrowers, together with commentary on the variances from the volumes set forth in the Production Volumes Forecast for the applicable period and certified by a Responsible Officer of Administrative Borrower and (ii) beginning with the first full calendar month following the Petition Date, on each Mid-Month Production Volumes Test Date, a report of preliminary field estimates of operated production volumes of Borrowers for the first fifteen (15) calendar days of such calendar month, together with commentary on the variances from the volumes set forth in the Production Volumes Forecast for such period, which, in each case, shall be in form and detail reasonably acceptable to the Required Lenders;

(r)      on the last Friday of every four-week anniversary (commencing with the fourth Friday following the Friday of the first forecast week of the Initial DIP Budget) (or, to the extent such Friday is not a Business Day, the next Business Day thereafter), a DIP Budget.  Each DIP Budget shall be reasonably acceptable to the Required Lenders (including any changes made in any updated DIP Budget with respect to any periods that were included in a previously delivered Approved Budget; *provided* that a separate explanation in reasonable detail of such changes shall be provided to the Lenders) and no such DIP Budget shall be effective until so approved; *provided* that the Required Lenders shall be deemed to have approved a DIP Budget delivered after the Petition Date pursuant to this Section 4.01(r) unless Lenders constituting the Required Lenders shall have objected to such DIP Budget within ten (10) calendar days after delivery thereof.  To the extent any such updated DIP Budget is approved pursuant to this Section 4.01(r), the line item amounts set forth therein shall only be used to calculate the projected line items commencing with the week in which such updated DIP Budget is approved by the Required Lenders and for subsequent weeks set forth therein, and any prior weeks tested as part of any then applicable cumulative period shall be calculated using the projected line items set forth in the previously Approved Budget in which such prior weeks were first forecasted (unless

otherwise approved by the Required Lenders).  Upon such approval or deemed approval by the Required Lenders pursuant to this Section 4.01(r), a DIP Budget delivered pursuant to this Section 4.01(r) and the Initial DIP Budget shall constitute an "**Approved Budget**";

(s)     no later than 5:00 p.m. on the Friday of every second week (commencing with the second Friday following the Friday of the first forecast week of the Initial DIP Budget) or, to the extent such Friday is not a Business Day, the next Business Day thereafter (such date, a "**Budget Variance Test Date**"), a Budget Variance Report for the Test Period.  Each such report shall be certified by a Responsible Officer of Administrative Borrower as being prepared in good faith and fairly presenting in all material respects the information set forth therein;

(t)     (i) weekly, at a time mutually agreed with Administrative Borrower and Administrative Agent, participate in a conference call, including a question and answer session, with the Lenders' financial advisors to discuss the financial condition and results of operations of Borrowers, its Subsidiaries and Partnership B and (ii) monthly, at a time mutually agreed with Administrative Borrower and Administrative Agent, participate in a conference call, including a question and answer session, with Lenders and Agents to discuss the financial condition and results of operations of Borrowers, its Subsidiaries and Partnership B.  Borrowers shall make members of its senior management (including senior management of Manager) available for such weekly and monthly conference calls;  and

(u)     if any amendment or other modification is made after the Closing Date to any Net Profits Document, the Intercompany Loan Agreement, or the Organizational Documents of any Loan Party or Partnership B in accordance with the terms of this Agreement, Borrowers shall promptly provide copies of such amendment or modification to Administrative Agent; and

(v)     promptly after delivery thereof, all written operating and financial performance information of any Loan Party or Partnership B provided by Borrowers, its advisors or any other Person to the board of directors (or similar governing body) of any General Partner.

Section 4.02.  *Payment and Performance of Obligations*.   In accordance with the Bankruptcy Code and subject to any required approval of the Bankruptcy Court, Borrowers (a) will pay and discharge, and cause each Subsidiary and direct each Loan Party to pay and discharge, at or before maturity, all of their respective material obligations and liabilities constituting post-petition obligations that constitute administrative expenses in the Cases under the Bankruptcy Code or otherwise ordered by the Bankruptcy Court, including material tax liabilities, except for such obligations and/or liabilities that may be the subject of a Permitted Contest, (b) will maintain, and cause each Subsidiary and direct each Loan Party to maintain, in accordance with GAAP, appropriate reserves for the accrual of all of their respective obligations and liabilities and (c) will not breach, or permit any Subsidiary or any Loan Party to breach, or permit to exist any default under, the terms of any lease, commitment, contract, instrument or obligation to which it is a party, or by which its properties or assets are bound, except for such breaches or defaults which could not reasonably be expected to have a Material Adverse Effect. Without limiting the foregoing, but in accordance with the Bankruptcy Code and subject to any required approval of the Bankruptcy Court, Borrowers will pay and perform, and cause each Subsidiary and direct each Loan Party to pay and perform, when due all of their respective material obligations and liabilities under the Net Profits Documents constituting post-petition

obligations that constitute administrative expenses in the Cases under the Bankruptcy Code or otherwise ordered by the Bankruptcy Court in accordance with the terms of this Agreement, except for such obligations and/or liabilities that may be subject to a Permitted Contest.

Section 4.03. *Maintenance of Existence*. Each Borrower will preserve, renew and keep in full force and effect, and subject to Section 5.04 will cause each Subsidiary and direct each Loan Party to preserve, renew and keep in full force and effect, (a) its existence and (b) its rights, privileges and franchises necessary or desirable in the normal conduct of its business then being conducted, except where the failure to do so under this clause (b) could not reasonably be expected to have a Material Adverse Effect. In addition, Borrowers will not, and will not cause any of its Subsidiaries or any Loan Party to, take any actions or engage in business in a manner that would require any of them to register as an "investment company", as that term is defined in the Investment Company Act of 1940, as amended; *provided* that it shall not constitute a violation of this provision if, notwithstanding Borrowers' compliance with the preceding clause, registration under the Investment Company Act is required solely due to a change in the Investment Company Act, the adoption of a rule or regulation thereunder or the promulgation of an interpretation thereof, in each case after the Closing Date, which requires such registration.

Section 4.04. *Insurance*.

(a)     Each Borrower will keep, and will cause each Subsidiary to (or with respect to Oil and Gas Properties operated by any other Person, use reasonable efforts to cause such Person to) keep, all property necessary in its business in good working order and condition, ordinary wear and tear excepted; *provided* that in respect to such property subject to casualty, Borrowers will make all repairs and replacements in a timely manner in accordance with prudent standards in the industry.

(b)     Each Borrower will, and will cause each Subsidiary to, (i) maintain in full force and effect all material oil, gas or mineral leases to the extent the same cover or otherwise relate to its Oil and Gas Properties that represent at least 95% of the total value of its Proved Reserves, and, except as could not reasonably be expected to have a Material Adverse Effect and could not reasonably be expected to be grounds for termination of such lease, timely perform all of its obligations thereunder and properly and timely pay, all rents, royalties and other payments due and payable under any such leases, and (ii) except to the extent that the same could not reasonably be expected to cause a Material Adverse Effect, maintain in full force and effect all other contracts, servitudes and agreements that otherwise relate to its Oil and Gas Properties that represent at least 95% of the total value of its Proved Reserves, timely perform all of its obligations thereunder and properly and timely pay all rents, royalties and other payments due and payable under any such contracts, servitudes and other agreements, or under the Permitted Liens, or otherwise attendant to its ownership or operation of any Oil and Gas Property that represents at least 95% of the total value of Proved Reserves.

(c)     With respect to Oil and Gas Properties, each Borrower will, and will cause each of its Subsidiaries to (or with respect to Oil and Gas Properties operated by any other Person, use reasonable efforts to cause such Person to), maintain, operate and develop such Oil and Gas Properties in such a way that the representations and warranties in Section 3.19 remain true and correct in all material respects.

(d)     Each Borrower will maintain, and will cause each Subsidiary and direct each Loan Party to maintain, insurance of the kinds and in such amounts as are customarily carried or maintained by similarly situated companies engaged in similar businesses.  All such insurance shall be provided by insurers with credit quality customary for insurers of Persons similar to such Borrower and engaged in similar businesses.

(e)     On or prior to the Closing Date (or such later date as Collateral Agent may agree in its sole discretion), and at all times thereafter, each Borrower will cause Collateral Agent to be named as an additional insured, mortgagee and loss payee, as applicable, on each insurance policy required to be maintained pursuant to this Section 4.04.  Each Borrower will deliver to Collateral Agent (i) on or prior to the Closing Date (or such later date as Collateral Agent may agree in its sole discretion), a certificate from such Borrower's insurance broker dated on or about such date in form and substance reasonably satisfactory to Collateral Agent and showing the amount of coverage as of such date, and that if any such policy is canceled before the expiration date thereof, the insurer will endeavor to provide thirty (30) days written notice thereof to the certificate holder (or 10 days in the case of cancellation for nonpayment),  (ii) within five (5) Business Days of the Chief Executive Officer or principal financial officer of Manager obtaining the knowledge of receipt by any Borrower or any of its Subsidiaries of notice from any insurer, a copy of any notice of cancellation, nonrenewal or material change in coverage from that existing on the date of this Agreement, (iii) upon the reasonable request of Collateral Agent from time to time after the Closing Date, information as to the insurance carried and (iv) upon the Chief Executive Officer or principal financial officer of Manager obtaining knowledge thereof, forthwith, notice of any cancellation or nonrenewal of coverage by any Borrower.

(f)     In the event any Borrower fails to provide Collateral Agent with evidence of the insurance coverage required by this Agreement after the lapse of any applicable grace period, Collateral Agent may purchase insurance at such Borrower's expense to protect Collateral Agent's interests in the Collateral.  This insurance may, but need not, protect such Borrower's interests.  The coverage purchased by Collateral Agent may not pay any claim made by such Borrower or any claim that is made against such Borrower in connection with the Collateral.  Such Borrower may later cancel any insurance purchased by Collateral Agent, but only after providing Collateral Agent with evidence that such Borrower has obtained insurance as required by this Agreement.  If Collateral Agent purchases insurance for the Collateral in accordance herewith, Borrowers will be responsible for the costs of that insurance to the fullest extent provided by law, until the effective date of the cancellation or expiration of the insurance.  The costs of the insurance may be added to the Obligations. The costs of the insurance may be more than the cost of insurance Borrowers are able to obtain on its own.

Section 4.05.  *Compliance with Laws*.  Each Borrower will comply, and cause each Subsidiary and direct each Loan Party to comply, with (i) the requirements of all applicable Laws, except for such non-compliance that could not reasonably be expected to have a Material Adverse Effect, (ii) the Bankruptcy Code, the Bankruptcy Rules and any order of the Bankruptcy Court (other than the Orders) in all material respects and (iii) the Orders in all respects.

Section 4.06.  *Inspection of Property, Books and Records*.  Each Borrower will keep, and will cause each Subsidiary and direct each Loan Party to keep, full and accurate books of record

and account in accordance with sound business practices and will permit, and will cause each Subsidiary and direct each Loan Party to permit, representatives of Administrative Agent (at the sole cost of Borrower or any applicable Subsidiary), and of the Required Lenders (but at such Lenders' expense unless such visit or inspection is made concurrently with Administrative Agent) to visit and inspect any of its properties, to examine and make abstracts or copies from any of its books and records, and to discuss its affairs, finances and accounts with officers or employees of such Borrower or its General Partner and, if reasonably requested by Administrative Borrower, in the presence of an officer or other representative of such Borrower or its General Partner designated by such Borrower or its General Partner, as applicable, for such purpose, independent public accountants as often as may reasonably be desired.  Administrative Agent or Lenders exercising any rights pursuant to this Section 4.06 shall give Borrowers, any applicable Subsidiary or any other Loan Party commercially reasonable prior written notice of such exercise and shall exercise such rights during normal business hours.

Section 4.07.   *Use of Proceeds*.

(a)     Borrowers shall use the proceeds of any Borrowing (including the Roll-Up Loans) solely in accordance with the Orders and the Approved Budget (subject to the variances permitted by Section 7.01) (i) to pay certain costs, fees and expenses related to a portion of the Cases, (ii) to pay certain adequate protection payments permitted by the Orders, (iii) to fund the Carve-Out in accordance with the terms of the Orders, (iv) to fund the operating disbursements of Partnership B, and (v) to fund the working capital needs and expenditures of the Borrowers during the Cases; *provided* that up to $50,000 of any Carve-Out shall be made available to a Committee (as defined in the Interim Order) for investigation costs in respect of any Pre-Petition Debt and liens in accordance with the Interim Order (or the Final Order, as applicable).

(b)     None of the proceeds from the Loans have been or will be used, whether directly or indirectly, for the purpose of purchasing or carrying any Margin Stock, for the purpose of reducing or retiring any indebtedness which was originally incurred to purchase or carry any Margin Stock or for any other purpose which might cause any of the Loans or other extensions of credit hereunder to be considered a "purpose credit" within the meaning of Regulation T, U or X.

Section 4.08.   *Hazardous Materials; Remediation.*   If any release or disposal of Hazardous Materials shall occur or shall have occurred on any real property or any other assets of any Borrower or any other Loan Party, Borrowers will cause, or direct the applicable Loan Party to cause, the removal and/or the remediation of such Hazardous Materials from such real property or other assets as is necessary to comply in all material respects with all applicable Environmental Laws. Without limiting the generality of the foregoing, Borrowers shall, and shall cause each other Loan Party to, comply in all material respects with each applicable Environmental Law requiring the performance at any real property by Borrowers or any other Loan Party of activities in response to the release or threatened release of any Hazardous Materials.

Section 4.09.   *Further Assurances and Collateral Matters.*

(a)     Borrowers will, and will cause each Subsidiary to, at its own cost and expense, cause to be promptly and duly taken, executed, acknowledged and delivered all such further acts, documents and assurances as may from time to time be necessary or as Administrative Agent, Collateral Agent or Required Lenders may from time to time reasonably request in order to carry out the intent and purposes of the Financing Documents and the Orders including all such actions to establish, create, preserve, protect and perfect a first priority Lien (subject only to Permitted Liens) in favor of Collateral Agent for the benefit of itself and the other Lender Parties on Collateral (including Collateral acquired after the date hereof).   If Borrowers establish any Commodity Account or Securities Account after the Closing Date, by no later than the date of the establishment of such account (or such later date as may be agreed to by Administrative Agent in its sole discretion), Borrowers will, at their own cost and expense, deliver to Collateral Agent a Control Agreement executed by Borrowers and the commodity intermediary or securities intermediary, as applicable, party thereto with respect to such Commodity Account or Securities Account.  If Borrowers maintain or establish any Deposit Account after the Closing Date, by no later than the Closing Date or the date of the establishment of such account, as applicable, Borrowers will, at their own cost and expense, deliver to Collateral Agent a Control Agreement executed by Borrowers and the depositary bank party thereto with respect to such Deposit Account.

(b)     Without limiting the generality of the foregoing and notwithstanding the restrictions in Section 5.18, in the event any Borrower or any Subsidiary shall acquire or form any new Subsidiary after the date hereof or shall cause any existing Subsidiary to convert to a different form or to a different jurisdiction of organization, Administrative Borrower will give notice to Administrative Agent of its intent to do so not less than 10 days prior to the date thereof (each such notice, as the same may be updated from time to time by written notice to Administrative Agent, a "**Loan Party Notice**") containing the information of the type contemplated by Section 3.04 and will promptly deliver or cause to be delivered to Collateral Agent certificates in respect of the Capital Stock of such Subsidiary, together with related transfer powers duly executed in blank, and cause such new Subsidiary, substantially concurrently with such acquisition or formation, (i) to execute a Guaranty (in form and substance reasonably acceptable to Collateral Agent) guaranteeing payment and performance of all of the Obligations and to take such other action (including, without limitation, authorizing the filing of such UCC financing statements) as shall be necessary or appropriate to establish, create, preserve, protect and perfect a first priority Lien (subject only to Permitted Liens) in favor of Collateral Agent for the benefit of Collateral Agent and the other Lender Parties on such Capital Stock and such assets of such Subsidiary, (ii) to execute such other Security Documents, in form and substance reasonably acceptable to Collateral Agent, as may be required or reasonably requested by Collateral Agent and (iii) to deliver such proof of corporate (or comparable) action, incumbency of officers, and opinions of counsel as Administrative Agent reasonably shall have required or requested.

(c)     Each Borrower will, and will cause each of its Subsidiaries, to take such action from time to time as shall be necessary to ensure that each of its Subsidiaries is a Wholly-Owned Subsidiary and that Collateral Agent shall have, for the benefit of Collateral Agent and the other Lender Parties, a first priority Lien on all Capital Stock of each Subsidiary subject to any Permitted Liens referred to in Section 5.02(c). In the event that any additional Capital Stock shall be issued by any Subsidiary, the applicable Borrower shall or shall cause each of its Subsidiaries

to, concurrently with such issuance, deliver to Collateral Agent to the extent required by the applicable Financing Documents the certificates evidencing such Capital Stock, accompanied by undated powers executed in blank and to take such other action as Collateral Agent may reasonably request to perfect the security interest created therein pursuant to such Financing Documents.

(d)     Pursuant to the terms of the Orders, no filings or other action (including the taking of possession or control) will be necessary to perfect or protect the Liens and security interests created pursuant to this Agreement, the Orders or any other Security Document.  Upon entry by the Bankruptcy Court, the Liens and security interests created by the Orders shall automatically constitute fully perfected first priority Liens on, and security interests in, all right, title and interest of the Credit Parties in the Collateral covered thereby (including after-acquired Collateral), in each case free of all Liens other than Liens permitted under Section 5.02, and prior and superior to all other Liens other than as provided in the Orders.  Notwithstanding the foregoing, upon the reasonable request of the Required Lenders, Credit Parties shall take any additional actions requested, with respect to any Real Estate Asset and any other tangible and intangible personal property of Borrowers or any other Credit Party, in each case constituting Collateral, to cause such Real Estate Assets and other Collateral to be subject to a Lien pursuant to the Security Documents (including any Mortgage) or the Orders or to evidence the Lien on such Real Estate Asset or other Collateral, including to execute and deliver such Mortgages and other Security Documents (in proper form for filing, registration or recordation, as applicable) as are requested by Collateral Agent or the Required Lenders, and take such actions necessary or advisable to subject such property to a Lien or evidence of the Lien on such property pursuant to the Security Documents.  Borrowers hereby authorize Collateral Agent to file one or more financing or continuation statements, and amendments thereto, relative to all or any part of the Real Estate Assets without the signature of any Borrower where permitted by law.  A carbon, photographic or other reproduction of the Security Documents or any financing statement covering the Real Estate Assets or other Collateral Agent or any part thereof shall be sufficient as a financing statement where permitted by law. Collateral Agent will promptly send Administrative Borrower any financing or continuation statements it files without the signature of any Borrower and Collateral Agent will promptly send Administrative Borrower the filing or recordation information with respect thereto.

(e)     Notwithstanding that, by the terms of this Agreement, the Security Documents and the Orders, Loan Parties are and will be assigning to Collateral Agent all of the Production Proceeds accruing to the property covered thereby, so long as no Event of Default has occurred and is continuing, the Loan Parties may continue to receive from the purchasers of production all such Production Proceeds, subject, however, to the Liens created under this Agreement, the Security Documents and the Orders. Upon the occurrence and during the continuance of an Event of Default (and subject to the Remedies Notice Period), Collateral Agent may exercise all rights and remedies granted under this Agreement, the Security Documents and the Orders, including the right to obtain possession of all Production Proceeds then held by Loan Parties or to receive directly from the purchasers of production all other Production Proceeds.  In no case shall any failure, whether intentional or inadvertent, by any Lender Party to collect directly any such Production Proceeds constitute in any way a waiver, remission or release of any of their rights under this Agreement, the Security Documents or the Orders, nor shall any release of any Production Proceeds by any Lender Party to Loan Parties constitute a waiver, remission, or

release of any other Production Proceeds or of any rights of any Lender Party to collect other Production Proceeds thereafter.

Section 4.10.  *Tax Elections.* With respect to any U.S. federal income tax audit, examination, adjustment or proceeding relating to any Borrower by any taxing authority or any other tax-related administrative or judicial proceeding relating to any Borrower, such Borrower shall, and shall cause its designated partnership representative and its "designated individual" (within the meaning of Treasury Regulations Section 301.6223-1(b)(3)), if any, to, timely make an election under Section 6226 of the Code (a "**Push-Out Election**") and take all actions necessary to effect such election, to the extent permitted by applicable Law. Without limiting the foregoing, within thirty 30 days following entry of the Interim Order (or such later date as agreed to by each Lender), each Borrower shall enter into a binding agreement with the "partnership representative" that it will designate pursuant to Section 6223 of the Code with respect to its 2018 taxable year (the "**Partnership Representative**") and the "designated individual" (within the meaning of Treasury Regulations Section 301.6223-1(b)(3)), if any, that it will designate with respect to its 2018 taxable year (the "**Designated Individual**") that requires the Partnership Representative and the Designated Individual to timely make a Push-Out Election and take all actions necessary to effect such election, to the extent permitted by applicable Law, with respect to any U.S. federal income tax audit, examination, adjustment or proceeding relating to each Borrower by any taxing authority or any other tax-related administrative or judicial proceeding relating to each Borrower with respect to such Borrower's 2018 taxable year and all subsequent taxable years. Each Borrower shall deliver notice to each Lender within ten (10) days of its entry into such agreement. Unless each Lender (or the Administrative Agent on behalf of the Lenders) agrees otherwise, each Borrower shall not designate a partnership representative that is not the Partnership Representative or a designated individual that is not the Designated Individual for any taxable year (including following a termination of the designation of the Partnership Representative or the Designated Individual) unless, on or prior to the effective date of such designation, such Borrower has entered into such an agreement with such partnership representative or designated individual, as the case may be, and shall deliver notice to each Lender within ten (10) days of its entry into such an agreement.   The terms of this Section 4.10 shall survive the termination of this Agreement.

Section 4.11.  *USA Patriot Act and Beneficial Ownership*.  Promptly following any request therefor, Borrowers will provide information and documentation reasonably requested by Administrative Agent or any Lender for purposes of compliance with applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the USA PATRIOT Act and the Beneficial Ownership Regulation.

Section 4.12.  *Milestones*.  The Loan Parties shall cause the satisfaction of the following milestones (collectively, the "**Milestones**" and each a "**Milestone**"), unless waived or extended with the consent of the Required Lenders or Administrative Agent (with the consent of the Required Lenders):

(a)     No later than the close of business on the next Business Day following the Petition Date, the Credit Parties that are Debtors shall have filed a motion with the Bankruptcy Court seeking approval of this Agreement and other Financing Documents and the transactions contemplated hereby;

(b)     On or before three (3) Business Days after the Petition Date at 11:59 p.m. (New York City time), the Interim Order shall have been entered by the Bankruptcy Court;

(c)     On or before 11:59 p.m. (New York City time) on October 17, 2019 days at, the Final Order shall have been entered by the Bankruptcy Court;

(d)     On or before 11:59 p.m. (New York City time) November 14, 2019, the Bankruptcy Court shall have entered an order, in form and substance reasonably satisfactory to the Required Lenders, confirming an Acceptable Plan of Reorganization; and

(e)     On or before 11:59 p.m. (New York City time) December 17, 2019, the Plan Effective Date shall have occurred; *provided* that such date may be extended solely in accordance with the RSA;

*provided* that if any milestone in the RSA that is also a Milestone hereunder is extended pursuant to the terms of the RSA, the corresponding Milestone hereunder shall be deemed to be extended to the same date.

Section 4.13. *Bankruptcy Related Matters*. Borrowers shall, and shall cause each of their Subsidiaries to:

(a)     cause all proposed (i) "first day" orders, (ii) "second day" orders, (iii) orders related to or affecting the Term Loans, the Pre-Petition Debt and the Financing Documents, any other financing or use of Cash Collateral, any sale or other disposition of Collateral outside the ordinary course, adequate protection, any (iv) Acceptable Plan of Reorganization and/or any disclosure statement related thereto, (v) orders concerning the financial condition of the Debtors, or other Debt of the Debtors and (vi) orders establishing procedures for administration of the Cases or approving significant transactions submitted to the Bankruptcy Court, in each case, proposed by the Debtors to be in accordance with the terms of this Agreement, it being understood and agreed that the forms of orders approved by the Required Lenders prior to the Petition Date are in accordance with the terms of this Agreement and are reasonably acceptable or acceptable, as the case may be, to the Required Lenders in all respects;

(b)     comply in all material respects with each order entered by the Bankruptcy Court in connection with the Cases;

(c)     deliver to Administrative Agent (for distribution to the Lenders) and to counsel to Administrative Agent promptly as soon as reasonably practicable, no less than two (2) Business Days prior to any filing, copies of all proposed pleadings, motions, applications, orders, financial information and other documents to be filed by or on behalf of the Credit Parties with the Bankruptcy Court in the Cases that affect or may affect the Administrative Agent or the Lenders, or distributed by or on behalf of the Credit Parties to any official or unofficial committee appointed or appearing in the Cases or any other party in interest, and shall consult in good faith with Administrative Agent and its advisors regarding the form and substance of any such document;

(d)     if not otherwise provided through the Bankruptcy Court's electronic docketing system, as soon as available, deliver to Administrative Agent (for distribution to the Lenders)

and to counsel to Administrative Agent and Lenders promptly as soon as available, copies of all final pleadings, motions, applications, orders, financial information and other documents distributed by or on behalf of the Credit Parties to any official or unofficial committee appointed or appearing in the Cases; and

(e)     except as otherwise is permitted by the Orders or an Acceptable Plan of Reorganization, Borrowers shall provide prior written notice as soon as reasonably practicable to the Administrative Agent prior to any assumption or rejection of any Debtor's or any Subsidiary's material contracts or material non-residential real property leases pursuant to Section 365 of the Bankruptcy Code, and no such contract or lease shall be assumed or rejected, if such assumption or rejection adversely impacts the Collateral, any Liens thereon or any Superpriority Claims payable therefrom (including, without limitation, any sale or other disposition of Collateral or the priority of any such Liens or Superpriority Claims), if the Administrative Agent informs Borrowers in writing within three (3) Business Days of receipt of the notice from Borrowers referenced above that it objects to such assumption or rejection, as applicable.

Section 4.14.   *Priority of Liens and Claims*.   Each Borrower hereby covenants, represents and warrants that, upon entry of the Interim Order (and when applicable, the Final Order), its Obligations hereunder and under the other Financing Documents:

(a)     pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute an allowed Superpriority Claim against each of the Credit Parties that are Debtors on a joint and several basis, which will be payable from and have recourse to all pre- and post-petition property of such Credit Parties and all proceeds thereof (excluding Avoidance Actions but including, subject to entry of a Final Order, Avoidance Proceeds), subject only to the Carve-Out to the extent provided in the Interim Order or the Final Order, as applicable, and any payments or proceeds on account of such Superpriority Claim shall be distributed in accordance with Section 9.05(b);

(b)     pursuant to Section 364(c)(2) of the Bankruptcy Code and subject to the Carve-Out to the extent provided in the Interim Order or Final Order, as applicable, shall be secured by a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest and Lien on all of the assets of the Credit Parties that are Debtors, whether currently existing or thereafter acquired, of the same nature, scope and type as the Collateral that are not subject to (x) valid, perfected and non-avoidable liens as of the Petition Date or (y) valid Liens in existence as of the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, excluding Avoidance Actions but including, subject to entry of the Final Order, Avoidance Proceeds;

(c)     pursuant to section 364(d)(1) of the Bankruptcy Code and subject only to the Carve-Out to the extent provided in the applicable Order, shall at all times be secured by (i) a valid, binding, continuing, enforceable, fully-perfected first priority priming security interest in and Lien upon the property of the Credit Parties that are Debtors of the same nature, scope and type as the Collateral to the extent that such Collateral is subject to existing Liens that secure the obligations of the applicable Credit Party under the Pre-Petition Secured Financing Documents

and (ii) such priming liens shall be senior in all respects to any Adequate Protection Liens (as defined in the Orders);

(d)     pursuant to Section 364(c)(3) of the Bankruptcy Code, subject only to the Carve-Out to the extent provided in the applicable Order and except as provided in clause (c) above, shall be secured by a valid, binding, continuing, enforceable, fully-perfected junior security interest in and Lien on the Collateral, which is subject to (A) valid, perfected and non-avoidable senior Liens in existence at the time of the commencement of the Cases and (B) valid senior Liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code;

(e)     shall not be subject or subordinate to (i) any Lien or security interest that is avoided and preserved for the benefit of the Credit Parties that are Debtors and their estates under section 551 of the Bankruptcy Code or (ii) unless otherwise provided for in the Financing Documents, any Liens arising after the Petition Date including, without limitation, any Liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Credit Parties that are Debtors; and

(f)     for the avoidance of doubt, the Collateral shall exclude Avoidance Actions, but shall, subject to entry of the Final Order, include Avoidance Proceeds.

Subject to and effective only upon entry of the Final Order, except to the extent of the Carve-Out, no costs or expenses of administration of the Cases or any future proceeding that may result therefrom, including a case under Chapter 7 of the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of section 552 of the Bankruptcy Code, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) or any similar principle of Law, without the prior written consent of Administrative Agent and the Required Lenders, as the case may be with respect to their respective interests, and no consent shall be implied from any action, inaction or acquiescence by Administrative Agent or the Lenders.  In no event shall Administrative Agent or the Lenders be subject to (i) the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code (subject only to and effective upon entry of the Final Order), or (ii) the equitable doctrine of "marshaling" or any other similar doctrine with respect to the Collateral.

Except for the Carve-Out, the Superpriority Claims shall at all times be senior to the rights of any Credit party, any Chapter 11 trustee and, subject to section 726 of the Bankruptcy Code, any Chapter 7 trustee, or any other creditor (including, without limitation, post-petition counterparties and other post-petition creditors) in the Cases or any subsequent proceedings under the Bankruptcy Code, including, without limitation, any Chapter 7 cases (if any of the Cases are converted to cases under Chapter 7 of the Bankruptcy Code).

(g)     Notwithstanding any provision in the Financing Documents the contrary, in no event is any Building (as defined in the applicable Flood Insurance Regulations) or Manufactured (Mobile) Home (as defined in the applicable Flood Insurance Regulations) included in the definition of "Collateral" and no Building or Manufactured (Mobile) Home is

hereby encumbered by the Financing Documents; provided that (a) the Loan Parties' interests in all lands and hydrocarbons situated under any such Building or Manufactured (Mobile) Home are included in the definition of "Collateral" and are encumbered by the Financing Documents and (b) the Loan Parties agree not to permit to exist any Lien on any Building or Manufactured (Mobile) Home that is owned by the Loan Parties located on the Oil and Gas Properties except liens permitted under this Agreement.

Section 4.15.  *Title Information*.  On or before the delivery to Administrative Agent of each Reserve Report, each Borrower will deliver title information in form and substance reasonably acceptable to Collateral Agent covering enough of the Oil and Gas Properties evaluated in the most recently delivered Reserve Report, so that Collateral Agent shall have received, together with title information previously delivered to Collateral Agent in connection with previous Reserve Reports or otherwise (including title information previously delivered to Collateral Agent under the Pre-Petition Secured Credit Agreements), satisfactory title information on at least 95% of the total value of Proved Reserves attributable to the Oil and Gas Properties evaluated by such Reserve Report (the Lenders hereby acknowledge that Borrowers have satisfied such requirement as of the Closing Date with respect to the most recent Reserve Report delivered prior to the Closing Date). If Borrowers have provided title information for Oil and Gas Properties under the preceding sentence, Borrowers shall, within sixty (60) days after the receipt of notice from Collateral Agent ("**Title Cure Period**") that material title defects or exceptions exist with respect to such Oil and Gas Properties, either (1) cure any such material title defects or exceptions (including defects or exceptions as to priority) raised by such information, or (2) deliver title information in form and substance reasonably acceptable to Collateral Agent so that Collateral Agent shall have received, together with title information previously delivered to Collateral Agent satisfactory title information on at least 95% of the total value of Proved Reserves attributable to the Oil and Gas Properties evaluated by the most recently delivered Reserve Report.

Section 4.16.  *Credit Ratings*.  Borrowers will use commercially reasonable efforts to obtain and maintain (but not obtain or maintain any specific rating) ratings in respect of the New Money Loans from one of S&P or Moody's at the direction of the Required Lenders.

Section 4.17. *Post-Closing Obligations*.   Borrowers shall deliver, or cause to be delivered, as the case may be, each of the items set forth on Schedule 4.17, in each case on or prior to the date specified in such Schedule for such item or such later date as the applicable Agent may determine and agree to in writing in its sole discretion.

## ARTICLE 5
## NEGATIVE COVENANTS

Each Borrower agrees that, until a Payment in Full has occurred:

Section 5.01.  *Debt*.  Loan Parties will not, and will not permit any of their Subsidiaries to, directly or indirectly, create, incur, assume or otherwise become or remain, directly or indirectly, liable with respect to, any Debt, except for:

(a)      Debt under the Financing Documents;

(b)     [reserved];

(c)     Debt of SIP arising in the Ordinary Course of Business with respect to appeal or supercedeas bonds and other similar obligations, in an amount outstanding at any one time, not to exceed Materiality Threshold, including the amount of any judgments referred to in Section 5.02(d);

(d)     Debt of Partnership A and Partnership M arising in the Ordinary Course of Business with respect to surety, bid or performance bonds, appeal bonds, insurance obligations and other similar obligations;

(e)     (i) Debt of Partnership A and Partnership M arising in the Ordinary Course of Business with respect to customary indemnification and reimbursement obligations under asset purchase and sale agreements, division and transfer orders, joint operating agreements, pooling, unitization or communitization agreements, gathering agreements, processing agreements, farmout agreements and other agreements customary in the industry pertaining to the exploration for, development, disposition or operation of, or the production or sale of hydrocarbons produced from, Oil and Gas Property, including any such arrangements relating to Oil and Gas Properties in which Partnership A, Partnership M or any of their respective Subsidiaries holds an interest and pursuant to which Partnership A, Partnership M or any of their respective Subsidiaries has joint and several liability with one or more of Manager or any their Affiliates that also holds an interest in such Oil and Gas Properties to the extent that an agreement in form and substance reasonably satisfactory to Administrative Agent has been executed by such Persons pursuant to which Partnership A, Partnership M and/or any Subsidiary, as applicable, is responsible only for that portion of such obligations incurred for the benefit of Partnership A, Partnership M and/or any such Subsidiary, as applicable and (ii) Debt in the form of Guarantees permitted under Section 5.07(f);

(f)     endorsements for collection or deposit in the Ordinary Course of Business;

(g)     intercompany Debt arising from loans or other obligations between or among Borrowers; *provided* that upon the request of Administrative Agent at any time, any such Debt shall be evidenced by promissory notes having terms reasonably satisfactory to Administrative Agent, the sole originally executed counterparts of which shall be pledged and delivered to Administrative Agent, for the benefit of Administrative Agent and Lenders, as security for the Obligations;;

(h)     Debt of Partnership M under the Intercompany Loan Agreement outstanding on the Closing Date and any accrued but unpaid interest thereunder; and

(i)     Pre-Petition Debt outstanding on the Closing Date and any accrued but unpaid interest thereunder.

Section 5.02.  *Liens*.  Loan Parties will not, and will not permit any of their Subsidiaries to, directly or indirectly, create, assume or suffer to exist any Lien on any asset now owned or hereafter acquired by it, except for:

(a)     Liens created by the Orders and the Security Documents that secure the Obligations;

(b)     [reserved];

(c)     Liens for taxes or other governmental charges not at the time delinquent or thereafter payable without penalty or the subject of a Permitted Contest;

(d)     Liens arising in connection with bonds and similar obligations that are permitted by Section 5.01(c) or (d);

(e)     Liens arising in the Ordinary Course of Business (i) in favor of landlords, royalty owners, vendors, carriers, warehousemen, repairmen, mechanics and materialmen, and other similar Liens imposed by Law and (ii) on cash or securities, in connection with worker's compensation, unemployment compensation and other types of social security (excluding Liens arising under ERISA) or in connection with surety, appeal, tender, bid, payment or performance bonds, leases and similar obligations for sums not overdue or the subject of a Permitted Contest and not involving any advances, borrowed money or the deferred purchase price of property or services and, in each case, for which it maintains adequate reserves;

(f)     attachment and judgment Liens, in connection with a judgment after the Petition Date that does not constitute an Event of Default;

(g)     easements, rights of way, restrictions, servitudes, permits, conditions, covenants, exceptions or reservations in any property of any Credit Party that do not secure any monetary obligations and which in the aggregate do not materially impair the use of such property for the purposes of which such property is held by such Credit Party or materially impair the value of such property subject thereto;

(h)     Liens reserved in customary oil, gas and/or mineral leases for bonus or rental payments and for compliance with the terms of such leases;

(i)     Liens arising out of all presently existing and future division and transfer orders, joint operating agreements, unit operating agreements, oil and gas leases, farm-out agreements, contracts for sale, purchase, gathering, transportation, processing or exchange of oil or natural gas, pooling, unitization or communitization agreements, gas balancing agreements, injection, repressuring and recycling agreements, salt water disposal agreements, seismic or other geophysical permits or agreements, and other agreements which are usual and customary in the oil and gas industry, limited to the Oil and Gas Property and any related property that is the subject of such agreement, arising out of or pertaining to the operation or the production or sale of hydrocarbons produced from such Oil and Gas Property; *provided* that such agreements arise in the Ordinary Course of Business and the obligations of the Credit Parties thereunder are not delinquent (or are subject to a Permitted Contest); *provided*, *further*, that such Liens do not materially impair the use or value of the Oil and Gas Property encumbered thereby;

(j)     Liens arising by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies and burdening only deposit or securities accounts or other funds maintained with such creditor depository institution or

securities intermediary holding such account; *provided* that no such deposit account is a dedicated cash collateral account or is subject to restrictions against access by the depositor in excess of those set forth by regulations promulgated by bank regulators and no such deposit account otherwise serves as collateral to any Person other than Collateral Agent;

(k)      rights reserved to or vested in a Governmental Authority having jurisdiction to control or regulate any Oil and Gas Property in any manner whatsoever and all laws of such Governmental Authorities, so long as Borrower and its Subsidiaries are in compliance with all such laws, except for any non-compliance that would not result in a Material Adverse Effect;

(l)      consents to assignment and similar contractual provisions affecting an Oil and Gas Property to the extent, and only to the extent, such consents are not affected by or required for the execution, delivery, performance and enforcement of any Financing Document or Net Profits Document or have been obtained;

(m)      preferential rights to purchase and similar contractual provisions affecting an Oil and Gas Property to the extent and only to the extent, such rights are not affected by delivery of any Financing Document or Net Profits Document or, if affected, have been waived;

(n)      all defects and irregularities affecting title to an Oil and Gas Property that do not and could not operate to reduce the net revenue interest or Net Profit Interest of any Borrower and its Subsidiaries for such Oil and Gas Property, increase the working interest of any Borrower and its Subsidiaries for such Oil and Gas Property without a corresponding proportionate increase in the corresponding net revenue interest for such Oil and Gas Property, or otherwise interfere materially with the operation, value or use of such Oil and Gas Property or cause a Material Adverse Effect or Partnership B Material Adverse Effect;

(o)      Liens securing the Debt under the Intercompany Loan Agreement;

(p)      the Net Profits Interest;

(q)      Liens on the Collateral securing the Pre-Petition Secured Debt permitted under Section 5.01(i); and

(r)      Liens on the Collateral granted to provide adequate protection pursuant to the Interim Order (and, when entered, the Final Order).

Section 5.03.  *Restricted Distributions Payments*.  Loan Parties will not, and will not permit any their Subsidiaries to, directly or indirectly, declare, order, pay, make or set apart any sum for any Restricted Distribution, except for distributions made by any Loan Party to any other Loan Party.

Section 5.04.  *Restrictive Agreements*.  Except as may be provided in any Financing Document, Loan Parties will not, and will not permit any of their Subsidiaries to, directly or indirectly, (a) enter into or assume any agreement (other than the Financing Documents) prohibiting the creation or assumption of any Lien upon its properties or assets, whether now owned or hereafter acquired or (b) create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Subsidiary

to (i) pay or make Restricted Distributions to any Loan Party, (ii) pay any Debt owed to any Loan Party or any Subsidiary, (iii) make loans or advances to any Loan Party or any Subsidiary or (iv) transfer any of its property or assets to any Loan Party or any Subsidiary; *provided* that the foregoing shall not prohibit any (A) provisions restricting subletting or assignment of any lease in the Ordinary Course, (B) provisions restricting transfer or licensing of any intellectual property in the Ordinary Course, (C) provisions in any assignment, lease, easement, permit, license, deed, farmout agreement or other agreement or instrument restricting or prohibiting assignment of such agreement or instrument or rights created, or property conveyed or assigned, thereunder, including, without limitation, preferential purchase rights and consent requirements in each case and (D) customary restrictions and conditions contained in any agreement relating to the sale of any property permitted under this Agreement pending the consummation of such sale.

Section 5.05.  *Consolidations and Mergers*.  Except with the approval of the Required Lenders, Loan Parties will not, and will not permit any of their Subsidiaries to, directly or indirectly, consolidate or merge with or into any other Person, or be subjected to any Division.

Section 5.06.  *Asset Dispositions*.  Loan Parties will not, and will not permit any of their Subsidiaries to, directly or indirectly, consummate any Asset Disposition or terminate or otherwise monetize any Swap Contract in respect of commodities other than (a) farmouts of undeveloped acreage and assignments in connection with such farmouts, (b) transfers of Net Profit Interests pursuant to the terms of the Net Profits Agreements and (c) Asset Dispositions for sale consideration for any transaction or series of related transactions not to exceed $500,000 in the aggregate (when taken together with all other Asset Dispositions made pursuant to this Section 5.06(c)).

Section 5.07.  *Investments*.  Loan Parties will not, and will not permit any of the Subsidiaries to, directly or indirectly, acquire or own any Investment (or enter into any agreement to acquire or own any Investment), acquire any other asset or otherwise make any Investment other than:

(a)    Cash Equivalents and bank deposits, in each case, in accordance with the Approved Budget (subject to permitted variances);

(b)    (x) Investments of Partnership A and Partnership M in the Capital Stock of Holdco and (y) Investments of SIP in the Preferred Interests, in each case in existence on the Closing Date;

(c)    Investments of Partnership A and Partnership M in the Pre-Petition Swap Contracts in existence on the Closing Date;

(d)    Investments among Borrowers in the form of intercompany receivables and payables incurred in the Ordinary Course of Business in connection Borrowers' cash management arrangements in effect on the Closing Date;

(e)    Investments of SIP in the form of the right to reimbursement from Partnership B under the Partnership Agreement for Fund Expenses (as defined in the Partnership B Partnership Agreement) incurred by Borrowers in accordance with the Approved Budget (subject to permitted variances);

(f)    Investments in the form of Guarantees by Partnership A, Partnership M or any of their respective Subsidiaries of obligations (other than Debt (excluding Debt permitted by Section 5.01(f)) incurred by Holdco, Manager, Partnership A General Partner, Partnership M General Partner or any other Affiliate of Partnership A or Partnership M, as applicable, in the Ordinary Course of Business (including, without limitation, general indemnification obligations protecting Holdco against any loss relating to any Oil and Gas Properties) either (A) solely for the benefit of Partnership A, Partnership M or any of their respective Subsidiaries, as applicable or (B) solely for the benefit of one or more of Partnership A, Partnership M, any Subsidiary thereof and one or more Affiliates Partnership A or Partnership M, in which case any such Guarantees shall be either (x) on a of several, and not joint and several, basis and be limited to that portion of such obligations incurred for the benefit of Partnership A, Partnership M or any of their respective Subsidiaries, as applicable or (y) on a joint and several basis among one or more of Partnership A, Partnership M, any Subsidiary thereof and one or more Affiliates Partnership A or Partnership M, to the extent that an agreement has been executed by such Persons pursuant to which neither Partnership A, Partnership M nor any of their Subsidiaries, as applicable, is responsible for amounts in excess of the portion of such obligations incurred for the benefit of such Borrower or any such Subsidiary;

(g)    Investments in existence as of the Closing Date and set forth on Schedule 5.07(g);

(h)    Investments permitted under Section 5.01(g) and 5.17; and

(i)    de minimis acquisitions of equipment and other property in the Ordinary Course of Business in connection with the operation of the Loan Parties' business, in each case in accordance with the Approved Budget (subject to permitted variances).

Section 5.08.    *Transactions with Affiliates*.  Loan Parties will not, and will not permit any of their Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any Affiliate, except:

(a)    pursuant to the Preferred Equity Documents and the Intercompany Loan Agreement in existence on the Closing Date;

(b)    Investments permitted under Section 5.07(d), (e), (f) and (h);

(c)    for transactions with Affiliates of any Loan Party incidental to the administration of the businesses of the Loan Parties and the other entities managed by Manager (including the allocation of expenses and liabilities) and in respect of which no fees are charged to the Loan Parties or any Subsidiary (it being understood and agreed that expenses and reimbursement obligations in connection with such administration of the Loan Parties may be so charged to the Loan Parties or any Subsidiary);

(d)    for all transactions with Manager permitted by the Partnership Agreements, taking into account any consents or waivers that may be obtained from the limited partners of the applicable partnership or the Advisory Committee (as such terms are defined in each of the Partnership Agreements);

(e)      the rights of the Loan Parties to be reimbursed for costs it incurs in accordance with the Approved Budget (subject to permitted variances) that constitute Fund Expenses (as defined in the Partnership B Partnership Agreement);

(f)      for the Net Profits Documents in existence on the Closing Date or as amended as permitted by Section 5.15 hereof and the transactions contemplated thereby to the extent not prohibited under the terms of this Agreement;

(g)      for compensation arrangements entered into on or prior to the date hereof and approved by the Required Lenders, in each case in accordance with the Approved Budget (subject to permitted variances); and

(h)      for transactions referred to in Section 5.01(e).

Section 5.09.  *Swap Contracts*.  Loan Parties will not, and will not permit any of their Subsidiaries to, (i) enter into any Swap Contracts or (ii) make any payments with respect to any Swap Contracts, in either case, without the consent of the Required Lenders.

Section 5.10.  *Take-or-Pay or Other Prepayments*.  Loan Parties will not, and will not permit any of their Subsidiaries to, allow take-or-pay or other prepayments with respect to the Oil and Gas Properties of any Loan Party or any Subsidiary that would require such Loan Party or such Subsidiary to deliver hydrocarbons at some future time without then or thereafter receiving full prepayment therefor.

Section 5.11.  *Conduct of Business*.  Loan Parties will not, and will not permit any of their Subsidiaries to, directly or indirectly, engage in any line of business other than (x) in the case or SIP, the ownership of the Preferred Interests and obtaining Loans in accordance with this Agreement (it being understood and agreed, for the avoidance of doubt that SIP shall not become the beneficial or title owner of any Oil and Gas Properties), (y) in the case of Partnership A, Partnership M and Holdco, the business of acquiring, exploring, developing, operating and disposing of, and producing, gathering, processing, transporting, and marketing production from, Oil and Gas Properties on-shore or off-shore in the United States, including the outer continental shelf, or any line of business reasonably and directly related thereto, in each case, only to the extent permitted by their respective Partnership Agreements or operating agreement and (z) in the case of each of the General Partners, (i) the ownership of the Capital Stock of the applicable Borrower and, in the case of Partnership A General Partner, the Capital Stock of Partnership B General Partner and Partnership M General Partner and (ii) the performance of its duties and obligations as a general partner of the applicable Borrower, in each case in accordance with the applicable Partnership Agreement or operating agreement (it being understood and agreed, for the avoidance of doubt that no General Partner shall become the beneficial or title owner of any Oil and Gas Properties).

Section 5.12.  *Compliance with Anti-Terrorism Laws*.  Loan Parties will not, and will not permit any of their Subsidiaries to, directly or indirectly, knowingly enter into any agreement with any Person listed on the OFAC Lists.  Borrowers shall immediately notify Administrative Agent if any Loan Party has knowledge that a Borrower, any other Loan Party, Partnership B or any Net Profits Interest Grantor or any of their Respective agents acting or benefiting in any

capacity in connection with this Agreement or any transaction contemplated hereby is or becomes a Blocked Person or (a) is convicted on, (b) pleads *nolo contendere* to, (c) is indicted on or (d) is arraigned and held over on charges involving money laundering or predicate crimes to money laundering.  Borrowers will not, and will permit any of their subsidiaries to, directly or indirectly, (i) conduct any business or engage in any transaction or dealing with any Blocked Person, including, without limitation, the making or receiving of any contribution of funds, goods or services to or for the benefit of any Blocked Person, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224, any similar executive order or other Anti-Terrorism Law, or (iii) engage in or conspire to engage in any transaction that violates, evades or avoids, or has the purpose of evading or avoiding, any of the prohibitions set forth in Executive Order No. 13224 or other Anti-Terrorism Law.

Section 5.13.  *[Reserved]*.

Section 5.14.  *Amendment and Waiver of Preferred Equity Documents*.  Loan Parties will not, and will not permit any of their Subsidiaries to, directly or indirectly, (a) consent or otherwise give its approval to any amendment, supplement, restatement or other modification of the Preferred Equity Annex, any certificate representing the Preferred Interests, or any other provision of the Partnership B Partnership Agreement, (b) agree to any initial capital commitment or increase in the capital commitment in respect of the Preferred Equity, (c) defer or waive its entitlement to distributions under Section 4(a)(ii) of the Preferred Equity Annex or (d) give its consent, make any election or determination or otherwise give its approval to any matter for which its consent, election, determination or other approval is required under the Preferred Equity Annex or the Partnership B Partnership Agreement without the consent of the Required Lenders; *provided* that the restrictions in the preceding clauses (a)-(d) shall not apply if such action has been consented to by Administrative Agent.

Section 5.15.  *Amendments of Organizational Documents, Pre-Petition Financing Documents and Other Documents; Prepayments of Other Debt*.

(a)  Loan Parties will not, and will not permit any of their Subsidiaries and the other Credit Parties to (i) terminate, amend, waive or otherwise modify any of the Loan Party's Organizational Documents, including the Partnership Agreements, (ii) amend or otherwise modify any term or condition of any Pre-Petition Financing Document or give any consent, waiver or approval thereunder, or waive any default under or any breach of any term or condition of any Pre-Petition Financing Document, (iii) amend or otherwise modify any term or condition of the Net Profits Documents, or give any consent, waiver or approval thereunder, or waive any default under or any breach of any term or condition of any such documents, except for any amendments to the Net Profits Documents in connection with any Asset Disposition permitted under Section 5.06, or (iv) terminate, amend, waive or otherwise modify the Sheridan Omnibus Cash Management and Agency Agreement; *provided* that any of the restrictions in the preceding clauses (i)-(iv) shall not apply if such action has been consented to by Administrative Agent.

(b)  Loan Parties will not, and will not permit any of their Subsidiaries to, make (or give any notice in respect of) any voluntary or optional payment or prepayment on or redemption or acquisition for value of, or any prepayment or redemption as a result of any asset sale, change of

control or similar event of, any outstanding Pre-Petition Debt, except as otherwise permitted by the Orders or any other order of the Bankruptcy Court.

Section 5.16.  *Participation Agreements*.  Loan Parties will not, and will not permit any of their Subsidiaries to, directly or indirectly, consent or otherwise give its approval to any amendment, supplement, restatement or other modification of the Participation Agreement without the consent of the Required Lenders.

Section 5.17.  *Permitted Accounts*.  Other than Fund II Operating Cash, Loan Parties will not, and will not permit any of their Subsidiaries or Partnership B (subject to, in respect of Partnership B, Statement 6 of Part B of Annex 9.1) to, directly or indirectly, hold or otherwise maintain any of their cash, cash equivalents, bank deposits or investments other than at a Deposit Account, Commodity Account or Securities Account held and otherwise maintained and owned by a Borrower that is subject to a Control Agreement in accordance with the requirements of Section 4.09 hereof (inclusive of any applicable cure or waiver periods). Notwithstanding the foregoing, any cash receipts received by a non-Debtor Affiliate (consistent with past practices) will be promptly as practicable (but in no event later than three (3) business days after receipt of applicable documentation) reconciled and transmitted to a Deposit Account of the Borrowers subject to a Control Agreement.

Section 5.18.  *Subsidiaries*.  Loan Parties will not, and will not permit any of their Subsidiaries to directly or indirectly to, form, create or acquire any Subsidiary without the prior written consent of the Required Lenders.

Section 5.19.  *[Reserved]*.

Section 5.20.  *Additional Bankruptcy Matters*.  Loan Parties will not and will not permit any of their Subsidiaries to, do any of the following:

(a)     subject to the terms of the Interim Order or the Final Order, as applicable, assert or prosecute any claim or cause of action against any of the Lender Parties (in their capacities as such), unless such claim or cause of action is in connection with the enforcement of the Financing Documents against Administrative Agent or the Lenders;

(b)     subject to the terms of the Interim Order or the Final Order, as applicable, object to, contest, delay, prevent or interfere with in any material manner the exercise of rights and remedies by Administrative Agent or the Lenders with respect to the Collateral following the occurrence and during the continuance of an Event of Default; or

(c)     except (i) as expressly provided or permitted hereunder (including to the extent pursuant to any "first day" or "second day" orders complying with the terms of this Agreement), (ii) with the prior consent of the Required Lenders in their sole discretion or (iii) as provided pursuant to any other order of the Bankruptcy Court acceptable to the Required Lenders make any payment or distribution on account of any Pre-Petition Debt or any other Indebtedness arising prior to the Petition Date.

**ARTICLE 6**
**[RESERVED]**

**ARTICLE 7**
**FINANCIAL COVENANTS**

Borrowers agree that, until a Payment in Full has occurred:

Section 7.01.  *Budget Variance Covenant*.  Beginning with the delivery of the initial Budget Variance Report, as of each Budget Variance Test Date, for the most recently ended Test Period, (i) the positive variance (as compared to the Approved Budget) of the aggregate operating disbursements (excluding disbursements paid to third parties on account of royalty interests) made by the Debtors shall not exceed 15.0%, (ii) the positive variance (as compared to the Approved Budget) of the aggregate payroll, benefit and G&A expenses made by the Debtors shall not exceed the greater of 15.0% and $300,000 and (iii) the positive variance (as compared to the Approved Budget) of the aggregate capital expenditures made by the Debtors shall not exceed the greater of 15.0% and $300,000. For the avoidance of doubt, all fees, charges and expenses incurred in connection with obtaining or maintaining credit ratings pursuant to Section 4.16 are deemed to be permitted in accordance with the Approved Budget (regardless of whether provided for therein) for all purposes.

Section 7.02.  *Monthly Covenant*.  Beginning with the calendar month in which the Petition Date occurs, as of each Monthly Production Volumes Test Date, the negative variance (as compared to the Production Volumes Forecast) of actual total production volumes of Borrowers shall not exceed 15.0%.

Section 7.03.  *Mid-Month Production Covenant*.  Beginning in the first full calendar month following the Petition Date, as of each Mid-Month Production Volumes Test Date, the negative variance (as compared to the Production Volumes Forecast) of preliminary field estimates of operated production volumes of Borrowers for the first fifteen (15) calendar days of such calendar month shall not exceed 20.0%.

**ARTICLE 8**
**CONDITIONS**

Section 8.01.  *Conditions to Closing*.  The effectiveness of this Agreement, and the obligation of each Lender to make the Initial Loans on the Closing Date, is subject to the satisfaction (or waiver in accordance with Section 12.05) of the following conditions precedent:

(a)     the payment of all fees payable on or before the Closing Date to the Agents, the Sole Lead Arranger and the Lenders in their capacities as such and all expenses payable pursuant to Section 10.01 which have accrued to the Closing Date and have been presented in an invoice at least one (1) Business Day prior to the Closing Date;

(b)     Administrative Agent shall have received such certificates executed by Borrowers, the Manager or another Credit Party as reasonably requested by Administrative Agent relating to the authorization of the borrowing (or deemed borrowing) of the Loans and the other transactions

contemplated by this Agreement to occur on the Closing Date and the Delayed Draw Borrowing Date and such other legal matters relating to the Credit Parties or the Financing Documents, all in form and substance reasonably satisfactory to Administrative Agent;

(c)     immediately after giving effect to this Agreement, no Default or Event of Default shall have occurred and be continuing;

(d)     the representations and warranties of each Credit Party contained in the Financing Documents and each of the statements set forth in Part A of Annex 9.1 shall be true and correct in all material respects (except to the extent any such representation or warranty itself is qualified as to materiality, in which case it shall have been true and correct in all respects) on and as of the Closing Date, except to the extent that any such representation or warranty relates to a specific earlier date in which case such representation or warranty shall be true and correct in all material respects (except to the extent any such representation or warranty itself is qualified as to materiality, in which case it shall have been true and correct in all respects) as of such earlier date;

(e)     Administrative Agent (for prompt further distribution to the Lenders) shall have received a certificate of Borrowers, in form and substance reasonably satisfactory to Administrative Agent, certifying as to matters set forth in the foregoing clauses (a) and (d);

(f)     Collateral Agent shall have received executed copies of all such Security Documents (including all Control Agreements) as Collateral Agent may reasonably request to effectuate the grant of security interests by the Loan Parties in the Collateral to Collateral Agent to secure the Obligations;

(g)     [reserved];

(h)     Administrative Agent shall have (for prompt further distribution to the Lenders) received insurance certificates evidencing insurance coverage as contemplated by Section 4.04(e) and Section 3(d) of Part B of Annex 9.1 with respect to the Oil and Gas Properties and Subject Properties;

(i)     Administrative Agent (for prompt further distribution to the Lenders) shall have received certificates of the appropriate State agencies with respect to the existence, qualification and good standing of the Credit Parties, Manager, each General Partner and Partnership B in their States of formation, incorporation or organization as reasonably requested by Administrative Agent;

(j)     Administrative Agent (for prompt further distribution to the Lenders) shall have received from Borrowers, Collateral Agent and each Lender party thereto counterparts (in such number as may be requested by Administrative Agent) of this Agreement signed on behalf of each such party;

(k)     Administrative Agent shall have received duly executed Notes payable to each Lender requesting a Note pursuant to Section 2.05;

(l)      Collateral Agent shall have received appropriate UCC search certificates as of a recent date reflecting Liens satisfactory to Collateral Agent, encumbering the properties of Borrowers or any Collateral pledged by any pledgor under the Security Documents for each jurisdiction reasonably requested by Collateral Agent;

(m)      Borrowers shall, concurrently with the borrowing of the Initial Loans hereunder on the Closing Date, use all of the net proceeds from the Initial Loans in accordance with Section 4.07;

(n)      upon request of Administrative Agent, Administrative Agent (for prompt further distribution to the Lenders) shall have received all reports in Borrowers' possession or under its control disclosing environmental conditions relating to its Oil and Gas Properties constituting or reasonably expected to give rise to material liabilities or obligations under or material violations of Environmental Law  that have been acquired subsequent to the Effective Date (as defined in the Pre-Petition Secured Credit Agreements) whether (i) prepared by employees of Borrowers or (ii) prepared for or provided to Borrowers by any other Person;

(o)      [reserved];

(p)      Administrative Agent shall have received a Notice of Borrowing in accordance with Section 2.01(b);

(q)      on or prior to the Closing Date, Administrative Agent and each Lender shall have received true and correct copies of the Initial DIP Budget and the Production Volumes Forecast, which shall be in form and substance reasonably satisfactory to the Required Lenders;

(r)      at least two (2) days prior to the Closing Date, if any Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, such Borrower shall have delivered, to each Lender that so requests, a Beneficial Ownership Certification;

(s)       the RSA shall be in full force and effect and no RSA Termination Event or notice delivered by any party thereto in respect thereof shall have occurred;

(t)      the Petition Date shall have occurred, and Borrowers and each other Debtor shall be a debtor and debtor-in-possession in the Cases;

(u)      a motion, in form and substance reasonably satisfactory to the Required Lenders, seeking approval of the DIP Facility, shall have been filed in each of the Cases within one (1) day of the Petition Date;

(v)      all "first day" orders (other than the Interim Order) and all related pleadings intended to be entered on or prior to the Interim Order Entry Date shall have been entered by the Bankruptcy Court and shall be reasonably acceptable in form and substance to the Required Lenders, it being understood that drafts approved by counsel to the Required Lenders prior to the Petition Date are acceptable;

(w)     Borrowers shall have made no payments after the Petition Date on account of any Debt arising prior to the Petition Date unless such payment is made pursuant to "first day" orders acceptable to the Required Lenders;

(x)     [reserved];

(y)     there shall exist no unstayed action, suit, investigation, litigation or proceeding pending or (to the knowledge of the Credit Parties) threatened in any court or before any arbitrator or governmental instrumentality (other than the Cases) that would reasonably be expected to have a Material Adverse Effect or Partnership B Material Adverse Effect;

(z)     the Interim Order Entry Date shall have occurred not later than two (2) calendar days following the Petition Date, and the Interim Order shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any respect without the prior written consent of the Required Lenders or Administrative Agent (with the consent of the Required Lenders); and

(aa)     Administrative Agent shall have entered into a cooperation agreement with Borrowers, the General Partners, the Manager and Production Company pursuant to which Borrowers, the General Partner, the Manager and Production Company grant Administrative Agent and the Lenders certain access rights to their books, records, management and properties and make certain other agreements in respect of their cash management operations.

Each Lender, by delivering its signature page to this Agreement, shall be deemed to have acknowledged receipt of, and consented to and approved, each Financing Document and each other document, agreement and/or instrument required to be approved by Administrative Agent, Collateral Agent, Required Lenders or Lenders, as applicable, on the Closing Date.

Section 8.02.   *Delayed Draw Borrowings*.   The obligation of each Lender to make Delayed Draw Loans hereunder, is subject to the satisfaction (or waiver in accordance with Section 12.05) of the following conditions precedent:

(a)     the Closing Date shall have occurred;

(b)     Administrative Agent shall have received a Notice of Borrowing in accordance with Section 2.01(b);

(c)     the representations and warranties of each Credit Party contained in the Financing Documents and each of the statements set forth in Part A of Annex 9.1 shall be true and correct in all material respects (except to the extent any such representation or warranty itself is qualified as to materiality, in which case it shall have been true and correct in all respects) on and as of the date of proposed borrowing of such Delayed Draw Loans, except to the extent that any such representation or warranty relates to a specific earlier date in which case such representation or warranty shall be true and correct in all material respects (except to the extent any such representation or warranty itself is qualified as to materiality, in which case it shall have been true and correct in all respects) as of such earlier date;

(d)      no Default or Event of Default shall have occurred and be continuing, including from such Delayed Draw Loan or from the application of the proceeds thereof;

(e)      Administrative Agent shall have received duly executed Notes payable to each Lender requesting a Note pursuant to Section 2.05;

(f)      at any time prior to the Final Order Entry Date, the Interim Order shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any respect without the prior written consent of the Required Lenders or Administrative Agent (with the consent of the Required Lenders);

(g)      the Lenders (or Administrative Agent on their behalf) shall have received all payments, fees and expenses payable to them on the Delayed Draw Borrowing Date (including the Delayed Draw Fees), in each case which amounts may be offset against the proceeds of the Delayed Draw Loans;

(h)      the Final Order Entry Date shall have occurred and the Final Order shall be in full force and effect, shall not have been vacated or reversed, and shall not be subject to any stay (*provided* that, for the avoidance of doubt, no Lender holding Delayed Draw Commitments shall be required to fund any Delayed Draw Loans to the extent that the Final Order does not approve the Roll-Up that is to be consummated on the Final Order Entry Date pursuant to Section 2.01(a)(ii));

(i)      the RSA shall be in full force and effect and no RSA Termination Event or notice delivered by any party thereto in respect thereof shall have occurred;

(j)      the Loan Parties shall have satisfied all required Milestones as set forth in Section 4.12; and

(k)      all material "second day" orders (other than the Final Order) approving on a final basis any first day orders intended to be entered on or prior to the date of entry of the Final Order shall have been entered by the Bankruptcy Court, shall be reasonably acceptable to the Required Lenders, shall be in full force and effect, shall not have been vacated or reversed, shall not be subject to a stay and shall not have been modified or amended other than as reasonably acceptable to the Required Lenders or Administrative Agent (at the direction of the Required Lenders).

Each Notice of Borrowing submitted by the Borrowers pursuant to this Section 8.02 shall be deemed to be a representation and warranty that the conditions specified in Section 8.02(c) through and including Section 8.02(k) have been satisfied on and as of the date of the applicable Loan.

# ARTICLE 9
## EVENTS OF DEFAULT

Section 9.01. *Events of Default*.  For purposes of the Financing Documents, the occurrence of any of the following conditions and/or events, whether voluntary or involuntary, by operation of Law or otherwise, shall constitute an "Event of Default":

(a)     Borrowers shall fail to pay when due any principal, interest, premium or fee under any Financing Document or any other amount payable under any Financing Document and such failure, in the case of any such amount other than principal, is continuing for three (3) days after the date thereof;

(b)     (i) Borrowers or any other Loan Party shall fail to observe or perform any covenant contained in Section 2.03, Sections 4.01(a), 4.01(b), 4.01(c) or 4.01(g), (other than clause (iv) thereof), Section 4.07, Section 4.09(a), Article 5 or Article 7, (ii) Borrowers or any other Credit Party shall fail to perform or comply with the obligation contained in Section 2.14, and (iii) Borrowers shall fail to deliver a DIP Budget, a Budget Variance Report or a production volumes variance report as required to be delivered pursuant to Section 4.01(q), (r) and (s), respectively, within two (2) days of the date of such DIP Budget, Budget Variance Report or production volumes variance report, as applicable, is required to be delivered;

(c)     (x) any Borrower or any Subsidiary shall cease to exist or (y)(i) there occurs one or more of the events listed in Part B of Annex 9.1 which shall continue to exist for a period of five (5) days after the earlier of (A) receipt by Borrower of notice from Administrative Agent or Required Lenders of such event or (B) actual knowledge of a Responsible Officer of such event; or (ii) there occurs one or more of the events listed in Part C of Annex 9.1;

(d)     any Credit Party defaults in the performance of or compliance with any term contained in this Agreement or in any other Financing Document (other than occurrences described in the foregoing clauses (a) or (b) of this Section 9.01 for which a different grace or cure period is specified or for which no grace or cure period is specified and thereby constitute immediate Events of Default) and such default is not remedied or waived within ten (10) Business Days after the earlier of (i) receipt by Borrower of notice from Administrative Agent or Required Lenders of such default or (ii) actual knowledge of a Responsible Officer of such default;

(e)     any representation, warranty or certification made (or deemed made, including regarding Part A of Annex 9.1) by any Credit Party or any other Affiliate of any Borrower in any Financing Document or in any certificate delivered pursuant to any Financing Document is incorrect in any respect (or in any material respect if such representation, warranty or certification is not by its terms already qualified as to materiality) when made (or deemed made);

(f)     (i) failure of any Borrower or any Subsidiary to pay when due or within any applicable grace period any Debt (other than the Loans, the Pre-Petition Debt or Debt under the Intercompany Loan Agreement) or the occurrence of any breach, default, condition or event with respect to any such Debt which has continued beyond any applicable grace period, if the effect of such failure or occurrence is to cause or to permit the holder or holders of any such Debt to cause

any such Debt having an aggregate principal amount in excess of the Materiality Threshold to become or be declared immediately due and payable; or (ii) failure of Partnership B to pay when due or within any applicable grace period any Debt (other than Debt under Partnership B Pre-Petition Swap Contracts) or the occurrence of any breach, default, condition or event with respect to any such Debt which has continued beyond any applicable grace period, if the effect of such failure or occurrence is to cause or to permit the holder or holders of any such Debt to cause any such Debt having an aggregate principal amount in excess of the Materiality Threshold to become or be declared immediately due and payable;

(g)     any Credit Party or Subsidiary of Borrower, in each case, that is not a Debtor shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar Law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors, or shall fail generally to pay its debts as they become due or shall take any limited partnership or corporate or limited liability company action to authorize any of the foregoing;

(h)     an involuntary case or other proceeding shall be commenced against any Credit Party or Subsidiary of Borrower, in each case, that is not a Debtor seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar Law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding is not dismissed or stayed within sixty (60) days from its commencement, or an order for relief shall be entered against any Credit Party or Subsidiary of Borrower, in each case, that is not a Debtor under the federal bankruptcy laws as now or hereafter in effect;

(i)     (i) institution of any steps by any Person to terminate a Pension Plan if as a result of such termination any Loan Party or any member of the Controlled Group could be required to make a contribution to such Pension Plan, or could reasonably be expected to incur a liability or obligation to such Pension Plan, in excess of the Materiality Threshold, (ii) a contribution failure occurs with respect to any Pension Plan sufficient to give rise to a Lien under Section 303(k) of ERISA, or (iii) there shall occur any withdrawal or partial withdrawal from a Multiemployer Plan and the withdrawal liability (without unaccrued interest) to Multiemployer Plans as a result of such withdrawal (including any outstanding withdrawal liability that any Loan Party or any member of the Controlled Group have incurred on the date of such withdrawal) exceeds the Materiality Threshold;

(j)     one or more judgments or orders for the payment of money (not paid or fully covered by insurance maintained in accordance with the requirements of this Agreement and as to which the relevant insurance company has acknowledged coverage) aggregating in excess of Materiality Threshold shall be rendered against any Borrower or any Subsidiary or aggregating in excess of the Materiality Threshold shall be rendered against Partnership B and either (i) enforcement proceedings shall have been commenced by any creditor upon any such judgment or order or (ii) there shall be any period of thirty (30) consecutive days during which

such judgment or order, shall continue undismissed, unbonded, undischarged or unstayed, in each case, arising following the Petition Date;

(k)     (i) Partnership A General Partner shall cease to own all of the outstanding Capital Stock of Partnership B General Partner or Partnership M General Partner, (ii) any "person" or "group" (as such term is used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934), other than Investor or Sheridan SMG, LLC (A) is or becomes the beneficial owner (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that for purposes of this clause such person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time), directly or indirectly, of Capital Stock of Partnership A General Partner or Manager representing 50% or more of the voting power of the total outstanding Capital Stock of Partnership A General Partner or Manager, as the case may be, or (B) shall, directly or indirectly, have the right to elect 50% or more of the members of the board of directors (or similar governing body) of Manager; (iii) (A) Partnership A General Partner shall cease to be the sole general partner Partnership A, (B) Partnership M General Partner shall cease to be the sole general partner Partnership M, (C) Partnership B General Partner shall cease to be the sole general partner Partnership B or (D) Manager shall cease to be the manager of any General Partner or SIP; (iv) Partnership A and Partnership M shall, collectively, cease to  directly own and control one hundred percent (100%) of each class of the outstanding Capital Stock of Holdco; or (v) any Borrower shall cease to, directly or indirectly, own and control one hundred percent (100%) of each class of the outstanding Capital Stock of each of its Wholly-Owned Subsidiaries;

(l)     any Lien created by any of the Security Documents shall at any time (other than pursuant to the terms hereof) fail to constitute a valid and perfected Lien on a material portion of the Collateral purported to be secured thereby except to the extent such loss of perfection results from the failure of Collateral Agent to maintain possession of certificates actually delivered to it representing securities pledged under the Security Documents or to file UCC or similar continuation statements, subject to no prior or equal Lien except Permitted Liens, or any Borrower or any other Credit Party shall so assert;

(m)     (i) any of the Financing Documents shall for any reason fail to constitute the valid and binding agreement of any Borrower or any Credit Party which is a party thereto, or any such Credit Party shall so assert; (ii) the Preferred Equity Annex, any certificate representing the Preferred Interest or any provision of the Partnership B Partnership Agreement applicable to the Preferred Interest, shall for any reason fail to constitute the valid and binding obligation of Partnership B, or Partnership B shall so assert; or (iii) the Net Profits Agreement shall for any reason fail to constitute the valid and binding agreement of Partnership M or Partnership M shall so assert or any material Net Profits Conveyance shall for any reason fail to constitute the valid and binding agreement of the Net Profits Interest Grantor party thereto, or any Net Profits Interest Grantor shall so assert;

(n)     Holdco, directly or indirectly, creates, incurs, assumes or otherwise becomes or remains directly or indirectly liable with respect to any Debt, except for Debt owed to Partnership A or Partnership M or Partnership B;

(o)     Dismissal or Conversion of Cases; Appointment of Trustee or Examiner; Cash Collateral Use.

(i)     any of the Cases of the Debtors shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

(ii)     a trustee under Section 1104 of the Bankruptcy Code, a receiver or an examiner having expanded powers (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code) (other than a fee examiner) is appointed or elected in the any of the Cases, any Credit Party applies for, consents to, supports, acquiesces in or fails to promptly oppose, any such appointment, or the Bankruptcy Court shall have entered an order providing for such appointment;

(iii)     an order of the Bankruptcy Court shall be entered denying or terminating use of Cash Collateral by the Credit Parties and the Credit Parties shall have not obtained use of Cash Collateral pursuant to an order consented to by, and in form and substance acceptable to, the Required Lenders;

(iv)     any Credit Party, or any person on behalf of any Credit Party, shall file a motion or other pleading seeking, or otherwise consenting to, any of the matters set forth in clauses (i) through (iii) above or the granting of any other relief that if granted would give rise to an Event of Default, in each case, except as may otherwise be permitted under the Orders;

(v)     any Credit Party or any of its Subsidiaries, or any person claiming by or through any Credit Party or any of its Subsidiaries shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against (A) Administrative Agent or any of the Lenders relating to the DIP Facility, or (B) Administrative Agent or any lender relating to the Pre-Petition Debt, in each case, except as may otherwise be permitted under the Orders;

(p)     without the prior written consent of the Required Lenders, the entry of any order of the Bankruptcy Court authorizing (i) any claims or charges, other than in respect of the DIP Facility and the Carve-Out or as otherwise permitted under the applicable Financing Documents or the Orders, entitled to superpriority administrative expense claim status in any Chapter 11 case pursuant to section 364(c)(1) of the Bankruptcy Code that are pari passu with or senior to the claims of Administrative Agent and the Lenders under the DIP Facility, or there shall arise or be granted by the Bankruptcy Court any claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code (other than the Carve-Out), or (ii) any Lien on the Collateral having a priority senior to or pari passu with the Liens and security interests granted herein, except, in each case, as expressly provided in the Financing Documents or in the Order then in effect, whichever is in effect;

(q)     the Bankruptcy Court shall enter an order or orders granting relief from any stay of proceeding (including, the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest) to (i) permit foreclosure (or the granting of a

deed in lieu of foreclosure or the like) on any assets of any of the Credit Parties which have a value in excess of $500,000 in the aggregate or (ii) permit other actions that would have a Material Adverse Effect on the Credit Parties or their estates, as applicable (taken as a whole);

(r)     Certain Orders.

(i)     an order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying, vacating or otherwise amending, supplementing or modifying the Interim Order or the Final Order, or a Credit Party files an application, motion or other pleading seeking such entry of such an order or supports or fails to promptly oppose such an order, in each case without the prior written consent of the Required Lenders;

(ii)     the Interim Order (prior to the Final Order Entry Date) or the Final Order (on and after the Final Order Entry Date) shall cease to create a valid and perfected Lien on a material portion of the Collateral or to be in full force and effect, shall have been reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, in the case of modification or amendment, without prior written consent of the Required Lenders (or Administrative Agent with the consent of the Required Lenders);

(iii)     an order shall have been entered by the Bankruptcy Court avoiding or requiring disgorgement by either Administrative Agent or any of the Lenders of any amounts received in respect of the Obligations, or a pre-petition secured party under the Pre-Petition Debt;

(iv)     an order shall have been entered by the Bankruptcy Court terminating or modifying the exclusive right of any Credit Party that is a Debtor to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the Required Lenders;

(v)     an order shall have been entered by the Bankruptcy Court providing for a change in venue with respect to the Cases;

(vi)     any of the Credit Parties shall fail to comply with a material provision of the Interim Order (prior to the Final Order Entry Date) or the Final Order (on and after the Final Order Entry Date); or

(vii)     other than with respect to the Carve-Out, an order in the Cases shall be entered charging any of the Collateral (as defined herein and in the Pre-Petition Financing Documents) under section 506(c) of the Bankruptcy Code against the Lenders, the Pre-Petition Term Lenders or the Pre-Petition RBL Lenders, or an order in the Cases shall be entered that is materially adverse to Administrative Agent, the Lenders, Administrative Agent, the Pre-Petition Term Lenders or the Pre-Petition RBL Lenders or their respective rights and remedies under the DIP Facility in any of the Cases or inconsistent with any of the Financing Documents;

(s)     any order shall be entered which dismisses any of the Cases of the Credit Parties that are Debtors and which order does not provide for Payment in Full in cash of the Obligations under the Financing Documents (other than contingent indemnification obligations not yet due

and payable), or any of the Credit Parties and their Subsidiaries shall seek, support or fail to contest in good faith the entry of any such order;

(t)     failure to satisfy any of the Milestones in accordance with the terms relating to such Milestone (unless waived or extended with the consent of the Required Lenders);

(u)     any Credit Party or any Subsidiary thereof shall take any action in support of any matter set forth in clauses (o) through (t) (inclusive) of this Section 9.01 or any other Person shall do so and such application is not contested in good faith by the Credit Parties and the relief requested is granted in an order that is not stayed pending appeal, in each case unless the Required Lenders give prior written consent to such action;

(v)     any Credit Party or any Subsidiary thereof shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding seeking, or otherwise consenting to (i) the invalidation, subordination or other challenging of the Superpriority Claims and Liens granted to secure the Obligations or any other rights granted to Administrative Agent and the Lenders in the Orders or this Agreement or (ii) any relief under section 506(c) of the Bankruptcy Code with respect to any Collateral;

(w)     any Credit Party shall challenge, support or encourage a challenge of any payments made to Administrative Agent or any Lender with respect to the Obligations or any lender under any Pre-Petition Secured Debt with respect to the obligations thereunder, other than to challenge the occurrence of a Default or Event of Default;

(x)     without the consent of Administrative Agent and the Required Lenders, the filing of any motion by the Credit Parties seeking approval of (or the entry of an order by the Bankruptcy Court approving) adequate protection to any pre-petition agent, trustee or lender that is inconsistent with the Interim Order (prior to the Final Order Entry Date) or the Final Order (on and after the Final Order Entry Date);

(y)     without the Required Lenders' consent, the entry of any order by the Bankruptcy Court granting, or the filing by any Credit Party or any of its Subsidiaries of any motion or other request with the Bankruptcy Court (in each case, other than the Orders and motions seeking entry thereof or permitted amendments or modifications thereto) seeking, authority to use any cash proceeds of any of the Collateral without Administrative Agent's and the Required Lenders' consent or to obtain any financing under section 364 of the Bankruptcy Code other than the facility hereunder unless such motion or order contemplates payment in full in cash of the Obligations immediately upon consummation of the transactions contemplated thereby;

(z)     without the consent of Administrative Agent and the Required Lenders, the filing of any motion by the Credit Parties or any person on behalf of any Credit Party seeking authority to consummate a sale of assets of the Credit Parties that are Debtors or the Collateral having a value in excess of $500,000 outside the ordinary course of business and not otherwise permitted hereunder;

(aa)     if any Credit Party or any of its Subsidiaries is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any part of the business affairs of the Credit Parties and their Subsidiaries, taken as a whole, which could reasonably be expected to

have a Material Adverse Effect; *provided* that the Credit Parties shall have five (5) Business Days after the entry of such an order to obtain a court order vacating, staying or otherwise obtaining relief from the Bankruptcy Court or another court to address any such court order;

(bb)     without the consent of Administrative Agent and the Required Lenders, the making by any Credit Party of any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition Debt or payables other than payments in respect of the repayment of the Pre-Petition Secured Debt or as otherwise permitted under this Agreement, in each case, to the extent authorized by one or more "first day" orders, the Interim Order or the Final Order and consistent with the Approved Budget;

(cc)     if, unless otherwise approved by Administrative Agent and the Required Lenders, an order of the Bankruptcy Court shall be entered providing for a change in venue with respect to the Cases and such order shall not be reversed or vacated within ten (10) days;

(dd)     without the Required Lenders' consent, any Credit Party or any Subsidiary thereof shall file any motion or other request with the Bankruptcy Court seeking (i) to grant or impose, under section 364 of the Bankruptcy Code or otherwise, liens or security interests in any Collateral, whether senior, equal or subordinate to Administrative Agent's liens and security interests; (ii) to use, or seek to use, Cash Collateral; or (iii) to modify or affect any of the rights of Administrative Agent, or the Lenders under the Orders or the Financing Documents, by any order entered in the Cases;

(ee)     without the Required Lenders' consent, any Credit Party shall file a motion seeking or take any action supporting a motion seeking, or the Bankruptcy Court shall enter an order in any of the Cases authorizing the sale of all or substantially all of the Credit Parties' assets (unless such order contemplates payment in full in cash of the Obligations upon the closing of such financing or consummation of such sale, whether pursuant to a plan of reorganization or otherwise);

(ff)     any Credit Party or other debtor in a Chapter 11 case proposes or otherwise supports any plan of reorganization that is not an Acceptable Plan of Reorganization; or

(gg)     an RSA Termination Event occurs, whether or not the RSA is then in effect.

Section 9.02. *Acceleration of Term Loans.*   Upon the occurrence and during the continuance of an Event of Default, Administrative Agent shall, at the direction of the Required Lenders, by notice to Administrative Borrower declare all or any portion of the Obligations to be, and such Obligations shall thereupon become, immediately due and payable, with accrued and unpaid interest thereon, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by Borrowers and Borrowers will pay the same.

Notwithstanding anything to the contrary in this Article 9, subject to the provisions of the Interim Order (and, when entered, the Final Order), (x) with respect to enforcement of Liens or remedies with respect to Collateral, Administrative Agent shall provide Borrower not less than five (5) Business Days' notice prior to taking such action (in any hearing after the giving of such notice, the only issue that may be raised by any party in opposition thereto being whether, in fact, an Event of Default has occurred and is continuing (the "**Remedies Notice Period**")), and (y)

after expiration of the Remedies Notice Period, Administrative Agent and Collateral Agent shall, at the direction of the Required Lenders, (x) terminate the consensual use of Cash Collateral and (y) exercise all other rights and remedies provided for in this Agreement, the Security Documents, the Orders and under applicable law; *provided* that no such notice shall be required for any exercise of rights or remedies to the extent provided in the Orders.  During the Remedies Notice Period, the Borrowers may continue to use Cash Collateral as provided in the Orders. During the Remedies Notice Period, any party in interest shall be entitled to seek an emergency hearing with the Bankruptcy Court, for the sole purpose of contesting whether an Event of Default has occurred and/or is continuing and cash collateral may be used for this purpose and in accordance with the Orders during the Remedies Notice Period.

Section 9.03.  *Default Rate of Interest and Suspension of LIBO Rate Options*.  At the election of Administrative Agent or Required Lenders, after the occurrence of an Event of Default and for so long as it continues and upon notice to Administrative Borrower by Administrative Agent, subject to Section 2.07: (i) to the extent permitted by Law, all Obligations (other than Loans) that are past due and the Loans shall bear interest at rates that are 2.00% in excess of the rates otherwise payable under this Agreement, (ii) as the Interest Periods for LIBOR Loans then in effect expire, such Loans shall be converted into Base Rate Loans, and (iii) the LIBO Rate election will not be available to Borrowers.

Section 9.04.  *Setoff Rights*.  During the continuance of any Event of Default, subject to the Orders (including the Remedies Notice Period (as defined therein) and the Carve-Out), each Lender is hereby authorized by Borrowers at any time or from time to time, with reasonably prompt subsequent notice to Administrative Borrower (any prior or contemporaneous notice being hereby expressly waived to the extent permitted by applicable law) to set off and to appropriate and to apply any and all (i) balances held by such Lender (or any branch or agency thereof) to or for the account of Borrowers, and (ii) other property at any time held or owing by such Lender (or any branch or agency thereof) to or for the credit or for the account of Borrowers, against and on account of any of the Obligations; except that no Lender shall exercise any such right without the prior written consent of Administrative Agent.  Any Lender exercising a right to set off shall purchase for cash (and the other Lenders shall sell) interests in each of such other Lender's Pro Rata Share of the Obligations as would be necessary to cause all Lenders to share the amount so set off with each other Lender in accordance with their respective Pro Rata Share of the Obligations.  Each Borrower agrees, to the fullest extent permitted by Law, that any Lender may exercise its right to set off with respect to the Obligations as provided in this Section 9.04.

Section 9.05.  *Application of Proceeds.*

(a)      Notwithstanding anything to the contrary contained in this Agreement, upon the occurrence and during the continuance of an Event of Default, each Borrower irrevocably waives the right to direct the application of any and all amounts at any time or times thereafter received by Administrative Agent from or on behalf of such Borrower or any guarantor of all or any part of the Obligations, and, as between such Borrower on the one hand and Administrative Agent and Lenders on the other, Administrative Agent shall have the continuing and exclusive right to apply and to reapply any and all amounts received against the Obligations in such manner as

Administrative Agent may deem advisable notwithstanding any previous application by Administrative Agent.

(b)    Notwithstanding anything to the contrary contained in this Agreement, if an Acceleration Event shall have occurred and subject to the Orders (including the Remedies Notice Period (as defined therein) and the Carve-Out), and so long as it continues, each Lender Party shall deliver any and all amounts received in respect of the Obligations to Collateral Agent, and Collateral Agent shall apply any and all amounts so received or otherwise received in respect of the Obligations in the following order: **first**, ratably to the payment of all Obligations constituting fees, costs, indemnities, liabilities, obligations and expenses incurred by or owing to Agents with respect to this Agreement, the other Financing Documents or the Collateral; **second**, ratably to the payment of Obligations constituting fees, costs, indemnities and expenses incurred by or owing to any Lender with respect to this Agreement, the other Financing Documents or the Collateral; **third**, to payment of Obligations constituting accrued and unpaid interest on the Loans (other than the Roll-Up Loan) ratably among the Lenders (other than Defaulting Lenders) in accordance with their Pro Rata Shares; **fourth**, to the payment of Obligations constituting the principal amount of the Loans (other than the Roll-Up Loans) outstanding ratably to the Lenders (other than Defaulting Lenders) in accordance with their Pro Rata Shares; **fifth**, to the payment of Obligations constituting accrued and unpaid interest on the Roll-Up Loans ratably to the Lenders (other than Defaulting Lenders) in accordance with their Pro Rata Shares; **sixth**, to the payment of Obligations constituting the principal amount of the Roll-Up Loans outstanding ratably to the Lenders (other than Defaulting Lenders) in accordance with their Pro Rata Shares; **seventh**, to the payment of Obligations owing to the Defaulting Lenders ratably in accordance with their Pro Rata Shares; **eighth**, ratably to payment of remaining Obligations outstanding; **ninth**, ratably to payment of any superpriority adequate protection claims of the Pre-Petition Lender Parties; and **tenth**, to the payment of the obligations outstanding under the Pre-Petition Secured Debt ratably to the Pre-Petition Lender Parties *provided* that each repayment of Borrowings made under each tranche shall be applied, **first** ratably to any Base Rate Loan then outstanding under such tranche, and, **second**, to any LIBOR Loans then outstanding under such tranche; *provided, further*, that if more than one LIBOR Loan is outstanding under such tranche, such repayments shall be made to each such LIBOR Loans in order of priority beginning with the LIBOR Loan with the least number of days remaining in the Interest Period applicable thereto and ending with the LIBOR Loan with the most number of days remaining in the Interest Period applicable thereto.

(c)    Any balance remaining after giving effect to the applications set forth in this Section 9.05 shall be delivered to Borrowers or to whomever may be lawfully entitled to receive such balance or as the Bankruptcy Court may direct.  In carrying out any of the applications set forth in this Section 9.05, (i) amounts received shall be applied in the numerical order provided until exhausted prior to the application to the next succeeding category and (ii) each of the Persons entitled to receive a payment in any particular category shall receive an amount equal to its pro rata share of amounts available to be applied pursuant thereto for such category.

# ARTICLE 10
# EXPENSES AND INDEMNITY

Section 10.01. *Expenses*.  Each Borrower hereby agrees to promptly pay (i) all reasonable and documented out-of-pocket costs and expenses of (I) Administrative Agent and the Sole Lead Arranger (including without limitation the reasonable and documented fees, costs and expenses of (I) Davis Polk & Wardwell LLP and Vinson & Elkins LLP as counsel to Administrative Agent and the Lenders and (II) Houlihan Lokey, Inc., in its capacity as financial advisor to the Lenders in connection with the Restructuring Transactions (as defined in the RSA)), in each case in connection with the examination, review, due diligence investigation, documentation, negotiation, closing and syndication of the credit transactions contemplated by the Financing Documents, in connection with the performance by Administrative Agent of its rights and remedies under the Financing Documents and in connection with the continued administration of the Financing Documents including (A) any amendments, modifications, restatements, consents and waivers to and/or under any and all Financing Documents (whether or not the transactions contemplated hereby or thereby shall be consummated) and (B) any periodic public record searches conducted by or at the request of Administrative Agent (including, without limitation, title investigations, UCC searches, fixture filing searches, judgment, pending litigation and tax lien searches and searches of applicable corporate, limited liability, partnership and related records concerning the continued existence, organization and good standing of any Credit Party), (ii) without limitation of the preceding clause (i), all documented, out-of-pocket reasonable costs and expenses of Collateral Agent in connection with the creation, perfection and maintenance of Liens pursuant to the Financing Documents, (iii) without limitation of the preceding clause (i), all documented, out-of-pocket reasonable costs and expenses of each Agent (including without limitation the reasonable fees, costs and expenses of counsel to, and during the continuance of an Event of Default or after an Acceleration Event and during the continuance thereof, of independent appraisers and consultants retained by, each Agent) in connection with (A) protecting, storing, insuring, handling, maintaining or selling any Collateral, (B) any litigation, dispute, suit or proceeding relating to any Financing Document, and (C) any workout, collection, bankruptcy, insolvency and other enforcement proceedings under any and all of the Financing Documents, and (iv) all documented, out-of-pocket, reasonable costs and expenses incurred by Lenders in connection with any litigation, dispute, suit or proceeding relating to any Financing Document and, during the continuance of an Event of Default or after an Acceleration Event and during the continuance thereof, in connection with any workout, collection, bankruptcy, insolvency and other enforcement proceedings under any and all Financing Documents; *provided* that, to the extent that the costs and expenses referred to in this clause (iv) consist of fees, costs and expenses of counsel, Borrowers shall be obligated to pay such reasonable fees, costs and expenses for only one counsel acting for both Agents (or, if Administrative Agent and Collateral Agent are not Affiliates of each other, for only one counsel acting for Administrative Agent and only one counsel acting for Collateral Agent), plus a single local counsel for both Agents in each jurisdiction where local counsel is required, and for only one counsel acting for all Lenders (other than an Agent) so long as one counsel may represent all Lenders (other than an Agent) without any conflict of interest other than any conflicts that may be waived by each Lender under applicable rules of professional conduct regarding such waivers.

Section 10.02. *Indemnity*.  Borrowers hereby agree to indemnify, pay and hold harmless each Lender Party, the Sole Lead Arranger and their respective Related Parties (each an "**Indemnitee**" and collectively called the "**Indemnitees**") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (collectively, "**Losses**") (including the documented out-of-pocket, reasonable fees and disbursements of counsel for such Indemnitees) in connection with any actual or prospective claim, litigation, investigative, response, remedial, administrative or judicial matter or proceeding (each, a "**Proceeding**"), whether based on contract, tort or any other theory, whether brought by a third party and whether or not such Indemnitees shall be designated a party thereto and the documented out-of-pocket, reasonable expenses of investigation by engineers, environmental consultants and similar technical personnel and any commission, fee or compensation claimed by any broker (other than any broker retained by a Lender Party) asserting any right to payment for the transactions contemplated hereby, which may be imposed on, incurred by or asserted against such Indemnitees as a result of or in connection with the execution or delivery of this Agreement, any other Financing Document or any amendment, restatement, modification or waiver of the provisions hereof or thereof, or any agreement or instrument contemplated hereby or thereby, the performance of parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or by the other Financing Documents (including under any Environmental Law or in connection with any Hazardous Materials Contamination) and the use or intended use of the proceeds of the Loans IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF THE INDEMNITEE, except that Borrower shall have no obligation hereunder to an Indemnitee with respect to (x) any Loss resulting from the gross negligence, bad faith or willful misconduct of such Indemnitee(s), as determined by a final non-appealable judgment of a court of competent jurisdiction, (y) any Loss arising out of a Proceeding brought by one Indemnitee against any other Indemnitee caused solely by the actions of the first such Indemnitee (other than any such Proceeding against such Indemnitee in its capacity or in fulfilling its role as an Agent or Sole Lead Arranger, subject to clause (x) above) or (z) any Loss resulting from a material breach of this Agreement by such Indemnitee, as determined by a final non-appealable judgment of a court of competent jurisdiction.  To the extent that the undertaking set forth in the immediately preceding sentence may be unenforceable, Borrower shall contribute the maximum portion, which it is permitted to pay and satisfy under applicable Law, to the payment and satisfaction of all such indemnified liabilities incurred by the Indemnitees or any of them.

## ARTICLE 11
## AGENTS

Section 11.01. *Appointment and Authorization*.  Each Lender hereby irrevocably appoints and authorizes each Agent to enter into each of the Financing Documents and enter into amendments to each applicable Financing Document, to which it is a party (other than this Agreement) on its behalf and to take such actions as such Agent on its behalf and to exercise such powers under the Financing Documents as are delegated to such Agent by the terms thereof, together with all such powers as are reasonably incidental thereto.  Subject to the terms of Section 12.05 and to the terms of the other Financing Documents, Administrative Agent is

authorized and empowered to amend, modify, or waive any provisions of this Agreement or the other Financing Documents on behalf of Lenders.  Except for Sections 11.09, 11.10 and 11.12, the provisions of this Article 11 are solely for the benefit of Lender Parties and neither Borrowers nor any other Credit Party shall have any rights as a third party beneficiary of, nor shall they be bound by, any of the provisions hereof.

In performing its functions and duties under this Agreement, except as expressly provided in Section 12.06(a)(iii), each Agent shall act solely as agent of Lender Parties and does not assume and shall not be deemed to have assumed any obligation toward or relationship of agency or trust with or for Borrowers or any other Credit Party.  Each Agent may perform any of its duties hereunder, or under the Financing Documents, by or through its own agents or employees.

Section 11.02. *Agents and Affiliates*.  Each Agent, in its capacity as a Lender, shall have the same rights and powers under the Financing Documents as any other Lender and may exercise or refrain from exercising the same as though it were not an Agent, and each Agent and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with each Credit Party or Affiliate of any Credit Party as if it were not an Agent hereunder and without any duty to account therefor to the Lenders.

Section 11.03. *Action by Agents*.  The duties of each Agent shall be mechanical and administrative in nature.  Neither Agent shall have by reason of this Agreement a fiduciary relationship in respect of any Lender Party.  Nothing in this Agreement or any of the Financing Documents is intended to or shall be construed to impose upon an Agent any obligations in respect of this Agreement or any of the Financing Documents except as expressly set forth herein or therein.  Without limiting the generality of the foregoing, except as otherwise expressly provided herein (subject to Section 11.05), Administrative Agent shall not have any duty to disclose to any Lender Party, and shall not be liable to any Lender Party for the failure to disclose to any Lender Party, any information relating to Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as Agent or any of its Affiliates in any capacity.  Each Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Financing Document, relating to Collateral and administrative matters by or through any one or more sub agents appointed by each Agent.  Each Agent and any such sub agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub agent and to the Related Parties of each Agent and any such sub agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as an Agent, but each Agent shall be liable for any liability of its sub-agents and the Related Parties of such Agent and its sub-agents under such exculpatory provisions.   All such sub-agents and Related Parties shall be subject to the confidentiality provisions of Section 12.08 as though they were Lender Parties.

Section 11.04. *Consultation with Experts*.  Each Agent may consult with legal counsel (who may be legal counsel for Borrowers), independent accountants and other experts selected by it in good faith and shall not be liable for any action taken or not taken by it in good faith in accordance with the advice or other statements of such counsel, accountants or experts.

Section 11.05. *Liability of Agents*.  Neither Agent nor any of its Related Parties shall be liable to any Lender for any action taken or not taken by it (i) with the consent of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances provided in Section 12.05 and Article 9 or (ii) in the absence of its own gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction.  Neither Agent nor any of its respective directors, officers, agents or employees shall be responsible for or have any duty to ascertain, inquire into or verify (a) any statement, warranty or representation made in connection with any Financing Document or any borrowing hereunder, (b) the performance or observance of any of the covenants or agreements specified in any Financing Document, (c) the satisfaction of any condition specified in any Financing Document, (d) the validity, effectiveness, sufficiency or genuineness of any Financing Document, any Lien purported to be created or perfected thereby or any certificate, report or other document or writing furnished in connection therewith, (e) the existence or non-existence of any Default or Event of Default, or (f) the financial condition of any Credit Party.  Neither Agent shall incur any liability by acting in reliance upon any notice, request, certificate, consent, statement, instrument, document or other writing (which may be a bank wire, telex, facsimile or electronic transmission or similar writing) reasonably believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  To the extent a notice hereunder is permitted to be given by telephone, each Agent also may rely upon any statement made to it by telephone and reasonably believed by it to have been made by the proper Person, and shall not incur any liability to any Lender for relying thereon.  Neither Agent shall be liable for any apportionment or distribution of payments made by it in good faith and if any such apportionment or distribution is subsequently determined to have been made in error the sole recourse of any Lender to whom payment was due but not made, shall be to recover from other Lenders any payment in excess of the amount to which they are determined to be entitled (and such other Lenders hereby agree to return to such Lender any such erroneous payments received by them).

Section 11.06. *Indemnification*.  Each Lender shall, in accordance with its Pro Rata Share, indemnify each Agent (to the extent not reimbursed by Borrower) upon demand against any cost, expense (including counsel fees and disbursements), claim, demand, action, loss or liability (except such as result from such Agent's gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction) that such Agent may suffer or incur in connection with the Financing Documents or any action taken or omitted by such Agent hereunder or thereunder.  If any indemnity furnished to an Agent for any purpose shall, in the opinion of such Agent, be insufficient or become impaired, such Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against even if so directed by Required Lenders until such additional indemnity is furnished.

Section 11.07. *Right to Request and Act on Instructions*.  Each Agent may at any time request instructions from Lender Parties (other than itself) with respect to any actions or approvals which by the terms of this Agreement or of any of the Financing Documents such Agent is permitted or desires to take or to grant, and if such instructions are promptly requested, such Agent shall be absolutely entitled to refrain from taking any action or to withhold any approval and shall not be under any liability whatsoever to any Person for refraining from any action or withholding any approval under any of the Financing Documents until it shall have received such instructions from Required Lenders or all or such other portion of Lender Parties

as shall be prescribed by this Agreement.  Without limiting the foregoing, no Lender Party shall have any right of action whatsoever against an Agent as a result of such Agent acting or refraining from acting under this Agreement or any of the other Financing Documents in accordance with the instructions of Required Lenders (or all or such other portion of Lender Parties as shall be prescribed by this Agreement) and, notwithstanding the instructions of Required Lenders (or such other applicable portion of Lender Parties), such Agent shall have no obligation to take any action if it believes, in good faith, that such action would violate applicable Law or exposes such Agent to any liability.

Section 11.08. *Credit Decision*.  Each Lender acknowledges that it has, independently and without reliance upon any Agent, Sole Lead Arranger or any other Lender Party or any of their Related Parties, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon any Agent or any other Lender Party or any of their Related Parties, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking any action under the Financing Documents or any related agreement or any document furnished thereunder.

Section 11.09. *Collateral Matters*.  Each Lender irrevocably authorizes and directs Administrative Agent and Collateral Agent to release any Lien or Guarantee granted to or held by Administrative Agent or Collateral Agent under any Financing Document (i) upon a Payment in Full (other than contingent obligations not yet due and payable), or (ii) with respect to property sold or disposed of as part of or in connection with any disposition permitted under any Financing Document to a Person that is not a Credit Party.  Upon request by Administrative Agent or Collateral Agent at any time, Lenders will confirm Administrative Agent's and Collateral Agent's authority to release and/or subordinate particular types or items of Collateral pursuant to this Section 11.09.

Section 11.10. *Agency for Perfection*.  Each Agent and each Lender hereby appoint each other Agent or Lender as agent for the purpose of perfecting Collateral Agent's security interest in assets which, in accordance with the UCC in any applicable jurisdiction, can be perfected by possession or control.  Should Administrative Agent or any Lender (other than Collateral Agent) obtain possession or control of any such assets, such Lender shall notify Collateral Agent thereof, and, promptly upon Collateral Agent's request therefor, shall deliver such assets to Collateral Agent or in accordance with Collateral Agent's instructions or transfer control to Collateral Agent in accordance with Collateral Agent's instructions.  Each Lender agrees that it will not have any right individually to enforce or seek to enforce any Security Document or to realize upon any Collateral for the Loans unless instructed to do so by Collateral Agent (or consented to by Administrative Agent, as provided in Section 9.04), it being understood and agreed that such rights and remedies may be exercised only by Collateral Agent; *provided* that the foregoing shall not prohibit (a) each Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as an Agent) hereunder and under the other Financing Documents, (b) any Lender from exercising setoff rights in accordance with Section 9.04, or (c) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Credit Party under any Debtor Relief Law; *provided*, *further*, that if at any time there is no Person acting as Administrative

Agent hereunder and under the other Financing Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to Administrative Agent pursuant to Section 9.02 and (ii) in addition to the matters set forth in clauses (b), and (c) of the preceding proviso, the Required Lenders may enforce any rights and remedies available to Administrative Agent, Lenders or Collateral Agent.

Section 11.11. *Notice of Default*.   Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default except with respect to defaults in the payment of principal, interest and fees required to be paid to Administrative Agent for the account of Lenders, unless Administrative Agent shall have received written notice from a Lender or Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".   Administrative Agent will notify each Lender of its receipt of any such notice.   Administrative Agent shall take such action with respect to such Default or Event of Default as may be requested by Required Lenders (or all or such other portion of Lenders as shall be prescribed by this Agreement) in accordance with the terms hereof.   Unless and until Administrative Agent has received any such request, Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable or in the best interests of Lenders.

Section 11.12. *Successor Agent*.   Each Agent may at any time give notice of its resignation to Lenders and Administrative Borrower.   Upon receipt of any such notice of resignation, Required Lenders shall have the right to appoint a successor Agent, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.   If no such successor shall have been so appointed by Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Agent gives notice of its resignation (or such earlier day as shall be agreed by Required Lenders), then the retiring Agent may on behalf of Lenders (but without any obligation), appoint (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund, or (d) any other Person (other than a natural person), which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States, as a successor Agent.   If no such successor Agent has been effectively appointed within thirty (30) days after the retiring Agent gives notice of its resignation, at the retiring Agent's request, Borrowers agree to use commercially reasonable efforts to (i) assist the retiring Agent in finding a successor agent and (ii) cause a successor Agent meeting the requirements set forth above to accept such appointment.   Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date. The resignation of the retiring Agent shall become effective upon acceptance by a successor of its appointment as Agent or, if a successor has not been appointed by the date which is sixty (60) days after the retiring Agent gives notice of its resignation, on such 60th day after the retiring Agent gives notices of its resignation (the date of effectiveness of the successor appointment or such 60th day, as the case may be, the "**Resignation Effective Date**"), and the Required Lenders shall perform all of the duties of the Agent hereunder until such time, if any, as the Required Lenders appoint a successor as provided for above.   With effect from the Resignation Effective Date, the retiring Agent shall be discharged from all of its duties and obligations hereunder and under the other Financing Documents.   Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Agent (other

than any rights to indemnity payments or other amounts owed to the retiring Agent).  The fees payable by Borrowers to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between Borrowers and such successor.  The provisions of this Agreement shall continue in effect for the benefit of any retiring Agent and its sub-agents after the effectiveness of its resignation hereunder and under the other Financing Documents in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting or was continuing to act as Agent.

Section 11.13. *Disbursements of Term Loans; Payment and Sharing of Payment*.

(a)      *Term Loan Advances, Payments and Settlements; Interest and Fee Payments*.

(i)      On the Closing Date and the Delayed Draw Borrowing Date, Administrative Agent, on behalf of Lenders, may elect to advance to Borrowers the full amount of the New Money Loans to be made on each of the Closing Date and the Delayed Draw Borrowing Date prior to receiving funds from the applicable Lenders, in reliance upon each such Lender's commitment to make its Pro Rata Share of the New Money Loans to Borrowers in a timely manner on such date regardless of whether the conditions precedent set forth in Section 8.01 or Section 8.02, as applicable, are then satisfied, including the existence of any Default or Event of Default either before or after giving effect to the making of such New Money Loans.  Administrative Agent shall be conclusively entitled to assume, for purposes of the preceding sentence, that each Lender will fund its Pro Rata Share of the New Money Loans requested by Borrowers.  Each Lender shall reimburse Administrative Agent on demand, in accordance with the provisions of the next sentence of this paragraph, for all funds disbursed on its behalf by Administrative Agent pursuant to the first sentence of this clause (i), or if Administrative Agent so requests, each Lender will remit to Administrative Agent its Pro Rata Share of the applicable New Money Loan before Administrative Agent disburses the same to Borrowers.  If Administrative Agent elects to advance such New Money Loans to Borrowers in such manner, Administrative Agent shall be entitled to receive all interest that accrues on the Closing Date or the Delayed Draw Borrowing Date, as applicable, on each Lender's Pro Rata Share of New Money Loans unless Administrative Agent receives such Lender's Pro Rata Share of Loans by 4:00 p.m. (New York City time) on the Closing Date or the Delayed Draw Borrowing Date, as applicable.  If Administrative Agent elects to require that each Lender make funds available to Administrative Agent, prior to a disbursement by Administrative Agent to Borrowers, Administrative Agent shall advise each Lender by telephone, facsimile or e-mail of the amount of such Lender's Pro Rata Share of the New Money Loan requested by Borrowers no later than 1:00 p.m. (New York City time) on the Closing Date or the Delayed Draw Borrowing Date, as applicable, and each such Lender shall pay Administrative Agent no later than 2:00 p.m. (New York City time) on such date such Lender's Pro Rata Share of such requested New Money Loan, in same day funds, by wire transfer to the Payment Account, or such other account as may be identified by Administrative Agent to Lenders from time to time.  If any Lender fails to pay the amount of its Pro Rata Share of the New Money Loans within one (1) Business Day after Administrative Agent's demand, Administrative Agent shall promptly notify Administrative Borrower, and Borrower shall immediately repay such amount to Administrative Agent.  Any repayment required by

Borrowers pursuant to this Section 11.13 shall be accompanied by accrued interest thereon from and including the date such amount is made available to Borrowers to but excluding the date of payment at the rate of interest then applicable to New Money Loans which are Base Rate Loans.   Nothing in this Section 11.13 or elsewhere in this Agreement or the other Financing Documents shall be deemed to require Administrative Agent to advance funds on behalf of any Lender or to relieve any Lender from its obligation to fulfill its commitments hereunder or to prejudice any rights that Administrative Agent or Borrowers may have against any Lender as a result of any default by such Lender hereunder.

(ii)     The provisions of this Section 11.13(a) shall be deemed to be binding upon Administrative Agent and Lenders notwithstanding the occurrence of any Default or Event of Default, or any insolvency or bankruptcy proceeding pertaining to Borrower or any other Credit Party.

(b)     *Return of Payments*.

(i)     If an Agent pays an amount to a Lender under this Agreement in the belief or expectation that a related payment has been or will be received by such Agent from Borrowers and such related payment is not received by such Agent, then such Agent will be entitled to recover such amount from such Lender on demand without setoff, counterclaim or deduction of any kind, together with interest accruing on a daily basis at the Federal Funds Rate.

(ii)     If an Agent determines at any time that any amount received by such Agent under this Agreement must be returned to Borrowers or paid to any other Person pursuant to any insolvency Law or otherwise, then, notwithstanding any other term or condition of this Agreement or any other Financing Document, such Agent will not be required to distribute any portion thereof to any Lender.   In addition, each Lender will repay to an Agent on demand any portion of such amount that such Agent has distributed to such Lender, together with interest at such rate, if any, as such Agent is required to pay to Borrowers or such other Person, without setoff, counterclaim or deduction of any kind.

(c)     [Reserved.]

(d)     *Sharing of Payments*.  If any Lender shall obtain any payment or other recovery (whether voluntary, involuntary, by application of setoff or otherwise) on account of any Loan (other than pursuant to the terms of Section 2.04(e)(v) or Section 2.09) in excess of its pro rata share of payments entitled pursuant to the other provisions of this Agreement, such Lender shall purchase from the other Lenders such participations in extensions of credit made by such other Lenders of Loans (without recourse, representation or warranty) as shall be necessary to cause such purchasing Lender to share the excess payment or other recovery ratably with each of them; *provided* that if all or any portion of the excess payment or other recovery is thereafter required to be returned or otherwise recovered from such purchasing Lender, such portion of such purchase shall be rescinded and each Lender which has sold a participation to the purchasing Lender shall repay to the purchasing Lender the purchase price to the ratable extent of such return or recovery, without interest.   Each Borrower agrees that any Lender so purchasing a

105

participation from another Lender pursuant to this clause (d) may, to the fullest extent permitted by Law, exercise all its rights of payment (including pursuant to Section 9.04) with respect to such participation as fully as if such Lender were the direct creditor of Borrower in the amount of such participation.  If under any applicable bankruptcy, insolvency or other similar Law, any Lender receives a secured claim in lieu of a setoff to which this clause (d) applies, such Lender shall, to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights of Lenders entitled under this clause (d) to share in the benefits of any recovery on such secured claim.

Section 11.14. *Right to Perform, Preserve and Protect*.  If any Credit Party or any of its Subsidiaries fails to perform any obligation hereunder or under any other Financing Document, the Agent party to such Financing Document itself may, but shall not be obligated to, after the lapse of any applicable grace period, cause such obligation to be performed at Borrowers' expense. Each Agent is further authorized by Borrowers and Lenders to make expenditures from time to time during the continuance of an Event of Default which such Agent, in its reasonable business judgment, deems necessary or desirable to (a) preserve or protect the Collateral, or any portion thereof and/or (b) enhance the likelihood of, or maximize the amount of, repayment of the Loans and other Obligations, each Borrower hereby agrees to reimburse such Agent on demand for any and all costs, liabilities and obligations incurred by such Agent during the continuance of an Event of Default pursuant to this Section 11.14.  Each Lender hereby agrees to indemnify each Agent upon demand for any and all costs, liabilities and obligations incurred by such Agent pursuant to this Section 11.14, in accordance with the provisions of Section 11.06.

Section 11.15. *Additional Titled Agents*.  With respect to any co-bookrunner, Sole Lead Arranger, syndication agent or any other agent named on the cover page of this Agreement, other than an Agent (collectively, the **"Additional Titled Agents"**), no Additional Titled Agent, in such capacity, has any rights, powers, liabilities, duties or responsibilities hereunder or under any of the other Financing Documents.  Without limiting the foregoing, no Additional Titled Agent shall have nor be deemed to have a fiduciary relationship with any Lender.  At any time that any Lender serving (or whose Affiliate is serving) as an Additional Titled Agent shall have transferred to any other Person (other than any Affiliates) all of its interests in the Loans and in the Commitments, such Person shall be deemed to have concurrently resigned as such Additional Titled Agent.

Section 11.16. *[Reserved]*.

Section 11.17. *Withholding Tax*.   To the extent required by any applicable law, Administrative Agent may deduct or withhold from any payment to any Lender an amount equivalent to any applicable withholding tax.  If the Internal Revenue Service or any authority of the United States or other jurisdiction asserts a claim that Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender (because the appropriate form was not delivered or was not properly executed, or because such Lender failed to notify Administrative Agent of a change in circumstances that rendered the exemption from, or reduction of, withholding tax ineffective, or for any other reason), such Lender shall indemnify and hold harmless Administrative Agent (to the extent that Administrative Agent has not already been reimbursed by Borrower pursuant to Section 2.08 and without increasing or limiting the obligation of Borrower to do so) fully for all amounts paid, directly or indirectly, by

Administrative Agent as Tax or, if any, otherwise, together with all expenses incurred, including legal expenses, allocated staff costs and any out-of-pocket expenses, whether or not such Tax was correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Financing Document against any amount due to Administrative Agent under this Section 11.17. The agreements in this Section 11.17 shall survive the resignation and/or replacement of Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of this Agreement and the repayment, satisfaction or discharge of all other Obligations.

Section 11.18. *Lender ERISA Representation.*

(a)    Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, Administrative Agent and not, for the avoidance of doubt, to or for the benefit of Borrowers or any other Credit Party, that at least one of the following is and will be true:

(i)    such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans or this Agreement;

(ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable, and the conditions of such exemption have been satisfied, with respect to such Lender's entrance into, participation in, administration of and performance of the Loans or this Agreement;

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans or this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans or this Agreement satisfies the requirements of subsections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans or this Agreement; or

(iv)    such other representation, warranty and covenant as may be agreed in writing between Administrative Agent, Borrowers, and such Lender.

(b)    In addition, unless either (1) sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, Administrative Agent and not, for the avoidance of doubt, to or for the benefit of Borrowers or any other Credit Party, that Administrative Agent is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans or this Agreement (including in connection with the reservation or exercise of any rights by Administrative Agent under this Agreement, any Financing Document or any documents related hereto or thereto).

## ARTICLE 12
## MISCELLANEOUS

Section 12.01. *Survival; Release*.

(a)    All agreements, representations and warranties made herein and in every other Financing Document shall survive the execution and delivery of this Agreement and the other Financing Documents.  Such representations and warranties have been or will be relied upon by Administrative Agent and each Lender, regardless of any investigation made by Administrative Agent or any Lender or on their behalf and notwithstanding that Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any credit extensions. This Agreement shall terminate upon the payment in full of all amounts due under this Agreement and all amounts owing to the Lender Parties under the other Financing Documents; *provided* that the provisions of Sections 2.04(e)(iv), 2.04(e)(v), 2.08 and 2.09 and Article 10 and Article 11 and Sections 12.08, 12.09, 12.11 and 12.12 shall survive a Payment in Full (both with respect to any Lender and all Lenders collectively) and any termination of this Agreement.

(b)    Collateral Agent agrees for the benefit of Credit Parties to execute and deliver the releases of Liens and Guarantees which it is authorized to do pursuant to Section 11.09.

Section 12.02. *No Waivers*.  No failure or delay by an Agent or any Lender in exercising any right, power or privilege under any Financing Document shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein and therein provided shall be cumulative and not exclusive of any rights or remedies provided by Law. Any reference in any Financing Document to the "continuing" nature of any Event of Default shall not be construed as establishing or otherwise indicating that Borrowers or any other Credit Party has the independent right to cure any such Event of Default, but is rather presented merely for convenience should such Event of Default be waived in accordance with the terms of the applicable Financing Documents.

Section 12.03. *Notices*.

(a)     All notices, requests and other communications to any party hereunder shall be in writing (including prepaid overnight courier, facsimile transmission, e-mail, electronic submissions or similar writing) and shall be given to such party at its address, facsimile number or e-mail address set forth on Annex B hereto (or, in the case of any such Lender who becomes a Lender after the Closing Date, in an Assignment Agreement or in the register maintained by Administrative Agent pursuant to Section 12.06(a)(iii) or in a notice delivered to Administrative Borrower and Administrative Agent by the assignee Lender forthwith upon such assignment) or at such other address, facsimile number or e-mail address as such party may hereafter specify for the purpose by notice to Administrative Agent and Administrative Borrower; *provided* that notices, requests or other communications shall be permitted by e-mail or other electronic submissions only in accordance with the provisions of Section 12.03(b).  Each such notice, request or other communication shall be effective (i) if given by facsimile, when such notice is transmitted to the facsimile number specified by this Section and the sender receives a confirmation of transmission from the sending facsimile machine, (ii) if given by e-mail or other electronic submissions, as set forth in Section 12.03(c) or (iii) if given by mail, prepaid overnight courier or any other means, when received at the applicable address specified by this Section.

(b)     Notices and other communications to the parties hereto may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites); *provided* that (i) the foregoing shall not apply to notices sent directly to any party hereto if such party has notified Administrative Agent that it has elected not to receive notices by electronic communication (which election may be limited to particular notices) and (ii) no Notices of Borrowing shall be permitted to be delivered or furnished by Borrowers by electronic communication unless made in accordance with specific procedures approved from time to time by Administrative Agent.

(c)     Unless Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor; *provided* that if any such notice or other communication is not sent or posted during normal business hours, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day.

(d)     THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE**.**"  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF BORROWER MATERIALS (AS DEFINED BELOW) OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE

DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH BORROWER MATERIALS OR THE PLATFORM. "**Borrower Materials**" means the information and materials provided by or on behalf of the Credit Parties. To the fullest extent permitted by applicable law, in no event shall Administrative Agent or any of its Related Parties (collectively, the "**Agent Parties**") have any liability to Borrowers, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of Borrowers' or Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the bad faith, gross negligence or willful misconduct of an Agent Party; *provided* that that in no event shall any Agent Party have any liability to Borrowers, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages) arising out of any such transmission.  Borrower hereby acknowledges that certain of the Lenders (each, a "**Public Lender**") may have personnel who do not wish to receive material nonpublic information with respect to any Borrower or its Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market related activities with respect to such Persons' securities.  Each Borrower hereby agrees that (i) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (ii) by marking Borrower Materials "PUBLIC," Borrowers shall be deemed to have authorized Administrative Agent and the Lenders to treat such Borrower  Materials as not containing any material nonpublic information with respect to Borrowers or their securities for purposes of United States Federal and state securities laws; (iii) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information;" and (iv) Administrative Agent shall be entitled to treat any Borrower Material that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information"; *provided* that in the case of clause (iv) above, such Borrower Materials shall be treated as set forth in Section 12.08.

Section 12.04. *Severability*.  In case any provision of or obligation under this Agreement or any other Financing Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

Section 12.05. *Amendments and Waivers*.  No provision of this Agreement or any other Financing Document may be amended, waived or otherwise modified unless such amendment, waiver or other modification is in writing and is signed or otherwise approved by Borrowers and the Required Lenders; *provided* that no such amendment, waiver or other modification shall, unless signed or otherwise approved in writing by each Lender directly affected thereby:

(i)    reduce the principal of, or rate of interest due such Lender with respect to any Loan, reduce any fee to any Lender Party that may be provided for after the Closing Date or forgive any principal or interest with respect to any Loan (other than the default rate of interest which may be waived by the Required Lenders);

(ii)     postpone the date fixed for, or waive, any payment of principal of any Loan under Section 2.03(a) or (b) any interest on any Loan of such Lender or any fee to any Lender Party that may be provided for after the Closing Date or postpone or extend the Maturity Date with respect to any Term Loan;

(iii)    change the definition of the term "Required Lenders" or the percentage of Lenders which shall be required for Lenders to take any other action hereunder;

(iv)    release all or substantially all of the Collateral, authorize any Borrower or any other Credit Party to sell or otherwise dispose of all or substantially all of the Collateral or release any guarantor of all or any portion of the Obligations of its Guarantee obligations with respect thereto, except, in each case with respect to this clause (iv) as otherwise may be provided in this Agreement or the other Financing Documents (including in connection with any disposition permitted hereunder);

(v)     amend, waive or otherwise modify this Section 12.05;

(vi)    change Section 11.13(d) or any similar provision in any Financing Document in a manner that would alter the pro rata sharing or allocation of payments required thereby;

(vii)   consent to the assignment, delegation or other transfer by any Credit Party of any of its rights and obligations under any Financing Document or release Borrowers or any other Loan Party of its payment obligations under any Financing Document, except, in each case with respect to this clause (vii), pursuant to a merger or consolidation or other transaction permitted pursuant to this Agreement;

(viii)  amend, modify or change in any manner any term or condition of the Exit Facility Term Sheet that refers to the consent of all Lenders, without the prior written consent of each Lender;

(ix)    except as provided by operation of any Law, subordinate the Liens granted hereunder or under the other Financing Documents to any other Lien, in each case without the prior written consent of each Lender; or

(x)     except as provided by operation of any Law or otherwise permitted hereunder, amend or modify the Superpriority Claims status of the Obligations under the Orders or under any Financing Document.

*provided*, *further*, that no such amendment, waiver or other modification shall affect the rights or duties of any Agent hereunder or under any other Financing Document without the prior written consent of the affected Agent.  Notwithstanding the foregoing, (A) any Financing Document may be waived, amended, supplemented or modified pursuant to an agreement or agreements in writing entered into by Borrowers and Administrative Agent and/or Collateral Agent (without the consent of any Lender) solely to cure a defect or error, or to effect the grant, perfection or protection of a new or existing Lien for the benefit of the Lender Parties or extend an existing Lien over additional property or so that the Liens thereon comply with applicable law and (B) any fee agreement between Borrowers and an Agent on the Sole Lead Arranger may be

111

amended or waived by an agreement in writing entered into by the parties thereto. Notwithstanding anything to the contrary set forth in this Section 12.05, Required Lenders are authorized, in their sole and absolute discretion, and without the consent of any other Lenders, to waive (x) any and all conditions to the funding of Loans set forth in Section 8.01 or Section 8.02 and/or (y) any Event of Default solely for the purpose of satisfying one or more conditions to the funding of Loans set forth in Section 8.01 or Section 8.02; *provided* that no Lender holding Delayed Draw Commitments shall be required to fund any Delayed Draw Loans to the extent that the Final Order does not approve the Roll-Up without such Lender's consent. Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that the Commitment of such Lender may not be increased without the consent of such Lender (it being understood that any Commitment or Loan held or deemed held by any Defaulting Lender shall be excluded from a vote of the Lenders hereunder requiring any consent of the Lenders, except as provided in Section 2.12(a))

Section 12.06. *Assignments; Participations; Replacement of Lenders.*

(a)     *Assignments.*

(i)     Any Lender may at any time (*provided* that it does not result in a prohibited transaction under ERISA) assign to one or more Eligible Assignees all or any portion of such Lender's Term Loans and interest in its Commitments together with all related obligations of such Lender hereunder; *provided* that no Lender may assign or otherwise transfer (including through participations) its rights or obligations hereunder to a Person that is not a Qualified Purchaser; *provided*, *further*, that no such assignment shall be effective unless and until: (A) Administrative Borrower and Administrative Agent shall have received prior notice of such assignment; (B) (I) unless an Event of Default exists or in the case of any assignment by a Lender to any other Lender (other than a Defaulting Lender), an Affiliate of any Lender (other than a Defaulting Lender) or an Approved Fund, Administrative Borrower shall have given its written consent to such assignment (such consent shall not be unreasonably withheld and shall be deemed given if no objection is provided within five (5) Business Days) and (II) Administrative Agent shall have given its written consent to such assignment; (C) other than in the case of an assignment to an Affiliate or an Approved Fund of such Lender, such assigning Lender shall assign to such Eligible Assignee(s) a pro rata amount of its Loans and Commitments under this Agreement (meaning, for the avoidance of doubt, proportionate amounts of both the New Money Loans and the Roll-Up Loans) and Pre-Petition RBL Loans and Pre-Petition Term Loans (or, in the event such assigning Lender does not hold Prepetition RBL Loans or Pre-Petition Term Loans, such Lender's Affiliate shall assign a pro rata amount of its Pre-Petition RBL Loans and Pre-Petition Term Loans); and (D) except as Administrative Agent may otherwise agree, each such Eligible Assignee shall, upon the effectiveness of such assignment, hold Term Loans or Commitments hereunder and loans or commitments under each of the Facilities which in the aggregate exceed $1,000,000 or, if less, the assignor's entire interests in the Term Loans or Commitments; *provided*, *further*, that, in connection with simultaneous assignments to two or more related Approved Funds, such Approved Funds shall be treated as one assignee for purposes of determining compliance with the minimum assignment size referred to above.  Borrowers

and Administrative Agent shall be entitled to continue to deal solely and directly with such Lender in connection with the interests so assigned to an Eligible Assignee until Administrative Agent shall have received and accepted an effective Assignment Agreement executed, delivered and fully completed by the applicable parties thereto, such other information regarding such Eligible Assignee as Administrative Agent reasonably shall require and a processing fee of $3,500 paid by or on behalf of the assigning Lender; *provided* that only one processing fee shall be payable in connection with simultaneous assignments to two or more related Approved Funds.  Execution and delivery of any Assignment Agreement by the assignee shall constitute a representation and warranty by such assignee to Administrative Agent and Administrative Borrowers that it is an Eligible Assignee and that the assignment does not result in a prohibited transaction under ERISA.   Notwithstanding anything to the contrary herein, Administrative Agent shall have no responsibility for determining whether a Lender is a Qualified Purchaser or whether an assignment is permitted by ERISA, and shall have no liability hereunder if a Lender is not a Qualified Purchaser or if an assignment is a prohibited transaction under ERISA.

(ii)    Subject to recording of the applicable Assignment Agreement by Administrative Agent pursuant to Section 12.06(a)(iii), from and after the date on which the conditions described above have been met, (A) such Eligible Assignee shall be deemed automatically to have become a party hereto and, to the extent of the interests assigned to such Eligible Assignee pursuant to such Assignment Agreement, shall have the rights and obligations of a Lender hereunder and (B) the assigning Lender, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment Agreement, shall be released from its rights and obligations hereunder (other than those that survive termination pursuant to Section 12.01).  Upon the request of the Eligible Assignee (and, as applicable, the assigning Lender) pursuant to an effective Assignment Agreement, Borrowers shall execute and deliver to Administrative Agent, for delivery to the Eligible Assignee (and, as applicable, the assigning Lender) Notes, if any, in the aggregate principal amount of the Eligible Assignee's percentage interest in the Term Loans (and, as applicable, Notes, if any, in the principal amount of that portion of the Term Loans retained by the assigning Lender), and the assigning Lender shall mark the predecessor Notes "exchanged" and deliver them to Borrower.

(iii)    Administrative Agent, acting solely for this purpose as a non-fiduciary agent of Borrowers, shall maintain at Administrative Agent's office a copy of each Assignment Agreement delivered to it and a register (the "**Register**") for the recordation of the names and addresses of each Lender, and the commitments of, and principal amount (and stated interest) of the Loans owing to, such Lender pursuant to the terms hereof.  The entries in such register shall be conclusive, and Borrowers, Administrative Agent and Lenders shall treat each Person whose name is recorded therein pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  Such register shall be available for inspection by Administrative Borrower and any Lender (with respect to its own interest only), at any reasonable time upon reasonable prior notice to Administrative Agent.

(iv)     Notwithstanding the foregoing provisions of this Section 12.06(a) or any other provision of this Agreement, any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or any other central bank having jurisdiction over such Lender; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(v)     Notwithstanding the foregoing provisions of this Section 12.06(a) or any other provision of this Agreement, Administrative Agent has the right, but not the obligation, to effectuate assignments of Term Loans via an electronic settlement system acceptable to Administrative Agent as designated in writing from time to time to Lenders by Administrative Agent (the "**Settlement Service**").  At any time when Administrative Agent elects, in its sole discretion, to implement such Settlement Service, each such assignment shall be effected by the assigning Lender and proposed assignee pursuant to the procedures then in effect under the Settlement Service, which procedures shall be consistent with the other provisions of this Section 12.06(a), and each such proposed assignee so effectuating such an assignment shall be deemed to have made all of the representations and warranties of an "Assignee" pursuant to an Assignment Agreement as though it were a signatory thereto.  Each assigning Lender and proposed Eligible Assignee shall comply with the requirements of the Settlement Service in connection with effecting any assignment of Term Loans pursuant to the Settlement Service.  With the prior approval of Administrative Agent, Administrative Agent's approval of such Eligible Assignee shall be deemed to have been automatically granted with respect to any transfer effected through the Settlement Service.  Assignments and assumptions of the Term Loans shall be effected by the provisions otherwise set forth herein until Administrative Agent notifies Lenders of the Settlement Service as set forth herein.

(b)     *Participations.*  Subject to the condition set forth in the first proviso to Section 12.06(a)(i), any Lender may at any time, without the consent of, or notice to, Borrowers or Administrative Agent (provided it does not result in a prohibited transaction under ERISA) sell to one or more Persons (other than a natural person, a Defaulting Lender any Borrower or any of Borrowers' Affiliates or Subsidiaries) participating interests in its Term Loans or other interests hereunder (any such Person, a "**Participant**"); *provided* that other than in the case of a sale to an Affiliate or an Approved Fund of such Lender, each such participant purchases a pro rata participation in all of the Loans and Commitments of such Lender under this Agreement (meaning, for the avoidance of doubt, proportionate amounts of both the New Money Loans and the Roll-Up Loans) and Pre-Petition RBL Loans and Pre-Petition Term Loans.  In the event of a sale by a Lender of a participating interest to a Participant; (i) such Lender's obligations hereunder shall remain unchanged for all purposes; (ii) Borrower and Administrative Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations hereunder; and (iii) Borrower shall not be required to pay any amount under any Financing Document that is greater than the amount which it would have been required to pay had no such participating interest been sold.  No Participant shall have any direct or indirect voting rights hereunder except it may be granted indirect voting rights with respect to any event

described in the first proviso contained in Section 12.05 expressly requiring the vote of each Lender affected thereby (but only to the extent such Participant is affected thereby).

Each Lender that sells a participation shall, acting solely for this purpose as a nonfiduciary agent of Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each participant's interest in the Loans or other obligations under this Agreement (the "**Participant Register**").  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  No Lender shall be required to disclose a Participant Register or any information contained therein (including the identity of a Participant or the terms of the participation) except to the extent such disclosure is required to establish that any Obligations are in registered form for U.S. Federal income tax purposes.  Except as required in connection with a tax audit or other tax proceeding or as otherwise required by a Governmental Authority, any disclosure required by the foregoing sentence shall be made by the relevant Lender directly and solely to the Internal Revenue Service or other applicable Governmental Authority.

(c)      *Borrower Assignments*.  No Borrower may assign, delegate or otherwise transfer any of its rights or other obligations hereunder or under any other Financing Document without the prior written consent of Administrative Agent and each Lender.

Section 12.07. *Headings*.   Headings and captions used in the Financing Documents (including the Exhibits, Schedules and Annexes hereto and thereto) are included for convenience of reference only and shall not be given any substantive effect.

Section 12.08. *Confidentiality*.   With respect to all Information heretofore or hereafter obtained by any Lender Party pursuant to the requirements hereof or otherwise in connection with any of the Financing Documents (including written, oral and electronic communications), each Lender Party shall take all normal and reasonable precautions to keep such Information confidential except that disclosure of such Information may be made (a) on a confidential need-to-know basis to those of their respective agents, employees, Subsidiaries, Affiliates, attorneys, auditors and other professional consultants who are involved in the administration of this Agreement and the transactions contemplated hereby, (b) to prospective transferees, pledgees or purchasers of any interest in the Loans, in each case in accordance with Section 12.06 or to actual or prospective party (or its managers, administrators, trustees, partners, directors, officers, employees, agents, advisors and other representatives) to any swap, derivative or other transaction under which payments are to be made by reference to any Credit Party and its obligations, this Agreement or payments hereunder and to any insurers of any Lenders; *provided* that any such Persons shall have agreed in writing for the benefit of the Credit Parties and their respective Affiliates to be bound by the provisions of this Section 12.08 as though a party hereto or pursuant to a confidentiality agreement with terms substantially similar, (c) as required by Law, subpoena, judicial order or similar compulsory legal order (based on advice of legal counsel) and in connection with any litigation; *provided* that (i) in the event of any such subpoena or order, any disclosing Person shall give prompt notice thereof (to the extent permitted by applicable law), and cooperate with Borrowers or any Affiliate of Borrowers which is the subject of the disclosure, in securing a protective order and (ii) any disclosure made

pursuant to any public filing shall to the extent practicable be made after prior written notice, and an opportunity to comment on such disclosure, is given to Administrative Borrower, (d) as may be required in connection with any regulatory examination or oversight, any audit or any similar investigation of such Person or its Affiliates, (e) as may otherwise be deemed necessary to be disclosed, in connection with any litigation to which such Person is a party or to the extent such Person determines such disclosure to be necessary or appropriate in the enforcement of or the protection of its rights and remedies under the Financing Documents during the continuance of an Event of Default; *provided* that, to the extent practicable and unless otherwise prohibited by applicable Law, any Person disclosing Information pursuant to this clause (e) shall use its reasonable commercial efforts to give Administrative Borrower at least five (5) Business Days' prior written notice of disclosure, (f) to a Person that is a trustee, investment advisor, collateral manager, servicer, noteholder or secured party in a Securitization (as hereinafter defined) in connection with the administration, servicing and reporting on the assets serving as collateral for such Securitization; *provided* that any such Persons shall have agreed in writing for the benefit of the Credit Parties and their respective Affiliates to be obligated to maintain the confidentiality of such Information to the same extent as is imposed on the disclosing Person by the provisions of this Section 12.08, (g) with Administrative Borrower's prior written consent, (h) in connection with any pledge or assignment permitted under Section 12.06(a)(iv) or (i) to the Bankruptcy Court in connection with the approval of the Transactions contemplated hereby.  For the purposes of this Section, "**Securitization**" shall mean a public or private offering by a Lender or any of its Affiliates of Capital Stock which represent an interest in, or which are collateralized, in whole or in part, by the Loans.  "**Information**" means any and all information regarding any of the Credit Parties and their respective Affiliates, or regarding any of the businesses of the Credit Parties and their respective Affiliates, other than information that either (i) is in the public domain, or becomes part of the public domain after disclosure to such Person without breach of this Section 12.08, or (ii) is disclosed to such Person by a Person other than (A) a Credit Party or an Affiliate of a Credit Party or (B) a Beneficiary who received such information from a Credit Party or an Affiliate of a Credit Party (or by any representative or agent of a Credit Party or any such Affiliate or any such Beneficiary); *provided* that Administrative Agent and the recipient of such information do not have knowledge that such Person is prohibited from disclosing such information.  The obligations of Lender Parties under this Section 12.08 shall supersede and replace the obligations of Administrative Agent, Collateral Agent and Lenders under any confidentiality agreement in respect of this financing executed and delivered by Administrative Agent, Collateral Agent or any Lender prior to the date hereof.

Section 12.09. *Waiver of Consequential and Other Damages*.  To the fullest extent permitted by applicable Law, no Borrower shall not assert, and each hereby waives, any claim against any Indemnitee, and no Lender Party shall assert, and each hereby waives, any claim against any Credit Party or any Affiliate of a Credit Party, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of this Agreement, any other Financing Document or any agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnitee, and none of the Credit Parties or any Affiliate of a Credit Party, shall be liable for any damages arising from the use by unintended recipients of any information or other materials obtained without authorization through telecommunications, electronic or other information transmission systems, except to the

extent of any such Person's bad faith, gross negligence or willful misconduct, and each Lender Party will take reasonable precautions to prevent any such unauthorized use.

Section 12.10. *Marshaling; Payments Set Aside*.  No Lender Party shall be under any obligation to marshal any assets in payment of any or all of the Obligations.  To the extent that any Borrower makes any payment or Collateral Agent enforces its Liens or any Lender Party exercises its right of set-off, and such payment or the proceeds of such enforcement or set-off is subsequently invalidated, declared to be fraudulent or preferential, set aside, or required to be repaid by anyone, then to the extent of such recovery, the Obligations or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefore, shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or set-off had not occurred.

Section 12.11. *GOVERNING LAW; SUBMISSION TO JURISDICTION*.  THIS AGREEMENT, EACH NOTE AND EACH OTHER FINANCING DOCUMENT, AND ALL MATTERS RELATING HERETO OR THERETO OR ARISING THEREFROM (WHETHER SOUNDING IN CONTRACT LAW, TORT LAW OR OTHERWISE), SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.  TO THE EXTENT PERMITTED BY LAW, BORROWER HEREBY CONSENTS TO THE JURISDICTION OF THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT HAVE, OR ABSTAINS FROM, JURISDICTION, ANY STATE OR FEDERAL COURT LOCATED WITHIN THE BOROUGH OF MANHATTAN, CITY OF NEW YORK, STATE OF NEW YORK AND APPELLATE COURTS FROM EITHER OF THEM AND IRREVOCABLY AGREES THAT, SUBJECT TO ADMINISTRATIVE AGENT'S ELECTION, ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER FINANCING DOCUMENTS SHALL BE LITIGATED IN SUCH COURTS.  TO THE EXTENT PERMITTED BY LAW, EACH BORROWER EXPRESSLY SUBMITS AND CONSENTS TO THE JURISDICTION OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS.  TO THE EXTENT PERMITTED BY LAW, EACH BORROWER HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON ANY BORROWER BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO SUCH BORROWER AT THE ADDRESS SET FORTH IN THIS AGREEMENT, OR AS OTHERWISE DESIGNATED IN ACCORDANCE WITH 12.03, AND THAT SERVICE SO MADE SHALL BE COMPLETE 10 DAYS AFTER THE SAME HAS BEEN POSTED.

Section 12.12. *WAIVER OF JURY TRIAL*.  EACH BORROWER AND EACH LENDER PARTY EACH HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THE FINANCING DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY) AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. EACH BORROWER AND EACH LENDER PARTY EACH ACKNOWLEDGES THAT THIS

WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THE OTHER FINANCING DOCUMENTS, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS.  EACH BORROWER AND EACH LENDER PARTY EACH WARRANTS AND REPRESENTS THAT EACH HAS HAD THE OPPORTUNITY OF REVIEWING THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS AND WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO AVOID THE FOREGOING WAIVER.

Section 12.13. *Publication; Advertisement.*

(a) *Publication.*  Borrowers will take all normal and reasonable precaution so as not to directly or indirectly publish, disclose or otherwise use in any public disclosure, advertising material, promotional material, press release or interview, any reference to the name, logo or any trademark of Administrative Agent or any of its Affiliates or any reference to this Agreement or the financing evidenced hereby, in any case except (a) as required by Law, subpoena or judicial or similar compulsory legal order; *provided* that (i) in the event of any such subpoena or order, any disclosing Person shall give prompt notice thereof and cooperate with the applicable Person which is the subject of the disclosure; in securing a protective order and (ii) any disclosure made pursuant to any public filing shall to the extent practicable be made after prior written notice, and an opportunity to comment on such disclosure, is given to Administrative Agent, or (b) with Administrative Agent's prior written consent.

(b) *Advertisement.*  Each Lender Party and each Borrower hereby authorizes Administrative Agent, subject to Administrative Borrower's prior consent (not to be unreasonably withheld or delayed), to publish at Administrative Agent's expense the name of such Lender Party and Borrower, the existence of the financing arrangements referenced under this Agreement, the primary purpose of those arrangements, the amount, form and tenor of credit extended under each facility, the title and role of each party to this Agreement, and the total amount of the financing evidenced hereby in any "tombstone", comparable advertisement or press release which Administrative Agent elects to submit for publication.  In addition, each Lender Party and each Borrower agrees that Administrative Agent, subject to Administrative Borrower's prior consent (not to be unreasonably withheld or delayed), may provide lending industry trade organizations with information necessary and customary for inclusion in league table measurements after the Closing Date.  With respect to any of the foregoing, Administrative Agent shall provide Borrowers with an opportunity to review and confer with Administrative Agent regarding, and to approve as aforesaid, the contents of any such tombstone, advertisement or information, as applicable, prior to its submission for publication and, following such review period and upon obtaining Administrative Borrower's consent as aforesaid, Administrative Agent may, from time to time, republish such information in any media form desired by Administrative Agent, until such time that Administrative Borrower shall have requested Administrative Agent to cease any such further publication.

Section 12.14. *Counterparts; Integration*.  This Agreement and the other Financing Documents may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

Signatures by facsimile or other electronic submission shall bind the parties hereto.  THIS AGREEMENT AND THE OTHER FINANCING DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES HERETO AND THERETO AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.   THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

Section 12.15. *No Strict Construction*.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

Section 12.16. *USA PATRIOT Act Notification*.  Administrative Agent (for itself and not on behalf of any Lender) and each Lender hereby notifies Borrowers that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record certain information and documentation that identifies each Credit Party, which information includes the name and address of each Credit Party and such other information that will allow Administrative Agent or such Lender, as applicable, to identify each Credit Party in accordance with the USA PATRIOT Act.  Each Borrower shall, promptly following a request by Administrative Agent or any Lender, provide all documentation and other information that Administrative Agent or such Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

Section 12.17. *No Fiduciary Duty*.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Financing Document), each Borrower acknowledges and agrees that: (a) (i) the arranging and other services regarding and providing of credit under this Agreement provided by Agents and the Lenders are arm's-length commercial transactions between Borrowers and their respective Affiliates, on the one hand, and the Agents, the Sole Lead Arranger and the Lenders, on the other hand, (ii) Borrowers have consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (iii)  each Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Financing Documents; (b)(i) the Agents and each Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for any Borrower and (ii) neither the Agents, the Sole Lead Arranger nor any Lender has any obligation to Borrowers or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Financing Documents; and (c) the Agents, the Sole Lead Arranger and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of Borrowers and their respective Affiliates, and neither the Agents, the Sole Lead Arranger nor any Lender has any obligation to disclose any of such interests to Borrowers or their respective Affiliates.  To the fullest extent permitted by law, each Borrower hereby waives and releases any claims that it may have against the Agents and the Lenders with

respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 12.18. *EXCULPATION PROVISIONS*.  EACH OF THE PARTIES HERETO SPECIFICALLY AGREES THAT IT HAS A DUTY TO READ THIS AGREEMENT AND THE OTHER FINANCING DOCUMENTS AND AGREES THAT IT IS CHARGED WITH NOTICE AND KNOWLEDGE OF THE TERMS OF THIS AGREEMENT AND THE OTHER FINANCING DOCUMENTS; THAT IT HAS IN FACT READ THIS AGREEMENT AND IS FULLY INFORMED AND HAS FULL NOTICE AND KNOWLEDGE OF THE TERMS, CONDITIONS AND EFFECTS OF THIS AGREEMENT; THAT IT HAS BEEN REPRESENTED BY INDEPENDENT LEGAL COUNSEL OF ITS CHOICE THROUGHOUT THE NEGOTIATIONS PRECEDING ITS EXECUTION OF THIS AGREEMENT AND THE OTHER FINANCING DOCUMENTS; AND HAS RECEIVED THE ADVICE OF ITS ATTORNEY IN ENTERING INTO THIS AGREEMENT AND THE OTHER FINANCING DOCUMENTS; AND THAT IT RECOGNIZES THAT CERTAIN OF THE TERMS OF THIS AGREEMENT AND THE OTHER FINANCING DOCUMENTS RESULT IN ONE PARTY ASSUMING THE LIABILITY INHERENT IN SOME ASPECTS OF THE TRANSACTION AND RELIEVING THE OTHER PARTY OF ITS RESPONSIBILITY FOR SUCH LIABILITY.  EACH PARTY HERETO AGREES AND COVENANTS THAT IT WILL NOT CONTEST THE VALIDITY OR ENFORCEABILITY OF ANY EXCULPATORY PROVISION OF THIS AGREEMENT AND THE OTHER FINANCING DOCUMENTS ON THE BASIS THAT THE PARTY HAD NO NOTICE OR KNOWLEDGE OF SUCH PROVISION OR THAT THE PROVISION IS NOT "CONSPICUOUS".

Section 12.19. *[Reserved]*.

Section 12.20. *Acknowledgement and Consent to Bail-In of EEA Financial Institutions*. Notwithstanding anything to the contrary in any Financing Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an EEA Financial Institution arising under any Financing Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender that is an EEA Financial Institution; and

(b)     the effects of any Bail-In Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Financing Document; or

(iii)     the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

Section 12.21. *Waiver of Notices, etc*.  Each Borrower hereby expressly waives:

(a)     demand, presentment, protest and notice of protest and notice of dishonor with respect to any and all instruments and chattel paper, included in or evidencing any of the Obligations or the Collateral, and any and all other demands and notices of any kind or nature whatsoever with respect to the Obligations, the Collateral and this Agreement, except such as are expressly provided for herein.  No notice to or demand on any Credit Party which Administrative Agent or any Lender may elect to give shall entitle any Credit Party to any other or further notice or demand in the same, similar or other circumstances; and

(b)     any right that the any Credit Party may have to seek authority (i) to use cash collateral of Administrative Agent, the Lenders or any other Lender Party under Section 363 of the Bankruptcy Code, (ii) to obtain post-petition loans or other financial accommodations, other than from Administrative Agent and the Lenders, pursuant to Sections 364(c) or (d) of the Bankruptcy Code without the prior written consent of the Required Lenders, (iii) to challenge, contest or otherwise seek to impair or object to the validity, extent, enforceability or priority of Administrative Agent's post-petition liens and claims, (iv) to challenge the application of any payments or collections received by Administrative Agent, the Lenders or any other Lender Party to the obligations of the Credit Parties as provided for herein, (v) to propose or support a plan of reorganization that is not in form and substance satisfactory to the Required Lenders, or (vi) to seek relief under the Bankruptcy Code, including without limitation, under Section 105, to the extent any such relief would in any way restrict or impair the rights and remedies of Administrative Agent, any Lender or other Lender Party as provided herein, any financing agreement or the Orders.

Section 12.22. *Orders.*   The Credit Parties, the Administrative Agent, the Collateral Agent and the Lenders hereby expressly agree that in the event of any conflict between this Agreement and the Orders, the Orders shall control.

Section 12.23. *Acknowledgement Regarding Any Supported QFCs*.  To the extent that the Financing Documents provide support, through a guarantee or otherwise, for any Swap Contract or any other agreement or instrument that is a QFC (such support, "**QFC Credit Support**", and each such QFC, a "**Supported QFC**"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "**U.S. Special Resolution Regimes**") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Financing Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States): In the event a Covered Entity that is party to a Supported QFC (each, a "**Covered Party**") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit

Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Financing Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Financing Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, each of the undersigned have executed this Agreement as of the date first above written.

**SHERIDAN HOLDING COMPANY II, LLC**

By: Sheridan Production Partners Manager, LLC, with respect to its Series II, its manager

By:_____
Name: Aaron K. Skidmore
Title: Vice President and Chief Financial Officer

**SHERIDAN PRODUCTION PARTNERS II-A, L.P.**

By: Sheridan Production Partners II, LLC, its general partner

By: Sheridan Production Partners Manager, LLC, with respect to its Series II, its manager

By:_____
Name: Aaron K. Skidmore
Title: Vice President and Chief Financial Officer

**SHERIDAN PRODUCTION PARTNERS II-M, L.P.**

By: SPP II-M GP, LLC, its general partner

By: Sheridan Production Partners Manager, LLC, with respect to its Series II, its manager

By:_____
Name: Aaron K. Skidmore
Title: Vice President and Chief Financial Officer

**SHERIDAN INVESTMENT PARTNERS II, L.P.**

By: Sheridan Investment Partners II GP, LLC, its general partner

By: Sheridan Production Partners Manager, LLC, with respect to its Series II, its manager


By: _____
Name: Aaron K. Skidmore
Title: Vice President and Chief Financial Officer

**BANK OF AMERICA, N.A.,**
as Administrative Agent and Collateral Agent


By:_____
Name:
Title:

**[NAME OF LENDER],**
as a Lender

By:_____
Name:
Title:

[*for Lenders requiring two signature blocks*]


By:_____
Name:
Title:

**ANNEX A**

**Commitment Annex**

| Lender | Initial Commitment | Delayed Draw Commitment |
|---|---|---|
| [                ] | $[              ] | $[                ] |
| TOTAL | $28,000,000 | $22,000,000 |

**ANNEX B**

**Notice Addresses**

<u>Borrower</u>:

Sheridan Production Partners II-A, L.P.
1360 Post Oak Boulevard, Suite 2500
Houston, Texas 77056
Attention: General Counsel
Telephone: (713) 548-1000

with a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
609 Main Street
Houston, TX 77002
Attention:     Mary Kogut Brawley
Facsimile:     (713) 836-3601
E-mail:        <u>mary.kogut@kirkland.com</u>

<u>Administrative Agent</u>:

<u>Administrative Agent's Office</u>
(for payments and requests for New Money Loans, continuations and conversions):

Bank of America, N.A.
2380 PERFORMANCE DR
BUILDING C
Mailcode: <u>TX2-984-03-23</u>
RICHARDSON, TX, 75082
Attention: Karen Renee Puente
Telephone: 1.469.201.8912
Facsimile: 1.214.290.8378
Email: <u>karen.r.puente@bofa.com</u>

USD Payment Instructions:
Bank of America, N.A.
ABA # 026009593
New York, NY
Account #: 1366072250600
Attn: Wire Clearing Acct for Syn Loans - LIQ

<u>Other Notices as Administrative Agent and Collateral Agent</u>:
Bank of America, N.A.
Agency Management
222 Broadway, 14th Floor
Mail Code: NY3-222-14-03

Annex B-1

New York, New York 10038
Attention: Don B. Pinzon
Telephone: 646.556.3280
Facsimile: 212.901.7843
Electronic Mail: don.b.pinzon@bofa.com

**ANNEX 9.1**

**[Attached]**

**ANNEX 9.1**

**Certain Statements and Events**

A.    *Statements*

1.    *Existence and Power.*  Each of Partnership B and each Net Profits Interest Grantor is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has the same legal name as it appears in such Person's Organizational Documents and an organizational identification number (if any), and has all powers and all governmental licenses, authorizations, registrations, permits, consents and approvals required under all applicable Laws in order to own its assets and to carry on its business as now conducted (collectively, "**Partnership Permits**"), except where the failure to have such Partnership Permits could not reasonably be expected to have a Partnership B Material Adverse Effect.  Each of Partnership B and each Net Profits Interest Grantor is qualified to do business as a foreign entity and is in good standing in each jurisdiction in which it is required to be so qualified, except where the failure to be so qualified and in good standing could not reasonably be expected to have a Partnership B Material Adverse Effect.

2.    *Authorization; No Contravention.*  Subject to the entry of the Orders and the terms thereof, the execution, delivery and performance by each of Partnership B and each Net Profits Interest Grantor of the Transaction Documents to which it is a party are within its powers, have been duly authorized by all necessary action pursuant to its Organizational Documents, and require no further action by or in respect of, or filing with, any Governmental Authority, and do not violate, conflict with or cause a breach or a default under (i) any of the Organizational Documents of such Person or (ii) any Law or any agreement or instrument binding upon such Person, except for such violations, conflicts, breaches or defaults with respect to this clause (ii) as could not reasonably be expected to have a Partnership B Material Adverse Effect.

3.    *Validity and Enforceability.*  Subject to the entry of the Orders and the terms thereof, each of the Transaction Documents to which Partnership B or any Net Profits Interest Grantor is a party constitutes a valid and binding agreement or instrument of such Person, enforceable against such Person in accordance with its respective terms, except as the enforceability thereof may be limited by bankruptcy, insolvency or other similar laws relating to the enforcement of creditors' rights generally (in each case, other than with respect to any Debtors) and by general equitable principles.

4.    *Subsidiaries.*  Partnership B has no Subsidiaries.

5.    *Financial Information.*

(a)    The Partnership B Financial Statements for the Fiscal Year ending December 31, 2018, the Fiscal Quarter ending March 31, 2019 and the most recent Partnership B Financial Statements, fairly present in all material respects, in conformity with GAAP, the financial position of Partnership B as of the date thereof and its results of operations, changes in partners' equity (or comparable calculation) and cash flows for the period reflected therein (subject, in the case of interim or unaudited financial statements to changes resulting from audit and normal year-end

adjustments and the absence of footnote disclosures).  As of the date of such Partnership B Financial Statements, Partnership B had no material liabilities, contingent or otherwise, including liabilities for taxes, long term leases or forward or long term commitments, which are not properly reflected on such balance sheet in accordance with GAAP as aforesaid.

(b)     Since December 31, 2018, there has been no Partnership B Material Adverse Effect.

6.     *Litigation.*  Except for the Cases, there is no Litigation pending or, to the knowledge of Borrowers or Partnership B, threatened against Partnership B or any Net Profits Interest Grantor or the subject of which is any Subject Property, including any action challenging or otherwise pertaining to any Net Profits Interest Grantor's title to any Subject Property or Partnership B's title to any Net Profits Interest (including rights to produce and sell oil and gas therefrom), in each case which could reasonably be expected to have a Partnership B Material Adverse Effect.

7.     *Ownership of Property Generally.*

(a)     Partnership B is the lawful owner of, has good and defensible title to and is in lawful possession of, or has valid leasehold interests or other rights in, all properties and assets (real or personal, tangible, intangible or mixed) necessary to carry out its business as presently conducted and as presently proposed to be conducted hereafter, free and clear of Liens other than Permitted Liens.  Partnership B possesses all licenses, permits, franchises, patents, copyrights, trademarks and trade names, and other intellectual property (or otherwise possesses the right to use such intellectual property without violation of the rights of any other Person) that are necessary to carry out its business as presently conducted and as presently proposed to be conducted hereafter, and Partnership B is not in violation in any material respect of the terms under which it possesses such intellectual property or the right to use such intellectual property except, in each case, where such failure to so possess any such property or such violation could not reasonably be expected to have a Partnership B Material Adverse Effect.

(b)     Each Net Profits Interest Grantor possesses all licenses, permits, franchises, patents, copyrights, trademarks and trade names, and other intellectual property (or otherwise possesses the right to use such intellectual property without violation of the rights of any other Person) that are necessary to carry out its respective business as presently conducted and as presently proposed to be conducted hereafter, and no Net Profits Interest Grantor is in violation in any material respect of the terms under which it possesses such intellectual property or the right to use such intellectual property except, in each case, where such failure to so possess any such property or such violation could not reasonably be expected to have a Partnership B Material Adverse Effect.

8.     *No Default.*  Other than violations arising as a result of the commencement of the Cases and except as otherwise excused by the Bankruptcy Court, neither Partnership B nor any Net Profits Interest Grantor is in breach or default under or with respect to any contract, agreement, lease or other instrument to which it is a party or by which its property is bound or affected, which breach or default could reasonably be expected to have a Partnership B Material Adverse Effect.

9.     *Investment Company Act.*  Partnership B is not an "investment company" or a company "controlled" by an "investment company" or a "subsidiary" of an "investment company", all within the meaning of the Investment Company Act of 1940.

10.     *Compliance with Laws; Anti-Terrorism Laws.*

(a)     Each of Partnership B and each Net Profits Interest Grantor is in compliance with the requirements of all applicable Laws, except for such non-compliance as would not reasonably be expected to have a Partnership B Material Adverse Effect or such compliance is excused by the Bankruptcy Court.

(b)     Partnership B (i) is not in violation of any Anti-Terrorism Law, (ii) does not engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti- Terrorism Law, (iii) is not a Blocked Person, (iv) is not acting nor will act for or on behalf of a Blocked Person, (v) is not associated with, nor will become associated with, a Blocked Person or (vi) is not providing, nor will provide, material, financial or technical support or other services to or in support of acts of terrorism of a Blocked Person. Partnership B is not, to the knowledge of Partnership B and any agents of Partnership B acting or benefiting in any capacity in connection with the Transactions, (A) conducting any business or engaging in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person, or (B) dealing in, or otherwise engaging in any transaction relating to, any property or interest in property blocked pursuant to Executive Order No. 13224, any similar executive order or other Anti-Terrorism Law.

11.     *Taxes/Ad Valorem and Severance Taxes.*

(a)     All material Federal, state and local tax returns, reports and statements required to be filed by or on behalf of Partnership B have been filed with the appropriate Governmental Authorities in all jurisdictions in which such returns, reports and statements are required to be filed and, except to the extent subject to a Permitted Contest, all material taxes (including real property taxes) and other material charges shown thereon to be due and payable in respect thereof have been timely paid prior to the date on which any fine, penalty, interest, late charge or loss may be added thereto for nonpayment thereof.  Except to the extent subject to a Permitted Contest, all material state and local sales and use taxes required to be paid by Partnership B have been paid.  Without limiting the foregoing, all material Federal and state returns have been filed by Partnership B for all periods for which returns were due with respect to employee income tax withholding, social security and unemployment taxes, and, except to the extent subject to a Permitted Contest, the amounts shown thereon to be due and payable have been paid in full or adequate provisions therefor have been made.  There is no audit, examination or investigation involving Partnership B by any taxing authority or any other tax-related administrative or judicial proceeding involving Partnership B currently pending, being conducted or, to Partnership B's knowledge, proposed or threatened with respect to any material taxes or material tax return of or with respect to Partnership B.

(b)     Except to the extent subject to a Permitted Contest, Partnership B has paid and discharged all material ad valorem taxes which are due and payable and are assessed against the Net Profits Interests or any part thereof and all material production, severance and other taxes assessed against, or measured by, the production or the value, or proceeds, of the production therefrom.

(c)       With respect to any U.S. federal income tax audit, examination, adjustment or proceeding relating to Partnership B by any taxing authority or any other tax-related administrative or judicial proceeding relating to Partnership B, Partnership B shall, and shall cause its designated partnership representative and its "designated individual" (within the meaning of Treasury Regulations Section 301.6223-1(b)(3)), if any, to, timely make Push-Out Election and take all actions necessary to effect such election, to the extent permitted by applicable Law.   Without limiting the foregoing, prior to entry of the Final Order (or such later date as agreed to by each Lender), Partnership B shall enter into a binding agreement with the "partnership representative" that it will designate pursuant to Section 6223 of the Code with respect to its 2018 taxable year (the "**Partnership B Representative**") and the "designated individual" (within the meaning of Treasury Regulations Section 301.6223-1(b)(3)), if any, that it will designate with respect to its 2018 taxable year (the "**Partnership B Designated Individual**") that requires the Partnership B Representative and the Partnership B Designated Individual to timely make a Push-Out Election and take all actions necessary to effect such election, to the extent permitted by applicable Law, with respect to any U.S. federal income tax audit, examination, adjustment or proceeding relating to Partnership B by any taxing authority or any other tax-related administrative or judicial proceeding relating to Partnership B with respect to such Partnership B's 2018 taxable year and all subsequent taxable years. Partnership B shall deliver notice to the Administrative Agent within ten (10) days of its entry into such agreement along with an executed copy of the agreement.   Unless each Lender (or the Administrative Agent on behalf of the Lenders) agrees otherwise, Partnership B shall not designate a partnership representative that is not the Partnership B Representative or a designated individual that is not the Partnership B Designated Individual for any taxable year (including following a termination of the designation of the Partnership B Representative or the Partnership B Designated Individual) unless, on or prior to the effective date of such designation, Partnership B has entered into such an agreement with such partnership representative or designated individual, as the case may be, and shall deliver notice to the Administrative Agent within ten (10) days of its entry into such an agreement along with an executed copy of the agreement.  The terms of this  clause (c) shall survive the termination of this Agreement.

12.      *Compliance with ERISA.*

(a)       Each Partnership B ERISA Plan (and the related trusts and funding agreements) complies in form and in operation with, has been administered in compliance with, and the terms of each Partnership B ERISA Plan satisfy, the applicable requirements of ERISA and the Code in all material respects.   Each Partnership B ERISA Plan which is intended to be qualified under Section 401(a) of the Code is so qualified, and the IRS has issued a favorable determination letter (or an application for such letter is currently being processed by the IRS with respect thereto) or an opinion letter (in the case of a prototype plan) with respect to each such Partnership B ERISA Plan which may be relied on currently.  Partnership B has not incurred liability for any material excise tax under any of Sections 4971 through 5000 of the Code.

(b)       No steps have been taken to terminate any Partnership B Pension Plan and no contribution failure has occurred with respect to any Partnership B Pension Plan sufficient to give rise to a Lien under Section 303(k) of ERISA.   No condition exists or event or transaction has occurred with respect to any Partnership B Pension Plan which could result in the incurrence by Partnership B of any material liability, fine or penalty.   Partnership B has not incurred liability to the PBGC (other than for current premiums) with respect to any Partnership B Pension Plan.   All

contributions (if any) have been made on a timely basis to any Partnership B Multiemployer Plan that are required to be made by Partnership B or any other member of the Partnership B Controlled Group under the terms of the plan or of any collective bargaining agreement or by applicable Law. Neither Partnership B nor any member of the Partnership B Controlled Group has withdrawn or partially withdrawn from any Partnership B Multiemployer Plan, incurred any withdrawal liability with respect to any such plan or received notice of any claim or demand for withdrawal liability or partial withdrawal liability from any such plan, and no condition has occurred which, if continued, could result in a withdrawal or partial withdrawal of Partnership B from any such plan, and neither Partnership B nor any member of the Partnership B Controlled Group has received any notice described in Section 4245(e) of ERISA from any Partnership B Multiemployer Plan in critical status, that increased contributions may be required to avoid a reduction in plan benefits or the imposition of any excise tax, that any such plan is or has been funded at a rate less than that required under Section 412 of the Code, that any such plan is or may be terminated.

(c)        As of the Closing Date and throughout the term of this Agreement, Partnership B is not using "plan assets" (within the meaning of 29 C.F.R. 2510.3-101, as modified by Section 3(42) of ERISA) in connection with the Loans.

13.        *Compliance with Environmental Laws.*   Except in each case as could not reasonably be expected to have a Partnership B Material Adverse Effect:

(a)        no Hazardous Materials are located on any properties now or previously owned, leased or operated by any Net Profits Interest Grantor have been released into the environment, or deposited, discharged, placed or disposed of at, on, under or near any of such properties in a manner that would require the taking of any action under any applicable Environmental Law and have given rise to, or could reasonably be expected to give rise to, remediation costs and expenses on the part of such Person.  No portion of any such property is being used, or has been used at any previous time, for the disposal, storage, treatment, processing or other handling of Hazardous Materials in violation of any applicable Environmental Law nor is any such property affected by any Hazardous Materials Contamination;

(b)        to the knowledge of Borrowers or Partnership B, no notice, notification, demand, request for information, citation, summons, complaint or order, and no complaint has been filed, no penalty has been assessed and no investigation or review is pending, or to the knowledge Partnership B, threatened by any Governmental Authority or other Person against Partnership B, or to Partnership B's knowledge, any other Person with respect to any (i) alleged violation by any Net Profits Interest Grantor of any applicable Environmental Law, (ii) alleged failure by any Net Profits Interest Grantor to have any Partnership Permits required in connection with the conduct of its business or to comply with the terms and conditions thereof, (iii) generation, treatment, storage, recycling, transportation or disposal of any Hazardous Materials on any property now or previously owned, leased or operated by any Net Profits Interest Grantor or (iv) release of Hazardous Materials on any property now or previously owned, leased or operated by any Net Profits Interest Grantor;

(c)        to the knowledge of Borrowers or Partnership B, all oral or written notifications of a release of Hazardous Materials required to be filed by or on behalf of any Net Profits Interest Grantor under any applicable Environmental Law have been filed or are in the process of being timely filed by or on behalf of such Net Profits Interest Grantor;

(d)        no property now owned or leased by any Net Profits Interest Grantor and, to the knowledge of Borrowers or Partnership B, no such property previously owned or leased by any Net Profits Interest Grantor, to which any Net Profits Interest Grantor has, directly or indirectly, transported or arranged for the transportation of any Hazardous Materials, is listed or, to the knowledge of Borrowers or Partnership B, proposed for listing, on the National Priorities List promulgated pursuant to CERCLA, or CERCLIS (as defined in CERCLA) or any similar state list or is the subject of Federal, state or local enforcement actions or, to the knowledge of Borrowers or Partnership B, other investigations which may lead to claims against any Net Profits Interest Grantor for clean-up costs, remedial work, damage to natural resources or personal injury claims, including, but not limited to, claims under CERCLA;

(e)        there are no underground storage tanks located on any property owned or operated by any Net Profits Interest Grantor that are not properly registered or permitted under applicable Environmental Laws; and

(f)        there are no Liens under or pursuant to any applicable Environmental Laws on any real property or other assets owned or leased by any Net Profits Interest Grantor and no actions by any Governmental Authority have been taken or, to the knowledge of Borrowers or Partnership B, are in process which could subject any of such properties or assets to such Liens.

14.        *[Reserved]*.

15.        *Reserve Reports, Imbalances, Marketing and Other Related Matters.*  Other than as disclosed in the related Reserve Documents, as of the effective date of each Reserve Report with respect to the Subject Properties reflected in such Reserve Report (and taking into account the Net Profits Interest):

(a)        Except as would not reasonably be expected to have a Partnership B Material Adverse Effect, the ownership of each Net Profits Interest Grantor in in such Subject Properties (i) entitles such Net Profits Interest Grantor to the interests in production attributable to such Subject Properties as reflected in such Reserve Report for the periods set forth therein, subject to no Liens or prior encumbrances other than Permitted Liens and the Net Profits Interests, and (ii) does not obligate such Net Profits Interest Grantor to bear the costs and expenses relating to the maintenance, development and operations of such Subject Properties in excess of the working interests of such Subject Properties as reflected in such Reserve Report for the periods set forth therein except for any increase which is offset by a corresponding proportionate increase in such Net Profits Interest Grantor's net revenue interest in such Subject Properties.

(b)        (i) The material leases, contracts, servitudes and other agreements forming a part of the Subject Properties reflected in such Reserve Report are in full force and effect, (ii) all rents, royalties and other payments due and payable under such leases, contracts, servitudes and other agreements, or under any Permitted Liens, or otherwise attendant to each Net Profits Interest Grantor's ownership or operation of any such Subject Properties, have been properly and timely paid in all material respects, (iii) no Net Profits Interest Grantor is in default with respect to its obligations under any such leases, contracts, servitudes and other agreements, or under any Permitted Liens, or otherwise attendant to its ownership or operation of any part of the Subject Properties reflected in such Reserve Report, where such default could adversely affect in any material respect the

ownership or operation of any such Subject Properties. Such Subject Properties were acquired by the applicable Net Profits Interest Grantor in connection with an acquisition permitted by the Pre-Petition Secured Credit Agreements consummated in all material respects pursuant to the provisions of the applicable acquisition documents and in compliance in all material respects with applicable Law.

(c)     No Net Profits Interest Grantor is currently accounting in any material respect for any royalties, or overriding royalties or other payments out of production, on a basis (other than delivery in kind) less favorable to such Net Profits Interest Grantor than proceeds received by such Net Profits Interest Grantor (calculated at the well) from sale of production (other than in respect to leases that provide for royalty payments to be made on a market value basis), and such Net Profits Interest Grantor has no material liability (or alleged liability) to account for the same on any such less favorable basis.

(d)     No material production in respect of an Subject Property is subject to any agreement for the marketing, sale, processing, transportation or delivery of production in respect thereof (i) whereby payment for production is or can be deferred in the case of oil, in excess of sixty (60) days after delivery, or in the case of gas, in excess of ninety (90) days after delivery, (ii) whereby payments are made to the applicable Net Profits Interest Grantor other than in cash (except in connection with gas processing agreements), (iii) with respect to agreements for marketing or sale of production, that cannot be canceled on 120 days' or less notice unless the price for such production is based on a monthly market price index or (iv) under which the applicable Net Profits Interest Grantor is having deliveries of production from such Subject Property curtailed substantially below such property's delivery capacity.

(e)     There are no material take or pay or other prepayments (excluding imbalances) which would require any Net Profits Interest Grantor to deliver production from any such Subject Properties at some future time without then or thereafter receiving full payment therefor.

(f)     No such Subject Property is subject at the present time to any material regulatory refund obligation and, to the best of knowledge of any Borrower or Partnership B, no facts exist which might cause the same to be imposed.

(g)     Except in an aggregate amount not representing more than 1% of Proved Reserves as reflected in such Reserve Report, no Net Profits Interest Grantor, nor to the knowledge of any Borrower or Partnership B, any Net Profits Interest Grantor's predecessors in title, has, prior to the date hereof, taken in the net aggregate more ("overproduced") production from the lands covered thereby (or pooled or unitized therewith) than its ownership interest in such Subject Property would entitle it to take. No Subject Property is subject to a gas balancing arrangement under which one or more third parties may take a portion of the production attributable to such Subject Property as a result of production having been taken from, or as a result of other actions or inactions with respect to, other properties.

16.     *Maintenance and Development of Properties.*  Other than as disclosed in the related Reserve Documents, as of the effective date of each Reserve Report with respect to the Subject Property reflected in such Reserve Report:

(a)        Except as could not reasonably be expected to have a Partnership B Material Adverse Effect, the Subject Properties (and all properties unitized therewith) are being maintained operated and developed in a good and workmanlike manner, in accordance with prudent industry standards and in conformity with (i) all applicable Laws, (ii) all oil, gas or other mineral leases and other contracts and agreements forming a part of such Subject Properties and (iii) any Permitted Liens burdening such Subject Properties.

(b)        Except as could not reasonably be expected to have a Partnership B Material Adverse Effect, no Subject Property reflected in the most recently delivered Reserve Report is subject to having allowable production after the date hereof reduced below the full and regular allowable (including the maximum permissible tolerance) because of any overproduction (whether or not the same was permissible at the time) prior to the date hereof and none of the wells located on any such Properties (or properties unitized therewith) are or will be deviated from the vertical more than the maximum permitted by applicable Laws, and all of the wells reflected in such Reserve Report are bottomed under and producing from, with the well bores wholly within, the Subject Properties or subsurface easements (or, in the case of wells located on properties unitized therewith, such unitized properties).

(c)        Each Net Profits Interest Grantor has all governmental licenses and permits necessary to own and, where applicable, operate, the Subject Properties, and such Net Profits Interest Grantor has not received notice of any violations in respect of any such licenses or permits except where the failure to have any such licenses or permits or such violation could not reasonably be expected to have a Partnership B Material Adverse Effect.

(d)        Except where the failure to do so could not reasonably be expected to have a Partnership B Material Adverse Effect: all pipelines, wells, gas processing plants, platforms and other material improvements, fixtures and equipment owned in whole or in part by any Net Profits Interest Grantor that are necessary to conduct normal operations are being maintained in a good and workmanlike manner in accordance with prudent industry standards, and with respect to such of the foregoing which are operated by any Net Profits Interest Grantor, in a manner consistent with such Net Profits Interest Grantor's past practices.

B.        *Certain Events*

If any of the following is at any time not true and correct, it shall be an event referred to in Section 9.01(c)(i):

1.        *Payment and Performance of Obligations.*  Each of Partnership B and each Net Profits Interest Grantor (a) will pay and discharge, at or before maturity, all of its material obligations and liabilities (including under the Net Profits Agreement), including material tax liabilities, except for such obligations and/or liabilities that may be the subject of a Permitted Contest, (b) will maintain, in accordance with GAAP, appropriate reserves for the accrual of all of their respective obligations and liabilities and (c) will not breach, or permit to exist any default under, the terms of any lease, commitment, contract, instrument or obligation to which it is a party, or by which its properties or assets are bound, except for such breaches or defaults which could not reasonably be expected to have a Partnership B Material Adverse Effect.  Without limiting the foregoing, Partnership B will perform and observe in all material respects the terms

and agreements set forth in the Preferred Equity Annex and each certificate representing the Preferred Interest.

2.  *Maintenance of Existence.*  Each of Partnership B and each Net Profits Interest Grantor will preserve, renew and keep in full force and effect, (x) its existence and (y) its rights, privileges and franchises necessary or desirable in the normal conduct of its business then being conducted, except where the failure to do so under this clause (y) could not reasonably be expected to have a Partnership B Material Adverse Effect.

3.  *Maintenance of Property; Insurance.*

(a)  Each Net Profits Interest Grantor will (i) maintain in full force and effect all material oil, gas or mineral leases to the extent the same cover or otherwise relate to its Subject Properties burdened by Net Profits Interests, and, except as could not reasonably be expected to have a Partnership B Material Adverse Effect and could not reasonably be expected to be grounds for termination of such lease, timely perform all of its obligations thereunder and properly and timely pay, all rents, royalties and other payments due and payable under any such leases, and (ii) except to the extent that the same could not reasonably be expected to cause a Partnership B Material Adverse Effect, maintain in full force and effect all other contracts, servitudes and agreements that otherwise relate to Subject Properties burdened by Net Profits Interests, timely perform all of its obligations thereunder and properly and timely pay all rents, royalties and other payments due and payable under any such contracts, servitudes and other agreements, or under the Permitted Liens, or otherwise attendant to its ownership or operation of any Subject Properties burdened by a Net Profits Interest.

(b)  With respect to Subject Properties burdened by a Net Profits Interest, each Net Profits Interest Grantor will (or with respect to Oil and Gas Properties operated by any other Person, use reasonable efforts to cause such Person to), maintain, operate and develop such Subject Properties in such a way that Statement No. 16 in Part A of this Annex 9.1 remain true and correct in all material respects.

4.  *Compliance with Laws.*  Each of Partnership B and each Net Profits Interest Grantor will comply with (i) the requirements of all applicable Laws, except for such non-compliance that could not reasonably be expected to have a Partnership B Material Adverse Effect, (ii) the Bankruptcy Code, the Bankruptcy Rules and any order of the Bankruptcy Court (other than the Orders) in all material respects and (iii) the Orders in all respects.

5.  *Inspection of Property, Books and Records.* Partnership B will keep full and accurate books of record and account in accordance with sound business practices.

6.  *Partnership B Cash*.  Partnership B shall distribute or otherwise transfer to an account of a Borrower subject to a Control Agreement no less often than once every week all cash, cash equivalents, bank deposits and investments held or maintained by Partnership B in excess of $85,000 in the aggregate.

7.  *Net Profits Documents.*  Partnership B and each Net Profits Interest Grantor shall promptly cure any defect in any Net Profits Documents in order to cause each Net Profits

Document to constitute the valid and binding agreement of the Net Profits Interest Grantor party thereto.

       8.     *Bankruptcy Related Matters*.  Partnership B shall:

      (a)     cause all proposed (i) "first day" orders, (ii) "second day" orders, (iii) orders related to or affecting the Term Loans, the Pre-Petition Debt and the Financing Documents, any other financing or use of Cash Collateral, any sale or other disposition of Collateral outside the ordinary course, adequate protection, any (iv) Acceptable Plan of Reorganization and/or any disclosure statement related thereto, (v) orders concerning the financial condition of the Debtors, or other Debt of the Debtors and (vi) orders establishing procedures for administration of the Cases or approving significant transactions submitted to the Bankruptcy Court, in each case, proposed by the Debtors to be in accordance with and permitted by the terms of the Agreement and satisfactory to the Required Lenders in all respects, it being understood and agreed that the forms of orders approved by the Required Lenders prior to the Petition Date are in accordance with and permitted by the terms of this Agreement and are reasonably acceptable or acceptable, as the case may be, to the Required Lenders in all respects;

      (b)     comply in all material respects with each order entered by the Bankruptcy Court in connection with the Cases; and

      (c)     provide Administrative Agent and the Lenders with reasonable access to non-privileged information (including historical information) and relevant personnel regarding strategic planning, cash and liquidity management, operational and restructuring activities, in each case subject to customary confidentiality restrictions.

       C.    *Certain Events*

If any of the following is at any time not true and correct, it shall be an event referred to in Section 9.01(c)(ii):

       1.     *Debt.*  Partnership B will not directly or indirectly, create, incur, assume or otherwise become or remain directly or indirectly liable with respect to, any Debt, except for (a) Debt under the Partnership B Pre-Petition Swap Contracts in existence as of the Closing Date, (b) Debt arising in the Ordinary Course of Business with respect to appeal bonds, insurance obligations and other similar obligations, (c) endorsements for collection or deposit in the Ordinary Course of Business, (d) [reserved], (e) Debt arising in the Ordinary Course of Business with respect to customary indemnification and reimbursement obligations under asset purchase and sale agreements, division and transfer orders and other agreements customary in the industry pertaining to the exploration for, development, disposition or operation of, or the production or sale of hydrocarbons produced from, Oil and Gas Property, including any such arrangements relating to Oil and Gas Properties in which Partnership B holds an interest and pursuant to which Partnership B has joint and several liability with one or more of Manager or any Affiliate of Partnership B that also holds an interest in such Oil and Gas Properties to the extent that an agreement has been executed by such Persons pursuant to which Partnership B is responsible only for that portion of such obligations incurred for the benefit of Partnership B, and (f) Debt pursuant to Guarantees permitted under Section 4(d) of this Part C.

2.      *Liens.*

(a)      Partnership B will not, directly or indirectly, create, assume or suffer to exist any Lien on any asset now owned or hereafter acquired by it except for Permitted Liens (other than Permitted Liens provided under Sections 5.02(o) and (p) of the Agreement); or

(b)      No Net Profits Interest Grantor will, directly or indirectly, create, assume or suffer to exist any Lien on any Subject Property now owned or hereafter acquired by it that is or could become senior in right or priority to the Net Profits Interest except for Permitted Liens (other than Permitted Liens provided under Section 5.02(d) of the Agreement).

3.      *Consolidations and Mergers.*   Partnership B will not, directly or indirectly, consolidate or merge with or into any other Person, or be subjected to any Division.

4.      *Investments.*   Partnership B will not, directly or indirectly, acquire or own any Investment (or enter into any agreement to acquire or own any Investment), acquire any other asset (except for Net Profits Interests burdening Subject Properties) or otherwise make any Investment other than:

(a)      Cash Equivalents and bank deposits, in each case, in accordance with the Approved Budget (subject to permitted variances);

(b)      Investments in the Partnership B Pre-Petition Swap Contracts in existence on the Closing Date;

(c)      Investments in the form of loans or advances to or for the account of Manager or Production Company in the Ordinary Course of Business not to exceed the Fund II Operating Cash at any time outstanding pursuant to the Sheridan Omnibus Cash Management and Agency Agreement;

(d)      Investments in the form of Guarantees by Partnership B of obligations (other than Debt (excluding Debt permitted under clause (e) of Statement number 0 of Part C of this Annex 9.1)) incurred by Holdco, Manager, Partnership B General Partner or any other Affiliate of Partnership B in the Ordinary Course of Business (including, without limitation, general indemnification obligations protecting Holdco against any loss relating to any of the Subject Properties) either (A) solely for the benefit of Partnership B, or (B) solely for the benefit of one or more of Partnership B and one or more Affiliates of Partnership B, in which case any such Guarantees shall be either (x) on a several, and not joint and several, basis and be limited to that portion of such obligations incurred for the benefit of Partnership B or (y) on a joint and several basis among one or more of Partnership B and any other Affiliate of Partnership B, to the extent that an agreement has been executed by such Persons pursuant to which Partnership B is not responsible for amounts in excess of the portion of such obligations incurred for the benefit of Partnership B;

(e)      Investments under the Intercompany Loan Agreement in existence on the Closing Date;

(f)      Investments in the form of advances or other payments to Partnership M for payment of the purchase price for Net Profits Interests and the receipt of Production Payments as

defined in and granted pursuant to the terms of the Net Profits Agreement, in each case, in accordance with the terms of the Agreement;

(g)     Investments between Partnership B and any Borrower in the form of intercompany receivables and payables incurred in the Ordinary Course of Business in connection Partnership B's and Borrowers' cash management arrangements in effect on the Closing Date; and

(h)     de minimis acquisitions of equipment and other property in the Ordinary Course of Business in connection with the operation of Partnership B's business, in each case in accordance with the Approved Budget (subject to permitted variances).

5.     *Transactions with Affiliates.*  Partnership B will not directly or indirectly enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any Affiliate of Partnership B, except:

(a)     pursuant to the Preferred Equity Documents and the Intercompany Loan Agreement in existence on the Closing Date;

(b)     Investments permitted Statement number 4 of Part C of this Annex 9.1;

(c)     transactions permitted under Section 5.07(h) and Section 5.08(f) and (g);

(d)     for transactions with Affiliates of Partnership B incidental to the administration of the business of Partnership B and the other entities managed by Manager (including the allocation of expenses and liabilities) and in respect of which no fees are charged to Partnership B (it being understood and agreed that expenses and reimbursement obligations in connection with such administration of Partnership B may be so charged to Partnership B); and

(e)     for all transactions with Manager permitted by the Partnership Agreements, taking into account any consents or waivers that may be obtained from the limited partners of the applicable partnership or the Advisory Committee (as such terms are defined in each of the Partnership Agreements), in each case subject to and in accordance with the Approved Budget (subject to Permitted Variances).

6.     *Swap Contracts.*  Partnership B will not enter into any Swap Contracts without the consent of the Required Lenders.

7.     *[Reserved].*

8.     *Conduct of Business.*  Partnership B will not, directly or indirectly, engage in any line of business other than the business of (a) acquiring or entering into, managing and disposing of Net Profits Interests in accordance with the terms of the Agreement and (b) making loans that are permitted investments under Section 4 of this part C of Annex 9.1.  Partnership B will have no Subsidiaries.

9.     *Net Profits Documents.*  Partnership B will not, directly or indirectly, amend, supplement, restate or otherwise modify any Net Profits Document or the Intercompany Loan

Agreement, except for any amendments to the Net Profits Documents in connection with any Asset Disposition permitted under Section 5.06, without the consent of the Required Lenders.

10.      *Permitted Accounts*.  Subject to Statement 6 of Part B of this Annex 9.1 and other than Fund II Operating Cash, Partnership B will not hold or otherwise maintain any of its cash, cash equivalents, bank deposits or investments other than at a Deposit Account, Commodity Account or Securities Account held and otherwise maintained and owned by a Borrower that is subject to a Control Agreement in accordance with the requirements of Section 4.09 (inclusive of any applicable cure or waiver periods). Notwithstanding the foregoing, any cash receipts of Partnership B received by a non-Debtor Affiliate (consistent with past practices) will be promptly as practicable (but in no event later than three (3) business days after receipt of applicable documentation) reconciled and transmitted to a Deposit Account of the Borrowers subject to a Control Agreement.

11.      *Restricted Distributions Payments.* Partnership B will not, directly or indirectly, declare, order, pay, make or set apart any sum for any Restricted Distribution to any holder of its common equity interests.

12.      *Additional Bankruptcy Matters*.  Partnership B will not do any of the following:

(a)      assert or prosecute any claim or cause of action against any of the Lender Parties (in their capacities as such), unless such claim or cause of action is in connection with the enforcement of the Financing Documents against Administrative Agent or the Lenders;

(b)      subject to the terms of the Interim Order or the Final Order, as applicable, object to, contest, delay, prevent or interfere with in any material manner the exercise of rights and remedies by Administrative Agent or the Lenders with respect to the Collateral following the occurrence of an Event of Default; or

(c)      except (i) as expressly provided or permitted hereunder (including to the extent pursuant to any "first day" or "second day" orders complying with the terms of this Agreement), (ii) with the prior consent of the Required Lenders in their sole discretion or (iii) as provided pursuant to any other order of the Bankruptcy Court acceptable to the Required Lenders make any payment or distribution on account of any Prepetition Debt or any other Indebtedness arising prior to the Petition Date.