**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| SHERIDAN HOLDING COMPANY II, LLC, *et al.*,[1] | § | Case No. 19-[_____] (___) |
| | § | |
| Debtors. | § | (Joint Administration Requested) |
| | § | |

**DISCLOSURE STATEMENT
RELATING TO THE DEBTORS' JOINT PREPACKAGED PLAN OF
REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Matthew D. Cavenaugh (TX Bar No. 24062656)
**JACKSON WALKER LLP**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:   (713) 752-4200
Facsimile:   (713) 752-4221
Email:      mcavenaugh@jw.com

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*

Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
Steven N. Serajeddini (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900
Email:      joshua.sussberg@kirkland.com
             steven.serajeddini@kirkland.com

-and-

Spencer A. Winters (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200
Email:      spencer.winters@kirkland.com

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, include:  Sheridan Holding Company II, LLC (7040); Sheridan Investment Partners II GP, LLC (8298); Sheridan Investment Partners II, L.P. (9405); Sheridan Production Partners II, LLC (8034); Sheridan Production Partners II-A, L.P. (8813); Sheridan Production Partners II-B, L.P. (9232); Sheridan Production Partners II-M, L.P. (9084); SPP II-B GP, LLC (8554); and SPP II-M GP, LLC (0488).  The location of the Debtors' service address is:  1360 Post Oak Blvd., Suite 2500, Houston, Texas 77056.

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT PREPACKAGED PLAN OF REORGANIZATION OF SHERIDAN HOLDING COMPANY II, LLC AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VIII HEREIN.

THE DEBTORS AND CERTAIN HOLDERS OF CLAIMS AND INTERESTS SUPPORT THE PLAN, INCLUDING THE MAJORITY OF THE STEERING COMMITTEES OF BOTH THE SHERIDAN II REVOLVING LENDERS AND THE SHERIDAN II TERM LENDERS AND HOLDERS OF OVER 2/3 IN AMOUNT OF THE SHERIDAN II SUBORDINATED TERM LOAN CLAIMS. THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS. AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES. THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE EVENT THE DEBTORS COMMENCE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS

INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH

IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE X OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING ARTICLE VIII, ENTITLED "RISK FACTORS" BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING VOTES FOR THE ACCEPTANCES AND CONFIRMATION OF THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE

DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE HEREIN.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS. THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS, INCLUDING THE FOLLOWING, TO BE FORWARD-LOOKING STATEMENTS:

- BUSINESS STRATEGY;

- TECHNOLOGY;

- FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;

- FINANCIAL STRATEGY, BUDGET, PROJECTIONS, AND OPERATING RESULTS;

- OIL AND NATURAL GAS PRICES AND THE OVERALL HEALTH OF THE OIL AND NATURAL GAS INDUSTRY;

- THE AMOUNT, NATURE, AND TIMING OF CAPITAL EXPENDITURES;

- AVAILABILITY AND TERMS OF CAPITAL;

- **SUCCESSFUL RESULTS FROM THE DEBTORS' OPERATIONS;**

- **THE INTEGRATION AND BENEFITS OF ASSET AND PROPERTY ACQUISITIONS OR THE EFFECTS OF ASSET AND PROPERTY ACQUISITIONS OR DISPOSITIONS ON THE DEBTORS' CASH POSITION AND LEVELS OF INDEBTEDNESS;**

- **COSTS OF CONDUCTING THE DEBTORS' OTHER OPERATIONS;**

- **GENERAL ECONOMIC AND BUSINESS CONDITIONS;**

- **EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;**

- **ENVIRONMENTAL LIABILITIES;**

- **COUNTERPARTY CREDIT RISK;**

- **THE OUTCOME OF PENDING AND FUTURE LITIGATION;**

- **GOVERNMENTAL REGULATION AND TAXATION OF THE OIL AND NATURAL GAS INDUSTRY;**

- **DEVELOPMENTS IN OIL-PRODUCING AND NATURAL GAS-PRODUCING COUNTRIES;**

- **UNCERTAINTY REGARDING THE DEBTORS' FUTURE OPERATING RESULTS;**

- **PLANS, OBJECTIVES, AND EXPECTATIONS;**

- **THE ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY;**

- **RISKS IN CONNECTION WITH ACQUISITIONS;**

- **THE POTENTIAL ADOPTION OF NEW GOVERNMENTAL REGULATIONS; AND**

- **THE DEBTORS' ABILITY TO SATISFY FUTURE CASH OBLIGATIONS AND ENVIRONMENTAL COSTS.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE REORGANIZED DEBTORS' FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE REORGANIZED DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE**

**THE FOLLOWING: THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE DEBTORS' ABILITY TO REDUCE THEIR OVERALL FINANCIAL LEVERAGE; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESSES DURING THE CHAPTER 11 CASES; CUSTOMER RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; CURRENCY FLUCTUATIONS; INTEREST RATE FLUCTUATIONS; PRICE INCREASES; EXPOSURE TO LITIGATION; A DECLINE IN THE DEBTORS' MARKET SHARE DUE TO COMPETITION; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER; THE DEBTORS' ABILITY TO DIVEST EXISTING BUSINESSES; FINANCIAL CONDITIONS OF THE DEBTORS' CUSTOMERS; ADVERSE TAX CHANGES; LIMITED ACCESS TO CAPITAL RESOURCES; CHANGES IN DOMESTIC AND FOREIGN LAWS AND REGULATIONS; TRADE BALANCE; NATURAL DISASTERS; GEOPOLITICAL INSTABILITY; AND THE EFFECTS OF GOVERNMENTAL REGULATION ON THE DEBTORS' BUSINESSES.**

## SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

The Bankruptcy Court has not reviewed this Disclosure Statement or the Plan, and the securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the Securities Act of 1933, as amended (the "Securities Act"), or any securities regulatory authority of any state under any state securities law ("Blue Sky Laws"). The Plan has not been approved or disapproved by the SEC or any state regulatory authority and neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the Plan. Any representation to the contrary is a criminal offense. The Debtors are relying on section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder, and similar Blue Sky Laws provisions, to exempt from registration under the Securities Act and Blue Sky Laws the offer to certain holders of Sheridan II RBL Claims, Sheridan II Term Loan Claims, and Sheridan II Subordinated Term Loan Claims of new securities prior to the Petition Date, including in connection with the solicitation of votes to accept or reject the Plan (the "Solicitation"). The securities may not be offered or sold within the United States or to, or for the account or benefit of, United States persons (as defined in Regulation S under the Securities Act), except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable laws of other jurisdictions.

After the Petition Date, the Debtors will rely on section 1145(a) of the Bankruptcy Code to exempt from registration under the Securities Act and Blue Sky Laws the offer, issuance, and distribution, if applicable, of New Common Stock under the Plan. Neither the Solicitation nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

This Disclosure Statement contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Readers are cautioned that any forward-looking statements in this Disclosure Statement are based on assumptions that are believed to be reasonable, but are subject to a wide range of risks, including risks associated with the following: (a) future financial results and liquidity, including the ability to finance operations in the ordinary course of business; (b) the relationships with and payment terms provided by trade creditors; (c) additional post-restructuring financing requirements; (d) future dispositions and acquisitions; (e) the effect of competitive products, services, or procuring by competitors; (f) changes to the costs of commodities and raw materials; (g) the proposed restructuring and costs associated therewith; (h) the effect of conditions in the local, national, and global economy on the Debtors; (i) the ability to obtain relief from the bankruptcy court to facilitate the smooth operation of the Debtors' businesses under chapter 11; (j) the confirmation and consummation of the Plan; (k) the terms and conditions of the Exit Facilities and the New Common Stock to be entered into, or issued, as the case may be, pursuant to the Plan; and (l) each of the other risks identified in this Disclosure Statement. Due to these uncertainties, reader cannot be assured that any forward-looking statements will prove to be correct. The Debtors are under no obligation to (and expressly disclaim any obligation to) update or alter any forward-looking statements whether as a result of new information, future events, or otherwise, unless instructed to do so by the Bankruptcy Court.

Except to the extent publicly available, this Disclosure Statement, the Plan, and the information set forth herein and therein are confidential.  This Disclosure Statement and the Plan contain material non-public information concerning the Debtors, their subsidiaries, and their respective debt and Securities.  Each recipient hereby acknowledges that it (a) is aware that the federal securities laws of the United States prohibit any person who has material non-public information about a company, which is obtained from the company or its representatives, from purchasing or selling Securities of such company or from communicating the information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such Securities and (b) is familiar with the Securities Exchange Act of 1934, as amended (the "<u>Exchange Act</u>"), and the rules and regulations promulgated thereunder, and agrees that it will not use or communicate to any Person or Entity, under circumstances where it is reasonably likely that such Person or Entity is likely to use or cause any Person or Entity to use, any confidential information in contravention of the Exchange Act or any of its rules and regulations, including Rule 10b-5 promulgated thereunder.

You are cautioned that all forward-looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements.  The liquidation analysis, financial projections, and other projections and forward-looking information contained herein and attached hereto are only estimates, and the timing and amount of actual distributions to Holders of Allowed Claims and Allowed Interests, among other things, may be affected by many factors that cannot be predicted. Any analyses, estimates, or recovery projections may or may not turn out to be accurate.

# TABLE OF CONTENTS

Page

I.      INTRODUCTION...................................................................................................... 1

II.     TREATMENT OF CLAIMS AND INTERESTS ................................................. 4

        A.      Administrative Claims and Priority Claims..................................................... 4

        B.      Classified Claims and Interests Summary ...................................................... 7

        C.      Classified Claims and Interests Details........................................................... 8

        D.      Special Provision Governing Unimpaired Claims ................................ 14

        E.      Elimination of Vacant Classes ............................................................... 14

        F.      Voting Classes, Presumed Acceptance by Non-Voting Classes........................... 14

        G.      Intercompany Interests ........................................................................... 14

        H.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the
                Bankruptcy Code ................................................................................... 15

        I.      Controversy Concerning Impairment ................................................... 15

        J.      Subordinated Claims ............................................................................. 15

        K.      Subordination Agreements...................................................................... 15

III.    SOLICITATION AND VOTING PROCEDURES ............................................. 16

        A.      Holders of Claims Entitled to Vote on the Plan......................................... 16

        B.      Votes Required for Acceptance by a Class.................................................. 16

        C.      Certain Factors to Be Considered Prior to Voting ............................... 16

        D.      Solicitation Procedures .......................................................................... 17

IV.     THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND
        BUSINESS OVERVIEW....................................................................................... 18

        A.      The Sheridan Group's Corporate History, Operations, and Key Assets............... 18

        B.      The Debtor's Prepetition Capital Structure.......................................... 23

V.      EVENTS LEADING TO THE CHAPTER 11 FILINGS.................................... 25

|       | A. | Market and Industry-Specific Challenges | 25 |
|-------|----|------------------------------------------|----|
|       | B. | Financial Responses and the 2017 Sheridan II Subordinated Term Loan Facilities | 26 |
|       | C. | Appointment of Special Committees | 28 |
|       | D. | The Restructuring Negotiations and Temporary Waivers | 28 |
|       | E. | Exploration of Strategic Alternatives | 29 |
| VI.   | **SUMMARY OF THE PLAN** | | **30** |
|       | A. | General Settlement of Claims and Interests | 31 |
|       | B. | Restructuring Transactions | 31 |
|       | C. | Cancellation of Existing Agreements and Interests | 32 |
|       | D. | Section 1146 Exemption | 32 |
|       | E. | The Equitization Restructuring | 33 |
|       | F. | The Asset Sale Restructuring | 37 |
| VII.  | **OTHER KEY ASPECTS OF THE PLAN** | | **42** |
|       | A. | Treatment of Executory Contracts and Unexpired Leases | 42 |
|       | B. | Provisions Governing Distributions | 45 |
|       | C. | The Plan Administrator | 49 |
|       | D. | Procedures for Resolving Contingent, Unliquidated, and Disputed Claims | 51 |
|       | E. | Settlement, Release, Injunction, and Related Provisions | 53 |
|       | F. | Conditions Precedent to Confirmation and Consummation of the Plan | 58 |
|       | G. | Modification, Revocation, or Withdrawal of the Plan | 60 |
| VIII. | **RISK FACTORS** | | **60** |
|       | A. | Bankruptcy Law Considerations | 61 |
|       | B. | Risks Related to Recoveries Under the Plan | 65 |
|       | C. | Risks Related to the Debtors' and the Reorganized Debtors' Businesses | 66 |
| IX.   | **CONFIRMATION OF THE PLAN** | | **71** |

A.     The Confirmation Hearing ................................................................. 71

B.     Requirements for Confirmation of the Plan......................................... 72

C.     Feasibility........................................................................................ 72

D.     Acceptance by Impaired Classes ....................................................... 73

E.     Confirmation without Acceptance by All Impaired Classes................. 73

F.     Valuation Analysis........................................................................... 74

G.     Liquidation Analysis ........................................................................ 75

**X.     CERTAIN SECURITIES LAW MATTERS........................................ 75**

A.     New Common Stock ......................................................................... 75

B.     Issuance and Resale of New Common Stock ...................................... 75

C.     Resales of New Common Stock; Definition of Underwriter ................ 76

**XI.     CERTAIN UNITED STATES FEDERAL INCOME TAX
CONSEQUENCES OF THE PLAN................................................... 77**

A.     Introduction..................................................................................... 77

B.     Certain U.S. Federal Income Tax Consequences to the Borrowers...................... 79

C.     Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of
Claims ............................................................................................. 81

D.     Certain U.S. Federal Income Tax Consequences to Certain Non-U.S.
Holders of Claims ............................................................................ 87

E.     Information Reporting and Back-Up Withholding ............................... 92

**XII.     RECOMMENDATION ................................................................... 93**

## EXHIBITS[2]

EXHIBIT A    Plan of Reorganization

EXHIBIT B    RSA

EXHIBIT C    Financial Projections

EXHIBIT D    Valuation Analysis

EXHIBIT E    Liquidation Analysis

---

[2]    Each Exhibit is incorporated herein by reference.

# I.    INTRODUCTION

Sheridan Holding Company II, LLC ("Holdco II") and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors" or "Sheridan II," and together with their non-Debtor affiliates, the "Sheridan Group"), submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the *Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan"), dated September 4, 2019.[3]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.

The Debtors are an oil and natural gas company headquartered in Houston, Texas, with a principal focus on acquiring and exploiting a balanced portfolio of mature producing properties in onshore basins in the United States.  As described in further detail herein, the Debtors comprise the second fund ("Fund II") of three related series of private placement funds, each of which is managed by Sheridan Production Partners Manager, LLC (the "Manager").

As of June 28, 2019, the Debtors[4] have approximately $1.1 billion of funded debt, consisting of:

- three first-lien revolving credit facilities with approximately $66.0 million in aggregate principal outstanding (the "Sheridan II Revolving Credit Facilities");

- three first-lien term loan credit facilities with approximately $543.1 million in aggregate principal outstanding, which share an equal lien with the Sheridan II Revolving Credit Facilities (the "Sheridan II Term Loan Facilities"); and

- three unsecured subordinated credit facilities with approximately $495.5 million in aggregate principal outstanding (the "Sheridan II Subordinated Term Loan Facilities").

Since their founding in 2010, the Debtors have focused on acquiring oil and gas properties, primarily from large independent operators.  The Debtors' strategy includes application of cost-effective reinvestment, operational improvements, and enhanced recovery programs to the acquired assets.  Continued weakness in the commodities markets, however, has hindered the Debtors' ability to implement their strategy.  For the year ending December 31, 2018, the Debtors' EBITDA was $78.5 million.

Over the past several years, the Debtors have taken steps to avoid a chapter 11 filing, even while many other oil and gas companies have pursued in-court restructurings.  To stave off an

---

[3]    Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning ascribed to such terms in the Plan. The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

[4]    The Borrowers under the Sheridan II Revolving Credit Facilities, the Sheridan II Term Loan Facilities and the Sheridan II Subordinated Term Loan Facilities are Sheridan Production Partners II-A, L.P., Sheridan Production Partners II-M, L.P., and Sheridan Investment Partners II, L.P. (all as defined herein).

impending liquidity crisis, the Debtors took a proactive approach to the market challenges facing the oil and gas industry. This included comprehensive efforts to decrease capital expenditures, lease operating expenses, and general and administrative expenses. Based on the market's positive views of the Debtors' potential, in 2017, the Debtors raised approximately $455 million, $391 million of which consisted of new capital through the Sheridan II Subordinated Term Loan Facilities. As a condition of the Sheridan II Subordinated Term Loan Facilities, in October 2017, the Debtors' limited partners (the "Limited Partners") funded a recall of 50% of all previous distributions made to the Limited Partners, approximately $64 million in the aggregate.

Before the Petition Date, the Debtors also obtained waivers of certain covenants under their secured credit facilities. These efforts ultimately did not provide a long-term solution to the Debtors' liquidity crisis. Despite owning and operating a valuable portfolio of oil and gas properties, at currently depressed commodity prices, the Debtors cannot continue to service the interest obligations on their $1.1 billion in funded debt. As detailed below, the Debtors' current debt load is unsustainable, particularly when compared against that of its competitors. A substantial balance sheet deleveraging will allow the Debtors to withstand the current commodity cycle and continue to maximize the value of their oil and gas producing properties.

Beginning in early 2019, the Debtors entered into comprehensive restructuring negotiations with the lenders under the Sheridan II Term Loan Facilities (the "Sheridan II Term Lenders"), the lenders under the Sheridan II Revolving Credit Facilities (the "Sheridan II Revolving Lenders" and, together with the Sheridan II Term Lenders, the "Senior Secured Lenders"), and the lenders under the Sheridan II Subordinated Term Loan Facilities (the "Sheridan II Subordinated Term Lenders" and, together with the Senior Secured Lenders, the "Lenders"). Bank of America, N.A. as administrative agent and collateral agent under both the Sheridan II Term Loan Facilities and Sheridan II Revolving Credit Facilities, respectively, organized steering committees for these groups and retained advisors to facilitate due diligence and negotiations. Each of these groups organized and retained advisors to facilitate due diligence and negotiations.

Over the course of six months leading up to the Petition Date, the Debtors and Lenders engaged in hard-fought, good-faith negotiations around the terms of the Plan. The Debtors and Senior Secured Lenders also agreed on the terms for debtor-in-possession financing as set forth in the DIP Term Sheet attached to the RSA as Exhibit B. The Debtors and Lenders reached an agreement-in-principle as reflected by the Plan and the terms of the Restructuring Support Agreement (the "RSA"), the form of which is attached hereto as **Exhibit B**. The Debtors anticipate the RSA will be executed as soon as practicable in advance of the Petition Date.

The RSA and Plan contemplate that the restructuring transactions will involve the equitization of the vast majority of the Sheridan II secured and unsecured debt (the "Equitization Restructuring"), unless the Debtors, with the consent of a specified threshold of the Senior Secured Lenders, agree to sell all or substantially all their assets to a third-party purchaser pursuant to the Plan (the "Asset Sale Restructuring"). If the restructuring transactions are consummated through the Equitization Restructuring, the Debtors' corporate structure will be streamlined under a single holding company, New Sheridan, owned by the current Lenders, which holding company, either directly or through one of its subsidiaries, will acquire all of the assets of the Debtors. Whether confirmed and consummated through the debt-for-equity transaction or a

sale transaction, the Plan will resolve these Chapter 11 Cases, will cut off the expense of bankruptcy, and will permit the Debtors to distribute value to their stakeholders in a timely manner.

Alternatively, and to ensure the restructuring transactions maximize value for all stakeholders, the Plan includes a sale "toggle" feature, allowing for a potential Asset Sale Restructuring if supported by the Required Consenting Secured Lenders (as defined in the Plan) and accomplished through the Plan. In parallel with the restructuring negotiations, the Debtors, with the assistance of their advisors, and at the request of the Senior Secured Lenders, commenced an exhaustive marketing process for a going-concern sale in connection with a potential Asset Sale Restructuring. In May 2019, the Debtors and their advisors distributed a teaser to approximately 900 potential buyers and since then have corresponded with approximately 100 of those parties, entered into 49 confidentiality agreements, granted data room access to 45 participants and hosted 18 in-person data room presentations, and engaged in substantial due diligence Q&A via telephone and writing. During the week of July 15, 2019, the Debtors received 8 bids following expiration of the first-round bid deadline. The Debtors are continuing negotiations with these bidders in an effort to achieve the highest and best offer for their assets at a price supported by their Senior Secured Lenders.

The Plan contemplates the following stakeholder recoveries:

- Holders of Administrative Claims and Other Priority Claims will receive payment in full in cash;

- Holders of Allowed DIP Claims will receive either:

  o if the DIP Lender holds an Allowed New Money DIP Claim: (i) in an Equitization Restructuring, a Pro-Rata share of Tranche A of the First-Out/Second-Out Exit Facility; or (ii) in an Asset Sale Restructuring, payment in full in cash; and

  o if the DIP Lender holds an Allowed Roll-Up DIP Claim: (i) in an Equitization Restructuring, a Pro-Rata share of Tranche B of the First-Out/Second-Out Exit Facility; or (ii) in an Asset Sale Restructuring, payment in full in cash;

- Sheridan II Revolving Lenders and Sheridan II Term Lenders will receive either: (i) in an Equitization Restructuring, their ratable share of (a) Tranche C of the Last-Out Exit Facility and (b) 95% of the New Common Stock; or (ii) in an Asset Sale Restructuring, their ratable share of the sale proceeds up to the allowed amount of their claims, less the sale proceeds given to junior stakeholders;

- Sheridan II Subordinated Term Lenders will receive either: (i) in an Equitization Restructuring, their ratable share of 5% of the New Common Stock; or (ii) in an Asset Sale Restructuring, their ratable share of $9,000,000 of the sale proceeds; and

- General Unsecured Claims will be Reinstated or otherwise receive payment in full in cash.

Given the overwhelming support for the Debtors' restructuring, the Debtors elected to pursue a prepackaged restructuring to maximize value by minimizing both the costs of restructuring and the impact on the Debtors' businesses. Accordingly, the RSA contains certain milestones, including securing an order confirming the Plan by November 14, 2019, and the incurrence of the Effective Date by December 17, 2019. The Debtors believe they can confirm a plan of reorganization and emerge from chapter 11 within these time periods without prejudicing the ability of any parties to assert their rights in these Chapter 11 Cases.

The restructuring transactions embodied by the Plan and RSA are a significant achievement for the Debtors in the wake of a historically challenging operating environment. Each of the Debtors strongly believes that the Plan is in the best interests of the Debtors' estates, and represents the best available alternative at this time. Given the Debtors' core strengths, including the strategic location of their assets, the Debtors are confident that they can implement the restructuring transactions contemplated by the Plan and RSA to ensure the Debtors' long-term viability. For these reasons, the Debtors strongly recommend that Holders of Claims entitled to vote to accept or reject the Plan vote to accept the Plan.

## II.    TREATMENT OF CLAIMS AND INTERESTS

### A.    Administrative Claims and Priority Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

#### 1.    Administrative Claims

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

## 2. DIP Claims

On the Effective Date and if an Equitization Restructuring occurs, except to the extent that a Holder of an Allowed DIP Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each (a) Allowed New Money DIP Claim, each Holder thereof will receive its Pro Rata share of Tranche A of the First-Out/Second-Out Exit Facility, and (b) Allowed Roll-Up DIP Claim, each Holder thereof will receive its Pro Rata share of Tranche B of the First-Out/Second-Out Exit Facility.

On the Effective Date and if an Asset Sale Restructuring occurs, except to the extent that a Holder of an Allowed DIP Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each (a) Allowed New Money DIP Claim, each Holder thereof shall receive payment in full in cash of such Holder's Allowed New Money DIP Claim, and (b) Allowed Roll-Up DIP Claim, each Holder thereof shall receive payment in full in cash of such Holder's Allowed Roll-Up DIP Claim.

Unless and until Holders of Allowed DIP Claims receive, in an Equitization Restructuring, their Pro Rata share of Tranche A of the First-Out/Second-Out Exit Facility and Tranche B of the First-Out/Second-Out Exit Facility, or in an Asset Sale Restructuring, payment in full in Cash, then notwithstanding entry of the Confirmation Order and anything to the contrary in the Plan or the Confirmation Order, (i) none of the DIP Claims shall be discharged, satisfied or released or otherwise affected in whole or in part, and each of the DIP Claims shall remain outstanding, (ii) none of the Liens securing the DIP Claims shall be deemed to have been waived, released, satisfied or discharged, in whole or in part, and (iii) neither the DIP Credit Agreement nor any other agreement, instrument, or document executed at any time in connection therewith shall be deemed terminated, discharged, satisfied or released or otherwise affected in whole or in part, and each such agreement, instrument and document shall remain in effect.

## 3. Professional Fee Claims

### a. Final Fee Applications and Payment of Professional Fee Claims

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date.

### b. Professional Fee Escrow Account

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount, which shall be funded by the Reorganized Debtors. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Professional Fee Claims owing to the Professionals shall

be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed. When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

### c.      Professional Fee Amount

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than two (2) Business Days before the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

### d.      Post-Confirmation Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

### 4.      Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

### 5.      Payment of Restructuring Expenses

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the RSA, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least two (2) Business Days before the anticipated Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses.  On the Effective Date, final invoices for all Restructuring

Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.  In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay pre- and post-Effective Date, when due and payable in the ordinary course, Restructuring Expenses related to implementation, consummation, and defense of the Plan, whether incurred before, on, or after the Effective Date.

### B.  Classified Claims and Interests Summary

The Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims against and Interests in the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3(a) | SIP II RBL Credit Agreement Claims | Impaired | Entitled to Vote |
| 3(b) | SPP II-A RBL Credit Agreement Claims | Impaired | Entitled to Vote |
| 3(c) | SPP II-M RBL Credit Agreement Claims | Impaired | Entitled to Vote |
| 4(a) | SIP II Term Loan Credit Agreement Claims | Impaired | Entitled to Vote |
| 4(b) | SPP II-A Term Loan Credit Agreement Claims | Impaired | Entitled to Vote |
| 4(c) | SPP II-M Term Loan Credit Agreement Claims | Impaired | Entitled to Vote |
| 5(a) | SIP II Subordinated Term Loan Credit Agreement Claims | Impaired | Entitled to Vote |
| 5(b) | SPP II-A Subordinated Term Loan Credit Agreement Claims | Impaired | Entitled to Vote |
| 5(c) | SPP II-M Subordinated Term Loan Credit Agreement Claims | Impaired | Entitled to Vote |

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| 6 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| 9 | Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

### C.   Classified Claims and Interests Details

The following chart provides a summary of the anticipated recovery to Holders of Claims or Interests under the Plan if the Equitization Restructuring occurs.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

The projected recoveries set forth in the table below are estimates only and therefore are subject to change.  For a complete description of the debtors' classification and treatment of claims and interests, reference should be made to the entire Plan.[5]

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Interest | Treatment of Claim/ Interest | Projected Amount of Claims[6][7] | Estimated % Recovery Under Plan[8] |
| 1 | Other Secured Claims | Each Holder of an Allowed Other Secured Claim shall receive, at the | N/A | 100% |

---

[5]   The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions.

[6]   The estimated total of Allowed Claims for Classes 3(a), 3(b), 3(c), 4(a), 4(b), and 4(c) assumes a reduction on account of each class's pro-rata share of Allowed Roll-Up DIP Claims (as defined in the Plan).

[7]   The estimated total of Allowed Claims for Classes 3(a), 3(b), 3(c), 4(a), 4(b), 4(c), 5(a), 5(b), and 5(c) includes the principal amount outstanding plus estimated accrued and unpaid interest as of September 13, 2019.

[8]   The projected recoveries assume the Allowed Claims for Classes 3(a), 3(b), 3(c), 4(a), 4(b), and 4(c) are reduced by an amount of the Allowed Roll-Up DIP Claims based on each such class's pro-rata share of total secured debt.

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Interest | Treatment of Claim/ Interest | Projected Amount of Claims[67] | Estimated % Recovery Under Plan[8] |
| | | option of the applicable Debtor (subject to the reasonable consent of the Required Consenting Secured Lenders), and subject to any applicable intercreditor agreement: (i) payment in full in Cash of its Allowed Class 1 Claim; (ii) the collateral securing its Allowed Class 1 Claim; (iii) Reinstatement of its Allowed Class 1 Claim; or (iv) such other treatment rendering its Allowed Class 1 Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | | |
| 2 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim shall receive Cash in an amount equal to such Allowed Class 2 Claim. | N/A | 100% |
| 3(a) | SIP II RBL Credit Agreement Claims | On the Effective Date, each Holder of Allowed SIP II RBL Credit Agreement Claims shall receive, in full and final satisfaction of such Claims, its ratable share (measured by reference to the Secured Lender Claim Amount) of:<br><br>(i)     if the Equitization Restructuring occurs, (A) Tranche C of the Last-Out Exit Facility and (B) the Secured Lender Common Stock Pool; or<br><br>(ii)    if the Asset Sale Restructuring occurs, the Sale Proceeds up to the Allowed amount of such Claims, less the Junior Stakeholder Sale Recovery. | $52,790,346 | 55.8% |
| 3(b) | SPP II-A RBL Credit Agreement Claims | On the Effective Date, each Holder of Allowed SPP II-A RBL Credit Agreement Claims shall receive, in full and final satisfaction of such Claims, its ratable share (measured by reference to the Secured Lender Claim Amount) of: | $7,343,547 | 55.8% |

| Class | Claim/Interest | Treatment of Claim/ Interest | Projected Amount of Claims[67] | Estimated % Recovery Under Plan[8] |
|---|---|---|---|---|
| | | (i)    if the Equitization Restructuring occurs, (A) Tranche C of the Last-Out Exit Facility and (B) the Secured Lender Common Stock Pool; or<br><br>(ii)    if the Asset Sale Restructuring occurs, the Sale Proceeds up to the Allowed amount of such Claims, less the Junior Stakeholder Sale Recovery. | | |
| 3(c) | SPP II-M RBL Credit Agreement Claims | On the Effective Date, each Holder of Allowed SPP II-M RBL Credit Agreement Claims shall receive, in full and final satisfaction of such Claims, its ratable share (measured by reference to the Secured Lender Claim Amount) of:<br><br>(i)    if the Equitization Restructuring occurs, (A) Tranche C of the Last-Out Exit Facility and (B) the Secured Lender Common Stock Pool; or<br><br>(ii)    if the Asset Sale Restructuring occurs, the Sale Proceeds up to the Allowed amount of such Claims, less the Junior Stakeholder Sale Recovery. | $2,738,730 | 55.8% |
| 4(a) | SIP II Term Loan Credit Agreement Claims | On the Effective Date, each Holder of Allowed SIP II Term Loan Credit Agreement Claims shall receive, in full and final satisfaction of such Claims, its ratable share (measured by reference to the Secured Lender Claim Amount) of:<br><br>(i)    if the Equitization Restructuring occurs, (A) Tranche C of the Last-Out Exit Facility and (B) the Secured Lender Common Stock Pool; or<br><br>(ii)    if the Asset Sale Restructuring occurs, the Sale Proceeds up to the Allowed amount of such Claims, less the Junior Stakeholder Sale Recovery. | $438,825,970 | 55.8% |

| | | | Projected Amount of Claims[67] | Estimated % Recovery Under Plan[8] |
|---|---|---|---|---|
| **SUMMARY OF EXPECTED RECOVERIES** | | | | |
| **Class** | **Claim/Interest** | **Treatment of Claim/ Interest** | | |
| 4(b) | SPP II-A Term Loan Credit Agreement Claims | On the Effective Date, each Holder of Allowed SPP II-A Term Loan Credit Agreement Claims shall receive, in full and final satisfaction of such Claims, its ratable share (measured by reference to the Secured Lender Claim Amount) of:<br><br>(i)    if the Equitization Restructuring occurs, (A) Tranche C of the Last-Out Exit Facility and (B) the Secured Lender Common Stock Pool; or<br><br>(ii)    if the Asset Sale Restructuring occurs, on the Effective Date, the Sale Proceeds up to the Allowed amount of such Claims, less the Junior Stakeholder Sale Recovery. | $61,043,840 | 55.8% |
| 4(c) | SPP II-M Term Loan Credit Agreement Claims | On the Effective Date, each Holder of Allowed SPP II-M Term Loan Credit Agreement Claims shall receive, in full and final satisfaction of such Claims, its ratable share (measured by reference to the Secured Lender Claim Amount) of:<br><br>(i)    if the Equitization Restructuring occurs, (A) Tranche C of the Last-Out Exit Facility and (B) the Secured Lender Common Stock Pool; or<br><br>(ii)    if the Asset Sale Restructuring occurs, the Sale Proceeds up to the Allowed amount of such Claims, less the Junior Stakeholder Sale Recovery. | $22,766,017 | 55.8% |
| 5(a) | SIP II Subordinated Term Loan Credit Agreement Claims | On the Effective Date, each Holder of Allowed SIP II Subordinated Term Loan Credit Agreement Claims shall receive, in full and final satisfaction of such Claims, its ratable share (measured by reference to the Allowed amount of Sheridan II Subordinated | $415,998,880 | 2.6% |

| Class | Claim/Interest | Treatment of Claim/ Interest | Projected Amount of Claims[67] | Estimated % Recovery Under Plan[8] |
|---|---|---|---|---|
| | | Term Loan Claims) of: (i)    if the Equitization Restructuring occurs, the Junior Stakeholder Equitization Recovery; or (ii)    if the Asset Sale Restructuring occurs, the Junior Stakeholder Sale Recovery; *provided*, *however*, that each Applicable Affiliate is conclusively deemed to have waived its ratable share of the recovery set forth herein for the benefit of the other Holders of Claims in Class 5(a). | | |
| 5(b) | SPP II-A Subordinated Term Loan Credit Agreement Claims | On the Effective Date, each Holder of Allowed SPP II-A Subordinated Term Loan Credit Agreement Claims shall receive, in full and final satisfaction of such Claims, its ratable share (measured by reference to the Allowed amount of Sheridan II Subordinated Term Loan Claims) of: (i)    if the Equitization Restructuring occurs, the Junior Stakeholder Equitization Recovery; or (ii)    if the Asset Sale Restructuring occurs, the Junior Stakeholder Sale Recovery; *provided*, *however*, that each Applicable Affiliate is conclusively deemed to have waived its ratable share of the recovery set forth herein for the benefit of the other Holders of Claims in Class 5(b). | $57,868,455 | 2.6% |
| 5(c) | SPP II-M Subordinated Term Loan | On the Effective Date, each Holder of Allowed SPP II-M Subordinated Term Loan Credit Agreement Claims shall | $21,581,763 | 2.6% |

| Class | Claim/Interest | Treatment of Claim/ Interest | Projected Amount of Claims[67] | Estimated % Recovery Under Plan[8] |
|---|---|---|---|---|
| | Credit Agreement Claims | receive, in full and final satisfaction of such Claims, its ratable share (measured by reference to the Allowed amount of Sheridan II Subordinated Term Loan Claims) of:<br><br>(i)　　if the Equitization Restructuring occurs, the Junior Stakeholder Equitization Recovery; or<br><br>(ii)　　if the Asset Sale Restructuring occurs, the Junior Stakeholder Sale Recovery;<br><br>*provided*, *however*, that each Applicable Affiliate is conclusively deemed to have waived its ratable share of the recovery set forth herein for the benefit of the other Holders of Claims in Class 5(c). | | |
| 6 | General Unsecured Claims | Each Holder of an Allowed General Unsecured Claim shall receive either: (i) Reinstatement of such Allowed General Unsecured Claim pursuant to section 1124 of the Bankruptcy Code; or (ii) payment in full in Cash on (a) the Effective Date, or (b) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claim. | $9,116,319 | 100% |
| 7 | Intercompany Claims | Intercompany Claims shall be, at the option of the Reorganized Debtors, either: (i) Reinstated; or (ii) cancelled and released without any distribution on account of such Claims. | N/A | 0% / 100% |
| 8 | Intercompany Interests | Intercompany Interests shall be, at the option of the Reorganized Debtors, either: (a) Reinstated; or (b) cancelled and released without any distribution | N/A | 0% / 100% |

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Interest | Treatment of Claim/ Interest | Projected Amount of Claims[6][7] | Estimated % Recovery Under Plan[8] |
| | | on account of such Interests. | | |
| 9 | Interests | If the Equitization Restructuring occurs, all Interests will be cancelled, released, and extinguished and will be of no further force or effect, and Holders of Interests will not receive any distribution on account of such Interests.<br><br>If the Asset Sale Restructuring occurs, on the Effective Date, each Holder of Interests shall receive, in full and final satisfaction of such Interests, its Pro Rata share of the Interest Holder Sale Recovery. | N/A | 0% |

**D.      Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claims, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

**E.      Elimination of Vacant Classes**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**F.      Voting Classes, Presumed Acceptance by Non-Voting Classes**

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

**G.      Intercompany Interests**

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany

Interests but for the purposes of administrative convenience, for the ultimate benefit of the Holders of New Common Stock, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims.

### H. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article XI of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

### I. Controversy Concerning Impairment

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### J. Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, and subject to the RSA, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### K. Subordination Agreements.

Notwithstanding anything to the contrary in the Plan, (i) nothing in the Plan (unless specifically set forth therein) terminates, cancels, modifies, discharges or releases the Subordination Agreements, any rights of the non-Debtor parties thereto, or any Claims of the non-Debtor parties thereunder (except as against the Debtor parties thereto in accordance with the treatment provisions of the Plan) and (ii) for the purposes of enforcement of any and all rights and Claims between the non-Debtor parties to the Subordination Agreements, the Sheridan II RBL Claims and the Sheridan II Term Loan Claims shall not be terminated, canceled, discharged, released, satisfied, or impaired by the Plan or any Restructuring Transaction contemplated therein.

Any distributions made pursuant to the Plan, including any proceeds related thereto, shall not be subject to the Subordination Agreements. For the avoidance of doubt, any and all rights,

claims, Causes of Action, payments, or distributions arising from, related to, or made on account of the New Common Stock shall not be subject to the Subordination Agreements.

## III. SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a ballot (the "Ballot") to be used for voting on the Plan, is being distributed to the Holders of Claims or Interests in those Classes that are entitled to vote to accept or reject the Plan.

### A. Holders of Claims Entitled to Vote on the Plan

The Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Classes 3(a)–(c), 4(a)–(c), and 5(a)–(c) (collectively, the "Voting Classes"). The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan. The Debtors are *not* soliciting votes from Holders of Claims or Interests in Classes 1, 2, 6, 7, 8, and 9.

### B. Votes Required for Acceptance by a Class

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted. Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted. Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

### C. Certain Factors to Be Considered Prior to Voting

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan. These factors may impact recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of the Plan by all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Claims.

While these factors could affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan, the occurrence or impact of such factors may not necessarily affect the validity of the vote of the Voting Classes or necessarily require a re-solicitation of the votes of Holders of Claims in the Voting Classes pursuant to section 1127 of the Bankruptcy Code.

For a further discussion of risk factors, please refer to "Risk Factors" described in Article VIII of this Disclosure Statement.

### D.    Solicitation Procedures

#### 1.    Claims and Noticing Agent

The Debtors have retained Prime Clerk LLC to act as, among other things, the Claims and Noticing Agent in connection with the solicitation of votes to accept or reject the Plan.

#### 2.    Solicitation Package

The following materials constitute the solicitation package (collectively, the "Solicitation Package") distributed to Holders of Claims in the Voting Classes:

- the Disclosure Statement (including all exhibits); and

- a customized paper Ballot.

#### 3.    Distribution of the Solicitation Package and Plan Supplement

The Debtors will cause the Claims and Noticing Agent to distribute the Solicitation Package to Holders of Claims in the Voting Classes on September 4, 2019, which is seven (7) days before the Voting Deadline (*i.e.*, 5:00 p.m. (prevailing Eastern Time) on September 11, 2019).

The Solicitation Package (except the Ballots) may also be obtained from the Claims and Noticing Agent by: (i) calling the Claims and Noticing Agent at (844) 232-0772 (toll free) or (917) 942-6394 (international), (ii) emailing sheridanballots@primeclerk.com and referencing "Sheridan II" in the subject line, and/or (iii) writing to the Claims and Noticing Agent at Sheridan Holding Ballot Processing c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165. After the Debtors file the Chapter 11 Cases, you may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://cases.primeclerk.com/SheridanII, or for a fee via PACER at https://www.pacer.gov/.

The Debtors shall file the Plan Supplement, to the extent reasonably practicable, with the Bankruptcy Court no later than seven (7) days before the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court. If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website. The Debtors will not serve copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement from the Claims and Noticing Agent by: (i) calling the Claims and Noticing Agent at the telephone numbers set forth above; (ii) visiting the Debtors' restructuring website, https://cases.primeclerk.com/SheridanII; or (iii) writing to the Claims and

Noticing Agent at Sheridan Holding Ballot Processing c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165.

## IV. THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A. The Sheridan Group's Corporate History, Operations, and Key Assets

Manager was established in 2006 by a seasoned team of oil and gas executives with Warburg Pincus, LLC, a private equity firm, with the long-term plan of creating a premier oil and gas operating company. Since inception, Manager has raised $4.6 billion in equity capital commitments across the three series of funds, primarily from institutional investors, to acquire and operate a balanced portfolio of oil and gas properties. Fund II was formed in 2010 with approximately $1.8 billion in equity commitments. The Debtors' Fund II strategy employed a combination of equity commitments and debt financing to fund the purchase of oil and gas producing assets.

The Debtors consist solely of entities that comprise—and which operate as a part of—Fund II. Following their inception in 2010, the Debtors completed four major asset acquisitions, calling $1.8 billion of capital from their Limited Partners to fund acquisition costs, operations, management fees and other expenses. During the lifetime of the Debtors, $783 million has been reinvested to enhance and maintain production from the acquired properties.



| | Sheridan II | | |
|---|---|---|---|
| | Total Debt: $1,104,585,507.87 | | |
| | Revolver (Secured) | Term Loan (Secured) | Subordinated Loan |
| | Outstanding Principal | Outstanding Principal | Outstanding Principal |
| SIP II | $55,418,345.61 | $450,036,949.73 | $415,990,879.88 |
| II-A | $7,709,122.44 | $63,638,010.99 | $57,868,454.52 |
| II-M | $2,875,069.24 | $23,658,912.80 | $21,581,762.66 |
| | Total Outstanding: $66,002,537.29 | Total Outstanding: $540,333,873.52 | Total Outstanding: $495,449,097.06 |

The Debtors' corporate structure was designed to accommodate the different needs of a diverse group of investors. The Debtors' oil and gas assets are held by Holdco II, which holds bare legal title to the assets for the benefit of Sheridan Production Partners II-M, L.P. ("SPP II-M") and Sheridan Production Partners II-A, L.P. ("SPP II-A"). SPP II-M, SPP II-A, and Sheridan Production Partners II-B, L.P. ("SPP II-B") are the fund-level entities through which the Limited Partners have invested in Fund II. The Limited Partners who contributed to SPP II-A generally consist of taxable entities, and the Limited Partners who contributed to SPP II-B generally consist of tax-exempt entities. The Limited Partners who contributed to SPP II-M generally consist of current and former executives, directors, principals, and investment professionals of Manager and its non-debtor affiliate, Sheridan Production Company, LLC ("SPC"), as well as members of Warburg Pincus. Use of separate investment vehicles in this manner is typical amongst private funds similar to the Debtors because tax-exempt and taxable investors operate under different tax rules, laws, and regulations. Due to this structure, SPP II-B is not a borrower and has no debt. However, SPP II-B sold preferred equity to Sheridan Investment Partners II, L.P. ("SIP II"), the proceeds of which were utilized to fund a portion of the purchase price paid by SPP II-B for a net profits overriding royalty interest purchased from SPP II-M. SIP II incurred loans to finance the purchase price paid for the preferred equity.

Non-Debtor affiliate, SPC, a subsidiary of Manager, serves as the contract operator of the Debtors' properties. In that capacity, SPC performs all services with respect to the operation of

the Debtors' properties, including but not limited to, drilling, testing, completion and operation of the wells operated by the Debtors, and procurement of drilling rigs, equipment, supplies, and other services as may be necessary for the operation and supervision of the contractors and vendors providing such equipment and services. SPC is the counterparty to office leases, as well as certain contracts, licenses, surface use agreements, easements and other agreements used in operation of the Debtors' properties.

The Debtors' exploration and production ("E&P") activities involve the production and sale of oil and natural gas from domestic onshore hydrocarbon basins. The Debtors primarily conduct their E&P activities through Holdco II, which holds legal title to working interests in oil and gas properties for the benefit of SPP II-A and SPP II-M. Through oil and gas leases entered into with mineral rights owners, Holdco II holds the right to drill, rework, operate, produce and maintain oil and gas wells. The Debtors' produced hydrocarbons are typically either sold at the wellhead or transported by pipeline or truck for processing and/or sale to purchasers. After receipt of proceeds, SPC, on behalf of the Debtors, distributes funds to various working interest holders, royalty interest holders, taxing authorities, and other parties with an interest in production. The remaining proceeds are retained as operating revenues and are utilized for payment of operating expenses, reinvestment in the assets or debt service.

Since the Debtors' inception, the Debtors have executed four major acquisitions across several basins, with the bulk of the Debtors' oil and gas assets purchased in early 2013 as part of an acquisition from SandRidge Energy, Inc. for assets located in the Central Basin Platform of the Permian Basin. The map below depicts the assets currently held by the Debtors:



The Debtors presently operate in the following basins:

- ***Permian Basin***. The Permian Basin is one of the largest and most prolific oil and natural gas producing basins in the United States, extending over West Texas and southeast New Mexico. The Permian Basin is characterized by oil and natural gas fields with long production histories and multiple producing formations. The majority of the Debtors' producing wells in the Permian Basin are mature vertical oil wells that also produce high-Btu casinghead gas with significant natural gas liquids ("NGLs") content. Additionally, the Debtors have drilled and completed 43 horizontal wells in the San Andres formation in the Tex-Mex and Goldsmith fields. The Debtors' assets are yield-oriented, long-lived oil assets on shallow natural declines with strong operating margins. There is already significant infrastructure in place and the Debtors own approximately 100,000 net acres held by production.

- ***Powder River Basin***. The Powder River Basin primarily is located in northeastern Wyoming. The Debtors own a non-operating working interest in several large waterflood units in Campbell County, Wyoming, which produce from the Sussex and Parkman formations. The Debtors' assets are yield-oriented, long-lived oil assets on shallow natural declines with strong operating margins. There is already significant infrastructure in place and the Debtors own approximately 10,000 net acres held by production.

The Debtors' oil and gas producing assets have been acquired through four separate, strategic transactions. Descriptions of each of those transaction are below:

- ***Juno Energy Acquisition.*** On March 29, 2011, Holdco II and other members of the Sheridan Group executed a definitive agreement to purchase from Juno Operating Company, LLC ("Juno") certain oil and natural gas properties in the Permian Basin for $310 million. The transaction became effective on May 1, 2011, and closed on April 29, 2011. Holdco II, joined by other members of the Sheridan Group, also executed a definitive agreement on April 8, 2011, to purchase from Three Rivers Acquisition LLC additional working interests in the Juno properties for $18 million, also with an effective date of May 1, 2011, and a closing date of April 29, 2011. The acquired properties consist primarily of two waterflood units located in Crosby and Lubbock Counties, Texas. As of May 1, 2011, combined production of the two acquisitions was approximately 1,150 barrels equivalent per day, virtually all of which was oil. Holdco II acquired an undivided 1/3 interest in the properties, for which it paid $112.6 million, constituting 1/3 of the combined adjusted purchase price for the assets. The remaining 2/3 interest was purchased by other members of the Sheridan Group on behalf of Manager's first series of funds ("Sheridan Fund I").

- ***El Paso E&P Acquisition.*** On August 4, 2011, Holdco II and other members of the Sheridan Group executed a definitive agreement to purchase certain oil and natural gas properties in the Powder River Basin from El Paso E&P Company, L.P. ("El Paso") for $356 million. The transaction became effective on July 1, 2011, and closed in September 2011. The acquired properties include several large waterflood units in Campbell County, Wyoming. As of the effective date, there were 175 active wells on

the property producing approximately 1,560 barrels equivalent per day, virtually all of which was oil. Holdco II acquired an undivided 1/3 interest in the properties, for which it paid $118.5 million, constituting 1/3 of the adjusted purchase price for the assets. The remaining 2/3 interest was purchased by other members of the Sheridan Group on behalf of Sheridan Fund I.

- *Noble Energy Inc. Acquisition.* On July 23, 2012, Holdco II acquired from Noble Energy, Inc. ("Noble") certain oil and natural gas properties in the Permian Basin for an adjusted purchase price of approximately $307.7 million. The transaction had an effective date of April 1, 2012, and closed in August 2012. The acquired properties included Noble's interest in approximately 250 producing wells located across approximately 11,000 net acres. As of the effective date, the net daily production of those assets was over 1,500 barrels of oil equivalent per day consisting of more than 90 percent crude oil and NGLs. The properties had been predominantly operated by Noble, and Holdco II succeeded Noble as operator.

- *SandRidge Energy Inc. Acquisition.* On December 19, 2012, the Debtors announced the purchase of certain assets from SandRidge Energy, Inc. ("SandRidge") located in Texas and New Mexico on the Central Basin Platform of the Permian Basin for a total amount of $2.6 billion. The transaction became effective on January 1, 2013, and closed in February 2013. The assets included over 2,500 producing wellbores spread over multiple, large fields. Production was oil-weighted, primarily from vertical wells completed in established, conventional formations. The acquisition included proved reserves of approximately 107.3 MMboe. The properties had been predominantly operated by SandRidge, and Holdco II succeeded SandRidge as operator.

As of June 30, 2019, Sheridan II owned interests in approximately 2,111 gross producing wells, a substantial majority of which are operated by Sheridan II.

| Location | Oil (BOPD) | Gas (MCFD) | Total (BOE) | Well Count |
|---|---|---|---|---|
| Permian District | 6,604 | 12,411 | 8,673 | 1,991 |
| Rocky Mountain District | 389 | 0 | 389 | 120 |
| Total Amount Held by Sheridan II | 6,993 | 12,411 | 9,062 | 2,111 |

As noted, the Debtors primarily conduct their business operations in the "upstream" sector, meaning their operations consist of E&P operations for the capture and sale of oil and natural gas. Their E&P operations produce from domestic, onshore hydrocarbon basins through oil and natural gas leases entered into with mineral rights owners in the regions in which the Debtors conduct business. Certain of the Debtors hold working interests in oil and gas properties that give them the right to drill and maintain wells in the applicable geographic areas.

SPC, as the entity contracted by the Debtors to operate their assets, conducts the day-to-day business of drilling, reworking, operating, producing, and maintaining the Debtors' oil and natural gas wells. In that capacity, SPC employs personnel and contracts with third parties to provide goods and services necessary to operate the Debtors' properties. The Debtors cover the expenses associated with those operations. To the extent covered by a joint operating agreement,

unit agreement, pooling order, or similar agreement, any other owners of working interests in the oil and gas properties advance or reimburse SPC for their proportionate share of the cost of the operations. Debtors' produced hydrocarbons are typically either sold at the wellhead or transported by pipeline or truck for processing and/or sale to purchasers.

In instances where the Debtors own undivided interests in oil and natural gas leases, but do not act as operator, a third-party will serve as the operator of the properties. As non-operators, the Debtors may either elect to take their share of production in kind or have the operator of the property market their share of production on their behalf. Where the operator markets production on behalf of the Debtors, the operator distributes proceeds of such sale to the Debtors. In addition, the operator invoices the Debtors for their share of operating expenses and capital investment. These non-operating interests are material, but constitute a minority of the Debtors' business, accounting for approximately 4.8% of the Debtors' total estimated proved reserves as of June 30, 2019.

**B.      The Debtor's Prepetition Capital Structure**

As of the Petition Date, the Debtors have approximately $1.1 billion in total funded debt. This consists of $66.0 million under the Sheridan II Revolving Credit Facilities, $543.1 million under the Sheridan II Term Loan Facilities, and $495.5 million under the Sheridan II Subordinated Term Loan Facilities. SIP II, SPP II-A, and SPP II-M (together, the "Borrowers") are each borrowers under separate lending facilities, as set forth herein. The Debtors' aggregate debt load is depicted in the table below:

| Funded Debt | Maturity | Outstanding Principal Amount as of June 28, 2019 |
|---|---|---|
| Sheridan II Revolving Credit Facilities | June 2020 | $66.0 million |
| Sheridan II Term Loan Facilities | December 2020 | $543.1 million |
| Sheridan II Subordinated Term Loan Facilities | October 2022 | $495.5 million |
| | **Total Funded Debt** | $1,104.6 million |

The following table depicts the distribution of the Debtors' debt load across SIP II, SPP II-A, and SPP II-M:

| | Sheridan II Revolving Credit Facilities | | Sheridan II Term Loan Credit Facilities | | Sheridan II Subordinated Term Loan Facilities | |
|---|---|---|---|---|---|---|
| | *Outstanding Principal* | *Maturity* | *Outstanding Principal* | *Maturity* | *Outstanding Principal* | *Maturity* |
| **SIP II** | $55.4 million | 6/4/20 | $456.0 million | 12/16/20 | $416.0 million | 10/6/22 |
| **SPP II-A** | $7.7 million | 6/4/20 | $63.4 million | 12/16/20 | $57.9 million | 10/6/22 |
| **SPP II-M** | $2.9 million | 6/4/20 | $23.7 million | 12/16/20 | $21.6 million | 10/6/22 |
| Total Commitments | $66.0 million | | $543.1 million | | $495.5 million | |

### 1. The Sheridan II Revolving Credit Facilities

SIP II, SPP II-M, and SPP II-A each individually is the respective borrower under one of three Amended and Restated Credit Agreements dated as of February 26, 2013 (as have been amended, amended and restated, or otherwise modified from time to time prior to the Petition Date) with Bank of America, N.A., as administrative agent and collateral agent (together with any successor administrative or collateral agent), and the other lenders party thereto. The Sheridan II RBL Credit Agreements allow SIP II to access approximately $55.4 million in revolving credit commitments, SPP II-A to access approximately $7.7 million in revolving credit commitments, and SPP II-M to access approximately $2.9 million from the Sheridan II Revolving Credit Facilities. The obligations under the Sheridan II Revolving Credit Facilities are secured by perfected first-priority liens in substantially all of the Debtors' assets, including, among other things, equity pledges in the borrower's assets, oil and gas assets, and control agreements on bank accounts. As of June 28, 2019, in the aggregate, approximately $66.0 million in principal amount remains outstanding under the Sheridan II Revolving Credit Facilities, leaving no availability for additional borrowings. The maturity date on each of the Sheridan II Revolving Credit Facilities is June 4, 2020.

### 2. The Sheridan II Term Loan Facilities

SIP II, SPP II-M, and SPP II-A each individually is the respective borrower under one of three Amended and Restated Credit Agreements dated as of December 16, 2013 (as have been amended, amended and restated, or otherwise modified from time to time prior to the Petition Date) with Bank of America, N.A., as administrative agent and collateral agent (together with any successor administrative or collateral agent), and the other lenders party thereto. The Sheridan II Term Loan Facilities share substantially the same collateral package and are *pari passu* with the Sheridan II Revolving Credit Facilities. The maturity date for the Sheridan II Term Loan Facilities is December 16, 2020. As of June 28, 2019, approximately $543.1 million in aggregate principal amount remains outstanding under the Sheridan II Term Loan Facilities.

### 3. The Sheridan II Subordinated Term Loan Facilities

SIP II, SPP II-M, and SPP II-A each individually is the respective borrower under one of three Subordinated Unsecured Term Loan Credit Agreements dated as of October 6, 2017 (as have been amended, amended and restated, or otherwise modified from time to time prior to the Petition Date) with Wilmington Trust, N.A., as administrative agent (together with any successor administrative agent), and the other lenders party thereto. Pursuant to the Subordination Agreements (as defined below), the Sheridan II Subordinated Term Loan Facilities are payment subordinated to the Sheridan II Revolving Credit Facilities and the Sheridan II Term Loan Facilities. The maturity date for the Sheridan II Subordinated Term Loan Facilities is October 6, 2022. As of June 28, 2019, approximately $495.5 million in aggregate principal amount remains outstanding under the Sheridan II Subordinated Term Loan Facilities.

### 4. Subordination Agreements

The Subordination Agreements set forth the agreements between the respective agents under each of the Sheridan II Revolving Credit Facilities, the Sheridan II Term Loan Facilities,

and the Sheridan II Subordinated Term Loan Facilities with respect to the rights and remedies of the various Lenders under each respective facility. Entry into the Subordination Agreements was a condition for entry into amendments to the Sheridan II RBL Credit Agreements and Sheridan II Term Loan Credit Agreements to allow the Debtors to obtain access to the Sheridan II Subordinated Term Loan Facilities. The Subordination Agreements provide that the obligations of SIP II, SPP II-M, and SPP II-A, respectively, under the Sheridan II Subordinated Term Loan Facilities are payment subordinated to the obligations of each such entity under the respective silo of the Sheridan II Revolving Credit Facilities and the Sheridan II Term Loan Facilities. Further, the Subordination Agreements provide that if an agent or lender under the Sheridan II Subordinated Term Loan Facilities receives payment in contravention of the priorities as set forth in the Subordination Agreements without the consent of the respective agents under the Sheridan II Term Loan Facilities and the Sheridan II Revolving Credit Facilities, the respective agent or lender under the Sheridan II Subordinated Term Loan Facilities is required to turn over such payment to the collateral agent for the lenders under the Sheridan II RBL Credit Agreements and Sheridan II Term Loan Credit Agreements.

### 5. Hedging Obligations

The Debtors maintain a portfolio of hedging arrangements intended to insulate revenues against commodity price downturns, which involve entering into commodity-price derivative contracts with third-party financial institutions (the "Prepetition Hedging Arrangements"). All of the counterparties to the Prepetition Hedging Arrangements are also lenders under the Sheridan II Revolving Credit Facilities. The Prepetition Hedging Arrangements currently consist primarily of oil and natural gas fixed swaps, basis swaps and collars. As of the Petition Date, the obligations under the Prepetition Hedging Arrangements were equal in priority to the obligations under, and secured by equal liens in the collateral under, the Sheridan II Revolving Credit Facilities.

Historically, the Debtors hedged over 80% of their production over a one to three-year horizon. By removing some measure of price volatility associated with production, the Debtors' hedge portfolio has helped mitigate the effects of a sustained decline in commodity prices, but conversely, has prevented the Debtors from benefitting from rises in commodity prices. As of the Petition Date, approximately 55% of the Debtors' average projected production was hedged through 2019 and the Debtors' hedging portfolio had a negative fair market value to the Debtors of approximately $6 million.

## V. EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A. Market and Industry-Specific Challenges

Oil and natural gas prices have declined substantially since 2014. The difficulties faced by the Debtors are consistent with those faced industry-wide. Historically, the markets for oil, natural gas and NGLs have been volatile, and they likely will continue to be volatile, especially given current geopolitical and economic conditions. Among the factors causing such volatility are the domestic and foreign supply of oil and natural gas, the ability of members of the Organization of Petroleum Exporting Countries ("OPEC") to comply with the agreed upon production cuts and the cooperation of other producing countries to reduce production levels, social unrest and political instability, particularly in major oil and natural gas producing regions outside the United States,

and the levels and growth of domestic and global economic activity. In particular, the U.S. "Shale Revolution"—the implementation of horizontal drilling and hydraulic fracking techniques to unlock oil and natural gas from previously non-producible shale formations—has resulted in a dramatic increase in U.S. crude oil and natural gas production, greatly increasing supplies at a time of uncertain demand. Although prices have recovered somewhat from their lows at the beginning of 2016, NYMEX futures curves for both natural gas and crude oil indicate an expectation among traders in the derivatives market that these commodity prices are expected to decline over the next several years.

**West Texas Intermediate ("WTI") Crude Oil Closing**       **Natural Gas Henry Hub Prices**



These market conditions have affected oil and gas companies at every level of the industry around the world. Although all companies in the oil and gas industry have been affected at some level, independent oil and gas companies such as Sheridan II have been especially hard-hit, as their revenues primarily are generated from the sale of unrefined oil, natural gas, and NGLs. Over 100 oil and gas companies have filed for chapter 11 since the beginning of 2015, including, most recently, Halcon Resources, Legacy Reserves, White Star Petroleum, Vanguard Natural Resources, Inc., Rex Energy Corporation, EV Energy Partners, LP, Fieldwood Energy LLC, Stone Energy Corporation, Parker Drilling Company, Gastar Exploration, Inc., EXCO Resources, Inc., Bonanza Creek Energy, Inc., Memorial Production Partners LP, Seadrill Limited, and Cobalt International Energy Inc. Numerous other oil and gas companies have defaulted on their debt obligations, negotiated amendments or covenant relief with creditors to avoid defaulting, or have effectuated out-of-court restructurings. The current volatility in the commodity markets has made it especially difficult for some companies to execute on any viable out-of-court restructuring alternatives.

### B.     Financial Responses and the 2017 Sheridan II Subordinated Term Loan Facilities

The Debtors were not immune to these macroeconomic forces. From the beginning of the downturn, the Debtors took steps to reduce expenditures. These efforts included a move to less-expensive office space as well as various other measures to reduce general and administrative costs and streamline operations, including implementation of initiatives to reduce costs of: salaries and benefits; information and technology; tax, legal, engineering, and audit expenses; and occupancy and insurance expenses.

Nevertheless, the Debtors recognized that cost savings alone would not insulate them from the depressed commodities market. The Debtors turned to the capital markets, and on October 6, 2017, the Debtors borrowed $388 million through the Sheridan II Subordinated Term Loan Facilities and simultaneously raised equity contributions from the Limited Partners. The proceeds of the debt financing and equity raise were used to pay down $450 million of the Sheridan II Revolving Credit Facilities. Simultaneously with the Sheridan II Revolving Credit Facilities pay-down, the Debtors extended the maturity of those facilities to June 2020 and obtained a redetermination holiday until March 2019.

Although this transaction brought the Debtors temporary reprieve, the Debtors were still burdened with a significant debt load and their liquidity situation did not improve. The Debtors' debt to EBITDA ratio is depicted below, as compared to other small-cap E&P companies' ratios. For the year 2019, the Debtors estimate that their total debt to EBITDA ratio will be approximately 21.1x, approximately 10 times the median for an entity with their market capitalization.



Although oil prices improved significantly during the first three-quarters of 2018, with WTI ultimately reaching a high of $74.96 in October 2018, over the next two months prices retreated significantly, giving back much of the gains since 2016. Furthermore, the West Texas Sour ("WTS") differential hit a low in September of 2018 at $16.21/Bbl, significantly worse than the historical average for the posting. Approximately 94% of the Debtors' assets are subject to either WTS or Midland-Cushing basis differentials. The Debtors have been able to mitigate some of the damage through basis hedges. However, the Debtors' substantial commodity price hedge position also limited their ability to protect margins because the Debtors were unable to take advantage of any upward move in spot prices during the year. As a result of these factors, the liquidity of the Debtors continued to deteriorate throughout 2018.

As the Debtors approached the two-year mark of the execution of the Sheridan II Subordinated Term Loan Facilities, the performance of the Debtors' assets, when combined with the recent commodity price and differential volatility, made meeting the Debtors' obligations challenging, if not impossible. With limited cash flow in 2018, the Debtors were unable to drill as many wells as planned, which contributed to a shortfall in production volumes.

## C.     Appointment of Special Committees

The Debtors are managed and operated by Manager, which in turn acts at the direction of an eight member investment committee (the "Investment Committee"), consisting of Lisa Stewart, as Executive Chairman, two members appointed by Warburg Pincus, four independent directors, and one additional member of the Sheridan Group's management. The Investment Committee is responsible for making investment decisions for all Sheridan II entities.

In connection with their restructuring efforts, the Investment Committee established special committees of disinterested directors at certain of the Debtors to determine and decide potential conflicts matters between the Debtors, on the one hand, and Manager, Sheridan Production Company, LLC, Warburg Pincus, Limited Partners, and entities which make up Sheridan Fund II, on the other. To that end, on January 29, 2019, the Debtors established a special committee at each of SPP II-A, SPP II-B, SPP-M, and SIP II (collectively, the "Fund II Special Committees"). The Investment Committee appointed two disinterested directors, Alan J. Carr and Jonathan F. Foster, to serve on the Fund II Special Committees (collectively, the "Special Committee Members"). Quinn Emanuel Urquhart & Sullivan, LLP has been retained as independent counsel, and Opportune LLP has been retained as an independent financial advisor, with both acting at the Special Committee Members' sole direction to assist in the discharge of their duties.

The Special Committee Members and the professionals acting at their sole direction have commenced an independent investigation (which remains ongoing as of the Petition Date) into interested party issues in connection with a potential sale, restructuring, reorganization, or other recapitalization transactions and related financings. The Special Committee Members may also conduct inquiries or investigations relating to any conflicts matters as the Fund II Special Committees deem necessary in their business judgment. Similarly, the Special Committee Members' activities include evaluating a restructuring transaction, approving or terminating the restructuring transactions, participating in consultation with management and advisors, and if necessary, authorizing approval of a restructuring. The Debtors expect that the Special Committee Members will be in a position to make a final recommendation whether the releases contemplated by the Plan are appropriate in advance of the Debtors' proposed confirmation hearing.

## D.     The Restructuring Negotiations and Temporary Waivers

Beginning in late 2018, the Debtors organized and commenced comprehensive restructuring negotiations with creditors, including the agent under the Sheridan II Revolving Credit Facilities and Sheridan II Term Loan Facilities, the steering committees of the Sheridan II Revolving Lenders and the Sheridan II Term Lenders, and the Sheridan II Subordinated Term Lenders. Substantive discussions with the Senior Secured Lenders centered around both the terms of a comprehensive restructuring transaction as well as avoiding a potential default under the Sheridan II Revolving Credit Facilities and Sheridan II Term Loan Facilities. As of December 31, 2018, the Debtors were out of compliance with the current ratio covenant under the Sheridan II Revolving Credit Facilities and the Sheridan II Term Loan Facilities. To avoid an event of default, on March 29, 2019, SPP II-M, SPP II-A, and SIP II entered into waiver agreements with the Senior Secured Lenders to waive this non-compliance until May 31, 2019 (the "2019 Waivers"). The

2019 Waivers provided the Debtors with runway to continue negotiating the terms of a comprehensive restructuring with the holders of their funded debt.

The Debtors also initiated discussions with the advisors to the Sheridan II Revolving Lenders, the Sheridan II Term Lenders, and the Sheridan II Subordinated Term Lenders and began facilitating a substantial due diligence process. These discussions focused on the full equitization of the Sheridan II Subordinated Term Loan Facilities and the allocation of the New Common Stock between the Sheridan II Term Loan Facilities, the Sheridan II Revolving Credit Facilities, and the Sheridan II Subordinated Term Loan Facilities. In the time leading up to solicitation, the Debtors and their advisors engaged in a substantial due diligence process with the Sheridan II Subordinated Term Lenders to facilitate a consensual deal.

The Debtors also provided updates regarding the Debtors' financial condition to, and engaged in extensive negotiations with, the Sheridan II Subordinated Term Lenders leading up to the Petition Date. Beginning in February 2019, the Debtors encouraged the Sheridan II Subordinated Term Lenders to make a new-money restructuring proposal. Throughout the process, the Debtors were transparent that, absent a significant new money investment, it would be necessary to equitize a meaningful portion of the funded debt obligations through and including a significant amount of the Sheridan II Term Loan Facilities and the Sheridan II Revolving Credit Facilities.

On May 14, 2019, the Sheridan II Subordinated Term Lenders submitted a proposal contemplating a new-money investment on terms that were not acceptable to the steering committees of both the Sheridan II Revolving Lenders and the Sheridan II Term Lenders. Subsequently, the Debtors, Senior Secured Lenders, and Sheridan II Subordinated Term Lenders exchanged proposals with materially similar terms to those under the Plan but with differing positions on the allocation of consideration between the Senior Secured Lenders and the Sheridan II Subordinated Term Lenders. Ultimately, in the weeks leading up to solicitation, the Debtors, Senior Secured Lenders, and Sheridan II Subordinated Term Lenders reached an agreement-in-principle as reflected in the Plan.

### E.    Exploration of Strategic Alternatives

In the period leading up to the Petition Date, the Debtors provided Lenders' advisors and principals substantial due diligence, and the parties held numerous meetings and telephone conferences among both advisors and principals over months of hard-fought, arms' length negotiations. As a result of these efforts, the Debtors and a majority of the steering committees of both the Sheridan II Revolving Lenders and the Sheridan II Term Lenders reached an agreement-in-principle on the restructuring transactions as reflected in the Plan, DIP Term Sheet, RSA, and the Exit Facility Term Sheet attached as Exhibit A to the Plan.

The Plan contemplates a comprehensive Equitization Restructuring or alternative Asset Sale Restructuring achieved through the Plan. The Equitization Restructuring includes entry into the Exit Facilities and distribution of New Common Stock of the Reorganized Debtors that will deleverage the Debtors' balance sheet by more than $900 million, provide $100 million through a debtor-in-possession financing facility (including $50 million delayed draw new money term loans) that will be refinanced with $175 million exit facilities to fund the Debtors' businesses in

and upon emergence from chapter 11, and minimize the time and administrative costs associated with the Debtors' Chapter 11 Cases. On the Effective Date of the Equitization Restructuring, the Debtors will be streamlined into a simplified corporate structure owned by the current Lenders, which will continue to be operated pursuant to the Services Agreement.

In connection with a potential Asset Sale Restructuring, the Debtors, with the assistance of their advisors, and at the request of the Senior Secured Lenders, commenced an extensive marketing process in May 2019. Following a distribution of the initial teaser to approximately 900 potential buyers, the Debtors and their advisors have corresponded with approximately 100 of those parties, entered into 49 confidentiality agreements, granted data room access to 45 participants, hosted 18 in-person data room presentations, engaged in over 10 telephonic Q&A sessions, and responded to over 150 written diligence request lists. During the week of July 15, 2019, the Debtors received 8 bids following expiration of the first-round bid deadline. The Debtors are continuing negotiations with bidders in an effort to achieve the highest and best offer for their assets at a price supported by their Senior Secured Lenders. The marketing process will continue through the duration of these Chapter 11 Cases in an effort to consummate the Asset Sale Restructuring.

The level of consensus for this comprehensive reorganization reflects the efforts undertaken by the Debtors and the parties' belief in the Debtors' prospects as a reorganized enterprise and the value of the Debtors' assets. More importantly, the Plan proposes to pay in full all non-funded debt. In so doing, the Plan is intended to minimize any potential adverse effects to the Debtors' businesses, customers, and trade partners as a result of the restructuring, and thus positioning the Debtors for a prompt emergence from bankruptcy.

The RSA requires that the Debtors proceed in accordance with the RSA milestones, including securing confirmation of the Plan by November 14, 2019, within 60 days after the Petition Date. In light of the Debtors' extensive prepetition marketing efforts, the timeline from the anticipated Petition Date to the confirmation hearing provides more than sufficient time to administer these Chapter 11 Cases in a manner that gives all parties in interest a full and fair opportunity to participate in the process. Following solicitation, the Debtors will file a scheduling motion seeking approval of the following confirmation schedule (including applicable RSA milestones):

| Event | Date |
|---|---|
| Confirmation Milestone | November 14, 2019 |
| Effective Date Milestone | December 17, 2019 |

## VI.    SUMMARY OF THE PLAN

As discussed in Article I in this Disclosure Statement, the Plan contemplates, among other things, an Equitization Restructuring, unless otherwise determined by the Debtors before the Confirmation Hearing in consultation with the Required Consenting Secured Lenders, and, in the alternative, an Asset Sale Restructuring. The Plan contemplates the following key terms, among others described herein and therein:

## A. General Settlement of Claims and Interests

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including (1) any challenge to the amount, validity, perfection (as applicable), enforceability, priority or extent of the DIP Claims, the Sheridan II RBL Claims, the Sheridan II Term Loan Claims, or the Sheridan II Subordinated Term Loan Claims, and (2) any claim to avoid, subordinate, or disallow any DIP Claims, Sheridan II RBL Claims, the Sheridan II Term Loan Claims, or Sheridan II Subordinated Term Loan Claims, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates.

## B. Restructuring Transactions

On the Effective Date, the applicable Debtors or the Reorganized Debtors shall enter into any transaction and shall take any actions as may be necessary or appropriate to effectuate the Equitization Restructuring or Asset Sale Restructuring, as applicable, including to establish New Sheridan and to transfer all of the assets of the Debtors to New Sheridan or a subsidiary thereof. The applicable Debtors or the Reorganized Debtors will take any actions as may be necessary or advisable to effect a corporate restructuring of the overall corporate structure of the Debtors, to the extent provided in the Plan, the Description of Transaction Steps, or in the Definitive Documentation, including the issuance of all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, one or more inter-company mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions.

The actions to implement the Restructuring Transactions may include, in accordance with the consent rights in the RSA: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (4) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan.

### C. Cancellation of Existing Agreements and Interests

On the Effective Date, except with respect to the Exit Facilities or to the extent otherwise provided in the Plan or the Confirmation Order, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be cancelled and the obligations of the Debtors and any non-Debtor Affiliate thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect. Holders of or parties to such cancelled instruments, securities, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to the Plan. Notwithstanding the foregoing or anything to the contrary in the Plan, any rights of the Agents to indemnification under the DIP Facility Documents, the Sheridan II RBL Credit Agreements, and the Sheridan II Term Loan Credit Agreements shall remain binding and enforceable in accordance with the terms of such documents and shall not be subject to discharge, impairment, or release under the Plan or the Confirmation Order (in the Asset Sale Restructuring, any payments related to such indemnification obligations shall be made in a manner consistent with the Wind-Down Budget).

### D. Section 1146 Exemption

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan, including the Asset Sale, if applicable, or pursuant to: (1) the issuance, reinstatement, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for any or all of the Exit Facilities; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### E. The Equitization Restructuring

If the Equitization Restructuring occurs, the following provisions shall govern.

#### 1. Reorganized Debtors

On the Effective Date, the New Board shall be established, and each Reorganized Debtor shall adopt its New Organizational Documents. The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan.

#### 2. Sources of Consideration for Plan Distributions

##### a. Exit Facilities

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities, the terms of which will be set forth in the Exit Facility Documents. Confirmation of the Plan shall be deemed approval of the Exit Facilities and the Exit Facility Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Reorganized Debtors to enter into and execute the Exit Facility Documents and such other documents as may be required to effectuate the treatment afforded by the Exit Facilities. Execution of the Exit Facility Credit Agreements by the Exit Agent shall be deemed to bind all Holders of Sheridan II RBL Claims and Sheridan II Term Loan Claims as if each such Holder had executed the Exit Facility Credit Agreements with appropriate authorization. The Last-Out Exit Facility shall constitute a refinancing of the obligations under the Sheridan II Term Loan Credit Agreements and the Sheridan II RBL Credit Agreements.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility Documents, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Facility Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### b. New Common Stock

New Sheridan shall be authorized to issue a certain number of shares of New Common Stock pursuant to its New Organizational Documents. On the Effective Date, the Debtors shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan.

All of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

### 3. Corporate Existence

Except as otherwise provided in the Plan, Holdco II shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which Holdco II is incorporated or formed and pursuant to the certificate of incorporation and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

### 4. Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances; *provided, however*, that any and all liens securing the DIP Claim, the Sheridan II RBL Claims, and the Sheridan II Term Loan Claims shall be retained by the applicable Agents and assigned to the Exit Agent to secure any and all obligations of the Reorganized Debtors under the Exit Facilities. On and after the Effective Date, except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated in the Plan, the Reorganized Debtors may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### 5. Corporate Action

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including: (a) adoption or assumption, as applicable, of the Employment Obligations; (b) selection of the directors, officers, or managers for the

Reorganized Debtors; (c) the distribution of the New Common Stock; (d) implementation of the Restructuring Transactions; (e) entry into the Exit Facility Documents; (f) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (g) adoption of the New Organizational Documents; (h) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (i) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security Holders, directors, officers, or managers of the Debtors or the Reorganized Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Common Stock, the New Organizational Documents, the Exit Facilities, the Exit Facility Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by Article IV.E.5 of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### 6. New Organizational Documents

On or immediately prior to the Effective Date, the New Organizational Documents shall be amended in a manner acceptable to the Debtors, as may be necessary to effectuate the transactions contemplated by the Plan. Each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation. The New Organizational Documents will prohibit the issuance of non-voting Equity Securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code. For the avoidance of doubt, the New Organizational Documents shall be included as exhibits to the Plan Supplement.

### 7. Directors and Officers of the Reorganized Debtors

As of the Effective Date, the term of the current members of the Sheridan II Special Committee shall expire, and the members for the initial term of the New Board shall be appointed. The New Board shall initially consist of five (5) members, consisting of the Chief Executive Officer of New Sheridan and other members appointed by the Required Consenting Secured Lenders. In subsequent terms, following the Effective Date, the members of the New Board shall be selected in accordance with the New Organizational Documents of the Reorganized Debtors. The initial members of the New Board will be identified in the Plan Supplement, to the extent known at the time of filing. Each such member and officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors.

### 8. Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtors and the New Board are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

### 9. Certain Securities Law Matters

The offering, issuance, and distribution of the New Common Stock, as contemplated by Article III of the Plan, shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities in accordance with, and pursuant to, section 1145 of the Bankruptcy Code. Such New Common Stock will be freely tradable in the United States by the recipients thereof, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, and compliance with applicable securities laws and any rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments and subject to any restrictions in the New Organizational Documents.

### 10. Employee Matters

Unless otherwise provided in the Plan, and subject to Article V of the Plan, the Reorganized Debtors shall: (a) assume all employment agreements, indemnification agreements, or other agreements with current and former members of any Governing Body, employees, officers, directors, or managers of the Debtors; or (b) enter into new agreements with such persons on terms and conditions acceptable to the Reorganized Debtors and such person. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

### 11. Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article IX of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article IX of the Plan.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause**

of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it. **The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article IX of the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article IX of the Plan. The Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

### 12. Services Agreement

On or prior to the Effective Date New Sheridan shall enter into and adopt the Services Agreement (if any).

### 13. Dissolution of Certain Debtors

To the extent there are no remaining Claims against a Debtor and such Debtor has no assets and no liabilities, each such Debtor, other than Holdco II, shall be deemed dissolved in accordance with applicable law, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

### 14. Closing the Chapter 11 Cases

Upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases except for one of the Chapter 11 Cases as determined by the Reorganized Debtors and the Required Consenting Secured Lenders, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in such Chapter 11 Case.

### F. The Asset Sale Restructuring

If the Asset Sale Restructuring occurs, the following provisions shall govern.

1. **Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Plan, the Confirmation Order, the Asset Purchase Agreement, or any agreement, instrument, or other document incorporated in the Plan or therein, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, the assets of the Debtors shall vest in the Reorganized Debtors for the purpose of liquidating the Estates, free and clear of all Liens, Claims, charges, or other encumbrances; *provided* that, after funding the Professional Fee Escrow Account, the collateral, or proceeds of sales of such collateral, of the Reorganized Debtors securing the DIP Claims, Sheridan II RBL Claims, and Sheridan II Term Loan Claims shall remain subject to the liens and claims of the Sheridan II Revolving Lenders and Sheridan II Term Lenders, as applicable, to the same extent as such liens and claims were enforceable against the Debtors and the Debtors' assets until such DIP Claims, Sheridan II RBL Claims, and Sheridan II Term Loan Claims are repaid in full pursuant to Article II.B of the Plan. On and after the Effective Date, except as otherwise provided for in the Plan, the DIP Orders, or the Asset Purchase Agreement, the Debtors and the Reorganized Debtors may operate their business and use, acquire, or dispose of property in accordance with the Wind-Down Budget, and compromise or settle any Claims, Interests, or Causes of Action.

2. **Sources of Consideration for Plan Distributions**

The Reorganized Debtors will fund distributions under the Plan with Cash on hand on the Effective Date and the revenues and proceeds of all assets of the Debtors, including proceeds from all Causes of Action not settled, released, discharged, enjoined, or exculpated under the Plan or otherwise on or prior to the Effective Date.

Notwithstanding anything to the contrary in the Plan or in the Asset Purchase Agreement, on the Effective Date, any Cause of Action not settled, released, discharged, enjoined, or exculpated under the Plan on or prior to the Effective Date shall vest in the Reorganized Debtors and shall be subject to administration by the Plan Administrator.

3. **Reorganized Debtors**

On and after the Effective Date, the Reorganized Debtors shall continue in existence for purposes of (a) winding down the Debtors' business and affairs as expeditiously as reasonably possible in accordance with the Wind-Down Budget and Wind-Down Milestones, (b) resolving Disputed Claims, (c) making distributions on account of Allowed Claims as provided hereunder, (d) funding distributions in accordance with the Wind-Down Budget, (e) enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action on the Retained Causes of Action List, or otherwise vested in the Reorganized Debtors as provided for in the Plan, in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith, (f) filing appropriate tax returns, (g) complying with its continuing obligations under the Asset Purchase Agreement, if any, and the DIP Orders (as applicable), and (h) administering the Plan in an efficacious manner. The Reorganized Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (i) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, DIP Orders (as applicable) and (ii) all matters pending in any courts, tribunals,

forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

### 4. Plan Administrator

On and after the Effective Date, the Plan Administrator shall act for the Reorganized Debtors in the same fiduciary capacity as applicable to a board of managers, directors, officers, or other Governing Body, subject to the provisions of the Plan (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same). On the Effective Date, the authority, power, and incumbency of the persons acting as managers, officers, directors, sale director, or Governing Body of the Reorganized Debtors shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Reorganized Debtors, and shall succeed to the powers of the Reorganized Debtors' managers, directors, officers, and other Governing Bodies. From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Reorganized Debtors. The foregoing shall not limit the authority of the Reorganized Debtors or the Plan Administrator, as applicable, to continue the employment of any former manager or officer, including pursuant to any transition services agreement entered into on or after the Effective Date by and between the Reorganized Debtors and the Purchaser. The Plan Administrator shall use commercially reasonable efforts to operate in a manner consistent with the Wind-Down Budget.

### 5. Dissolution and Governing Bodies of the Debtors

As of the Effective Date, the Sheridan II Special Committee shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, members, or Governing Bodies, and any remaining officers, directors, managers, or managing members of any Debtor shall be dismissed without any further action required on the part of any such Debtor, the equity holders of the Debtors, the officers, directors, managers, or Governing Body, as applicable, of the Debtors, or the members of any Debtor. Subject in all respects to the terms of the Plan, the Debtors shall be dissolved as soon as practicable on or after the Effective Date, but in no event later than the closing of the Chapter 11 Cases.

As of the Effective Date, the Plan Administrator shall act as the sole officer, director, manager, and Governing Body, as applicable, of the Debtors with respect to its affairs. Subject in all respects to the terms of the Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve any of the Debtors, and shall: (a) file a certificate of dissolution for any of the Debtors, together with all other necessary corporate and company documents, to effect the dissolution of Sheridan under the applicable laws of its state of formation; and (b) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the Debtors or their Estates for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

The filing by the Plan Administrator of any of the Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of Manager or any of its affiliates.

## 6.    Release of Liens

Except as otherwise expressly provided in the Plan or in the Confirmation Order, on the Effective Date, all Liens on any property of any Debtors or the Reorganized Debtors shall automatically terminate, all property subject to such Liens shall be automatically released, and all guarantees of any Debtors or the Reorganized Debtors shall be automatically discharged and released; *provided* that notwithstanding anything to the contrary set forth in the Plan, subject to the funding of the Professional Fee Escrow Account, (a) all Liens of the DIP Lenders, the Sheridan II Revolving Lenders, and the Sheridan II Term Lenders, on any property of any Debtors or the Reorganized Debtors shall remain valid, binding, and in full effect on and after the Effective Date, (b) all property of the Debtors and Reorganized Debtors shall remain subject to the Liens and claims of the DIP Lenders, the Sheridan II Revolving Lenders, and the Sheridan II Term Lenders and shall continue to secure all Obligations (as defined in the DIP Credit Agreement, the Sheridan II RBL Credit Agreements, or the Sheridan II Term Loan Credit Agreements, as applicable) owing to the DIP Lenders, the Sheridan II Revolving Lenders, and the Sheridan II Term Lenders, (c) all guarantees of any Debtors or the Reorganized Debtors in favor of the DIP Lenders, the Sheridan II Revolving Lenders, and the Sheridan II Term Lenders shall be reaffirmed and remain in full force and effect, and (d) the proceeds of sales of any collateral of the Reorganized Debtors securing the DIP claims, Sheridan II RBL Claims, and Sheridan II Term Loan Claims shall remain subject to the liens and claims of the Sheridan II Revolving Lenders and Sheridan II Term Lenders, as applicable, to the same extent as such liens and claims were enforceable against the Debtors and the Debtors' assets, in each case of (a)-(d) until the DIP Lenders, Sheridan II Revolving Lenders, and Sheridan II Term Lenders receive their distributions or other treatment in accordance with Article II.B and Article III.B of the Plan.

## 7.    Corporate Action

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects, including:  (a) consummation of the Asset Sale; and (b) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan or deemed necessary or desirable by the Debtors before, on, or after the Effective Date involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan or corporate structure of the Debtors or Reorganized Debtors, shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors.  Before, on, or after the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors.  The

authorizations and approvals contemplated by Article IV.F of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### 8. Effectuating Documents; Further Transactions

Prior to the Effective Date, the Debtors are, and on and after the Effective Date, the Reorganized Debtors, the Plan Administrator, and the officers and members thereof are, authorized to and may issue, execute, deliver, file, or record to the extent not inconsistent with any provision of the Plan such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, notice, or consents, except for those expressly required pursuant to the Plan.

### 9. Preservation of Causes of Action

Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Debtors shall convey to the Plan Administrator all rights to commence, prosecute, or settle, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, which shall vest in the Plan Administrator pursuant to the terms of the Plan. The Plan Administrator may enforce all rights to commence, prosecute, or settle, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and the Plan Administrator's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Plan Administrator may, in its reasonable business judgment, pursue such Causes of Action and may retain and compensate professionals in the analysis or pursuit of such Causes of Action to the extent the Plan Administrator deems appropriate, including on a contingency fee basis. No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Plan Administrator will not pursue any and all available Causes of Action against them. The Debtors and the Plan Administrator expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan; *provided* that the Reorganized Debtors, in consultation with the Plan Administrator after the Effective Date, may prosecute any such Cause of Action against any party only in connection with their objection to and resolution of any Claim asserted by such party. Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Plan Administrator expressly reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. The Plan Administrator shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to, or action, order, or approval of, the Bankruptcy Court.

### 10. Closing the Chapter 11 Cases

Upon the occurrence of the Effective Date, the Plan Administrator shall be permitted to close all of the Chapter 11 Cases except for one of the Chapter 11 Cases as determined by the Plan Administrator, the Reorganized Debtors, and the Required Consenting Secured Lenders, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of Holdco II.

When all Disputed Claims have become Allowed or Disallowed and all remaining Cash has been distributed in accordance with the Plan, the Plan Administrator shall seek authority from the Bankruptcy Court to close the Chapter 11 Case of Holdco II in accordance with the Bankruptcy Code and the Bankruptcy Rules.

## VII. OTHER KEY ASPECTS OF THE PLAN

### A. Treatment of Executory Contracts and Unexpired Leases

#### 1. Assumption and Rejection of Executory Contracts and Unexpired Leases

Each Executory Contract and Unexpired Lease shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code. The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates. The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions and assignments.

Except as otherwise provided in the Plan or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

#### 2. Indemnification Obligations

All Indemnification Provisions, consistent with applicable law, currently in place (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other

professionals of, or acting on behalf of, the Debtors than the indemnification provisions in place prior to the Effective Date.

On or before the Effective Date, the Reorganized Debtors shall and are authorized to procure the New D&O Tail Coverage, unless otherwise agreed between the Debtors and the Required Consenting Secured Lenders. To the extent any Entity seeks payment under an Indemnification Provision from the Reorganized Debtors, such Entity and/or the Reorganized Debtors, as applicable, shall use commercially reasonable efforts to first or simultaneously pursue coverage under, and pursue claims from, the New D&O Tail Coverage (or any other available directors and officers insurance policy, runoff policy, excess DIC policy, management liability solutions policy, excess protect liability insurance, excess liability insurance, excess select insurance policy, or excess policy declarations in which the Reorganized Debtors have an interest or that provides or may provide coverage for the Reorganized Debtors, or any other available insurance policy or coverage of any kind in which the Reorganized Debtors have an interest or that provides or may provide coverage for the Reorganized Debtors), to the extent applicable (without limiting or altering the entitlement to, or timing of, payment under such Indemnification Provision).

### 3. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

The Debtors or the Reorganized Debtors, as applicable, shall pay Cures, if any, on the Effective Date or as soon as reasonably practicable thereafter. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date. Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure; *provided* that nothing in the Plan shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure. The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely Filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute,

approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure pursuant to Article V.C of the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to Article V.C of the Plan shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

### 4. Insurance Policies

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (2) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

### 5. Reservation of Rights

Nothing contained in the Plan or the Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under the Plan.

### 6. Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

### 7. Contracts and Leases Entered Into After the Petition Date

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors liable thereunder in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## B.    Provisions Governing Distributions

### 1.    Timing and Calculation of Amounts to Be Distributed

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Allowed Interest (as applicable) shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests (as applicable) in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VIII of the Plan.  Except as otherwise provided in the Plan, Holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

### 2.    Disbursing Agent

All distributions under the Plan shall be made by the Disbursing Agent on the Effective Date.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

### 3.    Rights and Powers of Disbursing Agent

#### a.    Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

#### b.    Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

4. **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

a. **Record Date for Distribution**

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.

b. **Delivery of Distributions in General**

Except as otherwise provided in the Plan, the Disbursing Agent shall make distributions to Holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors; *provided further* that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.

c. **Minimum Distributions**

No fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest (as applicable) would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefore. The total number of authorized shares of New Common Stock to be distributed to Holders of Allowed Claims and Allowed Interests (as applicable) shall be adjusted as necessary to account for the foregoing rounding.

d. **Undeliverable Distributions and Unclaimed Property**

In the event that any distribution to any Holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder of Claims and Interests to such property or Interest in property shall be discharged and forever barred.

### 5.    Manner of Payment

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

### 6.    Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

### 7.    Allocations

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

### 8.    No Postpetition Interest on Claims

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims (other than the Sheridan II RBL Claims and Sheridan II Term Loan Claims) against the Debtors, and no Holder of a prepetition Claim (other than the Sheridan II RBL Claims and Sheridan II Term Loan Claims) against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

### 9.    Foreign Currency Exchange Rate

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal (National Edition)*, on the Effective Date.

### 10. Setoffs and Recoupment

Except as expressly provided in the Plan, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and Holder of Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable Holder. In no event shall any Holder of Claims against, or Interests in, the Debtors be entitled to recoup any such Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XIII.H of the Plan on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

### 11. Claims Paid or Payable by Third Parties

#### a. Claims Paid by Third Parties

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

#### b. Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### c. Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

### C. The Plan Administrator

The following provisions shall apply only if an Asset Sale Restructuring occurs and a Plan Administrator is appointed.

### 1. The Plan Administrator

The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and wind down the business and affairs of the Debtors and the Reorganized Debtors, including:  (a) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Reorganized Debtor in accordance with the Wind-Down Milestones and Wind-Down Budget; (b) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan in accordance with the Wind-Down Budget; (c) making distributions as contemplated under the Plan; (d) establishing and maintaining bank accounts in the name of the Reorganized Debtors; (e) subject to the terms set forth in the Plan, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (f) paying all reasonable fees, expenses, debts, charges, and liabilities of the Reorganized Debtors on and after the Effective Date; (g) administering and paying taxes of the Reorganized Debtors, including filing tax returns; (h) representing the interests of the Reorganized Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding, or audit; and (i) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan, in each case of the forgoing clauses, strictly in accordance with the Wind-Down Milestones and Wind-Down Budget.

The Plan Administrator may resign at any time upon thirty (30) days' written notice delivered to the Bankruptcy Court; *provided* that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator in accordance with the Plan Administrator Agreement.  Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor (as set forth in the Plan Administrator Agreement) and all responsibilities of the predecessor Plan Administrator relating to the Reorganized Debtors in the Plan Administrator Agreement shall be terminated.

### a. Plan Administrator Rights and Powers

The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under the Plan in accordance with the Wind-Down Milestones

and Wind-Down Budget, and as otherwise provided in the Confirmation Order. The Plan Administrator shall be the exclusive trustee of the assets of the Reorganized Debtors for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

### b. Compensation and Expenses of the Plan Administrator

The Plan Administrator's post Effective Date compensation will be set forth in the Plan Supplement and paid out of the Wind-Down Budget and Plan Administrator Assets.

### c. Wind-Down Budget

The Debtors shall include in the Plan Supplement a Wind-Down Budget.

### 2. Wind Down

On and after the Effective Date, the Plan Administrator will be authorized and directed to implement the Plan and any applicable orders of the Bankruptcy Court in accordance with the Wind-Down Milestones and Wind-Down Budget, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates in accordance with the Wind-Down Milestones and Wind-Down Budget.

As soon as practicable after the Effective Date, the Plan Administrator shall: (1) cause the Debtors and the Reorganized Debtors, as applicable, to comply with, and abide by, the terms of the Asset Purchase Agreement and any other documents contemplated thereby; (2) to the extent applicable, file a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of their state of incorporation or formation (as applicable); and (3) take such other actions in accordance with the Wind-Down Milestones and Wind-Down Budget as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan. Any certificate of dissolution or equivalent document may be executed by the Plan Administrator without need for any action or approval by the shareholders, board of directors or managers, or Governing Body of any Debtor. From and after the Effective Date, except with respect to the Reorganized Debtors as set forth in the Plan, the Debtors (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have canceled pursuant to the Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. Notwithstanding the Debtors' dissolution, the Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

### 3. Tax Returns

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors reflecting all tax consequences relating to the activities of the Reorganized Debtors as attributable to and for the account of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

### 4. Dissolution of the Reorganized Debtors

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Reorganized Debtors shall be deemed to be dissolved without any further action by the Reorganized Debtors, including the filing of any documents with the secretary of state for the state in which the Reorganized Debtors is formed or any other jurisdiction. The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Reorganized Debtors in and withdraw the Reorganized Debtors from applicable state(s).

### D. Procedures for Resolving Contingent, Unliquidated, and Disputed Claims

### 1. Disputed Claims Process

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of all Allowed General Unsecured Claims under the Plan, except as required by the Plan, Holders of Claims need not File Proofs of Claim, and the Reorganized Debtors and the Holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced except that (unless expressly waived pursuant to the Plan) the Allowed amount of such Claims shall be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable. All Proofs of Claim filed in these Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors. Upon the Effective Date, all Proofs of Claim filed against the Debtors, regardless of the time of filing, and including Proofs of Claim filed after the Effective Date, shall be deemed withdrawn and expunged, other than as provided below. Notwithstanding anything in the Plan to the contrary, disputes regarding the amount of any Cure pursuant to section 365 of the Bankruptcy Code and Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court.

For the avoidance of doubt, there is no requirement to File a Proof of Claim or Proof of Interest (or move the Bankruptcy Court for allowance) to be an Allowed Claim or Allowed Interest, as applicable, under the Plan. Notwithstanding the foregoing, Entities must File Cure objections as set forth in Article V.C of the Plan to the extent such Entity disputes the amount of the Cure paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty. **Except as otherwise provided in the Plan, all Proofs of Claim filed after the Effective Date shall be**

**disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

### 2. Allowance of Claims

After the Effective Date and subject to the terms of the Plan, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date. The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

### 3. Claims Administration Responsibilities

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority: (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest.

Any objections to Claims and Interests other than General Unsecured Claims shall be served and filed on or before the 180th day after the Effective Date or by such later date as ordered by the Bankruptcy Court. All Claims and Interests other than General Unsecured Claims not objected to by the end of such 180-day period shall be deemed Allowed unless such period is extended upon approval of the Bankruptcy Court.

Notwithstanding the foregoing, the Debtors and Reorganized Debtors shall be entitled to dispute and/or otherwise object to any General Unsecured Claim in accordance with applicable nonbankruptcy law. If the Debtors, or Reorganized Debtors dispute any General Unsecured Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced. In any action or proceeding to determine the existence, validity, or amount of any General Unsecured Claim, any and all claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such General Unsecured Claim are preserved as if the Chapter 11 Cases had not been commenced.

### 4. Adjustment to Claims or Interests without Objection

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 5. Disallowance of Claims or Interests

All Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

### E. Settlement, Release, Injunction, and Related Provisions

### 1. Discharge of Claims and Termination of Interests

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

### 2. Release of Liens

**Except as otherwise provided in the Exit Facility Documents, the Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to reinstate in accordance with Article III.B.1 of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against**

any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

3.      Releases by the Debtors

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Company Party and another Company Party, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the DIP Credit Agreement, the Exit Facilities, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the RSA, the Disclosure Statement, the DIP Credit Agreement, or the Plan, the Plan Supplement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the

Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facility Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

4.      Releases by Holders of Claims and Interests

Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Company Party and another Company Party, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the DIP Credit Agreement, the Exit Facilities, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the RSA, the Disclosure Statement, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of

Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any party of any obligations related to customary banking products, banking services or other financial accommodations (except as may be expressly amended or modified by the Plan and the Exit Facility Credit Agreements, or any other financing document under and as defined therein) or (ii) any post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facility Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third Party Release is: (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

5.      Exculpation

Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the RSA and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties and other parties set forth above have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

6.     Injunction

Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

7.     Protections Against Discriminatory Treatment

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

### 8. Document Retention

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

### 9. Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

### F. Conditions Precedent to Confirmation and Consummation of the Plan

### 1. Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article X.B of the Plan:

> a. the Bankruptcy Court shall have entered the Confirmation Order;
>
> b. the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;
>
> c. the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in a manner consistent in all material respects with the RSA and the Plan;
>
> d. all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date have been placed in the Professional Fee Escrow Account pending approval by the Bankruptcy Court;
>
> e. the RSA shall remain in full force and effect;
>
> f. in the event of the Asset Sale Restructuring, the conditions to effectiveness to the Asset Purchase Agreement shall have been satisfied;

g.      in the event of the Asset Sale Restructuring, the Asset Purchase Agreement shall have been executed and remains in full force and effect;

h.      in the event of the Equity Restructuring, entry into the Exit Facility Documents, and all conditions precedent to the consummation of such Exit Facility Documents shall have been waived or satisfied in accordance with their terms thereof and the closing of such Exit Facility Documents shall have occurred;

i.      in the event of the Equity Restructuring, the New Common Stock shall have been issued by New Sheridan;

j.      the Reorganized Debtors shall have procured or become insured under (i) the New D&O Tail Coverage acceptable to the Required Consenting Secured Lenders and the Debtors and (ii) one or more other director and officer's insurance policies acceptable to the Debtors and the Required Consenting Secured Lenders;

k.      to the extent invoiced, the payment in cash in full of all Restructuring Expenses;

l.      each of SIP II, SPP II-A, SPP II-B, and SPP II-M shall have entered into the Push-Out Election Agreement (as defined in the Plan); and

m.      the Debtors shall have otherwise substantially consummated the applicable Restructuring Transaction, and all transactions contemplated in the Plan, in a manner consistent in all respects with the RSA and the Plan.

## 2.      Waiver of Conditions

The conditions to Confirmation and Consummation set forth in Article X of the Plan may be waived by the Debtors only with the prior written consent of the Required Consenting Secured Lenders (email shall suffice), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.  Sections 9 and 11 in Article X.A of the Plan may be waived by the Debtors only with the prior written consent of both the Required Consenting Secured Lenders and the Ad Hoc Group (email shall suffice), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

## 3.      Effect of Failure of Conditions

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (a) constitute a waiver or release of any Claims by the Debtors, Claims, or Interests; (b) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (c) constitute an admission,

acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity.

### G.    Modification, Revocation, or Withdrawal of the Plan

#### 1.    Modification and Amendments

Except as otherwise specifically provided in the Plan and to the extent permitted by the RSA, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to those restrictions on modifications set forth in the Plan and the requirements of section 1127 of the Bankruptcy Code, Rule 3019 of the Federal Rules of Bankruptcy Procedure, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or, to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

#### 2.    Effect of Confirmation on Modifications

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

#### 3.    Revocation or Withdrawal of Plan

To the extent permitted by the RSA, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan shall:  (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of such Debtor or any other Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## VIII.  RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

## A. Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

### 1. Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2. The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article X of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are not waived or not met, the Effective Date will not take place.

### 3. The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may need to seek to confirm an alternative chapter 11 plan or transaction, subject to the terms of the RSA. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

### 4. The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan and the RSA, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 5. Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6. Continued Risk upon Confirmation

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for oil and natural gas, and increasing expenses. See Article VIII.C of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Reorganized Debtors' Businesses." Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

### 7. The Bankruptcy Court May Find the Solicitation of Acceptances Inadequate

Usually, votes to accept or reject a plan of reorganization are solicited after the filing of a petition commencing a chapter 11 case. Nevertheless, a debtor may solicit votes prior to the commencement of a chapter 11 case in accordance with sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b). Sections 1125(g) and 1126(b) and Bankruptcy Rule 3018(b) require that:

- solicitation comply with applicable nonbankruptcy law;

- the plan of reorganization be transmitted to substantially all creditors and other interest holders entitled to vote; and

- the time prescribed for voting is not unreasonably short.

In addition, Bankruptcy Rule 3018(b) provides that a Holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code will not be deemed to have accepted or rejected the plan if the court finds after notice and a hearing that the plan was not transmitted in accordance with reasonable solicitation procedures. Section 1126(b) of the Bankruptcy Code provides that a Holder of a claim or interest that has accepted or rejected a plan before the commencement of a case under the Bankruptcy Code is deemed to have accepted or rejected the plan if (i) the solicitation of such acceptance or rejection was in compliance with applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation or (ii) there is no such law, rule, or regulation, and such acceptance or rejection was solicited after disclosure to such Holder of adequate information (as defined by section 1125(a) of the Bankruptcy Code). While the Debtors believe that the requirements of sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) will be met, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 8. The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 9. The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan, subject to the terms of the RSA. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 10. Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 11. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may

materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

### 12. Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article IX of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties is necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts and have agreed to make further contributions, but only if they receive the full benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an inextricable component of the Plan and the significant deleveraging and financial benefits that they embody.

### B. Risks Related to Recoveries Under the Plan

### 1. The Reorganized Debtors May Not Be Able to Achieve Their Projected Financial Results

The Reorganized Debtors may not be able to achieve their projected financial results. The Financial Projections set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular. While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized. If the Debtors do not achieve their projected financial results, the value of the New Common Stock may be negatively affected and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

### 2. The Debtors May Be Controlled by Significant Holders

If the Plan contemplating the Equitization Restructuring is confirmed and consummated, Holders of Sheridan II RBL Claims, Sheridan II Term Loan Claims, and Sheridan II Subordinated Term Loan Claims will receive the New Common Stock. The Holders of Sheridan II RBL Claims, Sheridan II Term Loan Claims, and Sheridan II Subordinated Term Loan Claims will own approximately 100% of the New Common Stock (subject to dilution on account of other shares issued after the Effective Date not pursuant to the Plan). If the holders of a significant portion of

the New Common Stock were to act as a group, such holders would be in a position to control the outcome of actions requiring shareholder approval.

### 3.   The New Equity is Subject to Dilution

The ownership percentage represented by the New Common Stock distributed on the Effective Date under the Plan will be subject to dilution from the New Common Stock issued in connection with the conversion of any other options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence.

### 4.   Certain Tax Implications of the Plan

Holders of Allowed Claims should carefully review Article XI of this Disclosure Statement, entitled "Certain United States Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and Holders of certain Claims.

### 5.   The Debtors May Not Be Able to Accurately Report Their Financial Results

The Debtors have established internal controls over financial reporting. However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud. Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required for the Debtors' financial reporting under SEC rules and regulations and the terms of the agreements governing the Debtors' indebtedness. Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition. Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

### C.   Risks Related to the Debtors' and the Reorganized Debtors' Businesses

### 1.   The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, potential borrowings under the Exit Facilities upon emergence.

2.     **The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases**

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

3.     **Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses**

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases. The chapter 11 proceedings also require the Debtors to

seek debtor-in-possession financing to fund operations. If the Debtors are unable to obtain final approval of such financing on favorable terms or at all, or if the Debtors are unable to fully draw on the availability under the DIP Facility, the chances of successfully reorganizing the Debtors' businesses may be seriously jeopardized, the likelihood that the Debtors will instead be required to liquidate or sell their assets may be increased, and, as a result, creditor recoveries may be significantly impaired.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

4.    **Financial Results May Be Volatile and May Not Reflect Historical Trends**

The Financial Projections attached hereto as **<u>Exhibit C</u>** are based on assumptions that are an integral part of the projections, including Confirmation and Consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize.

In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtors' operations. These variations may be material and may adversely affect the value of the New Common Stock and the ability of the Debtors to make payments with respect to their indebtedness. Because the actual results achieved may vary from projected results, perhaps significantly, the Financial Projections should not be relied upon as a guarantee or other assurance of the actual results that will occur.

Further, during the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date. In addition, if the Debtors emerge from the Chapter 11 Cases, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

Lastly, the business plan was developed by the Debtors with the assistance of their advisors. There can be no assurances that the Debtors' business plan will not change, perhaps materially, as a result of decisions that the board of directors may make after fully evaluating the

strategic direction of the Debtors and their business plan.  Any deviations from the Debtors' existing business plan would necessarily cause a deviation.

### 5.     The Debtors' Substantial Liquidity Needs May Impact Revenue

The Debtors operate in a capital-intensive industry. If the Debtors' cash flow from operations remains depressed or decreases as a result of low commodity prices, decreased E&P sector capital expenditures, or otherwise, the Debtors may not have the ability to expend the capital necessary to improve or maintain their current operations, resulting in decreased revenues over time.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources.  In addition to the cash necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with preparing for the Chapter 11 Cases and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Cases.  The Debtors cannot guarantee that cash on hand, cash flow from operations, and cash provided by the DIP Facility will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things:  (a) their ability to comply with the terms and condition of any debtor-in-possession financing and/or cash collateral order entered by the Bankruptcy Court in connection with the Chapter 11 Cases; (b) their ability to maintain adequate cash on hand; (c) their ability to develop, confirm, and consummate a chapter 11 plan or other alternative restructuring transaction; and (d) the cost, duration, and outcome of the Chapter 11 Cases. The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control.  In the event that cash on hand, cash flow from operations, and cash provided under the DIP Facility are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing.  The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms.  The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all.  The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

### 6.     Oil and Natural Gas Prices Are Volatile, and Continued Low Oil or Natural Gas Prices Could Materially Adversely Affect the Debtors' Businesses, Results of Operations, and Financial Condition

The Debtors' revenues, profitability and the value of the Debtors' properties substantially depend on prevailing oil and natural gas prices.  In short, the Debtors face a high level of exposure to oil and natural gas price swings.  Oil and natural gas are commodities, and therefore, their prices are subject to wide fluctuations in response to changes in supply and demand and are subject to both short- and long-term cyclical trends.  Oil and natural gas prices historically have been volatile and are likely to continue to be volatile in the future, especially given current economic and

geopolitical conditions.  The prices for oil and natural gas are subject to a variety of factors beyond the Debtors' control, such as:

- the current uncertainty in the global economy;

- changes in global supply and demand for oil and natural gas;

- the condition of the United States and global economies;

- the actions of certain foreign countries;

- the price and quantity of imports of foreign oil and natural gas;

- political conditions, including embargoes, war or civil unrest in or affecting other oil producing activities of certain countries;

- the level of global oil and natural gas exploration and production activity;

- the level of global oil and natural gas inventories;

- production or pricing decisions made by OPEC;

- weather conditions;

- technological advances affecting energy consumption; and

- the price and availability of alternative fuels.

Continued volatility or weakness in oil and natural gas prices (or the perception that oil and natural gas prices will remain depressed) generally leads to decreased upstream spending, which in turn negatively affects demand to the Debtors' services.  A sustained decline in oil or natural gas prices may materially and adversely affect the Debtors' future business, financial condition, results of operations, liquidity or ability to finance planned capital expenditures.  As a result, if there is a further decline or sustained depression in commodity prices, the Debtors may, among other things, be unable to maintain or increase their borrowing capacity, meet their debt obligations or other financial commitments, or obtain additional capital, all of which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

> **7.     The Debtors' Business is Subject to Complex Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business**

The Debtors' operations are subject to extensive federal, state and local laws and regulations, including complex environmental laws and occupational health and safety laws.  The Debtors may be required to make large expenditures to comply with such regulations.  Failure to comply with these laws and regulations may result in the suspension or termination of operations and subject the Debtors to administrative, civil and criminal penalties.  Additionally, in recent years, the practice of hydraulic fracturing has come under increased scrutiny by the environmental

community.  The Debtors' operations create the risk of environmental liabilities to the government or third parties for any unlawful discharge of oil, gas or other pollutants into the air, soil or water. In the event of environmental violations, the Reorganized Debtors may be charged with remedial costs and land owners may file claims for alternative water supplies, property damage or bodily injury.  Laws and regulations protecting the environment have become more stringent in recent years, and may, in some circumstances, result in liability for environmental damage regardless of negligence or fault.  In addition, pollution and similar environmental risks generally are not fully insurable.  These liabilities and costs could have a material adverse effect on the business, financial condition, results of operations and cash flows of the Reorganized Debtors.

### 8. The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases

In the future, the Reorganized Debtors may become parties to litigation.  In general, litigation can be expensive and time consuming to bring or defend against.  Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results.  It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan.  It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation.  The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

### 9. The Loss of Key Personnel Could Adversely Affect the Debtors' Operations

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly-skilled employee base.  The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Debtors have experienced and may continue to experience increased levels of employee attrition.  Because competition for experienced personnel can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses.  In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

## IX. CONFIRMATION OF THE PLAN

### A. The Confirmation Hearing

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization.  The Debtors will request, on the Petition Date, that the Bankruptcy Court set a hearing to approve the Plan and Disclosure Statement.  The Confirmation Hearing may, however, be continued or adjourned from time to time without further notice to parties in interest other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules. Subject to section 1127 of the Bankruptcy Code and the Restructuring Support Agreement, the

Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation. The Debtors, in the same motion requesting a date for the Confirmation Hearing, will request that the Bankruptcy Court set a date and time for parties in interest to file objections to Confirmation of the Plan. An objection to Confirmation of the Plan must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that it is actually received on or before the deadline to file such objections as set forth therein.

### B.      Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

### C.      Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared their projected consolidated balance sheet, income statement, and statement of cash flows (the "Financial Projections"). Creditors and other interested parties should review Article VIII of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections are attached hereto as **Exhibit C** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### D.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[9]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan.  Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan.  Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Article III.E of the Plan, if a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

### E.    Confirmation without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided*, that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b)

---

[9]    A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the Holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the Holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the Holder of such claim or equity interest.

of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1. No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2. Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### F. Valuation Analysis

The Plan provides for the New Common Stock to be distributed to Holders of Claims and Interests in Classes 3(a)–(c), 4(a)–(c), and 5(a)–(c), as applicable, upon consummation of the Equitization Restructuring contemplated by the Plan. Accordingly, Evercore performed an analysis of the estimated implied value of the Debtors on a going-concern basis as of October 31, 2019 (the "Valuation Analysis") at the Debtors' request. Based on the Valuation Analysis which is attached hereto as **Exhibit D**, the Reorganized Debtors will have an implied equity value at emergence of approximately $265 million at the midpoint.

The Valuation Analysis, including the procedures followed, assumptions made, qualifications, and limitations on review undertaken, should be read in conjunction with section VIII of this Disclosure Statement entitled "Risk Factors." The Valuation Analysis is based on data and information as of August 5, 2019. Evercore makes no representations as to changes to such data and information that may have occurred since the date of the Valuation Analysis.

### G. Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a Claim or Interest in such impaired class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting Holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **<u>Exhibit E</u>** and incorporated herein by reference is a liquidation analysis (the "<u>Liquidation Analysis</u>") prepared by the Debtors with the assistance of the Debtors' advisors. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

## X. CERTAIN SECURITIES LAW MATTERS

### A. New Common Stock

As discussed herein, the Plan provides for the offer, issuance, sale, and distribution of New Common Stock (collectively, the "<u>1145 Securities</u>").

As discussed herein, the Equitization Restructuring contemplated by the Plan provides for the Reorganized Debtors to distribute the New Common Stock to Holders of Sheridan II RBL Claims, Sheridan II Term Loan Claims, and Sheridan II Subordinated Term Loan Claims in accordance with Article III of the Plan. The Debtors believe that the class of New Common Stock will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and any applicable Blue Sky Law.

The Debtors further believe that the issuance of the New Common Stock pursuant to the Equitization Restructuring under the Plan is, and subsequent transfers of the New Common Stock by the holders thereof that are not "underwriters" (as defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code) will be, exempt from federal and state securities registration requirements under the Bankruptcy Code and any applicable state Blue Sky Law as described in more detail below, except in certain limited circumstances.

### B. Issuance and Resale of New Common Stock

Other than with respect to the Consenting Stakeholders, all shares of New Common Stock will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on Section 1145(a) of the Bankruptcy Code. The shares of New Common Stock issued to the Consenting Stakeholders will be issued without registration under the Securities Act in reliance upon Section 4(a)(2) of the Securities Act.

Section 1145 of the Bankruptcy Code provides that Section 5 of the Securities Act and any state law requirements for the issuance of a security do not apply to the offer or sale of stock, options, warrants or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization, (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor, and (c) the securities are issued in exchange for a claim against, interest in, or claim for an administrative expense against a debtor or are issued principally in such exchange or partly for cash and property. The Debtors believe that all shares of New Common Stock issued in exchange for the Claims and Interests described above satisfy the requirements of section 1145(a) of the Bankruptcy Code. Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act. The Private Placement Securities are issuable without registration under the Securities Act in reliance upon the exemption from registration provided under section 4(a)(2) of the Securities Act. The Private Placement Securities will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration, under the Securities Act and other applicable law, as described below.

Accordingly, no registration statement will be filed under the Securities Act or any state securities laws. Recipients of the New Common Stock are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state Blue Sky Law. As discussed below, the exemptions provided for in section 1145(a) do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code.

### C.      Resales of New Common Stock; Definition of Underwriter

#### 1.      1145 Securities

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all "affiliates," which are all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling

Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns 10% or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of the New Common Stock constituting 1145 Securities by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of New Common Stock constituting 1145 Securities who are deemed to be "underwriters" may be entitled to resell their New Common Stock pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such Person if the required holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met. Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the New Common Stock would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to such New Common Stock and, in turn, whether any Person may freely trade such New Common Stock. However, the Debtors do not intend to make publicly available the requisite information regarding the Debtors, and, as a result, after the holding period, Rule 144 will not be available for resales of such New Common Stock by Persons deemed to be underwriters or otherwise.

Accordingly, the Debtors recommend that potential recipients of the New Common Stock consult their own counsel concerning their ability to freely trade such securities without compliance with the federal law and any applicable state Blue Sky Law. In addition, these securities will not be registered under the Exchange Act or listed on any national securities exchange. The Debtors make no representation concerning the ability of a person to dispose of the New Common Stock.

## XI. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A. Introduction

The following discussion summarizes certain United States federal income tax consequences of the implementation of the Plan to the Borrowers and certain Holders of Claims entitled to vote on the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable

<u>Tax Law</u>").  Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.  The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, local or non-income tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Borrowers within the meaning of the Tax Code, persons liable for alternative minimum tax, U.S. Holders whose functional currency is not the U.S. dollar, U.S. expatriates, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, controlled foreign corporations, passive foreign investment companies, pass-through entities, beneficial owners of pass-through entities, subchapter S-corporations, persons who hold Claims or who will hold the New Common Stock as part of a straddle, hedge, conversion transaction, or other integrated investment, persons who hold Claims, Tranche C of the Last-Out Exit Facility, or New Common Stock as part of a straddle, hedge, conversion transaction, or other integrated investment, accrual method U.S. Holders that prepare an "applicable financial statement" (as defined in Section 451 of the Tax Code), persons using a mark-to-market method of accounting, and Holders of Claims who are themselves in bankruptcy).  Further, this summary assumes that a Holder of a Claim holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code).  This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form and that the Sheridan II RBL Claims, Sheridan II Term Loan Claims, Sheridan II Subordinated Term Loan Claims and Tranche C of the Last-Out Exit Facility constitute interests in the Borrowers "solely as a creditor" for purposes of section 897 of the Tax Code.  This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described herein.  This summary does not address the U.S. federal income tax consequences to Holders (1) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, or (2) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the Tax Code) have authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.  For purposes of this discussion, a "non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder or a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

### B.      Certain U.S. Federal Income Tax Consequences to the Borrowers

#### 1.      Characterization of Restructuring Transactions

The characterization of the Restructuring Transactions for tax purposes will depend on whether they are effected as an Asset Sale Restructuring or an Equitization Restructuring. In the case of an Asset Sale Restructuring, the Borrowers will be treated as (i) selling their assets to purchasers under the Asset Purchase Agreements, (ii) undertaking any further wind-down activities conducted by the Plan Administrator and (iii) delivering the proceeds of those sales to creditors in satisfaction of Claims. In the case of an Equitization Restructuring, the Borrowers will (i) transfer their assets to an indirect subsidiary of New Sheridan in satisfaction of Claims contributed to New Sheridan by certain Holders of Claims and in consideration for New Common Stock and Tranche C of the Last-Out Exit Facility and (ii) distribute the New Common Stock and Tranche C of the Last-Out Exit Facility received in satisfaction of Claims of other Holders. The Equitization Restructuring is intended to be treated as a taxable sale or exchange of the assets of the Borrowers to a subsidiary of New Sheridan for U.S. federal income tax purposes in which New Sheridan's subsidiary has an initial tax basis in the transferred assets equal to their respective fair market values at the time of transfer.

Regardless of whether the Restructuring Transactions are structured as an Asset Sale Restructuring or an Equitization Restructuring, the Borrowers will realize gain or loss upon the transfer of their assets in amounts equal to the difference between the aggregate amounts realized on the sales or exchanges and the Borrowers' aggregate tax basis in such assets and will report the transactions contemplated by the Plan on their tax returns consistent with such characterization. In addition, as discussed below, it is expected that the Borrowers will realize cancellation of indebtedness income ("CODI") as a result of the Restructuring Transactions.

Each Borrower is treated as a partnership for U.S. federal income tax purposes. Accordingly, the U.S. federal income tax consequences of consummating the Plan will generally not be borne by the Borrowers, but by the applicable Borrowers' partners (i.e., the Holders of partnership interests in each Borrower). In connection with any U.S. federal income tax audit, examination, adjustment or proceeding relating to the 2018 or any subsequent taxable year of any

Borrower by any taxing authority or any other tax-related administrative or judicial proceeding relating to any Borrower, such Borrower shall, and shall cause its designated "partnership representative" (within the meaning of section 6223 of the Tax Code) and its "designated individual" (within the meaning of Treasury Regulations Section 301.6223-1(b)(3)), if any, to timely make a "push-out" election under section 6226 of the Code, requiring each partner of such Borrower to take into account any tax, interest or other liabilities arising from IRS audit adjustments relating to such Borrower, and to take all actions necessary to effect such election, to the extent permitted by applicable law.

## 2.    Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, a taxpayer will realize and recognize CODI for U.S. federal income tax purposes, upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of CODI, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash paid, (ii) the issue price (determined as discussed below) of any new indebtedness of the taxpayer issued, and (iii) the fair market value of any other new consideration (including stock of the debtor) given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a taxpayer is not required to include CODI in gross income if (a) the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding (the "Bankruptcy Exception"), or (b) to the extent that the taxpayer is insolvent immediately before the discharge (the "Insolvency Exception").  Instead, as a consequence of such exclusion, a taxpayer must reduce its tax attributes by the amount of CODI that it excluded from gross income pursuant to the rule discussed in the preceding sentence. Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined (including, as described above, the amount of gain or loss recognized by the Borrowers with respect to the sale of all or a portion of their assets in a taxable transaction). In general, tax attributes will be reduced in the following order: (a) net operating losses ("NOLs") and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the taxpayer remains subject); (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers.[10]    Alternatively, a taxpayer with CODI may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code.[11]  Any excess CODI over the amount of available tax attributes is not subject to U.S. federal income tax and has no other U.S. federal income tax impact.

---

[10]    Under the 2017 tax reform legislation commonly referred to as the tax cuts and jobs act, interest deductions in excess of statutorily-defined limits are deferred under section 163(j) of the Tax Code unless and until a debt issuer has sufficient adjusted taxable income to be entitled to claim such deductions.  It is unclear whether interest deductions that are deferred under section 163(j) of the Tax Code are subject to reduction under section 108 of the Tax Code.

[11]    This extent to which this election can apply to the Debtors' assets that are subject to depletion, as opposed to depreciation, is subject to uncertainty.

Under section 108(d)(6) of the Tax Code, when an entity that is a flow-through entity (other than an S corporation), such as the Borrowers, realizes CODI, its members/partners are treated as receiving their allocable share of such CODI and the Bankruptcy Exception and the Insolvency Exception (and related attribute reduction) are applied at the member/partner level rather than at the entity level. Accordingly, the Holders of equity in a Borrower will be treated as receiving their allocable shares, if any, of the CODI realized by the applicable Borrower.

As a result of the Restructuring Transactions, the Borrowers may realize CODI. Under the Asset Sale Restructuring construct and Equitization Restructuring construct, the exact amount of any CODI that will be realized by the Borrowers will not be determinable until the consummation of the Plan. Because the Plan provides that certain Claim Holders will receive (x) cash consideration based on Sale Proceeds if the Asset Sale Restructuring occurs or (y) non-Cash consideration if the Equitization Restructuring occurs, the amount of CODI, and, if applicable, the amount of tax attributes required to be reduced, will depend, in part, on the amount of Sale Proceeds or the fair market value (or, in the case of debt instruments, the issue price) of the non-Cash consideration received, as applicable, which cannot be known with certainty at this time.

### C. Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Claims

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan. Holders of Claims are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

#### 1. U.S. Federal Income Tax Consequences to U.S. Holders of Allowed RBL Credit Agreement Claims, Term Loan Credit Agreement Claims, and Subordinated Term Loan Credit Agreement Claims

The U.S. federal income tax consequences to a U.S. Holder of a Class 3(a)–(c) (the "RBL Credit Agreement Claims"), Class 4(a)–(c) (the "Term Loan Credit Agreement Claims"), and Class 5(a)–(c) Claim will depend, in part, on whether the form of the Restructuring Transactions is an Equitization Restructuring or Asset Sale Restructuring.

##### a. Holders of RBL Credit Agreement Claims and Term Loan Credit Agreement Claims With Respect to an Asset Sale Restructuring

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of RBL Credit Agreement Claims, each Holder thereof will receive its ratable share (measured by reference to the Secured Lender Claim Amount) of the Sale Proceeds up to the Allowed amount of such Claims, less the Junior Stakeholder Sale Recovery, if the Asset Sale Restructuring occurs.

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of Term Loan Credit Agreement Claims, each Holder thereof will receive its ratable share (measured by reference to the Secured Lender Claim Amount) of the Sale Proceeds up to the Allowed amount of such Claims, less the Junior Stakeholder Sale Recovery, if the Asset Sale Restructuring occurs.

A Holder of an RBL Credit Agreement Claim or Term Loan Credit Agreement Claim will generally be treated as having received its share of the Sale Proceeds from Borrowers in exchange for its RBL Credit Agreement Claim or Term Loan Credit Agreement Claim in an exchange governed by section 1001 of the Tax Code in which taxable gain or loss is realized in an amount equal to the difference between (A) the amount of Sale Proceeds received and (B) such U.S. Holders' adjusted basis, if any, in the RBL Credit Agreement Claim or Term Loan Credit Agreement Claim exchanged therefor. Any cash received in respect of accrued but untaxed interest will be taxed as set forth below under "*Accrued but Untaxed Interest*."

        **b.**      **Holders of RBL Credit Agreement Claims and Term Loan Credit Agreement Claims With Respect to an Equitization Restructuring**

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of RBL Credit Agreement Claims, each Holder thereof will receive its ratable share (measured by reference to the Secured Lender Claim Amount) of (1) Tranche C of the Last-Out Exit Facility and (2) the Secured Lender Common Stock Pool, if the Equitization Restructuring occurs.

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of Term Loan Credit Agreement Claims, each Holder thereof will receive its ratable share (measured by reference to the Secured Lender Claim Amount) of (a) Tranche C of the Last-Out Exit Facility and (b) the Secured Lender Common Stock Pool, if the Equitization Restructuring occurs.

A Holder of an RBL Credit Agreement Claim or Term Loan Credit Agreement Claim will generally be treated as having exchanged its RBL Credit Agreement Claim or Term Loan Credit Agreement Claim for New Common Stock and its share of Tranche C of the Last-Out Exit Facility in an exchange governed by section 1001 of the Tax Code in which taxable gain or loss is realized in an amount equal to the difference between (A) the issue price of Tranche C of the Last-Out Exit Facility and the fair market value of the New Common Stock received and (B) such U.S. Holders' adjusted basis, if any, in the RBL Credit Agreement Claim or Term Loan Credit Agreement Claim exchanged therefor. Any cash received in respect of accrued but untaxed interest will be taxed as set forth below under "*Accrued but Untaxed Interest*."

A U.S. Holder's aggregate tax basis in its share of Tranche C of the Last-Out Exit Facility received in the exchange should be equal to its issue price (as discussed below) and a U.S. Holder's holding period would begin on the day after the Effective Date.

A U.S. Holder's initial aggregate tax basis in the New Common Stock received in the exchange should be equal to the fair market value of the New Common Stock. A U.S. Holder's holding period of the New Common Stock would begin on the day after the Effective Date.

The determination of "issue price" for purposes of the analysis herein will depend, in part, on whether the debt instruments issued to a Holder or surrendered under the Plan are traded on an "established market" at any time during the 31-day period ending fifteen (15) days after the Effective Date. In general, a debt instrument will be treated as traded on an established market if

(a) a "sales price" for an executed purchase of the debt instrument appears on a medium that is made available to issuers of debt instruments, persons that regularly purchase or sell debt instruments, or persons that broker purchases or sales of debt instruments; (b) a "firm" price quote for the debt instrument is available from at least one broker, dealer, or pricing service for property and the quoted price is substantially the same as the price for which the person receiving the quoted price could purchase or sell the property; or (c) there are one or more "indicative" quotes available from at least one broker, dealer, or pricing service for property. However, a debt instrument will not be treated as traded on an established market if at the time the determination is made the outstanding stated principal amount of the issue that includes the debt instrument does not exceed $100 million. The issue price of a debt instrument that is traded on an established market would be the fair market value of such debt instrument on the issue date as determined by such trading. The issue price of a debt instrument that is neither so traded nor issued for another debt instrument so traded generally would be its stated principal amount (provided that the interest rate on the debt instrument exceeds the applicable federal rate published by the Internal Revenue Service).

The interests in Tranche C of the Last-Out Exit Facility will not be considered to be traded on an established market based on the exception described above for a debt instrument with an outstanding principal amount less than $100 million. If any of the relevant Claims exchanged for interests in Tranche C of the Last-Out Exit Facility is considered to be traded on an established market for these purposes, the issue price of the Tranche C Exit Facilities may be determined in whole or in part by reference to such trading prices and could be treated as issued with original issue discount, in which case the rules described below under "*Accrual of Original Issue Discount on Tranche C of the Last-Out Exit Facility*" would apply. If neither the interests in Tranche C of the Last-Out Exit Facility nor the relevant Claims exchanged therefor are considered to be publicly traded, the issue price of Tranche C of the Last-Out Exit Facility generally would be the stated principal amount.

### c. Holders of Subordinated Term Loan Credit Agreement Claims With Respect to an Asset Sale Restructuring

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of Subordinated Term Loan Credit Agreement Claims, each Holder thereof will receive its ratable share (measured by reference to the Allowed amount of Sheridan II Subordinated Term Loan Claims) of the Junior Stakeholder Accepting Class Sale Recovery if the Asset Sale Restructuring occurs.

Subject to the rules regarding accrued but untaxed interest described below, each Holder of such Claim should recognize gain or loss equal to the difference between (1) the amount of cash received and (2) such Holder's adjusted basis, if any, in such Claim.

### d. Holders of Subordinated Term Loan Credit Agreement Claims With Respect to an Equitization Restructuring

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of Subordinated Term Loan Credit Agreement Claims, each Holder thereof will receive its ratable share (measured by reference to the Allowed amount of Sheridan II

Subordinated Term Loan Claims) of the Junior Stakeholder Equitization Recovery if the Equitization Restructuring occurs.

Subject to the rules regarding accrued but untaxed interest described below, each Holder of such Claim should recognize gain or loss equal to the difference between (1) the fair market value of New Common Stock received and (2) such Holder's adjusted basis, if any, in such Claim. A Holder's tax basis in any New Common Stock received should equal the fair market value of such New Common Stock as of the date such New Common Stock is distributed to the Holder. A Holder's holding period for the New Common Stock received should begin on the day following the date it receives such New Common Stock.

### 2. Accrued but Untaxed Interest

To the extent that any amount received by a U.S. Holder of a Claim is attributable to accrued but untaxed interest on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder). Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest previously was included in the U.S. Holder's gross income but was not paid in full by the Borrowers. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration received pursuant to the Plan is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated to principal, rather than interest, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the Holder should be allocated in some way other than as provided in the Plan.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST**.

### 3. Market Discount

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim who exchanges the Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original

issue and if its Holder's initial tax basis in the debt instrument is less than (x) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (y) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of an Allowed Claim (determined as described above) that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE APPLICATION OF THE MARKET DISCOUNT RULES TO THEIR CLAIM**S.

### 4. Character of Gain or Loss With Respect to Impaired Claims

Generally, the gain or loss recognized by a U.S. Holder with respect to a Claim will be a capital gain or loss unless the Claim was acquired at a market discount (as discussed above), and depending on whether and the extent to which the holder previously claimed a bad debt deduction. Any such capital gain or loss generally should be long-term if the U.S. Holder's holding period in the Claim is more than one year and otherwise should be short-term. Under current U.S. federal income tax law, certain non-corporate U.S. Holders (including individuals) are eligible for preferential rates of U.S. federal income tax on long-term capital gains.

A U.S. Holder of a Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (x) $3,000 ($1,500 for married individuals filing separate returns) or (y) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, capital losses may only be used to offset capital gains. A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

### 5. Payments of Stated Interest on Tranche C of the Last-Out Exit Facility

Payments of stated interest on Tranche C of the Last-Out Exit Facility generally should be taxable to a Holder as ordinary interest income at the time such payments are accrued or are received (in accordance with the Holder's regular method of tax accounting).

### 6. Accrual of Original Issue Discount on Tranche C of the Last-Out Exit Facility

Tranche C of the Last-Out Exit Facility may be treated as issued with original issue discount ("OID"). A debt instrument generally has OID if its "stated redemption price at maturity" exceeds its "issue price" (as described above) by more than a de minimis amount. Tranche C of the Last-Out Exit Facility's "stated redemption price at maturity" for this purpose would include all principal and interest payable over the term of Tranche C of the Last-Out Exit Facility, other than "qualified stated interest," *i.e.*, stated interest that is unconditionally payable at least annually at a constant rate in cash or property (other than debt of the issuer). The stated interest payable on Tranche C of the Last-Out Exit Facility should be considered qualified stated interest for this purpose.

If Tranche C of the Last-Out Exit Facility is issued with OID, the holder of Tranche C of the Last-Out Exit Facility generally will be required to include OID in gross income as it accrues over the term of the loan in accordance with a constant yield-to-maturity method, regardless of whether the U.S. Holder is a cash or accrual method taxpayer, and regardless of whether and when the Holder receives cash payments of interest on the obligation. Accordingly, a Holder could be treated as receiving interest income in advance of a corresponding receipt of cash. Any OID that a Holder includes in income will increase the Holder's adjusted tax basis in Tranche C of the Last-Out Exit Facility. A U.S. Holder generally will not be required to include separately in income cash payments (other than in respect of qualified stated interest) received on Tranche C of the Last-Out Exit Facility; instead, such payments will reduce the Holder's adjusted tax basis in Tranche C of the Last-Out Exit Facility by the amount of the payment.

The amount of OID includible in income for a taxable year by a U.S. Holder generally equals the sum of the daily portions of OID that accrue on Tranche C of the Last-Out Exit Facility for each day during the taxable year on which such Holder holds Tranche C of the Last-Out Exit Facility, whether reporting on the cash or accrual basis of accounting for U.S. federal income tax purposes. The daily portion is determined by allocating to each day of an accrual period (generally, the period between interest payments or compounding dates) a ratable portion of the OID allocable to such accrual period. The amount of OID that will accrue during an accrual period is the product of the "adjusted issue price" of Tranche C of the Last-Out Exit Facility at the beginning of the accrual period multiplied by the yield to maturity of Tranche C of the Last-Out Exit Facility less the amount of any qualified stated interest allocable to such accrual period. The "adjusted issue price" of Tranche C of the Last-Out Exit Facility at the beginning of an accrual period will equal its issue price, increased by the aggregate amount of OID that has accrued on Tranche C of the Last-Out Exit Facility in all prior accrual periods, and decreased by any payments made during all prior accrual periods on Tranche C of the Last-Out Exit Facility other than qualified stated interest.

**THE RULES REGARDING THE DETERMINATION OF ISSUE PRICE AND OID ARE COMPLEX, AND THE OID RULES DESCRIBED ABOVE MAY NOT APPLY IN ALL CASES. ACCORDINGLY, EACH HOLDER OF TRANCHE C OF THE LAST-OUT EXIT FACILITY IS URGED TO CONSULT ITS TAX ADVISOR REGARDING THE POSSIBLE APPLICATION OF THE OID RULES TO TRANCHE C OF THE LAST-OUT EXIT FACILITY.**

### 7. Distributions on New Common Stock

The gross amount of any distribution of cash or property made to a U.S. Holder with respect to New Common Stock generally will be includible in gross income by a U.S. Holder as dividend income to the extent such distribution is paid out of current or accumulated earnings and profits, as determined under U.S. federal income tax principles. To the extent those distributions exceed New Sheridan's current and accumulated earnings and profits, the distribution (i) will be treated as a non-taxable return of the U.S. Holder's adjusted basis in the New Common Stock and (ii) thereafter as capital gain. Dividends received by non-corporate U.S. Holders may qualify for reduced rates of taxation. Subject to applicable limitations, a distribution which is treated as a dividend for U.S. federal income tax purposes may qualify for the dividends-received deduction if such amount is distributed to a corporate U.S. Holder and certain other requirements are satisfied.

### 8. Sale, Exchange or Other Taxable Disposition of Tranche C of the Last-Out Exit Facility and New Common Stock

Upon the disposition of Tranche C of the Last-Out Exit Facility or any New Common Stock by sale, exchange, retirement, redemption or other taxable disposition, a U.S. Holder will generally recognize gain or loss equal to the difference, if any, between (i) the amount realized on the disposition (other than, in the case of Tranche C of the Last-Out Exit Facility, amounts attributable to accrued but untaxed interest, which will be taxed as ordinary interest income to the extent not previously so taxed) and (ii) the U.S. Holder's adjusted tax basis in Tranche C of the Last-Out Exit Facility or New Common Stock. A U.S. Holder's adjusted tax basis in Tranche C of the Last-Out Exit Facility will generally be equal to the holder's initial tax basis in Tranche C of the Last-Out Exit Facility, increased by any accrued OID previously included in such holder's gross income. A U.S. Holder's adjusted tax basis in the New Common Stock will generally be equal to its initial tax basis in the New Common Stock. A U.S. Holder's gain or loss will generally constitute capital gain or loss and will be long-term capital gain or loss if the U.S. Holder has held Tranche C of the Last-Out Exit Facility or New Common Stock for longer than one year. Non-corporate taxpayers are generally subject to a reduced federal income tax rate on a net long-term capital gains. The deductibility of capital losses is subject to certain limitations.

### 9. Medicare Tax

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, dividends and gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of consideration received pursuant to the Plan.

### D. Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims

The following discussion includes only certain U.S. federal income tax consequences of the Restructuring Transactions to non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to non-U.S. Holders are complex. Each non-U.S. Holder should consult its own tax advisor regarding the

U.S. federal, state, local and foreign tax consequences of the consummation of the Plan to such non-U.S. Holder and the ownership and disposition of the New Common Stock and Tranche C of the Last-Out Exit Facility, as applicable.

Whether a non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders.

### 1. Gain Recognition on Exchange of Claims

Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or OID, if any), any gain realized by a non-U.S. Holder on the exchange of its Claim pursuant to the Plan generally will not be subject to U.S. federal income taxation unless  (i) the non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (ii) such gain is effectively connected with the conduct by such non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax (and possibly withholding tax) with respect to any gain realized on the exchange if such gain is effectively connected with the non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder.  In order to claim an exemption from withholding tax, such non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates).  In addition, if such a non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 2. Interest Payments on Tranche C of the Last-Out Exit Facility; Accrued Interest With Respect to Claims

Subject to the discussion of FATCA below, payments to a non-U.S. Holder that are attributable to (x) interest on (or OID accruals with respect to) Tranche C of the Last-Out Exit Facility received under the Plan or (y) accrued but untaxed interest with respect to Claims generally will not be subject to U.S. federal income or withholding tax, *provided* that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the non-U.S. Holder is not a U.S. person, unless:

> a. the non-U.S. Holder actually or constructively owns 10 percent or more of the total combined voting power of New Sheridan (in the case of interest payments with respect to debt received under the

Plan) or capital or profits of the applicable Borrower (in the case of consideration received in respect of accrued but untaxed interest);

b.    the non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to New Sheridan (in the case of interest payments with respect to debt received under the Plan) or the applicable Borrower (in the case of consideration received in respect of accrued but untaxed interest) (each, within the meaning of the Tax Code);

c.    the non-U.S. Holder is a bank receiving interest described in Section 881(c)(3)(A) of the Tax Code; or

d.    such interest is effectively connected with the conduct by the non-U.S. Holder of a trade or business within the United States (in which case, provided the non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A non-U.S. Holder that does not qualify for exemption from withholding tax with respect to any payment attributable to (a) interest on Tranche C of the Last-Out Exit Facility received under the Plan and (b) accrued but untaxed interest with respect to a Claim that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty). For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

3.    **U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Common Stock and Tranche C of the Last-Out Exit Facility**

A non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on a subsequent sale or other taxable disposition of consideration received under the Plan unless:

a.    such non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who

is subject to special rules applicable to former citizens and residents of the United States;

b. such gain is effectively connected with such non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States); or

c. in the case of the sale of New Common Stock, New Sheridan is or has been, during a specified testing period, a "United States real property holding corporation" (a "USRPHC") for U.S. federal income tax purposes.

If the first exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition. If the second exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If the third exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of its New Common Stock under FIRPTA and be required to file U.S. federal income tax returns. In general, a corporation is a USRPHC if the fair market value of the corporation's U.S. real property interests (as defined in the Tax Code and applicable Treasury Regulations) equals or exceeds 50% of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) at any time within the shorter of (x) the 5-year period ending on the effective time of the applicable disposition or (y) the period of time the non-U.S. Holder held such interest. Taxable gain from the disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and such non-U.S. Holder's adjusted tax basis in such interest) will constitute effectively connected income. Further, the buyer of the New Common Stock will be required to withhold a tax equal to 15 percent of the amount realized on the sale. The amount of any such withholding would be allowed as a credit against the non-U.S. Holder's federal income tax liability and may entitle the non-U.S. Holder to a refund, provided that the non-U.S. Holder properly and timely files a tax return with the IRS.

Although the Debtors have not performed an analysis to definitively determine whether New Sheridan will constitute a USRPHC, the Debtors expect that New Sheridan will constitute a USRPHC as of the Effective Date, and thus that the New Common Stock (but not Tranche C of the Last-Out Exit Facility) will constitute a United States real property interest, for the period required under the Tax Code. Under the FIRPTA rules, if the stock of a USRPHC is regularly traded on an established securities market, a person that holds 5% or less of such stock will not be

subject to substantive FIRPTA taxation or FIRPTA withholding upon a disposition of its shares, and FIRPTA withholding upon dispositions will generally be inapplicable other than in the case of certain distributions and redemptions by the issuer. Whether and when the New Common Stock will be considered regularly traded on an established securities market will depend, in part, on whether a market develops in such equity, and cannot currently be determined. The FIRPTA provisions will also not apply if, at the time of a disposition, the corporation does not directly or indirectly hold any United States real property interests and it had directly or indirectly disposed of all of the United States real property interests it directly or indirectly owned in one or more fully taxable transactions.

Non-U.S. Holders who may receive or acquire New Common Stock in connection with the Equitization Restructuring are urged to consult a U.S. tax advisor with respect to the U.S. tax consequences applicable to their acquisition, holding, and disposition of such New Common Stock.

### 4. Distributions on New Common Stock

The gross amount of any distribution of cash or property made to a non-U.S. Holder with respect to New Common Stock generally will be includible in gross income by a non-U.S. Holder as dividend income to the extent such distribution is paid out of current or accumulated earnings and profits, as determined under U.S. federal income tax principles. To the extent those distributions exceed New Sheridan's current and accumulated earnings and profits, the distribution (i) will be treated as a non-taxable return of the non-U.S. Holder's adjusted basis in the New Common Stock and (ii) thereafter as capital gain treated as described above under "*3. U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Common Stock and Tranche C of the Last-Out Exit Facility*."

Subject to the withholding requirements under FATCA (as defined below) and with respect to effectively connected dividends, each of which is discussed below, any distribution made to a non-U.S. Holder on the New Common Stock generally will be subject to U.S. withholding tax at a rate of 30% of the gross amount of the distribution unless an applicable income tax treaty provides for a lower rate. To receive the benefit of a reduced income tax treaty rate, a non-U.S. Holder must provide the applicable withholding agent with an IRS Form W-8BEN or IRS Form W-8BEN-E (or other applicable or successor form) certifying qualification for the reduced rate.

If dividends paid to a non-U.S. Holder are effectively connected with non-U.S. Holder's conduct of a trade or business within the United States (and, if required by an applicable income tax treaty, the non-U.S. Holder maintains a permanent establishment in the United States to which such dividends are attributable), the non-U.S. Holder will be exempt from the U.S. federal withholding tax described above. Any such effectively connected dividends will be subject to U.S. federal income tax on a net income basis at the rates and in the manner generally applicable to United States persons (as defined under the Code) regular graduated rates. A non-U.S. Holder that is a corporation also may be subject to a branch profits tax at a rate of 30% (or such lower rate specified by an applicable income tax treaty) on its effectively connected earnings and profits (as adjusted for certain items), which will include such effectively connected dividends.

5. **FATCA**

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account Holders and investors or be subject to withholding on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including dividends, if any, on New Common Stock), and also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends (which would include dividends, if any, on New Common Stock and interest on Exit Facilities). FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

Previously, withholding with respect to gross proceeds from the disposition of a debt instrument was scheduled to begin on January 1, 2019, however, such withholding has been eliminated under proposed U.S. Treasury regulations, which can be relied on until final regulations become effective. Each non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules on such non-U.S. Holder.

E. **Information Reporting and Back-Up Withholding**

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors will comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan, as well as future payments made with respect to the consideration received under the Plan. In addition, backup withholding of taxes will generally apply to payments in respect of a Claim under the Plan, as well as future payments made with respect to the consideration received under the Plan, unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 or, in the case of a non-U.S. Holder, such non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or, in each case, such Holder otherwise establishes eligibility for an exemption).

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR**

**HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XII. RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated: September 4, 2019

SHERIDAN HOLDING COMPANY II, LLC
SHERIDAN INVESTMENT PARTNERS II GP, LLC
SHERIDAN INVESTMENT PARTNERS II, L.P.
SHERIDAN PRODUCTION PARTNERS II, LLC
SHERIDAN PRODUCTION PARTNERS II-A, L.P.
SHERIDAN PRODUCTION PARTNERS II-B, L.P.
SHERIDAN PRODUCTION PARTNERS II-M, L.P.
SPP II-B GP, LLC
SPP II-M GP, LLC

*/s/ Lisa A. Stewart*

Lisa A. Stewart
Executive Chairman, President, Chief Investment Officer, and Chief Executive Officer
Sheridan Holding Company II, LLC
Sheridan Investment Partners II GP, LLC
Sheridan Production Partners II, LLC
SPP II-B GP, LLC
SPP II-M GP, LLC

## EXHIBIT A

## Plan of Reorganization

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| SHERIDAN HOLDING COMPANY II, LLC, *et al.*,[1] | § | Case No. 19-[____] (___) |
| | § | |
| Debtors. | § | (Joint Administration Requested) |
| | § | |

**DEBTORS' JOINT PREPACKAGED PLAN OF REORGANIZATION
PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

> **THIS CHAPTER 11 PLAN IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126. THIS CHAPTER 11 PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR CHAPTER 11 BANKRUPTCY.**

Matthew D. Cavenaugh (TX Bar No. 24062656)
**JACKSON WALKER LLP**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:     (713) 752-4200
Facsimile:     (713) 752-4221
Email:          mcavenaugh@jw.com

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*

Joshua A. Sussberg P.C. (*pro hac vice* admission pending)
Steven N. Serajeddini (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          joshua.sussberg@kirkland.com
                   steven.serajeddini@kirkland.com

-and-

Spencer A. Winters (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          spencer.winters@kirkland.com

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Sheridan Holding Company II, LLC (7040); Sheridan Investment Partners II GP, LLC (8298); Sheridan Investment Partners II, L.P. (9405); Sheridan Production Partners II, LLC (8034); Sheridan Production Partners II-A, L.P. (8813); Sheridan Production Partners II-B, L.P. (9232); Sheridan Production Partners II-M, L.P. (9084); SPP II-B GP, LLC (8554); and SPP II-M GP, LLC (0488).  The location of the Debtors' service address is:  1360 Post Oak Blvd., Suite 2500, Houston, Texas 77056.

# TABLE OF CONTENTS

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
      GOVERNING LAW ...................................................................................................................... 1
    A.    Defined Terms. .................................................................................................................. 1
    B.    Rules of Interpretation. ................................................................................................... 15
    C.    Computation of Time. ..................................................................................................... 15
    D.    Governing Law. .............................................................................................................. 16
    E.    Reference to Monetary Figures. ...................................................................................... 16
    F.    Reference to the Debtors or the Reorganized Debtors. .................................................... 16
    G.    Controlling Document. .................................................................................................... 16
    H.    Consent Rights ................................................................................................................ 16

ARTICLE II. ADMINISTRATIVE CLAIMS, PRIORITY CLAIMS, AND RESTRUCTURING
      EXPENSES ............................................................................................................................. 16
    A.    Administrative Claims. .................................................................................................... 16
    B.    DIP Claims. .................................................................................................................... 17
    C.    Professional Fee Claims. ................................................................................................. 17
    D.    Priority Tax Claims. ........................................................................................................ 18
    E.    Payment of Restructuring Expenses. ............................................................................... 18

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ................................... 18
    A.    Classification of Claims and Interests. ............................................................................ 18
    B.    Treatment of Claims and Interests. ................................................................................. 19
    C.    Special Provision Governing Unimpaired Claims. ........................................................... 25
    D.    Elimination of Vacant Classes ........................................................................................ 25
    E.    Voting Classes, Presumed Acceptance by Non-Voting Classes ....................................... 25
    F.    Intercompany Interests ................................................................................................... 26
    G.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. ................. 26
    H.    Controversy Concerning Impairment. .............................................................................. 26
    I.    Subordinated Claims. ...................................................................................................... 26

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ............................................................... 26
    A.    General Settlement of Claims and Interests. .................................................................... 26
    B.    Restructuring Transactions. ............................................................................................. 27
    C.    Cancellation of Existing Agreements and Interests. ......................................................... 27
    D.    Section 1146 Exemption. ................................................................................................. 28
    E.    The Equitization Restructuring. ....................................................................................... 28
    F.    The Asset Sale Restructuring. .......................................................................................... 32

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................. 35
    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases. ...................... 35
    B.    Indemnification Obligations. ........................................................................................... 35
    C.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ..................... 35
    D.    Insurance Policies. .......................................................................................................... 36
    E.    Reservation of Rights. ..................................................................................................... 36
    F.    Nonoccurrence of Effective Date. .................................................................................... 36
    G.    Contracts and Leases Entered Into After the Petition Date. ............................................. 37

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ..................................................................... 37
    A.    Timing and Calculation of Amounts to Be Distributed. ................................................... 37
    B.    Disbursing Agent. ........................................................................................................... 37
    C.    Rights and Powers of Disbursing Agent. ......................................................................... 37
    D.    Delivery of Distributions and Undeliverable or Unclaimed Distributions. ........................ 38
    E.    Manner of Payment. ....................................................................................................... 38

F.      Compliance with Tax Requirements. ...................................................................38
G.     Allocations. .............................................................................................................39
H.     No Postpetition Interest on Claims. .......................................................................39
I.      Foreign Currency Exchange Rate. .........................................................................39
J.      Setoffs and Recoupment. .......................................................................................39
K.     Claims Paid or Payable by Third Parties. ..............................................................39

ARTICLE VII. THE PLAN ADMINISTRATOR ......................................................................40
A.     The Plan Administrator. ..........................................................................................40
B.     Wind Down. ............................................................................................................41
C.     Tax Returns. ............................................................................................................41
D.     Dissolution of the Reorganized Debtors. ...............................................................42

ARTICLE VIII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND
               DISPUTED CLAIMS ...................................................................................42
A.     Disputed Claims Process. .......................................................................................42
B.     Allowance of Claims. ..............................................................................................42
C.     Claims Administration Responsibilities. ................................................................42
D.     Adjustment to Claims or Interests without Objection. ...........................................43
E.     Disallowance of Claims or Interests. .....................................................................43

ARTICLE IX. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ...............43
A.     Discharge of Claims and Termination of Interests. ................................................43
**B.     Release of Liens.** ......................................................................................................44
**C.     Releases by the Debtors.** .........................................................................................44
**D.     Releases by Holders of Claims and Interests.** ......................................................45
**E.     Exculpation.** ...........................................................................................................46
**F.      Injunction.** ..............................................................................................................46
G.     Protections Against Discriminatory Treatment. .....................................................46
H.     Document Retention. ...............................................................................................47
I.      Reimbursement or Contribution. ............................................................................47

ARTICLE X. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN .........................47
A.     Conditions Precedent to the Effective Date. ..........................................................47
B.     Waiver of Conditions. .............................................................................................48
C.     Effect of Failure of Conditions. .............................................................................48

ARTICLE XI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ...................48
A.     Modification and Amendments. ..............................................................................48
B.     Effect of Confirmation on Modifications. ..............................................................49
C.     Revocation or Withdrawal of Plan. ........................................................................49

ARTICLE XII. RETENTION OF JURISDICTION ....................................................................49

ARTICLE XIII. MISCELLANEOUS PROVISONS .....................................................................51
A.     Immediate Binding Effect. ......................................................................................51
B.     Additional Documents. ...........................................................................................51
C.     Payment of Statutory Fees. .....................................................................................51
D.     Statutory Committee and Cessation of Fee and Expense Payment. .......................51
E.     Holders of Working and Similar Interests. .............................................................51
F.      Reservation of Rights. .............................................................................................51
G.     Successors and Assigns. ..........................................................................................52
H.     Tax Elections. ..........................................................................................................52
I.      Notices. ....................................................................................................................52
J.      Term of Injunctions or Stays. .................................................................................53
K.     Entire Agreement. ...................................................................................................53

L.      Exhibits. ............................................................................................................................54
M.      Nonseverability of Plan Provisions. ................................................................................54
N.      Votes Solicited in Good Faith. ........................................................................................54
O.      Closing of Chapter 11 Cases. ..........................................................................................54
P.      Waiver or Estoppel. ..........................................................................................................54

# INTRODUCTION

The Debtors propose this Plan for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used herein and not otherwise defined have the meanings ascribed to such terms in Article I.A of this Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Holders of Claims against or Interests in the Debtors may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of this Plan, the Restructuring Transactions, and certain related matters. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A. *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1. "*Ad Hoc Group*" means those certain funds or accounts managed, advised, or sub-advised by Pantheon Ventures (US) LP and HarbourVest Partners L.P. that hold Sheridan II Subordinated Term Loan Claims.

2. "*Administrative Claim*" means a Claim for costs and expenses of administration of the Estates under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims in the Chapter 11 Cases; and (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930.

3. "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

4. "*Agents*" means the DIP Agent, any administrative agent, collateral agent, or similar Entity under any of the Sheridan II RBL Credit Agreements, Sheridan II Term Loan Credit Agreements, and the Exit Facility Credit Agreements, including any successors thereto.

5. "*Allowed*" means, as to a Claim or an Interest, a Claim or an Interest allowed under the Plan, under the Bankruptcy Code, or by a Final Order, as applicable. For the avoidance of doubt, (a) there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan, and (b) the Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable nonbankruptcy law.

6. "*Amended Hedging Agreement*" means that certain hedging agreement, as amended, restated, supplemented, or otherwise modified from time to time.

7. "*Applicable Affiliate*" means SPP II Mgmt Investors, L.P., Warburg Pincus Co., and Peter Kagan Revocable Trust.

8. "*Asset Purchase Agreement*" means one or more asset purchase agreements pursuant to which the Asset Sale is consummated.

9. "*Asset Sale*" means the sale or sales of substantially all of the Debtors' assets under this Plan, the terms of which shall be reasonably acceptable to the Debtors and the Required Consenting Secured Lenders.

10. "*Asset Sale Election Notice*" means a notice filed with the Plan Supplement indicating that the Debtors and the Required Consenting Secured Lenders have elected to pursue the Asset Sale.

11. "*Asset Sale Restructuring*" means a restructuring under this Plan in accordance with Article IV.F hereof pursuant to which the Asset Sale is consummated, which shall occur if (i) the Debtors and Required Consenting Secured Lenders elect to pursue the Asset Sale, (ii) the Debtors file the Asset Sale Election Notice and (iii) an Asset Purchase Agreement acceptable to the Debtors, the Required Consenting Secured Lenders, and the Purchaser is entered into prior to the filing of the Plan Supplement and consummated on the Effective Date.

12. "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

13. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532.

14. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas.

15. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

16. "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

17. "*Cash*" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

18. "*Causes of Action*" means any claims, interests, damages, judgments, remedies, causes of action, controversies, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, indemnities, and guaranties of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law preferential or fraudulent transfer or similar claim.

19. "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

20. "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

21. "*Claims and Noticing Agent*" means Prime Clerk LLC, the claims, noticing, and solicitation agent retained by the Debtors in the Chapter 11 Cases by Bankruptcy Court order.

22. "*Claims Register*" means the official register of Claims and Interests in the Debtors maintained by the Claims and Noticing Agent.

23.     "*Class*" means a class of Claims or Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

24.     "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

25.     "*Company Parties*" means Sheridan and each of its Affiliates that are or become parties to the RSA, solely in their capacity as such.

26.     "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

27.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

28.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court on confirmation of the Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

29.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

30.     "*Consenting Sheridan II Revolving Lenders*" means the Holders of Sheridan II RBL Claims that are or become parties to the RSA, solely in their capacity as such.

31.     "*Consenting Sheridan II Subordinated Term Lenders*" means the Holders of Sheridan II Subordinated Term Loan Claims that are or become parties to the RSA, solely in their capacity as such.

32.     "*Consenting Sheridan II Term Lenders*" means the Holders of Sheridan II Term Loan Claims that are or become parties to the RSA, solely in their capacity as such.

33.     "*Consenting Stakeholders*" means any party (other than the Company Parties) to the RSA, each solely in their capacity as such, including each: (a) Consenting Sheridan II Revolving Lender, (b) Consenting Sheridan II Term Lender, and (c) Consenting Sheridan II Subordinated Term Lender.

34.     "*Consummation*" means the occurrence of the Effective Date.

35.     "*Cure*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

36.     "*Debtor Release*" means the release set forth in Article IX.C of this Plan.

37.     "*Debtors*" means, collectively, each of the following: Sheridan Holding Company II, LLC; Sheridan Investment Partners II GP, LLC; Sheridan Investment Partners II, L.P.; Sheridan Production Partners II, LLC; Sheridan Production Partners II-A, L.P.; Sheridan Production Partners II-B, L.P.; Sheridan Production Partners II-M, L.P.; SPP II-B GP, LLC; and SPP II-M GP, LLC.

38.     "*Definitive Documentation*" means the definitive documents and agreements governing the Restructuring Transactions (including any related orders, agreements, instruments, schedules, or exhibits) that are contemplated by and referenced in the Plan (as amended, modified, or supplemented from time to time), including the following: (a) the Plan (and all exhibits, ballots, solicitation procedures, and other documents and instruments related thereto); (b) the RSA (including the "Definitive Documents" as defined therein and not explicitly so defined herein); (c) any document or agreement comprising the Plan Supplement; (d) the Disclosure Statement; (e) the DIP Credit Agreement and the DIP Facility Documents; (f) the DIP Orders; (g) the Exit Facility Credit Agreements and the Exit

Facility Documents; (h) the New Organizational Documents; (i) the Confirmation Order; and (j) such other agreements and documentation desired or necessary to consummate and document the transactions contemplated by this Plan and the RSA.

39.      "*Description of Transaction Steps*" means the description of the steps to be carried out to effectuate the Restructuring Transactions in accordance with the Plan and as set forth in the Plan Supplement.

40.      "*Designated Individual*" means the "designated individual" within the meaning of Treasury Regulations Section 301.6223-1(b)(3).

41.      "*DIP Agent*" means Bank of America, N.A., in its capacity as administrative agent under the DIP Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Credit Agreement.

42.      "*DIP Claim*" means any Claim held by the DIP Lenders or the DIP Agent arising under or relating to the DIP Credit Agreement or the DIP Orders, including any and all fees, interests paid in kind, and accrued but unpaid interest and fees arising under the DIP Credit Agreement.

43.      "*DIP Credit Agreement*" means that certain debtor-in-possession credit agreement by and among the Debtors, the guarantors party thereto, the DIP Agent, and the DIP Lenders, as approved by the DIP Orders.

44.      "*DIP Facility*" means the debtor-in-possession credit facility entered into on the terms and conditions set forth in the DIP Facility Documents.

45.      "*DIP Facility Documents*" means any notes, certificates, agreements, security agreements, documents, or instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection with the DIP Credit Agreement.

46.      "*DIP Lenders*" means the lenders under the DIP Credit Agreement.

47.      "*DIP Orders*" means, collectively, the Interim DIP Order and the Final DIP Order.

48.      "*Disbursing Agent*" means, as applicable, the Reorganized Debtors or any Entity the Reorganized Debtors select to make or to facilitate distributions in accordance with the Plan, which Entity may include the Claims and Noticing Agent.

49.      "*Disclosure Statement*" means the *Disclosure Statement Relating to the Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, including all exhibits and schedules thereto, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law.

50.      "*Disputed*" means, as to a Claim or an Interest, a Claim or an Interest:  (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order, as applicable; and (c) with respect to which a party in interest has filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

51.      "*Distribution Participation Agreements*" means, collectively, each of the following, as amended, restated, supplemented, or otherwise modified from time to time:

    a.    that certain distribution participation agreement dated as of October 6, 2017 among Sheridan Investment Partners II, L.P., the participants party thereto, and solely for the purposes of section 3.5 of the agreement, Sheridan Investment Partners II GP, LLC;

    b.    that certain distribution participation agreement dated as of October 6, 2017 among Sheridan Production Partners II-A, L.P., the participants party thereto, and solely for the purposes of

section 3.5 of the agreement, Sheridan Production Partners II, LLC; and

      c.     that certain distribution participation agreement dated as of October 6, 2017 among Sheridan Production Partners II-M, L.P., the participants party thereto, and solely for the purposes of section 3.5 of the agreement, SPP II-M GP, LLC.

52.     "*Distribution Record Date*" means the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be the first day of the Confirmation Hearing or such other date agreed to by the Debtors, the Required Consenting Secured Lenders, and the Consenting Sheridan II Subordinated Term Lenders.

53.     "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent to the occurrence of the Effective Date set forth in Article X.A. of the Plan have been satisfied or waived in accordance with Article IX.B. of the Plan. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

54.     "*Employment Obligations*" means any existing obligations to employees to be assumed, reinstated, or honored, as applicable, in accordance with Article IV.E.10 of the Plan.

55.     "*Entity*" means any entity, as defined in section 101(15) of the Bankruptcy Code.

56.     "*Equitization Restructuring*" means the transactions and reorganization contemplated by, and pursuant to, this Plan in accordance with Article IV.E of this Plan, under which the New Common Stock is distributed, among other things, which shall occur on the Effective Date if the Asset Sale Restructuring does not occur.

57.     "*Equity Security*" means any equity security, as defined in section 101(16) of the Bankruptcy Code, in a Debtor.

58.     "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

59.     "*Exculpated Partie*s" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) each Consenting Stakeholder; (c) any official committees appointed in the Chapter 11 Cases and each of their respective members; and (d) each current and former Affiliate of each Entity in clause (a) through the following clause (e); and (e) each Related Party of each Entity in clause (a) through this clause (e).

60.     "*Executory Contract*" means a contract to which one or more of the Debtors are a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

61.     "*Exit Agent*" means Bank of America, N.A., in its capacity as administrative agent under the Exit Facility Credit Agreements, its successors, assigns, or any replacement agent appointed pursuant to the terms of the Exit Facility Credit Agreements.

62.     "*Exit Facilities*" means, collectively, the First-Out/Second-Out Exit Facility and the Last-Out Exit Facility.

63.     "*Exit Facility Credit Agreements*" means, collectively, the First-Out/Second-Out Exit Facility Credit Agreement and the Last-Out Exit Facility Credit Agreement.

64.     "*Exit Facility Documents*" means the agreements memorializing the Exit Facilities including any amendments, modifications, supplements thereto, and together with any related notes, certificates, agreements, intercreditor agreements, security agreements, mortgages, deeds of trust, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection with the Exit Facilities.

65.     "*Exit Facility Lenders*" means those lenders party to the Exit Facility Credit Agreements.

66.     "*Exit Facility Term Sheet*" means the Exit Facility Term Sheet attached hereto as <u>Exhibit A</u>.

67.     "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date.

68.     "*File*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases. "Filed" and "Filing" shall have correlative meanings.

69.     "*Final DIP Order*" means the *Final Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b).*

70.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

71.     "*First-Out/Second-Out Exit Facility Credit Agreement*" means that certain loan agreement memorializing the First-Out/Second-Out Exit Facility, which shall be entered into among one or more of the Reorganized Debtors, the Exit Agent, those Exit Facility Lenders which are DIP Lenders.

72.     "*First-Out/Second-Out Exit Facility*" means the new senior secured term loan facilities in the aggregate principal amount of $100,000,000 consisting of Tranche A and Tranche B that is consistent with the terms and conditions set forth in the Exit Facility Term Sheet and entered into on the Effective Date on the terms and conditions set forth in the Exit Facility Documents.

73.     "*General Unsecured Claim*" means any Claim that is not (a) an Administrative Claim, (b) a Professional Fee Claim, (c) a Secured Tax Claim, (d) an Other Secured Claim, (e) a Priority Tax Claim, (f) an Other Priority Claim, (g) a Sheridan II RBL Claim, (h) a Sheridan II Term Loan Claim, (i) a Sheridan II Subordinated Term Loan Claim, (j) an Intercompany Claim, or (k) a DIP Claim.

74.     "*Governing Body*" means, in each case in its capacity as such, the board of directors, board of managers, manager, general partner, investment committee, special committee, or such similar governing body of any of the Debtors or the Reorganized Debtors, as applicable.

75.     "*Governmental Unit*" means any governmental unit, as defined in section 101(27) of the Bankruptcy Code.

76.     "*Holder*" means an Entity holding a Claim or Interest.

77.     "*Impaired*" means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

78.     "*Incentive Stock*" means an amount of the New Common Stock, on a fully-diluted basis, reserved for (a) compensation under and as set forth in the Services Agreement (if any) or (b) otherwise for an employee incentive program determined by the New Board.

79.     "*Indemnification Provisions*" means each of the Debtors' indemnification provisions currently in place, whether in the respective Debtors' bylaws, certificates of incorporation, limited partnership agreements, other formation documents, board resolutions, or contracts, for the current and former members of any Governing Body,

directors, officers, managers, employees, attorneys, other professionals, and respective agents of, or acting on behalf of, the Debtors.

80. "*Intercompany Claim*" means any Claim against a Debtor held by another Debtor.

81. "*Intercompany Interest*" means an Interest in a Debtor held by another Debtor.

82. "*Interest*" means, collectively, (a) any Equity Security, or any other equity or ownership interest (including any such interest in a partnership, limited liability company, or other Entity), in any Debtor, (b) any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, including the Distribution Participation Agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor, and (c) any and all Claims that are otherwise determined by the Court to be an equity interest, including any Claim or debt that is recharacterized as an equity interest.

83. "*Interest Holder Sale Recovery*" means, after the payment in full in Cash of all Administrative Claims and outstanding amounts under the DIP Facility, the Sheridan II RBL Claims, the Sheridan II Term Loan Claims, the Sheridan II Subordinated Term Loan Claims, and the Allowed General Unsecured Claims, the Sale Proceeds.

84. "*Interim DIP Order*" means the *Interim Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b) and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c).*

85. "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

86. "*Junior Stakeholder Equitization Recovery*" means Holders of Claims in Class 5(a), Class 5(b), and Class 5(c) shall receive 5 percent of the New Common Stock, subject to dilution by the Incentive Stock.

87. "*Junior Stakeholder Sale Recovery*" means Holders of Claims in Class 5(a), Class 5(b), and Class 5(c) shall receive (i) Cash equal to $9,000,000 and (ii) after the payment in full in Cash of all Administrative Claims and outstanding amounts under the DIP Facility, the Sheridan II RBL Claims, and the Sheridan II Term Loan Claims, the Sale Proceeds; *provided* that the sum of (i) and (ii) shall not exceed the Allowed amount of such Claims.

88. "*Last-Out Exit Facility Credit Agreement*" means that certain loan agreement memorializing the Last-Out Exit Facility, which shall be entered into among one or more of the Reorganized Debtors, the Exit Agent, and the Exit Facility Lenders.

89. "*Last-Out Exit Facility*" means the new senior secured term loan facility in the aggregate principal amount of $75,000,000 consisting of Tranche C that is consistent with the terms and conditions set forth in the Exit Facility Term Sheet and entered into on the Effective Date on the terms and conditions set forth in the Exit Facility Documents.

90. "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

91. "*Manager*" means Sheridan Production Partners Manager, LLC, a limited liability company organized under the Laws of Delaware.

92. "*Manager Affiliate*" means each of Sheridan ICM, LLC, Sheridan SMG, LLC, Sheridan Production Company, LLC, Sheridan Production Company II, LLC, Sheridan Production Operating Company, LLC, Warburg Pincus LLC, and WPS Production Partners II, LLC.

93. "*New Board*" means the board of directors or the board of managers of New Sheridan.

94. "*New Common Stock*" means new common stock of New Sheridan issued on the Effective Date.

95. "*New D&O Tail Coverage*" means reasonably sufficient "tail" or "runoff" liability insurance policy coverage, acceptable to the Required Consenting Secured Lenders and the Debtors, that provides (x) coverage for the six-year period following the Effective Date for the benefit of the Reorganized Debtors and all current and former members of any Governing Body, directors, officers, managers, employees, attorneys, other professionals, and respective agents of, or acting on behalf of, the Debtors with coverage with an available aggregate limit of liability upon the Effective Date of no less than the aggregate limit of liability under the existing policies applicable to such Persons upon placement, or (y) such other coverage terms as are otherwise acceptable to the Debtors and the Required Consenting Secured Lenders.

96. "*New Money DIP Claim*" means any Claim derived from or based upon the New Money DIP Loans.

97. "*New Money DIP Loans*" means the $50,000,000 of new money term loans extended to the Debtors pursuant to the DIP Credit Agreement and the DIP Orders.

98. "*New Organizational Documents*" means the documents providing for corporate governance of New Sheridan and the other Reorganized Debtors, including charters, bylaws, operating agreements, or other organizational documents or shareholders' agreements, as applicable, which shall be consistent with section 1123(a)(6) of the Bankruptcy Code (as applicable), which shall be consistent with the RSA (and subject to the consent, approval, and consultation rights set forth therein) and section 1123(a)(6) of the Bankruptcy Code (as applicable).

99. "*New Sheridan*" means the newly formed corporation that will become the ultimate parent of the Reorganized Debtors on the Effective Date and the issuer of the New Common Stock under the Plan pursuant to the Equitization Restructuring.

100. "*Other Priority Claim*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

101. "*Other Secured Claim*" means any Secured Claim against the Debtors other than a DIP Claim, a Sheridan II RBL Claim, or a Sheridan II Term Loan Claim.

102. "*Partnership Representative*" means the "partnership representative" within the meaning of Section 6223 of the Internal Revenue Code of 1986, as amended.

103. "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

104. "*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

105. "*Plan*" means this *Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, including the Plan Supplement, which is incorporated herein by reference.

106. "*Plan Administrator*" means the person selected by the Debtors (with the consent of the Required Consenting Secured Lenders) to administer the Plan Administrator Assets if the Asset Sale Restructuring has occurred. All costs, liabilities, and expenses reasonably incurred by the Plan Administrator, and any personnel employed by the Plan Administrator in the performance of the Plan Administrator's duties, shall be paid from the Plan Administrator Assets, subject to and in accordance with the Wind-Down Budget.

107. "*Plan Administrator Agreement*" means, if the Asset Sale Restructuring has occurred, that certain agreement entered into no later than the Effective Date setting forth, among other things, the Plan Administrator's rights, powers, obligations, and compensation, all of which shall be consistent with the applicable provisions of the Plan; and which shall be in form and substance satisfactory to the Debtors and the Required Consenting Secured Lenders.

108. "*Plan Administrator Assets*" means, if the Asset Sale Restructuring has occurred, on the Effective Date, all assets of the Estates vested in the Reorganized Debtors to be administered by Plan Administrator, and, thereafter, all assets held from time to time by Reorganized Debtors to be administered by Plan Administrator.

109. "*Plan Distribution*" means a payment or distribution to Holders of Allowed Claims, Allowed Interests, or other eligible Entities under and in accordance with the Plan.

110. "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed by the Debtors, to the extent reasonably practicable, no later than seven (7) days before the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, including the following, as applicable: (a) the New Organizational Documents; (b) the identity and members of the New Board and any executive management for the Reorganized Debtors; (c) the Schedule of Retained Causes of Action; (d) the Exit Facility Documents; (e) the Description of Transaction Steps; (f) the Amended Hedging Agreement; (g) the form of the Services Agreement, if any; (h) the Asset Purchase Agreement, if any; (i) the identity of the Plan Administrator and the compensation of the Plan Administrator; (j) the Plan Administrator Agreement; (k) the Asset Sale Election Notice; (l) the Wind-Down Budget, if applicable; and (m) any additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.

111. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

112. "*Pro Rata*" means, unless otherwise specified, the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

113. "*Professional*" means an Entity: (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

114. "*Professional Fee Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses of Professionals estimate they have incurred or will incur in rendering services to the Debtors as set forth in 0 of the Plan.

115. "*Professional Fee Claim*" means a Claim by a professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

116. "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Amount.

117. "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

118. "*Purchaser*" means the purchaser or purchasers under the Asset Purchase Agreement, together with their successors and permitted assigns.

119. "*Push-Out Election*" means the election described in Article XIII.H of the Plan.

120. "*Push-Out Election Agreement*" means a binding agreement between Sheridan Investment Partners II, L.P., Sheridan Production Partners II-A, L.P., Sheridan Production Partners II-B, L.P., or Sheridan Production Partners II-M, L.P., as applicable, and such entity's Partnership Representative (and the Designated Individual, if any) with respect to its 2018 taxable year that requires the Partnership Representative (and the Designated Individual, if any) to timely make a Push-Out Election and take all actions necessary to effect such election, to the extent permitted by applicable Law, with respect to any U.S. federal income tax audit, examination, adjustment or proceeding relating

to such entity by any taxing authority or any other tax-related administrative or judicial proceeding relating to such entity with respect to such entity's 2018 taxable year and all subsequent taxable years.

121. "*Reinstate*" means reinstate, reinstated, or reinstatement with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code. "Reinstated" and "Reinstatement" shall have correlative meanings.

122. "*Related Party*" means, each of, and in each case in its capacity as such, current and former directors, managers, officers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors. For the avoidance of doubt, the members of each Governing Body are Related Parties of the Debtors.

123. "*Released Party*" means, each of, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) each Consenting Stakeholder; (d) each Company Party; (e) each Sheridan II Revolving Lender; (f) each Sheridan II Term Lender; (g) each DIP Lender; (h) Manager; (i) each Manager Affiliate; (j) each Agent; (k) all Holders of Interests; (l) each Exit Facility Lender; (m) each current and former Affiliate of each Entity in clause (a) through the following clause (n); and (n) each Related Party of each Entity in clause (a) through this clause (n); *provided* that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases contained in Article IX.D of the Plan; or (y) timely files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in Article IX.D of the Plan that is not resolved before Confirmation; *provided*, *further*, that any such Entity shall be identified by name as a non-Released Party in the Confirmation Order.

124. "*Releasing Party*" means, each of, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) each Consenting Stakeholder; (d) each Company Party; (e) each Sheridan II Revolving Lender; (f) each Sheridan II Term Lender; (g) each Sheridan II Subordinated Term Lender; (h) Manager; (i) each Manager Affiliate; (j) each Agent; (k) all Holders of Claims; (l) all Holders of Interests; (m) each DIP Lender; (n) each Exit Facility Lender; (o) each current and former Affiliate of each Entity in clause (a) through the following clause (p); and (p) each Related Party of each Entity in clause (a) through this clause (p); *provided* that in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the releases contained in Article IX.D of the Plan; or (y) timely files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in Article IX.D of the Plan that is not resolved before Confirmation; *provided*, *further*, that any such Entity shall be identified by name as a non-Releasing Party in the Confirmation Order.

125. "*Reorganized Debtors*" means, collectively, a Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Effective Date. For purposes of this Plan, New Sheridan shall be deemed to be a Reorganized Debtor.

126. "*Required Consenting Secured Lenders*" means each of the Required Consenting Sheridan II Revolving Lenders and the Required Consenting Sheridan II Term Lenders.

127. "*Required Consenting Sheridan II Revolving Lenders*" means, as of the relevant date, Consenting Sheridan II Revolving Lenders holding greater than 50% of the aggregate outstanding principal amount of the Sheridan II RBL Claims that are held by all Consenting Stakeholders.

128. "*Required Consenting Sheridan II Subordinated Term Lenders*" means, as of the relevant date Consenting Sheridan II Subordinated Term Lenders holding greater than 50% of the aggregate outstanding principal amount of the Sheridan II Subordinated Term Loan Claims that are held by all Consenting Stakeholders.

129. "*Required Consenting Sheridan II Term Lenders*" means, as of the relevant date Consenting Sheridan II Term Lenders holding greater than 50% of the aggregate outstanding principal amount of the Sheridan II Term Loan Claims that are held by all Consenting Stakeholders.

130.     "*Restructuring Expenses*" means the reasonable and documented fees and expenses accrued since the inception of their respective engagements related to the implementation of the Restructuring Transactions and not previously paid by, or on behalf of, the Debtors of: (i) (a) Davis Polk & Wardwell LLP, as counsel to Bank of America, N.A. in its capacity as administrative agent and collateral agent under the Sheridan II Term Loan Credit Agreements, (b) any local counsel to Bank of America, N.A. in its capacity as administrative agent and collateral agent under the Sheridan II Term Loan Credit Agreements, and (c) Houlihan Lokey Capital, Inc., as financial advisor to Davis Polk & Wardwell LLP in connection with its representation of the Bank of America, N.A. in its capacity as administrative agent and collateral agent under the Sheridan II Term Loan Credit Agreements, (ii) (a) Vinson & Elkins LLP, as counsel to Bank of America, N.A. in its capacity as administrative agent and collateral agent under the Sheridan II RBL Credit Agreements, (b) any local counsel to Bank of America, N.A. in its capacity as administrative agent and collateral agent under the Sheridan II RBL Credit Agreements, and (c) Houlihan Lokey Capital, Inc., as financial advisor to Vinson & Elkins LLP in connection with its representation of the Bank of America, N.A. in its capacity as administrative agent and collateral agent under the Sheridan II RBL Credit Agreements, (iii) (a) Weil Gotshal & Manges, LLP, as counsel to the Ad Hoc Group and (b) PJT Partners LP, as investment banker to Weil Gotshal & Manges, LLP in connection with its representation of the Ad Hoc Group, in each case of (a) and (b) up to an aggregate amount not to exceed $2,000,000, and (iv) any consultants or other professionals retained by Davis Polk & Wardwell LLP, Vinson & Elkins LLP, and the Agents in connection with the Company Parties or the Restructuring Transactions with the consent of the Company Parties (not to be unreasonably withheld), in each case, in accordance with the engagement letters of such consultant or professional signed by the Company Parties, including, without limitation, any success, back-end, or restructuring fees contemplated therein (which such fees are deemed reasonable hereunder), and in each case, without further order of, or application to, the Bankruptcy Court by such consultant or professionals. Notwithstanding anything to the contrary in the Plan, no fees and expenses of the type specified in the foregoing clause (iii) shall be paid or required to be paid by the Debtors or the Reorganized Debtors in excess of the amount specified therein.

131.     "*Restructuring Transactions*" means the transactions described in Article IV.E and Article IV.F of the Plan.

132.     "*Roll-Up DIP Claim*" means any Claim derived from or based upon the Roll-Up DIP Loans.

133.     "*Roll-Up DIP Loans*" means the $50,000,000 of Sheridan II RBL Claims and Sheridan II Term Loan Claims rolled-up pursuant to the DIP Credit Agreement and the DIP Orders.

134.     "*RSA*" means that certain *Restructuring Support Agreement* by and among the Debtors and the other parties thereto, as may be amended, modified, or supplemented from time to time, in accordance with its terms.

135.     "*Sale Proceeds*" means the Cash and non-Cash consideration provided by an Entity in connection with any Asset Sale, net of expenses (including transaction costs, severance, hedge breakage, and other costs and expenses arising from the Asset Sale).

136.     "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time with the consent (such consent not to be unreasonably withheld) of the Required Consenting Secured Lenders and the Debtors.

137.     "*Schedules*" means, collectively, the schedules of assets and liabilities, Schedule of Retained Causes of Action, and statement of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules, as they may be amended, modified, or supplemented from time to time.

138.     "*Secured Claim*" means a Claim:  (a) secured by a valid, perfected and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

139. "*Secured Lender Claim Amount*" means an amount equal to the sum of 100 percent of the aggregate Allowed Claims in Class 3(a), Class 3(b), Class 3(c), Class 4(a), Class 4(b), and Class 4(c).

140. "*Secured Lender Common Stock Pool*" means 100 percent of the New Common Stock (less the New Common Stock issued on account of the Junior Stakeholder Equitization Recovery), subject to dilution by the Incentive Stock.

141. "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

142. "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

143. "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

144. "*Services Agreement*" means either a new management agreement (if any) or a customary transition services agreement (if any), in each case by and among New Sheridan and Manager, which shall be either (a) in a form included in the Plan Supplement and reasonably acceptable to Manager and the Required Consenting Secured Lenders or (b) if not included in the Plan Supplement, as reasonably agreed between Manager and the New Board.

145. "*Sheridan*" means Sheridan Holding Company II, LLC.

146. "*Sheridan II RBL Claims*" means any and all Claims arising under, derived from, or based upon the Sheridan II RBL Credit Agreements or any other agreement, instrument, or document executed at any time in connection therewith including, without limitation, all Obligations (as defined in the Sheridan II RBL Credit Agreements) under the Sheridan II RBL Credit Agreements.

147. "*Sheridan II RBL Credit Agreements*" means, collectively, each of the following, as amended, restated, supplemented, or otherwise modified from time to time:

    a. that certain amended and restated credit agreement dated as of February 26, 2013 among Sheridan Investment Partners II, L.P., as borrower, Bank of America, N.A., as administrative agent and collateral agent (together with any successor administrative or collateral agent), and the other lenders party thereto, as amended (the "*SIP II RBL Credit Agreement*," and any and all Claims arising under, derived from, or based upon the SIP II RBL Credit Agreement, the "*SIP II RBL Credit Agreement Claims*");

    b. that certain amended and restated credit agreement dated as of February 26, 2013 among Sheridan Production Partners II-A, L.P., as borrower, Bank of America, N.A., as administrative agent and collateral agent (together with any successor administrative or collateral agent), and the other lenders party thereto, as amended (the "*SPP II-A RBL Credit Agreement*," and any and all Claims arising under, derived from, or based upon the SPP II-A RBL Credit Agreement, the "*SPP II-A RBL Credit Agreement Claims*"); and

    c. that certain amended and restated credit agreement dated as of February 26, 2013 among Sheridan Production Partners II-M, L.P., as borrower, Bank of America, N.A., as administrative agent and collateral agent (together with any successor administrative or collateral agent), and the other lenders party thereto, as amended (the "*SPP II-M RBL Credit Agreement*," and any and all Claims arising under, derived from, or based upon the SPP II-M RBL Credit Agreement, the "*SPP II-M RBL Credit Agreement Claims*").

148. "*Sheridan II Revolving Lenders*" means those lenders under the Sheridan II RBL Credit Agreements.

149.     "*Sheridan II Special Committee*" means collectively, the special committees of disinterested directors of Sheridan Investment Partners II, L.P., Sheridan Production Partners II-A, L.P., Sheridan Production Partners II-B, L.P., and Sheridan Production Partners II-M, L.P.

150.     "*Sheridan II Subordinated Term Lenders*" means those lenders under the Sheridan II Subordinated Term Loan Credit Agreements.

151.     "*Sheridan II Subordinated Term Loan Claims*" means any and all Claims arising under, derived from, or based upon the Sheridan II Subordinated Term Loan Credit Agreements, or any other agreement, instrument, or document executed at any time in connection therewith including, without limitation, all Obligations (as defined in the Sheridan II Subordinated Term Loan Credit Agreements) under the Sheridan II Subordinated Term Loan Credit Agreements.

152.     "*Sheridan II Subordinated Term Loan Credit Agreements*" means, collectively, each of the following, as amended, restated, supplemented, or otherwise modified from time to time:

   a.   that certain subordinated unsecured term loan credit agreement dated as of October 6, 2017 among Sheridan Investment Partners II, L.P., as borrower, Wilmington Trust, N.A., as administrative agent (together with any successor administrative or collateral agent), and the other lenders party thereto (the "*SIP II Subordinated Term Loan Credit Agreement*," and any and all Claims arising under, derived from, or based upon the SIP II Subordinated Term Loan Credit Agreement, the "*SIP II Subordinated Term Loan Credit Agreement Claims*");

   b.   that certain subordinated unsecured term loan credit agreement dated as of October 6, 2017 among Sheridan Production Partners II-A, L.P., as borrower, Wilmington Trust, N.A., as administrative agent (together with any successor administrative or collateral agent), and the other lenders party thereto (the "*SPP II-A Subordinated Term Loan Credit Agreement*," and any and all Claims arising under, derived from, or based upon the SPP II-A Subordinated Term Loan Credit Agreement, the "*SPP II-A Subordinated Term Loan Credit Agreement Claims*"); and

   c.   that certain subordinated unsecured term loan credit agreement dated as of October 6, 2017 among Sheridan Production Partners II-M, L.P., as borrower, Wilmington Trust, N.A., as administrative agent (together with any successor administrative or collateral agent), and the other lenders party thereto (the "*SPP II-M Subordinated Term Loan Credit Agreement*," and any and all Claims arising under, derived from, or based upon the SPP II-M Subordinated Term Loan Credit Agreement, the "*SPP II-M Subordinated Term Loan Credit Agreement Claims*").

153.     "*Sheridan II Term Lenders*" means those lenders under the Sheridan II Term Loan Credit Agreements.

154.     "*Sheridan II Term Loan Claims*" means any and all Claims arising under, derived from, or based upon the Sheridan II Term Loan Credit Agreements or any other agreement, instrument, or document executed at any time in connection therewith including, without limitation, all Obligations (as defined in the Sheridan II Term Loan Credit Agreements) under the Sheridan II Term Loan Credit Agreements.

155.     "*Sheridan II Term Loan Credit Agreements*" means, collectively, each of the following, as amended, restated, supplemented, or otherwise modified from time to time:

   a.   that certain amended and restated senior secured term loan credit agreement dated as of December 16, 2013 among Sheridan Investment Partners II, L.P., as borrower, Bank of America, N.A., as administrative agent (together with any successor collateral agent), and the other lenders party thereto (the "*SIP II Term Loan Credit Agreement*," and any and all Claims arising under, derived from, or based upon the SIP II Term Loan Credit Agreement, the "*SIP II Term Loan Credit Agreement Claims*");

b. that certain amended and restated senior secured term loan credit agreement dated as of December 16, 2013 among Sheridan Production Partners II-A, L.P., as borrower, Bank of America, N.A., as administrative agent (together with any successor collateral agent), and the other lenders party thereto (the "*SPP II-A Term Loan Credit Agreement*," and any and all Claims arising under, derived from, or based upon the SPP II-A Term Loan Credit Agreement, the "*SPP II-A Term Loan Credit Agreement Claims*"); and

c. that certain amended and restated senior secured term loan credit agreement dated as of December 16, 2013 among Sheridan Production Partners II-M, L.P., as borrower, Bank of America, N.A., as administrative agent (together with any successor collateral agent), and the other lenders party thereto (the "*SPP II-M Term Loan Credit Agreement*," and any and all Claims arising under, derived from, or based upon the SPP II-M Term Loan Credit Agreement, the "*SPP II-M Term Loan Credit Agreement Claims*").

156. "*Subordination Agreements*" means, collectively, each of the following, as amended, restated, supplemented, or otherwise modified from time to time:

a. that certain subordination agreement dated as of October 6, 2017 among Wilmington Trust, National Association, as administrative agent for the Sheridan II Subordinated Term Lenders (together with any successor administrative agent), Bank of America, N.A., as administrative agent for the Sheridan II Revolving Lenders (together with any successor administrative agent), Bank of America, N.A., as administrative agent for the Sheridan II Term Lenders (together with any successor administrative agent), and Bank of America, N.A., as collateral agent for the Sheridan II Revolving Lenders and the Sheridan II Term Lenders (together with any successor collateral agent), and acknowledged by Sheridan Investment Partners II, L.P.;

b. that certain subordination agreement dated as of October 6, 2017 among Wilmington Trust, National Association, as administrative agent for the Sheridan II Subordinated Term Lenders (together with any successor administrative agent), Bank of America, N.A., as administrative agent for the Sheridan II Revolving Lenders (together with any successor administrative agent), Bank of America, N.A., as administrative agent for the Sheridan II Term Lenders (together with any successor administrative agent), and Bank of America, N.A., as collateral agent for the Sheridan II Revolving Lenders and the Sheridan II Term Lenders (together with any successor collateral agent), and acknowledged by Sheridan Production Partners II-A, L.P.; and

c. that certain subordination agreement dated as of October 6, 2017 among Wilmington Trust, National Association, as administrative agent for the Sheridan II Subordinated Term Lenders (together with any successor administrative agent), Bank of America, N.A., as administrative agent for the Sheridan II Revolving Lenders (together with any successor administrative agent), Bank of America, N.A., as administrative agent for the Sheridan II Term Lenders (together with any successor administrative agent), and Bank of America, N.A., as collateral agent for the Sheridan II Revolving Lenders and the Sheridan II Term Lenders (together with any successor collateral agent), and acknowledged by Sheridan Production Partners II-M, L.P.

157. "*Third-Party Release*" means the release set forth in Article VIII.D of this Plan.

158. "*Tranche A*" means a $50,000,000 first-out tranche of term loans under the First-Out/Second-Out Exit Facility Credit Agreement.

159. "*Tranche B*" means a $50,000,000 second-out tranche of term loans under the First-Out/Second-Out Exit Facility Credit Agreement.

160. "*Tranche C*" means a $75,000,000 last-out tranche of term loans under the Last-Out Exit Facility Credit Agreement.

161. "*Unexpired Lease*" means a lease to which one or more of the Debtors are a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

162. "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

163. "*Wind Down*" means, if the Asset Sale Restructuring occurs, the wind down and dissolution of the Debtors' Estates following the Effective Date as set forth in **Error! Reference source not found.**.B hereof.

164. "*Wind-Down Budget*" means a budget in form and substance reasonably acceptable to the Company Parties and acceptable to the Required Consenting Secured Lenders and as set forth in the Plan Supplement.

165. *"Wind-Down Milestones"* means the deadlines, set forth in the Plan Supplement by which the Plan Administrator must complete certain aspects of the Wind Down.

## B. Rules of Interpretation.

For purposes of this Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; *provided* that nothing in this clause (2) shall affect any parties' consent rights over any of the Definitive Documents or any amendments thereto (as defined in the RSA); (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with the Plan or Confirmation Order, as applicable; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document created or entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) unless otherwise specified, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (10) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (11) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (12) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (13) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (14) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (15) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (16) unless otherwise specified, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

## C. Computation of Time.

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

*D.* *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or the Reorganized Debtors, as applicable.

*E.* *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

*F.* *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in this Plan to the contrary, references in this Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

*G.* *Controlling Document.*

In the event of an inconsistency between the Plan, and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order). In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

*H.* *Consent Rights*

Notwithstanding anything herein to the contrary, any and all consent rights of the parties to the RSA set forth in the RSA with respect to the form and substance of this Plan, all exhibits to the Plan, and the Plan Supplement, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Section A hereof) and be fully enforceable as if stated in full herein.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, PRIORITY CLAIMS, AND RESTRUCTURING EXPENSES

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

*A.* *Administrative Claims.*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (1) if an Administrative Claim

is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

B.    *DIP Claims.*

On the Effective Date and if an Equitization Restructuring occurs, except to the extent that a Holder of an Allowed DIP Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each (a) Allowed New Money DIP Claim, each Holder thereof will receive its Pro Rata share of Tranche A of the First-Out/Second-Out Exit Facility, and (b) Allowed Roll-Up DIP Claim, each Holder thereof will receive its Pro Rata share of Tranche B of the First-Out/Second-Out Exit Facility.

On the Effective Date and if an Asset Sale Restructuring occurs, except to the extent that a Holder of an Allowed DIP Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each (a) Allowed New Money DIP Claim, each Holder thereof shall receive payment in full in cash of such Holder's Allowed New Money DIP Claim, and (b) Allowed Roll-Up DIP Claim, each Holder thereof shall receive payment in full in cash of such Holder's Allowed Roll-Up DIP Claim.

Unless and until Holders of Allowed DIP Claims receive, in an Equitization Restructuring, their Pro Rata share of Tranche A of the First-Out/Second-Out Exit Facility and Tranche B of the First-Out/Second-Out Exit Facility, or in an Asset Sale Restructuring, payment in full in Cash, then notwithstanding entry of the Confirmation Order and anything to the contrary in this Plan or the Confirmation Order, (i) none of the DIP Claims shall be discharged, satisfied or released or otherwise affected in whole or in part, and each of the DIP Claims shall remain outstanding, (ii) none of the Liens securing the DIP Claims shall be deemed to have been waived, released, satisfied or discharged, in whole or in part, and (iii) neither the DIP Credit Agreement nor any other agreement, instrument or document executed at any time in connection therewith shall be deemed terminated, discharged, satisfied or released or otherwise affected in whole or in part, and each such agreement, instrument and document shall remain in effect.

C.    *Professional Fee Claims.*

    1.    Final Fee Applications and Payment of Professional Fee Claims.

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date.

    2.    Professional Fee Escrow Account.

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount, which shall be funded by the Reorganized Debtors. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed. When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow

Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

3. Professional Fee Amount.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than two (2) Business Days before the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

4. Post-Confirmation Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

D.      *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

E.      *Payment of Restructuring Expenses.*

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the RSA, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least two (2) Business Days before the anticipated Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses. On the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors. In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay pre- and post-Effective Date, when due and payable in the ordinary course, Restructuring Expenses related to implementation, consummation, and defense of the Plan, whether incurred before, on, or after the Effective Date.

### ARTICLE III.
### CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Classification of Claims and Interests.*

This Plan constitutes a separate Plan proposed by each Debtor. Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of

such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims against and Interests in the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3(a) | SIP II RBL Credit Agreement Claims | Impaired | Entitled to Vote |
| Class 3(b) | SPP II-A RBL Credit Agreement Claims | Impaired | Entitled to Vote |
| Class 3(c) | SPP II-M RBL Credit Agreement Claims | Impaired | Entitled to Vote |
| Class 4(a) | SIP II Term Loan Credit Agreement Claims | Impaired | Entitled to Vote |
| Class 4(b) | SPP II-A Term Loan Credit Agreement Claims | Impaired | Entitled to Vote |
| Class 4(c) | SPP II-M Term Loan Credit Agreement Claims | Impaired | Entitled to Vote |
| Class 5(a) | SIP II Subordinated Term Loan Credit Agreement Claims | Impaired | Entitled to Vote |
| Class 5(b) | SPP II-A Subordinated Term Loan Credit Agreement Claims | Impaired | Entitled to Vote |
| Class 5(c) | SPP II-M Subordinated Term Loan Credit Agreement Claims | Impaired | Entitled to Vote |
| Class 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 6 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 7 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.      *Treatment of Claims and Interests.*

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

1. Class 1 - Other Secured Claims

    (a)    *Classification*: Class 1 consists of any Other Secured Claims against any Debtor.

    (b)    *Treatment*: Each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor (subject to the reasonable consent of the Required Consenting Secured Lenders), and subject to any applicable intercreditor agreement:

        (i)    payment in full in Cash of its Allowed Class 1 Claim;

        (ii)    the collateral securing its Allowed Class 1 Claim;

        (iii)    Reinstatement of its Allowed Class 1 Claim; or

        (iv)    such other treatment rendering its Allowed Class 1 Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

    (c)    *Voting*: Class 1 is Unimpaired under the Plan. Holders of Allowed Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2. Class 2 - Other Priority Claims

    (a)    *Classification*: Class 2 consists of any Other Priority Claims against any Debtor.

    (b)    *Treatment*: Each Holder of an Allowed Other Priority Claim shall receive Cash in an amount equal to such Allowed Class 2 Claim.

    (c)    *Voting*: Class 2 is Unimpaired under the Plan. Holders of Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3. Class 3(a) - SIP II RBL Credit Agreement Claims

    (a)    *Classification*: Class 3(a) consists of any SIP II RBL Credit Agreement Claims.

    (b)    *Allowance*: On the Effective Date, the SIP II RBL Credit Agreement Claims shall be Allowed in the aggregate principal amount of $55,418,345.61, plus accrued and unpaid interest on such principal amount through the Petition Date and any other amounts due and owing pursuant to the SIP II RBL Credit Agreement through and including the Effective Date, less the amount rolled up pursuant to the Roll-Up DIP Loans.

    (c)    *Treatment*: On the Effective Date, each Holder of Allowed SIP II RBL Credit Agreement Claims shall receive, in full and final satisfaction of such Claims, its ratable share (measured by reference to the Secured Lender Claim Amount) of:

        (i)    if the Equitization Restructuring occurs, (A) Tranche C of the Last-Out Exit Facility and (B) the Secured Lender Common Stock Pool; or

        (ii)    if the Asset Sale Restructuring occurs, the Sale Proceeds up to the Allowed

amount of such Claims, less the Junior Stakeholder Sale Recovery.

    (d)     *Voting:* Class 3(a) is Impaired under the Plan and Holders of Allowed Claims in Class 3(a) are entitled to vote to accept or reject the Plan.

4.    Class 3(b) - SPP II-A RBL Credit Agreement Claims

    (a)     *Classification*: Class 3(b) consists of any SPP II-A RBL Credit Agreement Claims.

    (b)     *Allowance*: On the Effective Date, the SPP II-A RBL Credit Agreement Claims shall be Allowed in the aggregate principal amount of $7,709,122.44, plus accrued and unpaid interest on such principal amount through the Petition Date and any other amounts due and owing pursuant to the SPP II-A RBL Credit Agreement through and including the Effective Date, less the amount rolled up pursuant to the Roll-Up DIP Loans.

    (c)     *Treatment*: On the Effective Date, each Holder of Allowed SPP II-A RBL Credit Agreement Claims shall receive, in full and final satisfaction of such Claims, its ratable share (measured by reference to the Secured Lender Claim Amount) of:

        (i)     if the Equitization Restructuring occurs, (A) Tranche C of the Last-Out Exit Facility and (B) the Secured Lender Common Stock Pool; or

        (ii)     if the Asset Sale Restructuring occurs, the Sale Proceeds up to the Allowed amount of such Claims, less the Junior Stakeholder Sale Recovery.

    (d)     *Voting:* Class 3(b) is Impaired under the Plan and Holders of Allowed Claims in Class 3(b) are entitled to vote to accept or reject the Plan.

5.    Class 3(c) - SPP II-M RBL Credit Agreement Claims

    (a)     *Classification*: Class 3(c) consists of any SPP II-M RBL Credit Agreement Claims.

    (b)     *Allowance*: On the Effective Date, the SPP II-M RBL Credit Agreement Claims shall be Allowed in the aggregate principal amount of $2,875,069.24, plus accrued and unpaid interest on such principal amount through the Petition Date and any other amounts due and owing pursuant to the SPP II-M RBL Credit Agreement through and including the Effective Date, less the amount rolled up pursuant to the Roll-Up DIP Loans.

    (c)     *Treatment*: On the Effective Date, each Holder of Allowed SPP II-M RBL Credit Agreement Claims shall receive, in full and final satisfaction of such Claims, its ratable share (measured by reference to the Secured Lender Claim Amount) of:

        (i)     if the Equitization Restructuring occurs, (A) Tranche C of the Last-Out Exit Facility and (B) the Secured Lender Common Stock Pool; or

        (ii)     if the Asset Sale Restructuring occurs, the Sale Proceeds up to the Allowed amount of such Claims, less the Junior Stakeholder Sale Recovery.

    (d)     *Voting*: Class 3(c) is Impaired under the Plan and Holders of Allowed Claims in Class 3(c) are entitled to vote to accept or reject the Plan.

6. Class 4(a) - SIP II Term Loan Credit Agreement Claims

    (a)    *Classification*:  Class 4(a) consists of any SIP II Term Loan Credit Agreement Claims.

    (b)    *Allowance*:  On the Effective Date, the SIP II Term Loan Credit Agreement Claims shall be Allowed in the aggregate principal amount of $456,036,949.73, plus accrued and unpaid interest on such principal amount through the Petition Date and any other amounts due and owing pursuant to the SIP II Term Loan Credit Agreement through and including the Effective Date, less the amount rolled up pursuant to the Roll-Up DIP Loans.

    (c)    *Treatment*:  On the Effective Date, each Holder of Allowed SIP II Term Loan Credit Agreement Claims shall receive, in full and final satisfaction of such Claims, its ratable share (measured by reference to the Secured Lender Claim Amount) of:

        (i)    if the Equitization Restructuring occurs, (A) Tranche C of the Last-Out Exit Facility and (B) the Secured Lender Common Stock Pool; or

        (ii)    if the Asset Sale Restructuring occurs, the Sale Proceeds up to the Allowed amount of such Claims, less the Junior Stakeholder Sale Recovery.

    (d)    *Voting:*  Class 4(a) is Impaired under the Plan and Holders of Allowed Claims in Class 4(a) are entitled to vote to accept or reject the Plan.

7. Class 4(b) - SPP II-A Term Loan Credit Agreement Claims

    (a)    *Classification*:  Class 4(b) consists of any SPP II-A Term Loan Credit Agreement Claims.

    (b)    *Allowance*:  On the Effective Date, the SPP II-A Term Loan Credit Agreement Claims shall be Allowed in the aggregate principal amount of $63,438,010.99, plus accrued and unpaid interest on such principal amount through the Petition Date and any other amounts due and owing pursuant to the SPP II-A Term Loan Credit Agreement through and including the Effective Date, less the amount rolled up pursuant to the Roll-Up DIP Loans.

    (c)    *Treatment*:  On the Effective Date, each Holder of Allowed SPP II-A Term Loan Credit Agreement Claims shall receive, in full and final satisfaction of such Claims, its ratable share (measured by reference to the Secured Lender Claim Amount) of:

        (i)    if the Equitization Restructuring occurs, (A) Tranche C of the Last-Out Exit Facility and (B) the Secured Lender Common Stock Pool; or

        (ii)    if the Asset Sale Restructuring occurs, on the Effective Date, the Sale Proceeds up to the Allowed amount of such Claims, less the Junior Stakeholder Sale Recovery.

    (d)    *Voting:*  Class 4(b) is Impaired under the Plan and Holders of Allowed Claims in Class 4(b) are entitled to vote to accept or reject the Plan.

8. Class 4(c) - SPP II-M Term Loan Credit Agreement Claims

    (a)    *Classification*:  Class 4(c) consists of any SPP II-M Term Loan Credit Agreement Claims.

    (b)    *Allowance*:  On the Effective Date, the SPP II-M Term Loan Credit Agreement Claims shall be Allowed in the aggregate principal amount of $23,658,912.80, plus accrued and unpaid interest on such principal amount through the Petition Date and any other amounts

due and owing pursuant to the SPP II-M Term Loan Credit Agreement through and including the Effective Date, less the amount rolled up pursuant to the Roll-Up DIP Loans.

(c) *Treatment*: On the Effective Date, each Holder of Allowed SPP II-M Term Loan Credit Agreement Claims shall receive, in full and final satisfaction of such Claims, its ratable share (measured by reference to the Secured Lender Claim Amount) of:

    (i) if the Equitization Restructuring occurs, (A) Tranche C of the Last-Out Exit Facility and (B) the Secured Lender Common Stock Pool; or

    (ii) if the Asset Sale Restructuring occurs, the Sale Proceeds up to the Allowed amount of such Claims, less the Junior Stakeholder Sale Recovery.

(d) *Voting:* Class 4(c) is Impaired under the Plan and Holders of Allowed Claims in Class 4(c) are entitled to vote to accept or reject the Plan.

9. <u>Class 5(a) - SIP II Subordinated Term Loan Credit Agreement Claims</u>

(a) *Classification*: Class 5(a) consists of any SIP II Subordinated Term Loan Credit Agreement Claims.

(b) *Treatment*: On the Effective Date, each Holder of Allowed SIP II Subordinated Term Loan Credit Agreement Claims shall receive, in full and final satisfaction of such Claims, its ratable share (measured by reference to the Allowed amount of Sheridan II Subordinated Term Loan Claims) of:

    (i) if the Equitization Restructuring occurs, the Junior Stakeholder Equitization Recovery; or

    (ii) if the Asset Sale Restructuring occurs, the Junior Stakeholder Sale Recovery;

*provided, however*, that each Applicable Affiliate is conclusively deemed to have waived its ratable share of the recovery set forth herein for the benefit of the other Holders of Claims in Class 5(a).

(c) *Voting:* Class 5(a) is Impaired under the Plan and Holders of Allowed Claims in Class 5(a) are entitled to vote to accept or reject the Plan.

10. <u>Class 5(b) - SPP II-A Subordinated Term Loan Credit Agreement Claims</u>

(a) *Classification*: Class 5(b) consists of any SPP II-A Subordinated Term Loan Credit Agreement Claims.

(b) *Treatment*: On the Effective Date, each Holder of Allowed SPP II-A Subordinated Term Loan Credit Agreement Claims shall receive, in full and final satisfaction of such Claims, its ratable share (measured by reference to the Allowed amount of Sheridan II Subordinated Term Loan Claims) of:

    (i) if the Equitization Restructuring occurs, the Junior Stakeholder Equitization

> Recovery; or

> > (ii)    if the Asset Sale Restructuring occurs, the Junior Stakeholder Sale Recovery;

> *provided, however*, that each Applicable Affiliate is conclusively deemed to have waived its ratable share of the recovery set forth herein for the benefit of the other Holders of Claims in Class 5(b).

> (c)    *Voting:*  Class 5(b) is Impaired under the Plan and Holders of Allowed Claims in Class 5(b) are entitled to vote to accept or reject the Plan.

11. Class 5(c) - SPP II-M Subordinated Term Loan Credit Agreement Claims

> (a)    *Classification*:  Class 5(c) consists of any SPP II-M Subordinated Term Loan Credit Agreement Claims.

> (b)    *Treatment*:  On the Effective Date, each Holder of Allowed SPP II-M Subordinated Term Loan Credit Agreement Claims shall receive, in full and final satisfaction of such Claims, its ratable share (measured by reference to the Allowed amount of Sheridan II Subordinated Term Loan Claims) of:

> > (i)    if the Equitization Restructuring occurs, the Junior Stakeholder Equitization Recovery; or

> > (ii)    if the Asset Sale Restructuring occurs, the Junior Stakeholder Sale Recovery;

> *provided, however*, that each Applicable Affiliate is conclusively deemed to have waived its ratable share of the recovery set forth herein for the benefit of the other Holders of Claims in Class 5(c).

> (c)    *Voting:*  Class 5(c) is Impaired under the Plan and Holders of Allowed Claims in Class 5(c) are entitled to vote to accept or reject the Plan.

12. Class 6 – General Unsecured Claims

> (a)    *Classification*:  Class 6 consists of all General Unsecured Claims.

> (b)    *Treatment*:  Each Holder of an Allowed General Unsecured Claim shall receive either: (i) Reinstatement of such Allowed General Unsecured Claim pursuant to section 1124 of the Bankruptcy Code; or (ii) payment in full in Cash on (a) the Effective Date, or (b) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claim.

> (c)    *Voting*:  Class 6 is Unimpaired under the Plan.  Holders of Claims in Class 6 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

13. Class 7 - Intercompany Claims

> (a)    *Classification:*  Class 7 consists of all Intercompany Claims.

> (b)    *Treatment:*  Intercompany Claims shall be, at the option of the Reorganized Debtors, either: (i) Reinstated; or (ii) cancelled and released without any distribution on account of such Claims.

      (c)       *Voting:*  Class 7 is Unimpaired if the Class 7 Claims are Reinstated or Impaired if the Class 7 Claims are cancelled.  Holders of Class 7 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Class 7 Claims are not entitled to vote to accept or reject the Plan.

14.  Class 8 - Intercompany Interests

      (a)       *Classification:*  Class 8 consists of all Intercompany Interests.

      (b)       *Treatment:*  Intercompany Interests shall be, at the option of the Reorganized Debtors, either:  (a) Reinstated; or (b) cancelled and released without any distribution on account of such Interests.

      (c)       *Voting*:  Class 8 is Unimpaired if the Class 8 Interests are Reinstated or Impaired if the Class 8 Interests are cancelled.  Holders of Class 8 Interests are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Class 8 Interests are not entitled to vote to accept or reject the Plan.

15.  Class 9 - Interests

      (a)       *Classification:*  Class 9 consists of all Interests (other than Intercompany Interests).

      (b)       *Treatment*:  If the Equitization Restructuring occurs, all Interests will be cancelled, released, and extinguished and will be of no further force or effect, and Holders of Interests will not receive any distribution on account of such Interests.

               If the Asset Sale Restructuring occurs, on the Effective Date, each Holder of Interests shall receive, in full and final satisfaction of such Interests, its *Pro Rata* share of the Interest Holder Sale Recovery.

      (c)       *Voting*:  Class 9 is Impaired under the Plan.  Holders of Interests in Class 9 are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

C.     *Special Provision Governing Unimpaired Claims.*

      Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claims, including, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

D.     *Elimination of Vacant Classes*

      Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.     *Voting Classes, Presumed Acceptance by Non-Voting Classes*

      If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

*F.*     *Intercompany Interests*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of the Holders of New Common Stock, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims.

*G.*     *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article XI of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

*H.*     *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

*I.*     *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, and subject to the RSA, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

*J.*     *Subordination Agreements.*

Notwithstanding anything to the contrary in the Plan, (i) nothing in the Plan (unless specifically set forth herein) terminates, cancels, modifies, discharges or releases the Subordination Agreements, any rights of the non-Debtor parties thereto, or any Claims of the non-Debtor parties thereunder (except as against the Debtor parties thereto in accordance with the treatment provisions of this Plan) and (ii) for the purposes of enforcement of any and all rights and Claims between the non-Debtor parties to the Subordination Agreements, the Sheridan II RBL Claims and the Sheridan II Term Loan Claims shall not be terminated, canceled, discharged, released, satisfied, or impaired by this Plan or any Restructuring Transaction contemplated herein.

Any distributions made pursuant to this Plan, including any proceeds related thereto, shall not be subject to the Subordination Agreements. For the avoidance of doubt, any and all rights, claims, Causes of Action, payments, or distributions arising from, related to, or made on account of the New Common Stock shall not be subject to the Subordination Agreements.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

*A.*     *General Settlement of Claims and Interests.*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases,

and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including (1) any challenge to the amount, validity, perfection (as applicable), enforceability, priority or extent of the DIP Claims, the Sheridan II RBL Claims, the Sheridan II Term Loan Claims, or the Sheridan II Subordinated Term Loan Claims, and (2) any claim to avoid, subordinate, or disallow any DIP Claims, Sheridan II RBL Claims, Sheridan II Term Loan Claims, or Sheridan II Subordinated Term Loan Claims, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates. Subject to Article VI hereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

B.      *Restructuring Transactions.*

On the Effective Date, the applicable Debtors or the Reorganized Debtors shall enter into any transaction and shall take any actions as may be necessary or appropriate to effectuate the Asset Sale Restructuring or the Equitization Restructuring, as applicable, including to establish New Sheridan and to transfer all of the assets of the Debtors to New Sheridan or a subsidiary thereof. The applicable Debtors or the Reorganized Debtors will take any actions as may be necessary or advisable to effect a corporate restructuring of the overall corporate structure of the Debtors, to the extent provided herein, the Description of Transaction Steps, or in the Definitive Documentation, including the issuance of all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, one or more inter-company mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions.

The actions to implement the Restructuring Transactions may include, in accordance with the consent rights in the RSA: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (4) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan.

C.      *Cancellation of Existing Agreements and Interests.*

On the Effective Date, except with respect to the Exit Facilities or to the extent otherwise provided in the Plan or the Confirmation Order, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be cancelled and the obligations of the Debtors and any non-Debtor Affiliate thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect. Holders of or parties to such cancelled instruments, securities, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to this Plan. Notwithstanding the foregoing or anything to the contrary herein, any rights of the Agents to indemnification under the DIP Facility Documents, the Sheridan II RBL Credit Agreements, and the Sheridan II Term Loan Credit Agreements shall remain binding and enforceable in accordance with the terms of such documents and shall not be subject to discharge, impairment, or release under the Plan or the Confirmation Order (in the Asset Sale Restructuring, any payments related to such indemnification obligations shall be made in a manner consistent with the Wind-Down Budget).

D.    *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan, including the Asset Sale, if applicable, or pursuant to: (1) the issuance, reinstatement, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for any or all of the Exit Facilities; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

E.    *The Equitization Restructuring.*

If the Equitization Restructuring occurs, the following provisions shall govern.

1.    Reorganized Debtors.

On the Effective Date, the New Board shall be established, and each Reorganized Debtor shall adopt its New Organizational Documents. The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan.

2.    Sources of Consideration for Plan Distributions.

(a)    Exit Facilities.

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities, the terms of which will be set forth in the Exit Facility Documents. Confirmation of the Plan shall be deemed approval of the Exit Facilities, including the Exit Facilities, and the Exit Facility Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Reorganized Debtors to enter into and execute the Exit Facility Documents and such other documents as may be required to effectuate the treatment afforded by the Exit Facilities. Execution of the Exit Facility Credit Agreements by the Exit Agent shall be deemed to bind all holders of Sheridan II RBL Claims and Sheridan II Term Loan Claims as if each such holder had executed the Exit Facility Credit Agreements with appropriate authorization. The Last-Out Exit Facility shall constitute a refinancing of the obligations under the Sheridan II Term Loan Credit Agreements and the Sheridan II RBL Credit Agreements.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility Documents, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Facility Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances

under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

(b)     New Common Stock.

New Sheridan shall be authorized to issue a certain number of shares of New Common Stock pursuant to its New Organizational Documents. On the Effective Date, the Debtors shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan.

All of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

3.     Corporate Existence.

Except as otherwise provided in the Plan, Sheridan shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which Sheridan is incorporated or formed and pursuant to the certificate of incorporation and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

4.     Vesting of Assets in the Reorganized Debtors.

Except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances; *provided*, *however*, that any and all liens securing the DIP Claim, the Sheridan II RBL Claims, and the Sheridan II Term Loan Claims shall be retained by the applicable Agents and assigned to the Exit Agent to secure any and all obligations of the Reorganized Debtors under the Exit Facilities. On and after the Effective Date, except as otherwise provided in the Plan the Confirmation Order, or any agreement, instrument, or other document incorporated herein, the Reorganized Debtors may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

5.     Corporate Action.

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including: (1) adoption or assumption, as applicable, of the Employment Obligations; (2) selection of the directors, officers, or managers for the Reorganized Debtors; (3) the distribution of the New Common Stock; (4) implementation of the Restructuring Transactions; (5) entry into the Exit Facility Documents; (6) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (7) adoption of the New Organizational Documents; (8) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (9) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or

after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security Holders, directors, officers, or managers of the Debtors or the Reorganized Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Common Stock, the New Organizational Documents, the Exit Facilities, the Exit Facility Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.E.5 shall be effective notwithstanding any requirements under non-bankruptcy law.

6.   New Organizational Documents.

On or immediately prior to the Effective Date, the New Organizational Documents shall be amended in a manner acceptable to the Debtors, as may be necessary to effectuate the transactions contemplated by the Plan. Each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation. The New Organizational Documents will prohibit the issuance of non-voting Equity Securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code. For the avoidance of doubt, the New Organizational Documents shall be included as exhibits to the Plan Supplement.

7.   Directors and Officers of the Reorganized Debtors.

As of the Effective Date, the term of the current members of the Sheridan II Special Committee shall expire, and the members for the initial term of the New Board shall be appointed. The New Board shall initially consist of 5 members, consisting of the Chief Executive Officer of New Sheridan and other members appointed by the Required Consenting Secured Lenders. In subsequent terms, following the Effective Date, the members of the New Board shall be selected in accordance with the New Organizational Documents of the Reorganized Debtors. The initial members of the New Board will be identified in the Plan Supplement, to the extent known at the time of filing. Each such member and officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors.

8.   Effectuating Documents; Further Transactions.

On and after the Effective Date, the Reorganized Debtors and the New Board are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

9.   Certain Securities Law Matters.

The offering, issuance, and distribution of the New Common Stock, as contemplated by Article III of this Plan, shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities in accordance with, and pursuant to, section 1145 of the Bankruptcy Code. Such New Common Stock will be freely tradable in the United States by the recipients thereof, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, and compliance with applicable securities laws and any rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments and subject to any restrictions in the New Organizational Documents.

10. Employee Matters.

Unless otherwise provided herein, and subject to Article V of the Plan, the Reorganized Debtors shall: (a) assume all employment agreements, indemnification agreements, or other agreements with current and former members of any Governing Body, employees, officers, directors, or managers of the Debtors; or (b) enter into new agreements with such persons on terms and conditions acceptable to the Reorganized Debtors and such person. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

11. Preservation of Causes of Action.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article IX hereof, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article IX.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article IX of the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article IX of the Plan. The Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

12. Services Agreement.

On or prior to the Effective Date, New Sheridan shall enter into and adopt the Services Agreement (if any).

13. Dissolution of Certain Debtors.

To the extent there are no remaining Claims against a Debtor and such Debtor has no assets and no liabilities, each Debtor, other than Sheridan, shall be deemed dissolved in accordance with applicable law, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

14. Closing the Chapter 11 Cases.

Upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases except for one of the Chapter 11 Cases as determined by the Reorganized Debtors and the Required

Consenting Secured Lenders, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in such Chapter 11 Case.

F.      *The Asset Sale Restructuring.*

If the Asset Sale Restructuring occurs, the following provisions shall govern.

1.      Vesting of Assets in Reorganized Debtors.

Except as otherwise provided in the Plan, the Confirmation Order, the Asset Purchase Agreement, or any agreement, instrument, or other document incorporated herein or therein, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, the assets of the Debtors shall vest in the Reorganized Debtors for the purpose of liquidating the Estates, free and clear of all Liens, Claims, charges, or other encumbrances; *provided* that, after funding the Professional Fee Escrow Account, the collateral, or proceeds of sales of such collateral, of the Reorganized Debtors securing the DIP Claims, Sheridan II RBL Claims, and Sheridan II Term Loan Claims shall remain subject to the liens and claims of the Sheridan II Revolving Lenders and Sheridan II Term Lenders, as applicable, to the same extent as such liens and claims were enforceable against the Debtors and the Debtors' assets until such DIP Claims, Sheridan II RBL Claims, and Sheridan II Term Loan Claims are repaid in full pursuant to Article II.B.  On and after the Effective Date, except as otherwise provided for in the Plan, the DIP Orders, or the Asset Purchase Agreement, the Debtors and the Reorganized Debtors may operate their business and use, acquire, or dispose of property in accordance with the Wind-Down Budget, and compromise or settle any Claims, Interests, or Causes of Action.

2.      Sources of Consideration for Plan Distributions.

The Reorganized Debtors will fund distributions under the Plan with Cash on hand on the Effective Date and the revenues and proceeds of all assets of the Debtors, including proceeds from all Causes of Action not settled, released, discharged, enjoined, or exculpated under the Plan or otherwise on or prior to the Effective Date.

Notwithstanding anything to the contrary in the Plan or in the Asset Purchase Agreement, on the Effective Date, any Cause of Action not settled, released, discharged, enjoined, or exculpated under the Plan on or prior to the Effective Date shall vest in the Reorganized Debtors and shall be subject to administration by the Plan Administrator.

3.      Reorganized Debtors.

On and after the Effective Date, the Reorganized Debtors shall continue in existence for purposes of (a) winding down the Debtors' business and affairs as expeditiously as reasonably possible in accordance with the Wind-Down Budget and Wind-Down Milestones, (b) resolving Disputed Claims, (c) making distributions on account of Allowed Claims as provided hereunder, (d) funding distributions in accordance with the Wind-Down Budget, (e) enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action on the Retained Causes of Action List in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith, (f) filing appropriate tax returns, (g) complying with its continuing obligations under the Asset Purchase Agreement, if any, and the DIP Orders (as applicable), and (h) administering the Plan in an efficacious manner.  The Reorganized Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (i) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, DIP Orders (as applicable) and (iii) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

4.      Plan Administrator.

On and after the Effective Date, the Plan Administrator shall act for the Reorganized Debtors in the same fiduciary capacity as applicable to a board of managers, directors, officers, or other Governing Body, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).  On the Effective Date, the authority, power, and incumbency of the persons acting as managers, officers, directors, sale director, or Governing Body of the Reorganized Debtors

shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed as the sole manager, sole director, sole manager, and sole officer of the Reorganized Debtors, and shall succeed to the powers of the Reorganized Debtors' managers, directors, officers, and other Governing Bodies. From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Reorganized Debtors. The foregoing shall not limit the authority of the Reorganized Debtors or the Plan Administrator, as applicable, to continue the employment of any former manager or officer, including pursuant to any transition services agreement entered into on or after the Effective Date by and between the Reorganized Debtors and the Purchaser. The Plan Administrator shall use commercially reasonable efforts to operate in a manner consistent with the Wind-Down Budget.

     5.   Dissolution and Governing Bodies of the Debtors.

As of the Effective Date, the Sheridan II Special Committee shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, members, or Governing Bodies, and any remaining officers, directors, managers, or managing members of any Debtor shall be dismissed without any further action required on the part of any such Debtor, the equity holders of the Debtors, the officers, directors, managers, or Governing Body, as applicable, of the Debtors, or the members of any Debtor. Subject in all respects to the terms of this Plan, the Debtors shall be dissolved as soon as practicable on or after the Effective Date, but in no event later than the closing of the Chapter 11 Cases.

As of the Effective Date, the Plan Administrator shall act as the sole officer, director, manager, and Governing Body, as applicable, of the Debtors with respect to its affairs. Subject in all respects to the terms of this Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve any of the Debtors, and shall: (a) file a certificate of dissolution for any of the Debtors, together with all other necessary corporate and company documents, to effect the dissolution of Sheridan under the applicable laws of its state of formation; and (b) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the Debtors or their Estates for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

The filing by the Plan Administrator of any of the Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of Manager or any of its affiliates.

     6.   Release of Liens.

Except as otherwise expressly provided herein or in the Confirmation Order, on the Effective Date, all Liens on any property of any Debtors or the Reorganized Debtors shall automatically terminate, all property subject to such Liens shall be automatically released, and all guarantees of any Debtors or the Reorganized Debtors shall be automatically discharged and released; *provided* that notwithstanding anything to the contrary set forth in this Plan, subject to the funding of the Professional Fee Escrow Account, (a) all Liens of the DIP Lenders, the Sheridan II Revolving Lenders, and the Sheridan II Term Lenders, on any property of any Debtors or the Reorganized Debtors shall remain valid, binding, and in full effect on and after the Effective Date, (b) all property of the Debtors and Reorganized Debtors shall remain subject to the Liens and claims of the DIP Lenders, the Sheridan II Revolving Lenders, and the Sheridan II Term Lenders and shall continue to secure all Obligations (as defined in the DIP Credit Agreement, the Sheridan II RBL Credit Agreements, or the Sheridan II Term Loan Credit Agreements, as applicable) owing to the DIP Lenders, the Sheridan II Revolving Lenders, and the Sheridan II Term Lenders, (c) all guarantees of any Debtors or the Reorganized Debtors in favor of the DIP Lenders, the Sheridan II Revolving Lenders, and the Sheridan II Term Lenders shall be reaffirmed and remain in full force and effect, and (d) the proceeds of sales of any collateral of the Reorganized Debtors securing the DIP claims, Sheridan II RBL Claims, and Sheridan II Term Loan Claims shall remain subject to the liens and claims of the Sheridan II Revolving Lenders and Sheridan II Term Lenders, as applicable, to the same extent as such liens and claims were enforceable against the Debtors and the Debtors' assets, in each case of (a)-(d) until the DIP Lenders, Sheridan II Revolving Lenders, and Sheridan II Term Lenders receive their distributions or other treatment in accordance with Article II.B and Article III.B.

7.    Corporate Action.

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects, including:  (a) consummation of the Asset Sale; and (b) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan or deemed necessary or desirable by the Debtors before, on, or after the Effective Date involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan or corporate structure of the Debtors or Reorganized Debtors, shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors.  Before, on, or after the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors.  The authorizations and approvals contemplated by this Article IV.F shall be effective notwithstanding any requirements under non-bankruptcy law.

8.    Effectuating Documents; Further Transactions.

Prior to the Effective Date, the Debtors are, and on and after the Effective Date, the Reorganized Debtors, the Plan Administrator, and the officers and members thereof are, authorized to and may issue, execute, deliver, file, or record to the extent not inconsistent with any provision of this Plan such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, notice, or consents, except for those expressly required pursuant to the Plan.

9.    Preservation of Causes of Action.

Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Debtors shall convey to the Plan Administrator all rights to commence, prosecute, or settle, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, which shall vest in the Plan Administrator pursuant to the terms of the Plan.  The Plan Administrator may enforce all rights to commence, prosecute, or settle, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and the Plan Administrator's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Plan Administrator may, in its reasonable business judgment, pursue such Causes of Action and may retain and compensate professionals in the analysis or pursuit of such Causes of Action to the extent the Plan Administrator deems appropriate, including on a contingency fee basis.  No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Plan Administrator will not pursue any and all available Causes of Action against them.  The Debtors and the Plan Administrator expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan; *provided* that the Reorganized Debtors, in consultation with the Plan Administrator after the Effective Date, may prosecute any such Cause of Action against any party only in connection with their objection to and resolution of any Claim asserted by such party.  Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Plan Administrator expressly reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.  The Plan Administrator shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to, or action, order, or approval of, the Bankruptcy Court.

10.    Closing the Chapter 11 Cases.

Upon the occurrence of the Effective Date, the Plan Administrator shall be permitted to close all of the Chapter 11 Cases except for one of the Chapter 11 Cases as determined by the Plan Administrator, the Reorganized

Debtors, and the Required Consenting Secured Lenders, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of Sheridan.

When all Disputed Claims have become Allowed or Disallowed and all remaining Cash has been distributed in accordance with the Plan, the Plan Administrator shall seek authority from the Bankruptcy Court to close the Chapter 11 Case of Sheridan in accordance with the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

Each Executory Contract and Unexpired Lease shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code. The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates. The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions and assignments.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

B.      *Indemnification Obligations.*

All Indemnification Provisions, consistent with applicable law, currently in place (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors than the indemnification provisions in place prior to the Effective Date.

On or before the Effective Date, the Reorganized Debtors shall and are authorized to procure the New D&O Tail Coverage, unless otherwise agreed between the Debtors and the Required Consenting Secured Lenders. To the extent any Entity seeks payment under an Indemnification Provision from the Reorganized Debtors, such Entity and/or the Reorganized Debtors, as applicable, shall use commercially reasonable efforts to first or simultaneously pursue coverage under, and pursue claims from, the New D&O Tail Coverage (or any other available directors and officers insurance policy, runoff policy, excess DIC policy, management liability solutions policy, excess protect liability insurance, excess liability insurance, excess select insurance policy, or excess policy declarations in which the Reorganized Debtors have an interest or that provides or may provide coverage for the Reorganized Debtors, or any other available insurance policy or coverage of any kind in which the Reorganized Debtors have an interest or that provides or may provide coverage for the Reorganized Debtors), to the extent applicable (without limiting or altering the entitlement to, or timing of, payment under such Indemnification Provision).

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

The Debtors or the Reorganized Debtors, as applicable, shall pay Cures, if any, on the Effective Date or as soon as reasonably practicable thereafter. Unless otherwise agreed upon in writing by the parties to the applicable

Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date. Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure; *provided* that nothing herein shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure. The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before 30 days after the Effective Date. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure pursuant to this Article V.C shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Article V.C, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court**.

D.      *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (2) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

E.      *Reservation of Rights.*

Nothing contained in the Plan or the Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under the Plan.

F.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

*G.      Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors liable thereunder in the ordinary course of their business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

*A.      Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), each holder of an Allowed Claim or Allowed Interest (as applicable) shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests (as applicable) in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VIII hereof.  Except as otherwise provided in the Plan, holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

*B.      Disbursing Agent.*

All distributions under the Plan shall be made by the Disbursing Agent on the Effective Date.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

*C.      Rights and Powers of Disbursing Agent.*

1.   Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.   Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

*D.      Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

      1.    Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.

      2.    Delivery of Distributions in General.

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors; *provided further* that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.

      3.    Minimum Distributions.

No fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional shares. When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest (as applicable) would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefore. The total number of authorized shares of New Common Stock to be distributed to Holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding.

      4.    Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder of Claims and Interests to such property or Interest in property shall be discharged and forever barred.

*E.      Manner of Payment.*

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

*F.      Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all

distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

G.    *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

H.    *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims (other than the Sheridan II RBL Claims and Sheridan II Term Loan Claims) against the Debtors, and no Holder of a prepetition Claim (other than the Sheridan II RBL Claims and Sheridan II Term Loan Claims) against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

I.    *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal (National Edition)*, on the Effective Date.

J.    *Setoffs and Recoupment.*

Except as expressly provided in this Plan, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and Holder of Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable Holder. In no event shall any Holder of Claims against, or Interests in, the Debtors be entitled to recoup any such Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XIII.H of the Plan on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

K.    *Claims Paid or Payable by Third Parties.*

1.    <u>Claims Paid by Third Parties</u>.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such

distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

     2.     <u>Claims Payable by Third Parties</u>.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

     3.     <u>Applicability of Insurance Policies</u>.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**THE PLAN ADMINISTRATOR**

The following provisions shall apply only if an Asset Sale Restructuring occurs and a Plan Administrator is appointed.

*A.*     *The Plan Administrator.*

The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and wind down the business and affairs of the Debtors and the Reorganized Debtors, including: (1) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Reorganized Debtor in accordance with the Wind-Down Milestones and Wind-Down Budget; (2) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan in accordance with the Wind-Down Budget; (3) making distributions as contemplated under the Plan; (4) establishing and maintaining bank accounts in the name of the Reorganized Debtors; (5) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (6) paying all reasonable fees, expenses, debts, charges, and liabilities of the Reorganized Debtors on and after the Effective Date; (7) administering and paying taxes of the Reorganized Debtors, including filing tax returns; (8) representing the interests of the Reorganized Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding, or audit; and (9) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan, in each case of the forgoing clauses, strictly in accordance with the Wind-Down Milestones and Wind-Down Budget.

The Plan Administrator may resign at any time upon 30 days' written notice delivered to the Bankruptcy Court; *provided* that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator in accordance with the Plan Administrator Agreement. Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor (as set forth in the Plan Administrator Agreement) and all responsibilities of the predecessor Plan Administrator relating to the Reorganized Debtors in the Plan Administrator Agreement shall be terminated.

1. Plan Administrator Rights and Powers.

The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan in accordance with the Wind-Down Milestones and Wind-Down Budget, and as otherwise provided in the Confirmation Order. The Plan Administrator shall be the exclusive trustee of the assets of the Reorganized Debtors for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

2. Compensation and Expenses of the Plan Administrator.

The Plan Administrator's post Effective Date compensation will be set forth in the Plan Supplement and paid out of the Wind-Down Budget and Plan Administrator Assets.

3. Wind-Down Budget.

The Debtors shall include in the Plan Supplement a Wind-Down Budget.

B.    *Wind Down.*

On and after the Effective Date, the Plan Administrator will be authorized and directed to implement the Plan and any applicable orders of the Bankruptcy Court in accordance with the Wind-Down Milestones and Wind-Down Budget, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates in accordance with the Wind-Down Milestones and Wind-Down Budget.

As soon as practicable after the Effective Date, the Plan Administrator shall: (1) cause the Debtors and the Reorganized Debtors, as applicable, to comply with, and abide by, the terms of the Asset Purchase Agreement and any other documents contemplated thereby; (2) to the extent applicable, file a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of their state of incorporation or formation (as applicable); and (3) take such other actions in accordance with the Wind-Down Milestones and Wind-Down Budget as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan. Any certificate of dissolution or equivalent document may be executed by the Plan Administrator without need for any action or approval by the shareholders, board of directors or managers, or Governing Body of any Debtor. From and after the Effective Date, except with respect to the Reorganized Debtors as set forth herein, the Debtors (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have canceled pursuant to this Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. Notwithstanding the Debtors' dissolution, the Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

C.    *Tax Returns.*

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors reflecting all tax consequences relating to the activities of the Reorganized Debtors as attributable to and for the account of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

*D.      Dissolution of the Reorganized Debtors.*

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Reorganized Debtors shall be deemed to be dissolved without any further action by the Reorganized Debtors, including the filing of any documents with the secretary of state for the state in which the Reorganized Debtors is formed or any other jurisdiction. The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Reorganized Debtors in and withdraw the Reorganized Debtors from applicable state(s).

# ARTICLE VIII.
# PROCEDURES FOR RESOLVING CONTINGENT,
# UNLIQUIDATED, AND DISPUTED CLAIMS

*A.      Disputed Claims Process.*

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of all Allowed General Unsecured Claims under the Plan, except as required by the Plan, Holders of Claims need not File Proofs of Claim, and the Reorganized Debtors and the Holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced except that (unless expressly waived pursuant to the Plan) the Allowed amount of such Claims shall be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable. All Proofs of Claim filed in these Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors. Upon the Effective Date, all Proofs of Claim filed against the Debtors, regardless of the time of filing, and including Proofs of Claim filed after the Effective Date, shall be deemed withdrawn and expunged, other than as provided below. Notwithstanding anything in this Plan to the contrary, disputes regarding the amount of any Cure pursuant to section 365 of the Bankruptcy Code and Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court.

For the avoidance of doubt, there is no requirement to File a Proof of Claim or Proof of Interest (or move the Bankruptcy Court for allowance) to be an Allowed Claim or Allowed Interest, as applicable, under the Plan. Notwithstanding the foregoing, Entities must File Cure objections as set forth in Article V..C of the Plan to the extent such Entity disputes the amount of the Cure paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty. **Except as otherwise provided herein, all Proofs of Claim filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

*B.      Allowance of Claims.*

After the Effective Date and subject to the terms of this Plan, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date. The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

*C.      Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority:  (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest.

Any objections to Claims and Interests other than General Unsecured Claims shall be served and filed on or before the 180th day after the Effective Date or by such later date as ordered by the Bankruptcy Court. All Claims and Interests other than General Unsecured Claims not objected to by the end of such 180-day period shall be deemed Allowed unless such period is extended upon approval of the Bankruptcy Court.

Notwithstanding the foregoing, the Debtors and Reorganized Debtors shall be entitled to dispute and/or otherwise object to any General Unsecured Claim in accordance with applicable nonbankruptcy law. If the Debtors, or Reorganized Debtors dispute any General Unsecured Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced. In any action or proceeding to determine the existence, validity, or amount of any General Unsecured Claim, any and all claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such General Unsecured Claim are preserved as if the Chapter 11 Cases had not been commenced.

D.      *Adjustment to Claims or Interests without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Disallowance of Claims or Interests.*

All Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

## ARTICLE IX.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

B.      *Release of Liens.*

Except as otherwise provided in the Exit Facility Documents, the Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to reinstate in accordance with Article III.B.1 hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

C.      *Releases by the Debtors.*

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Company Party and another Company Party, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the DIP Credit Agreement, the Exit Facilities, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the RSA, the Disclosure Statement, the DIP Credit Agreement, or the Plan, the Plan Supplement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facility Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

D.      *Releases by Holders of Claims and Interests.*

Except as otherwise expressly set forth in this Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Company Party and another Company Party, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the DIP Credit Agreement, the Exit Facilities, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the RSA, the Disclosure Statement, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any party of any obligations related to customary banking products, banking services or other financial accommodations (except as may be expressly amended or modified by the Plan and the Exit Facility Credit Agreements, or any other financing document under and as defined therein) or (ii) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facility Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

E.    *Exculpation.*

Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the RSA and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties and other parties set forth above have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

F.    *Injunction.*

Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

G.    *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the

Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

H.      *Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

I.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE X.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of 1 hereof:

1.      the Bankruptcy Court shall have entered the Confirmation Order;

2.      the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

3.      the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in a manner consistent in all material respects with the RSA and the Plan;

4.      all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date have been placed in the Professional Fee Escrow Account pending approval by the Bankruptcy Court;

5.      the RSA shall remain in full force and effect;

6.      in the event of the Asset Sale Restructuring, the conditions to effectiveness to the Asset Purchase Agreement shall have been satisfied;

7.      in the event of the Asset Sale Restructuring, the Asset Purchase Agreement shall have been executed and remains in full force and effect;

8.      in the event of the Equity Restructuring, entry into the Exit Facility Documents, and all conditions precedent to the consummation of such Exit Facility Documents shall have been waived or satisfied in accordance with their terms thereof and the closing of such Exit Facility Documents shall have occurred;

9.    in the event of the Equity Restructuring, the New Common Stock shall have been issued by New Sheridan;

10.    the Reorganized Debtors shall have procured or become insured under (i) the New D&O Tail Coverage acceptable to the Required Consenting Secured Lenders and the Debtors and (ii) one or more other director and officer's insurance policies acceptable to the Debtors and the Required Consenting Secured Lenders;

11.    to the extent invoiced, the payment in cash in full of all Restructuring Expenses;

12.    each of Sheridan Investment Partners II, L.P., Sheridan Production Partners II-A, L.P., Sheridan Production Partners II-B, L.P., and Sheridan Production Partners II-M, L.P. shall have entered into the Push-Out Election Agreement; and

13.    the Debtors shall have otherwise substantially consummated the applicable Restructuring Transaction, and all transactions contemplated herein, in a manner consistent in all respects with the RSA and the Plan.

B.    *Waiver of Conditions.*

The conditions to Confirmation and Consummation set forth in this Article X may be waived by the Debtors only with the prior written consent of the Required Consenting Secured Lenders (email shall suffice), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan. Sections 9 and 11 in Article X.A. may be waived by the Debtors only with the prior written consent of both the Required Consenting Secured Lenders and the Ad Hoc Group (email shall suffice), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

C.    *Effect of Failure of Conditions.*

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by the Debtors, Claims, or Interests; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity.

## ARTICLE XI.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.    *Modification and Amendments.*

Except as otherwise specifically provided in the Plan and to the extent permitted by the RSA, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to those restrictions on modifications set forth in the Plan and the requirements of section 1127 of the Bankruptcy Code, Rule 3019 of the Federal Rules of Bankruptcy Procedure, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or, to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

*B.*     *Effect of Confirmation on Modifications.*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

*C.*     *Revocation or Withdrawal of Plan.*

To the extent permitted by the RSA, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XII.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.     allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.     decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.     resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.     ensure that distributions to Holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of the Plan;

5.     adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.     adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.                enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8.                enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.                resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.             issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.             resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article IX hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, exculpations, and other provisions;

12.             resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.K hereof;

13.             enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.             determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan, the Plan Supplement, or the Disclosure Statement;

15.             enter an order concluding or closing the Chapter 11 Cases;

16.             adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.             consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.             determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.             hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.             hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.             hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions and releases granted in the Plan, including under Article IX hereof, regardless of whether such termination occurred prior to or after the Effective Date;

22.             enforce all orders previously entered by the Bankruptcy Court; and

23.             hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in this Article XII to the contrary, the Exit Facilities shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain any jurisdiction with respect thereto.

# ARTICLE XIII.
## MISCELLANEOUS PROVISONS

A.     *Immediate Binding Effect.*

Subject to Article X.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.     *Additional Documents.*

On or before the Effective Date, and consistent in all respects with the terms of the RSA, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of the Plan and the RSA.  The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.     *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors (or the Disbursing Agent on behalf of each of the Reorganized Debtors) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

D.     *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.  The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Effective Date.

E.     *Holders of Working and Similar Interests.*

The legal and equitable rights, interests, defenses, and obligations of lessors under the Debtors' oil and gas leases and holders of certain other mineral interests related to the Debtors' oil and gas properties, owners of non-operating working interests in the Debtors' oil and gas properties, counterparties to the Debtors' joint operating agreements, and Holders of Claims related to joint-interest billings and other similar working interests shall not be impaired in any manner by the provisions of this Plan, and nothing in this Plan shall impair the related legal and equitable rights, interests, defenses, or obligations of the Debtors or the Reorganized Debtors.  To the extent applicable, such Claims or Interests shall be Reinstated pursuant to this Plan.

F.     *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action

by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

G.    *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

H.    *Tax Elections.*

With respect to any U.S. federal income tax audit, examination, adjustment or proceeding relating to Sheridan Investment Partners II, L.P., Sheridan Production Partners II-A, L.P., Sheridan Production Partners II-B, L.P., or Sheridan Production Partners II-M, L.P., as applicable, by any taxing authority or any other tax-related administrative or judicial proceeding relating to any such entity, such entity shall, and shall cause its designated Partnership Representative and its Designated Individual, if any, to, timely make an election under Section 6226 of the Internal Revenue Code of 1986, as amended, and take all actions necessary to effect such Push-Out Election, to the extent permitted by applicable Law. Without limiting the foregoing, prior to the Effective Date, each such entity shall have entered into the Push-Out Election Agreement. Each such entity shall deliver notice to the Administrative Agent within ten (10) days of its entry into the Push-Out Election Agreement along with an executed copy of such Push-Out Election Agreement. Unless each Lender (or the Administrative Agent on behalf of the Lenders) agrees otherwise, no such entity shall designate a partnership representative that is not the Partnership Representative or a designated individual that is not the Designated Individual for any taxable year (including following a termination of the designation of the Partnership Representative or the Designated Individual) unless, on or prior to the effective date of such designation, such entity has entered into an agreement that is substantially similar to the Push-Out Election Agreement with such Partnership Representative or Designated Individual, as the case may be, and shall deliver notice to the Administrative Agent within ten (10) days of its entry into such an agreement along with an executed copy of such agreement. The terms of this provision H shall survive the Effective Date.

I.    *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

1.    <u>if to the Debtors, to:</u>

Sheridan Holding Company II, LLC
1360 Post Oak Blvd., Suite 2500
Houston, Texas 77056
Attention: Cheryl S. Phillips, Vice President and General Counsel
Email address: cheryl.phillips@sheridanproduction.com

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Facsimile: (212) 446-4900
Attention: Joshua A. Sussberg, P.C. and Steven N. Serajeddini
E-mail addresses: joshua.sussberg@kirkland.com and steven.serajeddini@kirkland.com

-and-

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Facsimile: (312) 862-2200
Attention: Spencer A. Winters
E-mail address: spencer.winters@kirkland.com


2. if to a Consenting Sheridan II Revolving Lender, to:

Vinson & Elkins LLP
2001 Ross Avenue
Suite 3900
Houston, Texas 75201
Attention.: William L. Wallander and Erec R. Winandy
E-mail addresses: bwallander@velaw.com and ewinandy@velaw.com


3. if to a Consenting Sheridan II Term Lender, to:

Davis Polk & Wardwell LLP
450 Lexington Avenue,
New York, New York 10017
Attention: Damian S. Schaible, Nathaniel Sokol, and Stephen D. Piraino
E-mail addresses: damian.schaible@davispolk.com, nathaniel.sokol@davispolk.com, and stephen.piraino@davispolk.com


4. if to a member of the Ad Hoc Group:

Weil Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn: Matthew D. Barr, Esq., and Gabriel Morgan, Esq.
Telephone: (212) 310-8000
Facsimile: (212) 310-8007


After the Effective Date, the Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

*J.        Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

*K.        Entire Agreement.*

Except as otherwise indicated, and without limiting the effectiveness of the RSA, the Plan (including, for the avoidance of doubt, the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

L.      *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at http://cases.primeclerk.com/SheridanII or the Bankruptcy Court's website at www.txs.uscourts.gov/bankruptcy. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

M.      *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent, *provided*, that any such deletion or modification must be consistent with the RSA; and (3) nonseverable and mutually dependent.

N.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

O.      *Closing of Chapter 11 Cases.*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

P.      *Waiver or Estoppel.*

Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

*[Remainder of page intentionally left blank]*

Dated: September 4, 2019

SHERIDAN HOLDING COMPANY II, LLC
SHERIDAN INVESTMENT PARTNERS II GP, LLC
SHERIDAN INVESTMENT PARTNERS II, L.P.
SHERIDAN PRODUCTION PARTNERS II, LLC
SHERIDAN PRODUCTION PARTNERS II-A, L.P.
SHERIDAN PRODUCTION PARTNERS II-B, L.P.
SHERIDAN PRODUCTION PARTNERS II-M, L.P.
SPP II-B GP, LLC
SPP II-M GP, LLC

*/s/ Lisa A. Stewart*

Lisa A. Stewart
Executive Chairman, President, Chief Investment
Officer, and Chief Executive Officer
Sheridan Holding Company II, LLC
Sheridan Investment Partners II GP, LLC
Sheridan Production Partners II, LLC
SPP II-B GP, LLC
SPP II-M GP, LLC

**Exhibit A to Plan**

**Exit Facility Term Sheet**

# Exit Facility Term Sheet

| | |
|---|---|
| **Size/Tranches** | $175 million, consisting of three tranches:<br><br>• $50 million first-out term loans (the "**First-Out New Term Loans**");<br><br>• $50 million second-out term loans (the "**Second-Out New Term Loans**" and, together with the First-Out New Term Loans, the "**Priority-Out New Term Loans**");<br><br>• $75 million last-out term loans (the "**Last-Out New Term Loans**" and, collectively with the Priority-Out New Term Loans, the "**Exit Term Loans**").<br><br>Payment waterfall shall reflect the first-out, second-out and last-out nature of the tranches. |
| **Security** | A first priority security interest on current collateral under the existing credit documents (currently 95% of proved PV-9) and previously unencumbered assets (subject to customary exceptions to be agreed).<br><br>The Last-Out New Term Loans shall be documented in a separate credit agreement and subject to an intercreditor agreement with the Priority-Out New Term Loans. |
| **Maturity** | 3 years from the Effective Date. |
| **Rate** | First-Out New Term Loans:  L + 700<br><br>Second-Out New Term Loans:  L + 700<br><br>Last-Out New Term Loans:  L + 700 |
| **Fees** | 50 bps upfront fee payable on the aggregate principal amount of each tranche.<br><br>Customary arranger and customary agency fees to be mutually agreed. |
| **Amortization** | Amortization of 1.0% annually with the remaining balance due at maturity. |
| **Mandatory Prepayments** | TBD (to include asset sale proceeds and excess cash flow sweep), subject to the payment waterfall described above. |
| **Negative Covenants** | Usual and customary negative covenants. |
| **Financial Covenants** | Total Leverage:<br><br>| **Fiscal Quarter** | **Covenant Level** |<br>|---|---|<br>| 03/31/20 | 4.00x |<br>| 06/30/20 | 3.85x |<br>| 09/30/20 | 3.50x |<br>| 12/31/20 | 3.25x | |

|          |       |
|----------|-------|
| 03/31/21 | 3.15x |
| 06/30/21 | 3.15x |
| 09/30/21 | 3.15x |
| 12/31/21 | 2.90x |
| 03/31/22 | 2.90x |
| 06/30/22 | 2.65x |
| 09/30/22 | 2.65x |
| 12/31/22 | 2.65x |

Cash Interest Coverage:

| **Fiscal Quarter** | **Covenant Level** |
|--------------------|--------------------|
| 03/31/20 | 2.50x |
| 06/30/20 | 2.50x |
| 09/30/20 | 2.75x |
| 12/31/20 | 3.00x |
| 03/31/21 | 3.10x |
| 06/30/21 | 3.35x |
| 09/30/21 | 3.60x |
| 12/31/21 | 3.60x |
| 03/31/22 | 4.00x |
| 06/30/22 | 4.25x |
| 09/30/22 | 4.25x |
| 12/31/22 | 4.25x |

Current Ratio: 1.00:1.00

- For the avoidance of doubt, the parties agree that any fees or expenses incurred in connection with seeking or obtaining a rating of the First-Out New Term Loans shall be added back to the definition of "EBITDAX" (or such similar term in the definitive documentation).
- Until the Priority-Out New Term Loans are repaid in full in cash, (x) the financial covenants shall be solely for the benefit of the Priority-Out New Term Loans and (y) a breach of the financial covenants shall only result in an event of default under the credit agreement governing the Last-Out New Term Loans upon the acceleration of the Priority-Out New Term Loans in connection therewith.

| | |
|---|---|
| **Hedging Requirements** | None. |
| **Disclosure & Reporting** | Requirement for customary and usual information reporting, including, without limitation, semiannual reserve reports (x) prepared by a third party in respect of the semiannual period ending on June 30 and (y) audited by a third party in respect of the semiannual period ending on December 31. The first report shall be provided for the semiannual period ending on December 31, 2019. |
| **Assignments** | Assignments of First-Out New Term Loans and Second-Out New Term Loans shall be required to include a proportional amount of Second-Out New Term Loans (in the case of assignments of First-Out New Term Loans) and First-Out New Term Loans (in the case of assignments of Second-Out New Term Loans). |

**EXHIBIT B**

**RSA**

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED IN THIS AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES TO THIS AGREEMENT.

## *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules attached to this agreement in accordance with Section 14.02, this "**Agreement**") is made and entered into as of September [●], 2019 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) through (v) of this preamble, collectively, the "**Parties**"):[1]

i.   Sheridan Production Partners II-A, L.P. ("**SPP II-A**"), a limited partnership organized under the Laws of Delaware; Sheridan Investment Partners II, L.P. ("**SIP II**"), a limited partnership organized under the Laws of Delaware; Sheridan Production Partners II-B, L.P. ("**SPP II-B**"), a limited partnership organized under the Laws of Delaware; Sheridan Production Partners II-M, L.P. ("**SPP II-M**"), a limited partnership organized under the Laws of Delaware; Sheridan Holding Company II, LLC, a limited liability company organized under the Laws of Delaware ("**HoldCo**"); and each of the other Entities identified as Company Parties on their signature pages that have executed and delivered counterpart signature pages to this Agreement to counsel to either of the Senior Secured Agents and counsel to the Consenting Sheridan II Subordinated Term Lenders (the Entities in this clause (i), collectively, the "**Company Parties**");

ii.  Sheridan Production Partners Manager, LLC, a Delaware limited liability company ("**Manager**");

iii. Sheridan ICM, LLC, a Delaware limited liability company ("**ICM**"); Sheridan SMG, LLC, a Delaware limited liability company ("**SMG**"); Sheridan Production Company, LLC, a Delaware limited liability company ("**SPC**"); Warburg Pincus, LLC ("**Warburg**"); and WPS Production Partners II, LLC ("**WPS**" and, the Entities in this clause (iii), collectively, the "**Manager Affiliates**");

iv.  the undersigned holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, Sheridan II RBL Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer

---

[1] Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

Agreement to counsel to the Company Parties (the Entities in this clause (iv), collectively, the "**Consenting Sheridan II Revolving Lenders**"); and

v.      the undersigned holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, Sheridan II Term Loan Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (v), collectively, the "**Consenting Sheridan II Term Lenders**"; and

vi.     the undersigned holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, Sheridan II Subordinated Term Loan Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (vi), collectively, the "**Consenting Sheridan II Subordinated Lenders**" and, together with the other entities in clauses (iv) through (vi), the "**Consenting Lenders**").

## *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Stakeholders have in good faith and at arm's length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the following documents (the "**Restructuring Transactions**"):

- the proposed chapter 11 plan of reorganization, substantially in the form attached as **Exhibit A** to this Agreement (the "**Plan**");

- the term sheet setting forth the terms and conditions of a $100 million debtor in possession financing facility attached as **Exhibit B** to this Agreement (the "**DIP Term Sheet**"); and

- the term sheet setting forth the terms and conditions of the exit financing facilities, attached as **Exhibit A** to the Plan (the "**Exit Facility Term Sheet**").

**WHEREAS**, the Company Parties intend to implement the Restructuring Transactions by commencing voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the "**Chapter 11 Cases**") and consummating the Plan; and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained in this Agreement, and for other valuable consideration, the receipt and sufficiency of which are acknowledged, each Party, intending to be legally bound by this Agreement, agrees as follows:

**AGREEMENT**

**Section 1.** *Definitions and Interpretation.*

1.01. <u>Definitions</u>. The following terms shall have the following definitions:

"**<u>Ad Hoc Group</u>**" means those certain funds or accounts managed, advised, or sub-advised by Pantheon Ventures (US) LP and HarbourVest Partners L.P. that hold Sheridan II Subordinated Term Loan Claims.

"**<u>Affiliate</u>**" means, with respect to any specified Entity, any other Entity directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Entity. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by," and "under common control with"), as used with respect to any Entity, shall mean the possession, directly or indirectly, of the right or power to direct or cause the direction of the management or policies of such Entity, whether through the ownership of voting securities, by agreement, or otherwise.

"**<u>Agents</u>**" means the Senior Secured Agents and any administrative agent or similar Entity under any of the Sheridan II Subordinated Term Loan Credit Agreements including any successors thereto.

"**<u>Agreement</u>**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules attached to this Agreement in accordance with Section 14.02.

"**<u>Agreement Effective Date</u>**" means the date on which the conditions set forth in Section 2 have been satisfied or waived in accordance with this Agreement.

"**<u>Agreement Effective Period</u>**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**<u>Alternative Restructuring Proposal</u>**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that in each case is an alternative to one or more of the Restructuring Transactions; it being understood and agreed that the ongoing marketing process in respect of the Asset Sale Restructuring (as defined in the Plan) or soliciting any inquiry, proposal, offer, bid, term sheet, discussion, or agreement pursuant to such marketing process shall not constitute an Alternative Restructuring Proposal.

"**Amended Hedging Agreement**" means the amended Hedging Contracts, if any, to be entered into by the Company and holders of Hedging Claims on the Plan Effective Date, the form of which shall be included in the Plan Supplement.

"**Asset Purchase Agreement**" means one or more asset purchase agreements pursuant to which the Asset Sale is consummated.

"**Asset Sale**" means the sale or sales of substantially all of the Debtors' assets under the Plan, the terms of which shall be acceptable to the Debtors and the Required Consenting Senior Secured Lenders.

"**Asset Sale Election Notice**" means a notice filed with the Plan Supplement indicating that the Debtors and the Required Consenting Senior Secured Lenders have elected to pursue the Asset Sale.

"**Avoidance Actions**" means any and all actual or potential avoidance, recovery, subordination, or other Claims, causes of action, or remedies that may be brought by or on behalf of the Company Parties, their estates, or other parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, causes of action, or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court presiding over the Chapter 11 Cases, which shall be the United States Bankruptcy Court for the Southern District of Texas.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Cause of Action**" means any Claim, cause of action, Avoidance Action (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Company Parties), controversy, demand, right, action, indemnity, suit, obligation, liability, damage, judgment, account, defense, offset, power, and privilege of any kind or character whatsoever, whether known, unknown, contingent or noncontingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, in contract or in tort, in law or in equity, or pursuant to any other theory of law.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

4

"**Chosen Court**" means, (a) before one or more Company Parties commences Chapter 11 Cases, federal courts or state courts located in the City of New York, New York and, (b) after commencement of such proceeding, in the Bankruptcy Court with jurisdiction over such proceeding.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Collateral Agent**" means Bank of America, N.A., solely in its capacities as Collateral Agent under the Sheridan II RBL Credit Agreements and the Sheridan II Term Loan Credit Agreements.

"**Company Claims/Interests**" means any Claim against, or Equity Interest in, a Company Party, including the Sheridan II RBL Claims, Sheridan II Term Loan Claims, DIP Claims, Sheridan II Subordinated Term Loan Claims, and Hedging Claims.

"**Company Parties**" has the meaning set forth in the recitals to this Agreement.

"**Company Releasing Party**" means each of the Company Parties and, to the maximum extent permitted by Law, each of the Company Parties, on behalf of their respective Affiliates and Related Parties.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation Order**" means the confirmation order with respect to the Plan.

"**Consenting Lender Fees and Expenses**" means the reasonable and documented fees and expenses accrued since the inception of their respective engagements related to the implementation of the Restructuring Transaction and not previously paid by, or on behalf of, the Company Parties of: (i) (a) Davis Polk & Wardwell LLP, as counsel to Bank of America, N.A. in its capacity as administrative agent under the Sheridan II Term Loan Credit Agreements, (b) any local counsel to Bank of America, N.A. in its capacity as administrative agent under the Sheridan II Term Loan Credit Agreements, and (c) Houlihan Lokey Capital, Inc., as financial advisor to Davis Polk & Wardwell LLP in connection with its representation of the Bank of America, N.A. in its capacity as administrative agent under the Sheridan II Term Loan Credit Agreements, (ii) (a) Vinson & Elkins LLP, as counsel to Bank of America, N.A. in its capacity as administrative agent under the Sheridan II RBL Credit Agreements, and (b) any local counsel to Bank of America, N.A. in its capacity as administrative agent under the Sheridan II RBL Credit Agreements, and (c) Houlihan Lokey Capital, Inc., as financial advisor to Vinson & Elkins LLP in connection with its representation of the Bank of America, N.A. in its capacity as administrative agent under the Sheridan II RBL Credit Agreements, (iii) (a) Weil Gotshal & Manges, LLP, as counsel to the Ad Hoc Group and (b) PJT Partners, LP, as investment banker to Weil Gotshal & Manges, LLP in connection with its representation of the Ad Hoc Group, in each case of (a) and (b) up to an

aggregate amount not to exceed $2,000,000, and (iv) any consultants or other professionals retained by the Davis Polk & Wardwell LLP, Vinson & Elkins LLP, and the Senior Secured Agents in connection with the Company Parties or the Restructuring Transactions with the consent of the Company Parties (not to be unreasonably withheld), in each case, in accordance with the engagement letters of such consultant or professional signed by the Company Parties, including, without limitation, any success, back-end, or restructuring fees contemplated therein (which such fees are deemed reasonable hereunder), and in each case, without further order of, or application to, the Bankruptcy Court by such consultant or professionals. Notwithstanding anything to the contrary in this Agreement or the Plan, no fees and expenses of the type specified in the foregoing clause (iii) shall be paid or required to be paid by the Company Parties or the Reorganized Debtors in excess of the amount specified therein.

"**Consenting Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Senior Secured Lenders**" means the Consenting Sheridan II Revolving Lenders and the Consenting Sheridan II Term Lenders.

"**Consenting Sheridan II Revolving Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Sheridan II Subordinated Term Lender Consent Right**" means the right of the Required Consenting Sheridan II Subordinated Term Lenders to consent to or approve Definitive Documents or actions, as applicable, which right shall apply solely to the extent such Definitive Documents or actions, as applicable, (a) adversely affect any of the rights or benefits granted to or received by, or proposed to be granted to or received by, the Consenting Sheridan II Subordinated Term Lenders pursuant to this Agreement or the Plan, (b) affect the releases in favor of the Consenting Sheridan II Subordinated Term Lenders provided, or proposed to be provided, under any Definitive Document, or (c) modify any obligation the Consenting Sheridan II Subordinated Term Lenders may have pursuant to this Agreement or the Plan; *provided, however*, that any New Organizational Documents shall be reasonably acceptable to the Required Consenting Sheridan II Subordinated Term Lenders with respect to any customary minority protections.

"**Consenting Sheridan II Subordinated Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Sheridan II Term Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Stakeholder Releasing Party**" means, each of, and in each case in its capacity as such: (a) each Consenting Stakeholder; (b) each Agent; (c) to the maximum extent permitted by Law, each current and former Affiliate of each Entity in clause (a) through the following clause (d); and (d) to the maximum extent permitted by Law, each Related Party of each Entity in clause (a) through this clause (d).

"**Consenting Stakeholders**" means each of the Consenting Lenders and each of the Manager Parties.

"**Debtor**" means each of the Company Parties in its capacity as a debtor in its respective Chapter 11 Case.

"**Definitive Documents**" means all of the definitive documents implementing the Restructuring Transactions, including those set forth in Section 3.

"**DIP Agent**" means Bank of America, N.A., in its capacity as administrative agent under the DIP Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Credit Agreement.

"**DIP Claims**" means any Claim on account of the DIP Facility Documents.

"**DIP Credit Agreement**" means that certain debtor-in-possession credit agreement by and among certain Company Parties, the DIP Agent, and Consenting Sheridan II Revolving Lenders and Consenting Sheridan II Term Lenders that are lenders party thereto, consistent with the terms and conditions of the DIP Term Sheet and this Agreement and as approved by the Financing Order.

"**DIP Facility**" means the new superpriority secured term loans to be made by certain holders of Sheridan II RBL Claims and Sheridan II Term Loan Claims in accordance with the DIP Facility Credit Agreement.

"**DIP Facility Documents**" means the DIP Facility Credit Agreement and any other documentation necessary to effectuate the incurrence of the DIP Facility.

"**DIP Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan.

"**Enforcement Action**" means any action of any kind, except as necessary to file and defend any Company Claims/Interests in conjunction with the Chapter 11 Cases, to (a) exercise or enforce any right under any guarantee or any right in respect of any "Lien" as defined in the Sheridan II RBL Credit Agreements and Sheridan II Term Loan Credit Agreements (including, for the avoidance of doubt, any security interest granted under any of the Sheridan II RBL Credit Agreements and the Sheridan II Term Loan Credit Agreements), in each case granted in relation to (or given in support of) all or any part of any Company Claims/Interests or (b) sue, claim or institute or continue legal proceedings against any Company Party or any Manager Party.

"**Entity**" means any person, individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization, governmental body or any agency or political subdivision of any governmental body, or any other entity, whether acting in an individual, fiduciary, or other capacity.

"**Equity Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, general or limited partnership interests, limited liability company interests, and any other equity, ownership, or profits interests and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into or based on the value of such shares (or any class thereof) of, common stock, preferred stock, general or limited partnership interests, limited liability company interests, or other equity, ownership, or profits interests (in each case whether or not arising under or in connection with any employment agreement).

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Exit Facilities**" means the new senior secured term loans to be made by certain holders of Sheridan II RBL Claims and Sheridan II Term Loan Claims in accordance with the Exit Facility Credit Agreements.

"**Exit Facility Credit Agreement**" means the credit agreements governing the Exit Facility, which shall be consistent with the Exit Facility Term Sheet.

"**Exit Facility Documents**" means the Exit Facility Credit Agreements and any other documentation necessary to effectuate the incurrence of the Exit Facility.

"**Exit Facility Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Financing Order**" means, as applicable, the interim and final orders of the Bankruptcy Court setting forth the terms of debtor-in-possession financing and use of cash collateral, which shall be consistent with the DIP Term Sheet.

"**First Day Pleadings**" means the first-day pleadings that the Company Parties determine are necessary or desirable to file, and which are reasonably acceptable in form and substance to the Required Consenting Senior Secured Lenders.

"**Governing Body**" means the board of directors, board of managers, manager, general partner, investment committee, special committee, or such similar governing body of an Entity. As of the Execution Date, the Governing Body of each Company Party is the investment committee of Manager and, when acting within the authority delegated to them by the investment committee, the special committees of SPP II-A, SPP II-B, SPP II-M, and SIP II, respectively.

"**Hedging Claims**" means any Claim on account of any Hedging Contract.

"**Hedging Contract**" means any futures contract, forward contract, swap contract, derivative contract, hedging contract, or other like instrument with a Company Party.

"**Joinder**" means a joinder to this Agreement substantially in the form attached to this Agreement as **Exhibit D**.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Manager**" has the meaning set forth in the Preamble to this Agreement.

"**Manager Affiliates**" has the meaning set forth in the Preamble to this Agreement.

"**Manager Parties**" means Manager and each of the Manager Affiliates.

"**Milestones**" means the milestones set forth in Section 4.

"**New Board**" means the board of directors or board of managers of New Sheridan.

"**New Common Stock**" means the new common stock of New Sheridan issued on the Plan Effective Date.

"**New Money DIP Claims**" means any Claim on account of the New Money DIP Loans.

"**New Money DIP Loans**" means the $50,000,000 of new money term loans extended to the Debtors pursuant to the DIP Facility Documents and the Financing Order.

"**New Sheridan**" means the newly-formed corporation that will be the ultimate parent of the Reorganized Debtors and the issuer of the New Common Stock under the Plan.

"**New Organizational Documents**" means the documents providing for corporate governance of New Sheridan and the other Reorganized Debtors, including charters, bylaws, operating agreements, or other organizational documents or shareholders' agreements, as applicable, which shall be consistent with section 1123(a)(6) of the Bankruptcy Code (as applicable).

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 8.01.

"**Person**" means any natural person, corporation, limited liability company, professional association, limited partnership, general partnership, joint stock company, joint venture, association, company, trust, bank, trust company, land trust, business trust or other organization, whether or not a legal entity, and any governmental authority.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**Plan**" has the meaning set forth in the preamble to this Agreement.

"**Plan Effective Date**" means the occurrence of the effective date of the Plan according to its terms.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Company Parties with the Bankruptcy Court.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Related Party**" means, each of, and in each case in its capacity as such, current and former directors, managers, officers, investment committee members, special committee members, members of any Governing Body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.

"**Released Company Parties**" means, each of, and in each case in its capacity as such: (a) each Company Party; (b) each current and former Affiliate of each Entity in clause (a) through the following clause (c); and (c) each Related Party of each Entity in clause (a) through this clause (c).

"**Released Claim**" means, with respect to any Releasing Party, any Claim, or Cause of Action that is released by such Releasing Party under Section 13 of this Agreement.

"**Released Parties**" means each Released Company Party and each Released Stakeholder Party.

"**Released Stakeholder Parties**" means, each of, and in each case in its capacity as such: (a) each Consenting Stakeholder; (b) each Agent; (c) each current and former Affiliate of each Entity in clause (a) through the following clause (d); and (d) each Related Party of each Entity in clause (a) through this clause (d).

"**Releases**" means the releases contained in Section 13 of this Agreement.

"**Releasing Parties**" means, collectively, each Company Releasing Party and each Consenting Stakeholder Releasing Party.

"**Reorganized Debtors**" means, collectively, a Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Plan Effective Date. For purposes of this Agreement, New Sheridan shall be deemed to be a Reorganized Debtor.

"**Required Consenting Senior Secured Lenders**" means each of the Required Consenting Sheridan II Revolving Lenders and Required Consenting Sheridan II Term Lenders.

"**Required Consenting Stakeholders**" means each of the Required Consenting Senior Secured Lenders, Required Consenting Sheridan II Subordinated Term Lenders and Manager Parties.

"**Required Consenting Sheridan II Revolving Lenders**" means, as of the relevant date, Consenting Sheridan II Revolving Lenders holding greater than 50% of the aggregate outstanding principal amount of the Sheridan II RBL Claims that are held by all Consenting Lenders.

"**Required Consenting Sheridan II Subordinated Term Lenders**" means, as of the relevant date, Consenting Sheridan II Subordinated Term Lenders holding greater than 50% of the aggregate outstanding principal amount of the Sheridan II Subordinated Term Loan Claims that are held by all Consenting Lenders in the Ad Hoc Group.

"**Required Consenting Sheridan II Term Lenders**" means, as of the relevant date, Consenting Sheridan II Term Lenders holding greater than 50% of the aggregate outstanding principal amount of the Sheridan II Term Loan Claims that are held by all Consenting Lenders.

"**Restricted Period**" means the period commencing as of the date each Consenting Stakeholder, as applicable, executes this Agreement until the Termination Date, as to such Consenting Stakeholder.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of Regulation D under the Securities Act.

"**Sale Order**" means any order approving any transfer or sale of a Debtor's assets if separate from the Confirmation Order.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Senior Secured Agents**" means the DIP Agent and any administrative agent, collateral agent, or similar Entity under any of the Sheridan II RBL Credit Agreements and Sheridan II Term Loan Credit Agreements, including any successors thereto.

"**Services Agreement**" means either a new management agreement (if any) or a customary transition services agreement (if any), in each case by and among Reorganized Debtors and Manager, which shall be either (a) in a form included in the Plan Supplement and reasonably acceptable to Manager and the Required Consenting Senior Secured Lenders or (b) if not included in the Plan Supplement, as reasonably agreed between Manager and the New Board.

"**Sheridan**" has the meaning set forth in the Preamble to this Agreement.

"**Sheridan II RBL Claims**" means any Claim on account of the Sheridan II RBL Facilities.

"**Sheridan II RBL Credit Agreements**" means collectively, each of the following, as amended, restated, supplemented or otherwise modified from time to time:

(a)     that certain amended and restated credit agreement dated as of February 26, 2013 among SIP II as borrower, Bank of America, N.A., as administrative agent and collateral agent (together with any successor administrative or collateral agent), and the other lenders party thereto, as amended (the facility thereunder, the "**SIP II RBL Facility**");

(b)     that certain amended and restated credit agreement dated as of February 26, 2013 among SPP II-A as borrower, Bank of America, N.A., as administrative agent and collateral agent (together with any successor administrative or collateral agent), and the other lenders party thereto, as amended (the facility thereunder, the "**SPP II-A RBL Facility**"); and

(c)     that certain amended and restated credit agreement dated as of February 26, 2013 among SPP II-M as borrower, Bank of America, N.A., as administrative agent and collateral agent (together with any successor administrative or collateral agent), and the other lenders party thereto, as amended (the facility thereunder, the "**SPP II-M RBL Facility**" and, collectively with the SIP II RBL Facility and the SPP II-A RBL Facility, the "**Sheridan II RBL Facilities**").

"**Sheridan II RBL Forbearance Agreements**" means, collectively, the Extension of Forbearance and Limited Waiver agreements dated as of September 3, 2019, among certain of the Company Parties, the lender parties thereto, and Bank of America, N.A. as LC issuer, administrative agent, and collateral agent, as amended, restated, supplemented, or otherwise modified from time to time.

"**Sheridan II Subordinated Term Loan Claims**" means any Claim on account of the Sheridan II Subordinated Term Loans.

"**Sheridan II Subordinated Term Loan Credit Agreements**" means each of the following, as amended, restated, supplemented or otherwise modified from time to time:

(a)     that certain subordinated unsecured term loan credit agreement dated as of October 6, 2017 among SIP II as borrower, Wilmington Trust, N.A., as administrative agent, and the lenders party thereto (the facility thereunder, "**SIP II Subordinated Term Loan Facility**");

(b)     that certain subordinated unsecured term loan credit agreement dated as of October 6, 2017 among SPP II-A as borrower, Wilmington Trust, N.A., as administrative agent, and the lenders party thereto (the facility thereunder, the "**SPP II-A Subordinated Term Loan Facility**");

that certain subordinated unsecured term loan credit agreement dated as of October 6, 2017 among SPP II-M as borrower, Wilmington Trust, N.A., as administrative agent, and the lenders party thereto (the facility thereunder, "**SPP II-M Subordinated Term Loan Facility**" and, collectively with the SIP II Subordinated Term Loan Facility and the SPP II-A Subordinated Term Facility the "**Sheridan II Subordinated Term Loan Facilities**").

"**Sheridan II Term Loan Claims**" means any Claim on account of the Sheridan II Term Loan Facilities.

"**Sheridan II Term Loan Credit Agreements**" means collectively, each of the following, as amended, restated, supplemented or otherwise modified from time to time:

(a)     that certain amended and restated senior secured term loan credit agreement dated as of December 16, 2013 among SIP II as borrower, Bank of America, N.A., as administrative agent (together with any successor administrative agent), and the other lenders party thereto (the facility thereunder, the "**SIP II Term Loan Facility**");

(b)     that certain amended and restated senior secured term loan credit agreement dated as of December 16, 2013 among Sheridan Production Partners II-A, L.P., as borrower, Bank of America, N.A., as administrative agent (together with any successor administrative agent), and the other lenders party thereto (the facility thereunder, the "**SPP II-A Term Loan Facility**"); and

(c)     that certain amended and restated senior secured term loan credit agreement dated as of December 16, 2013 among SPP II-M as borrower, Bank of America, N.A., as administrative agent (together with any successor administrative agent), and the other lenders party thereto (the facility thereunder, the "**SPP II-M Term Loan Facility**" and, collectively with the SIP II Term Loan Facility and the SPP II-A Term Loan Facility, the "**Sheridan II Term Loan Facilities**").

"**Sheridan II Term Loan Limited Waivers**" means, collectively, the Seventh Amendment to the Third Amendment and Limited Waivers, dated as of September 3, 2019, among certain of the Company Parties, the lender parties thereto, and Bank of America, N.A. as administrative agent and collateral agent, as amended, restated, supplemented, or otherwise modified from time to time.

"**SIP II**" has the meaning set forth in the preamble to this Agreement.

"**Solicitation Materials**" means all solicitation materials in respect of the Plan.

"**SPP II-A**" has the meaning set forth in the preamble to this Agreement.

"**SPP II-B**" has the meaning set forth in the preamble to this Agreement.

"**SPP II-M**" has the meaning set forth in the preamble to this Agreement.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 11.01, 11.02, 11.03, 11.04, 11.05, or 11.06.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate, or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales, or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached to this Agreement as **Exhibit C**.

1.02.    Interpretation.  For purposes of this Agreement:

(a)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neutral gender shall include the masculine, feminine, and the neutral gender;

(b)    capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)    unless otherwise specified, any reference in this Agreement to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)    unless otherwise specified, any reference in this Agreement to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; notwithstanding the foregoing, any capitalized terms in this Agreement that are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date of this Agreement;

(e)    unless otherwise specified, all references in this Agreement to "Sections" are references to Sections of this Agreement;

(f)    the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)     captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)     references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws; and

(i)     the use of "include" or "including" is without limitation, whether stated or not.

**Section 2.     *Effectiveness of this Agreement.*** This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)     each of the Company Parties, the Manager, and each of the Manager Affiliates shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties, each of the Senior Secured Agents, and the Consenting Sheridan II Subordinated Term Lenders; and

(b)     the following shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties, each of the Senior Secured Agents, and the Consenting Sheridan II Subordinated Term Lenders:

(i)     holders of more than two thirds of the aggregate outstanding principal amount of the Sheridan II RBL Claims;

(ii)     holders of more than two thirds of the aggregate outstanding principal amount of the Sheridan II Term Loan Claims; and

(iii)     holders of more than two thirds of the aggregate outstanding principal amount of the Sheridan II Subordinated Term Loan Claims; and

(c)     the Company Parties shall have paid all Consenting Lender Fees and Expenses that are due and payable as of the Agreement Effective Date; *provided, however,* that the Company Parties shall have received an invoice for such Consenting Lender Fees and Expenses at least three (3) Business Days prior to the Agreement Effective Date.

**Section 3.     *Definitive Documents.***

3.01.   The Definitive Documents governing the Restructuring Transactions shall include the following: (A) the Plan (and all exhibits, ballots, solicitation procedures, and other documents and instruments related thereto), including any "Definitive Documentation" as defined therein and not explicitly so defined herein; (B) the Confirmation Order; (C) the Financing Order, the DIP Facility Documents; (D) the Disclosure Statement; (E) the order of the Bankruptcy Court

approving the Disclosure Statement and the other Solicitation Materials; (F) the First Day Pleadings and all orders sought pursuant thereto; (G) the Plan Supplement; (H) any and all documentation required to implement, issue, and distribute the New Common Stock; (I) the Services Agreement; (J) the Exit Facility Documents; and (K) all documents related to the Asset Sale including, without limitation, the Asset Purchase Agreement, the Asset Sale Election Notice and the Sale Order.

3.02.    The Definitive Documents that are not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter, or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants not inconsistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 12. Further, the Definitive Documents that are not executed or in a form attached to this Agreement as of the Execution Date, and any amendments thereto, shall be in form and substance reasonably acceptable to (a) the Company Parties, (b) the Required Consenting Senior Secured Lenders, and (c) solely to the extent required under the Consenting Sheridan II Subordinated Term Lender Consent Right, the Required Consenting Sheridan II Subordinated Term Lenders. Notwithstanding anything herein to the contrary, the DIP Facility Documents, the Financing Order, the Plan (including any amendment thereto), any substantive documents related to the Asset Sale including, without limitation, the Asset Purchase Agreement, the Asset Sale Election Notice and the Sale Order, and the New Organizational Documents shall, in each case, be acceptable to the Required Consenting Senior Secured Lenders.

**Section 4.**    *Milestones.*    The following Milestones shall apply to this Agreement unless extended or waived in writing by the Company Parties and the Required Consenting Lenders:

(a)    no later than September 9, 2019, the Company Parties shall commence solicitation of votes on the Plan;

(b)    no later than September 15, 2019, the Petition Date shall have occurred;

(c)    no later than September 18, 2019 the Financing Order shall have been entered on an interim basis;

(d)    no later than October  17, 2019 the Financing Order shall have been entered on a final basis;

(e)    no later than November 14, 2019, the Bankruptcy Court shall have entered the Confirmation Order and an order approving the Disclosure Statement; and

(f)    no later than December 17, 2019, the Plan Effective Date shall have occurred.

**Section 5.** *Commitments of the Consenting Lenders.*

5.01. <u>Affirmative Commitments</u>. During the Agreement Effective Period, each Consenting Lender severally, and not jointly, agrees in respect of all of its Company Claims/Interests to:

(a) support the Restructuring Transactions and vote and exercise any powers or rights available to it (including in any creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(b) give any notice, order, instruction, or direction to the applicable Agents necessary to give effect to the Restructuring Transactions;

(c) negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are not inconsistent with this Agreement to which it is required to be a party or to which it has consent right pursuant to Section 3.02; and

(d) negotiate in good faith any appropriate additional or alternative provisions or agreements to address any legal, financial, or structural impediment that may arise that would prevent, hinder, impede, delay, or are necessary to effectuate the consummation of the Restructuring Transactions.

5.02. <u>Negative Commitments</u>. During the Agreement Effective Period, each Consenting Lender severally, and not jointly, agrees in respect of all of its Company Claims/Interests that it shall not, directly or indirectly, and shall not direct any other Entity to:

(a) object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b) propose, file, support, or vote for any Alternative Restructuring Proposal;

(c) file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is materially inconsistent with this Agreement or the Plan;

(d) take (directly or indirectly), or direct any Agent to take, any Enforcement Actions or exercise any right or remedy for the enforcement, collection, or recovery of any of the Company Claims/Interests including rights or remedies arising from or asserting or bringing any claims under or with respect to the Sheridan II RBL Facilities, Sheridan II Term Loan Facilities, the Sheridan II Subordinated Term Loan Facilities, or Hedging Claims;

(e) initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Restructuring Transactions

contemplated in this Agreement against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement; or

(f)     object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code.

5.03.    Commitments with Respect to Chapter 11 Cases.

(a)     During the Agreement Effective Period, each Consenting Lender that is entitled to vote to accept or reject the Plan pursuant to its terms, severally, and not jointly, agrees that it shall, subject to receipt by such Consenting Lender, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials:

(i)     vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii)     to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election;

(iii)     not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (a)(i) and (ii) above;

(iv)     not directly or indirectly, through any Person, seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing, or prosecution of any Alternative Restructuring Proposal or object to or take any other action that would reasonably be expected to prevent, interfere with, delay, or impede the solicitation, approval of the Disclosure Statement, or the confirmation and consummation of the Plan and the Restructuring Transactions; *provided* that nothing in this Section 5.03(a)(iv) shall affect any rights of the Consenting Lenders set forth in 7.03(b); and

(v)     support and take all actions reasonably requested by the Company Parties to facilitate the solicitation, approval of the Disclosure Statement, and confirmation and consummation of the Plan within the timeframes contemplated by this Agreement.

(b)     During the Agreement Effective Period, each Consenting Lender, in respect of each of its Company Claims/Interests, severally, and not jointly, will support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is not inconsistent with this Agreement.

5.04.  Forbearance Agreements.

(a)  Each Consenting Sheridan II Revolving Lender, by signing this Agreement, agrees to extend the Forbearance Period and Limited Waiver Period (each as defined in each of the Sheridan II RBL Forbearance Agreements) through the earlier of September 15, 2019 and the Petition Date.

(b) Each Consenting Sheridan II Term Lender, by signing this Agreement, agrees to extend the Limited Waiver Period (as defined in each of the Sheridan II Term Loan Limited Waivers) through the earlier of September 15, 2019 and the Petition Date.

(c)  Notwithstanding anything herein to the contrary, all parties' respective rights under the Sheridan II RBL Forbearance Agreements and the Sheridan II Term Loan Limited Waivers are reserved.

5.05.  Hedging Contracts.  To the extent any Consenting Lender holds Hedging Contracts, during the Agreement Effective Period, such Consenting Lender agrees to not take any action to exercise remedies with respect to the Hedging Contracts unless otherwise agreed by the Company Parties and such Consenting Lender.

5.06.  Additional Provisions Regarding the Consenting Lenders' Commitments. Notwithstanding anything contained in this Agreement, nothing in this Agreement shall:

(a)  be construed to prohibit any Consenting Lender from appearing as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and are not for the purpose of delaying, interfering, impeding, or taking any other action to delay, interfere or impede, directly or indirectly, the Restructuring Transactions;

(b)  affect the ability of any Consenting Lender to consult with any other Consenting Stakeholder, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee);

(c)  impair or waive the rights of any Consenting Lender to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions;

(d)  prevent any Consenting Lender from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement; or

(e)  obligate a Consenting Lender to deliver a vote to support the Plan or prohibit a Consenting Lender from withdrawing such vote, in each case from and after the Termination Date (other than a Termination Date as a result of the occurrence of the Plan Effective Date); it being understood that upon the Termination Date as to a Consenting Lender (other than a Termination Date as a result of the occurrence of the Plan Effective Date), such Consenting Lender's vote shall

automatically be deemed void *ab initio* and such Consenting Lender shall have a reasonable opportunity to cast a vote.

**Section 6.**     *Commitments of the Manager Parties.*

6.01.    <u>Affirmative Commitments</u>.  During the Agreement Effective Period, each of the Manager Parties severally, and not jointly, agrees to:

(a)    support the Restructuring Transactions and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(b)    negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are not inconsistent with this Agreement to which it is required to be a party; and

(c)    negotiate in good faith any appropriate additional or alternative provisions or agreements to address any legal, financial, or structural impediment that may arise that would prevent, hinder, impede, delay, or are necessary to effectuate the consummation of the Restructuring Transactions.

6.02.    <u>Negative Commitments.</u> During the Agreement Effective Period, each of Manager Parties severally, and not jointly, agrees that it shall not, directly or indirectly, and shall not direct any other Entity to:

(a)    object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)    propose, file, support, or vote for any Alternative Restructuring Proposal;

(c)    file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is materially inconsistent with this Agreement or the Plan;

(d)    initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Restructuring Transactions contemplated in this Agreement against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement; or

(e)     object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code.

6.03.   <u>Commitments with Respect to Chapter 11 Cases.</u>  During the Agreement Effective Period, each of the Manager Parties severally, and not jointly, agrees that it shall, for the duration of the Agreement Effective Period, shall:

(a)     if solicited, timely vote or cause to be voted its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot or ballots on a timely basis following the commencement of the solicitation;

(b)     not change or withdraw (or cause or direct to be changed or withdrawn) any such vote described in clause (a) above or release described in clause (c) below;

(c)     agree to provide, and to not opt out of or object to, the releases set forth in the Plan against each Released Party;

(d)     if solicited, timely vote (or cause to be voted) its Company Claims/Interests against any Alternative Restructuring Proposal;

(e)     not directly or indirectly, through any Person, seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing, or prosecution of any Alternative Restructuring Proposal or object to or take any other action that would reasonably be expected to prevent, interfere with, delay, or impede the solicitation, approval of the Disclosure Statement, or the confirmation and consummation of the Plan and the Restructuring Transactions; and

(f)     support and take all actions necessary or reasonably requested by the Company Parties to facilitate the solicitation, approval of the Disclosure Statement, and confirmation and consummation of the Plan within the timeframes contemplated by this Agreement.

6.04.   <u>Additional Provisions Regarding the Manager Parties' Commitments.</u>

(a)     Notwithstanding anything contained in this Agreement, nothing in this Agreement shall:

(i)      impair or waive the rights of any Manager Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions;

(ii)     affect the ability of any Manager Party to consult with any Consenting Stakeholder, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee);

(iii)    restrict any representative or Governing Body of any Company Party, or any Manager Party in its capacity as manager or operator of any Company Party, from exercising its rights under Sections 7.03 or 11.03(b) of this Agreement or causing a Company Party or the Governing Body of a Company Party to exercise its rights under such provisions;

(iv)    restrict any Manager Party in its capacity as the manager or operator of fund Entities other than the Company Parties; or

(v)    prevent any Manager Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

(b)    Notwithstanding anything to the contrary in this Agreement, in no event shall a Manager Party be liable for money damages for any breach of this Agreement, and any remedy by any Party against a Manager party for any breach of this Agreement shall be limited to specific performance pursuant to Section 14.14; *provided*, *however*, that in no event shall a Manager Party be liable to any other Manager Party for any breach of this Agreement, whether for money damages, specific performance, or otherwise.  In the event of a breach by any Manager Party of any representation, warranty, covenant, or other provision of this Agreement that gives rise to a termination right under Section 11.01, then, upon notice to the Parties prior to the Plan Effective Date in accordance with Section 14.10, the Releases by and in favor of such Manager Party shall be fully revoked and deemed null and void.

**Section 7.    *Commitments of the Company Parties.***

7.01.    <u>Affirmative Commitments</u>.    Except as set forth in Section 7.03, during the Agreement Effective Period, each of the Company Parties agrees to:

(a)    support and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement;

(b)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated in this Agreement, support and take all steps reasonably necessary and desirable to address any such impediment;

(c)    use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring Transactions;

(d)    negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(e)    (i) provide counsel for the Consenting Lenders a reasonable opportunity (which, to the extent reasonably practicable, shall be no less than two (2) Business Days) to review draft copies of all pleadings, motions, and proposed orders (including without limitation the First Day

Pleadings and all "second day" motions) that affect or may affect the Consenting Lenders and, (ii) provide a reasonable opportunity (which, to the extent reasonably practicable, shall be no less than two (2) Business Days) to counsel to the Senior Secured Agents and the Consenting Sheridan II Subordinated Term Lenders to review draft copies of other documents that the Company Parties intend to file with the Bankruptcy Court if such a filing affects or may affect any Consenting Lender, as applicable;

(f)      actively oppose and object to the efforts of any person seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions (including, if applicable, the filing of timely filed objections or written responses) to the extent such opposition or objection is reasonably necessary or desirable to facilitate implementation of the Restructuring Transactions;

(g)      consult and negotiate in good faith with the Consenting Stakeholders and their advisors regarding the execution of Definitive Documents and the implementation of the Restructuring Transactions;

(h)      upon reasonable request of the Consenting Lenders, inform the advisors to the Consenting Lenders as to:  (i) the material business and financial (including liquidity) performance of the Company Parties; (ii) the status and progress of the Restructuring Transactions, including progress in relation to the negotiations of the Definitive Documents; and (iii) the status of obtaining any necessary or desirable authorizations (including any consents) from each Consenting Lender, any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body or any stock exchange;

(i)      inform counsel to the Senior Secured Agents and the Consenting Sheridan II Subordinated Term Lenders as soon as reasonably practicable after becoming aware of:  (i) any matter or circumstance which they know, or believe is likely, to be a material impediment to the implementation or consummation of the Restructuring Transactions; (ii) any notice of any commencement of any material involuntary insolvency proceedings, legal suit for payment of debt or securement of security from or by any person in respect of any Company Party; (iii) a breach of this Agreement (including a breach by any Company Party); and (iv) any representation or statement made or deemed to be made by them under this Agreement which is or proves to have been incorrect or misleading in any material respect when made or deemed to be made;

(j)      use commercially reasonable efforts to maintain their good standing under the Laws of the state or other jurisdiction in which they are incorporated or organized;

(k)      use commercially reasonable efforts to seek additional support for the Restructuring from their other material stakeholders to the extent reasonably prudent and, to the extent the Company Parties receive any Joinders or Transfer Agreements, to notify the Consenting Lenders of such Joinders and Transfer Agreements; and

(l) file the Asset Sale Election Notice if requested by the Required Consenting Senior Secured Lenders in accordance with the Plan.

7.02. <u>Negative Commitments</u>. Except as set forth in Section 7.03, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a) object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b) take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions described in, this Agreement or the Plan;

(c) file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is materially inconsistent with this Agreement, the Plan or the Definitive Documents;

(d) modify any Definitive Document, in whole or in part, in a manner that is inconsistent with this Agreement; or

(e) (i) operate its business outside the ordinary course, taking into account the Restructuring Transactions, without the consent of the Required Consenting Senior Secured Lenders or (ii) transfer any asset or right of the Company Parties or any asset or right used in the business of the Company Parties to any person or entity outside the ordinary course of business without the consent of the Required Consenting Senior Secured Lenders;

(f) take, or fail to take, any action that would cause a change to the tax status of any Company Party; or

(g) engage in any material merger, consolidation, disposition, acquisition, investment, dividend, incurrence of indebtedness or other similar transaction outside of the ordinary course of business other than the transactions contemplated herein.

7.03. <u>Additional Provisions Regarding Company Parties' Commitments.</u>

(a) Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the Governing Body of a Company Party to take or refrain from taking any action with respect to the Restructuring Transaction (including terminating this Agreement under <u>Section 11</u>) to the extent such person or persons determines, based on the advice of counsel, that taking or refraining from taking such action, as applicable, that would be inconsistent with applicable Law or its fiduciary obligations under applicable Law. The Company Parties shall give prompt written notice to the Consenting Stakeholders of any determination made in accordance with this Section 7.03(a). This Section 7.03(a) shall not impede any Party's right to

terminate this Agreement pursuant to Section 11, including, for the avoidance of doubt, the Consenting Lenders' rights to terminate in accordance with Section 11.01.

(b)     Notwithstanding anything to the contrary in this Agreement, upon receipt of an unsolicited Alternative Restructuring Proposal, each Company Party and their respective directors, managers, officers, employees, investment bankers, attorneys, accountants, and other advisors or representatives (including any Governing Body members) shall have the rights to:  (i) consider, respond to, and facilitate such Alternative Restructuring Proposal; (ii) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity in connection with such proposal; (iii) maintain or continue discussions or negotiations with respect to such Alternative Restructuring Proposal; (iv) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiations of such Alternative Restructuring Proposal; and (v) enter into or continue discussions or negotiations with holders of Company claims/Interests (including any Consenting Stakeholder) regarding the Restructuring Transactions or such Alternative Restructuring Proposal; *provided* that if any Company Party, receives an unsolicited Alternative Restructuring Proposal, then such Company Party shall (A) within one business day of receiving such proposal, notify counsel to the Senior Secured Agents and the Consenting Sheridan II Subordinated Term Lenders of the receipt of such proposal; (B) provide counsel to the Senior Secured Agents and the Consenting Sheridan II Subordinated Term Lenders with regular updates as to the status and progress of such Alternative Restructuring Proposal; and (C) use commercially reasonable efforts to respond promptly to reasonable information requests and questions from counsel to the Senior Secured Agents and Consenting Sheridan II Subordinated Term Lenders relating to such Alternative Restructuring Proposal.

(c)     Nothing in this Agreement shall: (i) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the implementation of the Restructuring Transactions; (ii) affect the ability of any Company Party to consult with any Consenting Stakeholder or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee); or (iii) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 8.**     *Transfer of Company Claims/Interests.*

8.01.   During the Restricted Period, no Consenting Stakeholder shall Transfer any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)     the transferee is either (i) a qualified institutional buyer as defined in Rule 144A under the Securities Act, (ii) a non-U.S. person in an offshore transaction as defined in Regulation S under the Securities Act, (iii) an institutional accredited investor (as defined in the Rules), and

in each case executes and delivers to the applicable Agent and counsel to the Company Parties, at or before the time of the proposed Transfer, a fully executed Transfer Agreement; or

(b)    the transferee is a Consenting Stakeholder and the transferee provides notice of such Transfer (including the amount and type of Company Claim/Interest Transferred) to counsel to the Company Parties at or before the time of the proposed Transfer.

8.02.    Upon compliance with the requirements of Section 8.01, the transferor of any Company Claims/Interests shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests.  Any Transfer in violation of Section 8.01 shall be void *ab initio*.

8.03.    This Agreement shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Company Claims/Interests.  Notwithstanding the foregoing, (a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to any of the Senior Secured Agents and Consenting Sheridan II Subordinated Term Lenders) and (b) such Consenting Stakeholder must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to the Company Parties within five (5) Business Days of such acquisition.

8.04.    This Section 8 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Company Claims/Interests.  Notwithstanding anything to the contrary in this Agreement, if a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

8.05.    Notwithstanding Section 8.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if (a) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (b) the transferee otherwise is a Permitted Transferee under Section 8.01; and (c) the Transfer otherwise is permitted under Section 8.01.  If a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title, or interests in Company Claims/Interests that the Qualified Marketmaker acquires from

a holder of the Company Claims/Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee.

8.06.    Notwithstanding anything to the contrary in this Section 8, the restrictions on Transfer set forth in this Section 8 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 9.    *Representations and Warranties of Consenting Lenders.*** Each Consenting Lender severally, and not jointly, represents and warrants that, as of the date such Consenting Lender executes and delivers this Agreement and as of the Plan Effective Date:

(a)    it is the beneficial or record owner of the aggregate principal amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests other than those reflected in, such Consenting Lender's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 8);

(b)    it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims/Interests;

(c)    such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Lender's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)    solely with respect to holders of Company Claims/Interests, (i) it is either (A) a qualified institutional buyer as defined in the provisions of Rule 144A promulgated under the Securities Act, (B) not a U.S. person (as defined in Regulation S under the Securities Act), or (C) an institutional accredited investor (as defined in the Rules under the Securities Act), and in each case is able to bear the risk of its investment in the Company Claims/Interests, and (ii) any securities acquired by the Consenting Stakeholder in connection with the Restructuring Transactions (A) will have been acquired for investment for its own account and not with a view to distribution or resale in violation of the Securities Act and (B) will not have been registered under the Securities Act or under the "blue sky" laws of any jurisdiction and may be resold or transferred only if registered pursuant to the provisions of the Securities Act (or if eligible, pursuant to the provisions of Rule 144 promulgated under the Securities Act or pursuant to another available exemption from the registration requirements of the Securities Act); and

(e)    it has the full power to vote, approve changes to, and transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law.

**Section 10.**     *Mutual Representations and Warranties*.  Each Party hereto, represents and warrants that, as of the date such Party executes and delivers this Agreement and as of the Plan Effective Date:

(a)     it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)     except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by any other Entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)     the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association, or other constitutional documents;

(d)     except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(e)     except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement; and

(f)     to the extent a Party is a Released Party, such Party has not assigned, conveyed, sold, hypothecated or otherwise transferred all, any part of or any interest in any Cause of Action that would be a Released Claim hereunder.

**Section 11.**     *Termination Events*.

11.01.  <u>Required Consenting Senior Secured Lender Termination Events</u>.  The Required Consenting Senior Secured Lenders may terminate this Agreement solely as to the Consenting Sheridan Senior Secured Lenders upon prior written notice to all Parties in accordance with Section 14.10 of this Agreement upon the occurrence of any of the following events:

(a)     the breach in any material respect by a Company Party, Manager Party, or Consenting Sheridan II Subordinated Term Lender of any of the representations, warranties, or covenants of such Company Party, such Manager Party, or such Consenting Sheridan II Subordinated Term Lender as applicable, set forth in this Agreement that would have, or could reasonably be expected to have, an adverse effect on the Restructuring Transaction, which breach

remains uncured for five (5) Business Days after such terminating Required Consenting Senior Secured Lenders transmit a written notice in accordance with Section 14.10 of this Agreement detailing any such breach;

(b)     any of the Company Parties files or otherwise makes public any of the Definitive Documents (including any modification or amendments thereto) (i) in a form that is materially inconsistent with this Agreement and (ii) without the consent of the applicable Required Consenting Senior Secured Lenders in accordance with this Agreement, which occurrence remains uncured (to the extent curable) for five (5) Business Days after such terminating Consenting Lender transmits a written notice in accordance with Section 14.10;

(c)     the Company Parties (i) withdraw the Plan, (ii) publicly announce their intention not to support the Restructuring Transactions, or (iii) publicly announce, or execute a definitive written agreement with respect to an Alternative Restructuring Proposal;

(d)     any of the Company Parties (i) files any motion seeking to avoid, disallow, subordinate, or recharacterize any Sheridan II RBL Claims, Sheridan II Term Loan Claims, or Sheridan II Subordinated Term Loan Claims, lien, or interest held by any Consenting Lender arising under or relating to the Sheridan II RBL Credit Agreements, Sheridan II Term Loan Credit Agreements, or Sheridan II Subordinated Term Loan Credit Agreements or (ii) shall have supported any application, adversary proceeding, or cause of action referred to in the immediately preceding clause (i) filed by a third party, or consents to the standing of any such third party to bring such application, adversary proceeding, or cause of action;

(e)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling, judgment or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) either (1) such ruling, judgment or order has been issued at the request of any of the Company Parties in contravention of any obligations set forth in this Agreement or (2) remains in effect for ten (10) Business Days after such terminating Consenting Lenders transmit a written notice in accordance with Section 14.10 of this Agreement detailing any such issuance; notwithstanding the foregoing, this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(f)     the Bankruptcy Court enters an order denying confirmation of the Plan and such order remains in effect for ten (10) Business Days after entry of such order;

(g)     the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Senior Secured Lenders), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, (iii) dismissing one

or more of the Chapter 11 Cases of a Company Party, (iv) terminating exclusivity under Section 1121 of the Bankruptcy Code, or (v) rejecting this Agreement; or

(h)    if any Company Party (i) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, receivership, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect, except as contemplated by this Agreement, (ii) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described in the preceding subsection (i), (iii) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator or similar official with respect to any Company Party or for a substantial part of such Company Party's assets, (iv) makes a general assignment or arrangement for the benefit of creditors, or (v) takes any corporate action for the purpose of authorizing any of the foregoing;

(i)    the termination of this Agreement by the Required Consenting Sheridan II Subordinated Term Lenders pursuant to Section 11.02; or

(j)    the failure to meet a Milestone, which has not been waived or extended in a manner consistent with this Agreement, unless such failure is the result of any act, omission, or delay on the part of the terminating Consenting Stakeholder in violation of its obligations under this Agreement.

11.02.    <u>Required Consenting Sheridan II Subordinated Term Lender Termination Events</u>. The Required Consenting Sheridan II Subordinated Term Lenders may terminate this Agreement solely as to the Consenting Sheridan II Subordinated Term Lenders by delivery to the Company Parties and the Senior Secured Agents of a written notice in accordance with Section 14.10 of this Agreement upon the occurrence of the following events:

(a)    the breach in any material respect by a Company Party, a Manager Party, or a Consenting Senior Secured Lender of any of the representations, warranties, or covenants of such Company Party, such Manager Party, or such Consenting Senior Secured Lender as applicable, set forth in this Agreement that would have, or could reasonably be expected to have, an adverse effect on the Consenting Sheridan II Subordinated Term Lenders, which breach remains uncured for five (5) Business Days after such terminating Required Consenting Sheridan II Subordinated Term Lenders transmit a written notice in accordance with Section 14.10 of this Agreement detailing any such breach;

(b)    the Company Parties (i) withdraw the Plan, (ii) publicly announce their intention not to support the Restructuring Transactions, or (iii) publicly announce, or execute a definitive written agreement with respect to an Alternative Restructuring Proposal;

(c)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling, judgment or order that (i)

enjoins the consummation of a material portion of the Restructuring Transactions and (ii) either (1) such ruling, judgment or order has been issued at the request of any of the Company Parties in contravention of any obligations set forth in this Agreement or (2) remains in effect for ten (10) Business Days after such terminating Consenting Sheridan II Subordinated Term Lenders transmit a written notice in accordance with Section 14.10 of this Agreement detailing any such issuance; notwithstanding the foregoing, this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(d)　　any of the Company Parties (i) files any motion seeking to avoid, disallow, subordinate, or recharacterize any Sheridan II Subordinated Term Loan Claim or any interest held by any Consenting Lender arising under or relating to the Sheridan II Subordinated Term Loan Credit Agreements or (ii) shall have supported any application, adversary proceeding, or cause of action referred to in the immediately preceding clause (i) filed by a third party, or consents to the standing of any such third party to bring such application, adversary proceeding, or cause of action;

(e)　　the Bankruptcy Court enters an order denying confirmation of the Plan and such order remains in effect for ten (10) Business Days after entry of such order;

(f)　　if any Company Party (i) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, receivership, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect, except as contemplated by this Agreement, (ii) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described in the preceding subsection (i), (iii) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator or similar official with respect to any Company Party or for a substantial part of such Company Party's assets, (iv) makes a general assignment or arrangement for the benefit of creditors, or (v) takes any corporate action for the purpose of authorizing any of the foregoing;

(g)　　the termination of this Agreement by the Required Consenting Senior Secured Lenders pursuant to Section 11.01; or

(h)　　the failure to meet a Milestone, which has not been waived or extended in a manner consistent with this Agreement, unless such failure is the result of any act, omission, or delay on the part of the terminating Consenting Stakeholder in violation of its obligations under this Agreement.

11.03. <u>Company Party Termination Events.</u> Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 14.10 of this Agreement upon the occurrence of any of the following events:

(a)　　the breach in any material respect by one or more of the Consenting Lenders of any of the representations, warranties, or covenants of the Consenting Lenders set forth in this

Agreement that would have, or could reasonably be expected to have, an adverse effect on the Restructuring Transaction, which breach remains uncured for five (5) Business Days after such terminating Company Party transmits a written notice in accordance with Section 14.10 of this Agreement detailing any such breach, but only if the non-breaching Consenting Lenders hold less than two thirds of the Sheridan II RBL Claims, Sheridan II Term Loan Claims, and Sheridan II Subordinated Term Loan Claims, calculated separately;

(b)     the Governing Body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(c)     the Bankruptcy Court enters an order denying confirmation of the Plan and such order remains in effect for ten (10) Business Days after entry of such order; or

(d)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for ten (10) Business Days after such terminating Company Party transmits a written notice in accordance with Section 14.10 of this Agreement detailing any such issuance; notwithstanding the foregoing, this termination right shall not apply to or be exercised by any Company Party if any Company Party or Manager Party sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement.

11.04.  <u>Manager Entity Termination Events.</u>  This Agreement may be terminated by a Manager Party in respect of such Manager Party by the delivery to the Company Parties of a written notice in accordance with Section 14.10 of this Agreement upon the occurrence of the following events:

(a)     the breach in any material respect by a Company Party or Consenting Lender of any of the representations, warranties, or covenants of the Company Parties or Consenting Lender, as applicable, set forth in this Agreement that (i) adversely affects the treatment, right or obligations under this Agreement or the Plan of any Manager Parties and (ii) remains uncured for five (5) Business Days after such terminating Manager Parties transmit a written notice in accordance with Section 14.10 of this Agreement detailing any such breach; or

(b)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling, judgment or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) either (1) such ruling, judgment or order has been issued at the request of any of the Company Parties in contravention of any obligations set forth in this Agreement or (2) remains in effect for five (5) Business Days after such terminating Manager Parties transmit a written notice in accordance with Section 14.10 of this Agreement detailing any such issuance; notwithstanding the foregoing, this

termination right may not be exercised by any Manager Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement.

11.05. <u>Mutual Termination</u>. This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following: (a) the Required Consenting Stakeholders; and (b) each Company Party.

11.06. <u>Automatic Termination</u>. This Agreement shall terminate automatically without any further required action or notice immediately after the Plan Effective Date.

11.07. <u>Effect of Termination.</u> After the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or Causes of Action that otherwise would have been subject to the Releases, subject to Section 14.21 herein. Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise. Notwithstanding the foregoing, any Consenting Stakeholder withdrawing or changing its vote pursuant to this Section 11.07 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court. Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with the terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date. Except as expressly provided in this Agreement, nothing in this Agreement is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder, and (b) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Stakeholder. No purported termination of this Agreement shall be effective under this Section 11.07 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Sections 11.03(b) or 11.05. Nothing in this Section 11.07 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 11.03(b) or affect any Party's rights under Section 14.21.

**Section 12.** *Amendments and Waivers*.

(a)   This Agreement, including the form of Plan attached hereto, may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 12.

(b)   This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in writing signed by: (i) each Company Party, (ii) the Required Consenting Sheridan II Revolving Lenders, (iii) the Required Consenting Sheridan II Term Lenders, (iv) the Required Consenting Sheridan II Subordinated Term Lenders, and (v) each Manager Party; *provided* that in the case of the Required Consenting Sheridan II Revolving Lenders, the Required Consenting Sheridan II Term Lenders, and the Manager Parties, consent shall not be unreasonably withheld to any modification, amendment, waiver, or supplement that does not adversely affect their rights, unless otherwise specified in this agreement; and *provided*, *further* that in the case of the Required Consenting Sheridan II Subordinated Term Lenders, (x) consent shall be required solely to the extent required under the Consenting Sheridan II Subordinated Term Lender Consent Right and (y) any Milestone may be extended by up to 30 days with the consent of only the Company Parties and the Required Consenting Senior Secured Lenders. Notwithstanding the foregoing, if the proposed modification, amendment, waiver, or supplement has a material, disproportionate, and adverse effect on any of the Company Claims/Interests held by a Consenting Stakeholder, then the consent of each such affected Consenting Stakeholder shall also be required to effectuate such modification, amendment, waiver, or supplement.

(c)   Any proposed modification, amendment, waiver, or supplement that does not comply with this Section 12 shall be ineffective and void *ab initio*.

(d)   The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power, or remedy by such Party preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power, or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 13.** *Mutual Releases.*

13.01.   <u>Releases</u>.

(a)   <u>Releases by the Company Releasing Parties</u>. Except as expressly set forth in this Agreement, effective on (i) the Agreement Effective Date and (ii) the Plan Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever

released and discharged by the Company Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of, the foregoing Entities, from any and all Causes of Action, including any derivative claims asserted on behalf of the Company Releasing Parties, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Company Releasing Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Equity Interest in, a Company Releasing party, based on or relating to, or in any manner arising from, in whole or in part, the Company Parties, their capital structure, the assertion or enforcement of rights and remedies against the Company Parties' out-of-court restructuring efforts, intercompany transactions between or among a Company Party and another Company Party, the formulation, preparation, dissemination, negotiation, or filing of this Agreement, the Definitive Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with this Agreement or the Definitive Documents, the pursuit of consummation, the administration and implementation of the Restructuring Transaction, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Company Parties taking place on or before, in respect of the forgoing clause (i), the Agreement Effective Date and, in respect of the forgoing clause (ii), the Plan Effective Date.

(b)     <u>Releases by the Consenting Stakeholder Releasing Parties</u>.  Except as expressly set forth in this Agreement, effective on (i) the Agreement Effective Date and (ii) the Plan Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Consenting Stakeholder Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Company Parties, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Company Parties, their capital structure, the assertion or enforcement of rights and remedies against the Company Parties' out-of-court restructuring efforts, intercompany transactions between or among a Company Party and another Company Party, the formulation, preparation, dissemination, negotiation, or filing of this Agreement, the Definitive Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with this Agreement or the Definitive Documents, the pursuit of consummation, the administration and implementation of the Restructuring Transaction, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Company Parties taking place on or before, in respect of the foregoing clause (i), the Agreement Effective Date and, in respect of the foregoing clause (ii), the Plan Effective Date.

13.02.  <u>No Additional Representations and Warranties</u>.  Each of the Parties agrees and acknowledges that, except as expressly provided in this Agreement and the Definitive Documents, no other Party, in any capacity, has warranted or otherwise made any representations concerning any Released Claim (including any representation or warranty concerning the existence, non-existence, validity, or invalidity of any Released Claim).  Notwithstanding the foregoing, nothing contained in this Agreement is intended to impair or otherwise derogate from any of the representations, warranties, or covenants expressly set forth in this Agreement or any of the Definitive Documents.

13.03.  <u>Release of Unknown Claims</u>.  Each of the Releasing Parties in each of the Releases contained in this Agreement expressly acknowledges that although ordinarily a general release may not extend to Released Claims which the Releasing Party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, they have carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or claims.  Without limiting the generality of the foregoing, each Releasing Party expressly waives and relinquishes any and all rights such Party may have or conferred upon it under any federal, state, or local statute, rule, regulation, or principle of common law or equity which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of providing the Release or which may in any way limit the effect or scope of the Releases with respect to Released Claims which such Party did not know or suspect to exist in such Party's favor at the time of providing the Release, which in each case if known by it may have materially affected its settlement with any Released Party including any rights under Section 1542 of the California Civil Code or any analogous applicable state or federal law or regulation.  Each of the Releasing Parties expressly acknowledges that the Releases and covenants not to sue contained in this Agreement are effective regardless of whether those released matters or Released Claims are presently known or unknown, suspected or unsuspected, or foreseen or unforeseen.

To the extent that the foregoing releases are releases to which Section 1542 of the California Civil Code or similar provisions of other applicable law applies, it is the intention of the Parties that the foregoing releases shall be effective as a bar to any and all Claims of whatsoever character, nature and kind, known or unknown, suspected or unsuspected specified in this Agreement. In furtherance of this intention, the Parties expressly waive any and all rights and benefits conferred upon them by the provisions of Section 1542 of the California Civil Code or similar provisions of applicable law, which are as follows:

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."**

The Parties acknowledge that the foregoing waiver of the provisions of Section 1542 of the California Civil Code was bargained for separately. Thus, notwithstanding the provisions of Section 1542 of the California Civil Code, and for the purpose of implementing a full and complete release and discharge of the Parties, and each of them, each Party expressly acknowledges that this Agreement is intended to include in its effect without limitation all of the claims, causes of action and liabilities which the Parties, and each of them do not know or suspect to exist in their favor at the time of execution of this Agreement, and this Agreement contemplates extinguishment of all such claims, causes of action and liabilities.

13.04.  Turnover of Subsequently Recovered Assets.  In the event that any Releasing Party (including any successor or assignee thereof and including through any third party, trustee, debtor in possession, creditor, estate, creditors' committee, or similar Entity) is successful in pursuing or receives, directly or indirectly, any funds, property, or other value on account of any Claim, Cause of Action, or litigation against any Released Party that was released pursuant to the Release, such Releasing Party (i) shall not commingle any such recovery with any of its other assets and (ii) agrees that it shall promptly turnover and assign any such recoveries to, and hold them in trust for, such Released Party.  In the event that any Releasing Party (including any successor or assignee thereof and including through any third party, trustee, debtor in possession, creditor, estate, creditors' committee, or similar Entity) recovers any funds, property, or other value pursuant to the Subordination Agreements (as defined in the Plan) solely on account of any Claim, Cause of Action, or litigation against any Released Party that was released pursuant to the Release (or would have been released pursuant to the Release if the party bringing such claim were a Releasing Party), such Releasing Party (x) shall not commingle any such recovery with any of its other assets and (y) agrees that it shall, subject to the proviso below, promptly turn over and assign any such recoveries to, and hold them in trust for such Released Party; *provided, however*, that, (A) this shall not apply to any such funds, property, or other value recovered on account of any policies of insurance in which the Reorganized Debtors have an interest or that provide or may provide coverage for the Reorganized Debtors, or any other source other than (i) funds of the Released Party or (ii) funds from a third party to whom the Released Party has a legal or contractual obligation to reimburse such funds and (B) to the extent the Reorganized Debtors are required to indemnify the Released Party or otherwise make out-of-pocket payments on account thereof, such Releasing Party shall hold such recoveries in trust and turnover such recoveries to the Reorganized Debtors (as defined in the Plan); *provided further*, *however*, that any such recoveries shall first be reduced by any reasonable and documented fees and expenses of the Releasing Parties or the Reorganized Debtors (as applicable), including attorney's fees, in connection with the foregoing; *provided*, *further*, *however*, that any distributions made pursuant to the Plan, including any proceeds related thereto, shall not be subject to the Subordination Agreements.  For the avoidance of doubt, any and all rights, claims, Causes of Action, payments, or distributions arising from, related to, or made on account of the New Common Stock shall not be subject to the Subordination Agreements.

13.05.  Certain Limitations on Releases.  For the avoidance of doubt, nothing in this Agreement and the Releases contained in this Section 13 shall or shall be deemed to result in the

waiving or limiting by (a) the Company Parties, the Manager Parties, or any officer, director, member of any Governing Body, or employee thereof of (i) any indemnification against any Company Party, any Manager Party, any of their insurance carriers, or any other Entity, (ii) any rights as beneficiaries of any insurance policies, (iii) wages, salaries, compensation, or benefits, (iv) intercompany claims, or (v) any Equity Interests in any Company Party, Manager Party, or any other Entity; (b) the Consenting Lenders or the Agents of any "Obligations" under and as defined in each of the Sheridan II RBL Credit Agreements, the Sheridan II Term Loan Credit Agreements, the Sheridan II Subordinated Term Loan Credit Agreements, or any other financing document (except as may be expressly amended or modified by the Plan and the Exit Facility Credit Agreements, or any other financing document under and as defined therein); (c) any party of any obligations related to customary banking products, banking services or other financial accommodations (except as may be expressly amended or modified by the Plan and the Exit Facility Credit Agreements, or any other financing document under and as defined therein); and (d) any party of any post-Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, the Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facility Documents, or any Claim or obligation arising under the Plan.

13.06. <u>Covenant Not to Sue</u>. Each of the Releasing Parties hereby further agrees and covenants not to, and shall not, commence or prosecute, or assist or otherwise aid any other Entity in the commencement or prosecution of, whether directly, derivatively or otherwise, any Released Claims.

## Section 14.  *Miscellaneous.*

14.01. <u>Acknowledgement</u>. Notwithstanding any other provision of this Agreement, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

14.02. <u>Exhibits Incorporated by Reference; Conflicts</u>. Each of the exhibits, annexes, signatures pages, and schedules attached to this Agreement is expressly incorporated and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules attached to this Agreement) and the exhibits, annexes, and schedules attached to this Agreement, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

14.03. <u>Further Assurances</u>. Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters specified in this Agreement, as may be reasonably appropriate or necessary, or as may be required

by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

14.04. <u>Complete Agreement</u>. Except as otherwise explicitly provided in this Agreement, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter of this Agreement and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement. The Parties acknowledge and agree that they are not relying on any representations or warranties other than as set forth in this Agreement.

14.05. <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN THE CHOSEN STATE, WITHOUT GIVING EFFECT TO ITS CONFLICT OF LAWS PRINCIPLES. Each Party to this Agreement agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Chosen Court; provided that nothing in this Agreement shall prevent the Company Parties from commencing the Chapter 11 Cases in the Bankruptcy Court. Solely in connection with claims arising under this Agreement, each Party to this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Chosen Court; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Court; and (c) waives any objection that the Chosen Court is an inconvenient forum or does not have jurisdiction over any Party to this Agreement.

14.06. <u>TRIAL BY JURY WAIVER</u>. EACH PARTY TO THIS AGREEMENT IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

14.07. <u>Execution of Agreement</u>. This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Agreement, each Person executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

14.08. <u>Rules of Construction</u>. This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders, and in the enforcement or interpretation of this Agreement, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion of this Agreement, shall not be effective in regard to the interpretation of this Agreement. The Company Parties and the Consenting Stakeholders were

each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

14.09.  <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third-party beneficiaries under this Agreement, and, except as set forth in Section 8, the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other Entity.

14.10.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)     if to a Company Party, to:

       c/o Sheridan Production Company, LLC
       1360 Post Oak Blvd., Suite 2500
       Houston, Texas 77056
       Attention:  Cheryl S. Phillips, Vice President and General Counsel
       E-mail address:  cheryl.phillips@sheridanproduction.com

       with copies to:

       Kirkland & Ellis LLP
       601 Lexington Avenue
       New York, New York 10022
       Attention:  Joshua Sussberg and Steven Serajeddini
       E-mail address:  joshua.sussberg@kirkland.com and
       steven.serajeddini@kirkland.com

       -and-

       Kirkland & Ellis LLP
       300 North LaSalle Street
       Chicago, Illinois 60654
       Attention:  Spencer Winters
       E-mail address:  spencer.winters@kirkland.com

(b)     if to a Consenting Sheridan I Revolving Lender, to:

       Vinson & Elkins LLP
       2001 Ross Avenue, Suite 3900
       Dallas, TX 75201-2975
       Attn.:  William L. Wallander and Erec Winandy

(c)    if to a Consenting Sheridan I Term Lender, to:

Davis Polk & Wardwell LLP
450 Lexington Avenue,
New York, New York 10017
Attn.:  Damian S. Schaible, Nate Sokol, and Stephen D. Piraino

(d)    if to a Consenting Sheridan I Subordinated Term Lender, to:

Weil, Gotshal & Manges LLP
767 5th Avenue
New York, New York 10153
Attn: Matt Barr and Gabriel A. Morgan


(e)    if to a Manager Affiliate, to:

Sheridan Production Company, LLC
1360 Post Oak Blvd., Suite 2500
Houston, Texas 77056
Attention:  Cheryl S. Phillips, Vice President and General Counsel
E-mail address:  cheryl.phillips@sheridanproduction.com

and

Warburg Pincus LLC
450 Lexington Avenue
New York, NY  10017
Attention:  Harsha Marti
E-mail address:  harsha.marti@warburgpincus.com

and

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
Attention: Brian Lennon
E-mail address: blennon@willkie.com

(f)    if to Manager, to:

Sheridan Production Company, LLC
1360 Post Oak Blvd., Suite 2500

Houston, Texas 77056
Attention: Cheryl S. Phillips, Vice President and General Counsel
E-mail address: cheryl.phillips@sheridanproduction.com

Any notice given by delivery, mail, or courier shall be effective when received.

14.11. <u>Independent Due Diligence and Decision Making</u>. Each Consenting Stakeholder confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties. Each Consenting Stakeholder acknowledges and agrees that it is not relying on any representations or warranties other than as set forth in this Agreement.

14.12. <u>Enforceability of Agreement</u>. Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

14.13. <u>Admissibility.</u> Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating to this Agreement shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

14.14. <u>Specific Performance</u>. It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

14.15. <u>Several, Not Joint, Claims</u>. Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

14.16. <u>Severability and Construction</u>. If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

14.17. <u>Remedies Cumulative</u>. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

14.18.  Capacities of Consenting Stakeholders.  Each Consenting Stakeholder has entered into this agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

14.19.  Email Consents.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3, Section 11, Section 12, or otherwise, including a written approval by the Company Parties, the Required Consenting Senior Secured Lenders, the Required Consenting Sheridan II Subordinated Term Lenders, or the Manager Parties, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to, as applicable,  the Company Parties, Manager Parties, each of the Senior Secured Agents, and the Consenting Sheridan II Subordinated Term Lenders, submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

14.20.  Fees and Expenses. Regardless of whether the Restructuring Transactions are or have been consummated, and subject to the terms of and solely to the extent authorized in the Financing Order and the Plan, the Company Parties shall promptly pay in cash all Consenting Lender Fees and Expenses; *provided*, *however*, that concurrently with the Agreement Effective Date, the Company Parties shall pay all Consenting Lender Fees and Expenses incurred at any time prior to the Agreement Effective Date not previously paid by the Company Parties.

14.21.  Survival.  Notwithstanding (a) any Transfer of any Company Claims/Interests in accordance with Section 8 or (b) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 11.07, Section 13, Section 14, and the Confidentiality Agreements shall survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof. Notwithstanding the foregoing, the Parties acknowledge and agree that (x) if this Agreement is terminated pursuant to either Section 11.03 or 11.05, Section 13 shall not survive such termination, and any and all Releases shall be fully revoked and deemed null and void and of no force and effect, and (y) if this Agreement is terminated pursuant to Section 11.01, 11.02 or 11.04, Section 13 shall survive such termination, except that any and all Releases received and granted by the Consenting Sheridan II Senior Secured Lenders (in case of a termination under Section 11.01), Consenting Sheridan II Subordinated Lenders (in the case of a termination under Section 11.02) or a Manager Party (in the case of a termination under Section 11.04) shall be fully revoked and deemed null and void and of no force and effect.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

**Company Parties' Signature Page to
the Restructuring Support Agreement**

SHERIDAN INVESTMENT PARTNERS II, L.P.
SHERIDAN PRODUCTION PARTNERS II-A, L.P.
SHERIDAN PRODUCTION PARTNERS II-B, L.P.
SHERIDAN PRODUCTION PARTNERS II-M, L.P.
SHERIDAN HOLDING COMPANY II, LLC
SHERIDAN INVESTMENT PARTNERS II GP, LLC
SHERIDAN PRODUCTION PARTNERS II, LLC
SPP II-B GP, LLC
SPP II-M GP, LLC


By:＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

Name:

Authorized Signatory

**Manager and Manager Affiliates' Signature Page to
the Restructuring Support Agreement**

SHERIDAN PRODUCTION PARTNERS MANAGER, LLC

By: _____
Name:
Authorized Signatory


SHERIDAN ICM, LLC
By: _____
Name:
Authorized Signatory


SHERIDAN PRODUCTION COMPANY, LLC

By: _____
Name:
Authorized Signatory


SHERIDAN SMG, LLC

By: _____
Name:
Authorized Signatory


WARBURG PINCUS, LLC

By: _____
Name:
Authorized Signatory


WPS PRODUCTION PARTNERS II, LLC

By: _____
Name:
Authorized Signatory

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**[CONSENTING STAKEHOLDER]**

_____
Name:
Title:

Address:

E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
| --- | --- |
| Sheridan II RBL Claims | |
| Sheridan II Term Loan Claims | |
| Sheridan II Subordinated Term Loan Claims | |

# EXHIBIT A

## Plan

OMITTED

<u>**EXHIBIT B**</u>

**DIP Term Sheet**

# DIP Term Sheet

| | |
|---|---|
| **Size** | $100 million debtor-in-possession financing facility (the "**DIP Facility**"), consisting of two tranches:<br><br>• $50 million delayed draw new money term loans (the "**New Money Term Loans**"), with $28 million available upon entry of the interim order and $22 million on entry of the final order.<br><br>• $50 million roll up of prepetition Sheridan II Revolving Loans and Sheridan II Term Loans held by those lenders that participate in the DIP ("**Roll-Up Term Loans**" and together with the New Money Term Loans, the "**DIP Loans**"). |
| **Agent** | Bank of America, N.A. (the "**DIP Agent**"). |
| **Lenders** | Consenting Sheridan II Revolving Lenders and Consenting Sheridan II Term Lenders that agree to provide the DIP Facility (the "**DIP Lenders**"). |
| **Security** | Superpriority priming security interest on unencumbered assets and current collateral under the existing credit documents (currently 95% of proved PV-9) (excluding any avoidance actions, but including the proceeds thereof (subject to entry of the final order)), subject to the carve-out. |
| **Maturity** | 6 months. |
| **Rate** | New Money Term Loans: L + 700 per annum<br><br>Roll-Up Term Loans: L + 700 per annum |
| **Fees** | 200 bps commitment/structuring fee.<br><br>100 bps unused line fee.<br><br>Customary arranger and agency fees to be mutually agreed. |
| **Mandatory Prepayments** | Customary for DIP facilities of this type. No call protection. |
| **Milestones** | Usual and customary milestones, including interim and final DIP orders and filing of the disclosure statement. |
| **Negative Covenants** | Usual and customary negative covenants |

| | |
|---|---|
| **Budget Compliance** | • Budget variance covenant, tested every two weeks (beginning with the second full week after the Petition Date) with respect to the immediately preceding four week period (or, if such four week period has not elapsed since the Petition Date, the cumulative period since the Petition Date) then-ended against the Approved Budget (as defined below), covering (i) payroll, benefit and G&A disbursements (in the aggregate), subject to the greater of a 15% or $300,000 variance, (ii) operating disbursements (in the aggregate and excluding royalty payments), subject to a 15% variance, and (iii) capital expenditures, subject to the greater of a 15% or $300,000 variance.<br><br>• "**Budget**" means, a rolling 13-week operating budget and cash flow forecast delivered on or prior to the Petition Date and every four weeks after the Petition Date, setting forth, among other things, the Debtors' projected receipts, operating disbursements (including payroll and benefits, G&A, and royalty payments), non-operating disbursements (including capital expenditures, debt service and professional fees), and net cash flow, during such 13-week period (i) initially, covering the period commencing on or about the Petition Date and (ii) thereafter, commencing on the first day of each four-week period thereafter. Any updates to the Budget delivered after the Petition Date shall be reasonably acceptable to the DIP Lenders holding a majority of the DIP Loans and outstanding commitments (the "**Required DIP Lenders**") (including any changes made in any such updated Budget with respect to any periods that were included in a previously delivered Budget; *provided* that a separate explanation in reasonable detail of such changes shall be provided to the Lenders), it being understood that if the Required DIP Lenders have not objected to an updated Budget within 10 days after delivery thereof, the updated Budget shall be deemed to be approved (each such approved Budget, the "**Approved Budget**"). |
| **Production Forecast and Monthly Covenant** | • A forecast (the "**Production Volumes Forecast**") to be delivered with the initial Budget, setting forth, on a monthly basis through the maturity date of the DIP Facility, forecasted total production volumes (which shall include a breakdown of projected operated volumes versus projected non-operated volumes).<br><br>• Actual total production volumes will be reported and tested on a monthly basis on the Friday of the first full week following the end of each calendar month (beginning with the calendar month in which the Petition Date occurs) and shall be subject to a 15% permitted variance. |
| **Mid-Month Production Covenant** | Preliminary field estimates of operated production volumes for the first fifteen days of each calendar month will be reported and tested against the Production Volumes Forecast on a mid-month basis on the fifth business day following such fifteen day period and shall be subject to a 20% variance. |

| | |
|---|---|
| **Permitted Accounts** | Obligors will not, directly or indirectly, hold or otherwise maintain any of its cash, cash equivalents, bank deposits or investments other than at a deposit account, commodity account or securities account held and otherwise maintained by it in its own name that is subject to a control agreement in favor of the DIP Agent (other than cash and cash equivalents attributable to the operation of the Sheridan II entities temporarily held in a deposit account of Sheridan Production Company, LLC ("**SPC**") for the sole purpose of funding payroll and disbursements to unaffiliated third parties in the ordinary course of business in accordance with the Approved Budget (subject to permitted variances) and for which SPC has previously or simultaneously issued checks or initiated wires or ACH transfers or has scheduled imminent disbursements within three business days). Any Sheridan II cash receipts received by a non-Debtor affiliate (consistent with past practices) will be promptly as practicable (but in no event later than three business days after receipt of applicable documentation) reconciled and transmitted to an account of an obligor subject to a control agreement in favor of the DIP Agent. |
| **Disclosure & Reporting** | • Requirement for customary and usual information reporting, which shall include weekly conference calls between the Lenders' financial advisors and senior management and monthly conferences call between the Lenders and the DIP Agent, on the one hand, and senior management, on the other, in each case at times to be mutually agreed to discuss the financial condition and operations of the Sheridan II entities.<br><br>• Borrower to use commercially reasonable efforts to obtain a rating of the New Money Term Loans by one of Moody's or S&P Global, as determined by the Required DIP Lenders. All fees and expenses incurred in connection with seeking or obtaining such rating are deemed to be permitted in accordance with the Approved Budget (regardless of whether provided for therein) for all purposes. |
| **Assignments** | Usual and customary for debtor-in-possession facilities of this type, including assignments of DIP Loans subject to the consent of the borrower (not to be unreasonably withheld) unless an event of default exists (such consent to be deemed given if no objection is provided within 5 business days) and the DIP Agent; provided that no lender shall have the right to assign all or any portion of its New Money Term Loans or Roll-Up Term Loans (except in the case of assignments to affiliates of the DIP Lender, provided that such affiliates simultaneously execute a Transfer Agreement or Joinder to the RSA) absent a simultaneous assignment of a corresponding proportional amount of Roll-Up Term Loans (in the case of an assignment of New Money Term Loans), New Money Term Loans (in the case of an assignment of Roll-Up Term Loans), Sheridan II Revolving Loans and Sheridan II Term Loans. |

<u>**Exhibit C**</u>

## Form of Transfer Agreement

# *TRANSFER AGREEMENT*

The undersigned ("**<u>Transferee</u>**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of [●], 2019 (the "**<u>Agreement</u>**"),[1] by and among the Company Parties and the Consenting Stakeholders, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**<u>Transferor</u>**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Stakeholder" and a "Consenting Sheridan II Revolving Lender," "Consenting Sheridan II Term Lender," or "Consenting Sheridan II Subordinated Term Lender" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed in this transfer agreement.

Date Executed:

_____

Name:
Title:

Address:

E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
| --- | --- |
| Sheridan II RBL Claims | |
| Sheridan II Term Loan Claims | |
| Sheridan II Subordinated Term Loan Claims | |
| New Money DIP Claims | |

---

[1] Capitalized terms not used but not otherwise defined in this transfer agreement shall have the meanings ascribed to such terms in the Agreement.

# EXHIBIT D

## Form of Joinder

# *JOINDER*

The undersigned ("**<u>Joinder Party</u>**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of [●], 2019 (the "**<u>Agreement</u>**"),[1] by and among Company Parties and the Consenting Stakeholders and agrees to be bound by the terms and conditions thereof to the extent the other Parties are thereby bound, and shall be deemed a "Consenting Sheridan II Revolving Lender," "Consenting Sheridan II Term Lender," or "Consenting Sheridan II Subordinated Term Lender" under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of this joinder and any further date specified in the Agreement.

Date Executed:

_____

Name:

Title:

Address:

E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| Sheridan II RBL Claims | |
| Sheridan II Term Loan Claims | |
| Sheridan II Subordinated Term Loan Claims | |
| New Money DIP Claims | |

---

[1] Capitalized terms not used but not otherwise defined in this joinder shall have the meanings ascribed to such terms in the Agreement.

**EXHIBIT C**

**Financial Projections**

**Financial Projections**

For purposes of demonstrating feasibility of the Plan, the Debtors have prepared the forecasted consolidated financial projections (the "Financial Projections") for the Reorganized Debtors for the periods of November 1, 2019 through December 31, 2023 (the "Projection Period"). The Financial Projections were prepared based on assumptions made by the Debtors' management as to the future performance of the Reorganized Debtors in the event the Plan effectuates a going-concern reorganization through a debt-for-equity exchange, and reflect management's judgment and expectations regarding their future operations and financial position. The Financial Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond management's control, incident to the exploration for and development, production, and sale of oil and natural gas. As described in detail in the Disclosure Statement, a variety of risk factors could affect the Debtors' financial results and must be considered. Although there are many risk factors as discussed below, these factors should not be regarded as constituting the only risks present in connection with these Financial Projections. Factors that may cause actual results to differ from expected results include:

1. fluctuations in oil and natural gas prices and the Reorganized Debtors' ability to hedge against movements in prices;

2. the uncertainty inherent in estimating reserves, future net revenues, and discounted future cash flows;

3. the timing and amount of future production of oil and natural gas;

4. changes in the availability and cost of capital;

5. environmental, drilling and other operating risks, including liability claims as a result of oil and natural gas operations;

6. proved and unproved drilling locations and future drilling plans;

7. production shut-in due to off-take infrastructure downtime or pipeline capacity constraints; and

8. the effects of existing and future laws and governmental regulations, including environmental, hydraulic fracturing, and climate change regulation.

Should one or more of the risks or uncertainties referenced in the Disclosure Statement occur, or should underlying assumptions prove incorrect, actual results and plans could differ materially from those expressed in the Financial Projections. Further, new factors could cause actual results to differ materially from those described in the Financial Projections, and it is not possible to predict all such factors, or to the extent to which any such factor or combination of factors may cause actual results to differ from those contained in the Financial Projections. The Financial Projections herein are not, and must not be viewed as, a representation of fact, prediction or guaranty of Reorganized Sheridan II future performance.

The Financial Projections have not been audited or reviewed by a registered independent accounting firm, and were not prepared with a view toward compliance with the guidelines of the Securities and Exchange Commission, the American Institute of Certified Public Accountants, or the Financial Accounting

Standards Board ("FASB"), particularly for reorganization accounting. The Projections should be read in conjunction with the significant assumptions, qualifications, and notes set forth below.

THE DEBTORS PREPARED THE PROJECTIONS WITH THE ASSISTANCE OF THEIR ADVISERS. EXCEPT FOR PURPOSES OF THE DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS. MOREOVER, THE FINANCIAL PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH WILL BE BEYOND THE CONTROL OF THE REORGANIZED DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, ACHIEVING OPERATING EFFICIENCIES, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, INDUSTRY-SPECIFIC RISK FACTORS, AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS AND REORGANIZED DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, INDUSTRY, REGULATORY, LEGAL, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING AFTER THE DATE ON WHICH THE DEBTORS PREPARED THESE PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE DISCLOSURE STATEMENT, THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE FINANCIAL PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISERS.

# I. OVERVIEW

The Debtors are a Houston, Texas-based independent oil and gas company engaged in the exploration, development, production, and acquisition of oil and natural gas properties in the mid-continent United States, spanning areas of New Mexico, Texas and Wyoming.

# II. ACCOUNTING AND PRESENTATION POLICIES

The Financial Projections have been prepared using accounting policies that are generally consistent with those applied in the Debtors' historical financial statements (GAAP consolidated basis). The Financial Projections have not been prepared under the intention of compliance with published guidelines of the SEC, the American Institute of Certified Public Accountants, the Financial Accounting Standards Board, or any other standard-setting body. The Financial Projections do not include adjustments or write-downs related to the predecessor Debtors' extinguishment of debt or other liabilities. The projected financial information does not reflect the impact of fresh start accounting, which could result in material changes to the projected values.

The Financial Projections do not reflect the formal implementation of reorganization accounting pursuant to FASB Accounting Standards Codification Topic 852, Reorganizations ("ASC 852"). Overall, the implementation of ASC 852 may or may not have a material impact on the underlying economics of the Plan.

# III. METHODOLOGY

The Financial Projections were prepared using a bottoms-up approach incorporating multiple sources of detailed information including region, area, and well-level analyses from each of the Debtors' operating divisions. The projections should be read in conjunction with the significant assumptions, qualifications, and notes set forth below.

Importantly, in the event the Plan effectuates a going-concern sale of the Debtors' assets to a third-party, such third party may have materially different views on future performance and stratey.  These projections are not meant to, nor should they be construed as, influencing or establishing a business plan of any such third party.  In the event of such a sale, the Financial Projections are no longer a relevant component of the Plan analysis as creditors will receive solely the cash proceeds of such sale.

# IV. ASSUMPTIONS

The Financial Projections include projected financial statements for November 1, 2019 – December 31, 2023, assuming that the Effective Date of the Plan is October 31, 2019 (the "Emergence Date").

# V. GENERAL ASSUMPTIONS

## A. Total Revenue
Total revenue consists of production revenue. Production revenue is generated from the exploration for and development, production, gathering, and sale of oil and natural gas. Oil and gas production volumes are estimates based on decline curves for existing producing wells and wells scheduled to be drilled and completed during the Projection Period. The actual production from new and existing wells could vary considerably from the assumptions used to prepare the production forecast contained herein.

The Financial Projections make an assumption for Reorganized Sheridan II hedge revenue based on the Debtors' current hedge portfolio.

**B. Commodity Pricing**

Commodity pricing is based on August 5, 2019 New York Mercantile Exchange ("NYMEX") forward pricing for crude oil and natural gas. Management estimates realized pricing based on forecasted oil and gas differentials for each producing area and includes select gathering, processing, and transportation ("GPT") offsets against sold volumes.

| | Nov - Dec | Year Ending December 31, | | | |
|---|---|---|---|---|---|
| | 2019 | 2020 | 2021 | 2022 | 2023 |
| WTI ($ / Bbl) | $55.04 | $53.03 | $51.58 | $51.47 | $52.20 |
| Hhub ($ / MMBtu) | 2.18 | 2.39 | 2.51 | 2.57 | 2.65 |

**C. Operating Expenses**

Operating expenses consist of lease operating expenses, transportation expenses, processing fees, oil and gas purchases, pre-drilling, workover, and other non-operating expenses.

Lease operating expenses ("LOE") for Reorganized Sheridan II reserves are forecasted at the well level and are expected to range from approximately $5.52 to $8.95 per boe over the Projection Period.

**D. Production and Property Taxes**

Production and property taxes includes severance and ad-valorem taxes, and are forecasted at the well level based on tax rates applicable in the jurisdiction of production.

**E. Maintenance**

Maintenance expense encompasses the cost to keep up current operations. Maintenance expense is based on producing well count and does not include any cost to restore a non-PDP well.

Annual Maintenance expense is forecasted to be between $16.2 million and $18.8 million over the Projection Period.

**F. General and Administrative Expenses**

General and administrative ("G&A") expenses primarily consists of personnel costs, rent, insurance, and other corporate overhead costs necessary to manage operations. The Reorganized Debtors' projected G&A expenses are based on the current development and operational plans.

**G. Capital Expenditures**

Capital expenditures include capital expenditures related to developing and optimizing oil & gas properties, capitalized engineering expenses, and/or expenditures to acquire properties.

From 2020 through 2023 the Company plans to invest $64.4 million in drilling projects and $92.4 million in reactivations, recompletions and stimulations.

**H. Capital Structure and Liquidity**

The Financial Projections assume a post-emergence capital structure consisting of:
- First-Out New Term Loans in an aggregate principal amount of $50 million, with a rate of L + 700 bps and 1% annual amortization on the initial principal amount of the term loans

- Second-Out New Term Loans in an aggregate principal amount of $50 million, with a rate of L + 700 bps and 1% annual amortization on the initial principal amount of the term loans
- Last-Out New Term Loans in an aggregate principal amount of $75 million, with a rate of L + 700 bps and 1% annual amortization on the initial principal amount of the term loans
- LIBOR is based on a forward 3-month LIBOR curve as of August 5, 2019
- Management expects to have approximately $15 million of liquidity on the Effective Date, all in the form of balance sheet cash

# REORGANIZED DEBTORS' FINANCIAL PROJECTIONS

| ($ in Millions) | At Emergence | Nov - Dec 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|
| | | | Year Ending December 31, | | | |
| **Commodity Assumption:** | | | | | | |
| Oil ($/Bbl) | | $55.04 | $53.03 | $51.58 | $51.47 | $52.20 |
| Gas ($/MMBtu) | | $2.18 | 2.39 | 2.51 | 2.57 | 2.65 |
| **Production:** | | | | | | |
| Oil (Boe/d) | | 7,316 | 7,730 | 8,476 | 9,948 | 10,443 |
| Gas (Mcf/d) | | 19,117 | 19,857 | 20,775 | 21,927 | 21,768 |
| **Boe/d** | | **10,502** | **11,040** | **11,939** | **13,603** | **14,071** |
| % Oil | | *70%* | *70%* | *71%* | *73%* | *74%* |
| **Cash Flows:** | | | | | | |
| **Oil & Gas Revenue** | | **$25** | **$153** | **$164** | **$191** | **$203** |
| Less: Production Taxes | | (2) | (13) | (14) | (17) | (18) |
| Less: Lease Operating Expense | | (6) | (30) | (30) | (30) | (30) |
| Less: Maintenance | | (3) | (16) | (18) | (19) | (16) |
| Less: G&A | | (3) | (16) | (16) | (16) | (16) |
| Less: Other[1] | | (0) | (1) | (1) | (1) | (1) |
| **Unhedged EBITDA** | | **$10** | **$77** | **$85** | **$109** | **$122** |
| Hedge Impact | | (1) | (3) | - | - | - |
| **EBITDA** | | **$9** | **$74** | **$85** | **$109** | **$122** |
| Capital | | (0) | (29) | (42) | (42) | (44) |
| Admin | | (0) | (2) | (2) | (2) | (2) |
| **Unlevered Free Cash Flow** | | **$9** | **$44** | **$42** | **$65** | **$76** |
| Cash Interest | | (3) | (16) | (16) | (16) | (16) |
| Amortization | | (0) | (2) | (2) | (2) | (2) |
| **Levered Free Cash Flow** | | **$6** | **$25** | **$24** | **$47** | **$59** |
| ***Memo:*** *LTM EBITDA* | *$56* | *$52* | *$74* | *$85* | *$109* | *$122* |
| **Liquidity:** | | | | | | |
| Beginning Cash Balance | | NA | $15 | $21 | $46 | $70 | $117 |
| Levered Free Cash Flow | | NA | 6 | 25 | 24 | 47 | 59 |
| **Ending Cash Balance[2]** | | **$15** | **$21** | **$46** | **$70** | **$117** | **$176** |
| **Credit Stats:** | | | | | | |
| Total Debt / LTM EBITDA | 3.1x | 3.3x | 2.3x | 2.0x | 1.6x | 1.4x |
| LTM EBITDA / LTM Cash Interest Expense | NA | 3.1x | 4.5x | 5.3x | 6.8x | 7.7x |
| **Debt Balances:** | | | | | | |
| First-Out Term Loan | $50 | $50 | $49 | $49 | $48 | $48 |
| Second-Out Term Loan | 50 | 50 | 49 | 49 | 48 | 48 |
| Last-Out Term Loan | 75 | 75 | 74 | 73 | 73 | 72 |
| **Total Debt** | **$175** | **$175** | **$173** | **$171** | **$169** | **$168** |
| *Net Debt* | *160* | *154* | *127* | *101* | *52* | *(8)* |

Note: in the Liquidity rows, columns shift — values shown under At Emergence column are blank; first value (NA / $15) is under Nov-Dec 2019 onwards.

---

[1] Includes Lease Rentals and Bank Fees
[2] Represents total liquidity given no revolver in pro forma capital structure; for illustrative purposes does not assume any excess cash flow sweep.

# EXHIBIT D

## Valuation Analysis

**Valuation Analysis**

THE VALUATION INFORMATION CONTAINED IN THE FOLLOWING ANALYSIS IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN. THIS VALUATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION AS REQUIRED BY SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS OR EQUITY INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTORS. IN ADDITION, THE VALUATION OF NEWLY-ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT. ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDITY THEIR INVESTMENT RATHER THAN HOLD IT ON A LONG-TERM BASIS, AND OTHER FACTORS WHICH GENERALLY INFLUENCE PRICES OF SECURITIES.

THE ESTIMATES OF THE ENTERPRISE VALUE AND EQUITY VALUE DETERMINED BY EVERCORE REPRESENT ESTIMATED ENTERPRISE VALUES AND DO NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE IMPUTED ESTIMATE OF THE RANGE OF THE EQUITY VALUE OF REORGANIZED DEBTORS ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET TRADING VALUE. ANY SUCH TRADING VALUE MAY BE MATERIALLY DIFFERENT FROM THE IMPUTED ESTIMATED OF THE EQUITY VALUE RANGE FOR THE REORGANIZED DEBTORS ASSOCIATED WITH EVERCORE'S VALUATION ANALYSIS.

Solely for purposes of the Plan[1] and the Disclosure Statement, Evercore Group L.L.C. ("Evercore"), as investment banker and financial advisor to the Debtors, has estimated the total enterprise value (the "Total Enterprise Value") and implied equity value (the "Equity Value") of the Reorganized Debtors on a going concern basis and pro forma for the transactions contemplated by the Plan.

In estimating the Total Enterprise Value of the Debtors, Evercore met with the Debtors' senior management team to discuss the Debtors' assets, operations and future prospects, reviewed the Debtors' historical financial information, reviewed certain of the Debtors' internal financial and operating data, including the Debtors' reserve report, reviewed the Debtors' financial projections for the Reorganized Debtors provided in **Exhibit C** to the Disclosure Statement (the "Projections"), reviewed publicly available third-party information and conducted such other studies, analyses, and inquiries we deemed appropriate.

The valuation analysis herein represents a valuation of the Reorganized Debtors as the continuing operators of the businesses and assets of the Debtors, after giving effect to the Plan, based on the application of standard valuation techniques. The estimated values set forth in this Exhibit D: (a) do not purport to constitute an appraisal of the assets of the Reorganized Debtors; (b) do not constitute an opinion on the terms and provisions or fairness from a financial point of view to any Holder of the consideration to be

---

[1]  Capitalized terms used but not otherwise defined in this Exhibit D have the meanings ascribed to such terms in the *Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan"), filed contemporaneously with this exhibit.

received by such Holder under the Plan; (c) do not constitute a recommendation to any Holder of Claims or Equity Interests as to how such Holder should vote or otherwise act with respect to the Plan; and (d) do not necessarily reflect the actual market value that might be realized through a sale or liquidation of the Reorganized Debtors.

In preparing the estimates set forth below, Evercore has relied upon the accuracy, completeness, and fairness of financial, reserve and other information furnished by the Debtors. Evercore did not attempt to independently audit or verify such information, nor did it perform an independent appraisal of the assets or liabilities of the Reorganized Debtors.

The estimated values set forth herein assume that the Reorganized Debtors will achieve their Projections in all material respects. Evercore has relied on the Debtors' representation and warranty that the Projections: (a) have been prepared in good faith; (b) are based on fully disclosed assumptions, which, in light of the circumstances under which they were made, are reasonable; (c) reflect the Debtors' best currently available estimates; and (d) reflect the good faith judgments of the Debtors. Evercore does not offer an opinion as to the attainability of the Projections. As disclosed in the Disclosure Statement, the future results of the Reorganized Debtors are dependent upon various factors, many of which are beyond the control or knowledge of the Debtors and Evercore, and consequently are inherently difficult to project.

This analysis contemplates facts and conditions known and existing as of the date of the Disclosure Statement. Events and conditions subsequent to this date, including updated projections, as well as other factors, could have a substantial effect upon the Total Enterprise Value. Among other things, failure to consummate the Plan in a timely manner may have a materially negative effect on the Total Enterprise Value. For purposes of this valuation, Evercore has assumed that no material changes that would affect value will occur between the date of the Disclosure Statement and the assumed Effective Date.

Evercore did not consider any one analysis or factor to the exclusion of any other analyses or factors. Accordingly, Evercore believes that its analysis and views must be considered as a whole and that selecting portions of its analysis and factors could create a misleading or incomplete view of the processes underlying the preparation of the valuation. Reliance on only one of these methodologies used or portions of the analysis performed could create a misleading or incomplete conclusion.

The following is a summary of analyses performed by Evercore to arrive at its recommended range of estimated Total Enterprise Value for the Reorganized Debtors.

### A. Net Asset Value

The value of the Debtors' proved, probable and possible (together, "3P") oil and gas reserves was estimated using a net asset value ("NAV") analysis. The NAV analysis estimates the value of the business by calculating the sum of the present value of cash flows generated by the Debtors' 3P reserves. Under this methodology, future cash flows from the Debtors' reserve report are discounted using various discount rates depending on reserve category. The Total Enterprise Value of the Reorganized Debtors is then calculated by adjusting the aggregate discounted cash flows for the present value of future general and administrative costs, lease rentals and bank fees, administrative capital, plug & abandonment expenses, hedge impact and taxes.

### B. Comparable Company Analysis

The comparable company analysis estimates the value of a company based on a relative comparison with other publicly traded companies with similar operating and financial characteristics.

Under this methodology, the enterprise value for each selected public company is determined by examining the trading prices for the equity securities of such company in the public markets and adding either the aggregate amount or market value of outstanding net debt for such company. Such enterprise values are commonly expressed as multiples of various measures of financial and operating statistics, such as earnings before interest, taxes, depreciation, depletion, amortization and exploration expenses ("EBITDAX"). The Total Enterprise Value is then calculated by applying these multiples to the Reorganized Debtors' actual and projected financial metrics. The selection of public comparable companies for this purpose was based upon the geographic location, scale, percentage of developed and undeveloped reserves, quantum of reserves relative to production and percentage of reserves represented by oil and natural gas liquids relative to natural gas, company tax structure as well as other characteristics that were deemed relevant.

### C.  Discounted Cash Flow Analysis

The discounted cash flow ("DCF") analysis estimates the value of the Debtors' business by calculating the present value of expected future cash flows to be generated by that asset or business. Under this methodology, projected future cash flows are discounted by a range of discount rates above and below the Debtors' estimated weighted average cost of capital (the "Discount Rate"). The Total Enterprise Value of the Reorganized Debtors is determined by calculating the present value of Reorganized Debtors' unlevered after-tax free cash flows over the course of the projection period plus an estimate for the value of the Reorganized Debtors beyond the projection period, known as the terminal value. The terminal values are calculated using (a) a range of EBITDAX multiples based on public company trading and (b) a range of perpetuity growth rates.

### D.  Precedent Transactions Analysis

Precedent transactions analysis estimates the value of a company by examining public and private transactions on both a corporate and asset-level basis. Under this methodology, transaction values are commonly expressed as multiples of various measures of financial and operating statistics, such as EBITDAX, proved reserves, acreage and production. The selection of asset-level transactions for this purpose was based upon the commodity weighting, reserve life, asset type, commodity price environment, development level, relative size, geographic location, and other characteristics that were deemed relevant. The selection of corporate transactions for this purpose was based upon the asset type, relative size and other characteristics that were deemed relevant. For precedent corporate transactions, due to the significant variation in commodity prices for the precedent transactions, proved reserve, and production multiples were not utilized in this analysis. The Total Enterprise Value in this case is calculated by applying multiples of EBITDAX to the Reorganized Debtors' actual and projected financial results.  For precedent asset transactions, a "sum-of-the-parts" approach using asset-level proved reserve, acreage and production level multiples, as applicable, was employed.

### E.  Total Enterprise Value and Implied Equity Value

The assumed range of the reorganization value, as of an assumed Emergence Date of October 31, 2019, reflects work performed by Evercore on the basis of information with respect to the business and assets of the Debtors available to Evercore as of the date of the Disclosure Statement. It should be understood that, although subsequent developments may affect Evercore's conclusions, Evercore does not have any obligation to update, revise, or reaffirm its estimate.

As a result of the analysis described herein, Evercore estimated the Total Enterprise Value of the Reorganized Debtors to be approximately $350 million to $500 million, with a midpoint of $425 million as of the assumed Emergence Date of October 31, 2019. Based on the assumed pro forma net debt of $160

million as of the Emergence Date, the Total Enterprise Value implies an Equity Value range of $190 million to $340 million, with a midpoint of $265 million. This estimate is based in part on information provided by the Debtors, solely for purposes of the Plan. For purposes of this analysis, Evercore assumes that no material changes that would affect value as stipulated in the Plan between the date of the Disclosure Statement and the Emergence Date.

The estimate of Total Enterprise Value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein depending on the results of the Debtors' operations or changes in the financial markets. Additionally, these estimates of value represent hypothetical enterprise and equity values of the Reorganized Debtors as the continuing operator of the Debtors' businesses and assets, and do not purport to reflect or constitute appraisals, liquidation values, or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. Such estimates were developed solely for purposes of formulation and negotiation of the Plan and analysis of implied relative recoveries to creditors thereunder. The value of an operating business such as the Debtors' businesses is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such businesses.

Evercore's estimated valuation range of the Reorganized Debtors does not constitute a recommendation to any Holder of Claims or Equity Interests as to how such Holder should vote or otherwise act with respect to the Plan. The estimated value of the Reorganized Debtors set forth herein does not constitute an opinion as to the fairness from a financial point of view to any Holder of the consideration to be received by such Holder under the Plan or of the terms and provisions of the Plan. Because valuation estimates are inherently subject to uncertainties, none of the Debtors, Evercore, or any other person assumes responsibility for their accuracy or any differences between the estimated valuation ranges herein and any actual outcome.

Evercore is acting as investment banker and financial advisor to the Debtors, and will not be responsible for, and will not provide, any tax, accounting, actuarial, legal or other specialist advice.

**EXHIBIT E**

**Liquidation Analysis**

# LIQUIDATION ANALYSIS[1]

## Introduction

Under the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a plan of reorganization unless the plan provides each holder of an allowed claim or interest that does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate that the Plan satisfies the best interests of creditors test, the Debtors, with the assistance of their restructuring advisors, AlixPartners, LLP, have prepared the hypothetical liquidation analysis (the "Liquidation Analysis"), which is based upon certain assumptions discussed in the Disclosure Statement and accompanying notes to the Liquidation Analysis.

The Liquidation Analysis sets forth an estimated range of recovery values for each Class of Claims and Interests upon disposition of assets pursuant to a hypothetical chapter 7 liquidation. As illustrated by this Liquidation Analysis, holders of Claims or Interests in Impaired Classes and Holders of Claims in certain Unimpaired Classes that would receive a full recovery under the Plan would receive a lower recovery in a hypothetical liquidation than they would under the Plan. Further, no holder of a Claim or Interest would receive or retain property under the Plan of a value that is less than such holder would receive in a chapter 7 liquidation. Accordingly, and as set forth in greater detail below, the Debtors believe that the Plan satisfies the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code.

## Statement of Limitations

The preparation of a liquidation analysis is an uncertain process involving the use of estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their advisors, are inherently subject to significant business, economic, and competitive risks, uncertainties and contingencies, most of which are difficult to predict and many of which are beyond the control of the Debtors, their management, and their advisors. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended and should not be used for any other purpose. The underlying financial information in the Liquidation Analysis and values stated herein have not been subject

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (as altered, amended, modified, or supplemented from time to time, the "Plan").

to any review, compilation, or audit by any independent accounting firm. In addition, various liquidation decisions upon which certain assumptions are based are subject to change. As a result, the actual amount of claims that would ultimately be Allowed against the Debtors' estates could vary significantly from the estimates stated herein, depending on the nature and amount of claims asserted during the pendency of the chapter 7 case. Similarly, the value of the Debtors' assets in a liquidation scenario is uncertain and could vary significantly from the values set forth in the Liquidation Analysis.

The Liquidation Analysis was prepared for the sole purpose of generating a reasonable and good faith estimate of the recoveries that would result if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code and is not intended and should not be used for any other purpose. The Liquidation Analysis does not include estimates for: (i) the tax consequences, either foreign or domestic, that may be triggered upon the liquidation and sale of assets, (ii) recoveries resulting from any potential preference, fraudulent transfer, or other litigation or avoidance actions, (iii) certain claims that may be entitled to priority under the Bankruptcy Code, including administrative priority claims under sections 503(b) and 507(b) of the Bankruptcy Code, or (iv) additional unsecured and contract breakage claims arising from a chapter 7 liquidation. More specific assumptions are detailed in the notes below. ACCORDINGLY, NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A LIQUIDATION OF THE DEBTORS WOULD OR WOULD NOT, IN WHOLE OR IN PART, APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED HEREIN. THE ACTUAL LIQUIDATION VALUE OF THE DEBTORS IS SPECULATIVE AND RESULTS COULD VARY MATERIALLY FROM ESTIMATES PROVIDED HEREIN.

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review the Debtors' financial statements to account for other known liabilities, as necessary. In addition, the Liquidation Analysis includes estimates for Claims not currently asserted in the chapter 11 cases, but which could be asserted and allowed in a chapter 7 liquidation, including unpaid chapter 11 Administrative Claims, and chapter 7 administrative claims such as wind down costs and trustee fees (together, the "Wind-Down Expenses"). To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing this Liquidation Analysis. Therefore, the Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and Interests under the Plan. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS. THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.

## Basis of Presentation

The Liquidation Analysis has been prepared assuming that the Debtors converted their current chapter 11 cases to cases under chapter 7 of the Bankruptcy Code on or about December 13, 2019 (the "Liquidation Date").  Except as otherwise noted herein, the Liquidation Analysis is based upon the unaudited financial statements of the Debtors as of June 30, 2019 and those values, in total, are assumed to be representative of the Debtors' assets and liabilities as of the Liquidation Date.  The Debtors' management team believes that the June 30, 2019 book value of assets and certain liabilities are a proxy for such book values as of the Liquidation Date.  It is assumed that on the Liquidation Date, the Bankruptcy Court would appoint a chapter 7 trustee (the "Trustee") to oversee the liquidation of the Debtors' estates, during which time all of the assets of the Debtors would be sold and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with applicable law: (i) *first*, for payment of liquidation, wind down expenses and trustee fees attributable to the Wind-Down Expenses; (ii) *second*, to pay the secured portions of all Allowed Secured Claims, including the DIP Facility Claims, from the respective collateral; and (iii) *third*, to pay amounts on the Allowed Other Priority Claims.  Any remaining net cash would be distributed to creditors holding Unsecured Claims, including deficiency Claims that arise to the extent of the unsecured portion of the Allowed Secured Claims.  An inability by the Debtors or the Trustee to maintain the Debtors' operations during the marketing period, a seizure of collateral by secured creditors, and/or significant employee attrition would likely yield significantly lower recoveries than those estimated in this Liquidation Analysis.  Accordingly, this Liquidation Analysis represents recoveries under a potentially optimistic-case chapter 7 liquidation scenario.

The Liquidation Analysis has been prepared assuming that the Debtors' current chapter 11 cases convert to chapter 7 on the Liquidation Date.  This Liquidation Analysis assumes operations of the Liquidating Entities will cease and the related individual assets will be sold in a sale under a three-month liquidation process (the "Liquidation Timeline") under the direction of the Trustee, utilizing the Debtors' resources and third-party advisors, to allow for the orderly wind down of the Debtors' estates.  There can be no assurance that the liquidation would be completed in a limited time frame, nor is there any assurance that the recoveries assigned to the assets would in fact be realized. Under section 704 of the Bankruptcy Code, a trustee must, among other duties, collect and convert the property of the estate as expeditiously (generally in a distressed process) as is compatible with the best interests of parties-in-interest.  The Liquidation Analysis is also based on the assumptions that: (i) the Debtors have continued access to cash collateral during the course of the Liquidation Timeline to fund Wind Down Expenses and (ii) operations, accounting, treasury, IT, and other management services needed to wind down the estates continue.  The Liquidation Analysis was prepared on a by-entity basis for all Liquidating Entities and is displayed below on a consolidated basis for convenience.  Asset recoveries accrue first to satisfy creditor claims at the legal entity level.  To the extent any remaining value exists, it flows to each individual entity's parent

organization or appropriate shareholder. In addition, the Liquidation Analysis includes an analysis of the recovery of pre-petition Intercompany Claims.

## DETAILED LIQUIDATION ANALYSIS

The liquidation analysis for the Liquidation Entities was analyzed on a by-entity basis. The following Liquidation Analysis for the Liquidating Entities should be reviewed in conjunction with the associated notes.

| Sheridan Fund II Hypothetical Liquidation Analysis | | | | | | |
|---|---|---|---|---|---|---|
| *In $Thousands* | Note: | Book Value | Recovery % Low | Recovery % High | Recovery $ Low | Recovery $ High |
| Cash and Cash Equivalents | [A] | $ 14,062 | 100% | 100% | $ 14,062 | $ 14,062 |
| Accounts Receivable | [B] | 11,897 | 80% | 95% | 9,517 | 11,302 |
| Prepaid Expenses | [C] | 3,027 | 12% | 14% | 356 | 438 |
| Oil and Gas Property and Equipment | [D] | 1,545,237 | 19% | 21% | 300,000 | 318,750 |
| Furniture, Fixtures and Other Office Equipment | [E] | 3,234 | 25% | 40% | 809 | 1,294 |
| Other Non-current Assets | [F] | 14,941 | 0% | 0% | - | - |
| Intercompany Receivables | [G] | 12,914 | 34% | 34% | 4,393 | 4,393 |
| Intercompany Notes Receivable | [H] | 154,616 | 0% | 0% | - | - |
| **Total Assets** | | **$ 1,759,929** | **19%** | **20%** | **$ 329,136** | **$ 350,238** |
| | | | | | | |
| **Wind-Down Expenses** | [I] | | | | 18,651 | 19,706 |
| Wind-Down Expenses Recovery | | | | | $ 18,651 | $ 19,706 |
| *Priority Recovery %* | | | | | *100.0%* | *100.0%* |
| | | | | | | |
| **DIP Claims** | [J] | | | | $ 100,000 | $ 100,000 |
| DIP Recovery | | | | | 100,000 | 100,000 |
| *DIP Recovery %* | | | | | *100.0%* | *100.0%* |
| | | | | | | |
| **Total Fund II Secured Claims** | [K] | | | | $ 569,284 | $ 569,284 |
| Total Fund II Secured Recovery | | | | | 210,486 | 230,532 |
| Total Fund II Secured Claims Deficiency Recovery | | | | | - | - |
| Total Fund II Recovery from Subordination Clause | | | | | - | - |
| **Total Fund II Secured Recovery** | | | | | **$ 210,486** | **$ 230,532** |
| *Total Fund II Secured Recovery %* | | | | | *37.0%* | *40.5%* |
| | | | | | | |
| **Total Fund II Unsecured Subordinated Term Loan Claim** | [L] | | | | $ 492,762 | $ 492,762 |
| Total Fund II Unsecured Subordinated Term Loan Recovery | | | | | - | - |
| *Total Fund II Unsecured Subordinated Term Loan Recovery %* | | | | | *0.0%* | *0.0%* |
| | | | | | | |
| **General Unsecured Claims** | [M] | | | | $ 11,200 | $ 11,200 |
| General Unsecured Recovery | | | | | - | - |
| *General Unsecured Recovery %* | | | | | *0.0%* | *0.0%* |
| | | | | | | |
| **Intercompany Unsecured Claims** | [N] | | | | $ 11,977 | $ 11,977 |
| Intercompany Unsecured Recovery | | | | | - | - |
| *Intercompany Unsecured Recovery %* | | | | | *0.0%* | *0.0%* |
| | | | | | | |
| **Intercompany Unsecured Notes Payable Claims** | [N] | | | | $ 154,616 | $ 154,616 |
| Intercompany Unsecured Notes Payable Recovery | | | | | - | - |
| *Intercompany Unsecured Notes Payable Recovery %* | | | | | *0.0%* | *0.0%* |
| | | | | | | |
| **Total Distributions** | | | | | **$ 329,136** | **$ 350,238** |

**Notes to the Liquidation Analysis**

[A] <u>Cash and Cash Equivalents</u>: The cash balance represents the estimated balance as of the Liquidation Date. A 100% recovery on cash and equivalents has been estimated for the low and high cases.

[B] <u>Accounts Receivable</u>: A 80% to 95% recovery has been estimated for the Debtors' receivables based on the high likelihood of recoverability.

[C] <u>Prepaid Expenses</u>: Prepaid expenses consist of prepaid items that will likely be largely unrecoverable in the event of a chapter 7 liquidation and have been evaluated on an individual basis. On a blended basis, a 12% to 14% recovery has been estimated on the Debtors' other prepaid expenses.

[D] <u>Oil and Gas Property and Equipment</u>: Oil and gas property and equipment recoveries have been estimated based on discounts to market-based indications of value for the subject property. The estimated recovery of $300 million to $319 million implies a recovery 19% to 21% of net book value.

[E] <u>Furniture, Fixtures, and Other Office Equipment</u>: Furniture, Fixtures, and Other Office Equipment consists of tangible assets such as vehicles that will likely have valid recovery values and other intangible assets such as developed software that are likely to be largely unrecoverable in a liquidation scenario. On a blended basis, a recovery of 25% to 40% of the June 30, 2019 net book value has been estimated.

[F] <u>Other Non-current Assets</u>: Other non-current assets consist of accounting assets that are not expected to have economic value in a liquidation scenario. No recovery has been assigned to these accounting assets.

[G] <u>Intercompany Receivables</u>: Intercompany receivables represent claims on other entities, both within the Debtors and against other Non-Debtor entities. Recoveries from Non-Debtors is estimated to be 100% of receivables while receivables from other Debtors receive no recovery. On a blended basis, the recovery is 34% of net book value.

[H] <u>Intercompany Notes Receivable</u>: Intercompany notes receivable represents a receivable balance between two Debtor entities. Based on an analysis of the recovery waterfall, no recovery is expected on this asset in a liquidation.

[I] <u>Wind-Down Expenses</u>: Wind-Down Expenses represent the expenses associated with administering the chapter 7 liquidation. A combined 5% trustee and related legal expense has been applied to non-cash asset recovery values. Additionally, an estimated $2.6 million of wind down expenses, and certain priority liabilities (e.g., accrued salary) that have been included in the estimated Wind-Down Expenses. A full recovery is estimated for Wind-Down Expenses.

[J] <u>DIP Claims</u>:  Represents the projected DIP balance as of the Liquidation Date.  A full recovery is estimated for DIP Claims.

[K] <u>Secured Claims</u>:  Represents the estimated claims for the Term Loan, Revolver and net derivative claims, net of the $50 million of principal which was rolled as part of the DIP.  Based on the available proceeds to pay Secured Claims, a blended recovery of 37.0% to 40.5% has been estimated for the Secured Claims.

[L] <u>Unsecured Subordinated Term Loan Claims</u>:  Represents the estimated Unsecured Subordinated Term Loan Claims as of June 2019.  No recovery has been estimated for the Unsecured Subordinated Term Loan Claims.

[M] <u>General Unsecured Claims</u>:  General Unsecured Claims represent an estimate of pre-petition unsecured claims.  Recovery on General Unsecured Claims is estimated to be 0%.

[N] <u>Intercompany Unsecured Claims and Intercompany Notes Payable Claims</u>:  Represents total payables by the Debtors to other Debtors and Non-Debtors.  Recovery on Intercompany Claims is estimated to be $0.