**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| SHERIDAN HOLDING COMPANY II, LLC, *et al.*,[1] | § | Case No. 19-35198 (MI) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |
| | § | **Re: Docket Nos. 192, 196** |

**NOTICE OF FILING OF SECOND SUPPLEMENT TO PLAN SUPPLEMENT**

**PLEASE TAKE NOTICE** that on October 24, 2019, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *Notice of Filing Plan Supplement for the Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code (Technical Modifications)* [Docket No. 192] (the "Original Plan Supplement") with the United States Bankruptcy Court for the Southern District of Texas (the "Court").

**PLEASE TAKE FURTHER NOTICE** that on October 28, 2019, the Debtors filed the *Notice of Filing of First Supplement to Plan Supplement* [Docket No. 196] (the "First Amended Plan Supplement").

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file this second amendment to the Original Plan Supplement (the "Second Amended Plan Supplement," and, together with the Original Plan Supplement and the First Amended Plan Supplement, the "Plan Supplement") in support of the *Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code (Technical Modifications)* [Docket No. 103] (as may be amended or modified from time to time and including all exhibits and supplements thereto, the "Plan").[2]

**PLEASE TAKE FURTHER NOTICE** that the Second Amended Plan Supplement includes current drafts of the following documents (which continue to be negotiated between the Debtors, the Consenting Sheridan II Revolving Lenders, the Consenting Sheridan II Term Lenders, and the Consenting Sheridan II Subordinated Term Lenders (together, the "Consenting Creditors") and will be filed in substantially final form on or prior to the Effective Date), as may be modified, amended, or supplemented from time to time:

| | |
|---|---|
| **Exhibit A** | Restructuring Transactions Memorandum |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sheridan Holding Company II, LLC (7040); Sheridan Investment Partners II GP, LLC (8298); Sheridan Investment Partners II, L.P. (9405); Sheridan Production Partners II, LLC (8034); Sheridan Production Partners II-A, L.P. (8813); Sheridan Production Partners II-B, L.P. (9232); Sheridan Production Partners II-M, L.P. (9084); SPP II-B GP, LLC (8554); and SPP II-M GP, LLC (0488). The location of the Debtors' service address is: 1360 Post Oak Blvd., Suite 2500, Houston, Texas 77056.

[2] Capitalized terms used but not defined in herein have the meanings given to them in the Plan.

| | |
|---|---|
| **Exhibit A-1** | Redline of the Restructuring Transactions Memorandum to the version filed in the Original Plan Supplement |
| **Exhibit H** | Form of Purchase and Sale Agreement and Profits Interest Term Sheet |
| **Exhibit I** | Form of Plan Administrator Agreement |
| **Exhibit J** | Asset Sale Election Notice |
| **Exhibit K** | Wind-Down Budget |

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve all rights, with the consent of any applicable counterparties to the extent required under the Plan and/or the RSA, to alter, amend, modify, or supplement the Plan Supplement and any of the documents contained therein in accordance with the terms of the Plan; *provided* that, if any document in the Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the Confirmation Hearing, the Debtors will file a redline of such document with the Court.

**PLEASE TAKE FURTHER NOTICE** that the documents contained in the Plan Supplement are integral to, and are considered part of, the Plan.  If the Plan is approved, the documents contained in the Plan Supplement will be approved by the Court pursuant to the order confirming the Plan.

**PLEASE TAKE FURTHER NOTICE** that the Debtors will seek confirmation of the Plan at the Confirmation Hearing scheduled for **November 12, 2019, at 2:00 p.m., prevailing Central Time** before the Honorable Marvin Isgur at the United States Bankruptcy Court, Courtroom 404, 515 Rusk Street, Houston, Texas, 77002.

**PLEASE TAKE FURTHER NOTICE** that copies of all documents filed in these chapter 11 cases are available free of charge by visiting http://cases.primeclerk.com/SheridanII. You may also obtain copies of any pleadings by visiting the Court's website at https://ecf.txsb.uscourts.gov in accordance with the procedures and fees set forth therein.

[*Remainder of page intentionally left blank*]

Houston, Texas
November 5, 2019

/s/ Matthew D. Cavenaugh

Matthew D. Cavenaugh (TX Bar No. 24062656)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:    (713) 752-4200
Facsimile:    (713) 752-4221
Email:        mcavenaugh@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        joshua.sussberg@kirkland.com
              steven.serajeddini@kirkland.com

-and-

Spencer A. Winters (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        spencer.winters@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**<u>Certificate of Service</u>**

I certify that on November 5, 2019, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*

Matthew D. Cavenaugh

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| SHERIDAN HOLDING COMPANY II, LLC, *et al.*,[1] | § | Case No. 19-35198 (MI) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**SECOND SUPPLEMENT TO PLAN SUPPLEMENT FOR THE
DEBTORS' JOINT PREPACKAGED PLAN OF REORGANIZATION PURSUANT
TO CHAPTER 11 OF THE BANKRUPTCY CODE (TECHNICAL MODIFICATIONS)**

**Table of Contents**[2]

**Exhibit A**        Restructuring Transactions Memorandum

**Exhibit A-1**      Redline of the Restructuring Transactions Memorandum to the version filed in the Original Plan Supplement

**Exhibit H**        Form of Purchase and Sale Agreement and Profits Interest Term Sheet

**Exhibit I**        Form of Plan Administrator Agreement

**Exhibit J**        Asset Sale Election Notice

**Exhibit K**        Wind-Down Budget

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Sheridan Holding Company II, LLC (7040); Sheridan Investment Partners II GP, LLC (8298); Sheridan Investment Partners II, L.P. (9405); Sheridan Production Partners II, LLC (8034); Sheridan Production Partners II-A, L.P. (8813); Sheridan Production Partners II-B, L.P. (9232); Sheridan Production Partners II-M, L.P. (9084); SPP II-B GP, LLC (8554); and SPP II-M GP, LLC (0488).  The location of the Debtors' service address is:  1360 Post Oak Blvd., Suite 2500, Houston, Texas 77056.

[2]   Capitalized terms used but not defined in herein have the meanings given to them in the *Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code (Technical Modifications)* [Docket No. 103] (as may be amended or modified from time to time and including all exhibits and supplements thereto, the "Plan").

## Exhibit A

### Restructuring Transactions Memorandum

Certain documents, or portions thereof, contained in this **Exhibit A** and the Plan Supplement remain subject to continuing negotiations and review by the Debtors and the Consenting Creditors.

The respective rights of the Debtors and the Consenting Creditors are expressly reserved, subject to the terms and conditions set forth in the Plan and the RSA, to alter, amend, modify, or supplement the Plan Supplement and any of the documents contained therein in accordance with the terms of the Plan, or by order of the Bankruptcy Court; *provided* that, if any document in the Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the Confirmation Hearing, the Debtors will file a redline of such document with the Bankruptcy Court.

*DRAFT*
*SUBJECT TO REVISION*

**Restructuring Transactions**

Article IV of the Plan provides for the means of implementing the Plan. Pursuant to and without limiting the generality of Article IV of the Plan, the Debtors and/or the Plan Administrator, as applicable, intend to generally implement the following Restructuring Transactions on or after the Effective Date:

1. The Debtors shall consummate the Asset Sale by, among other things, transferring substantially all of the assets of Sheridan Holding Company II, LLC, Sheridan Production Partners II-A, L.P., and Sheridan Production Partners II-M, L.P. to Crossing Rocks Energy Operating, LLC (the "Purchaser"). In exchange, the Purchaser shall transfer the Sale Proceeds to Sheridan Holding Company II, LLC, Sheridan Production Partners II-A, L.P., and Sheridan Production Partners II-M, L.P.

2. The Plan Administrator shall use the Sale Proceeds, in addition to the other sources of plan consideration set forth in Article IV.F of the Plan, to fund the distributions to Holders of Allowed Claims against the Debtors in accordance with the treatment of such Claims and the Wind-Down Budget and subject to the terms provided in the Plan.

3. The Plan Administrator shall take any action necessary to wind down the Debtors' Estates.

4. The Plan Administrator shall close all of the chapter 11 cases except for one of the chapter 11 cases as determined by the Reorganized Debtors and the Required Consenting Secured Lenders.

5. Upon completion of the Wind Down, the Plan Administrator shall close the remaining open chapter 11 case and dissolve the Reorganized Debtors.

## Exhibit A-1

**Redline of the Restructuring Transactions**
**Memorandum to the version filed in the Original Plan Supplement**

*DRAFT*
*SUBJECT TO REVISION*

## ~~Description of~~ **Restructuring Transactions**

~~Pursuant to~~ Article IV.~~B~~ of the Plan provides for the means of implementing the Plan.  Pursuant to and without limiting the generality of Article IV of the Plan, ~~if~~ the ~~Reorganized~~ Debtors and/or the Plan Administrator, as applicable, intend to generally implement the ~~Equitization, the~~ following Restructuring ~~t~~Transactions ~~will occur.~~

on or after ~~Before~~ the Effective Date:

1. ~~New Sheridan, [Intermediate HoldCo] ("Intermediate") and [Lower HoldCo] ("HoldCo") will be formed on behalf of the [Sheridan II Revolving Lenders, the Sheridan II Term Lenders, and the Sheridan II Subordinated Term Lenders].  Each of New Sheridan, Intermediate, and HoldCo will be formed as either a corporation or a limited liability corporation that elects to be taxed as a C corporation for U.S. tax purposes.~~

2. ~~Sheridan II Revolving Lenders and the Sheridan II Term Lenders will be separated into two groups: (1) "Group A Creditors" (consisting of Holders of Claims holding, in the aggregate, more than 20% of total Claims, but less than 50% of total Claims) who will receive New Common Stock from the Reorganized Debtors in satisfaction of their Claims (the "Group A Claims") and (2) "Group B Creditors" (consisting of Holders of Claims holding, in the aggregate, less than 80% of total Claims) who will contribute a portion of their Claims (the "Group B Claims") directly to New Sheridan in exchange for New Common Stock.~~

~~On the Effective Date, the Reorganized Debtors will undertake the following transactions, which will be deemed to occur in the following order:~~

1. ~~Group B Creditors will contribute a portion of their Claims (the "Contributed Claims") to New Sheridan in exchange for shares of New Common Stock that will constitute more than 50% but less than 80% of the total shares of New Common Stock.[1]~~

2. ~~New Sheridan will contribute the Contributed Claims to Intermediate, which will contribute the Contributed Claims to HoldCo.~~

3. ~~New Sheridan will issue shares of New Common Stock to Intermediate, which will contribute such shares of New Common Stock to HoldCo.[2]~~

4. ~~Sheridan Production Partners II-B, L.P. will distribute all of its assets to Sheridan Investment Partners II, L.P. in complete liquidation and all existing equity Interests in Sheridan Production Partners II-B, L.P. will be cancelled.~~

---

[1] ~~The remaining Claims held by Group B Creditors will be exchanged in Step 6.c for Tranche C of the First-Out/Second-Out Exit Facility.~~

[2] ~~The amount of shares of New Common Stock issued in Step 3 shall correspond to the number of shares of New Common Stock to which the Group A Creditors and Sheridan II Subordinated Term Lenders are entitled under the Plan.~~

1. ~~5.   Each~~The Debtors shall consummate the Asset Sale by, among other things, transferring substantially all of the assets of Sheridan ~~Investment Partners~~Holding Company II, LL~~C-P.~~C, Sheridan Production Partners II-A, L.P., and Sheridan Production Partners II-M, L.P. ~~will transfer its assets to HoldCo in exchange for (a) a portion of the shares of New Common Stock contributed to HoldCo in Step 3, (b) the Contributed Claims with respect to such Reorganized Debtor, (c) a portion of Tranche A of the First-Out/Second-Out Exit Facility, (d) a portion of Tranche B of the First-Out/Second-Out Exit Facility and (e) a portion of Tranche C of the First-Out/Second-Out Exit Facility.³~~

~~6.~~ to Crossing Rocks Energy Operating, LLC (the "Purchaser").  In exchange, the Purchaser shall transfer the Sale Proceeds to ~~Simultaneously:  Each of~~ Sheridan ~~Investment Partners~~Holding Company II, LL~~C-P.~~C, Sheridan Production Partners II-A, L.P., and Sheridan Production Partners II-M, L.P.~~will deliver:~~

2. The Plan Administrator shall use the Sale Proceeds, in addition to the other sources of plan consideration set forth in Article IV.F of the Plan, to fund the distributions to Holders of Allowed Claims against the Debtors in accordance with the treatment of such Claims and the Wind-Down Budget and subject to the terms provided in the Plan.

3. The Plan Administrator shall take any action necessary to wind down the Debtors' Estates.

4. The Plan Administrator shall close all of the chapter 11 cases except for one of the chapter 11 cases as determined by the Reorganized Debtors and the Required Consenting Secured Lenders.

5. Upon completion of the Wind Down, the Plan Administrator shall close the remaining open chapter 11 case and dissolve the Reorganized Debtors.

> ~~a. New Common Stock to the Sheridan II Subordinated Term Lenders of such Reorganized Debtor in full satisfaction of their Claims.~~

> ~~b. New Common Stock and Tranche C of the First-Out/Second-Out Exit Facility to the Group A Creditors of such Reorganized Debtor in full satisfaction of their Claims.~~

> ~~c. Tranche C of the First-Out/Second-Out Exit Facility to the Group B Creditors of such Reorganized Debtor in full satisfaction of the portion of their Claims not contributed to New Sheridan in Step 1.~~

---

~~³   The portion of New Common Stock, Tranche A of the First-Out/Second-Out Exit Facility, Tranche B of the First-Out/Second-Out Exit Facility and Tranche C of the First-Out/Second-Out Exit Facility (together, the "**HoldCo Consideration**") that will be transferred to each Reorganized Debtor will correspond to the amount of HoldCo Consideration to be distributed to such Reorganized Debtor's creditors in Step 6 hereof.~~

d. Tranche A of the First-Out/Second-Out Exit Facility to each Holder of Allowed New Money DIP Claims of such Reorganized Debtor in full satisfaction of such Claims.

e. Tranche B of the First-Out/Second-Out Exit Facility to each Holders of Allowed Roll-Up DIP Claims of such Reorganized Debtor in full satisfaction of such Claims.

7. All remaining Interests in Class 9 will be cancelled.

## **Exhibit H**

**Form of Purchase and Sale Agreement and Profits Interest Term Sheet**

Certain documents, or portions thereof, contained in this **Exhibit H** and the Plan Supplement remain subject to continuing negotiations and review by the Debtors and the Consenting Creditors.

The draft Purchase and Sale Agreement attached herein (the "Draft Purchase and Sale Agreement") is subject to material revision in all respects.  The Draft Purchase and Sale Agreement is subject in all respects to the consent rights set forth in the RSA.  At this time, the the Required Consenting Secured Lenders have not made an election to pursue an asset sale.  Consents are being solicited at this time.  The respective rights of the Debtors and the Consenting Creditors are expressly reserved, subject to the terms and conditions set forth in the Plan and the RSA, to alter, amend, modify, or supplement the Plan Supplement and any of the documents contained therein in accordance with the terms of the Plan, or by order of the Bankruptcy Court; *provided* that, if any document in the Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the Confirmation Hearing, the Debtors will file a redline of such document with the Bankruptcy Court.

*DRAFT*
*SUBJECT TO REVISION*

# PURCHASE AND SALE AGREEMENT

**between**

**SHERIDAN HOLDING COMPANY II, LLC, et al.**

**and**

**CROSSING ROCKS ENERGY OPERATING, LLC**

**EXECUTED ON NOVEMBER [•], 2019**

**THE FOLLOWING DRAFT IS FOR DISCUSSION PURPOSES ONLY AND IS NOT BINDING ON THE PARTIES.  NO TRANSACTION OR AGREEMENT TO ENTER INTO A TRANSACTION WILL EXIST OR BE DEEMED TO EXIST UNTIL A DEFINITIVE AGREEMENT IS EXECUTED BY ALL PARTIES INVOLVED.**

**THIS DRAFT ASSET PURCHASE AGREEMENT IS SUBJECT IN ALL RESPECTS TO THE CONSENT RIGHTS SET FORTH IN THE RESTRUCTURING SUPPORT AGREEMENT.  AT THIS TIME, THE REQUIRED CONSENTING SECURED LENDERS HAVE NOT MADE AN ELECTION TO PURSUE AN ASSET SALE.  CONSENTS ARE BEING SOLICITED AT THIS TIME.**

# TABLE OF CONTENTS

Page

**ARTICLE I DEFINITIONS AND INTERPRETATION** ...........................................................1
   1.1   Defined Terms .............................................................................1
   1.2   References and Rules of Construction ...........................................1

**ARTICLE II ASSET ACQUISITION** ...............................................................................2
   2.1   Asset Acquisition ........................................................................2
   2.2   Excluded Assets ..........................................................................4
   2.3   Confirmation Order .....................................................................5
   2.4   Assumption and Assignment of Contracts.....................................6

**ARTICLE III CONSIDERATION** ...................................................................................7
   3.1   Consideration ..............................................................................7
   3.2   Deposit .......................................................................................7
   3.3   Adjustments to Purchase Price......................................................7
   3.4   Preliminary Settlement Statement.................................................9
   3.5   Final Settlement Statement ..........................................................9
   3.6   Disputes......................................................................................10
   3.7   Allocated Values .........................................................................10
   3.8   Value Allocations for Tax Purposes .............................................10
   3.9   Withholding ................................................................................11
   3.10  Adjustment Holdback Amount .....................................................11
   3.11  Other Transaction Matters ...........................................................11

**ARTICLE IV ACCESS / DISCLAIMERS**.........................................................................11
   4.1   Access ........................................................................................11
   4.2   Confidentiality ...........................................................................13
   4.3   Disclaimers ................................................................................13

**ARTICLE V TITLE MATTERS; TRANSFER RESTRICTIONS** ...............................15
   5.1   General Disclaimer of Title Warranties and Representations..............15
   5.2   Special Warranty.........................................................................15
   5.3   Notice of Title Defects; Defect Adjustments.................................16
   5.4   Preferential Purchase Rights and Consents...................................22

**ARTICLE VI ENVIRONMENTAL MATTERS**.................................................................24
   6.1   Environmental Defects.................................................................24
   6.2   NORM, Wastes and Other Substances .........................................27

**ARTICLE VII REPRESENTATIONS AND WARRANTIES OF SELLER** .........................28
   7.1   Generally....................................................................................28
   7.2   Organization; Existence...............................................................28
   7.3   Authorization; Enforceability ......................................................28
   7.4   No Conflicts ...............................................................................29
   7.5   Consents.....................................................................................29

i

| 7.6 | Litigation | 29 |
|---|---|---|
| 7.7 | Material Contracts | 29 |
| 7.8 | No Violation of Laws | 31 |
| 7.9 | Preferential Rights | 31 |
| 7.10 | Payment of Burdens | 31 |
| 7.11 | Current Commitments | 31 |
| 7.12 | Taxes | 31 |
| 7.13 | Imbalances | 32 |
| 7.14 | Permits | 32 |
| 7.15 | Brokers' Fees | 32 |
| 7.16 | Environmental Matters | 32 |
| 7.17 | Employee Matters | 33 |
| 7.18 | Insurance | 33 |
| 7.19 | Plugging and Abandonment | 33 |
| 7.20 | Access | 33 |
| 7.21 | Qualified Operator | 34 |
| 7.22 | Leases and Surface Agreements | 34 |
| 7.23 | Wells and Payout Balances | 34 |
| 7.24 | Cure Costs | 34 |
| 7.25 | Hedging | 34 |
| 7.26 | Perdido Litigation Wells | 34 |

**ARTICLE VIII REPRESENTATIONS AND WARRANTIES OF BUYER** .......... **34**

| 8.1 | Organization; Existence | 34 |
|---|---|---|
| 8.2 | Authorization; Enforceability | 35 |
| 8.3 | No Conflicts | 35 |
| 8.4 | Bankruptcy | 35 |
| 8.5 | Litigation | 35 |
| 8.6 | Regulatory | 35 |
| 8.7 | Financing | 36 |
| 8.8 | Independent Evaluation | 36 |
| 8.9 | Brokers' Fees | 36 |
| 8.10 | Accredited Investor | 36 |

**ARTICLE IX CERTAIN AGREEMENTS** .......... **36**

| 9.1 | Conduct of Business | 36 |
|---|---|---|
| 9.2 | Governmental Bonds | 38 |
| 9.3 | Reports | 38 |
| 9.4 | HSR Act | 38 |
| 9.5 | Amendment to Schedules | 39 |
| 9.6 | Operatorship | 39 |
| 9.7 | Post-Closing Revenues | 39 |
| 9.8 | Profits Interest Documents | 40 |
| 9.9 | Change of Name | 41 |
| 9.10 | Casualty Loss | 42 |
| 9.11 | Suspended Funds | 42 |
| 9.12 | Bankruptcy Actions | 42 |

**ARTICLE X BUYER'S CONDITIONS TO CLOSING** ................................................**43**
    10.1    Representations ...............................................................................43
    10.2    Performance ....................................................................................43
    10.3    No Legal Proceedings .....................................................................43
    10.4    Title Defects, Environmental Defects, Consents, and Preferential Purchase
             Rights ..............................................................................................44
    10.5    HSR Act ..........................................................................................44
    10.6    Confirmation Order .........................................................................44
    10.7    Closing Deliverables .......................................................................44

**ARTICLE XI SELLER'S CONDITIONS TO CLOSING** .............................................**44**
    11.1    Representations ...............................................................................44
    11.2    Performance ....................................................................................44
    11.3    No Legal Proceedings .....................................................................44
    11.4    Title Defects, Environmental Defects, Consents, and Preferential Purchase
             Rights ..............................................................................................45
    11.5    HSR Act ..........................................................................................45
    11.6    Confirmation Order .........................................................................45
    11.7    Closing Deliverables .......................................................................45

**ARTICLE XII CLOSING** .......................................................................................**45**
    12.1    Date of Closing ...............................................................................45
    12.2    Place of Closing ..............................................................................45
    12.3    Closing Obligations ........................................................................45
    12.4    Delivery of Records ........................................................................47

**ARTICLE XIII ASSUMPTION; INDEMNIFICATION; SURVIVAL** ................................**48**
    13.1    Assumed Obligations ......................................................................48
    13.2    Indemnification by Seller ................................................................48
    13.3    Indemnification by Buyer ................................................................48
    13.4    Indemnity Holdback; Limitations on Liability ...............................49
    13.5    EXPRESS NEGLIGENCE ..............................................................50
    13.6    Exclusive Remedies ........................................................................50
    13.7    Indemnification Procedures .............................................................50
    13.8    Survival ...........................................................................................52
    13.9    Non-Compensatory Damages .........................................................53
    13.10   Waiver of Right to Rescission ........................................................53
    13.11   Insurance .........................................................................................53
    13.12   Treatment of Indemnity Payments ..................................................53

**ARTICLE XIV TERMINATION, DEFAULT AND REMEDIES** .....................................**53**
    14.1    Right of Termination ......................................................................53
    14.2    Effect of Termination .....................................................................55

**ARTICLE XV MISCELLANEOUS** ...........................................................................**57**
    15.1    Appendices, Exhibits and Schedules ..............................................57
    15.2    Allocation of Asset Taxes ...............................................................57

| 15.3 | Transfer Taxes | 57 |
| 15.4 | Cooperation on Tax Matters | 58 |
| 15.5 | Assignment | 58 |
| 15.6 | Preparation of Agreement | 58 |
| 15.7 | Publicity | 59 |
| 15.8 | Notices | 59 |
| 15.9 | Further Cooperation | 60 |
| 15.10 | Filings, Notices and Certain Governmental Approvals | 60 |
| 15.11 | Entire Agreement; Non-Reliance; Conflicts | 60 |
| 15.12 | Successors and Permitted Assigns | 61 |
| 15.13 | Parties in Interest | 61 |
| 15.14 | Amendment | 61 |
| 15.15 | Waiver; Rights Cumulative | 61 |
| 15.16 | Governing Law; Jurisdiction; Venue; Jury Waiver | 61 |
| 15.17 | Severability | 62 |
| 15.18 | Counterparts | 62 |

## LIST OF APPENDICES, EXHIBITS AND SCHEDULES

<u>Appendices</u>

Appendix I — Definitions

<u>Exhibits</u>

Exhibit A-1 — Leases
Exhibit A-2 — Fee Mineral Interests
Exhibit A-3 — Specified Counties
Exhibit B — Wells
Exhibit C — Surface Interests
Exhibit D — Applicable Contracts
Exhibit E — Allocated Values
Exhibit F — Form of Assignment
Exhibit G — Form of Transition Services Agreement
Exhibit H — Surface Agreements
Exhibit I — Profits Interests Term Sheet

<u>Schedules</u>

Schedule 2.1(l) — Field Offices
Schedule 2.1(n) — Vehicles
Schedule 3.11 — Other Transaction Matters
Schedule 7.4 — Conflicts
Schedule 7.5 — Consents
Schedule 7.6 — Litigation
Schedule 7.7(a) — Material Contracts
Schedule 7.7(b) — Breaches and Defaults
Schedule 7.8 — Violation of Laws
Schedule 7.9 — Preferential Rights
Schedule 7.10 — Payment of Royalties
Schedule 7.11 — Current Commitments
Schedule 7.12 — Taxes
Schedule 7.13 — Imbalances
Schedule 7.14 — Permits
Schedule 7.16 — Environmental Matters
Schedule 7.18 — Insurance
Schedule 7.19 — Plugging and Abandonment
Schedule 7.20 — Access
Schedule 7.22 — Leases and Surface Agreements
Schedule 7.23 — Wells; Payout Balances
Schedule 7.24 — Cure Costs
Schedule 7.26 — Perdido Litigation Wells
Schedule 9.2 — Governmental Bonds

Schedule 9.11      —      Suspended Funds
Schedule 12.3(j)   —      Form of Letter in Lieu of Transfer Order
Schedule I         —      Contested Liens

## PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (this "***Agreement***") is entered into on [•], 2019 (the "***Execution Date***")  between Sheridan Holding Company II, LLC, a Delaware limited liability company, Sheridan Production Partners II-M, L.P., a Delaware limited partnership, and Sheridan Production Partners II-A, L.P., a Delaware limited partnership (collectively, "***Seller***") and Crossing Rocks Energy Operating, LLC, a Delaware limited liability company, or its designee ("***Buyer***").  Seller and Buyer may be referred to collectively as the "***Parties***" and each individually as a "***Party***".

### Recitals

Seller owns and desires to sell to Buyer certain oil and gas properties located in Texas, Wyoming and New Mexico, all as more particularly described in Section 2.1 below as the Assets.

Seller intends to implement such sale by filing voluntary petitions for relief under Chapter 11 of Title 11, United States Code, 11 U.S.C. §§ 101-1532 (the "***Bankruptcy Code***" and, Seller's Chapter 11 cases administered in respect of such filing, encaptioned *In re Sheridan Holding Company II, LLC, et al.*, Case No. 19-35198 (Bankr. S.D. Tex.) (Jointly Administered), collectively, the "***Bankruptcy Case***") in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***").

Buyer has conducted an independent investigation of the Assets and desires to purchase the Assets in a Free and Clear (other than Permitted Encumbrances and Assumed Obligations) sale authorized by the Bankruptcy Court pursuant to the *Debtors' Joint Prepackaged Plan or Reorganization Pursuant to* Chapter 11 of the Bankruptcy Code filed at Docket No. [  ] in the Bankruptcy Case (the "***Plan***"), all on the terms and subject to the conditions set forth in this Agreement and the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code (the "***Confirmation Order***").

The transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to the Confirmation Order to be entered by the Bankruptcy Court and applicable provisions of the Bankruptcy Code.

**NOW, THEREFORE**, for and in consideration of the mutual agreements herein contained, the benefits to be derived by each Party, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

### ARTICLE I
### DEFINITIONS AND INTERPRETATION

**1.1**   **Defined Terms**.  Capitalized terms used herein and not otherwise defined shall have the meanings given such terms in Appendix I.

**1.2**   **References and Rules of Construction**.  All references in this Agreement to Exhibits, Appendices, Schedules, Articles, Sections, subsections and other subdivisions refer to the corresponding Exhibits, Appendices, Schedules, Articles, Sections, subsections and other subdivisions of or to this Agreement unless expressly provided otherwise.  Titles appearing at the

beginning of any Articles, Sections, subsections and other subdivisions of this Agreement are for convenience only, do not constitute any part of this Agreement, and shall be disregarded in construing the language hereof. The words "this Agreement," "herein," "hereby," "hereunder" and "hereof," and words of similar import, refer to this Agreement as a whole and not to any particular Article, Section, subsection or other subdivision unless expressly so limited. The word "including" (in its various forms) means including without limitation. All references to "$" or "dollars" shall be deemed to be references to United States dollars. Each accounting term not defined herein, and each accounting term partly defined herein to the extent not defined, will have the meaning given to it under GAAP as interpreted as of the Execution Date. Pronouns in masculine, feminine or neuter genders shall be construed to state and include any other gender, and words, terms and titles (including terms defined herein) in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires. References to any Law or agreement shall mean such Law or agreement as it may be amended from time to time. References to any date shall mean such date in Houston, Texas.

## ARTICLE II
## ASSET ACQUISITION

2.1  **Asset Acquisition**.  Pursuant to Sections 105, 363, 1123, and 1129 of the Bankruptcy Code and subject to the terms and conditions of this Agreement and the Confirmation Order, Seller agrees to sell and transfer to Buyer Free and Clear (other than Permitted Encumbrances and Assumed Obligations), and Buyer agrees to purchase and acquire from Seller Free and Clear (other than Permitted Encumbrances and Assumed Obligations) all of Seller's (and its Applicable Affiliates') right, title and interest in and to the following (less and except the Excluded Assets, collectively, the "***Assets***"):

(a)  (i) all oil, gas and/or mineral leases located in the counties listed on Exhibit A-3 (the "***Specified Counties***") including, without limitation, those more particularly described on Exhibit A-1 (the "***Leases***", and Seller's (and its Applicable Affiliates') interests in the Leases, less and except any interests included in the Excluded Assets, being referred to collectively as the "***Assigned Leases***" or individually as an "***Assigned Lease***"), (ii) all of Seller's (and its Applicable Affiliates') right, title and interest in and to all fee mineral interest located in the Specified Counties including, without limitation, those described on Exhibit A-2 (Seller's and its Applicable Affiliates' interests in such fee mineral interests, less and except any interests included in the Excluded Assets, being referred to collectively as the "***Fee Mineral Interests***" or individually as a "***Fee Mineral Interest***"), (iii) all of Seller's (and its Applicable Affiliates') right, title and interest in and to all lands described in or subject to the Assigned Leases or pooled, communitized or unitized therewith, including, without limitation, any fee mineral interest, fee royalty interests, overriding royalties, production payments, net profits interests and/or similar interests in such lands (the "***Lands***"), and (iv) all rights, titles and interests of Seller and its Applicable Affiliates in and to any units arising on account of any of the Assigned Leases or Fee Mineral Interests having been pooled or unitized into such units ("***Units***");

(b)  all oil and gas wells and all water, injection and disposal wells located on the Assigned Leases, Fee Mineral Interests, Lands or Units, whether producing, shut-in, temporarily abandoned or plugged and abandoned (the "***Wells***"), including those described on Exhibit B;

(c)     the fee surface interests and buildings described on Exhibit C (the "**Surface Interests**");

(d)     all personal property, fixtures and improvements (i) appurtenant to or located upon the Assigned Leases, Fee Mineral Interests, Lands, Units, Wells or Surface Interests as of the Effective Time or (ii) used in connection with the ownership or operation of the Assigned Leases, Fee Mineral Interests, Lands, Units, Wells or Surface Interests (the "**Equipment**"), including pipelines, gathering lines and compression facilities, and power lines, substations and other electrical infrastructure;

(e)     all rights-of-way, easements, servitudes, surface use agreements, surface leases, subsurface leases, permits, licenses registrations, approvals, exemptions, and all other authorizations from Governmental Authorities or any other Person, in each case that are held in connection with the ownership or operation of the Assigned Leases, Fee Mineral Interests, Lands, Units, Wells, Surface Interests or Equipment, including those described on Exhibit H (the "**Surface Agreements**");

(f)     all Contracts to which Seller (or any of its Applicable Affiliates) is a party and which relate to the Assigned Leases, Fee Mineral Interests, Lands, Units, Wells, Surface Interests, Equipment, or Surface Agreements or by which the Assigned Leases, Fee Mineral Interests, Lands, Units, Wells, Surface Interests, Equipment, or Surface Agreements are bound, including those described on Exhibit D (collectively, the "**Applicable Contracts**");

(g)     all Inventory;

(h)     all Hydrocarbon imbalances attributable to Seller's (or its Applicable Affiliates') interest in the Assigned Leases, Fee Mineral Interests, Lands, Units, Wells, Surface Interests, Equipment, Surface Agreements or Applicable Contracts, whether such imbalance arose before or after the Effective Time (the "**Imbalances**");

(i)     all claims, causes of action, rights, defenses, refunds and audit rights of Seller (or its Applicable Affiliates) concerning, arising under or with respect to any (x) Assets that are attributable to periods of time on or after the Effective Time (including claims for adjustments or refunds), or (y) Assumed Obligations with respect to which Buyer has an indemnification obligation hereunder;

(j)     all original files, records and data (including all geophysical and other seismic and related technical data and information to the extent not excluded under Section 2.2(k)) relating to the Assets described herein in the possession or control of Seller (or its Affiliates) (including lease and well files, and title abstracts, reports, memoranda and opinions, but excluding (i) company files, financial records, and tax-related records unrelated to the Assets, (ii) records and data to the extent transfer thereof is prohibited by un-Affiliated third party contractual restrictions on transfer, (iii) information entitled to legal privilege, including attorney work product and attorney-client communications (except with respect to title opinions), (iv) economic projections and (v) records of offers from, or negotiations with, Buyer or third parties with respect to the sale of the Assets and economic analyses associated therewith) (collectively, and subject to such exclusions, the "**Records**");

(k)      other than Suspended Funds, all trade credits, accounts, receivables, deposits, cash, checks, funds and all other proceeds, income or revenues to the extent attributable to the Assets (i) with respect to any period of time on or after the Effective Time and (ii) to the extent related to the Assumed Obligations, with respect to any period of time prior to the Effective Time;

(l)      the field office(s) (and associated office lease(s)) described on <u>Schedule 2.1(l)</u> and all personal computers and associated peripherals, office fixtures office equipment and inventory located at such field office(s);

(m)      all radio, communications and telephone equipment (but excluding any licenses relating thereto) used or held for use in connection with ownership or operation of the Assigned Leases, Fee Mineral Interests, Lands, Units, Wells or Surface Interests;

(n)      all trucks, cars, backhoes, trailers, and other vehicles held for use in connection with the use or operation of the Assets (including, but not limited to, those listed on Part I of <u>Schedule 2.1(n)</u>); and

(o)      all equipment, pipe and tangible inventory (regardless of location) used or held for use in connection with ownership or operation of the Assigned Leases, Fee Mineral Interests, Lands, Units, Wells or Surface Interests.

2.2      **Excluded Assets**.  Specifically excluded from the Assets, and reserved unto Seller, are Seller's (and its Affiliates') interests in the following assets (the "***Excluded Assets***"):

(a)      (i) all interests held by SPC in any Equipment (including vehicles), Surface Agreements or Contracts to the extent (and only to the extent) relating to SPC's operation of any Sheridan I Jointly Owned Asset and (ii) all interest held by Holdco II in any Surface Interests or Surface Agreements associated with any Sheridan I Jointly Owned Asset, in each case, except to the extent related to (A) the Assets operated by Seller or by an Applicable Affiliate on behalf of Seller, as applicable and (B) the Assumed Obligations;

(b)      all minute books and company financial records that relate to Seller's (or its Affiliates') business generally and any copies of Records retained pursuant to <u>Section 12.4</u>;

(c)      (i) all deposits for electricity or other utilities and (ii) other than Suspended Funds, all trade credits, accounts, receivables, deposits, cash, checks, funds and all other proceeds, income or revenues to the extent attributable to (A) any Excluded Assets for any period prior to, on or after the Effective Time or (B) Seller's or its Affiliates' interests in the Assets with respect to any period of time prior to the Effective Time, in each case, except in the case of each of (A) and (B) above, to the extent related to the Assumed Obligations;

(d)      all claims, causes of action, refunds and audit rights of Seller (or its Affiliates) arising under or with respect to (i) any Assets that are attributable to periods of time prior to the Effective Time (including claims for adjustments or refunds) or (ii) any Excluded Assets for any period prior to, on or after the Effective Time, in each case, except to the extent related to the Assumed Obligations;

(e)      all rights and interests of Seller (or its Affiliates) (i) under any policy or agreement of insurance, (ii) under any bond or (iii) to any insurance proceeds or awards;

(f)      with respect to any employee of Seller or its Affiliates that does not become an employee of Buyer (or its Affiliates) in connection with Closing, any personal computer, vehicle and personal tools designated for such individual's use as an employee of Seller (or its Affiliates);

(g)      except to the extent included as an Asset pursuant to <u>Section 2.1(j)</u>, all equipment, tangible property and vehicles located at Seller's corporate office in Houston, Texas;

(h)      all licenses relating to any radio communications and telephone equipment;

(i)      all computer software, patents, trade secrets, copyrights, names, trademarks, logos and other intellectual property, including any interpretation of data and information, whether geophysical, seismic, technical, or otherwise;

(j)      all documents and instruments that are protected by attorney-client privilege (except for title opinions);

(k)      all geophysical and other seismic and related technical data and information licensed from Third Party relating to the Assets to the extent that such geophysical and other seismic and related technical data and information is not transferable without payment of a fee or other penalty (unless Buyer agrees to pay such fee or penalty);

(l)      all documents and information relating to any proposed sale or marketing of any of the Assets;

(m)      all insurance contracts, master service agreements and hedging arrangements;

(n)      any assets or properties that are excluded from the transactions contemplated hereby pursuant to the provisions of this Agreement;

(o)      any and all claims of Seller for refunds of, credits attributable to, loss carry forwards with respect to, or similar items relating to (i) Taxes attributable to any period (or portion thereof) prior to the Effective Time, (ii) Income Taxes or (iii) Taxes attributable to the Excluded Assets;

(p)      the trucks, cars, backhoes, trailers and other vehicles listed on Part II of <u>Schedule 2.1(n)</u>; and

(q)      any equity interests in any of Seller or any of its Affiliates.

It is understood that certain of the Excluded Assets may not be embraced by the term Assets. The fact that certain properties, rights and interests have been expressly included in the Excluded Assets is not intended to suggest that they would otherwise have constituted Assets and shall not be used to interpret the meaning of any word or phrase used in describing the Assets.

**2.3     <u>Confirmation Order</u>**.  The Confirmation Order shall, among other things, (a) approve, pursuant to Sections 105, 363, 1123 and 1129 of the Bankruptcy Code, (i) the

execution, delivery and performance by Seller of this Agreement and the Transaction Documents, (ii) the sale of the Assets to Buyer on the terms set forth herein and Free and Clear (other than Permitted Encumbrances and Assumed Obligations) to the full extent allowed under Section 363(f), 1123(a)(5)(D) and 1129 of the Bankruptcy Code, and (iii) the performance by Seller of its obligations under this Agreement and the Transaction Documents, (b) find that Buyer is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code, not a successor to any Seller and grant Buyer the protections of Section 363(m) of the Bankruptcy Code, (c) provide for the assumption by Seller and the assignment to Buyer of each of the Applicable Contracts to which Seller is a party pursuant to Section 365 of the Bankruptcy Code, (d) find that, to the fullest extent permissible under the Bankruptcy Code, Buyer shall have no Liability or responsibility for any Liability or other obligation of Seller arising under or related to the Assets other than Permitted Encumbrances or Assumed Obligations, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor or transferee Liability, labor law, de facto merger, alter ego or substantial continuity, (e) incorporate as if set forth at length therein the terms and conditions of this Agreement and not be inconsistent therewith unless previously agreed in writing by Buyer, (f) include provisions customary for these types of transactions requested by Buyer, such as set forth in <u>Section 2.4</u> and the first sentence of <u>Section 15.3</u>, (g) include any other provisions that are reasonably requested by Buyer, not adverse to Seller or its Affiliates, and approved by the Bankruptcy Court, and (h) shall be in a form and substance acceptable to Buyer (which acceptance shall not be unreasonably withheld, delayed or conditioned).  Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining Bankruptcy Court approval of the Confirmation Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes of, among others, demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.  For purposes of clarification, in the event of any conflict or inconsistency between the Confirmation Order or any other order of the Bankruptcy Court and <u>Section 2.4</u>, the Confirmation Order shall control.

## 2.4    <u>Assumption and Assignment of Contracts</u>.

(a)    The Parties agree and acknowledge that the Assigned Leases and Surface Agreements shall constitute Assets for any and all purposes under this Agreement, and to the extent any Assigned Lease or Surface Agreement constitutes an executory contract or unexpired lease under Section 365 of the Bankruptcy Code, such Assigned Lease or Surface Agreement shall be considered an Applicable Contract for all purposes of this Agreement (other than <u>Article VII</u>), including the other provisions of this <u>Section 2.4</u>.

(b)    Seller shall assign to Buyer, and Buyer shall assume, the Applicable Contracts at the Closing pursuant to the Confirmation Order, subject to the other provisions of this <u>Section 2.4</u> and <u>Section 5.4(b)</u>.  Seller shall pay all Cure Costs in connection with the assignment and assumption of the Applicable Contracts at Closing.  The Confirmation Order shall provide for the assumption and the assignment to Buyer of each of the Applicable Contracts pursuant to Section 365 of the Bankruptcy Code on the terms and conditions set forth in the remainder of this <u>Section 2.4</u> and <u>Section 5.4(b)</u>.  Seller shall cooperate with Buyer as reasonably requested by Buyer to allow Buyer to enter into an amendment of any Applicable Contract upon assumption and assignment of such Applicable Contract to Buyer (and Seller shall cooperate with Buyer as reasonably requested by Buyer in negotiations with the counterparties thereof); provided, that (i)

in no event shall any such amendments be effective prior to the Closing, and (ii) Sellers shall not be required to enter into any such amendment if such amendment would result in the incurrence of any Liability by Seller that is not otherwise paid by Buyer at the time of the Closing.

## ARTICLE III
## CONSIDERATION

**3.1      Consideration**.    The consideration for the transfer of the Assets and the transactions contemplated hereby shall be $328,000,000 (the "***Purchase Price***").   The Purchase Price shall be adjusted pursuant to Section 3.3 as and when provided in this Agreement and shall be paid by wire transfer in same day funds to account(s) designated by Seller.

**3.2      Deposit**.    No later than three (3) Business Days after the execution of this Agreement, Buyer shall have deposited with Wells Fargo Bank, N.A. ("***Escrow Agent***"), by wire transfer in same day funds, an amount equal to ten percent (10%) of the Purchase Price (the "***Deposit***") to be held in accordance with the terms and provisions of the Escrow Agreement of even date herewith by and among Escrow Agent, Buyer and Seller (the "***Escrow Agreement***"). The entire amount of the Deposit shall not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of Seller or Buyer. The Purchase Price amount due from Buyer at Closing shall be reduced on a dollar for dollar basis by the Deposit.  If Closing does not occur, the Deposit shall be treated as provided in Section 14.2.  From and after Closing, the Deposit shall be treated as a portion of the Indemnity Holdback Amount, subject to the provisions set forth in Section 13.4.  If Buyer fails to timely fund the Deposit to Escrow Agent in accordance with this Section 3.2, Seller shall have the right to terminate this Agreement (unless Buyer funds the Deposit after the three (3) Business Day period and at the time of such funding, Seller has not terminated this agreement).

**3.3      Adjustments to Purchase Price**.  The Purchase Price shall be adjusted as follows (without duplication), and the resulting amount shall be herein called the "***Adjusted Purchase Price***":

(a)      The Purchase Price shall be adjusted upward by the following amounts:

(i)      the amount of all Asset Taxes allocable to Buyer in accordance with Section 15.2 but paid or otherwise economically borne by Seller (or any of Seller's Affiliates);

(ii)      the amount of all revenues (net of Burdens and Taxes not otherwise accounted for hereunder) received and retained by Buyer (or its Affiliates) with respect to the Assets (other than Inventory) which are attributable to periods prior to the Effective Time;

(iii)      the amount of all direct costs and expenses (including rentals) and amounts due under any Applicable Contract, paid by or on behalf of Seller (or its Affiliates) to (1) Third Parties and (2) solely for general and administrative expenses that are chargeable under a joint operating agreement as a direct cost and expense, to non-Third Parties, in each case, with respect to the Assets which are attributable to any period of time from and after the Effective Time (whether paid before or after the Effective Time), to the extent such costs and expenses are chargeable under the applicable joint operating agreements covering the Assets, or if an Asset is not covered by a joint operating agreement, to the extent such costs and expenses would be

chargeable under an A.A.P.L. 1989 model form joint operating agreement, but excluding (without limitation) costs and expenses attributable to (a) the remediation of any Environmental Defect asserted by Buyer, (b) obligations with respect to Imbalances, (c) the Specified Liabilities, (d) any overhead costs of Seller or any of its Affiliates, (e) the curing of any Title Defect asserted by Buyer, and (f) Burdens;

(iv)   an amount equal to the value (net of Burdens and Taxes not otherwise accounted for hereunder) of all Inventory, which value shall be based on the price that would have been received under the applicable marketing contract if the hydrocarbons in question had been sold at the Effective Time; and

(v)   any other amount provided for elsewhere in this Agreement to be an upward adjustment to the Purchase Price or otherwise agreed upon in writing by Seller and Buyer.

(b)   The Purchase Price shall be adjusted downward by the following amounts:

(i)   any amount provided for under Section 5.3 in respect of Title Defects;

(ii)   any amount provided for under Section 6.1 in respect of Environmental Defects;

(iii)   the Allocated Value of any Asset excluded from the transaction contemplated hereby or reassigned to Seller pursuant to Article V or Article VI;

(iv)   the amount of all Asset Taxes allocable to Seller in accordance with Section 15.2 that are paid or otherwise economically borne by Buyer;

(v)   the amount of all revenues (net of Burdens and Taxes not otherwise accounted for hereunder) received and retained by Seller (or its Affiliates) with respect to (x) the Assets which are attributable to periods from and after the Effective Time and (y) all Inventory;

(vi)   the amount of all direct costs and expenses (including rentals) and amounts due under any Applicable Contract with respect to the Assets which are attributable to periods prior to the Effective Time and that are paid by or on behalf of Buyer or its Affiliates to (1) Third Parties and (2) solely for general and administrative expenses that are chargeable under a joint operating agreement as a direct cost and expense, to non-Third Parties; and

(vii)   any other amount provided for elsewhere in this Agreement to be a downward adjustment to the Purchase Price or otherwise agreed upon in writing by Seller and Buyer.

(c)   The Purchase Price shall be adjusted downward or upward, as appropriate, by an amount equal to $50.00 per bbl and $2.50 per mcf for the aggregate net Imbalances existing as of the Effective Time.

(d)      For the period between the Effective Time and the Closing Date, the Purchase Price shall be adjusted upward by an amount equal to $750,000 per month (prorated for partial months), which amount shall serve as reimbursement of Seller's overhead and other general and administrative costs associated with the operation of such Wells by Seller (or its Affiliates).

(e)      The Parties agree that Seller shall be entitled to retain all proceeds from joint interest billings to third parties in respect of the operation of the Assets (including, without limitation, COPAS overhead and similar recoveries) during the period between the Effective Time and the Closing Date that are received prior to the one (1) year anniversary of the Closing Date.

3.4      **Preliminary Settlement Statement**.  Not less than five (5) Business Days prior to Closing, Seller shall prepare and submit to Buyer for review a draft settlement statement (the "***Preliminary Settlement Statement***") that shall set forth Seller's good faith estimate of the Adjusted Purchase Price, reflecting each adjustment made in accordance with this Agreement as of the date of preparation of such Preliminary Settlement Statement and the calculation of the adjustments used to determine such amount.  All adjustments on the Preliminary Settlement Statement shall be made on an accrual basis, net to Seller's (and its Applicable Affiliates') interest. Within three (3) Business Days of receipt of the Preliminary Settlement Statement, Buyer may deliver to Seller a written response containing any changes with the explanation therefor that Buyer proposes to be made to the Preliminary Settlement Statement.  If Buyer fails to deliver such response to Seller within three (3) Business Days of receipt of the Preliminary Settlement Statement, the Preliminary Settlement Statement submitted by Seller shall be deemed to be mutually agreed upon by the Parties.  The Preliminary Settlement Statement, as agreed upon by the Parties, will be used to determine the Adjusted Purchase Price paid at Closing (the "***Preliminary Adjusted Purchase Price***"); provided that if the Parties do not agree on the Preliminary Settlement Statement prior to the Closing Date the Preliminary Settlement Statement as submitted by Seller will be used to determine the Preliminary Adjusted Purchase Price.

3.5      **Final Settlement Statement**.  On or before the later of (i) one hundred and twenty (120) days after the Closing Date or (ii) thirty (30) days after the resolution of all Title Disputes and Environmental Disputes, Seller shall deliver to Buyer a final settlement statement (the "***Final Settlement Statement***"), which takes into account all final adjustments made to the Purchase Price in accordance with Section 3.3 and shows the resulting final Adjusted Purchase Price (the "***Final Price***").  As soon as practicable, and in any event within thirty (30) Business Days after receipt of the Final Settlement Statement, Buyer may deliver to Seller a written report containing any proposed changes to the Final Settlement Statement and an explanation of any such changes and the reasons therefor (the "***Dispute Notice***").  During such period, Seller shall provide reasonable supporting data for the Final Settlement Statement upon request by Buyer.  Any changes not so specified in the Dispute Notice shall be deemed waived and Seller's determinations with respect to all such elements of the Final Settlement Statement that are not addressed specifically in the Dispute Notice shall prevail. If Buyer fails to timely deliver a Dispute Notice to Seller, the Final Settlement Statement as delivered by Seller will be deemed to be mutually agreed upon by the Parties and will be final and binding on the Parties.  If the Final Price set forth in the Final Settlement Statement is mutually agreed upon by Seller and Buyer, then the Final Settlement Statement and the Final Price shall be final and binding on the Parties.  Within five (5) Business Days of any such agreement, the Parties shall account to one another for any difference between the Preliminary Adjusted Purchase Price and the Final Price, including by causing the Escrow

Agent to disburse all amounts of the Adjustment Holdback Amount to the Party or Parties entitled thereto in accordance with such agreement and, if necessary, and at Buyer's sole election, the Indemnity Holdback Amount. All amounts paid pursuant to this <u>Section 3.5</u> shall be delivered in dollars by wire transfer of immediately available funds to the account(s) specified in writing by the relevant Party.

      **3.6**    <u>**Disputes**</u>. If the Parties are unable to resolve a dispute as to the Final Price by forty-five (45) Business Days after Buyer's receipt of Seller's proposed Final Settlement Statement, either Party may submit the dispute to KPMG, Houston, Texas (or any other nationally recognized accounting firm mutually agreed upon by the Parties) (the "***Accounting Arbitrator***") for final and binding determination and Buyer and Seller shall execute such engagement, indemnity and other agreements as the Accounting Arbitrator may require in connection with or as a condition to such engagement. The place of arbitration shall be Houston, Texas, and the arbitration shall be conducted in accordance with the AAA Rules, to the extent such rules do not conflict with the terms of this <u>Section 3.6</u>. The Accounting Arbitrator's determination shall be made within thirty (30) days after submission of such matter for resolution pursuant to this <u>Section 3.6</u> and shall be final and binding upon all Parties, without right of appeal. To the extent that a value has been assigned to any objection that remains in dispute, the Accounting Arbitrator shall not assign a value to such objection that is greater than the greatest value for such objection claimed by either Party or less than the smallest value for such objection claimed by either Party. The Accounting Arbitrator shall act for the limited purpose of determining the specific disputed matters submitted by either Party, and the Accounting Arbitrator may not award damages, interest or penalties to either Party with respect to any matter. Seller and Buyer shall each bear its own legal fees and other costs of presenting its case to the Accounting Arbitrator. Seller, on the one hand, and Buyer, on the other hand, shall each bear one-half of the costs and expenses of the Accounting Arbitrator. Within five (5) Business Days of the final determination of any amounts in dispute with respect to the Final Price, the Parties shall account to one another for any difference between the Preliminary Adjusted Purchase Price and the Final Price, including by causing the Escrow Agent to disburse all amounts of the Adjustment Holdback Amount to the Party or Parties entitled thereto in accordance with such decision of the Accounting Arbitrator.

      **3.7**    <u>**Allocated Values**</u>. The "***Allocated Value***" for any Property equals the amount set forth with respect thereto on <u>Exhibit E</u>.

      **3.8**    <u>**Value Allocations for Tax Purposes**</u>. Seller and Buyer agree that the Final Price plus any other items constituting consideration for federal and applicable state and local income tax purposes (collectively, the "***Allocable Amount***") shall be allocated among the Assets for federal and applicable state and local income tax purposes and in accordance with the applicable federal, state and local income tax Law. A schedule of such allocations (the "***Allocation Schedule***") shall be prepared by Buyer in a manner consistent with the Allocated Values and delivered to Seller within thirty (30) days following final determination of the Final Settlement Statement. If Seller notifies the Buyer in writing that Seller objects to one or more items reflected in the Allocation Schedule, Seller and the Buyer shall negotiate in good faith to resolve such dispute. The allocation of the Allocable Amount shall be reflected on a completed Internal Revenue Service Form 8594 (Asset Acquisition Statement under Section 1060), which form will be timely filed separately by Seller and Buyer with the Internal Revenue Service pursuant to the requirements of Section 1060(b) of the Code. If Seller and Buyer cannot resolve any dispute with

respect to the Allocation Schedule, the procedures of <u>Section 3.6</u> shall be applied to resolve such dispute.  Each Party agrees not to take any position inconsistent with this <u>Section 3.8</u> or the allocations set forth in the Allocation Schedule unless required by Law or with the consent of the other Party.

**3.9**     <u>**Withholding**</u>.     Buyer shall be entitled to deduct and withhold from any consideration otherwise payable or deliverable to Seller such amounts as may be required to be deducted or withheld therefrom under the Code, under any Tax law or pursuant to any other applicable Laws; provided, that Buyer shall first notify Seller which may investigate the availability of any legally permissible reductions or exclusions from such withholdings, for which Buyer shall reasonably cooperate with Seller to pursue (such as obtaining such information and tax forms from Seller that may be available to reduce or eliminate withholding), prior to making any such deduction or withholding.  To the extent such amounts are so deducted or withheld and paid to the applicable Governmental Authority, such amounts shall be treated for all purposes as having been paid to the Person to whom such amounts would otherwise have been paid absent such deduction or withholding.

**3.10**     <u>**Adjustment Holdback Amount**</u>.     At Closing, Buyer shall deliver to the Escrow Agent an amount equal to one percent (1%) of the cash portion of the Purchase Price (such amount, the "***Adjustment Holdback Amount***"). The Adjustment Holdback Amount shall be retained by the Escrow Agent pending a final agreement (or other resolution) between Buyer and Seller with respect to the Final Settlement Statement. At such time, Buyer and Seller shall deliver a joint written instruction to the Escrow Agent instructing the Escrow Agent to disburse the Adjustment Holdback Amount to Buyer and/or Seller (as applicable) in accordance with the amounts due under the Final Settlement Statement.

**3.11**     <u>**Other Transaction Matters**</u>.     Notwithstanding anything to the contrary in this Agreement, the Parties shall be bound by the terms and obligations set forth in <u>Schedule 3.11</u>.

**ARTICLE IV**
**ACCESS / DISCLAIMERS**

**4.1**     <u>**Access**</u>.

(a)     From and after the Execution Date and up to and including the Closing Date (or earlier termination of this Agreement pursuant to the terms herein) but subject to the other provisions of this <u>Section 4.1</u> and obtaining any required consents of Third Parties, including Third Party operators of the Leases (with respect to which consents Seller shall use commercially reasonable efforts to obtain but shall not be obligated to expend any monies), Seller shall afford to Buyer and its Affiliates and their respective officers, employees, agents, accountants, attorneys, consultants and other authorized representatives ("***Buyer's Representatives***") reasonable access, during normal business hours, to the Assets and all Records and other documents in Seller's or its Affiliates' possession relating to the Assets; *provided*, *however*, that as to the Sheridan I Jointly Owned Assets (other than any such Sheridan I Jointly Owned Assets that are operated by a Third Party), Seller will cause Sheridan I to afford access to Buyer's Representatives pursuant to this <u>Section 4.1</u>.     All investigations and due diligence conducted by Buyer or any Buyer's Representative shall be conducted at Buyer's sole cost and expense and any conclusions made

11

from any examination done by Buyer or any Buyer's Representative shall result from Buyer's own independent review and judgment. Buyer shall coordinate its access rights and physical inspections of the Assets with Seller to minimize any inconvenience to or interruption of the conduct of business by Seller. Buyer and all Buyer's Representatives must be accompanied by a representative of Seller during all physical inspections of the Assets. Buyer shall, and shall cause all Buyer's Representatives to, abide by Seller's, and any Third Party operator's, reasonable safety rules, regulations and operating policies while conducting its due diligence evaluation of the Assets, including any environmental or other inspection or assessment of the Assets, and to the extent required by any Third Party operator, execute and deliver any required access agreement of such Third Party operator or maintain insurance as may be required by any Third Party operator, in each case before conducting Buyer's assessment on such Asset.

(b)    Buyer's physical inspection right under this Agreement may consist of conducting a Phase I Environmental Site Assessment of the Assets and may include visual inspections and record reviews relating to the Assets, including their condition and compliance with Environmental Laws. In conducting such inspection, Buyer shall not operate any equipment or conduct any testing or sampling of soil, groundwater or other materials (including any testing or sampling for Hazardous Substances, Hydrocarbons or NORM).

(c)    Buyer hereby defends, releases, indemnifies and holds harmless each of the operators of the Leases and each Seller Indemnified Party from and against any and all Liabilities arising out of, resulting from or relating to any field visit, environmental property assessment or other due diligence activity conducted by Buyer or any Buyer's Representative with respect to the Assets, EVEN IF SUCH LIABILITIES ARISE OUT OF OR RESULT FROM, IN WHOLE OR IN PART, THE SOLE, ACTIVE, PASSIVE, CONCURRENT OR COMPARATIVE SIMPLE NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT OF A SELLER INDEMNIFIED PARTY, BUT NOT IF CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF A SELLER INDEMNIFIED PARTY; AND PROVIDED FURTHER, HOWEVER, THAT (I) BUYER SHALL NOT BE REQUIRED UNDER THIS SECTION 4.1(c) TO DEFEND, RELEASE, INDEMNIFY AND HOLD HARMLESS ANY SELLER INDEMNIFIED PARTY FROM AND AGAINST LIABILITIES ARISING FROM THE DISCOVERY OR IDENTIFICATION OF EVENTS OR CONDITIONS THAT OCCURRED OR EXISTED PRIOR TO SUCH DISCOVERY OR IDENTIFICATION, AND (II) BUYER'S INDEMNIFICATION OBLIGATIONS UNDER THIS SECTION 4.1 SHALL IN NO WAY LIMIT BUYER'S RIGHTS AND REMEDIES UNDER Article VI.

(d)    Buyer acknowledges that any entry into Seller's offices or onto the Lands, the Surface Interests or lands on which the Equipment is located shall be at Buyer's sole risk and, subject to the terms hereof, that none of Seller Indemnified Parties shall be liable in any way for any injury, loss or damage arising out of such entry that may occur to Buyer or any of Buyer's Representatives pursuant to this Agreement except as may be caused by the gross negligence or willful misconduct of any of Seller Indemnified Parties. Buyer hereby fully waives and releases any and all Liabilities against the operators of the Leases and Seller Indemnified Parties for any injury, death, loss or damage to any of Buyer's Representatives or their property arising out of Buyer's due diligence activities, EVEN IF SUCH LIABILITIES ARISE OUT OF OR RESULT FROM, IN WHOLE OR IN PART, THE SOLE, ACTIVE, PASSIVE, CONCURRENT OR COMPARATIVE SIMPLE NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT OF, A

SELLER INDEMNIFIED PARTY, BUT NOT IF CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF A SELLER INDEMNIFIED PARTY; AND PROVIDED FURTHER, HOWEVER, THAT (I) BUYER SHALL NOT BE REQUIRED UNDER THIS SECTION 4.1(d) TO DEFEND, RELEASE, INDEMNIFY AND HOLD HARMLESS ANY SELLER INDEMNIFIED PARTY FROM AND AGAINST LIABILITIES ARISING FROM THE DISCOVERY OR IDENTIFICATION OF EVENTS OR CONDITIONS THAT OCCURRED OR EXISTED PRIOR TO SUCH DISCOVERY OR IDENTIFICATION, AND (II) BUYER'S INDEMNIFICATION OBLIGATIONS UNDER THIS SECTION 4.1 SHALL IN NO WAY LIMIT BUYER'S RIGHTS AND REMEDIES UNDER Article VI.

(e)     Buyer agrees to promptly provide Seller, but in no less than five (5) days after Buyer's receipt, copies of all final Phase I reports which contain data collected or generated from Buyer's due diligence with respect to the Assets.  Neither Buyer nor Seller shall be deemed by its receipt or delivery of said documents or otherwise to have made any representation or warranty, expressed, implied or statutory, as to the condition of the Assets or to the accuracy of said documents or the information contained therein.

(f)     During all periods prior to Closing that Buyer, and/or any of Buyer's Representatives are on the lands on which the Assets are located, Buyer shall maintain, at its sole expense, policies of insurance of the types and in the amounts consistent with those maintained by a reasonably prudent operator in the same or similar circumstances.  Upon request by Seller, Buyer shall provide evidence of such insurance to Seller prior to entering the lands on which the Assets are located.

**4.2**   **Confidentiality**.  Buyer acknowledges that, pursuant to its right of access to the Records or the Assets, Buyer will become privy to Confidential Information of Seller and that such Confidential Information shall be held confidential by Buyer and Buyer's Representatives in accordance with the terms of the Confidentiality Agreement.  If Closing should occur, the foregoing confidentiality restriction on Buyer, including those contained in the Confidentiality Agreement, shall terminate (except as to Confidential Information relating to assets other than the Assets (including the Excluded Assets), which confidentiality obligations shall terminate in accordance with the Confidentiality Agreement).

**4.3**   **Disclaimers**.

(a)     EXCEPT AS AND TO THE LIMITED EXTENT EXPRESSLY SET FORTH IN Article VII AND FOR THE SPECIAL WARRANTY, (i) SELLER MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS, STATUTORY OR IMPLIED, AND (ii) SELLER EXPRESSLY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT OR INFORMATION NOT SET FORTH HEREIN THAT IS MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO BUYER OR ANY OF ITS AFFILIATES, EMPLOYEES, AGENTS, CONSULTANTS OR REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN PROVIDED TO BUYER BY A MEMBER OF THE SELLER INDEMNIFIED PARTIES).

(b)     WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EXCEPT AS AND TO THE LIMITED EXTENT EXPRESSLY SET FORTH IN Article VII, SELLER EXPRESSLY DISCLAIMS ANY REPRESENTATION OR WARRANTY, EXPRESS, STATUTORY OR IMPLIED BY ANY MEMBER OF THE SELLER INDEMNIFIED PARTIES, AS TO (i) EXCEPT FOR THE SPECIAL WARRANTY, TITLE TO ANY OF THE ASSETS, (ii) THE CONTENTS, CHARACTER OR NATURE OF ANY REPORT OF ANY PETROLEUM ENGINEERING CONSULTANT, OR ANY ENGINEERING, GEOLOGICAL OR SEISMIC DATA OR INTERPRETATION, RELATING TO THE ASSETS, (iii) THE QUANTITY, QUALITY OR RECOVERABILITY OF HYDROCARBONS IN OR FROM THE ASSETS, (iv) ANY ESTIMATES OF THE VALUE OF THE ASSETS OR FUTURE REVENUES GENERATED BY THE ASSETS, (v) THE PRODUCTION OF HYDROCARBONS FROM THE ASSETS, (vi) THE MAINTENANCE, REPAIR, CONDITION, QUALITY, SUITABILITY, DESIGN OR MARKETABILITY OF THE ASSETS, (vii) THE CONTENT, CHARACTER OR NATURE OF ANY INFORMATION MEMORANDUM, REPORTS, BROCHURES, CHARTS OR STATEMENTS PREPARED BY SELLER OR THIRD PARTIES WITH RESPECT TO THE ASSETS, (viii) ANY OTHER MATERIALS OR INFORMATION THAT MAY HAVE BEEN MADE AVAILABLE TO BUYER OR ITS AFFILIATES, OR ITS OR THEIR EMPLOYEES, AGENTS, CONSULTANTS, REPRESENTATIVES OR ADVISORS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY DISCUSSION OR PRESENTATION RELATING THERETO AND (ix) ANY IMPLIED OR EXPRESS WARRANTY OF FREEDOM FROM PATENT OR TRADEMARK INFRINGEMENT. EXCEPT AS AND TO THE LIMITED EXTENT EXPRESSLY SET FORTH IN Article VII, SELLER FURTHER DISCLAIMS ANY REPRESENTATION OR WARRANTY, EXPRESS, STATUTORY OR IMPLIED, OF MERCHANTABILITY, FREEDOM FROM LATENT VICES OR DEFECTS, FITNESS FOR A PARTICULAR PURPOSE OR CONFORMITY TO MODELS OR SAMPLES OF MATERIALS OF ANY ASSETS, RIGHTS OF A PURCHASER UNDER APPROPRIATE STATUTES TO CLAIM DIMINUTION OF CONSIDERATION OR RETURN OF THE PURCHASE PRICE OR CONSIDERATION, IT BEING EXPRESSLY UNDERSTOOD AND AGREED BY THE PARTIES HERETO THAT BUYER SHALL BE DEEMED TO BE OBTAINING THE ASSETS IN THEIR PRESENT STATUS, CONDITION AND STATE OF REPAIR, "AS IS" AND "WHERE IS" WITH ALL FAULTS OR DEFECTS (KNOWN OR UNKNOWN, LATENT, DISCOVERABLE OR UNDISCOVERABLE), AND THAT BUYER HAS MADE OR CAUSED TO BE MADE SUCH INSPECTIONS AS BUYER DEEMS APPROPRIATE.

(c)     EXCEPT AS AND TO THE LIMITED EXTENT EXPRESSLY SET FORTH IN SECTION 7.16, (i) SELLER HAS NOT AND WILL NOT MAKE ANY REPRESENTATION OR WARRANTY REGARDING ANY MATTER OR CIRCUMSTANCE RELATING TO ENVIRONMENTAL LAWS, THE RELEASE OF MATERIALS INTO THE ENVIRONMENT OR THE PROTECTION OF HUMAN HEALTH, SAFETY, NATURAL RESOURCES OR THE ENVIRONMENT, OR ANY OTHER ENVIRONMENTAL CONDITION OF THE ASSETS, (ii) NOTHING IN THIS AGREEMENT OR OTHERWISE SHALL BE CONSTRUED AS SUCH A REPRESENTATION OR WARRANTY, AND (iii) SUBJECT TO BUYER'S RIGHTS UNDER SECTION 6.1 AND SECTION 13.2 IN RESPECT OF SECTION 7.16, BUYER SHALL BE DEEMED TO BE TAKING THE ASSETS "AS IS" AND "WHERE IS" WITH ALL FAULTS FOR PURPOSES OF THEIR ENVIRONMENTAL CONDITION AND THAT ON OR BEFORE

14

THE CLOSING DATE BUYER HAS MADE OR CAUSED TO BE MADE SUCH ENVIRONMENTAL INSPECTIONS AS BUYER DEEMS APPROPRIATE.

(d)     EXCEPT AS AND TO THE LIMITED EXTENT EXPRESSLY SET FORTH IN Article VIII, (i) BUYER MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS, STATUTORY OR IMPLIED, AND (ii) BUYER EXPRESSLY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT OR INFORMATION NOT SET FORTH HEREIN THAT IS MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO SELLER OR ANY OF ITS AFFILIATES, EMPLOYEES, AGENTS, CONSULTANTS OR REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN PROVIDED TO SELLER BY A MEMBER OF THE BUYER INDEMNIFIED PARTIES).

Seller and Buyer agree that, to the extent required by Law to be effective, the disclaimers of certain representations and warranties contained in this Section 4.3 are "conspicuous" disclaimers for the purpose of any Law.

## ARTICLE V
## TITLE MATTERS; TRANSFER RESTRICTIONS

**5.1     General Disclaimer of Title Warranties and Representations**.  Except for the Special Warranty, and without limiting Buyer's remedies in respect of Title Defects set forth in this Article V or for breaches of Seller's representations set forth in Sections 7.5, 7.6, 7.7, 7.8, 7.9, 7.10, 7.22, and 7.26, Seller make no warranty or representation, express, implied, statutory or otherwise, with respect to Seller's (or its Applicable Affiliates') title to any of the Assets, and Buyer hereby acknowledges and agrees that, except for Buyer's rights pursuant to Sections 10.4 and 13.2 (with respect to breaches of Seller's representations set forth in Sections 7.5, 7.6, 7.7, 7.8, 7.9, 7.10, 7.22Article XIII, and 7.26), Buyer's sole remedy for any defect of title, including any Title Defect, with respect to any of the Assets (a) before the Defect Claim Date, shall be as set forth in Section 5.3 and (b) from and after the Defect Claim Date, shall be pursuant to the Special Warranty as provided in Section 5.2.

**5.2     Special Warranty**.

(a)     Special Warranty of Title.  Pursuant to the Assignment, Seller shall warrant to Buyer Defensible Title to the Assets, against any Person claiming any part thereof by, through or under Seller (or its Affiliates), but not otherwise, subject, however, to the Permitted Encumbrances (as set forth in the Assignment, the "**Special Warranty**"). The Special Warranty shall be subject to the limitations and provisions of this Section 5.2.

(b)     Recovery on Special Warranty.  From and after Closing, Buyer may furnish Seller with written claim notices meeting the requirements of Section 5.3(a) setting forth any and all matters which Buyer asserts as a breach of the Special Warranty.  For the ninety (90) day period following Seller's receipt of such notice, Seller shall have a reasonable opportunity, but not the obligation, to cure any breach of the Special Warranty.  Buyer agrees to reasonably cooperate with any attempt by Seller to cure any such breach.  Recovery on the Special Warranty shall be limited to an amount (without any interest accruing thereon) equal to the reduction of the Purchase Price

to which Buyer would have been entitled had Buyer asserted the defect giving rise to such breach of the Special Warranty as a Title Defect prior to the Defect Claim Date pursuant to Section 5.3 (taking into account all applicable limitations, but without giving effect to the Individual Title Defect Threshold or the Aggregate Defect Deductible). For all purposes of this Agreement and notwithstanding anything herein to the contrary, Buyer shall be deemed to have waived, and Seller shall have no liability for, any breach of the Special Warranty that (i) has not been specifically asserted in a written claim notice meeting the requirements of Section 5.3(a) on or before the twelve (12) month anniversary of the Closing Date or (ii) of which Buyer had Knowledge on or prior to the Defect Claim Date.

       **5.3**    **Notice of Title Defects; Defect Adjustments**.

       (a)    Title Defect Notices. On or before 5:00 p.m. Central Time on the date that is sixty (60) days after the Confirmation Order is entered, (the "***Defect Claim Date***"), Buyer may deliver claim notices to Seller meeting the requirements of this Section 5.3(a) (each, a "***Title Defect Notice***") setting forth any matters which Buyer reasonably asserts as a Title Defect pursuant to this Article V. For all purposes of this Agreement and notwithstanding anything herein to the contrary other than Section 5.2, Buyer shall be deemed to have waived, and Seller shall have no liability for, any remedies for any defect of title under this Article V that Buyer fails to assert as a Title Defect by a Title Defect Notice received by Seller on or before the Defect Claim Date. To be effective, each Title Defect Notice shall be in writing, and shall include (i) a description of the alleged Title Defect(s), (ii) a description of the Property(ies) affected by the Title Defect (each, a "***Title Defect Property***"), (iii) the Allocated Value of each Title Defect Property, (iv) supporting documents available to Buyer and reasonably necessary for Seller to verify the existence of the alleged Title Defect(s) to the extent not in Seller's possession or are a matter of public record, and (v) the amount by which Buyer in reasonable good faith believes the Allocated Value of each Title Defect Property is reduced by the alleged Title Defect(s) and the computations (in reasonable detail) upon which Buyer's belief is based. Without prejudice to Buyer's rights and remedies hereunder, Buyer agrees to use commercially reasonable efforts to give Seller (i) on or before the end of each calendar week prior to the Defect Claim Date, written notice of all alleged Title Defects discovered by Buyer during the preceding calendar week, which notice may be preliminary in nature and supplemented prior to the Defect Claim Date; *provided*, *however*, that Buyer's failure to supply Seller with weekly notice(s) shall not be deemed to be a waiver by Buyer of any Title Defects. Buyer shall promptly (and in any event on or before the Defect Claim Date) furnish Seller with written notice of any Title Benefit of which Buyer has Knowledge prior to the Defect Claim Date.

       (b)    Title Benefit Notices. Seller shall have the right, but not the obligation, to deliver to Buyer, on or before the Defect Claim Date, a notice with respect to each Title Benefit (a "***Title Benefit Notice***") including (i) a description of the alleged Title Benefit, (ii) a description of the Assets affected by the Title Benefit (each, a "***Title Benefit Property***"), (iii) the Allocated Value of each Title Benefit Property, (iv) supporting documents available to Seller and reasonably necessary for Buyer to verify the existence of the alleged Title Benefit and (v) the amount by which Seller reasonably believes the Allocated Value of the Title Benefit Property is increased by the alleged Title Benefit and the computations (in reasonable detail) upon which Seller's belief is based. For all purposes of this Agreement and notwithstanding anything herein to the contrary, Seller shall be deemed to have waived any claim with respect to an alleged Title Benefit that Seller

fails to assert as a Title Benefit by a Title Benefit Notice received by Buyer on or before the Defect Claim Date.

(c)     Seller's Right to Cure.  Seller shall have the right, but not the obligation, to attempt, at its sole cost, to cure any Title Defects at any time prior to the date that is five (5) Business Days prior to Seller's delivery of the Final Settlement Statement (the "*Cure Period*"); provided that the Cure Period with respect to any Title Defect that Seller is attempting to cure through any judicial proceedings shall be tolled through the duration of such judicial proceedings, but such period of tolling shall not continue beyond the twelve (12) month anniversary of the Closing Date.  Buyer will reasonably cooperate with any such efforts but will not be obligated to pay any money in support of Seller's curative efforts.

(d)     Remedies for Title Defects.  Subject to Seller's continuing right to dispute the existence of a Title Defect and/or the Title Defect Amount asserted with respect thereto, in the event that any Title Defect timely asserted by Buyer in accordance with Section 5.3(a) is not waived in writing by Buyer or cured during the Cure Period, Seller shall, at its sole option, elect to, subject to Section 5.3(i):

(i)     reduce the Purchase Price by an amount (the "*Title Defect Amount*") determined pursuant to Section 5.3(g) or Section 5.3(j)(iii) as being the value of such Title Defect; or

(ii)     exclude the Title Defect Property that is subject to such Title Defect from the transactions contemplated hereunder (together with all directly associated Assets) as Excluded Assets and reduce the Purchase Price by an amount equal to the Allocated Value thereof; provided, that this clause (ii) shall only be applicable to the extent that the sum of (A) the Title Defect Amounts of all Title Defects affecting such Title Defect Property and (B) the Remediation Amounts of all Environmental Defects affecting such Title Defect Property exceed fifty percent (50%) of its Allocated Value.

(e)     Remedies for Title Benefits.  With respect to each Title Benefit timely asserted under Section 5.3(b), subject to Buyer's right to dispute the existence of a Title Benefit and the Title Benefit Amount asserted with respect thereto, the sole and exclusive remedy of Seller shall be as an offset against Title Defect Amounts which would otherwise result in a reduction to the Purchase Price.

(f)     Exclusive Remedy.  Notwithstanding any other provision of this Agreement, except for the Special Warranty, Section 5.3(d) shall be the exclusive right and remedy of Buyer with respect to any Title Defect or Seller's failure to have Defensible Title with respect to any Assigned Lease or any other title matter with respect to any Asset, and Buyer hereby waives any and all other rights or remedies with respect thereto (including any claim relating to title that otherwise would be covered under any representation and warranty or covenant contained herein (other than the representations and warranties in Sections 7.5, 7.6, 7.7, 7.8, 7.9, and 7.10)).

(g)     Title Defect Amount.  The Title Defect Amount in respect of any Title Defect Property resulting from a Title Defect shall be the amount by which the Allocated Value of such

Title Defect Property is reduced as a result of the existence of such Title Defect and shall be determined in accordance with the following terms and conditions:

(i)  if Buyer and Seller agree on the Title Defect Amount, then that amount shall be the Title Defect Amount;

(ii)  if the Title Defect is an Encumbrance that is undisputed and liquidated in amount, then the Title Defect Amount shall be the amount necessary to be paid to remove the Title Defect from the Title Defect Property;

(iii)  if the Title Defect represents a discrepancy between (A) the actual Net Revenue Interest for such Title Defect Property and (B) the Net Revenue Interest stated on Exhibit E for such Title Defect Property (and the Working Interest applicable to such Title Defect Property is decreased in the same proportion as the decrease in the Net Revenue Interest), then the Title Defect Amount shall be the product of (x) the Allocated Value of such Title Defect Property *multiplied by* (y) one (1), *minus* a fraction, the numerator of which is the actual Net Revenue Interest for such Title Defect Property and the denominator of which is the Net Revenue Interest for such Title Defect Property as set forth on Exhibit E;

(iv)  if the Title Defect represents an Encumbrance upon or other defect in title affecting such Title Defect Property of a type not described above, the Title Defect Amount shall be determined by taking into account the Allocated Value of such Title Defect Property, the portion of such Title Defect Property affected by the Title Defect, the legal effect of the Title Defect, the potential economic effect of the Title Defect over the life of such Title Defect Property, the values placed upon the Title Defect by Buyer and Seller and such other reasonable factors as are necessary to make a proper evaluation;

(v)  the Title Defect Amount with respect to a Title Defect Property shall be determined without duplication of any costs or losses included in another Title Defect Amount hereunder and the Title Defect Amount with respect to any Title Defect shall be determined without duplication of any costs or losses notwithstanding that the fact, circumstances or conditions giving rise to such Title Defect may qualify as a Title Defect under more than one prong of the definition of Defensible Title; and

(vi)  notwithstanding anything to the contrary in this Article V, except for Title Defect Amounts determined under Section 5.3(g)(ii) with respect only to Encumbrances for which, after Closing, a lienholder would have recourse against Buyer or Buyer's properties beyond the affected Asset(s), the aggregate Title Defect Amounts attributable to the effects of all Title Defects upon any Property shall not exceed the Allocated Value of such Property.

(h)  Title Benefit Amount.  The "***Title Benefit Amount***" resulting from a Title Benefit shall be determined in accordance with the following methodology, terms and conditions:

(i)  if Buyer and Seller agree on the Title Benefit Amount, then that amount shall be the Title Benefit Amount;

(ii)  if the Title Benefit represents an excess of (A) the actual Net Revenue Interest for any Title Benefit Property over (B) the Net Revenue Interest stated on

18

Exhibit E for such Title Benefit Property (and the Working Interest in such Title Benefit Property is increased in the same proportion as the increase in the Net Revenue Interest), then the Title Benefit Amount shall be the product of (x) the Allocated Value of such Title Benefit Property multiplied by (y) the result obtained by subtracting one (1) from a fraction, the numerator of which is the actual Net Revenue Interest for such Title Benefit Property and the denominator of which is the Net Revenue Interest for such Title Benefit Property as set forth on Exhibit E;

(iii)   if the Title Benefit is of a type not described above, then the Title Benefit Amounts shall be determined by taking into account the Allocated Value of the Title Benefit Property, the portion of such Title Benefit Property affected by such Title Benefit, the legal effect of the Title Benefit, the potential economic effect of the Title Benefit over the life of such Title Benefit Property, the values placed upon the Title Benefit by Buyer and Seller and such other reasonable factors as are necessary to make a proper evaluation; and

(iv)   the Title Benefit Amount with respect to a Title Benefit Property shall be determined without duplication of any amounts included in another Title Benefit Amount hereunder and the Title Benefit Amount with respect to any Title Benefit shall be determined without duplication of any amounts notwithstanding that the fact, circumstances or conditions giving rise to such Title Benefit may qualify as a Title Benefit under more than one prong of the definition of Title Benefit.

(i)   Title Recovery Limitations.  Notwithstanding anything to the contrary, (i) in no event shall there be any adjustments to the Purchase Price or other remedies provided by Seller hereunder for any Title Defect in respect of any individual Title Defect Property if the Title Defect Amount for such Title Defect Property attributable to such Title Defect does not exceed $50,000 (the "***Individual Title Defect Threshold***") and (ii) in no event shall there be any adjustments to the Purchase Price or other remedies provided by Seller hereunder for any Title Defect unless the sum of (A) all Title Defect Amounts which are not excluded as a result of the operation of the Individual Title Defect Threshold and (B) all Remediation Amounts which are not excluded as a result of the operation of the Individual Environmental Defect Threshold exceeds three percent (3%) of the Final Price (the "***Aggregate Defect Deductible***"), after which point Buyer shall be entitled to remedies for such Title Defects only to the extent of such excess.  For the avoidance of doubt, no Title Defect Amounts in respect of any Title Defect Property retained by Seller pursuant to Article V, Article VI or otherwise will be counted towards the Aggregate Defect Deductible.

(j)   Pending Title Matters at Closing; Title Dispute Resolution.

(i)   Subject to Section 5.3(i) above, any Title Defect Property in respect of timely asserted Title Defects that have not been cured to Buyer's reasonable satisfaction prior to Closing shall be excluded from the Assets to be assigned or conveyed to Buyer at Closing and the Purchase Price shall be reduced by the Allocated Value of such Title Defect Property unless (a) Seller elects to reduce the Purchase Price in respect of such Title Defect pursuant to Section 5.3(d)(i) and has agreed with Buyer upon the Title Defect Amount in respect thereof or (b) Seller elects to include any such interest in the Assets assigned or conveyed to Buyer at Closing pending subsequent resolution pursuant to the terms of this Section 5.3(j), with Buyer's asserted Title Defect Amount in respect thereof to be deposited with the Escrow Agent in an account (the "***Defect Escrow Account***") separate from the Indemnity Holdback Amount pursuant to the

Escrow Agreement. Any Title Benefit Property in respect of any timely asserted Title Benefit for which, as of Closing, Buyer is disputing the existence of such Title Benefit or the Title Benefit Amount associated therewith shall nevertheless be included in the Assets assigned or conveyed to Buyer at Closing, with no adjustment to the Purchase Price at Closing in respect of such Title Benefit. Neither the exclusion of any Title Defect Property pursuant to the first sentence of this Section 5.3(j)(i) nor the inclusion of any Title Defect Property or Title Benefit Property pursuant to the preceding sentence or clause (b) of the first sentence of this Section 5.3(j)(i) shall be deemed a waiver by any Party of any rights in respect of the associated Title Defects and Title Benefits. From and after Closing, all disputes as to the existence of any Title Defect or Title Benefit (including the effectiveness or sufficiency of any curative measures) or the amount of any Title Defect Amount or any Title Benefit Amounts (collectively "Title Disputes") shall, subject to Seller's right to cure any such Title Defect during the Cure Period, be resolved pursuant to Section 5.3(j)(iii) below unless otherwise agreed by the Parties.

(ii)     To the extent that during the Cure Period, Seller cures to Buyer's reasonable satisfaction any Title Defect in respect of which the Title Defect Property was withheld from Closing pursuant to Section 5.3(j)(i), then promptly after Seller and Buyer agree upon such cure, Seller shall convey the applicable Title Defect Property to Buyer, effective as of the Effective Time, pursuant to an assignment substantially in the form of the Assignment and Buyer shall pay Seller the Allocated Value of such Title Defect Property as adjusted pursuant to Section 3.3 through the date of such assignment with respect to such Title Defect Property. To the extent that, during the Cure Period, Seller cures to Buyer's reasonable satisfaction any Title Defect in respect of which the Title Defect Property was included in the interests conveyed to Buyer at Closing pursuant to clause (a) of Section 5.3(j)(i), then promptly after Seller and Buyer agree upon such cure, Buyer shall pay to Seller all amounts, if any, by which the Purchase Price was reduced at Closing in respect of such Title Defect. To the extent that, during the Cure Period, Seller cures to Buyer's reasonable satisfaction any Title Defect in respect of which the Title Defect Property was included in the interests conveyed to Buyer at Closing pursuant to clause (b) of Section 5.3(j)(i), then promptly after Seller and Buyer agree upon such cure, the Parties shall jointly instruct the Escrow Agent to release all amounts deposited in the Defect Escrow Account in respect of such Title Defect in accordance with such agreement of the Parties. To the extent that Seller has not, by the end of the Cure Period, cured to Buyer's reasonable satisfaction any Title Defect in respect of which the Title Defect Property was included in the interest conveyed to Buyer at Closing pursuant to clause (b) of Section 5.3(j)(i), then the Parties shall, to the extent the Title Defect Amount in respect of such Title Defect has been agreed by the Parties, promptly jointly instruct the Escrow Agent to release all amounts deposited in the Defect Escrow Account in respect of such Title Defect in accordance with such agreement of the Parties (taking into account operation of Section 5.3(i)) or, if the Title Defect Amount has not been agreed, such matter shall be resolved pursuant to Section 5.3(j)(iii) below unless otherwise agreed by the Parties.

(iii)     If Seller and Buyer are unable to agree on any Title Dispute by the Title Dispute Date or as described in Section 14.1(c) regarding a failure of the condition to Close in Section 10.4 or Section 11.4 with respect to a Title Dispute, such Title Dispute shall be exclusively and finally resolved pursuant to this Section 5.3(j)(iii). There shall be a single arbitrator, who shall be a title attorney with at least ten (10) years of experience in oil and gas titles involving properties of similar size and value and who has not represented any of the Parties

or their Affiliates during the five (5)-year period prior to his or her appointment as arbitrator hereunder, in each case as selected by mutual agreement of Buyer and Seller within fifteen (15) days after the Title Dispute Date or, in the event the Parties are in dispute as to the satisfaction of the conditions set forth in Section 10.4 or Section 11.4 (as described in Section 14.1(c)) with respect to a Title Dispute, within two (2) days of the date the Parties would have otherwise been required to Close pursuant to Section 12.1 but for such dispute (and assuming the satisfaction of all other conditions to Closing set forth in Article X and Article XI) (the "**Title Arbitrator**"). If the Parties are unable to mutually agree upon the Title Arbitrator, the Houston office of the AAA shall appoint the Title Arbitrator. The place of arbitration shall be Houston, Texas, and the arbitration shall be conducted in accordance with the AAA Rules, to the extent such rules do not conflict with the terms of this Section 5.3(j)(iii). The Title Arbitrator's determination shall be made within thirty (30) days after submission of Title Disputes and shall be final and binding upon all Parties, without right of appeal. In making his determination with respect to any Title Dispute, the Title Arbitrator shall be bound by the rules set forth in Section 5.3(g) and Section 5.3(h) and, subject to the foregoing, may consider such other matters as in the opinion of the Title Arbitrator are necessary to make a proper determination. The Title Arbitrator, however, may not award (A) Buyer a greater Title Defect Amount than the Title Defect Amount claimed by Buyer in its applicable Title Defect Notice or (B) Seller a greater Title Benefit Amount than the Title Benefit Amount claimed by Seller in the applicable Title Benefit Notice, if any. The Title Arbitrator shall act for the limited purpose of determining the specific Title Disputes submitted by either Party, and the Title Arbitrator may not award damages, interest or penalties to either Party with respect to any Title Dispute. Seller and Buyer shall each bear its own legal fees and other costs of presenting its case to the Title Arbitrator. Seller, on the one hand, and Buyer, on the other hand, shall each bear one-half of the costs and expenses of the Title Arbitrator.

(iv)    Promptly upon receipt of the Title Arbitrator's decision with respect to any Title Dispute:

(A)    With respect to each decision relating to a Title Defect or Title Defect Amount, Seller shall promptly notify Buyer of which remedy under Section 5.3(d) it elects with respect to such Title Defect.

(B)    To the extent such decision relates to a Title Defect for which the affected Title Defect Property was excluded from Closing pursuant to the first sentence of Section 5.3(j)(i), then, within five (5) Business Days of receipt of notice of Seller's election pursuant to clause (A) above, either (i) if Seller elects to reduce the Purchase Price in respect of such Title Defect in accordance with Section 5.3(d)(i) then Seller shall convey the applicable Title Defect Property to Buyer, effective as of the Effective Time, pursuant to an assignment substantially in the form of the Assignment and Buyer shall pay Seller the Allocated Value of such Title Defect Property as adjusted in accordance with the Title Arbitrator's decision and Section 3.3 through the date of such assignment (taking into account operation of Section 5.3(i)) or (ii) if Seller

21

elects to retain such Title Defect Property in accordance with Section 5.3(d)(ii) then the applicable Title Defect Property shall permanently become an Excluded Asset.

(C)     To the extent such decision relates to a Title Defect for which the affected Title Defect Property was included in the interests conveyed to Buyer at Closing pursuant to clause (b) of Section 5.3(j)(i), then, within five (5) Business Days of receipt of notice of Seller's election pursuant to clause (A) above, either (i) if Seller elects to reduce the Purchase Price in respect of such Title Defect in accordance with Section 5.3(d)(i) the Parties shall jointly instruct the Escrow Agent to release all amounts deposited in the Defect Escrow Account in respect of such Title Defect to Seller and/or Buyer in accordance with such Agreement (taking into account operation of Section 5.3(i)) or (ii) if Seller elects to retain the affected Title Defect Property in accordance with Section 5.3(d)(ii) then Buyer shall reassign, effective as of the Effective Time, to Seller, with special warranty of title against claims by, through or under Buyer, but not otherwise, the affected Title Defect Property, Seller shall repay Buyer all portions of the Purchase Price paid to Seller at Closing in respect of such Title Defect Property and the Parties shall jointly instruct the Escrow Agent to release all amounts deposited in the Defect Escrow Account in respect of such Title Defect to Buyer.

(D)     To the extent such decision relates to a Title Benefit and the Title Arbitrator's decision entitles Seller to additional amounts in respect of such Title Benefit Property (as a result of the operation of Section 5.3(e)), then, within five (5) days of receipt of the Title Arbitrator's decision, Buyer shall pay to Seller all additional amounts due in respect of such Title Benefit.

(v)     All payments by any Party pursuant to this Section 5.3(j) in respect of any Title Defect or Title Benefit shall be considered adjustments to the Purchase Price.

**5.4     Preferential Purchase Rights and Consents**.

(a)     With respect to each Preferential Purchase Right set forth on Schedule 7.9 or otherwise identified prior to Closing, Seller shall, within seven (7) Business Days after (x) the Execution Date or (y) the identification of such Preferential Purchase Rights, to the extent not set forth on Schedule 7.9, send to the holder of each such Preferential Purchase Right a notice in material compliance with the contractual provisions applicable to such Preferential Purchase Right.  If any such Preferential Purchase Right is timely exercised prior to the Closing Date, then the Asset subject to such Preferential Purchase Right shall be excluded from the Assets to be

assigned or conveyed to Buyer at Closing and the Purchase Price shall be reduced by the Allocated Value of such Asset (or portion thereof).  Except as set forth in the preceding sentence, no Asset shall be excluded from Closing due to the existence of any Preferential Purchase Right and, at Closing, Buyer will assume all obligations to comply with any Preferential Purchase Rights affecting the Assets assigned or conveyed to it and Buyer will be entitled to the compensation owed, if any, under the applicable Preferential Purchase Right.  If the holder of any exercised Preferential Purchase Right in respect of which Assets were withheld from Closing fails to consummate the purchase of such Assets (or portion thereof) within 90 days after Closing (A) Seller shall have the option to notify Buyer of such fact and (B) upon receipt of such notification, Seller shall, subject to the other terms of this Agreement, assign or convey, effective as of the Effective Time, such Assets (or portion thereof) that was so excluded to Buyer pursuant to an instrument in substantially the same form as the Assignment and Buyer shall, subject to the other terms of this Agreement, pay to Seller the Allocated Value associated with such Assets (or portion thereof) that was so excluded (as adjusted pursuant to <u>Section 3.3</u> through the date of such assignment).

(b)      With respect to each Consent set forth on <u>Schedule 7.9</u> or otherwise identified prior to Closing, Seller shall, within seven (7) Business Days after (x) the Execution Date or (y) the identification of such Consent, to the extent not set forth on <u>Schedule 7.5</u>, send to the holder of each such Consent a notice in material compliance with the contractual provisions applicable to such Consent seeking such holder's consent to assign the Assets in connection with the transactions contemplated hereby. If any Consent other than a Punitive Consent is not obtained, waived or satisfied prior to Closing, the Assets affected by such Consent shall nevertheless be conveyed to Buyer at Closing.  If any Punitive Consent (as defined below) is not obtained, waived or satisfied prior to Closing and is applicable to the transactions contemplated hereby (notwithstanding any order of the Bankruptcy Court), then, at the option of Buyer, the Assets (or portions thereof) affected by such Punitive Consent shall be excluded from the Assets to be assigned or conveyed to Buyer at Closing, and the Purchase Price shall be reduced by the sum of the Allocated Value of such Assets (or portions thereof) so excluded.  In the event that any such Punitive Consent with respect to which any Asset was excluded pursuant to this <u>Section 5.4(b)</u> is obtained within one hundred eighty (180) days after the Closing Date, then, on or before the tenth (10th) Business Day after such Punitive Consent is obtained, Seller shall convey, effective as of the Effective Time, the Assets (or portions thereof) that were so excluded as a result of such previously un-obtained Consent to Buyer pursuant to an instrument in substantially the same form as the Assignment and Buyer shall pay to Seller the Allocated Value associated with such Assets (or portions thereof) that were so excluded (as adjusted pursuant to <u>Section 3.3</u> through the date of such assignment).  From and after Closing, to the extent Seller has complied with its obligations under this <u>Section 5.4(b)</u> and subject to Buyer's remedies for a breach of Seller's representations in <u>Section 7.5</u>, Buyer shall defend, release, indemnify and hold harmless the Seller Indemnified Parties from and against any Liabilities arising out of the failure to obtain any Consent in respect of the transfer of the Assets pursuant to this Agreement.  As used herein, the term **"*Punitive Consent*"** shall mean any Consent (i) where the applicable Lease or Contract does not provide by its express terms that such Consent may not be unreasonably withheld or (ii) the failure of which to obtain would (A) cause the assignment of an Asset to Buyer to be void or voidable, (B) trigger an express termination or right of termination of any Asset or (C) trigger any express monetary fee or penalty.

23

**ARTICLE VI**
**ENVIRONMENTAL MATTERS**

6.1     **Environmental Defects**.

(a)     Environmental Defect Notices.  On or before the Defect Claim Date, Buyer may deliver claim notices to Seller meeting the requirements of this Section 6.1(a) (each, an "*Environmental Defect Notice*") setting forth any matters which Buyer reasonably asserts as an Environmental Defect pursuant to this Section 6.1.  For all purposes of this Agreement and notwithstanding anything herein to the contrary but subject to Section 7.16 and remedies for a breach thereof, Buyer shall be deemed to have waived, and Seller shall have no liability for, any Environmental Defect that Buyer fails to assert as an Environmental Defect by an Environmental Defect Notice received by Seller on or before the Defect Claim Date.  To be effective, each Environmental Defect Notice shall be in writing, and shall include (i) a description of the alleged Environmental Defect(s) (including the applicable Environmental Law violated or implicated thereby), (ii) a description of the Assets that are affected by the alleged Environmental Defect ("*Environmental Defect Property*"), (iii) Buyer's assertion of the Allocated Value of the Environmental Defect Property affected by the alleged Environmental Defect, (iv) supporting documents reasonably necessary for Seller to verify the existence of the alleged Environmental Defect and (v) a calculation of the Remediation Amount (itemized in reasonable detail) that Buyer asserts is attributable to such alleged Environmental Defect.  Buyer's calculation of the Remediation Amount included in the Environmental Defect Notice must description in reasonable detail all assumptions used by Buyer in calculating the Remediation Amount.  Without prejudice to Buyer's rights and remedies hereunder, Buyer agrees to use commercially reasonable efforts to give Seller, on or before the end of each calendar week prior to the Defect Claim Date, written notice of all alleged Environmental Defects discovered by Buyer during the preceding calendar week, which notice may be preliminary in nature and supplemented prior to the Defect Claim Date; *provided*, *however*, that Buyer's failure to supply Seller with weekly notice(s) shall not be deemed to be a waiver by Buyer of any Environmental Defects.  Seller shall at its sole discretion have the right, but not the obligation, to cure any claimed Environmental Defect on or before Closing.

(b)     Remedies for Environmental Defects.  Subject to Seller's continuing right to dispute the existence of an Environmental Defect and/or the Remediation Amount asserted with respect thereto, in the event that any Environmental Defect timely asserted by Buyer in accordance with Section 6.1(a) is not waived in writing by Buyer or cured prior to Closing, Buyer shall, at its sole option, elect to, subject to Section 6.1(d):

(i)     reduce the Purchase Price by the Remediation Amount; or

(ii)     no later than five (5) Business Days prior to Closing, elect to exclude the Environmental Defect Property that is subject to such Environmental Defect from the transaction contemplated hereunder (and all directly associated Assets) as Excluded Assets and reduce the Purchase Price by an amount equal to the Allocated Value thereof; provided, that this clause (ii) shall only be applicable to the extent that (X) the sum of (A) the Remediation Amounts of all Environmental Defects affecting such Environmental Defect Property and (B) the Title Defect Amounts of all Title Defects affecting such Environmental Defect Property exceed fifty percent (50%) of its Allocated Value or (Y) in the event the Environmental Defect Property does

24

not have an Allocated Value, the Remediation Amounts of all Environmental Defects affecting such Environmental Defect Property exceed $250,000.  With respect to any Environmental Defect in respect of which Buyer elects to reduce the Purchase Price pursuant to clause (i) above and in respect of which the affected Environmental Defect Property is held out of Closing pursuant to Section 6.1(e)(i), Seller, rather than Buyer, shall have the option, upon receipt of the Environmental Arbitrator's decision in respect of such Environmental Defect to elect to exclude the Environmental Defect Property that is subject to such Environmental Defect from the transaction contemplated hereunder (and all directly associated Assets) as an Excluded Asset.

To the extent Buyer elects the option set forth in clause (i) above, Buyer shall be deemed to have assumed responsibility for all costs and expenses attributable to the Remediation of the applicable Environmental Defect and Buyer's obligations with respect to the foregoing shall be deemed to constitute Assumed Obligations. To the extent that Buyer, prior to Closing, elects the option set forth in clause (ii) above, Seller shall have the option, in its sole discretion, to terminate this Agreement upon providing Buyer with written notice of such termination two (2) Business Days following Buyer's election of the option set forth in clause (ii) above; *provided*, that if Buyer elects the option set forth in clause (ii) above and Seller subsequently elects to terminate this Agreement as a result of Buyer electing the option in clause (ii) above, then Buyer will have the option, in its sole discretion, to rescind its election under clause (ii) above within two (2) Business Days after receipt of Seller's election to terminate this Agreement, and if Buyer rescinds its election under clause (ii) above then this Agreement will remain in full force and effect in accordance with the terms hereof.

(c)     Exclusive Remedy.  Notwithstanding any other provision of this Agreement, but subject to Section 7.16 and remedies for a breach thereof, Section 6.1(b) shall be the exclusive right and remedy of Buyer with respect to any Environmental Defect, and Buyer hereby waives any and all other rights or remedies with respect thereto (including any claim relating to environmental matters that otherwise would be covered under any other representation and warranty or covenant contained herein (other than Section 7.16)).

(d)     Environmental Recovery Limitations.  Notwithstanding anything to the contrary, (i) in no event shall there be any adjustments to the Purchase Price or other remedies provided by Seller hereunder for any Environmental Defect if the associated Remediation Amount does not exceed $50,000 (the "***Individual Environmental Defect Threshold***") and (ii) in no event shall there be any adjustments to the Purchase Price or other remedies provided by Seller hereunder for any Environmental Defect unless the sum of (A) all Remediation Amounts which are not excluded as a result of the operation of the Individual Environmental Defect Threshold and (B) all Title Defect Amounts which are not excluded as a result of the operation of the Individual Title Defect Threshold exceeds the Aggregate Defect Deductible, after which point Buyer shall be entitled to remedies for such Environmental Defects only to the extent of such excess.  For the avoidance of doubt, no Remediation Amounts in respect of any Environmental Defect Property retained by Seller pursuant to Article V, Article VI or otherwise will be counted towards the Aggregate Defect Deductible.

(e)     Pending Environmental Matters at Closing; Environmental Dispute Resolution.

(i)      Subject to Section 6.1(d) above, any Environmental Defect Property in respect of timely asserted Environmental Defects described in an Environmental Defect Notice in accordance with this Section 6.1 that have not been cured to Buyer's reasonable satisfaction prior to Closing shall be excluded from the Assets to be assigned or conveyed to Buyer at Closing and the Purchase Price shall be reduced by the Allocated Value of such Environmental Defect Property unless Buyer elects to reduce the Purchase Price by the Remediation Amount in respect of such Environmental Defect pursuant to Section 6.1(b)(i) and has agreed with Seller upon the Remediation Amount in respect thereof.  The exclusion of any Environmental Defect Property and associated adjustments to the Purchase Price for purposes of Closing pursuant to the first sentence of this Section 6.1(e)(i) shall not be deemed a waiver by any Party of any rights in respect of the associated Environmental Defects.  From and after Closing, all disputes as to the existence or cure of any Environmental Defect or the amount of any Remediation Amount (collectively "***Environmental Disputes***") shall be resolved pursuant to Section 6.1(e)(ii) below unless otherwise agreed by the Parties.

(ii)      All Environmental Disputes shall be exclusively and finally resolved pursuant to this Section 6.1(e)(ii) including as described in Section 14.1(c) regarding a failure of the condition to Close in Section 10.4 or Section 11.4 with respect to an Environmental Dispute.  There shall be a single arbitrator, who shall be an environmental attorney with at least ten (10) years of experience in environmental matters involving oil and gas producing properties of similar size and value, and who has not represented either of the Parties or their Affiliates during the five (5) year period prior to his or her appointment as arbitrator hereunder, in each case as selected by mutual agreement of Buyer and Seller within fifteen (15) days after the Closing Date or, in the event the Parties are in dispute as to the satisfaction of the conditions set forth in Section 10.4 or Section 11.4 (as described in Section 14.1(c)) with respect to an Environmental Dispute, within two (2) days of the date the Parties would have otherwise been required to Close pursuant to Section 12.1 but for such dispute (and assuming the satisfaction of all other conditions to Closing set forth in Article X and Article XI) (the "***Environmental Arbitrator***").  If the Parties are unable to mutually agree upon the Environmental Arbitrator, the Houston office of the AAA shall appoint the Environmental Arbitrator.  The place of arbitration shall be Houston, Texas, and the arbitration shall be conducted in accordance with the AAA Rules, to the extent such rules do not conflict with the terms of this Section 6.1(e)(ii).  The Environmental Arbitrator's determination shall be made within thirty (30) days after submission of Environmental Disputes and shall be final and binding upon all Parties, without right of appeal.  In making his determination with respect to any Environmental Dispute, the Environmental Arbitrator shall be bound by the rules set forth in this Section 6.1 and, subject to the foregoing, may consider such other matters as in the opinion of the Environmental Arbitrator are necessary to make a proper determination.  The Environmental Arbitrator, however, may not award Buyer a greater Remediation Amount than the Remediation Amount claimed by Buyer in its applicable Environmental Defect Notice.  The Environmental Arbitrator shall act for the limited purpose of determining the specific Environmental Disputes submitted by either Party, and the Environmental Arbitrator may not award damages, interest or penalties to either Party with respect to any Environmental Dispute.  Seller and Buyer shall each bear its own legal fees and other costs of presenting its case to the Environmental Arbitrator.  Seller, on the one hand, and Buyer, on the other hand, shall each bear one-half of the costs and expenses of the Environmental Arbitrator.

(iii)     Promptly upon receipt of the Environmental Arbitrator's decision with respect to any Environmental Dispute, to the extent such decision determines that an Environmental Defect exists:

(A)     Seller shall promptly notify Buyer of which remedy under Section 6.1(b) it elects with respect to such Environmental Defect.

(B)     Within five (5) Business Days of receipt of notice of Seller's election pursuant to clause (A) above, either (i) if Seller elects to reduce the Purchase Price in respect of such Environmental Defect in accordance with Section 6.1(b)(i) then Seller shall convey the applicable Environmental Defect Property to Buyer pursuant to an assignment substantially in the form of the Assignment and Buyer shall pay Seller the Allocated Value of such Environmental Defect Property as adjusted in accordance with the Environmental Arbitrator's decision and Section 3.3 through the date of such assignment (taking into account operation of Section 6.1(d)) or (ii) if Seller elects to retain such Environmental Defect Property in accordance with Section 6.1(b)(ii) then the applicable Environmental Defect Property shall permanently become an Excluded Asset.

(f)     All payments by any Party pursuant to this Section 6.1(e) in respect of any Environmental Defect shall be considered adjustments to the Purchase Price.

**6.2     NORM, Wastes and Other Substances**.  Subject to and without limitation of Buyer's remedies under this Agreement, Buyer acknowledges that the Lands and Surface Interests have been used for exploration, development and production of oil and gas and that there may be petroleum, produced water, wastes or other substances or materials located in, on or under such Lands and Surface Interests or other interests included in or associated with the Assets.  Equipment and sites included in the Assets may contain asbestos, NORM or other Hazardous Substances. NORM may affix or attach itself to the inside of wells, materials and equipment as scale, or in other forms.  The wells, materials and equipment located on the Assets or included in the Assets may contain NORM and other wastes or Hazardous Substances.  NORM containing material and/or other wastes or Hazardous Substances may have come in contact with various environmental media, including surface water, ground water, soils or sediment.   Special procedures may be required for the assessment, remediation, removal, transportation or disposal of environmental media, wastes, asbestos, NORM and other Hazardous Substances from the Assets.  Notwithstanding anything herein to the contrary, no Seller Indemnified Party shall have, and Buyer shall not assert against any Seller Indemnified Party any claims of, any Liability on the account of the presence of NORM in, on or under the Lands and Surface Interests or other interests included in or associated with the Assets if the same does not currently violate or require Remediation under Laws, including Environmental Laws, or under Surface Agreements or Applicable Contracts, and no such condition shall be considered an Environmental Defect if the

same does not currently violate or require Remediation under Laws, including Environmental Laws, or under Surface Agreements or Applicable Contracts.

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES OF SELLER

**7.1     Generally**.

(a)     Subject to this Section 7.1, the disclaimers and waivers contained herein and the other terms and conditions of this Agreement, Seller represents and warrants to Buyer as set forth in Section 7.2 through Section 7.26.

(b)     Inclusion of a matter on a Schedule in relation to a representation or warranty shall not be deemed an indication that such matter necessarily would, or may, breach such representation or warranty absent its inclusion on such Schedule or that any matter disclosed on any Schedule is or may be material.  Matters may be disclosed on a Schedule for information purposes only.

(c)     If any fact, condition, or matter disclosed in any Schedule applies to more than one provision of this Article VII, a single disclosure of such fact, condition, or matter on any Schedule shall constitute disclosure with respect to all sections of this Article VII which are expressly referenced in such disclosure, regardless of which Schedule in which such fact, condition, or other matter is described.

**7.2     Organization; Existence**.  Each Seller is a limited liability company or limited partnership, as the case may be, duly formed, validly existing and in good standing under the Laws of the State of Delaware, and has all requisite power and authority to own and operate its property (including the Assets) and to carry on its business as now conducted in all material respects, and is duly licensed or qualified to do business as a foreign limited liability company and in good standing in all jurisdictions in which such qualification is required by Law, including all jurisdictions in which the Assets are located.

**7.3     Authorization; Enforceability**.  Seller and its Affiliates have full power and authority to enter into and perform this Agreement and the Transaction Documents to which they are, or will be, a party and the transactions contemplated herein and therein, subject to the provisions of the Bankruptcy Code.   Subject to requisite Bankruptcy Court approvals, the execution, delivery and performance by Seller and its Affiliates of this Agreement and the Transaction Documents, as applicable, have been duly and validly authorized and approved by all necessary action on the part of Seller and such Affiliates.  Subject to requisite Bankruptcy Court approvals, this Agreement is, and the Transaction Documents to which Seller or any of its Affiliates are or will be a party, when executed and delivered by Seller or such Affiliates will be, the valid and binding obligation of Seller or such Affiliates, as applicable, and enforceable against Seller and such Affiliates, as applicable, in accordance with their respective terms, subject to the effects of bankruptcy, insolvency, reorganization, moratorium and similar Laws, as well as to principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).  Seller has all requisite corporate authority needed to cause all of its Applicable Affiliates to comply and otherwise perform all of the obligations set forth in this Agreement (including the obligation to sell each such Applicable Affiliate's ownership interest in the

28

applicable Assets). Additionally, other than the Applicable Affiliates and Sheridan I (solely with respect to the Sheridan I Jointly Owned Assets), there is no Affiliate of any Seller that owns any interest in any Asset.

      **7.4**    **No Conflicts**. Except as disclosed on <u>Schedule 7.4</u> and assuming the receipt of all requisite Bankruptcy Court approvals, Consents, the waiver of all Preferential Purchase Rights, and the expiration or termination of the applicable waiting period under the HSR Act, the execution, delivery and performance by Seller and its Affiliates, as applicable, of this Agreement and the Transaction Documents to which Seller and its Affiliates are a party and the consummation of the transactions contemplated herein will not (a) conflict with or result in a breach of any provisions of the organizational documents or other governing documents of Seller or its Affiliates, as applicable, (b) except for Permitted Encumbrances, result in the creation of any Encumbrance on any of the Assets, (c) result in any material default or give rise to any right of termination, cancellation or acceleration under any of the terms, conditions or provisions of any Assigned Lease, Applicable Contract, note, bond, mortgage or indenture to which Seller is a party or by which Seller or the Assets may be bound or (d) other than the HSR Act, violate in any material way any Law applicable to Seller or any of the Assets.

      **7.5**    **Consents**. Except (a) as set forth on <u>Schedule 7.5</u>, (b) for Customary Post-Closing Consents, (c) under any maintenance of uniform interest provisions contained in any operating or other agreements, (d) for any Preferential Purchase Rights and (e) for the expiration or termination of the applicable waiting period under the HSR Act, there are no Consents.

      **7.6**    **Litigation**. Except as set forth on <u>Schedule 7.6</u>, there is no (a) lawsuit, action or litigation by or before any Governmental Authority, pending, or to Seller's Knowledge, threatened in writing, against Seller or its Affiliates, or (b) administrative or arbitration proceedings, pending, or to Seller's Knowledge, threatened in writing, against Seller or its Affiliates that relates to Seller's or its Affiliates' ownership or operation of the Assets or would affect the ability of Seller or its Affiliates to consummate the transactions contemplated by this Agreement.

      **7.7**    **Material Contracts**.

      (a)    <u>Schedule 7.7(a)</u> sets forth as of the Execution Date all Applicable Contracts of the types described below (excluding, for the avoidance of doubt, any Excluded Assets) to which any of Seller or its Affiliates is a party or by which the Assets are bound and that will be binding on Buyer or the Assets after Closing (collectively, the "***Material Contracts***"):

      (i)    any Applicable Contract that can reasonably be expected to result in aggregate payments by Buyer after Closing of more than $100,000 in any fiscal year or $250,000 in the aggregate over the term of such Applicable Contract (in each case, based solely on the terms thereof and without regard to any expected increase in volumes or revenues);

      (ii)    any Applicable Contract that can reasonably be expected to result in aggregate revenues to Buyer after Closing of more than $100,000 in any fiscal year or $250,000 in the aggregate over the term of such Applicable Contract (in each case, based solely on the terms thereof and without regard to any expected increase in volumes or revenues);

(iii)    any Hydrocarbon purchase and sale, marketing, transportation, dedication, balancing, gathering, treating, processing or similar Applicable Contract that is not terminable without penalty on thirty (30) days or less notice;

(iv)    any obligation to make any take or pay payment, advance payment or other similar payment (other than gas balancing arrangements), to deliver Hydrocarbons, or proceeds from the sale thereof, attributable to the Assets at some future time without receiving payment therefor at market or higher rates at or after the time of delivery;

(v)    any indenture, mortgage, loan, note, credit, sale-leaseback or similar Applicable Contract (in each case) to which any of the Assets are subject (whether Seller is the borrower, or the lender) and all related security agreements or similar agreements associated therewith;

(vi)    any Applicable Contract obligating Seller to sell, acquire, lease, farmout, farmin, grant, convey, carry any Third Party interest, offer or provide to any Third Party a back-in working interest, or otherwise dispose of any of its interests in any of the Assets other than conventional rights of reassignment;

(vii)    any operating agreement, exploration agreement, development agreement, participation agreement, joint venture agreement, partnership agreement, drilling obligation, rig agreement, farmout agreement, farmin agreement, unitization agreement, pooling agreement, surface use agreement, plant agreement, injection, repressuring or recycling agreement or other similar agreement;

(viii)    any agreement that creates any area of mutual interest with respect to the acquisition of any interest in any oil, gas, minerals, lands or assets, or agreement that restricts Seller's ability to compete;

(ix)    any agreement entered into by Seller or its Affiliates to acquire or shoot seismic;

(x)    any agreement entered into by Seller or its Affiliates that contains a call on production;

(xi)    any agreement that evidences a lease or rental of any land, building or other improvements or portion thereof, excluding any oil and gas lease; and

(xii)    any Applicable Contract with any Affiliate of Seller that will be binding on Buyer after the Closing Date.

(b)    Except as set forth on Schedule 7.7(b), there exist no material defaults or breaches under any Material Contract by Seller or its Affiliates or, to Seller's Knowledge, by any other Person that is a party to such Material Contract. To Sellers' Knowledge, there are no events, which with notice, the passage of time or both, would constitute such material defaults or breaches under any Material Contract. Seller has not received any written notice (i) that any of the other parties to the Material Contracts will cancel, terminate or fail to perform such party's obligations under

any of the Material Contracts, or (ii) that such other parties believe Seller or its Affiliates are in breach or default of any Material Contract.

(c)     True, correct and complete copies of all Material Contracts (including all amendments or modifications thereto) have, to the extent in the possession or control of Seller or its Affiliates, been provided or otherwise made available by Seller to Buyer prior to the Execution Date.

**7.8     No Violation of Laws**.  Except as set forth on Schedule 7.8, (x) neither Seller nor any of its Affiliates is in material violation of any Laws with respect to Seller's ownership or operation of the Assets as of the Execution Date and (y) with respect to Properties which are not operated by Seller or its Affiliates, to Seller's Knowledge, neither Seller nor any of its Affiliates is in material violation of any Laws with respect to Seller's ownership of the Assets as of the Execution Date.  This Section 7.8 does not include any matters with respect to Environmental Laws.

**7.9     Preferential Rights**.  Except as set forth on Schedule 7.9, there are no preferential purchase rights, rights of first refusal or other similar rights that are applicable to the transfer of the Assets in connection with the transactions contemplated hereby (each a "***Preferential Purchase Right***").

**7.10     Payment of Burdens**.  Except for the Suspended Funds or as set forth in Schedule 7.6 or Schedule 7.10, all Burdens due from Seller (or its Affiliates) with respect to their interest in the Assets, or as operator of the Assets, have been paid in all material respects or, if not paid, are being contested in good faith in the normal course of business.  Seller does not owe any material amounts to Governmental Authorities under escheat or unclaimed property laws with respect to funds (including the Suspended Funds) or property received in connection with owning or operating the Assets.  Schedule 7.10 sets forth all Burdens that are being contested.  Schedule 9.11 sets forth a true and correct list of all Suspended Funds as of the Execution Date.

**7.11     Current Commitments**.  Schedule 7.11 sets forth, as of the Execution Date, all approved authorities for expenditures and other approved capital commitments ("***Current AFEs***") relating to the Assets for which all of the activities anticipated in such Current AFEs have not been completed by the Execution Date and the remaining costs (net to Seller's and its Affiliates' aggregate interest) are reasonably expected to exceed $100,000.

**7.12     Taxes**.  Except as disclosed on Schedule 7.12, (a) Seller has timely filed or caused to be timely filed on its behalf all Asset Tax Returns required to be filed by it or its Affiliates (taking into account any valid extension of the due date for filing), (b) all Asset Taxes (whether or not shown on a Tax Return) that have become due and payable by Seller or its Affiliates have been timely paid (other than any Asset Taxes that are being contested in good faith), (c) there are no liens on any of the Assets attributable to Taxes other than statutory liens for Taxes that are not yet due and payable, (d) no audit, litigation or other proceeding with respect to Asset Taxes has been commenced or is presently pending, and Seller has not received written notice of any pending Claim against it (in each case, which remains outstanding) from any applicable Governmental Authority for assessment of Asset Taxes and, to Seller's Knowledge, no such Claim has been threatened, (e) Seller has withheld and paid all Taxes required to have been withheld and paid in

connection with any amounts paid or owing to any employee, independent contractor, creditor stockholder, or other party, (f) to Seller's Knowledge, none of the Assets is subject to any tax partnership agreement or is otherwise treated, or required to be treated, as held in an arrangement requiring a partnership income Tax Return to be filed under Subchapter K of Chapter 1 of Subtitle A of the Code, (g) neither Seller nor any of its Affiliates have filed any Tax Returns as if there is a tax partnership agreement or other arrangement requiring a partnership income Tax Return to be filed under Subchapter K of Chapter 1 of Subtitle A of the Code burdening the Assets covered by such Tax Return, (h) none of the Assets are covered by or subject to any Tax-related agreements with any Governmental Authority, including any Tax abatement or Tax credit agreements, which would be binding on Buyer or any of its Affiliates, (i) neither Seller nor any of its Affiliates have waived any statute of limitations in respect of Asset Taxes or agreed to any extension of time with respect to any Asset Tax assessment or deficiency and (j) neither Seller nor any of its Affiliates is a party to any Tax allocation or sharing agreement with respect to the Assets, or has any liability for any Asset Taxes of any Person (other than Seller or such Affiliate) under the federal consolidated tax return rules (or any similar provision of state, local, or non-U.S. Law), as a transferee or successor, by contract, or otherwise.

**7.13**   **Imbalances**.   Schedule 7.13 sets forth all Imbalances associated with the Assets as of the Effective Time and as of the date specified therein.

**7.14**   **Permits**.   Except as set out on Schedule 7.14, with respect to Assets currently operated by Seller or its Affiliates, (i) Seller (or its applicable Affiliate) has obtained all federal, state and local governmental licenses, permits, and certificates (other than Environmental Permits) that are required for its operation of such Assets in compliance in all material respects with applicable Laws and (ii) such Assets have been operated in material compliance with such licenses, permits and certificates.

**7.15**   **Brokers' Fees**.   Neither Seller nor any of its Affiliates has incurred any Liability, contingent or otherwise, for brokers' or finders' fees relating to the transactions contemplated by this Agreement or the Transaction Documents for which Buyer or its Affiliates shall have any responsibility.

**7.16**   **Environmental Matters**.   Except as set forth in Schedule 7.16 (i) neither Seller nor its Affiliates have received written notice of any pending or threatened claim, proceeding, suit or action regarding any alleged or actual breach of Environmental Laws, Environmental Permits, or the environmental provisions of Assigned Leases, Applicable Contracts or Surface Agreements in respect of the ownership or operation of the Assets, or of any release of Hazardous Substances from the Assets or operations conducted in connection therewith; (ii) with respect to the Assets, Seller has not entered into and is not a party to, and the Assets are not subject to, any agreements, consent decrees, orders or judgments of or with Governmental Authorities based on any Environmental Laws relating to the future use of the Assets; (iii) as to each disposal well, during Seller's and/or its Affiliates' period of operation, no disposal well has accepted waste or materials that were not authorized by its Environmental Permits and were not characterized under applicable Environmental Laws as non-hazardous oilfield waste or saltwater; and (iv) to Seller's Knowledge, NORM is not present on at or any of the Assets in quantities or concentrations requiring Remediation; *provided, however,* except for remedies otherwise arising under this Agreement pursuant to Section 13.2 (including those arising under Section 3.11), Buyer shall be deemed to

32

have waived, and Seller will have no liability for, any remedy pursuant to Section 13.2 for any breach of this Section 7.16 of which Buyer had Knowledge on or before the Defect Claim Date and which constitutes, or the facts giving rise to such breach constitutes, an Environmental Defect.

7.17    **Employee Matters**.

(a)    Neither Seller nor any of its Affiliates has incurred any material Liabilities with respect to non-compliance with labor or employment Laws with respect to any employee of Seller or any of its Affiliates that has performed work in connection with the Assets. None of Seller or any of its Affiliates has made any commitments or representations to any of its employees inconsistent with the terms of this Agreement regarding (i) potential employment by Buyer or any Affiliate of Buyer, or (ii) any terms and conditions of such potential employment by Buyer or any Affiliate thereof. No labor union or similar organization represents any of employees of Seller or its Affiliates and, to Seller's Knowledge, no labor union or similar organization is attempting to organize any such employees, or has within the past five (5) years attempted to organize any individual with respect to work that he or she performed with respect to the Assets.

(b)    There does not now exist, nor do any circumstances exist that could result in, any Controlled Group Liabilities of Seller that could be a Liability of Buyer following the Closing Date.  In addition, the consummation of the transactions contemplated by this Agreement will not, either alone or in combination with any other event, result in Buyer or any of its Affiliates incurring any Liability with respect to any Employee Benefit Plan sponsored, maintained, or contributed to by Seller or any of its ERISA Affiliates.

7.18    **Insurance**.  Schedule 7.18 sets forth a list of all insurance policies maintained by or for the benefit of Seller with respect to the Assets.  All premiums due on such insurance policies have either been paid or, if not yet due, accrued.  All such insurance policies are in full force and effect and enforceable in accordance with their terms.  Seller is not in default under, and has not otherwise failed to comply with, any material provision contained in any such insurance policy.

7.19    **Plugging and Abandonment**.  Except as described on Schedule 7.19, (i) there are no dry holes, or shut in or otherwise inactive Wells that are located on the Assets that Seller or its Affiliates are currently obligated by Law or Contract to plug and abandon or, to Seller's Knowledge, the relevant Third Party operator thereof is currently obligated by Law or Contract to plug and abandon and (ii) there are not any Wells that have been plugged and abandoned by Seller or, to Seller's Knowledge, by other Third Parties, in a manner that does not comply in all material respects with all Laws and Contracts.

7.20    **Access**.  Except as set forth on Schedule 7.20, none of the Leases are subject to any restrictions on use of the surface in connection with operations that would materially affect such use or operations as currently conducted. None of the Leases are subject to any restrictions on use of the surface in connection with operations that would materially affect such use or operations as currently conducted. Seller has a legal right of access to all of the Leases and Equipment as would allow the use of any of the Assets in the manner for which such Asset is currently owned and operated.

33

**7.21** **Qualified Operator**.   Seller is qualified pursuant to all regulations of Governmental Authorities and other Laws to own the Assets, and SPC is qualified pursuant to all regulations of Governmental Authorities and other Laws to operate all Assets for which SPC is the operator.  SPC and Seller, as applicable, have all lease bonds, area-wide bonds or other surety bonds as may be required by, and in accordance with, all Laws governing the ownership of the Assets and has filed any and all currently required reports necessary for such ownership with all Governmental Authorities having jurisdiction over such ownership.

**7.22** **Leases and Surface Agreements**.  Each Surface Agreement is valid, binding and in full force and effect against Seller and, to Seller's Knowledge, each other party thereto.  Except as set forth on Schedule 7.22, Seller has, and to Seller's Knowledge, each other party to the Leases and Surface Agreements has, complied in all material respects with the terms of the Leases and Surface Agreements, as applicable.  Except as set forth on Schedule 7.22, no written claim adverse to the rights of Seller as lessee or assignee under any of such Leases or Surface Agreements has been received by Seller, and no party to any Lease or Surface Agreement or any successor to the interest of such party has filed or, to Seller's Knowledge, threatened to file any action to terminate, cancel, rescind or procure judicial reformation of any Lease and/or Surface Agreement.

**7.23** **Wells and Payout Balances**.  Schedule 7.23 contains a complete and accurate list of the status of any "payout" balance, as of the Effective Time, to which the interests of Seller (or its Affiliates) in any of the Assets is subject that would result in a reversion or other adjustment at some level of cost recovery or payout (or passage of time or other event other than termination of a Lease by its terms).  Except as set forth on Schedule 7.23, Seller does not have any unfulfilled drilling obligations affecting the Leases by virtue of a Contract.

**7.24** **Cure Costs**. Schedule 7.24, which shall be completed ten (10) Business Days prior to the Bankruptcy Court hearing to approve the Plan, will set forth Seller's good faith estimate of Cure Costs with respect to all of the Leases and Applicable Contracts, as of such date.

**7.25** **Hedging**.  There are no futures, options, swaps or other derivatives with respect to the sale of Hydrocarbons from the Properties that are or will be binding on the Properties at any time after the Closing Date.

**7.26** **Perdido Litigation Wells**.  Seller and/or its Applicable Affiliates own a Working Interest throughout the entire productive subsurface interval for each Perdido Litigation Well.

## ARTICLE VIII
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows:

**8.1** **Organization; Existence**.  Buyer is a limited liability company, duly formed, validly existing and in good standing under the Laws of the State of its formation and has all requisite power and authority to own and operate its property and to carry on its business as now conducted in all material respects.  Buyer is or prior to Closing will be duly licensed or qualified to do business in all jurisdictions in which it carries on business and such qualification is required by Law except where such failure to be so qualified would not reasonably be expected to have a

material adverse effect upon the ability of Buyer to consummate the transaction contemplated by this Agreement.

**8.2**     **Authorization; Enforceability**.  Buyer and its Affiliates have full power and authority to enter into and perform this Agreement and the Transaction Documents to which they are, or will be, a party and the transactions contemplated herein and therein.  The execution, delivery and performance by Buyer and its Affiliates of this Agreement and the Transaction Documents, as applicable, has been duly and validly authorized and approved by all necessary action on the part of Buyer and such Affiliates.  This Agreement is, and the Transaction Documents to which Buyer or any of its Affiliates are, or will be, a party when executed and delivered by Buyer or such Affiliates will be, the valid and binding obligation of Buyer or such Affiliates, as applicable, and enforceable against Buyer and such Affiliates, as applicable, in accordance with their respective terms, subject to the effects of bankruptcy, insolvency, reorganization, moratorium and similar Laws, as well as to principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

**8.3**     **No Conflicts**.  Subject to Article X and Section 12.3, the execution, delivery, and performance by Buyer and its Affiliates, as applicable, of this Agreement and the Transaction Documents to which Buyer and its Affiliates are a party and the consummation of the transactions contemplated herein will not (a) conflict with or result in a breach of any provisions of the organizational or other governing documents of Buyer or its Affiliates, as applicable, (b) result in a material default or give rise to any material right of termination, cancellation or acceleration under any of the terms, conditions or provisions of any note, bond, mortgage or indenture to which Buyer is a party or by which Buyer or any of its property may be bound or (c) assuming the expiration or termination of the applicable waiting period under the HSR Act violate in any material way any Law applicable to Buyer or any of its property.

**8.4**     **Bankruptcy**.  There are no bankruptcy, reorganization or receivership proceedings pending against Buyer.

**8.5**     **Litigation**.  There is no investigation, lawsuit, action or litigation by or before any Governmental Authority to which Buyer or any of its Affiliates is a party, and no legal, administrative, or arbitration proceedings pending, or to Buyer's Knowledge, threatened against Buyer or any of its Affiliates, that in each case would reasonably be expected to have a material adverse effect upon the ability of Buyer to consummate the transactions contemplated in this Agreement.

**8.6**     **Regulatory**.  At Closing, Buyer shall be qualified pursuant to all regulations of Governmental Authorities and other Laws to own the Assets, and the consummation of the transactions contemplated in this Agreement will not cause Buyer to be disqualified as such an owner.  Buyer currently has, or at Closing will have obtained, lease bonds, area-wide bonds or other surety bonds as may be required by, and in accordance with, all Laws governing the ownership of the Assets and has filed, or by Closing will file, any and all currently required reports necessary for such ownership with all Governmental Authorities having jurisdiction over such ownership.

35

**8.7**     **Financing**.   Buyer shall have, as of the Closing Date, sufficient financing with which to pay the Adjusted Purchase Price and consummate the transactions contemplated by this Agreement.

**8.8**     **Independent Evaluation**.   Buyer is sophisticated in the evaluation, purchase, ownership and operation of oil and gas properties and related facilities.   In making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer (a) has relied or shall rely solely on its own independent investigation and evaluation of the Assets and the advice of its own legal, tax, economic, environmental, engineering, geological and geophysical advisors and the express provisions of this Agreement and not on any comments, statements, projections or other materials made or given by any representatives or consultants or advisors engaged by Seller and (b) has satisfied or shall satisfy itself through its own due diligence as to the environmental and physical condition of and contractual arrangements and other matters affecting the Assets.

**8.9**     **Brokers' Fees**.   Neither Buyer nor any of its Affiliates has incurred any Liability, contingent or otherwise, for brokers' or finders' fees relating to the transactions contemplated by this Agreement or the Transaction Documents for which Seller or its Affiliates shall have any responsibility.

**8.10**     **Accredited Investor**.   Buyer is an "accredited investor," as such term is defined in Regulation D of the Securities Act of 1933, as amended, and will acquire the Assets for its own account and not with a view to a sale or distribution thereof in violation of the Securities Act of 1933, as amended, and the rules and regulations thereunder, any applicable state blue sky Laws or any other applicable securities Laws.

**ARTICLE IX**
**CERTAIN AGREEMENTS**

**9.1**     **Conduct of Business**.   Except (x) for the operations covered by the Current AFEs and other capital commitments or actions set forth on Schedule 7.11 and (y) as expressly contemplated by this Agreement or expressly consented to in advance in writing by Buyer (which consent shall not be unreasonably delayed, withheld or conditioned), Seller agrees that, during the Interim Period, Seller will (and/or cause its Affiliates to):

(a)     operate those Assets for which Seller (or its Affiliates) serves as operator as a reasonably prudent operator, and in accordance with all Applicable Contracts and Laws in all material respects and consistent with past practice;

(b)     not (i) enter into any Applicable Contract that if entered into on or prior to the Execution Date would have been a Material Contract, (ii) amend any Applicable Contract, (iii) amend any Material Contract, or (iv) terminate or reject, or take any action in respect thereof or that may cause termination or rejection as to, any Applicable Contract;

(c)     not transfer, sell, mortgage, pledge, farmout, convey, assign, abandon, encumber, cancel, or otherwise dispose of (or permit any Affiliate to do any of the foregoing) all or any portion of the Assets, or any equity interest in Seller or any of its Affiliates, other than sales of production and tangible inventory in the ordinary course of business;

(d)      use commercially reasonable efforts to maintain in full force and effect each Lease and Surface Agreement and all permits and licenses with Governmental Authorities;

(e)      perform in all material respects all of its obligations under the Applicable Contracts;

(f)      promptly notify Buyer if Seller receives actual written notice of any material claim, suit, action or other proceeding, or any threat thereof, of any kind relating, in whole or in part, to the Assets or Seller;

(g)      upon receipt thereof, promptly furnish Buyer with copies of all authority for expenditures pertaining to the Assets;

(h)      not relinquish voluntarily Seller's position as operator with respect to any Asset;

(i)      not waive, release, assign, settle or compromise any claim or action relating to the Assets for which Buyer shall have any responsibility or that would otherwise affect the ownership or operation of the Assets after the Effective Time (other than the Perdido Litigation Matter and any attendant claims by Oxy in respect of the Perdido Litigation Wells, to the extent such release, assignment, settlement or compromise (i) does not decrease the Net Revenue Interest Seller is entitled to with respect to such Perdido Litigation Well in an amount below the Net Revenue Interest set forth on Exhibit E, (ii) does not obligate Seller to bear more than the Working Interest specified for such Perdido Litigation Well as shown on Exhibit E, except increases to the extent that such increases are accompanied by a proportionate increase in the Net Revenue Interest of Seller or (iii) does not materially detract from the ownership, operation or development of such Perdido Litigation Well from and after the Effective Time;

(j)      other than the Plan, not enter into a plan of consolidation, merger, share exchange or other reorganization or change of control transaction with any Person or adopt a plan of complete or partial liquidation;

(k)      maintain all insurance now in effect with respect to the Assets in all material respects;

(l)      timely pay or cause to be paid its proportionate shares of all expenses incurred in connection with the ownership or operation of the Assets;

(m)      not approve or incur any expenditure (i) in excess of $50,000 individually or (ii) in excess of $150,000 in the aggregate (in each case, net to Seller's and its Affiliates' aggregate interest), in each case, with respect to any individual Property;

(n)      provide Buyer access to or copies of data and information as reasonably requested regarding the operation of the Assets from and after the Execution Date, including lease operating statements;

(o)      not make any non-consent elections with respect to operations affecting the Assets; or

(p)      not fail to contest, authorize, seek, commit or agree to do any of the foregoing.

37

Buyer acknowledges that Seller may own undivided interests in certain of the Assets with respect to which neither Seller nor any Affiliate of Seller is the operator, and Buyer agrees that the acts or omissions of the other owners (including the operators) who are not Seller or an Affiliate of Seller shall not constitute a breach of the provisions of this Section 9.1, nor shall any action required by a vote of owners constitute such a breach so long as Seller has voted its interest in a manner that complies with the provisions of this Section 9.1.

9.2 **Governmental Bonds**. The bonds, letters of credit and guarantees posted by Seller or its Affiliates and relating to the Assets are set forth on Schedule 9.2. Buyer acknowledges that none of such bonds, letters of credit and guarantees will be transferred to Buyer. At or prior to Closing, Buyer shall deliver to Seller evidence of the posting of bonds or other security to replace such bonds, letters of credit and guarantees set forth on Schedule 9.2, to the extent required to own the Assets.

9.3 **Reports**. Seller and Buyer agree to cooperate with each other in connection with the preparation by such Parties of any report to any Governmental Authorities that are required of such Parties as the result of the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

9.4 **HSR Act**. If compliance with the HSR Act is required in connection with the transactions contemplated by this Agreement, as promptly as practicable and in any event not later than ten (10) Business Days after the Execution Date, each Party shall file with the Federal Trade Commission and the Department of Justice, as applicable, the required notification and report forms and shall as promptly as practicable furnish any supplemental information that may be requested in connection therewith. Each Party shall request, and take all reasonable steps to achieve, early termination of applicable waiting periods. Buyer shall bear all filing fees under the HSR Act and each Party shall bear its own costs for the preparation of any such filing and its other costs associated with compliance with the HSR Act. The Parties shall have the right to review, provide comments on and discuss in advance all characterizations of the information relating to this Agreement and the transactions contemplated hereby that appear in any filing made with a Governmental Authority as contemplated herein. The Parties agree to respond promptly to any inquiries from Governmental Authorities, including the Department of Justice or the Federal Trade Commission, concerning such filings and to substantially comply with the filing requirements of the HSR Act or other applicable Law. The Parties shall cooperate with and assist each other and, subject to the terms of the Confidentiality Agreement, shall promptly furnish all information to the other Party that is necessary in connection with the Parties' compliance with the HSR Act or other applicable Law. The Parties shall keep each other fully apprised with respect to any requests from or communications with Governmental Authorities, including the Department of Justice or the Federal Trade Commission, concerning such filings and shall consult and discuss in advance with each other, and consider in good faith the views of each other, with respect to all responses or submissions thereto. Neither Party shall participate in any meeting or discussion with a Governmental Authority with respect to the HSR Act unless it consults with the other Party in advance and, to the extent permitted by such Governmental Authority, gives the other Party the opportunity to attend and participate thereat. Each Party shall use its reasonable best efforts to take or cause to take all actions reasonably necessary, proper, or advisable in connection with any HSR Act or other applicable Law filing to consummate the transactions contemplated hereby as promptly as practicable. Notwithstanding anything to the contrary in this Agreement, neither Party

shall not voluntarily extend any waiting period or other applicable time period under the HSR Act or enter into any agreement with any Governmental Authority to delay, or otherwise not to consummate as soon as practicable the transactions contemplated hereby, except with the prior written consent of the other Party, which consent may be withheld in the sole discretion of the non-requesting Party.

9.5    **Amendment to Schedules**.  Buyer agrees that, with respect to the representations and warranties of Seller contained in this Agreement, Seller shall have the right until three (3) Business Days prior to Closing to add, supplement or amend the Schedules to its representations and warranties.  For all purposes of this Agreement, including for purposes of determining whether the conditions set forth in Article X have been fulfilled, the Schedules to Seller's representations and warranties contained in this Agreement shall be deemed to include only that information contained therein on the Execution Date and shall be deemed to exclude all information contained in any addition, supplement or amendment thereto; provided, however, that if the matters disclosed in such additions, supplements or amendments (individually or in the aggregate) could reasonably be expected to cause a failure of a condition set forth in Section 10.1 or Section 10.2, Buyer shall have the right to refuse to proceed to Closing, and in the event Buyer proceeds with Closing, then such matters disclosed pursuant to any such addition, supplement or amendment at or prior to Closing shall be deemed waived, and Buyer shall not be entitled to make a claim with respect thereto pursuant to the terms of this Agreement or otherwise.

9.6    **Operatorship**.  Seller makes no representations or warranties to Buyer as to transferability or assignability of operatorship with respect to any of the Assets.  Rights and obligations associated with operatorship of such Assets are governed by the applicable operating and similar agreements and will be determined in accordance with the terms of such agreements. Notwithstanding the foregoing, Seller and its Affiliates shall use commercially reasonable efforts at and after the Closing to provide Buyer assistance to be named as successor operator of any portion of the Assets (other than the Sheridan I Jointly Owned Assets) of which Seller or any of its Affiliates was operator immediately prior to the Closing, including by voting for Buyer as successor operator if permitted to do so by the applicable operating agreement; provided that Seller shall not be obligated to pay any money in support of Buyer's efforts to be named operator of any Asset.  Buyer shall, promptly following Closing, file all appropriate forms and declarations or bonds with federal and state agencies relative to its assumption of operatorship.  For all Assets for which Seller or its Affiliates currently serves as operator (other than properties for which SPC serves as operator on behalf of any entity other than Seller), Seller shall execute and deliver at Closing, and Buyer shall promptly file, the appropriate forms with the applicable regulatory agency transferring operatorship of such Assets to Buyer.  Buyer agrees that, following Closing, as between Buyer and Holdco I, Holdco I shall be the operator of the Sheridan I Jointly Owned Assets (other than those operated by a Third Party).  Within sixty (60) days after Closing, Seller shall cause Holdco I to deliver and execute, and Buyer will execute, a mutually acceptable (in good faith) joint operating agreement or similar agreement (which shall include the right of access to the Surface Interests if reasonably necessary for Buyer to conduct operations thereon) covering any Sheridan I Jointly Owned Assets that are not otherwise subject to a joint operating agreement at Closing, which joint operating agreement shall designate Sheridan I as the operator thereunder.

9.7    **Post-Closing Revenues**.  If Closing occurs, (a) Buyer shall be entitled to all production and products from or attributable to the Assets from and after the Effective Time and

the proceeds thereof, and to all other income, proceeds, receipts, and credits earned with respect to the Assets on or after the Effective Time and (b) Seller shall be entitled to all production and products from or attributable to the Assets prior to the Effective Time and the proceeds thereof, and to all other income, proceeds, receipts, and credits earned with respect to the Assets prior to the Effective Time.  From and after Closing, for a period of 12 months after the Closing Date, if any Party receives amounts to which the other Party is entitled pursuant to this Agreement such amount shall be remitted or forwarded to the other Party unless accounted for in the Preliminary Settlement Statement or the Final Settlement Statement.

      **9.8**    **Profits Interest Documents**.  Prior to the Closing, the Parties will use reasonable best efforts to cooperate with one another to facilitate the negotiation, execution and delivery of the Third Amended and Restated Limited Liability Company Agreement (the "***CRE LLCA***") of Crossing Rocks Energy II, LLC ("***CRE II***") at the Closing by the contemplated parties thereto, which agreement will incorporate the terms set forth in Exhibit I hereto.  Notwithstanding anything to the contrary herein (including Sections 10.2, 10.7, 11.2, 11.7, 12.3(s) and 12.3(t)), (a) neither the finalization and delivery of such agreement by the parties thereto nor the issuance of the applicable profits interests in accordance therewith is a condition to Closing, (b) no Party, its Affiliates, or any of their respective stockholders, partners, members, directors, officers, managers, employees, attorneys, agents and representatives will incur or be subject to any Liability whatsoever if such agreement is not finalized or entered into (whether before or after Closing), and (c) the terms set forth in Exhibit I are non-binding in accordance with the section titled "Non-Binding Effect" therein; provided that, if Buyer materially breaches its obligations in this Section 9.8 and does not cure or otherwise remedy such breach within ten (10) Business Days of Holder providing written notice to Buyer of such breach, describing such breach in reasonable detail, then upon the occurrence of a Liquidity Event (as defined below) following the Closing, and subject to the occurrence thereof, Buyer will place into an escrow account an amount equal to the proceeds, if any, that would have been distributed to Holder (as defined in Exhibit I) with respect to the Series C Units (as defined in Exhibit I) had such Series C Units been issued to Holder at the Closing (taking into account the terms set forth in Exhibit I, all relevant events, including additional capital contributions and equity issuances that occur following the Closing), and upon a final determination that Buyer committed such material breach (including the final resolution of all appeals of any such judgment), Holder will be entitled to recover the amounts held in such escrow account.  Notwithstanding anything to the contrary contained in this Agreement, Holder's right to receive the proceeds held in such escrow account, if any, is conditioned on Holder timely providing the requisite notice of breach to Buyer and such escrowed proceeds will serve as Holder's sole and exclusive source of recovery for claims of breach of this Section 9.8 (and all other remedies are hereby deemed expressly waived and disclaimed), and EACH PARTY (AND BY ENFORCING ANY OF ITS RIGHTS HEREUNDER, HOLDER THEREBY) ACKNOWLEDGES AND AGREES THAT DAMAGES RESULTING FROM THE FAILURE TO ISSUE THE SERIES C UNITS AT THE CLOSING TO HOLDER WOULD BE DIFFICULT, IF NOT IMPOSSIBLE TO CALCULATE, AND THE PROCEEDS HELD IN SUCH ESCROW ACCOUNT, IF ANY, ARE A FAIR AND REASONABLE ESTIMATE OF DAMAGES IN LIGHT OF THE UNCERTAINTIES IN CALCULATING THE ACTUAL DAMAGES THAT WILL BE SUFFERED UPON SUCH FAILURE TO ISSUE THE SERIES C UNITS.  Holder (upon its formation) will be an express third party beneficiary of the preceding proviso.  Notwithstanding the foregoing, no Party will have any obligation to proceed with negotiating the CRE LLCA if any other Person whose agreement is necessary for the applicable parties to enter

into such agreement requests terms that conflict or are otherwise inconsistent with those set forth in <u>Exhibit I</u>.  "Liquidity Event" means the occurrence of any of the following: (a) a merger, business combination or consolidation of Buyer with a third party that is not an Affiliate of either (i) Buyer or (ii) any member of Buyer that (together with its Affiliates) holds at least 40% of the Series A Units of Buyer as of the Closing Date, following which the members of Buyer or their respective Affiliates immediately preceding such merger, business combination or consolidation do not hold equity interests representing the right to receive more than 5% of the distributions payable upon a hypothetical liquidation of Buyer (or its successor), or the right to appoint any of the Persons serving on the board or similar governing body, of the Person surviving or resulting from such merger, business combination or consolidation; (b) the sale or disposition, whether in a single transaction or a series of related transactions, of assets that represent at least 95% of the value of all of the assets held by Buyer (together with all of its Subsidiaries) prior to such sale or disposition to a third party that is not an Affiliate of either (A) Buyer or (B) any member of Buyer that (together with its Affiliates) holds at least 40% of the Series A Units of Buyer as of the Closing Date, followed promptly by the dissolution or liquidation of Buyer; (c) the transfer to a third party that is not either (i) Buyer or (ii) any member of Buyer that (together with its Affiliates) holds at least 40% of the Series A Units of Buyer as of the Closing Date, whether in a single transaction or a series of related transactions, of at least 95% of the capital interests (based on value) in Buyer (by merger, exchange, consolidation or otherwise); or (d) the winding up, dissolution or liquidation of Buyer. For the avoidance of doubt, none of (1) an internal reorganization or restructuring of Buyer and its Subsidiaries, (2) recapitalization of Buyer and its Subsidiaries, or (3) a public offering of securities in Buyer (or its successor, any parent entity or Subsidiary) shall be deemed a Liquidity Event for purposes of this Agreement, and if following a Liquidity Event the Series C Units would not be entitled to any of the proceeds that would have been distributable with respect thereto had the applicable parties entered into the CRE LLCA at the Closing, then no amount will be set aside in an escrow account and Holder will not be entitled to any payments hereunder.  The board of directors or similar governing body of CRE II (or its successor), in its sole discretion, will conclusively determine the value of any non-cash property that is distributed by CRE II (or its successor) to its equityholders for purposes of determining whether a distribution is required to such escrow account, and, if so, the value of any property, if any, to which Holder would be entitled pursuant to the terms hereof, to be placed in such escrow account; provided, any such non-cash property will have the same value that is used in connection with determining the amount distributable with respect to any other profits interests issued by CRE II (or its successor).  If CRE II (or its successor) proposes to make both cash and non-cash distributions and a portion of such distributions is payable into such escrow account, then CRE II's board of directors or similar governing body will conclusively determine in its sole discretion the proportions and types of property to be paid into such escrow account.

     **9.9**    **<u>Change of Name</u>**.  Within ninety (90) days after Closing, Buyer shall eliminate the name "Sheridan" and any other variants thereof from the Assets (except for Assets for which SPC will remain as contract operator following Closing on behalf of Affiliates of SPC (other than Seller)) which are acquired by Buyer pursuant to this Agreement and shall have no right to use any logos, trademarks or trade names belonging to Seller or its Affiliates.  For avoidance of doubt, Buyer shall not eliminate the name "Sheridan" from assets operated by SPC as contract operator for any entity other than Seller.

**9.10**     **Casualty Loss**.     Subject to Section 10.4 and Buyer's termination rights in connection therewith, if, after the Effective Time but prior to Closing, a portion of the Assets is damaged or destroyed by fire or other casualty, or is taken or threatened to be taken in condemnation or under the right of eminent domain, (with such event being a "*Casualty Loss*"), Buyer shall nevertheless purchase such Asset(s) at Closing for their Allocated Value without any adjustment for such Casualty Loss; *provided*, *however*, Seller shall either (i) cure such Casualty Loss, at Seller's sole cost and expense, to the reasonable satisfaction of Buyer prior to Closing and replace any personal property that is the subject of a Casualty Loss with equipment of similar grade and utility, or (ii) elect to reduce the Purchase Price by the cost to repair such Casualty Loss in an amount reasonably acceptable to Buyer.  Any and all insurance or other third party proceeds received by Seller (or its Affiliates) in recompense for any Casualty Loss shall be retained by Seller.

**9.11**     **Suspended Funds**.     At Closing, the amount otherwise payable by Buyer shall be reduced by the aggregate balance of all positive amounts held by Seller (or its Affiliates) representing monies payable to royalty owners, mineral owners, and other parties with an interest in production of Hydrocarbons from the Assets that Seller has not paid because such parties cannot be located, the identity of such parties is unknown, or any other reason, which funds are more particularly described on Schedule 9.11 as of the date specified therein ("*Suspended Funds*").  At Closing, Buyer shall assume full and complete responsibility for proper handling and payment of all Suspended Funds.

**9.12**     **Bankruptcy Actions**.

(a)     Seller and Buyer shall promptly take all actions as are reasonably necessary or requested by the other to obtain the entry by the Bankruptcy Court of the Confirmation Order and/or any other order reasonably necessary in connection with the transactions contemplated by this Agreement as promptly as practicable, including furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court and responding to and resolving all objections thereto.  If the Confirmation Order or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby are appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect thereto), Seller shall use best efforts to prosecute or defend such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion such that the Confirmation Order or other order is not modified and remains in full force and effect.  In the event that the entry of the Confirmation Order or any other order reasonably necessary in connection with the transactions contemplated by this Agreement is timely appealed, Buyer shall use its reasonable commercial efforts to cooperate with Seller in the defense of such appeal; provided, however, that any such appeal of the Confirmation Order shall not delay or affect the timing of the Closing unless the Bankruptcy Court or the court with jurisdiction over the appeal issues a stay of the Confirmation Order or any action or portion of the transactions contemplated by this Agreement.

(b)     Subject to Seller's compliance with the terms and conditions of this Agreement and the Lender Consent, Buyer shall (i) support entry of the Confirmation Order, (ii) not object to, delay, impede, or take any other action to interference with acceptance, implementation, or consummation of the transactions contemplated by, or other provisions of, the Confirmation Order,

and (iii) not file any motion, pleading, or other document (including any modifications or amendments thereof) with the Bankruptcy Court or any other court that, in whole or in part, is materially inconsistent with this Agreement or the Plan.

(c)     By the Execution Date, Seller shall file with the Bankruptcy Court and serve a notice by first class mail on all non-Seller counterparties to all of Seller's Applicable Contracts and Assigned Leases and provide a copy of the same to Buyer.  The notice shall (i) inform each recipient that its respective Applicable Contract or Assigned Lease may be designated to be assumed and assigned to Buyer, (ii) set forth the proposed Cure Costs, and (iii) inform each recipient of the requirement to file and duly serve any objections to assumption and assignment and Cure Costs, as well as the deadline to file and serve any objections.

(d)     The Parties shall consult with each other regarding pleadings that any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval of the Confirmation Order, including, with respect to Seller, sharing in advance any drafts thereof with reasonable time for Buyer's review and comment, which comments shall be considered by Seller in good faith.  Each Seller shall promptly provide Buyer and its counsel with copies of all notices, filings and orders of the Bankruptcy Court that such Seller has in its possession (or receives) pertaining to the Confirmation Order, or any other notice, filings or order related to any of the transactions contemplated hereby, but only to the extent such papers are not publicly available on the docket of the Bankruptcy Court or otherwise made available to Buyer and its counsel.  No Seller shall seek any modification to the Confirmation Order by the Bankruptcy Court or any other Governmental Authority of competent jurisdiction to which a decision relating to the Bankruptcy Case has been appealed, in each case, without the prior written consent of Buyer (not to be unreasonably withheld, conditioned or delayed).

## ARTICLE X
## BUYER'S CONDITIONS TO CLOSING

The obligations of Buyer to consummate the acquisition of the Assets provided for herein is subject, at the option of Buyer, to the fulfillment by Seller or written waiver by Buyer, on or prior to Closing of each of the following conditions:

**10.1**     **Representations**.  The representations and warranties of Seller set forth in Article VII shall be true and correct in all material respects (without regard to materiality or material adverse effect qualifiers) as of the date of Closing as though made on and as of such date (other than representations and warranties that refer to a specified date, which need only be true and correct on and as of such specified date).

**10.2**     **Performance**.  Seller shall have performed or complied in all material respects with all obligations, agreements and covenants contained in this Agreement as to which performance or compliance by Seller is required prior to or at the Closing Date.

**10.3**     **No Legal Proceedings**.  No suit, action or other proceeding instituted by a non-Affiliated Third Party shall be pending by or before any Governmental Authority seeking to, and no determination by a Governmental Authority or Law shall have been enacted, issued,

promulgated, entered or enforced that purports to, restrain, prohibit, enjoin or declare illegal, or seeking substantial damages in connection with, the transactions contemplated by this Agreement.

**10.4** **Title Defects, Environmental Defects, Consents, and Preferential Purchase Rights**.  The sum of (a) (i) all Title Defect Amounts and Remediation Amounts in respect of Title Defects and Environmental Defects which Buyer has timely asserted in good faith (taking into account the operation of Section 5.3(d)(i) and Section 6.1(d) and excluding any Title Defect Amounts or Remediation Amounts in respect of any Title Defect Property or Environmental Defect Property that is excluded from the Assets pursuant to Article V or Article VI) *less* (ii) all Title Benefit Amounts in respect of Title Benefits which Seller has timely asserted in good faith, *plus* (b) any reductions in the Purchase Price for Casualty Losses pursuant to Section 9.10, *plus* (c) the Allocated Value of all Assets excluded from Closing pursuant to Sections 5.3(d)(ii), 5.4 and/or 6.1(b)(ii), shall be less than twenty percent (20%) of the Purchase Price.

**10.5** **HSR Act**.  Consummation of the transactions contemplated under the terms of this Agreement is not prevented from occurring by (and the required waiting period, if any, has expired or terminated under) the HSR Act and the rules and regulations of the Federal Trade Commission and the Department of Justice.

**10.6** **Confirmation Order**.  The Bankruptcy Court shall have entered the Confirmation Order approving the transactions contemplated by this Agreement on the terms as set out in this Agreement (including Section 2.3) or on such other terms, in each case, as the Buyer approves in its reasonable discretion, and such order shall not be subject to a stay of any kind.

**10.7** **Closing Deliverables**.  Seller shall have delivered (or be ready, willing and able to deliver at Closing) to Buyer the documents and other items required to be delivered by Seller under Section 12.3.

## ARTICLE XI
## SELLER'S CONDITIONS TO CLOSING

The obligations of Seller to consummate the transfer of the Assets provided for herein is subject, at the option of Seller, to the fulfillment by Buyer or written waiver by Seller, on or prior to Closing of each of the following conditions:

**11.1** **Representations**.  The representations and warranties of Buyer set forth in Article VIII shall be true and correct in all material respects (without regard to materiality or material adverse effect qualifiers) as of the date of Closing as though made on and as of such date (other than representations and warranties that refer to a specified date, which need only be true and correct on and as of such specified date).

**11.2** **Performance**.  Buyer shall have performed or complied in all material respects with all obligations, agreements, and covenants contained in this Agreement as to which performance or compliance by Buyer is required prior to or at the Closing Date.

**11.3** **No Legal Proceedings**.  No suit, action or other proceeding instituted by a non-Affiliated Third Party shall be pending by or before any Governmental Authority seeking to, and no determination by a Governmental Authority or Law shall have been enacted, issued,

promulgated, entered or enforced that purports to, restrain, prohibit, enjoin or declare illegal, or seeking substantial damages in connection with, the transactions contemplated by this Agreement.

**11.4    Title Defects, Environmental Defects, Consents, and Preferential Purchase Rights**.  The sum of (a) (i) all Title Defect Amounts and Remediation Amounts in respect of Title Defects and Environmental Defects which Buyer has timely asserted in good faith (taking into account the operation of Section 5.3(i) and Section 6.1(d) and excluding any Title Defect Amounts or Remediation Amounts in respect of any Title Defect Property or Environmental Defect Property that is excluded from the Assets pursuant to Article V or Article VI) *less* (ii) all Title Benefit Amounts in respect of Title Benefits which Seller has timely asserted in good faith, *plus* (b) any reductions in the Purchase Price for Casualty Losses pursuant to Section 9.10, *plus* (c) the Allocated Value of all Assets excluded from Closing pursuant to Sections 5.3(d)(ii), 5.4 and/or 6.1(b)(ii), but excluding any reductions in the Purchase Price for exercised Preferential Purchase Rights pursuant to Section 5.4(a), shall be less than twenty percent (20%) of the Purchase Price.

**11.5    HSR Act**.  Consummation of the transactions contemplated under the terms of this Agreement is not prevented from occurring by (and the required waiting period, if any, has expired or terminated under) the HSR Act and the rules and regulations of the Federal Trade Commission and the Department of Justice.

**11.6    Confirmation Order**.  The Bankruptcy Court shall have entered the Confirmation Order and such order shall not be subject to a stay of any kind.

**11.7    Closing Deliverables**.  Buyer shall have delivered (or be ready, willing and able to deliver at Closing) to Seller the documents and other items required to be delivered by Buyer under Section 12.3.

## ARTICLE XII
## CLOSING

**12.1    Date of Closing**.  Subject to the conditions stated in this Agreement and Article XIV, the consummation of the purchase and sale of the Assets to Buyer pursuant to this Agreement (the "*Closing*") shall occur on the later to occur of (a) January 31, 2020, or (b) if all conditions to Closing in Article X and Article XI have not yet been satisfied or waived by that date, then five (5) Business Days after such conditions have been satisfied or waived, or such other date as Buyer and Seller may agree upon in writing; provided, however, that subject to the satisfaction of the conditions set forth in Article X and Article XI, the Closing shall occur concurrently with the Effective Date (as defined in the Plan).  The date on which Closing actually occurs is referred to herein as the "*Closing Date*."

**12.2    Place of Closing**.  Closing shall be held at the offices of Seller in Houston, Texas, or such other location as Buyer and Seller may agree upon in writing.

**12.3    Closing Obligations**.  At Closing, the following documents shall be delivered and the following events shall occur, the execution of each document and the occurrence of each event being a condition precedent to the others and each being deemed to have occurred simultaneously with the others:

(a)      Seller (and the Applicable Affiliates) and Buyer shall execute, acknowledge and deliver the Assignment, in sufficient counterparts to facilitate recording, covering the Assets;

(b)      Seller (and the Applicable Affiliates) and Buyer shall execute, acknowledge (as applicable) and deliver assignments, on appropriate governmental forms, of state, federal and tribal leases comprising portions of the Assets, if any, in sufficient counterparts to facilitate filing with the applicable Governmental Authority;

(c)      (A) Buyer shall deliver evidence (including evidence of satisfaction of all applicable bonding requirements set forth on Schedule 9.2) that Buyer is qualified with the applicable authorities to succeed Seller as the owner and, where applicable, operator of the Properties and (B) Seller (and the Applicable Affiliates) and Buyer shall execute, such change of operator and related forms prepared by Seller pursuant to Section 9.6 for filing with the applicable Governmental Authorities to reflect Buyer's assumption of operatorship and plugging and abandonment liabilities with respect to the Wells and the Units;

(d)      Seller and Buyer shall execute and deliver the Preliminary Settlement Statement;

(e)      Buyer shall deliver to Seller, to the account designated in the Preliminary Settlement Statement, by direct bank or wire transfer in same day funds, the Preliminary Adjusted Purchase Price, *less* (i) the amounts required to be delivered to the Escrow Agent as described in Section 12.3(f) and 12.3(g), (ii) the Deposit, (iii) the amount of any Suspended Funds as provided in Section 9.11, (iv) the Adjustment Holdback Amount, (v) the Additional Indemnity Holdback Amount and (vi) the amount set forth in Schedule 3.11;

(f)      Buyer shall deliver to the Escrow Agent all amounts in accordance with the Escrow Agreement required pursuant to Section 5.3(j)(i) (in respect of Title Disputes) and Section 6.1(e)(i) (in respect of Environmental Disputes);

(g)      Buyer shall deliver to the Escrow Agent the Adjustment Holdback Amount and the Additional Indemnity Holdback Amount required pursuant to Section 3.10 and Section 13.4;

(h)      Buyer shall deliver to the Escrow Agent the amount set forth in Schedule 3.11;

(i)      Seller shall deliver an executed statement described in Treasury Regulation § 1.1445-2(b)(2) certifying that Seller is not a foreign person within the meaning of the Code and the Treasury Regulations promulgated thereunder;

(j)      Seller (and its applicable Affiliates) shall execute and deliver letters in lieu of transfer orders, substantially in the form attached hereto as Schedule 12.3(j), directing all purchasers of production to pay Buyer the proceeds attributable to production from each Asset from and after the Effective Time (except as otherwise agreed in the Transition Services Agreement);

(k)      Seller shall deliver a copy of the Confirmation Order, as entered by the Bankruptcy Court;

(l)     Seller shall deliver a completed and executed Texas Statement of Occasional Sale (Form 01-917), dated as of the Closing Date;

(m)     An authorized officer of Seller shall execute and deliver a certificate dated as of the Closing Date certifying on behalf of Seller that the conditions set forth in <u>Section 10.1</u> and <u>Section 10.2</u> have been satisfied or waived by the appropriate Party;

(n)     An authorized officer of Buyer shall execute and deliver a certificate dated as of the Closing Date certifying on behalf of Buyer that the conditions set forth in <u>Section 11.1</u> and <u>Section 11.2</u> have been satisfied or waived by the appropriate Party;

(o)     Seller shall cause to be delivered releases of any liens, claims, encumbrances and/or interests on or with respect to the Assets arising under or in connection with financing arrangements of Seller or its Affiliates;

(p)     Seller shall cause Fund II-B to execute, acknowledge and deliver reconveyances of all Affiliate NPIs to Seller, on forms of reconveyance reasonably acceptable to Buyer, effective as of a time immediately preceding the Effective Time, in sufficient counterparts to facilitate recording;

(q)     Buyer and SPC shall execute and deliver, or cause their respective Affiliates to execute and deliver, the Transition Services Agreement;

(r)     Seller and Buyer (along with Escrow Agent) shall execute and deliver the Escrow Agreement;

(s)     Seller and Buyer (and their applicable Affiliates) shall execute and deliver any other Transaction Documents that are required by other terms of this Agreement to be executed and/or delivered at Closing; and

(t)     Seller and Buyer shall execute and deliver all other documents and instruments reasonably requested by either Party as are reasonably necessary to transfer the Assets to Buyer.

**12.4     <u>Delivery of Records</u>**.  Subject to the Transition Services Agreement, no later than thirty (30) days following the Closing Date, Seller shall make the Records available to Buyer for pick up at Seller's offices in Houston, Texas or, in the case of Records maintained at any field office acquired included in the Assets, at such field office.  Seller may, at its option, retain copies of all or any portion of the Records.  Buyer will not destroy or otherwise dispose of any Records for a period of seven (7) years after Closing unless Buyer first gives Seller reasonable notice and an opportunity to retain or copy the Records to be destroyed.  From and after the Closing Date, solely for purposes of Seller's indemnification obligations hereunder, Seller shall have the right to review and copy all Records in Buyer's (or its Affiliates') possession or control during standard business hours upon reasonable notice for so long as Buyer retains the Records.

# ARTICLE XIII
## ASSUMPTION; INDEMNIFICATION; SURVIVAL

**13.1**   **Assumed Obligations**.   Without duplication of amounts borne by Buyer as adjustments to the Purchase Price pursuant to Section 3.3, and without limiting Buyer's rights to indemnity under this Article XIII, or its remedies with respect to Title Defects under Article V or Environmental Defects under Article VI, or to adjustments to the Purchase Price under Section 3.3, from and after Closing, Buyer assumes and hereby agrees to fulfill, perform, pay and discharge (or cause to be fulfilled, performed, paid and discharged) all obligations and Liabilities, known or unknown, of Seller and its Affiliates to the extent arising from, based upon, related to or associated with the Assets, regardless of whether such obligations or Liabilities arose prior to, on or after the Closing Date, including such obligations (i) to pay Burdens attributable to sales of Hydrocarbons produced from the Assets, including those held in suspense, (ii) under the Assigned Leases, Applicable Contracts, Surface Agreements, and applicable Laws with respect to ownership or operation of the Assets, (iii) arising out of any environmental condition of, or relating to, the Assets or otherwise relating to the disposal, release, discharge or emission in, on, under or from the Assets of Hazardous Substances regardless of when occurring, (iv) to plug and abandon all Wells and reclaim all well sites located on the Lands, (v) relating to any Imbalances or the Suspended Funds and (vi) except for Buyer's remedies set forth in Section 3.11, those matters identified on Part I of Schedule 7.6 (and, for the avoidance of doubt, Buyer shall be entitled to assume control and defense of all such matters from and after Closing); provided that, notwithstanding anything to the contrary, Buyer does not assume, and shall acquire the Assets Free and Clear of, any Cure Costs and/or Retained Liabilities (all of said obligations and Liabilities as limited as provided above herein being referred to as the "***Assumed Obligations***").   Notwithstanding anything herein to the contrary, Seller acknowledges and agrees that Buyer shall not assume any Employee Benefit Plan in any way or accept any transfer of assets or liabilities (and such liabilities shall not constitute Assumed Obligations) with respect to any Employee Benefit Plan, and that same are excluded from the Assumed Obligations.

**13.2**   **Indemnification by Seller**.   Effective as of the Closing Date, subject to the limitations set forth in Sections 13.4, 13.6, 13.8, 13.9 and 13.11, Seller shall be responsible for and hereby agrees to defend, release, indemnify and hold harmless Buyer and its Affiliates, and all of its and their respective stockholders, partners, members, directors, officers, managers, employees, attorneys, agents and representatives (collectively, the "***Buyer Indemnified Parties***") from and against any and all Liabilities to the extent arising from, based upon, related to or associated with:

(a)   any breach by Seller or its Affiliates of their representations or warranties contained in this Agreement or the Transaction Documents;

(b)   any breach by Seller or its Affiliates of their covenants and agreements under this Agreement or the Transaction Documents; and

(c)   the Specified Liabilities.

**13.3**   **Indemnification by Buyer**.   Effective as of the Closing Date, subject to the limitations set forth in Sections 13.6, 13.8, 13.9 and 13.11, Buyer and its successors and assigns shall be responsible for and hereby agree to defend, release, indemnify and hold harmless Seller

and its Affiliates, and all of their respective stockholders, partners, members, directors, officers, managers, employees, attorneys, agents and representatives (collectively, the "***Seller Indemnified Parties***") from and against any and all Liabilities to the extent arising from, based upon, related to or associated with:

(a)      any breach by Buyer or its Affiliates of their representations or warranties contained in this Agreement or the Transaction Documents;

(b)      any breach by Buyer or its Affiliates of their covenants and agreements under this Agreement or the Transaction Documents; or

(c)      the Assumed Obligations.

**13.4      <u>Indemnity Holdback; Limitations on Liability</u>**.

(a)      In order to provide security for Seller's indemnification obligations under this Agreement or the Special Warranty, the Deposit and the Additional Indemnity Holdback Amount shall be held by Escrow Agent from and after Closing and thereafter, collectively, shall be deemed to be the Indemnity Holdback Amount, which shall be disbursed by Escrow Agent pursuant to the Escrow Agreement in accordance with this <u>Section 13.4(a)</u> and the Escrow Agreement.  With respect to each claim for breach of the Special Warranty or indemnification asserted by Buyer (on its own behalf or on behalf of the Buyer Indemnified Parties) against Seller pursuant to <u>Section 13.2</u> during the period from and after the Closing Date until the twelve (12) month anniversary of the Closing Date, upon final resolution or determination of such an indemnity or Special Warranty claim by the Parties, Buyer and Seller shall jointly instruct Escrow Agent to disburse to Buyer the amount set forth in such joint instruction, which will be that portion of the Indemnity Holdback Amount being held in the Escrow Account as would satisfy such finally resolved or determined indemnity or Special Warranty claim.  On the six (6) month anniversary of the Closing Date, Seller shall, subject to the remainder of this sentence, be entitled to receive one-half (1/2) of the Indemnity Holdback Amount as of such time, and within two (2) Business Days after such date, Seller and Buyer shall execute and deliver to Escrow Agent joint written instructions to distribute such amount to Seller pursuant to the terms of the Escrow Agreement; *provided*, *however*, that Seller at such time shall not be entitled to, and Escrow Agent shall retain, any amounts in excess of the would-be balance of the Indemnity Holdback Amount (after such contemplated distribution to Seller) necessary to satisfy any unresolved indemnity or Special Warranty claims that have been timely delivered by Buyer (which amounts shall remain in the Escrow Account until such indemnity or special warranty claims are finally resolved).  On the twelve (12) month anniversary of the Closing Date, Seller shall, subject to the remainder of this sentence, be entitled to receive the balance of the Indemnity Holdback Amount as of such time, and within two (2) Business Days after such date, Seller and Buyer shall execute and deliver to Escrow Agent joint written instructions to distribute such amount to Seller pursuant to the terms of the Escrow Agreement; *provided, however*, that Seller at such time shall not be entitled to, and Escrow Agent shall retain, any amounts necessary to satisfy any unresolved indemnity or Special Warranty claims that have been timely delivered by Buyer (which amounts shall remain in the Escrow Account until such indemnity or Special Warranty claims are finally resolved).  If there are any portions of the Indemnity Holdback Amount remaining in escrow after the resolution of all previously outstanding

indemnity or Special Warranty claims, then Seller and Buyer shall promptly jointly instruct Escrow Agent to release the remaining account balance to Seller.

(b)     Notwithstanding anything to the contrary contained in this Agreement, the Indemnity Holdback Amount will serve as Buyer's sole and exclusive source of recovery for indemnity claims under Section 13.2 or the Special Warranty.

**13.5     EXPRESS NEGLIGENCE**.     THE INDEMNIFICATION, RELEASE, ASSUMED OBLIGATIONS, WAIVER AND LIMITATION OF LIABILITY PROVISIONS PROVIDED FOR IN THIS AGREEMENT SHALL BE APPLICABLE WHETHER OR NOT THE LIABILITIES, LOSSES, COSTS, EXPENSES AND DAMAGES IN QUESTION AROSE OR RESULTED SOLELY OR IN PART FROM THE GROSS, SOLE, ACTIVE, PASSIVE, CONCURRENT OR COMPARATIVE NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT OR VIOLATION OF LAW OF OR BY ANY INDEMNIFIED PARTY.  BUYER AND SELLER ACKNOWLEDGE THAT THIS STATEMENT COMPLIES WITH THE EXPRESS NEGLIGENCE RULE AND IS CONSPICUOUS.

**13.6     Exclusive Remedies**.  Notwithstanding anything to the contrary contained in this Agreement, from and after Closing, Sections 4.1(c), 5.2, 5.4(b), 13.2 (subject to the limitations in Section 13.4) and 13.3 contain the Parties' exclusive remedies against each other with respect to breaches of the representations, warranties, covenants and agreements of the Parties and their Affiliates contained in this Agreement and the Transaction Documents.  Except for the remedies contained in Sections 4.1(c), 5.2, 5.4(b), 13.2 (subject to the limitations in Section 13.4) and 13.3, from and after Closing, Seller and Buyer release, remise and forever discharge the other and the Buyer Indemnified Parties (in the case of Seller) and the Seller Indemnified Parties (in the case of Buyer) from any and all Liabilities at law or in equity, known or unknown, which such Parties might now or subsequently may have, based on, relating to or arising out of this Agreement, the Transaction Documents, the consummation of the transactions contemplated hereby, the ownership, use or operation of the Assets prior to Closing, or the condition, quality, status or nature of the Assets prior to Closing, including rights to contribution under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, breaches of statutory or implied warranties, nuisance or other tort actions, rights to punitive damages, common law rights of contribution and rights under insurance maintained by Seller or its Affiliates.  The Parties acknowledge and agree that the foregoing in no way shall be deemed to prejudice or otherwise limit the rights and remedies of the Parties under Sections 3.5, 3.6, Article V and/or Article VI, the exercise of which may occur after Closing; provided further, each Party shall have the non-exclusive right to specific performance and other equitable remedies available at law or equity (including injunctive relief) for the breach or failure of the other Party to perform its obligations hereunder required to be performed after Closing.

**13.7     Indemnification Procedures**.  All claims for indemnification under Sections 4.1(c), 5.4(b), 13.2, and 13.3 shall be asserted and resolved as follows:

(a)     For purposes of Sections 4.1(c) and 5.4(b) and this Article XIII, the term "***Indemnifying Party***" when used in connection with particular Liabilities shall mean the Party having an obligation to indemnify another Party or Person(s) with respect to such Liabilities pursuant to Section 4.1(c) and this Article XIII, and the term "***Indemnified Party***" when used in

connection with particular Liabilities shall mean the Party or Person(s) having the right to be indemnified with respect to such Liabilities by another Party pursuant to Section 4.1(c) and 5.4(b) and this Article XIII.

(b)     To make a claim for indemnification under Sections 4.1(c), 5.4(b), 13.2 or 13.3, an Indemnified Party shall notify the Indemnifying Party in writing of its claim under this Section 13.7, including the specific details of and specific basis under this Agreement for its claim (the "**Claim Notice**").  In the event that the claim for indemnification is based upon a claim by a Third Party against the Indemnified Party (a "**Third Party Claim**"), the Indemnified Party shall provide its Claim Notice promptly after the Indemnified Party has actual knowledge of the Third Party Claim and shall enclose a copy of all papers (if any) served with respect to the Third Party Claim; provided that the failure of any Indemnified Party to give notice of a Third Party Claim as provided in this Section 13.7 shall not relieve the Indemnifying Party of its obligations under Sections 4.1(c), 5.4(b), 13.2 or 13.3 (as applicable) except to the extent such failure results in insufficient time being available to permit the Indemnifying Party to defend against the Third Party Claim or otherwise materially prejudices the Indemnifying Party's ability to defend against the Third Party Claim.  In the event that the claim for indemnification is based upon an inaccuracy or breach of a representation, warranty, covenant or agreement, the Claim Notice shall specify the representation, warranty, covenant or agreement that was inaccurate or breached.

(c)     In the case of a claim for indemnification based upon a Third Party Claim, the Indemnifying Party shall have thirty (30) days from its receipt of the Claim Notice to notify the Indemnified Party whether it admits or denies its obligation to defend the Indemnified Party against such Third Party Claim at the sole cost and expense of the Indemnifying Party.  The Indemnified Party is authorized, prior to and during such thirty (30) day period, at the expense of the Indemnifying Party, to file any motion, answer or other pleading that it shall deem necessary or appropriate to protect its interests or those of the Indemnifying Party and that is not prejudicial to the Indemnifying Party.

(d)     If the Indemnifying Party agrees to defend the Indemnified Party against a Third Party Claim, it shall have the right and obligation to diligently defend, at its sole cost and expense, such Third Party Claim.  The Indemnifying Party shall have full control of such defense and proceedings, including any compromise or settlement thereof.  If requested by the Indemnifying Party, the Indemnified Party agrees to cooperate in contesting any Third Party Claim which the Indemnifying Party elects to contest at its expense.  The Indemnified Party may participate in, but not control, at its own expense, any defense or settlement of any Third Party Claim controlled by the Indemnifying Party pursuant to this Section 13.7(d).  An Indemnifying Party shall not, without the written consent of the Indemnified Party, (i) settle any Third Party Claim or consent to the entry of any judgment with respect thereto which does not include an unconditional written release of and a statement of no admission of liability by the Indemnified Party from all Liabilities in respect of such Third Party Claim or (ii) settle any Third Party Claim or consent to the entry of any judgment with respect thereto in any manner that may materially and adversely affect the Indemnified Party (other than as a result of money damages covered by the indemnity).

(e)     If the Indemnifying Party does not agree to defend the Indemnified Party against the Third Party Claim, or fails to diligently prosecute or settle such Third Party Claim, then the Indemnified Party shall have the right to defend against the Third Party Claim at the sole cost and

expense of the Indemnifying Party, with counsel of the Indemnified Party's choosing; provided, however, the Indemnifying Party may later admit its liability and assume the defense of the Third Party Claim at any time prior to settlement or final determination thereof. If the Indemnifying Party has not yet admitted its liability to defend the Indemnified Party against the Third Party Claim, the Indemnified Party shall send written notice to the Indemnifying Party of any proposed settlement and the Indemnifying Party shall have the option for ten (10) days following receipt of such notice to (i) admit in writing its liability to indemnify the Indemnified Party from and against the liability and consent to such settlement, (ii) if liability is so admitted, reject, in its reasonable judgment, the proposed settlement or (iii) deny liability. Any failure to respond to such notice by the Indemnified Party shall be deemed to be an election under clause (i) above.

(f)     In the case of a claim for indemnification not based upon a Third Party Claim, the Indemnifying Party shall have thirty (30) days from its receipt of the Claim Notice to (i) cure the Liabilities complained of, or (ii) dispute the claim for such Liabilities. If the Indemnifying Party does not notify the Indemnified Party within such thirty (30) day period that it has cured the Liabilities or that it disputes the claim for such Liabilities, the amount of such Liabilities shall conclusively be deemed a liability of the Indemnifying Party hereunder.

(g)     Notwithstanding anything to the contrary contained in this Agreement, for purposes of determining the amount of damages for which any Party is obligated to indemnify or entitled to indemnity under this Article XIII (but not for the purpose of determining whether or not a representation or warranty has been breached), qualifiers as to materiality set forth in any such representation or warranty herein shall be disregarded.

**13.8   Survival**.

(a)     The representations and warranties of Seller and its Affiliates contained in this Agreement and the Transaction Documents and the covenants and obligations of Seller in Sections 9.1 and 12.4 shall terminate on the date that is twelve (12) months after the Closing Date. Subject to the foregoing and as set forth in Section 13.8(b), all remaining covenants and obligations of Seller and its Affiliates in this Agreement and the Transaction Documents shall expire at Closing other than any covenants and obligations which, in accordance with their terms and provisions, are to be performed after the Closing Date which shall survive for twelve (12) months after the Closing Date, after which time such covenants and obligations shall expire. All other representations, warranties, covenants and obligations of Buyer and its Affiliates in this Agreement and the Transaction Documents shall survive the Closing Date for forty-eight (48) months. Representations, warranties, covenants and obligations shall be of no further force and effect after the date of their expiration and no claims can be made with respect thereto after the date of their expiration; provided that there shall be no termination of any bona fide claim asserted pursuant to this Agreement with respect to such a representation, warranty, covenant or agreement prior to its expiration date.

(b)     The indemnities in Sections 13.2(a), 13.2(b), 13.3(a) and 13.3(b) shall terminate as of the termination date of each respective representation, warranty, covenant or agreement that is subject to indemnification. The indemnities set forth in Sections 4.1(c), 5.4(b) and 13.3(c) shall survive the Closing Date indefinitely. Seller's indemnities set forth in Section 13.2(c) shall terminate twelve (12) months after the Closing Date. Notwithstanding the foregoing, there shall

be no termination of any bona fide claim pursuant to the indemnities in Section 13.2 or Section 13.3 asserted in a Claim Notice delivered in accordance with Section 13.7 prior to the date of termination for such indemnity.

**13.9    Non-Compensatory Damages**.  None of the Buyer Indemnified Parties nor the Seller Indemnified Parties shall be entitled to recover from Seller or Buyer, or their respective Affiliates, any indirect, consequential, punitive, exemplary, remote or speculative damages arising under or in connection with this Agreement or the transactions contemplated hereby, except to the extent any such Party suffers such damages to a Third Party, which damages (including costs of defense and reasonable attorneys' fees incurred in connection with defending against such damages) shall not be excluded by this provision as to recovery hereunder.  Subject to the preceding sentence, Buyer, on behalf of each of the Buyer Indemnified Parties, and Seller, on behalf of each of the Seller Indemnified Parties, waive any right to recover punitive, special, indirect, exemplary, consequential damages, remote or speculative arising in connection with or with respect to this Agreement or the transactions contemplated hereby.

**13.10    Waiver of Right to Rescission**.  Seller and Buyer acknowledge that, following Closing, the payment of money, as limited by the terms of this Agreement, shall be adequate compensation for breach of any representation, warranty, covenant or agreement contained herein or for any other claim arising in connection with or with respect to the transactions contemplated by this Agreement.  As the payment of money shall be adequate compensation, following Closing, Buyer and Seller waive any right to rescind this Agreement or any of the transactions contemplated hereby.

**13.11    Insurance**.  The aggregate amount of Liabilities for which any Buyer Indemnified Party or Seller Indemnified Party is entitled to indemnification under this Agreement or in connection with or with respect to the transactions contemplated by this Agreement shall be reduced by any corresponding insurance proceeds received by or on behalf of such Buyer Indemnified Party or Seller Indemnified Party with respect to such Liabilities.  Buyer agrees to use commercially reasonable efforts to pursue any proceeds available under any insurance policies maintained by Buyer covering such Liabilities for which any Buyer Indemnified Party is so entitled to indemnification, and Seller agrees to use commercially reasonable efforts to pursue any proceeds available under any insurance policies maintained by Seller covering such Liabilities for which any Seller Indemnified Party is so entitled to indemnification.

**13.12    Treatment of Indemnity Payments**.  Any indemnity payments made by an Indemnifying Party pursuant to this Article XIII shall be treated as an adjustment to the Purchase Price for federal, state and local income Tax purposes unless otherwise required by Law.

## ARTICLE XIV
## TERMINATION, DEFAULT AND REMEDIES

**14.1    Right of Termination**.  This Agreement and the transactions contemplated herein may be terminated at any time prior to Closing:

(a)    by the mutual prior written consent of Seller and Buyer;

(b)        by Buyer, upon delivery of written notice to Seller, if (i) the Bankruptcy Court has not entered a Confirmation Order that complies with Section 2.3 on or before December 14, 2019, or (ii) if the Bankruptcy Case (or a bankruptcy case of any Seller entity or Applicable Affiliate jointly administered therewith) is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of a Seller entity or an Applicable Affiliate is appointed in the Bankruptcy Case (or a bankruptcy case of any Seller entity or Applicable Affiliate jointly administered therewith);

(c)        by Buyer, upon delivery of written notice to Seller, if Seller has committed a breach of this Agreement (including a breach of the representations and warranties contained in Article VII) and such breach causes any of the conditions to Closing set forth in Article X not to be satisfied on or before February 14, 2020 (or, if prior to Closing, such breach is of such a magnitude or effect that it will not be possible for such condition to be satisfied);

(d)        by Seller, upon delivery of written notice to Buyer, if Buyer has committed a breach of this Agreement (including a breach of the representations and warranties contained in Article VIII) and such breach causes any of the conditions to Closing set forth in Article XI not to be satisfied on or before February 14, 2020 (or, if prior to Closing, such breach is of such a magnitude or effect that it will not be possible for such condition to be satisfied);

(e)        by either Seller or Buyer, if Closing has not occurred on or before February 14, 2020;

(f)        by Buyer, if on the Execution Date, the Lender Consent shall not have been delivered to Buyer, or the Asset Sale Notice shall not have been filed on the docket of the Bankruptcy Case;

(g)        by Buyer or Seller, if Seller or its Applicable Affiliate enters into an Alternative Transaction, the Bankruptcy Court approves an Alternative Transaction, or automatically if an Alternative Transaction is consummated; provided that Seller or its Applicable Affiliate shall only enter into or consummate an Alternative Transaction and/or seek Bankruptcy Court approval thereof, as applicable, if Seller reasonably determines in good faith, after consultation with its professionals, that the Alternative Transaction is in the best interests of Seller's bankruptcy estates (giving due consideration to the Lender Consent and the fact that Buyer's purchase is undertaken with the purpose of continuing the operations of the Assets) and that the failure to enter into or consummate an Alternative Transaction and/or seek Bankruptcy Court approval thereof, as applicable, is reasonably expected to violate the fiduciary duties of Seller's directors and officers (or equivalent with respect to entities that are not corporations) under applicable Law; or

(h)        by Seller as provided in Section 3.2;

provided, however, that (A) except pursuant to Section 14.1(a) or in the case of a Seller termination under Section 14.1(g) above, no Party shall be entitled to terminate this Agreement if such Party is in material breach of its covenants or agreements hereunder, (B) Buyer shall not be entitled to terminate this Agreement if Buyer is in material breach of its representation in Section 8.7 as of the date of such termination, and (C) other than with respect to Section 14.1(g), to the extent that

Closing has not occurred due to a Party asserting failure of the conditions set forth in <u>Section 10.4</u> or <u>Section 11.4</u> and whether or not such condition has been satisfied is in dispute, no Party shall (unless Closing has failed to take place for a reason other than the asserted failure of such condition) be entitled to terminate this Agreement under this <u>Section 14.1</u> until such dispute has been finally resolved by the earlier of the mutual agreement of the Parties or pursuant to <u>Section 5.3(j)(iii)</u> and/or <u>Section 6.1(e)(ii)</u>, as applicable.

**14.2**    <u>**Effect of Termination**</u>.

(a)    If this Agreement is terminated prior to Closing, then, except for the provisions of <u>Article I</u>, <u>Sections 4.1(c)</u> through <u>4.1(e)</u>, <u>4.2</u>, <u>13.9</u>, this <u>Article XIV</u>, <u>Article XV</u> (other than <u>Sections 15.2</u>, <u>15.3</u>, <u>15.4</u>, <u>15.9</u>, <u>15.10</u> and <u>15.14</u>) and such of the defined terms in Appendix I to give context to the surviving provisions, this Agreement shall forthwith become void and the Parties shall have no liability or obligation hereunder.

(b)    If Seller has the right to terminate this Agreement pursuant to (i) <u>Section 14.1(d)</u> or (ii) <u>Section 14.1(e)</u>, if at such time Seller could have terminated this Agreement pursuant to <u>Section 14.1(d)</u>, then Seller shall have the right, at its sole discretion, to either (A) enforce, subject to the Closing conditions in <u>Articles X</u> and <u>XI</u> specific performance by Buyer of this Agreement, without posting any bond or the necessity of proving the inadequacy as a remedy of monetary damages, in which event the Deposit will be applied as called for herein, or (B) terminate this Agreement, and in such event, or, in the event that Buyer terminates this Agreement pursuant to <u>Section 14.1(e)</u> (if at such time Seller could have terminated this Agreement pursuant to <u>Section 14.1(d)</u>), receive the Deposit as liquidated damages (and not as a penalty) free of any claims by Buyer thereto, which shall be Seller's sole and exclusive remedy, all other remedies hereby being expressly waived. If Seller elects to terminate this Agreement pursuant to this <u>Section 14.2(b)</u>, and such purported termination is not disputed within three (3) Business Days, Seller shall be free to enjoy immediately all rights of ownership of the Assets and to sell, transfer, encumber, or otherwise dispose of the Assets to any Person without any restriction under this Agreement. THE PARTIES ACKNOWLEDGE AND AGREE THAT (X) DAMAGES RESULTING FROM TERMINATION OF THIS AGREEMENT UNDER THE CIRCUMSTANCES DESCRIBED IN THIS <u>SECTION 14.2(b)</u> WOULD BE DIFFICULT, IF NOT IMPOSSIBLE TO CALCULATE, (Y) THE LIQUIDATED DAMAGES SET FORTH HEREIN ARE A FAIR AND REASONABLE ESTIMATE OF LIQUIDATED DAMAGES IN LIGHT OF THE UNCERTAINTIES IN CALCULATING THE ACTUAL DAMAGES THAT WILL BE SUFFERED UPON SUCH TERMINATION AND (Z) SUCH LIQUIDATED DAMAGES ARE NOT A PENALTY.

(c)    If Buyer has the right to terminate this Agreement pursuant to (i) <u>Section 14.1(b)(i)</u> (if at such time Buyer could have terminated this Agreement pursuant to <u>Section 14.1(c)</u>), (ii) <u>Section 14.1(b)(ii)</u>, (iii) <u>Section 14.1(c)</u>, (iv) <u>Section 14.1(e)</u> (if at such time Buyer could have terminated this Agreement pursuant to <u>Section 14.1(c)</u>), (v) <u>Section 14.1(f)</u>, or (vi) <u>Section 14.1(g)</u>, Buyer shall have the right, at its sole discretion, to either (A) except in the event of a termination pursuant to <u>Section 14.1(b)(i)</u>, <u>Section 14.1(b)(ii)</u> or <u>Section 14.1(g)</u>, enforce, subject to the Closing conditions in <u>Articles X</u> and <u>XI</u> and entry of the Confirmation Order, specific performance by Seller of this Agreement, without posting any bond or the necessity of proving the inadequacy as a remedy of monetary damages, in which event the Deposit will be applied as called for herein, or (B) terminate this Agreement, and in such event, or, in the event that Seller terminates this

Agreement pursuant to Section 14.1(e) (if at such time Buyer could have terminated this Agreement pursuant to Section 14.1(c)) or Section 14.1(g), then Buyer shall receive the return of the Deposit plus liquidated damages (and not a penalty) equal to three percent (3%) of the Purchase Price, and payment of the Expense Reimbursement as its sole remedy, which Seller shall pay within one (1) Business Day of such termination by wire transfer to an account specified by Buyer, in either case as Buyer's sole and exclusive remedy, all other remedies hereby being expressly waived, with such liquidated damages and Expense Reimbursement constituting an allowed superpriority administrative expense claim in Seller's Bankruptcy Case and protection pursuant to sections 507 and 503(b) of the Bankruptcy Code without any further notice, order, or action. Additionally, if Buyer has the right to terminate this Agreement pursuant to Section 14.1(b)(i) (but at such time, Buyer could not have terminated this Agreement pursuant to Section 14.1(c)), then in the event of such termination, Buyer shall receive the return of the Deposit plus payment of the Expense Reimbursement as its sole remedy, which Seller shall pay within one (1) Business Day of such termination by wire transfer to an account specified by Buyer, as Buyer's sole and exclusive remedy, with all other remedies hereby being expressly waived, with such Expense Reimbursement constituting an allowed superpriority administrative expense claim in Seller's Bankruptcy Case and protection pursuant to sections 507 and 503(b) of the Bankruptcy Code without any further notice, order, or action. If Buyer elects to terminate this Agreement pursuant to this Section 14.2(c), after indefeasible payment of the Deposit, liquidated damages and Expense Reimbursement to Buyer in full in cash, Seller shall be free to enjoy immediately all rights of ownership of the Assets and to sell, transfer, encumber, or otherwise dispose of the Assets to any Person without any restriction under this Agreement. THE PARTIES ACKNOWLEDGE AND AGREE THAT (X) DAMAGES RESULTING FROM TERMINATION OF THIS AGREEMENT UNDER THE CIRCUMSTANCES DESCRIBED IN THIS SECTION 14.2(c) WOULD BE DIFFICULT, IF NOT IMPOSSIBLE TO CALCULATE, (Y) THE LIQUIDATED DAMAGES SET FORTH HEREIN ARE A FAIR AND REASONABLE ESTIMATE OF LIQUIDATED DAMAGES IN LIGHT OF THE UNCERTAINTIES IN CALCULATING THE ACTUAL DAMAGES THAT WILL BE SUFFERED UPON SUCH TERMINATION AND (Z) SUCH LIQUIDATED DAMAGES ARE NOT A PENALTY.

(d)     If the transactions contemplated by this Agreement are terminated under any circumstances other than as described in Section 14.2(b), Buyer shall be entitled to receive a return of the Deposit within five (5) Business Days of such termination.

(e)     Upon any termination of this Agreement, (i) the Parties shall, within three (3) Business Days of such termination, execute and deliver joint instructions to the Escrow Agent directing distribution of the Deposit to the applicable Party in accordance with this Article XIV and (ii) after indefeasible payment (X) of the Deposit in accordance with this Article XIV and (Y) to Buyer of any liquidated damages and any Expense Reimbursement in accordance with this Article XIV in full in cash, Seller shall be free to enjoy immediately all rights of ownership of the Assets and to sell, transfer, encumber, or otherwise dispose of the Assets to any Person without any restriction under this Agreement.

## ARTICLE XV
## MISCELLANEOUS

**15.1**    **Appendices, Exhibits and Schedules**.    All of the Appendices, Exhibits and Schedules referred to in this Agreement are hereby incorporated into this Agreement by reference and constitute a part of this Agreement.

**15.2**    **Allocation of Asset Taxes**.

(a)    All Asset Taxes shall be allocated among the Parties as of the Effective Time.  To the extent possible, the apportionment of Asset Taxes between the Parties shall take place as an adjustment to the Purchase Price pursuant to Article III, using estimates of such Asset Taxes if actual numbers are not available.  For purposes of allocating Asset Taxes, (i) Asset Taxes that are oil and gas production or severance taxes, and any other similar Taxes applicable to hydrocarbons produced and saved from or attributable to the Leases, Wells and Units (other than such Asset Taxes described in clause (iii)) shall be allocated to the period in which the severance or production giving rise to such Asset Taxes occurred, (ii) Asset Taxes that are based upon or related to sales or receipts or imposed on a transactional basis (other than such Asset Taxes described in clause (i) or (iii)), shall be allocated to the period in which the transaction giving rise to such Asset Taxes occurred, and (iii) Asset Taxes that are ad valorem, property or other Asset Taxes imposed on a periodic basis pertaining to a Straddle Period shall be allocated between the portion of such Straddle Period ending on and including the Effective Time and the portion of such Straddle Period beginning after the Effective Time by prorating each such Asset Tax based on the number of days in the applicable Straddle Period that occur on and before the day on which the Effective Time occurs, on the one hand, and the number of days in such Straddle Period that occur after the day on which the Effective Time occurs, on the other hand.

(b)    To the extent the actual amount of an Asset Tax is not determinable at the time an adjustment to the Purchase Price is to be made with respect to such Asset Tax pursuant to Article III, (i) Seller and Buyer shall utilize the most recent information available in estimating the amount of such Asset Tax for purposes of such adjustment and (ii) upon the later determination of the actual amount of such Asset Tax, timely payments will be made from Seller to Buyer or from Buyer to Seller, as applicable, to the extent necessary to cause Seller and Buyer to bear the amount of such Asset Tax that is allocable to it under this Section 15.2 (it being agreed that if such determination occurs prior to finalization of the Final Price such payments shall be effected through adjustments on the Final Settlement Statement).

(c)    Seller agrees to prepare and file (or cause to be prepared and filed), consistently with past practice except as otherwise required by Law all Asset Tax Returns due on or prior to the Closing Date and pay all Asset Taxes set forth thereon and Buyer agrees to prepare and file all Asset Tax Returns due after the Closing Date (including to the extent relating to periods prior to the Effective Time) and, subject to the indemnification rights under Section 13.2, pay all Asset Taxes set forth thereon.

**15.3**    **Transfer Taxes**.    To the maximum extent permitted by applicable law, the Confirmation Order shall provide that all documentary, stamp, transfer, motor vehicle registration, sales, use, value added, excise and other similar non-Income Taxes and all filing and recording

fees (and any penalties and interest associated with such Taxes and fees) arising from or relating to the consummation of the transactions contemplated hereby (collectively, "*Transfer Taxes*") shall not be payable in accordance with the Bankruptcy Code.  Seller and Buyer will consult and cooperate in timely preparing and making all filings, Tax Returns, reports and forms as may be required to comply with the provisions of the Laws relating to such Transfer Taxes, including by recording the Transaction Documents, and will cooperate and otherwise take commercially reasonable efforts to obtain any available refunds for or exemptions from such Transfer Taxes, including preparing exemption certificates and other instruments as are applicable to claim available exemptions from the payment of Transfer Taxes under applicable Law and executing and delivering such affidavits and forms as are reasonably requested by the other Party.  Seller shall provide Buyer with a completed Texas Statement of Occasional Sale (Form 01-917) as of the Closing Date.  If a determination is ever made that a Transfer Tax applies, Buyer will bear the entirety of such Transfer Tax.

      **15.4**　　**Cooperation on Tax Matters**.  After Closing, upon reasonable notice, Buyer and Seller agree to reasonably cooperate, and afford or cause to be afforded to each other and their representatives reasonable access, during normal business hours, to the personnel (without substantial disruption of employment), books, records and information relating to the Assets that are necessary or useful in connection with: (i) the filing of any Tax Return, any amended Tax Return, Tax election or claim for refund, (ii) determining a Liability for Taxes or a right to refund of Taxes, (iii) conducting any audit, litigation or other proceeding in respect of Taxes and (iv) in connection with the implementation of Sections 15.2 and 15.3; provided, however, that such access and assistance do not unreasonably disrupt the normal operations of Buyer or Seller and documents requested by Buyer or Seller shall require a reasonable business purpose and shall be limited to those documents that reasonably relate to such purpose.  In the event that documents requested by a Party include information that does not relate to the Assets, then the other Party shall be permitted to redact such information in such documents.  The Party requesting such personnel, books, records and information shall bear all of the out-of-pocket costs and expenses of the other Party reasonably incurred in connection with providing such personnel, books, records, and information.

      **15.5**　　**Assignment**.  Prior to Closing, no Party may assign this Agreement, or its rights or obligations under this Agreement, without the written consent of the other Party, such consent not to be unreasonably withheld, conditioned or delayed; *provided, however,* in connection with the assignment of the Assets or the right to receive the Assets by Buyer, Buyer may assign this Agreement and its rights and obligations under this Agreement to the applicable Affiliate identified in the Profits Interests Documents without consent of Seller.  Any attempt to make an assignment contrary to the prior sentence shall be void *ab initio*.  Notwithstanding any Party's assignment of all or a portion of its interests under this Agreement, such Party shall remain responsible for all of its obligations under this Agreement, including its indemnity obligations.  No assignment or obligation shall increase the burden on any non-assigning Party or impose any duty on any non-assigning Party to communicate with or report to any transferee, and each non-assigning Party may continue to look to the assigning Party for all purposes under this Agreement.

      **15.6**　　**Preparation of Agreement**.  Seller and Buyer and their respective counsel participated in the preparation of this Agreement.  In the event of any ambiguity in this Agreement, no presumption shall arise based on the identity of the draftsman of this Agreement.

    15.7   **Publicity**.  Seller and Buyer shall consult with each other with regard to all press releases or other public announcements issued or made concerning this Agreement or the transactions contemplated herein, and, except as may be required by Law or the applicable rules and regulations of any Governmental Authority or stock exchange, neither Buyer nor Seller shall issue any such press release or other publicity without the prior written consent of the other Party, which shall not be unreasonably withheld, conditioned or delayed.

    15.8   **Notices**.   All notices and communications required or permitted under this Agreement shall be in writing and addressed as set forth below.  Any communication or delivery hereunder shall be deemed to have been made and the receiving Party charged with notice when received whether by (i) personal delivery, (ii) electronic mail, (iii) mail with delivery confirmation, or (iv) overnight courier.  All notices shall be addressed as set forth below.  Any Party may, by written notice so delivered to the other Party, change the address or individual to which delivery shall thereafter be made.

    If to Seller:

    Sheridan Holding Company II, LLC
    1360 Post Oak Boulevard, Suite 2500
    Houston, Texas 77056
    Attention:  Mark A. Miertschin, Vice President of Business Development and Marketing
    Telephone:    713 548-1022
    Fax:          713-548-1099
    Email:       mmiertschin@sheridanproduction.com

    with a copy to:

    Sheridan Holding Company II, LLC
    1360 Post Oak Boulevard, Suite 2500
    Houston, Texas 77056
    Attention:  Cheryl S. Phillips, Vice President and General Counsel
    Telephone:    713 548-2105
    Email:       cheryl.phillips@sheridanproduction.com

    If to Buyer:

    Crossing Rocks Energy Operating, LLC
    301 Commerce St., Suite 2001
    Fort Worth, Texas 76102
    Attention: Bruce Selkirk, President & Chief Executive Officer
    Telephone:    (817) 708-3800
    Fax:          (817) 708-3888
    Email:       bselkirk@crossingrocksenergy.com

    With copies (which shall not constitute notice) to:

    Crossing Rocks Energy Operating, LLC

301 Commerce St., Suite 2001
Fort Worth, Texas 76102
Attention: Philip Jordan, Executive Vice President – Land & General Counsel
Telephone:     (817) 708-3802
Fax:           (817) 708-3888
Email:         pjordan@crossingrocksenergy.com

and

Willkie Farr & Gallagher LLP
600 Travis, Suite 2100
Houston, Texas 77002
Attention: Cody R. Carper; Jennifer Hardy
Email:         ccarper@willkie.com; jhardy2@willkie.com

**15.9     Further Cooperation**.  After Closing, Buyer and Seller shall execute and deliver, or shall cause to be executed and delivered from time to time, such further instruments of conveyance and transfer, and shall take such other actions as any Party may reasonably request, to consummate the transactions contemplated by this Agreement in accordance with the terms and conditions of this Agreement.  In addition, the Parties shall cooperate fully, as and to the extent reasonably requested by the other Parties, in connection with the filing of Tax returns and any audit, litigation, or other proceeding with respect to Taxes relating to the Assets.

**15.10     Filings, Notices and Certain Governmental Approvals**.  Promptly after Closing, Buyer shall (i) record the Assignments of the Assets in the real property records for all applicable counties and, if applicable, file any executed state, federal and tribal assignment forms with the relevant agencies and (ii) actively pursue obtaining all Customary Post-Closing Consents from applicable Governmental Authorities of the assignment of the Assets to Buyer.  Buyer shall take any and all customary action required by any Governmental Authority in order to obtain such approval.  Seller, when reasonably requested by Buyer, shall assist Buyer in all actions contemplated by this Section 15.10 at Buyer's expense.

**15.11     Entire Agreement; Non-Reliance; Conflicts**.  THIS AGREEMENT, THE APPENDICES, EXHIBITS AND SCHEDULES HERETO, THE TRANSACTION DOCUMENTS AND THE CONFIDENTIALITY AGREEMENT COLLECTIVELY CONSTITUTE THE ENTIRE AGREEMENT AMONG THE PARTIES PERTAINING TO THE SUBJECT MATTER HEREOF AND SUPERSEDE ALL PRIOR AGREEMENTS, UNDERSTANDINGS, NEGOTIATIONS AND DISCUSSIONS, WHETHER ORAL OR WRITTEN, OF THE PARTIES PERTAINING TO THE SUBJECT MATTER OF THIS AGREEMENT.   THERE ARE NO WARRANTIES, REPRESENTATIONS OR OTHER AGREEMENTS AMONG THE PARTIES RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT OR THE TRANSACTION DOCUMENTS, AND NO PARTY SHALL BE BOUND BY OR LIABLE FOR ANY ALLEGED REPRESENTATION, PROMISE, INDUCEMENT OR STATEMENTS OF INTENTION NOT SO SET FORTH.   EACH PARTY ACKNOWLEDGES THAT, IN ENTERING INTO THIS AGREEMENT, IT HAS RELIED SOLELY ON THE PROMISES, AGREEMENTS, STATEMENTS OR REPRESENTATIONS THAT ARE EXPRESSLY SET

FORTH IN THIS AGREEMENT AND THE TRANSACTION DOCUMENTS AND THAT NO PARTY HAD ANY DUTY TO MAKE ANY PROMISES, AGREEMENTS, STATEMENTS OR REPRESENTATIONS THAT ARE NOT EXPRESSLY SET FORTH IN THIS AGREEMENT OR IN THE TRANSACTION DOCUMENTS.  EACH PARTY ALSO ACKNOWLEDGES THAT, IN ENTERING THIS AGREEMENT, IT HAS NOT RELIED ON ANY PROMISES, AGREEMENTS, STATEMENTS OR REPRESENTATIONS THAT ARE NOT EXPRESSLY SET FORTH IN THIS AGREEMENT OR IN THE TRANSACTION DOCUMENTS.

**15.12** **Successors and Permitted Assigns**.  This Agreement shall be binding upon and inure to the benefit of the Parties and their successors and permitted assigns.

**15.13** **Parties in Interest**.  Nothing in this Agreement shall entitle any Person other than the Parties, or the Parties' respective related Indemnified Parties hereunder, to any claim, cause of action, remedy or right of any kind; provided that only a Party will have the right to enforce the provisions of this Agreement on its own behalf or on behalf of its related Indemnified Parties (but shall not be obligated to do so); provided that the "Holder" (as defined in Exhibit I) shall be entitled to enforce the provisions of Section 9.8 in accordance therewith.

**15.14** **Amendment**.  This Agreement may be amended, restated, supplemented or otherwise modified only by an instrument in writing executed by all of the Parties and expressly identified as an amendment, restatement, supplement or modification.

**15.15** **Waiver; Rights Cumulative**.  Any of the terms, covenants, representations, warranties or conditions hereof may be waived only by a written instrument executed by or on behalf of the Party waiving compliance.  No course of dealing on the part of any Party, or their respective officers, employees, agents or representatives, or any failure by a Party to exercise any of its rights under this Agreement shall operate as a waiver thereof or affect in any way the right of such Party at a later time to enforce the performance of such provision.  No waiver by any Party of any condition, or any breach of any term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such condition or breach or a waiver of any other condition or of any breach of any other term, covenant, representation or warranty.  The rights of the Parties under this Agreement shall be cumulative, and the exercise or partial exercise of any such right shall not preclude the exercise of any other right.

**15.16** **Governing Law; Jurisdiction; Venue; Jury Waiver**.  EXCEPT TO THE EXTENT THE MANDATORY PROVISIONS OF THE BANKRUPTCY CODE APPLY, THIS AGREEMENT AND THE LEGAL RELATIONS AMONG THE PARTIES SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS (EXCEPT THAT, WITH RESPECT TO ISSUES RELATING TO REAL PROPERTY FOR PROPERTIES LOCATED IN A SPECIFIC STATE, THE LAWS OF SUCH STATE SHALL GOVERN), EXCLUDING ANY CONFLICTS OF LAW RULE OR PRINCIPLE THAT MIGHT REFER CONSTRUCTION OF SUCH PROVISIONS TO THE LAWS OF ANOTHER JURISDICTION.  ALL OF THE PARTIES HERETO CONSENT TO THE EXERCISE OF JURISDICTION IN PERSONAM BY THE BANKRUPTCY COURT, THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN HOUSTON, TEXAS OR THE STATE COURTS LOCATED IN HOUSTON, TEXAS FOR ANY ACTION ARISING

OUT OF THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY.   ALL ACTIONS OR PROCEEDINGS WITH RESPECT TO, ARISING DIRECTLY OR INDIRECTLY IN CONNECTION WITH, OUT OF, RELATED TO OR FROM THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY SHALL BE EXCLUSIVELY LITIGATED IN (A) BEFORE THE PETITION DATE, COURTS HAVING SITUS IN HOUSTON, TEXAS, AND (B) AFTER THE PETITION DATE, THE BANKRUPTCY COURT AND ANY FEDERAL COURT TO WHICH AN APPEAL FROM THE BANKRUPTCY COURT MAY VALIDLY BE TAKEN.   EACH PARTY HERETO WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY.

     **15.17**   **Severability**.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any adverse manner to any Party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties shall negotiate in good faith and modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

     **15.18**   **Counterparts**.  This Agreement may be executed in any number of counterparts, and each such counterpart hereof shall be deemed to be an original instrument, but all of such counterparts shall constitute for all purposes one agreement.  Any signature hereto delivered by a Party by facsimile transmission or other electronic transmission shall be deemed an original signature hereto.

*[Remainder of page intentionally left blank.  Signature pages follow.]*

IN WITNESS WHEREOF, Seller and Buyer have executed this Agreement on the date first above written.

SELLER:

SHERIDAN HOLDING COMPANY II, LLC

_____

Name:
Title:

SHERIDAN PRODUCTION PARTNERS II-M, L.P.
By:  SPP II-M GP, LLC,
       its General Partner

_____

Name:
Title:

SHERIDAN PRODUCTION PARTNERS II-A, L.P.
By:  Sheridan Production Partners II, LLC,
       its General Partner

_____

Name:
Title:

BUYER:

CROSSING ROCKS ENERGY OPERATING, LLC

_____

Name:
Title:

# APPENDIX I

## Definitions

"*AAA*" means the American Arbitration Association.

"*AAA Rules*" means the Commercial Arbitration Rules of the AAA.

"*Accounting Arbitrator*" has the meaning set forth in Section 3.6.

"*Additional Indemnity Holdback Amount*" means an amount equal to the Indemnity Holdback Amount less the Deposit.

"*Adjusted Purchase Price*" has the meaning set forth in Section 3.3.

"*Adjustment Holdback Amount*" has the meaning set forth in Section 3.10.

"*Affiliate*" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, where "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether by ownership, contract or otherwise.  For the avoidance of doubt, Sheridan I shall be deemed to be an Affiliate of Seller for all purposes under this Agreement.

"*Affiliate NPIs*" means all net profits interests, overriding royalty interests and other similar interests burdening the Assets that are owned by Fund II-B.

"*Aggregate Defect Deductible*" has the meaning set forth in Section 5.3(i).

"*Agreement*" has the meaning set forth in the first paragraph herein.

"*Allocable Amount*" has the meaning set forth in Section 3.8.

"*Allocated Value*" has the meaning set forth in Section 3.7.

"*Allocation Schedule*" has the meaning set forth in Section 3.8.

"*Alternative Transaction*" means (a) the sale, conveyance, transfer or assignment, directly or indirectly, including through an asset sale, stock sale, cancellation of stock and re-issuance thereof, merger, consolidation, business combination, amalgamation or other transaction, of all or any material portion of the Assets, or equity in Seller or its Affiliates, in a transaction or a series of transactions with one or more Persons other than Buyer, (b) a plan of reorganization or liquidation that does not contemplate, or consummate in accordance therewith, the sale of the Assets by Seller to Buyer in accordance with the terms of this Agreement, or (c) the Equitization Restructuring (as defined in the Plan).

"*Applicable Affiliates*" means Fund II-B and SPC.

"*Applicable Contracts*" has the meaning set forth in Section 2.1(f).

"***Asset Sale Notice***" means a notice, in form and substance acceptable to Buyer, filed by the Debtors on the docket in the Bankruptcy Case confirming the Debtors' and Required Consenting Secured Lenders' (each as defined in the Plan) irrevocable (subject only to Closing) election to consummate the Asset Sale Restructuring (as defined in the Plan) by Closing on the sale of Assets pursuant to the transactions contemplated in this Agreement, and shall constitute the Asset Sale Election Notice (as defined in the Plan).

"***Asset Tax Return***" shall mean any Tax Return with respect to Asset Taxes.

"***Asset Taxes***" means all ad valorem, property, excise, net proceeds, severance, production, sales, use and other Taxes based upon the operation or ownership of the Assets or the production of, or receipt of proceeds from the sale of, Hydrocarbons therefrom, but excluding, for the avoidance of doubt, (i) Income Taxes and (ii) Transfer Taxes.

"***Assets***" has the meaning set forth in Section 2.1.

"***Assigned Lease***" or "***Assigned Leases***" have the meaning set forth in Section 2.1(a).

"***Assignment***" means the Assignment and Bill of Sale pertaining to the Assets, substantially in the form attached to this Agreement as Exhibit F, with such modifications as may be necessary for such instrument to be in a form suitable for recording in each county in which any of the Properties are located.

"***Assumed Obligations***" has the meaning set forth in Section 13.1.

"***Bankruptcy Case***" has the meaning set forth in the recitals to this Agreement.

"***Bankruptcy Code***" has the meaning set forth in the recitals to this Agreement.

"***Bankruptcy Court***" has the meaning set forth in the recitals to this Agreement.

"***Burden***" means any and all royalties (including lessor's royalties), overriding royalties, non-participating royalty interests, net revenue interests, net profits interests, reversionary interests, carried interests and other burdens upon, measured by, or payable out of production (including, without limitation, amounts due to mineral interest, working interest or similar interest owners).

"***Business Day***" means any day other than Saturday or Sunday or a day on which banking institutions in Houston, Texas are authorized by Law to close.

"***Buyer***" has the meaning set forth in the first paragraph herein.

"***Buyer Indemnified Parties***" has the meaning set forth in Section 13.2.

"***Buyer's Representatives***" has the meaning set forth in Section 4.1(a).

"***Casualty Loss***" has the meaning set forth in Section 9.10.

"**_Claim_**" means any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, known or unknown; or any other Claim as defined in Section 101(5) of the Bankruptcy Code.

"**_Claim Notice_**" has the meaning set forth in Section 13.7(b).

"**_Closing_**" has the meaning set forth in Section 12.1.

"**_Closing Date_**" has the meaning set forth in Section 12.1.

"**_Code_**" means the Internal Revenue Code of 1986, as amended.

"**_Confidential Information_**" has the meaning ascribed to it in the Confidentiality Agreement.

"**_Confidentiality Agreement_**" means that certain Confidentiality Agreement, dated as of May 21, 2019, by and between Seller and Crossing Rocks Energy II, LLC.

"**_Confirmation Order_**" has the meaning set forth in the recitals to this Agreement.

"**_Consent_**" means any approval, consent, ratification, waiver, or other authorization from any Person that is required to be obtained in connection with the execution or delivery of this Agreement or the consummation of the transactions contemplated hereby.

"**_Contract_**" means any written contract, agreement, agreement regarding indebtedness, indenture, debenture, note, bond, loan, collective bargaining agreement, lease, mortgage, franchise, license agreement, purchase order, binding bid, commitment, letter of credit or any other legally binding arrangement, including farmin and farmout agreements; participation, exploration and joint development agreements; crude oil, condensate and natural gas purchase and sale, gathering, transportation and marketing agreements; operating agreements; balancing agreements; unitization agreements; processing agreements; facilities or equipment leases; platform use and platform sharing agreements; production handling agreements and other similar contracts or agreements; but, excluding, however, any Assigned Lease, easement, right-of-way, permit or other instrument (other than acquisition or similar sales or purchase agreements) creating or evidencing an interest in the Assets or any real or immovable property related to or used in connection with the operations of any Assets.

"**_Controlled Group Liabilities_**" means any and all Liabilities of Seller or any of its ERISA Affiliates (i) under Title IV of ERISA, (ii) under Section 206(g), 302 or 303 of ERISA, (iii) under Section 412, 430, 431, 436 or 4971 of the Code, (iv) as a result of the failure to comply with the continuation of coverage requirements of Section 601 _et seq._ of ERISA and Section 4980B of the Code, and (v) under corresponding or similar provisions of any foreign Laws.

"**_CRE II_**" has the meaning set forth in Section 9.8.

"**_CRE LLCA_**" has the meaning set forth in Section 9.8.

"*Cure Costs*" means monetary amounts that must be paid under Sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and assignment of any Applicable Contract, Surface Agreement or Assigned Lease to Buyer at the Closing.

"*Cure Period*" has the meaning set forth in Section 5.3(c).

"*Current AFEs*" has the meaning set forth in Section 7.11.

"*Customary Post-Closing Consents*" means the consents and approvals from Governmental Authorities for the assignment of the Assets to Buyer, that are customarily obtained after the assignment of properties similar to the Assets.

"*Defect Claim Date*" has the meaning set forth in Section 5.3(a).

"*Defensible Title*" means such good and valid title of Seller and the Applicable Affiliates, in the aggregate, that:

(a)     with respect to the currently producing, shut-in and behind pipe formations for each Well identified on Exhibit E, entitles Seller, in the aggregate, to receive as of the Closing Date not less than the Net Revenue Interest specified for such Well (subject to any reservations, limitations or depth restrictions specified on Exhibit E), except for (i) decreases in connection with those operations in which Seller or the Applicable Affiliates may from and after the Execution Date and in accordance with the terms of this Agreement elect or be deemed to have elected to be a non-consenting co-owner, (ii) decreases resulting from the establishment or amendment from and after the Execution Date of pools or units in accordance with this Agreement, and (iii) decreases required to allow other working interest owners in the Assets to make up past underproduction or pipelines to make up past under deliveries of Hydrocarbons, in each case, in respect of which the Purchase Price is adjusted pursuant to Section 3.3(c) either at Closing or in the Final Settlement Statement;

(b)     with respect to the currently producing, shut-in and behind pipe formations for each Well identified on Exhibit E, obligates Seller and the Applicable Affiliates, in the aggregate, to bear not more than the Working Interest specified for such Well as shown on Exhibit E, except (i) increases resulting from contribution requirements with respect to defaulting co-owners under applicable operating agreements, or (ii) increases to the extent that such increases are accompanied by a proportionate increase in the Net Revenue Interest of Seller and the Applicable Affiliates;

(c)     with respect to each Asset, is free and clear of all Encumbrances and defects (other than the Permitted Encumbrances).

"*Deposit*" has the meaning set forth in Section 3.2.

"*Defect Escrow Account*" has the meaning set forth in Section 5.3(j)(i).

"*Dispute Notice*" has the meaning set forth in Section 3.5.

"*Effective Time*" means 7:00 a.m., Central Time, on June 1, 2019.

"***Employee Benefit Plan***" means any "employee benefit plan" (as defined in Section 3(3) of ERISA) or any other material employee benefit plan, program or policy, including any pension, retirement, profit-sharing, bonus, incentive, stock option or other equity or equity-based compensation, deferred compensation, equity purchase, severance pay, change of control, vacation, disability, hospitalization, health or medical insurance, life insurance, fringe benefit, welfare benefit, flexible spending account program or policy, in each case, sponsored, maintained or contributed to by Seller or one of more of its Affiliates, or with respect to which Seller or any of its ERISA Affiliates has, or could reasonably be expected to have, any direct or indirect Liability.

"***Encumbrance***" means any lien, mortgage, security interest, pledge, charge, deed of trust, easement, right of way or other similar encumbrance upon any of the Assets, including, but not limited to, any lien under Section 412 of the Code or Title IV of ERISA.

"***Environmental Arbitrator***" has the meaning set forth in Section 6.1(e)(ii).

"***Environmental Defect***" means (a) a condition or collection of similarly situated conditions existing on or before the Defect Claim Date with respect to operations, the Assets, or the air, soil, subsurface, surface waters, ground waters and/or sediments that causes an Asset or Assets (or Seller or operations with respect to such Asset(s)) not to be in compliance with or subject to Liability under any Environmental Law or (b) the existence on or before Defect Claim Date with respect to any Asset or collection of Assets of any environmental pollution, contamination, degradation, damage or injury caused by or related to such Asset(s) for which investigative, remedial or corrective action or other response is presently required (or, if known, would be presently required) under or to achieve compliance with Environmental Laws.

"***Environmental Defect Notice***" has the meaning set forth in Section 6.1(a).

"***Environmental Defect Property***" has the meaning set forth in Section 6.1(a).

"***Environmental Disputes***" has the meaning set forth in Section 6.1(e).

"***Environmental Laws***" means the following: the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq.; the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq. the Hazardous Materials Transportation Act, 49 U.S.C. § 1471 et seq.; the Toxic Substances Control Act, 15 U.S.C. §§ 2601 through 2629; the Oil Pollution Act, 33 U.S.C. § 2701 et seq.; the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 11001 et seq.; the Safe Drinking Water Act, 42 U.S.C. §§ 300f through 300j; the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 136 et seq.; the Atomic Energy Act, 42 U.S.C. § 2011 et seq.; and all applicable related Law, whether local, state, territorial, or national, of any Governmental Authority having jurisdiction over the property in question addressing (a) pollution or pollution control (including with respect to air, water or land), (b) the protection of human health, safety, natural resources, the environment or biological resources or (c) the generation, handling, treatment, storage, disposal or transportation of waste materials or Hazardous Substances (or the spill, release, regulation of or exposure thereto) and all regulations implementing the foregoing. The term "***Environmental Laws***" includes all judicial

and administrative decisions, orders, directives and decrees issued by a Governmental Authority pursuant to the foregoing.  The term "***Environmental Laws***" does not include (a) prudent, good or desirable operating practices, policies, statements or standards that may be voluntarily employed or adopted by other oil and gas well operators or recommended, but not required, by a Governmental Authority or (b) the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 *et seq.*, as amended, or any other Law governing worker safety or workplace conditions to the extent not related to exposure to Hazardous Substances.

"***Environmental Permits***" means all permits, licenses, certificates of authority, franchises, concessions, registrations, exemptions, approvals, or similar qualification or authorization issued, granted, or given by or under the authority of any Governmental Authority necessary to conduct all current and/or currently authorized operations of the Assets as presently owned and operated by Seller and/or its Affiliates in compliance with Environmental Laws.

"***Equipment***" has the meaning set forth in Section 2.1(d).

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended.

"***ERISA Affiliate***" means, with respect to any Person, any other Person that is a member of a group described in Section 414(b), (c), (m) or (o) of the Code.

"***Escrow Account***" means the escrow account established pursuant to the Escrow Agreement.

"***Escrow Agent***" has the meaning set forth in Section 3.2.

"***Escrow Agreement***" has the meaning set forth in Section 3.2.

"***Excluded Assets***" has the meaning set forth in Section 2.2.

"***Execution Date***" has the meaning set forth in the first paragraph herein.

"***Expense Reimbursement***" means an amount, for which Seller shall be liable under the circumstances set forth in Section 14.2, equal to the reasonable documented out-of-pocket costs and expenses of Buyer (including reasonable, documented expenses of counsel, investment bankers and other outside consultants, and other reasonable, documented expenses) related to negotiating this Agreement, consummating the transactions contemplated hereby and investigating Seller and the Assets in the aggregate up to a maximum amount of $2,000,000, which amount, upon entry of the Confirmation Order, shall constitute an administrative expense of Seller under section 364(c)(1) of the Bankruptcy Code, and be paid as set forth in Section 14.2.

"***Fee Mineral Interests***" has the meaning set forth in Section 2.1(a).

"***Final Price***" has the meaning set forth in Section 3.5.

"***Final Settlement Statement***" has the meaning set forth in Section 3.5.

"***Free and Clear***" means with respect to Assets of Seller and Fund II-B only (and not Assets of SPC), free and clear of, and not encumbered by, any lien, claim (for purposes of this definition, as that term is defined in Section 101 of the Bankruptcy Code), encumbrance, or interest (for purposes of this definition, as that term is utilized in Section 363(f) of the Bankruptcy Code) concerning, arising out of, or with respect to Retained Liabilities and/or Cure Costs.

"***Fund II-B***" means Sheridan Production Partners II-B, L.P., a Delaware limited partnership.

"***GAAP***" means generally accepted accounting principles in the United States of America as in effect from time to time.

"***Governmental Authority***" means any federal, state, local, municipal, tribal or other government; any governmental, regulatory or administrative agency, commission, body or other authority exercising or entitled to exercise any administrative, executive, judicial, legislative, regulatory or taxing authority or power; and any court or governmental tribunal, including any tribal authority having or asserting jurisdiction.

"***Hazardous Substances***" means any pollutants, contaminants, substances, materials, wastes, constituents, compounds or chemicals that are regulated by, or may form the basis of Liability under, any Environmental Laws, including NORM and other substances referenced in Section 6.2, as well as any such items and things listed, defined, or designated as a "hazardous substance", "pollutant", "contaminant", "hazardous waste", "solid waste", "oil and gas waste", "hazardous material", "regulated substance", "hazardous chemical", or "toxic chemical" under Environmental Laws.

"***Holdco I***" means Sheridan Holding Company I, LLC, a Delaware limited liability company.

"***Holdco II***" means Sheridan Holding Company II, LLC, a Delaware limited liability company.

"***HSR Act***" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the applicable rules and regulations promulgated thereunder.

"***Hydrocarbons***" means oil and gas and other hydrocarbons (including condensate) produced or processed in association therewith (whether or not such item is in liquid or gaseous form), or any combination thereof, and any minerals produced in association therewith.

"***Imbalances***" has the meaning set forth in Section 2.1(h).

"***Income Taxes***" means any income, franchise and similar taxes.

"***Indemnified Party***" has the meaning set forth in Section 13.7(a).

"***Indemnifying Party***" has the meaning set forth in Section 13.7(a).

"***Indemnity Holdback Amount***" means an amount equal to fifteen percent (15%) of the Purchase Price.

"***Individual Environmental Defect Threshold***" has the meaning set forth in <u>Section 6.1(d)</u>.

"***Individual Title Defect Threshold***" has the meaning set forth in <u>Section 5.3(i)</u>.

"***Interim Period***" means that period of time commencing with the Execution Date and ending at Closing.

"***Inventory***" means all hydrocarbons attributable to the Assets located in pipelines, gathering lines, tanks, separators or other vessels at the Effective Time; *provided however*, that Inventory shall not include tank bottoms.

"***Knowledge***" means (a) with respect to Seller, the actual knowledge (without investigation) of the following Persons: Lisa Stewart – Executive Chairman and Chief Executive Officer, Thomas E. Voytovich – Vice President and Chief Operating Officer, Mark A. Miertschin – Vice President – Business Development and Marketing, Michael T. Bose – Vice President Operations, Bart P. Hartman – Vice President and Controller, Frank Belveal – Business Development, Randy Ferrell – District Manager and Aimee Barriere – Land Manager and (b) with respect to Buyer, the actual knowledge (without investigation) of the following Persons: Bruce Selkirk.

"***Lands***" has the meaning set forth in <u>Section 2.1(a)</u>.

"***Law***" means any applicable statute, law, rule, regulation, ordinance, order, code, ruling, writ, injunction, decree or other official act requiring compliance of or by any Governmental Authority.

"***Leases***" has the meaning set forth in <u>Section 2.1(a)</u>.

"***Lender Consent***" means written confirmation by the Required Consenting Secured Lenders indicating their irrevocable election to consummate the Asset Sale Restructuring by Closing on the sale of Assets pursuant to the transactions contemplated in this Agreement.

"***Liabilities***" means any and all claims, causes of actions, payments, charges, judgments, assessments, liabilities, damages, penalties, fines or costs and expenses, including any attorneys' fees, legal or other expenses incurred in connection therewith and including liabilities, costs and damages for personal injury or death or property damage.

"***Liquidity Event***" has the meaning set forth in <u>Section 9.8</u>.

"***Lowest Cost Response***" means, with respect to an Environmental Defect, the response required or allowed under Environmental Laws that addresses such Environmental Defect giving good faith consideration to cost mitigation approaches allowed under Environmental laws that are designed to permit the lowest reasonable cost of such response (considered as a whole, taking into consideration any material negative impact such response may have on the operations of the relevant Assets and any potential material additional costs that may likely arise as a result of such

response) as compared to any other response that is required or allowed under Environmental Laws. The Lowest Cost Response may include taking no action, leaving the condition unaddressed, periodic monitoring or the recording of notices in lieu of remediation, if such responses are allowed under Environmental Laws and completely address and resolve the applicable Environmental Defect. The Lowest Cost Response shall not include remedial or corrective action that (i) would not have been required under Environmental Laws as they exist on or before the Defect Claim Date or (ii) is designed to achieve standards that are more stringent than those required for similar facilities or that fails to reasonably take advantage of applicable risk reduction or risk assessment principles allowed under applicable Environmental Laws.

"*Material Contracts*" has the meaning set forth in Section 7.7(a).

"*Multiemployer Plan*" means each Seller Plan that is a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA.

"*Net Revenue Interest*" means, with respect to any Property, the aggregate percentage interest of a Person in and to all Hydrocarbons produced, saved and sold from or allocated to such Property, after giving effect to all Burdens.

"*NORM*" means naturally occurring radioactive material.

"*Oxy*" means, collectively, OXY USA Inc., OXY USA WTP LP, Occidental Permian Ltd., Occidental Petroleum Corporation, and Occidental Oil and Gas Corporation.

"*Party*" and "*Parties*" has the meaning set forth in the first paragraph herein.

"*Perdido*" means Perdido Properties, LLC.

"*Perdido Litigation Matter*" means the lawsuit set forth as item 2 to "Part I – Assumed Obligations" of Schedule 7.6

"*Perdido Litigation Wells*" means, collectively, the Wells described in "Part 1" of Schedule 7.26.

"*Permitted Encumbrances*" means, subject to the terms and the effect of the Confirmation Order:

(a)      the terms and conditions of all Assigned Leases and all Burdens provided that the net cumulative effect of such Assigned Leases and Burdens do not cause Seller's ownership interest in the Assets to fail satisfy clauses (a) or (b) of the definition of Defensible Title;

(b)      Preferential Purchase Rights not exercisable or exercised prior to Closing;

(c)      liens for Asset Taxes not yet due that are payable post-Closing by Buyer;

(d)      Customary Post-Closing Consents;

(e)        conventional rights of reassignment that have not been triggered and will not be triggered by the transactions contemplated hereby;

(f)        such Title Defects as Buyer may have waived in writing or is deemed to have waived pursuant to Section 5.3;

(g)        all Laws and all rights reserved to or vested in any Governmental Authority (i) to control or regulate any Asset in any manner; (ii) by the terms of any right, power, franchise, grant, license or permit, or by any provision of Law, to terminate such right, power, franchise, grant, license or permit or to purchase, condemn, expropriate or recapture or to designate a purchaser of any of the Assets; (iii) to use such property in a manner which does not materially impair the use of such property for the purposes for which it is currently owned and operated; or (iv) to enforce any obligations or duties affecting the Assets to any Governmental Authority with respect to any franchise, grant, license or permit;

(h)        rights of a common owner of any interest in rights-of-way, permits or easements held by Seller (or its Affiliates) and such common owner as tenants in common or through common ownership which, in each case, do not materially impair the operation or use of the Assets as currently operated and used;

(i)        easements, conditions, covenants, restrictions, servitudes, permits, rights-of-way, surface leases and other rights in the Assets for the purpose of pad or other operations, facilities, pipelines, transmission lines, transportation lines, distribution lines, power lines, telephone lines and other like purposes, or for the joint or common use of lands, rights-of-way, facilities and equipment, which, in each case, do not materially impair the operation or use of the Assets as currently operated and used;

(j)        zoning and planning ordinances and municipal regulations;

(k)        vendors, carriers, warehousemen's, repairmen's, mechanics', workmen's, materialmen's, construction or other like liens arising by operation of Law in the ordinary course of business or incident to the construction or improvement of any property in respect of obligations which are not yet due or which are being contested in good faith by appropriate proceedings by or on behalf of Seller, which contested liens are set forth on Schedule I;

(l)        liens created under Leases and/or operating agreements or by operation of Law in respect of obligations that are not yet due or that are being contested in good faith by appropriate proceedings by or on behalf of Seller, which contested liens are set forth on Schedule I;

(m)        any Encumbrance affecting the Assets that is discharged or released at or prior to Closing including (i) interests in the Assets (including the Affiliate NPIs) held by any Affiliate that will be conveyed to Buyer at or prior to Closing and (ii) liens on the Assets arising under financing arrangements of Seller or any of its Affiliates that are released at or prior to Closing;

(n)        defects or irregularities in title which, in the opinion of a reasonably prudent purchaser of oil and gas assets, would not materially interfere with the development or current operation or use of any of the Assets impaired thereby;

(o)      defects arising from any change in Law after the Execution Date;

(p)      any encumbrance or loss of title resulting from Seller's conduct of business after the Execution Date in compliance with Section 9.1; and

(q)      any Encumbrance affecting Perdido Litigation Wells caused by or attributable to any Third Party's ownership of the unleased mineral interests described on Part II of Exhibit 7.26.

It is understood that certain of the Permitted Encumbrances may not be embraced by the term Encumbrance.  The fact that any fact, circumstance or condition has been expressly included in the definition of Permitted Encumbrance is not intended to suggest that it necessarily would be included in the definition of Encumbrance and shall not be used to interpret the meaning of Encumbrance.

"***Person***" means any individual, corporation, company, partnership, limited partnership, limited liability company, trust, estate, Governmental Authority or any other entity.

"***Petition Date***" means the date of the filing of the Chapter 11 petition of Seller.

"***Phase I Environmental Site Assessment***" means an environmental site assessment performed pursuant to the American Society for Testing and Materials E1527 - 13, or any similar environmental assessment.

"***Plan***" has the meaning set forth in the recitals to this Agreement.

"***Preferential Purchase Right***" has the meaning set forth in Section 7.9.

"***Preliminary Adjusted Purchase Price***" has the meaning set forth in Section 3.4.

"***Preliminary Settlement Statement***" has the meaning set forth in Section 3.4.

"***Property***" means any individual Well identified on Exhibit E.

"***Punitive Consent***" has the meaning set forth in Section 5.4(b).

"***Purchase Price***" has the meaning set forth in Section 3.1.

"***Records***" has the meaning set forth in Section 2.1(j).

"***Remediation***" means, with respect to an Environmental Defect, the implementation and completion of any investigative, remedial, removal, response, construction, closure, disposal or other corrective or other actions, including monitoring, required or allowed under Environmental Laws to correct, resolve, or remove such Environmental Defect.

"***Remediation Amount***" means, with respect to an Environmental Defect, the cost (net to Seller's interest) of the Lowest Cost Response in respect of such Environmental Defect.  The Remediation Amount shall not include (i) costs of Buyer's or its Affiliates' employees, in-house project manager(s) or in-house attorneys, (ii) expenses for matters that are ordinary costs of doing business, e.g., those costs that would ordinarily be incurred in the day-to-day lawful operations of

the affected properties and not in response to or to correct or resolve such Environmental Defect, (iii) internal overhead costs of Buyer or its Affiliates and/or (iv) costs or expenses relating to the assessment, remediation, removal, abatement, transportation and disposal of any asbestos, asbestos containing materials or NORM that does not violate or require Remediation under Environmental Laws.

"***Retained Liabilities***" means those matters included in clause (iii), (iv), (v), (vii), (viii), (ix), (x), (xi) and (xii) of the definition of Specified Liabilities.

"***Seller***" has the meaning set forth in the first paragraph herein.

"***Seller Indemnified Parties***" has the meaning set forth in Section 13.3.

"***Sheridan I***" means, collectively, Holdco I, Sheridan Production Partners I-A, L.P., a Delaware limited partnership, Sheridan Production Partners I-M, L.P., a Delaware limited partnership, and Sheridan Production Company I, LLC, a Delaware limited liability company.

"***Sheridan I Jointly Owned Assets***" means all Assets located in Crosby and Lubbock Counties, Texas, and Campbell County, Wyoming.

"***SPC***" means (i) Sheridan Production Company, LLC and (ii) Sheridan Production Company II, LLC, each a Delaware limited liability company.

"***Special Warranty***" has the meaning set forth in Section 5.2(a).

"***Specified Counties***" has the meaning set forth in Section 2.1(a).

"***Specified Liabilities***" means all obligations and Liabilities to the extent arising from, based upon, related to or associated with (i) the accounting for, failure to pay, or the improper payment to any working interest owner or of Burdens (and escheat obligations and related penalties) attributable to sales of Hydrocarbons produced from the Assets prior to the Closing Date (other than in respect of the Suspended Funds), (ii) personal injury (including death) and property damage (other than for Remediation of an Environmental Defect) claims attributable to Seller's (or its Affiliate's) operation of the Assets prior to the Closing Date, (iii) (A) Asset Taxes for which Seller is responsible pursuant to Section 15.2 (taking into account, and without duplication of, (x) such Asset Taxes effectively borne by Seller as a result of the adjustments to the Purchase Price made pursuant to Section 3.3 and (y) payments made from one Party to the other in respect of Asset Taxes pursuant to Section 15.2), (B) Taxes in respect of Excluded Assets and (C) any Income Taxes incurred by Seller or its Affiliates, (iv) disposal or transportation prior to the Closing Date of any Hazardous Substances generated or used by Seller (or its Affiliates) and taken from the Assets to any location that is not an Asset, (v) obligations owed to current or former employees of Seller or its Affiliates relating to the employment (or termination of employment) of such individuals by Seller or its Affiliates (including WARN Laws), (vi) fines or penalties imposed on Seller or its Affiliates by any Governmental Authority with respect to the ownership or operation of the Assets, (vii) other than those matters listed on Part I of Schedule 7.6, any action, suit or proceeding pertaining to the Assets pending before any Governmental Authority or arbitrator as of the Execution Date, including those listed on Part II of Schedule 7.6, (viii) any Withdrawal Liability, (ix) any Controlled Group Liabilities, (x) Cure Costs attributable to periods prior to the

Effective Time, (xi) all Third Party Claims associated with Seller's pre-Effective Time ownership interest in the Perdido Litigation Wells (including, without limitation, any Claims related to actions to quiet title, suits for an accounting from a co-tenant, and actions otherwise relating to subsurface trespass), and/or (xii) all Claims arising out of or associated with Item 2 of Part II in Schedule 7.6.

"***Straddle Period***" means any tax period beginning on or before and ending after the Effective Time.

"***Surface Agreements***" has the meaning set forth in Section 2.1(e).

"***Surface Interests***" has the meaning set forth in Section 2.1(c).

"***Suspended Funds***" has the meaning set forth in Section 9.11.

"***Tax***" or "***Taxes***" means (i) all taxes, assessments, fees, and other charges of any kind whatsoever imposed by any Governmental Authority, including any federal, state, local or foreign income tax, franchise tax, production tax, severance tax, value added tax, withholding tax, gross receipts tax, windfall profits tax, excess profits tax, ad valorem tax, property tax, sales tax, use tax, transfer tax, excise tax, premium tax, stamp tax, motor vehicle tax, fuel tax, insurance tax, environmental tax, capital stock tax, occupation tax, payroll tax, employment tax, unemployment tax, escheat, abandoned and unclaimed property, disability tax, alternative or add-on minimum tax and estimated tax, (ii) any interest, fine, penalty or additions to tax imposed by a Governmental Authority in connection with any item described in clause (i), and (iii) any liability in respect of any item described in clauses (i) or (ii) above, that arises by reason of a contract, assumption, transferee or successor liability, operation of Law (including by reason of participation in a consolidated, combined or unitary Tax Return) or otherwise.

"***Tax Return***" means any return, declaration, report, information, return or statement relating to Taxes, including any schedule or attachment thereto and any amendment thereof.

"***Third Party***" means any Person other than a Party to this Agreement or an Affiliate of a Party to this Agreement.

"***Third Party Claim***" has the meaning set forth in Section 13.7(b).

"***Title Arbitrator***" has the meaning set forth in Section 5.3(j)(iii).

"***Title Benefit***" means any right, circumstance or condition that operates to:

(a)      with respect to the currently producing, shut-in and behind pipe formations for each Well identified on Exhibit E, increase the Net Revenue Interest of Seller and the Applicable Affiliates, in the aggregate, above the Net Revenue Interest specified for such Well on Exhibit E (to the extent that such right, circumstance or condition does not cause a proportionately greater increase in the aggregate Working Interest of Seller and the Applicable Affiliates for such Well); or

(b)      with respect to the currently producing, shut-in and behind pipe formations for each Well identified on Exhibit E, reduce the Working Interest of Seller and the Applicable Affiliates,

in the aggregate, below the Working Interest specified for such Well on Exhibit E (to the extent that such right, circumstance or condition does not cause any decrease in the aggregate Net Revenue Interest of Seller and the Applicable Affiliates for such Well below the Net Revenue Interest set forth on Exhibit E for such Well).

"***Title Benefit Amount***" has the meaning set forth in Section 5.3(h).

"***Title Benefit Notice***" has the meaning set forth in Section 5.3(b).

"***Title Benefit Property***" has the meaning set forth in Section 5.3(b).

"***Title Defect***" means any Encumbrance, defect or other matter (including, for the avoidance of doubt, Leases that are past their primary terms and have not been held by continuous production in paying quantities, extension or renewal payments, lease amendments, or other methods after the termination of such primary terms) that causes Seller and the Applicable Affiliates not to have Defensible Title as of the Closing Date; provided that the following shall not be considered Title Defects:

(a)      defects in the chain of title consisting of omissions of successions of heirship or estate proceedings, unless Buyer provides evidence that such defect results in another Person's superior claim of title;

(b)      defects arising out of lack of survey, unless a survey is expressly required by Law or is necessary for a valid legal description;

(c)      defects arising out of lack of corporate or other entity authorization unless Buyer provides evidence that such corporate or other entity action was not authorized and results in another Person's superior claim of title;

(d)      defects that have been cured by Laws of limitations or proscription;

(e)      defects or irregularities resulting from or related to probate proceedings or the lack thereof, which defects or irregularities have been outstanding for five (5) years or more, unless Buyer provides evidence that such defect results in another Person's superior claim of title;

(f)      defects arising from prior oil and gas leases that are not surrendered of record unless Buyer provides evidence that any such prior oil and gas lease remains in force and effect and has priority;

(g)      defects arising from a mortgage encumbering the oil, gas or mineral estate of any lessor, unless (i) such mortgage expressly provides that the grant of an oil and gas lease is void or (ii) the surface of the lands covered by such lease is being used for oil and gas operations and such mortgage is not subordinated to such lease;

(h)      defects based solely on the absence of a document from Seller's files;

(i)        maintenance of uniform interest provisions contained in any operating or other agreements, unless Buyer provides evidence that such defect results in another Person's superior claim of title;

(j)        any limitation on the size of units, provided that, as to each Unit, such Unit is in compliance with such size limitation; and

(k)        defects solely with respect to the Perdido Litigation Wells.

"***Title Defect Amount***" has the meaning set forth in <u>Section 5.3(d)(i)</u>.

"***Title Defect Notice***" has the meaning set forth in <u>Section 5.3(a)</u>.

"***Title Defect Property***" has the meaning set forth in <u>Section 5.3(a)</u>.

"***Title Dispute Date***" means on or before 5:00 p.m. Central Time on the date thirty (30) days after the Cure Period; provided, that Seller may, by fifteen (15) days' advance written notice to Buyer, accelerate the Title Dispute Date to any earlier date that is after the Closing Date.

"***Title Disputes***" has the meaning set forth in <u>Section 5.3(j)(i)</u>.

"***Transaction Documents***" means those documents executed and/or delivered by Buyer, Seller or any of their Affiliates pursuant to or in connection with this Agreement including (a) the certificates delivered by each Party at Closing pursuant to <u>Section 12.3(m)</u> or <u>Section 12.3(n)</u>, (b) any other documents delivered at Closing, (c) this Agreement, (d) the Lender Consent and (e) the Confirmation Order, but excluding the CRE LLCA.

"***Transfer Taxes***" has the meaning set forth in <u>Section 15.3</u>.

"***Transition Services Agreement***" means a document relating to the transition of operations as to the Assets in substantially the form of <u>Exhibit G</u>.

"***Treasury Regulations***" means the regulations promulgated by the United States Department of the Treasury pursuant to and in respect of provisions of the Code. All references herein to Sections of the Treasury Regulations shall include any corresponding provision or provisions of succeeding, similar, substitute, proposed or final Treasury Regulations.

"***Units***" has the meaning set forth in <u>Section 2.1(a)</u>.

"***WARN Laws***" means the federal Worker Adjustment and Retraining Notification Act, or any other similar applicable state Law.

"***Wells***" has the meaning set forth in <u>Section 2.1(b)</u>.

"***Withdrawal Liability***" means liability to a Multiemployer Plan as a result of a "complete withdrawal" or "partial withdrawal" from such Multiemployer Plan, as those terms are defined in Part I of Subtitle E of Title IV of ERISA.

"***Working Interest***" means, with respect to any Property, the interest in and to such Property that is burdened with the obligation to bear and pay costs and expenses of maintenance, development and operations on or in connection with such Property, but without regard to the effect of any Burdens.

CONFIDENTIAL
DRAFT - SUBJECT TO REVISION

**Profits Interest Term Sheet**
**(Crossing Rocks Energy)**

**November [__], 2019**

THE FOLLOWING PROPOSED TERM SHEET IS NON-BINDING AND FOR DISCUSSION PURPOSES ONLY.  NO AGREEMENT TO ENTER INTO A TRANSACTION WILL EXIST OR BE DEEMED TO EXIST UNTIL A DEFINITIVE AGREEMENT IS EXECUTED BY ALL PARTIES INVOLVED.

**Parties:** The then existing members of Crossing Rocks Energy II, LLC (the "**Company**") and [_____][1] ("**Holder**", and together with such members and the Company, the "**Parties**").

**Transaction Overview:** As part of the consideration payable by Crossing Rocks Energy Operating, LLC ("**OpCo**") pursuant to that certain Purchase and Sale Agreement to which this is attached as an Exhibit, at the closing of the contemplated transaction (the "**Closing**") Holder will acquire the Series C Units (as defined below), subject to the terms set forth in this Term Sheet (this "**Term Sheet**").

Holder will enter into a Third Amended and Restated LLC Agreement of the Company (the "**LLC Agreement**") that, among other things, will provide for the issuance of the Series C Units to Holder and include the other terms and conditions set forth in this Term Sheet.

**Units:** Equity interests in the Company will initially be divided into three series of units ("**Units**") referred to as "**Series A Units**", "**Series B Units**" and "**Series C Units**".  Holder will neither have the right nor the obligation to make any capital contributions to the Company.

**Distribution Waterfall:** Subject to customary tax distributions payable to the holders of the Series A Units and the Series B Units and customary liquidation provisions to ensure creditors of the Company are paid before distributions are made to the members, all distributable property of the Company shall be distributed to the members at such time or times (if any) as the Board (as defined below), with the consent of certain holders of Series A Units, determines in its sole discretion and the holders of outstanding Series C Units shall be entitled to a portion of the distributable property as follows, with all other distributable property being allocated between the holders of Series A Units and Series B Units in accordance with the relative distribution sharing percentages currently in place between such holders such that distributions made to the holders of outstanding Series C Units are equally dilutive to the holders of Series A Units and Series B Units (for example, if 5% of the aggregate distribution is being paid to the holders of the Series C Units, then the percentage of the aggregate distribution payable to the holders of each of the Series A Units and the Series B Units will be reduced by 2.5%).

---

[1] **Note to Draft**:  Applicable creditors to form a single holding vehicle to hold all of the Series C Units.

CONFIDENTIAL

After the holders of outstanding Series A Units have received, with respect to each Series A Unit, aggregate distributions sufficient to achieve both (i) an eight percent (8%) IRR in respect of each such Series A Unit and (ii) at least 135% of the aggregate amount of Capital Contributions made in respect of such Series A Unit, 2.5% of any distributable property shall be paid to the holders of Series C Units. In addition, after the holders of outstanding Series A Units have received, with respect to each Series A Unit, aggregate distributions equal to 200% of the aggregate amount of Capital Contributions attributable to each Series A Unit[2], an incremental 2.5% of any such distributable amount shall be paid to the holders of Series C Units.

For the avoidance of doubt, if a specified distribution threshold is achieved at one time, but at a later time such distribution threshold ceases to be achieved (for example, due to the passage of time or the contribution of additional capital), then such distribution threshold will not be deemed to have been achieved for purposes of subsequent distributions of distributable property, until such time as such distribution is again achieved taking into account such subsequent distributions.

**Defined Terms:**     "**Capital Contributions**" means, with respect to any member, the amount of money and the initial book value of any property contributed to the Company by such member, in accordance with the LLC Agreement. Any reference to the Capital Contributions of a member will include the Capital Contributions made by a predecessor holder of such member's Units to the extent the Capital Contribution was made in respect of Units transferred to such member.

"**IRR**" means, with respect to each Series A Unit, as of the time of determination, an actual annual pre-tax return of the specified percentage, compounded annually, on the Capital Contribution attributable to such Series A Unit. IRR with respect to each Series A Unit shall be calculated (a) assuming (i) the Capital Contribution in respect of such Series A Unit was paid on the date it was funded and (ii) all relevant distributions in respect of such Series A Unit pursuant to the distribution waterfall have been made on the date actually paid by the Company; and (b) using the XIRR function in the most recent version of Microsoft Excel (or if such program is no longer available, such other software program for calculating IRR determined by the Board).

**Governance of the Company:**     The Company will be exclusively governed by its board of managers (the "**Board**") and certain holders of Series A Units.  For the avoidance of doubt, Holder will not have (a) any right to appoint a manager to the Board, (b) any governance rights with respect to the Company or (c) except to the extent expressly set forth in this Term Sheet, any other rights with respect to the Company.  The LLC Agreement will include customary provisions waiving

---

[2] **Note to Draft**: After the holders of Series A Units have achieved the first distribution hurdle, the holders of Series A Units will receive 78.75% of distributions until the second return threshold (the 2.0 ROI hurdle) has been achieved.

fiduciary duties and providing for the exculpation of the managers and members to the maximum extent permitted by law.

**Transfer Restrictions:**

Holder will not transfer its Units without the prior consent of the Board, except for transfers to another entity that is owned by the same direct and indirect owners as Holder in the same proportions.  Such prohibition on transfer will apply to direct and indirect transfers by Holder and its ultimate owners.

Certain holders of Series A Units will have customary drag-along rights, which they may exercise at any time in their sole discretion, and regardless of whether the holders of Series C Units would receive any proceeds in connection with such transaction.  Certain members holding Series A Units may also compel Holder to transfer or exchange its Units as part of an internal reorganization that is undertaken in connection with a drag-along transaction, initial public offering or other liquidity event.  Holder will grant the Company a customary power of attorney with respect to any acts that Holder may be obligated to take under the LLC Agreement.

**Amendments to LLC Agreement:**

Certain holders of Series A Units and the Board will have the right to amend or modify the LLC Agreement from time to time; provided, any such amendment that alters the relative rights to distributions set forth in the distribution waterfall as between the Series A Units and the Series C Units in a manner that is materially adverse to one such series vis-à-vis the other such series will require the consent of the members holding a majority of the Units of the adversely affected series.

Notwithstanding the foregoing, no member approval will be required for any amendment made by the Board or certain holders of Series A Units, as applicable, that is made either (a) in connection with the transfer, creation and issuance of additional or different classes or series of Units, (b) as part of an internal restructure undertaken in connection with a drag-along transaction, initial public offering or other liquidity event, (c) to address venture capital operating company matters, (d) relating to certain tax matters, or (e) curing any ambiguity or correcting or supplementing any provision of the LLC Agreement that may be incomplete or inconsistent with any other provision thereof; provided, in the case of an amendment effected pursuant to clauses (a) to (e) such amendment does not alter the relative rights to distributions set forth in the distribution waterfall as between the Series A Units and the Series C Units in a manner that is materially adverse to one such series vis-à-vis the other such series without the consent of the members holding a majority of the Units of the adversely affected series.

**Information Rights**

Subject to customary confidentiality protections, Holder will be entitled to receive the consolidated annual financial statements of the Company and other customary tax information (such as Form K-1s).

**Confidentiality:**

The contents of this Term Sheet are confidential.  For the avoidance of doubt, Holder (and its affiliates and their respective direct and indirect owners) will be restricted from using any information relating to or received

CONFIDENTIAL

from the Company or its affiliates for any purpose other than its role as Holder pursuant to the definitive documents.

**Expenses:**

All fees and expenses incurred by the Company and its existing members in connection with the negotiation of the transactions contemplated by this Term Sheet will be borne by the Company, and all fees and expenses incurred by Holder in connection with the negotiation of the transactions contemplated by this Term Sheet will be borne by Holder.

**Governing Law; Waiver of Jury Trial:**

The LLC Agreement will be governed by Delaware law (excluding its choice of law principles to the extent that they would direct the application of the law of another jurisdiction) and will contain a customary waiver of the right to jury trial and customary dispute resolution provisions involving AAA arbitration.

**Non-Binding Effect:**

Neither this Term Sheet nor any action of the Parties with respect hereto is intended, will be deemed or will constitute a legally binding obligation of the Parties, nor can it be relied upon, or be enforced by any person or entity, whether as a contract by estoppel or otherwise.  It is understood and agreed that (a) this Term Sheet creates no binding rights or obligations on the part of any Party or any legal offer of any kind, (b) no legally binding agreement will arise, directly or indirectly, as to the subject matter hereof unless and until the definitive agreements for the transactions contemplated hereby are negotiated, approved, executed and delivered by the Parties and (c) any legal obligations of the Parties will arise solely from the execution and delivery of such definitive agreements and any related agreements delivered pursuant thereto.  Prior to the execution and delivery of such definitive agreements, the Parties may modify or withdraw from proceeding with the transactions contemplated hereby at any time for any reason or no reason at all without incurring any liability or obligation to the other Party or any of its respective affiliates, directors, officers, employees, agents, advisors or equityholders.

**Exhibit I**

**Form of Plan Administrator Agreement**

Certain documents, or portions thereof, contained in this **Exhibit I** and the Plan Supplement remain subject to continuing negotiations and review by the Debtors and the Consenting Creditors.

The respective rights of the Debtors and the Consenting Creditors are expressly reserved, subject to the terms and conditions set forth in the Plan and the RSA, to alter, amend, modify, or supplement the Plan Supplement and any of the documents contained therein in accordance with the terms of the Plan, or by order of the Bankruptcy Court; *provided* that, if any document in the Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the Confirmation Hearing, the Debtors will file a redline of such document with the Bankruptcy Court.

*DRAFT*
*SUBJECT TO REVISION*

## PLAN ADMINISTRATOR AGREEMENT

This PLAN ADMINISTRATOR AGREEMENT (this "Agreement"), which shall constitute the "Plan Administrator Agreement" under, as defined in, and for all purposes of the Plan, unless and until it is replaced by an agreement with a successor "Plan Administrator" appointed under the Plan pursuant to Art VII thereof, dated as of [●], 2019, by and among (a) Sheridan Holding Company II, LLC, on behalf of itself and its Debtor affiliates (collectively, the "Debtors") and (b) AlixPartners, LLP ("AlixPartners"), which shall provide certain Plan administration services and make available Barry Folse, a Managing Director, to serve as (and who is deemed designated) the "Plan Administrator" under, as defined in, and for all purposes of the Plan, until the Plan Administrator ceases to be the "Plan Administrator" hereunder (the "Plan Administrator," and with the Debtors, the "Parties"), sets forth the terms and conditions under which the Plan Administrator shall effectuate the wind down, dissolution, and liquidation of the Debtors' Estates and to implement the terms and distributions under the *Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code (Technical Modifications)* [Docket No. 103] (as may be amended from time to time and including all supplements thereto, the "Plan").[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

1.     Appointment. Effective as of the  Effective Date, the Plan Administrator is appointed to act as the Plan Administrator under the Plan to implement the Plan and wind down the business and affairs of the Debtors and the Reorganized Debtors, subject to the terms and conditions set forth in this Agreement, the Plan, and the Confirmation Order.  The Debtors and the Plan Administrator acknowledge that the Plan Administrator shall be a fiduciary for the Debtors' Estates.  The Plan Administrator, as Plan Administrator for all purposes of the Plan, shall act for the Reorganized Debtors in the same fiduciary capacity as applicable to a board of managers, directors, officers, general partner, or other governing body (each, a "Governing Body"), subject to the provisions of the Plan (and all certificates of formation, membership agreements, partnership agreements, and related documents are deemed amended by the Plan to permit and authorize the same) and, on the Effective Date, shall succeed to the powers of the Reorganized Debtors' Governing Bodies.  The Plan Administrator shall be deemed a "representative" of the Debtors' Estates as contemplated by section 1123(b)(3)(B) of the Bankruptcy Code and appointed to enforce, in its reasonable business judgment, all claims, interests, or Retained Causes of Action, held by the Debtors' Estates on and after the  Effective Date, unless any Retained Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, provided that the Reorganized Debtors, in consultation with the Plan Administrator after the Effective Date, may prosecute any such Retained Cause of Action against any party only in connection with their objection to and resolution of any Claim asserted by such party and provided further that, for the avoidance of doubt, Retained Causes of Action shall not include those causes of action transferred to Purchaser pursuant to the Asset Purchase Agreement. The Plan Administrator shall be appointed the exclusive trustee of the assets of the Reorganized Debtors for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3).   The Plan Administrator, is hereby appointed to make any disbursements under the Plan on and after the Effective Date, subject to the terms and conditions set forth in this Agreement, the Plan, and the

---

[1]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

Confirmation Order. From and after the Effective Date, the Debtors' Estates shall be managed and administered through the Plan Administrator as Plan Administrator for all purposes of the Plan, who shall have full authority to administer the provisions of the Plan subject to the terms and conditions of this Agreement, the Plan, and the Confirmation Order. To the extent necessary, on and after the Effective Date, the Plan Administrator shall be deemed to be a judicial substitute for the applicable Debtors as the party in interest in the Chapter 11 Cases, under the Plan, or in any judicial proceeding or appeal to which any of the Debtors is a Party. For the avoidance of doubt, the foregoing shall not limit the authority of the Plan Administrator to continue the employment of any former manager or officer, pursuant to any transition services agreement entered into on or after the Effective Date by and between the Reorganized Debtors and the Purchaser.

2.     <u>Scope of Services</u>. The Plan Administrator and AlixPartners are to provide post-Effective Date administration, wind down, dissolution, and liquidation services that are necessary, required, desirable, or advisable to effectuate the Wind Down and to make certain distributions under the Plan. Without limiting the provisions of the Plan applicable to the Plan Administrator, the Plan Administrator and AlixPartners will perform the following services for the Debtors' or Reorganized Debtors' Estates (as such services may be further described in the Plan and/or Confirmation Order, together with any other or additional tasks required to be performed by the Plan Administrator as described in the Plan and/or the Confirmation Order):

        (a)     oversee the maintenance of the books, records, and accounts of the Debtors' Estates and the wind down and dissolution of the Debtors after the Effective Date;

        (b)     be responsible for the ongoing administration of the Chapter 11 Cases;

        (c)     be responsible for all actions related to the closing of the Chapter 11 Cases, except for one of the Chapter 11 Cases as determined by the Plan Administrator, the Reorganized Debtors, and the Required Consenting Secured Lenders;

        (d)     pursue the Retained Causes of Action in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith, subject to the terms and conditions set forth in this Agreement, the Plan, and the Confirmation Order;

        (e)     in connection with making any distributions under the Plan, comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority;

        (f)     liquidating, receiving, holding, investing, supervising, and protecting the assets of the Reorganized Debtor in accordance with the [Wind-Down Milestones and] Wind-Down Budget;

        (g)     taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan in accordance with the Wind-Down Budget;

        (h)     making distributions as contemplated under the Plan;

(i)     establishing and maintaining bank accounts in the name of the Reorganized Debtors;

(j)     subject to the terms set forth in the Plan, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary, *provided* that the Plan Administrator shall be permitted to pay such professionals in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court solely from the Plan Administrator Assets and subject to the Wind-Down Budget;

(k)     paying all reasonable fees, expenses, debts, charges, and liabilities of the Reorganized Debtors on and after the Effective Date;

(l)     administering and paying taxes of the Reorganized Debtors, including filing tax returns;

(m)     representing the interests of the Reorganized Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding, or audit;

(n)     oversee all other tax compliance matters, such as the filing of tax returns, payment of taxes, and pursuing tax refunds as necessary;

(o)     make all necessary filings in accordance with any applicable law, statute, or regulation;

(p)     prepare and file quarterly reports and other filings with the Bankruptcy Court; and

(q)     exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan, in each case of the forgoing clauses, strictly in accordance with the [Wind-Down Milestones and] Wind-Down Budget.

3.     <u>Timing and Fees</u>.

(a)     The Plan Administrator will commence its responsibilities as the Plan Administrator for all purposes of the Plan on the  Effective Date.

(b)     The Plan Administrator and AlixPartners shall be compensated for their services out of the Wind-Down Budget and Plan Administrator Assets.

(c)     The Plan Administrator and AlixPartners shall be compensated at AlixPartners' current standard hourly rates, subject to periodic adjustments in the ordinary course of business:

| Title | Hourly Rate |
|---|---|
| Managing Director | $960 – $1,165 |
| Director | $775 – $945 |
| Senior Vice President | $615 – $725 |
| Vice President | $440 – $600 |
| Consultant | $160 – $435 |
| Paraprofessional | $285 – $305 |

      (d)    Any professionals retained by the Plan Administrator pursuant to the terms of this Agreement shall be paid as set forth in the applicable professional's engagement letter, which shall be payable from the Plan Administrator Assets, subject to the Wind-Down Budget, in accordance with the terms of this Agreement, the Plan, and the Confirmation Order.

4.     <u>Relationship of the Parties</u>. The Parties intend that an independent contractor relationship shall be created by this Agreement. The Plan Administrator shall not be entitled to receive from the Debtors or its Estates any vacation pay, sick leave, retirement, pension or social security benefits, workers' compensation, disability, unemployment insurance benefits, or any other employee benefits.

5.     <u>Confidentiality</u>. The Plan Administrator shall treat confidentially all information not publicly available which is received by the Plan Administrator in connection with this engagement or that is developed during this engagement, and the Plan Administrator shall not disclose such information except as required by a court order or other legal process.

6.     <u>Exculpation; Indemnification; Insurance; Liability Limitation</u>. On and after the Effective Date, the Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Debtors. The Plan Administrator may obtain, at the expense of the Debtors, but solely from the Plan Administrator Assets and pursuant to the Wind-Down Budget, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Debtors. The Plan Administrator may rely upon written information previously generated by the Debtors. For the avoidance of doubt, notwithstanding anything to the contrary contained herein, the Plan Administrator in its capacity as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the Debtors.

7.     <u>Relationship to the Plan</u>. The principal purpose of this Agreement is to aid in the implementation of the Plan and, therefore, this Agreement incorporates and is, in all respects, subject to the provisions of the Plan and the Confirmation Order. In the event that any provision of this Agreement is found to be inconsistent with a provision of the Plan or the Confirmation Order, the provisions of the Plan or the Confirmation Order, as applicable, shall control.

8.     <u>Retention of Jurisdiction</u>. Notwithstanding the occurrence of the Effective Date, and to the fullest extent permitted by law, the Bankruptcy Court shall retain exclusive jurisdiction over the Debtors after the Effective Date, including, without limitation, jurisdiction to resolve any and

4

all controversies, suits, and issues that may arise in connection therewith, including, without limitation, this Agreement, or any entity's obligations incurred in connection herewith, including without limitation, any action against the Plan Administrator or any professional retained by the Plan Administrator, in each case in its capacity as such.  Each party to this Agreement hereby irrevocably consents to the exclusive jurisdiction of the Bankruptcy Court in any action to enforce, interpret, and/or construe any provision of this Agreement or of any other agreement or document delivered in connection with this Agreement, and also hereby irrevocably waives any defense of improper venue, forum *non conveniens*, or lack of personal jurisdiction to any such action brought in the Bankruptcy Court.  Each party further irrevocably agrees that any action to enforce, interpret, or construe any provision of this Agreement will be brought only in the Bankruptcy Court.  Each party hereby irrevocably consents to the service by certified or registered mail, return receipt requested, of any process in any action to enforce, interpret or construe any provision of this Agreement.

9.      Termination; Effect of Termination.  The Plan Administrator may resign at any time upon 30 days' written notice delivered to the Bankruptcy Court; provided that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator in accordance with this Agreement.  Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor (as set forth in this Agreement) and all responsibilities of the predecessor Plan Administrator relating to the Debtors or Reorganized Debtors in this Agreement shall be terminated.

        (a)      This Agreement may be terminated for cause shown pursuant to a Final Order entered by the Bankruptcy Court after notice and a hearing; provided that in the event that this Agreement is terminated before its automatic termination as provided herein, the Debtors (with the consent of the Required Consenting Secured Lenders) shall appoint a successor Plan Administrator to fill the vacancy left by the termination of this Agreement.

        (b)      Upon termination of this Agreement or resignation of the Plan Administrator, the Plan Administrator shall be entitled to all fees and expenses accrued to that date pursuant to this Agreement, including any travel or related expenses incurred in returning from the location of the services being provided under this Agreement prior to the termination date or resignation date.

10.      Effectiveness.  This Agreement shall be effective upon the Effective Date.

11.      Notice.  All invoices, notices, requests, demands, and other communications permitted or required to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed conclusively to have been given:  (a) when personally delivered; (b) when sent by facsimile (with hard copy to follow) during a Business Day (or on the next Business Day if sent after the close of normal business hours or on any non-Business Day); (c) when sent by electronic mail (with hard copy to follow) during a Business Day (or on the next Business Day if sent after the close of normal business hours or on any non-Business Day); (d) one (1) Business Day after being sent by reputable overnight express courier (charges prepaid); or (e) three (3) Business Days following mailing by certified or registered mail, postage prepaid and

return receipt requested.  Unless another address is specified in writing, notices, requests, demands, and communications to the Parties hereto shall be sent to the addresses indicated below:

        (a)     if to the Debtors, to:

                Sheridan Holding Company II, LLC
                1360 Post Oak Blvd., Suite 2500
                Houston, Texas 77056
                Attention:  Cheryl S. Phillips, Vice President and General Counsel
                Email address:  cheryl.phillips@sheridanproduction.com

                with copies to:

                Kirkland & Ellis LLP
                601 Lexington Avenue
                New York, New York 10022
                Facsimile:  (212) 446-4900
                Attention:  Joshua A. Sussberg, P.C. and Steven N. Serajeddini
                E-mail addresses:  joshua.sussberg@kirkland.com and
                                        steven.serajeddini@kirkland.com

                -and-

                Kirkland & Ellis LLP
                300 North LaSalle
                Chicago, Illinois 60654
                Facsimile:  (312) 862-2200
                Attention:  Spencer A. Winters
                E-mail address:  spencer.winters@kirkland.com

        (b)     if to the Plan Administrator, to:

                AlixPartners, LLP
                300 North LaSalle
                Suite 1900
                Chicago, Illinois 60654
                Attention.:  [Barry Folse]
                E-mail address:  [bfolse@alixpartners.com]

12.    Miscellaneous.

        (a)     Sections 5, 6, and all other provisions necessary to the enforcement of the intent of this Agreement will survive the termination or expiration of this Agreement.

        (b)     In the event of an inconsistency between this Agreement and the Plan, the terms of the Plan shall control in all respects.

6

(c)     If any portion of this Agreement shall be determined to be invalid or unenforceable, the remainder of this Agreement shall be valid and enforceable to the maximum extent provided by applicable law.

(d)     Neither this Agreement nor any of the rights, interests, or obligations under this Agreement shall be assigned by any of the Parties (whether by operation of law or otherwise) without the prior written consent of the other Party.

(e)     This Agreement is governed by and shall be construed in accordance with the laws of the State of New York without regard to choice of law or principles thereof.  In any court proceeding arising out of or related to this Agreement, each of the Parties hereby waive any right to trial by jury.  Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court for purposes of any proceeding arising from or related to this Agreement, and each of the Parties agrees not to commence any action, suit, or proceedings relating thereto except in the Bankruptcy Court.

(f)     This Agreement, the Plan, and the Confirmation Order encompass all of the terms and conditions between the Debtors and the Plan Administrator concerning the subject matter hereof.  This Agreement may not be amended or modified in any respect except in a writing signed by each of the Parties.

(g)     This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same Agreement. A signed copy of this Agreement delivered by facsimile, e-mail, or other means of electronic transmission (.pdf) shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGES FOLLOW]

THE DEBTORS:

Sheridan Holding Company II, LLC, on behalf of itself and its Debtor affiliates

By:_____
Name:  Lisa A. Stewart
Title:  Executive Chairman, President, Chief Investment Officer, and Chief Executive Officer

THE PLAN ADMINISTRATOR:


By:_____
Name:  [Barry Folse]
Title:  Managing Director
          AlixPartners, LLP

## **Exhibit J**

### **Asset Sale Election Notice**

Certain documents, or portions thereof, contained in this **Exhibit J** and the Plan Supplement remain subject to continuing negotiations and review by the Debtors and the Consenting Creditors.

The respective rights of the Debtors and the Consenting Creditors are expressly reserved, subject to the terms and conditions set forth in the Plan and the RSA, to alter, amend, modify, or supplement the Plan Supplement and any of the documents contained therein in accordance with the terms of the Plan, or by order of the Bankruptcy Court; *provided* that, if any document in the Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the Confirmation Hearing, the Debtors will file a redline of such document with the Bankruptcy Court.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | § § § | Chapter 11 |
| SHERIDAN HOLDING COMPANY II, LLC, *et al.*,[1] | § | Case No. 19-35198 (MI) |
| Debtors. | § § § § | (Jointly Administered) |

**NOTICE OF ASSET SALE RESTRUCTURING**

      **PLEASE TAKE NOTICE** that, on September 15, 2019, Sheridan Holding Company II, LLC and the other above-captioned debtors and debtors in possession (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code").

      **PLEASE TAKE FURTHER NOTICE** that, on September 15, 2019, the Debtors filed the *Debtors' Joint Prepackaged Plan of Reorganized Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 10].

      **PLEASE TAKE FURTHER NOTICE** that, on September 24, 2019, the Debtors filed the *Debtors' Joint Prepackaged Plan of Reorganized Pursuant to Chapter 11 of the Bankruptcy Code (Technical Modifications)* [Docket No. 103] (as modified, amended, or supplemented from time to time, the "Plan").[2]

      **PLEASE TAKE FURTHER NOTICE** that, on September 24, 2019, the Debtors filed the *Notice of Proposed Assumption or Assumption and Assignment of Executory Contracts or Unexpired Leases and Cure Amount* [Docket No. 112] (the "Notice of Proposed Assumption/Assignment").

      **PLEASE TAKE FURTHER NOTICE** that, pursuant to the Notice of Proposed Assumption/Assignment, objections to the proposed assumption or the assumption and assignment of an Assumed Contract, including any objection relating to cure costs were due to be filed no later than October 15, 2019.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Sheridan Holding Company II, LLC (7040); Sheridan Investment Partners II GP, LLC (8298); Sheridan Investment Partners II, L.P. (9405); Sheridan Production Partners II, LLC (8034); Sheridan Production Partners II-A, L.P. (8813); Sheridan Production Partners II-B, L.P. (9232); Sheridan Production Partners II-M, L.P. (9084); SPP II-B GP, LLC (8554); and SPP II-M GP, LLC (0488).  The location of the Debtors' service address is:  1360 Post Oak Blvd., Suite 2500, Houston, Texas 77056.

[2]    Capitalized terms used but not defined in this Notice shall have the meanings ascribed to them in the Plan.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Plan and subject to the approval of the Debtors' governing bodies, the Required Consenting Secured Lenders, and the Purchaser's board of directors:

(a) the Debtors will elect to effectuate the Asset Sale Restructuring and consummate the Asset Sale in accordance with the Plan; and

(b) the Debtors, subject to the consent of the Required Consenting Secured Lenders, intend to sell or transfer substantially all of the Debtors' assets under the Plan to Crossing Rocks Energy Operating, LLC (the "Purchaser"), which shall be the "Purchaser" as defined in the Plan and the Notice of Proposed Assumption/Assignment

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve the right to withdraw this Asset Sale Election Notice at any time prior to confirmation of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, in accordance with the terms set forth in the Plan, contemporaneously herewith, the Debtors filed the form of *Purchase and Sale Agreement Between Sheridan Holding Company II, LLC, et al. and Crossing Rocks Energy Operating, LLC* (as modified, amended, or supplemented from time to time, the "Asset Purchase Agreement"), which shall be the Asset Purchase Agreement as defined in the Plan.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Notice of Proposed Assumption/Assignment, the Debtors intend to assume and assign to Purchaser the executory contracts or unexpired leases set forth in the Notice of Proposed Assumption/Assignment (each, an "Assigned Contract") pursuant to section 365 of the Bankruptcy Code on the effective date of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Notice of Proposed Assumption/Assignment, any recipient of this notice may object to the proposed assumption and assignment of an Assumed Contract, including to adequate assurance of the Purchaser's future ability to perform, but excluding the cure amount.  Objections must:  (i) be in writing; (ii) comply with the Bankruptcy Code, Bankruptcy Rules and Local Bankruptcy Rules; (iii) state, with specificity, the legal and factual bases thereof, and (iv) be filed by no later than **November 12, 2019 at 2:00 p.m. (prevailing Central Time)**.

**PLEASE TAKE FURTHER NOTICE** that the deadline by which parties in interest may file any brief in support of confirmation of the Plan and reply to any objections is extended to **November 8, 2019**.

**PLEASE TAKE FURTHER NOTICE** that, subject to Bankruptcy Court approval and availability, a hearing to consider final approval of the adequacy of the disclosure statement and confirmation of the Plan, including the Asset Sale Restructuring, shall be held on **November 12, 2019 at 2:00 p.m. (prevailing Central Time)**.

**PLEASE TAKE FURTHER NOTICE** that this notice, the Asset Purchase Agreement, and the Notice of Proposed Assumption/Assignment remain subject to Bankruptcy Court approval and other approvals as set forth in this Notice and remain subject to further change and revision in all respects.

Houston, Texas
November 5, 2019

/s/ *Matthew D. Cavenaugh*
Matthew D. Cavenaugh (TX Bar No. 24062656)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:           mcavenaugh@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:           joshua.sussberg@kirkland.com
                 steven.serajeddini@kirkland.com

-and-

Spencer A. Winters (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:           spencer.winters@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

## Exhibit K

### Wind-Down Budget

Certain documents, or portions thereof, contained in this **Exhibit K** and the Plan Supplement are drafts and remain subject to continuing negotiations among the Debtors and interested parties with respect thereto.

The Wind-Down Budget is not final and remains subject to negotiation among the Debtors and the Required Consenting Senior Secured Lenders. The draft attached herein (the "Draft Wind-Down Budget") is subject to material revision in all respects. The final form of the Wind-Down Budget shall be subject to the terms and conditions of the Plan and the RSA, including all consent rights therein, and the Debtors and each interested party (solely to the extent such party has consent rights over the Wind-Down Budget) reserve all rights to amend (in whole or in part), revise, or supplement the Draft Wind-Down Budget, and any of the documents and designations contained therein, at any time before the Effective Date of the Plan, or any such other date as may be permitted by the Plan or by order of the Bankruptcy Court.

Confidential - Subject to Material Change - Subject to FRE 408

**Sheridan Fund II - Wind Down Budget**
**Bidder B Sale**
**November 5, 2019**

| Category | | Cost Estimate |
|---|---|---|
| Severance | $ | 3,400,000 |
| Employee Compensation (1) | $ | 8,200,000 |
| Corporate Leases | $ | 4,000,000 |
| Professional Fees (2) | $ | 1,150,000 |
| Plan Administrator | $ | 2,500,000 |
| Operating Cash (3) | $ | 15,000,000 |
| Contingency Reserve (4) | $ | 37,500,000 |
| Total | $ | 71,750,000 |

(1) Includes 30 days of WARN compensation
(2) Not inclusive of Professional Fee Escrow
(3) One month working capital
(4) The Debtors and the Required Consenting Lenders have not agreed to the amount of the contingency reserve.  The Debtors will work to find a mutually acceptable figure in advance of the confirmation hearing.