**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
11/12/2019

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| SHERIDAN HOLDING COMPANY II, LLC, *et al.*,[1] | § | Case No. 19-35198 (MI) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**ORDER APPROVING THE DEBTORS'
DISCLOSURE STATEMENT FOR, AND CONFIRMING,
THE DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN**

The above-captioned debtors (collectively, the "Debtors") having:

a.    distributed, on or about September 4, 2019, (i) the *Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 10] (as modified, amended, or supplemented from time to time, the "Plan"), (ii) the *Disclosure Statement for the Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 9] (the "Disclosure Statement"), and (iii) ballots for voting on the Plan to holders of Claims[2] entitled to vote on the Plan, namely holders of Class 3(a)-(c) (the "Sheridan II RBL Claims"), Class 4(a)-(c) (the "Sheridan II Term Loan Claims"), and Class 5(a)-(c) (the "Sheridan II Subordinated Term Loan Claims"), in accordance with the terms of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Local Rules");

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Sheridan Holding Company II, LLC (7040); Sheridan Investment Partners II GP, LLC (8298); Sheridan Investment Partners II, L.P. (9405); Sheridan Production Partners II, LLC (8034); Sheridan Production Partners II-A, L.P. (8813); Sheridan Production Partners II-B, L.P. (9232); Sheridan Production Partners II-M, L.P. (9084); SPP II-B GP, LLC (8554); and SPP II-M GP, LLC (0488).  The location of the Debtors' service address is:  1360 Post Oak Blvd., Suite 2500, Houston, Texas 77056.

[2]    Capitalized terms used but not otherwise defined in these findings of fact, conclusions of law, and order (collectively, the "Confirmation Order") have the meanings ascribed to them in the Plan, the Disclosure Statement, or the Bankruptcy Code (as defined herein), as applicable.  The rules of interpretation set forth in Article I.B of the Plan apply.

b.      commenced, on September 15, 2019 (the "Petition Date"), these chapter 11 cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code;

c.      filed, on September 15, 2019, the *Declaration of Lisa A. Stewart, Executive Chairman, President, Chief Investment Officer, and Chief Executive Officer of Sheridan Holding Company II, LLC, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 4] (the "First Day Declaration"), detailing the facts and circumstances of these chapter 11 cases;

d.      filed, on September 15, 2019, the Plan and the Disclosure Statement;

e.      filed, on September 15, 2019, the *Debtors' Emergency Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving Disclosure Statement, (III) Establishing a Plan and Disclosure Statement Objection Deadline and Related Procedures, (IV) Approving the Solicitation Procedures, (V) Approving the Combined Notice, and (VI) Waiving the Requirements that the U.S. Trustee Convene a Meeting of Creditors and the Debtors File Schedules and SOFAs* [Docket No. 11] (the "Scheduling Motion");

f.      filed, on September 15, 2019, the *Declaration of Craig E Johnson of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 20], which detailed the results of the Plan voting process (the "Voting Report");

g.      served, on September 17, 2019, the *Notice of (I) Non-Voting Status to Holders or Potential Holders of Unimpaired Claims Conclusively Presumed to Accept the Plan and Holders or Potential Holders of Impaired Claims Conclusively Presumed to Reject the Plan, and (II) Opportunity for Holders of Claims and Interests to Opt Out of the Third-Party Releases* [Docket No. 99, Exhibit I] (the "Notice of Non-Voting Status and Opt-Out Form");

h.      filed, on September 23, 2019, the *Notice of (I) Commencement of Prepackaged Chapter 11 Bankruptcy Cases, (II) Combined Hearing on the Disclosure Statement, Confirmation of the Joint Prepackaged Chapter 11 Plan, and Related Matters, and (III) Objection Deadlines, and Summary of the Debtors' Joint Prepackaged Chapter 11 Plan* [Docket No. 99, Exhibit B] (the "Confirmation Hearing Notice"), which contained notice of the commencement of these chapter 11 cases, the date and time set for the hearing to consider approval of the Disclosure Statement and Confirmation of the Plan (the "Confirmation Hearing"), and the deadline for filing objections to the Plan and the Disclosure Statement;

i.      filed, on September 23, 2019, the *Affidavit of Service* of the Confirmation Hearing Notice [Docket No. 99] (the "Confirmation Hearing Notice Affidavit");

j.      published, on September 23, 2019, in the (a) *Houston Chronicle*, as evidenced by the *Affidavit of Publication* [Docket No. 115] and (b) *New York Times*, as evidenced

by the *Proof of Publication* [Docket No. 116], (together with the Confirmation Hearing Notice Affidavit, the "Affidavits"), the Confirmation Hearing Notice, consistent with the *Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving Disclosure Statement, (III) Establishing a Plan and Disclosure Statement Objection Deadline and Related Procedures, (IV) Approving the Solicitation Procedures, (V) Approving the Combined Notice, and (VI) Waiving the Requirements that the U.S. Trustee Convene a Meeting of Creditors and the Debtors File Schedules and SOFAs* [Docket No. 53] (the "Scheduling Order");

k.   filed, on September 24, 2019, a modified version of the Plan [Docket No. 103], attached hereto as **Exhibit A**, and the *Notice of Filing of Redline of Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code (Technical Modifications)* [Docket No. 104];

l.   filed, on September 24, 2019, the *Notice of Proposed Assumption or Assumption and Assignment of Executory Contracts or Unexpired Leases and Cure Amount* [Docket No. 112] (the "Notice of Proposed Assumption/Assignment");

m.   filed, on October 3, 2019, the *Affidavit of Service of the Notice of Proposed Assumption or Assumption and Assignment of Executory Contracts or Unexpired Leases and Cure Amount* [Docket No. 122];

n.   filed, on October 24, 2019, the *Plan Supplement for the Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code (Technical Modifications)* (the "Initial Plan Supplement") [Docket No. 192];

o.   filed, on October 28, 2019, the *Notice of Filing First Supplement to Plan Supplement* [Docket No. 196] (the "First Plan Supplement" and together with the Initial Plan Supplement and the Notice of Proposed Assumption/Assignment, as may be amended, supplemented, or modified from time to time in accordance with the Plan, the "Plan Supplement");

p.   filed, on November 9, 2019, the *Notice of Withdrawal of Asset Sale Election Notice and Second Amended Plan Supplement* [Docket No. 215];

q.   filed, on November 11, 2019, the *Corrected Memorandum of Law of Sheridan Holding Company II, LLC., et al., in Support of an Order Approving the Debtors' Disclosure Statement for, and Confirming, the Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code (Technical Modifications)* [Docket No. 223] (the "Confirmation Brief");

r.   filed, on November 11, 2019, the (i) the *Corrected Declaration of Lisa A. Stewart, Chief Executive Officer, President, Chief Investment Officer, and Chief Executive Officer of Sheridan Holding Company II, LLC in Support of Confirmation of the Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 224] (the "Stewart Declaration");

3

s.      filed, on November 9, 2019, the *Declaration of Jeffrey Kopa in Support of Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code (Technical Modifications)* [Docket No. 219] (the "<u>Kopa Declaration</u>");

t.      filed, on November 10, 2019, the *Declaration of Curtis Flood in Support of in Support of Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code (Technical Modifications)* [Docket No. [221] (the "<u>Flood Declaration</u>," and together with the Stewart Declaration and Kopa Declaration, the "<u>Declarations</u>") in support of Confirmation of the Plan;

u.      filed, on November 9, 2019, the (i) the *Supplemental Declaration of Craig E. Johnson on Behalf of Prime Clerk LLC Regarding Tabulation of Ballots Cast on the Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 218] (the "<u>Supplemental Voting Report</u>"); and

v.      operated their businesses and managed their properties during these chapter 11 cases as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

The Court having:

a.      entered, on September 16, 2019, the Scheduling Order;

b.      set November 12, 2019, at 2:00 p.m. (prevailing Central Time), as the date and time for the Confirmation Hearing, pursuant to Bankruptcy Rules 3017 and 3018 and sections 1126, 1128, and 1129 of the Bankruptcy Code;

c.      taken notice of the Plan, the Disclosure Statement, the Scheduling Motion, the Plan Supplement, the Confirmation Brief, the Declaration, the Voting Report, the Confirmation Hearing Notice, the Affidavits, and all filed pleadings, exhibits, statements, and comments regarding approval of the Disclosure Statement and Confirmation, including all objections, statements, and reservations of rights;

d.      held the Confirmation Hearing;

e.      heard the statements and arguments made by counsel with respect to the approval of the requested relief in the Scheduling Motion, including the approval of the Solicitation Procedures and the Confirmation Schedule;

f.      heard the statements and arguments made by counsel in respect of approval of the Disclosure Statement and Confirmation;

g.      considered all oral representations, testimony, documents, filings, and other evidence regarding approval of the Disclosure Statement and Confirmation; and

h.      taken judicial notice of all pleadings and other documents filed, all orders entered, and all evidence and arguments presented in these chapter 11 cases.

4

NOW, THEREFORE, it appearing to the Court that notice of the Confirmation Hearing and the opportunity for any party in interest to object to approval of the Disclosure Statement and Confirmation having been adequate and appropriate as to all parties affected or to be affected by the Plan and the transactions contemplated thereby, and the legal and factual bases set forth in the documents filed in support of approval of the Disclosure Statement and Confirmation and other evidence presented at the Confirmation Hearing establish just cause for the relief granted herein; and after due deliberation thereon and good cause appearing therefor, the Court makes and issues the following findings of fact and conclusions of law, and orders:

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

IT IS DETERMINED, FOUND, ADJUDGED, DECREED, AND ORDERED THAT:

**A.     Findings and Conclusions.**

1.     The findings and conclusions set forth herein and in the record of the Confirmation Hearing constitute the Court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014.  To the extent any of the following conclusions of law constitute findings of fact, or vice versa, they are adopted as such.

**B.     Jurisdiction, Venue, and Core Proceeding.**

2.     The Court has jurisdiction over these chapter 11 cases pursuant to section 1334 of title 28 of the United States Code.  The Court has exclusive jurisdiction to determine whether the Disclosure Statement and the Plan comply with the applicable provisions of the Bankruptcy Code and should be approved and confirmed, respectively.  Venue is proper in this district pursuant to sections 1408 and 1409 of title 28 of the United States Code.  Approval of the Disclosure Statement, including associated solicitation procedures, and Confirmation of the Plan are core proceedings within the meaning of section 157(b)(2) of title 28 of the United States Code.

**C.      Eligibility for Relief.**

3.      The Debtors were and are entities eligible for relief under section 109 of the Bankruptcy Code.

**D.      Commencement and Joint Administration of these Chapter 11 Cases.**

4.      On the Petition Date, each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.  In accordance with the *Order Directing Joint Administration of Related Chapter 11 Cases* [Docket No. 13], these chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015. Since the Petition Date, the Debtors have operated their businesses and managed their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.  No statutory committee of unsecured creditors or equity security holders has been appointed pursuant to section 1102 of the Bankruptcy Code in these chapter 11 cases.

**E.      Burden of Proof—Confirmation of the Plan.**

5.      The Debtors, as proponents of the Plan, have met their burden of proving the applicable elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard for Confirmation.  In addition, and to the extent applicable, the Plan is confirmable under the clear and convincing evidentiary standard.

**F.      Notice.**

6.      As evidenced by the Affidavits and the Voting Report, the Debtors provided due, adequate, and sufficient notice of the Plan, the Disclosure Statement, the Confirmation Hearing Notice, the Plan Supplement, and all of the other materials distributed by the Debtors in connection with the Confirmation in compliance with the Bankruptcy Rules, including Bankruptcy Rules 2002(b), 3017, 3019, and 3020(b), the Bankruptcy Local Rules of the United States Bankruptcy

Court for the Southern District of Texas, and the procedures set forth in the Scheduling Order. The Debtors provided due, adequate, and sufficient notice of the Plan Objection Deadline, the Confirmation Hearing, and any applicable bar dates and hearings described in the Scheduling Order in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and the Scheduling Order. No other or further notice is or shall be required.

      **G.**    **Disclosure Statement.**

      7.    The Disclosure Statement contains (a) sufficient information of a kind necessary to satisfy the disclosure requirements of all applicable nonbankruptcy laws, rules, and regulations, including the Securities Act, and (b) "adequate information" (as such term is defined in section 1125(a) of the Bankruptcy Code and used in section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtors, the Plan, and the transactions contemplated therein. The filing of the Disclosure Statement with the clerk of the Court satisfied Bankruptcy Rule 3016(b).

      **H.**    **Ballots.**

      8.    The Classes of Claims and Interests entitled under the Plan to vote to accept or reject the Plan (the "<u>Voting Classes</u>") are set forth below:

| Class | Designation |
|-------|-------------|
| 3(a) | SIP II RBL Credit Agreement Claims |
| 3(b) | SPP II-A RBL Credit Agreement Claims |
| 3(c) | SPP II-M RBL Credit Agreement Claims |
| 4(a) | SIP II Term Loan Credit Agreement Claims |
| 4(b) | SPP II-A Term Loan Credit Agreement Claims |
| 4(c) | SPP II-M Term Loan Credit Agreement Claims |
| 5(a) | SIP II Subordinated Term Loan Credit Agreement Claims |
| 5(b) | SPP II-A Subordinated Term Loan Credit Agreement Claims |
| 5(c) | SPP II-M Subordinated Term Loan Credit Agreement Claims |

      9.    The ballots the Debtors used to solicit votes to accept or reject the Plan from holders in the Voting Classes adequately addressed the particular needs of these chapter 11 cases and were appropriate for holders in the Voting Classes to vote to accept or reject the Plan.

**I.      Solicitation.**

10.      As described in the Voting Report, the solicitation of votes on the Plan complied with the solicitation procedures set forth in the Scheduling Motion (the "Solicitation Procedures"), was appropriate and satisfactory based upon the circumstances of these chapter 11 cases, and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and any other applicable rules, laws, and regulations, including the Securities Act.

11.      As described in the Voting Report and the Declarations, as applicable, prior to the Petition Date, the Plan, the Disclosure Statement, and the ballots (collectively, the "Solicitation Packages"), and, following the Petition Date, the Confirmation Hearing Notice, were transmitted and served, including to all holders in the Voting Classes, in compliance with the Bankruptcy Code, including sections 1125 and 1126 thereof, the Bankruptcy Rules, including Bankruptcy Rules 3017 and 3018, the Bankruptcy Local Rules, the Scheduling Order, and any applicable nonbankruptcy law.  Transmission and service of the Solicitation Packages and the Confirmation Hearing Notice were timely, adequate, and sufficient under the facts and circumstances of these chapter 11 cases.  No further notice is required.

12.      As set forth in the Voting Report, the Solicitation Packages were distributed to holders in the Voting Classes that held a Claim or Interest as of August 13, 2019 (the date specified in such documents for the purpose of the solicitation).  The establishment and notice of the Voting Record Date were reasonable and sufficient.

13.      The period during which the Debtors solicited acceptances or rejections to the Plan was a reasonable and sufficient period of time for holders in the Voting Class to make an informed decision to accept or reject the Plan.

14.      Under section 1126(f) of the Bankruptcy Code, holders of Claims in Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), and Class 6 (General Unsecured Claims)

8

(collectively, the "Deemed Accepting Classes") are Unimpaired and conclusively presumed to have accepted the Plan. Also, the Debtors were not required to solicit votes from the holders of Interests in Class 9 (Interests), which were deemed to reject the Plan (the "Deemed Rejecting Class"). Holders of Claims in Class 7 (Intercompany Claims) and holders of Interests in Class 8 (Intercompany Interests) are Unimpaired and conclusively presumed to have accepted the Plan (to the extent reinstated) or are Impaired and deemed to reject the Plan (to the extent cancelled), and, in either event, are not entitled to vote to accept or reject the Plan. Nevertheless, the Debtors served holders of all non-voting Claims and Interests with the Confirmation Hearing Notice and the Notice of Non-Voting Status and Opt-Out Form.

**J.      Voting.**

15.      As evidenced by the Voting Report, votes to accept or reject the Plan have been solicited and tabulated fairly, in good faith, and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Disclosure Statement, and any applicable nonbankruptcy law, rule, or regulation.

**K.      Plan Supplement.**

16.      The Plan Supplement complies with the Bankruptcy Code and the terms of the Plan, and the filing and notice of such documents are good and proper in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules, and no other or further notice is required. All documents included in the Plan Supplement are integral to, part of, and incorporated by reference into the Plan. Subject to the terms of the Plan and RSA (including, for the avoidance of doubt, any consent rights set forth or incorporated therein), and only consistent therewith, the Debtors reserve the right to alter, amend, update, or modify, in each case in whole or in part, the Plan Supplement before the Effective Date. All parties were provided due, adequate, and sufficient notice of the Plan Supplement.

**L.      Compliance with Bankruptcy Code Requirements—Section 1129(a)(1).**

17.      The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code.  In addition, the Plan is dated and identifies the Entities submitting it, thereby satisfying Bankruptcy Rule 3016(a).

**(i)      Proper Classification—Sections 1122 and 1123.**

18.      The Plan satisfies the requirements of sections 1122(a) and 1123(a)(1) of the Bankruptcy Code.  Article III of the Plan provides for the separate classification of Claims and Interests into 15 Classes.  Valid business, factual, and legal reasons exist for the separate classification of such Classes of Claims and Interests.  The classifications reflect no improper purpose and do not unfairly discriminate between, or among, holders of Claims or Interests.  Each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class.

**(ii)      Specified Unimpaired Classes—Section 1123(a)(2).**

19.      The Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.  Article III of the Plan specifies that Claims, as applicable, in the following Classes (the "Unimpaired Classes") are Unimpaired under the Plan within the meaning of section 1124 of the Bankruptcy Code:

| Class | Designation |
|-------|-------------|
| 1 | Other Secured Claims |
| 2 | Other Priority Claims |
| 6 | General Unsecured Claims |

20.      Additionally, Article II of the Plan specifies that Allowed Administrative Claims, Professional Fee Claims, DIP Claims, and Priority Tax Claims will be paid in full in accordance with the terms of the Plan, although these Claims are not classified under the Plan.

**(iii)     Specified Treatment of Impaired Classes—Section 1123(a)(3).**

21.     The Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code. Article III of the Plan specifies that Claims and Interests, as applicable, in the following Classes (the "Impaired Classes") are Impaired under the Plan within the meaning of section 1124 of the Bankruptcy Code, and describes the treatment of such Classes:

| Class | Designation |
|-------|-------------|
| 3(a) | SIP II RBL Credit Agreement Claims |
| 3(b) | SPP II-A RBL Credit Agreement Claims |
| 3(c) | SPP II-M RBL Credit Agreement Claims |
| 4(a) | SIP II Term Loan Credit Agreement Claims |
| 4(b) | SPP II-A Term Loan Credit Agreement Claims |
| 4(c) | SPP II-M Term Loan Credit Agreement Claims |
| 5(a) | SIP II Subordinated Term Loan Credit Agreement Claims |
| 5(b) | SPP II-A Subordinated Term Loan Credit Agreement Claims |
| 5(c) | SPP II-M Subordinated Term Loan Credit Agreement Claims |

**(iv)     No Discrimination—Section 1123(a)(4).**

22.     The Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code. The Plan provides for the same treatment by the Debtors for each Claim or Interest in each respective Class unless the holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest.

**(v)     Adequate Means for Plan Implementation—Section 1123(a)(5).**

23.     The Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code. The provisions in Article IV and elsewhere in the Plan, and in the exhibits and attachments to the Plan, the Plan Supplement, and the Disclosure Statement, provide, in detail, adequate and proper means for the Plan's implementation, including regarding:  (a) the general settlement of Claims and Interests; (b) authorization of the Debtors and/or Reorganized Debtors' to take all actions necessary to effectuate the Plan, including those actions necessary to effect the Restructuring Transactions, including, without limitation, any restructuring transaction steps set forth in the Plan

11

Supplement, as the same may be modified or amended from time to time prior to the Effective Date; (c) the funding and sources of consideration for the Plan distributions, including the Exit Facilities and the New Common Stock; (d) the adoption of the New Organizational Documents; (e) the vesting of assets in the Reorganized Debtors; (f) Sheridan's continued existence as a separate corporate entity, limited liability company, partnership, or other form; (g) the cancellation of existing securities and agreements; (h) the authorization and approval of corporate actions under the Plan and consistent with the RSA; (i) the appointment of the New Board; (j) the effectuation and implementation of documents and further transactions; (k) the entry into and adoption of the Services Agreement; (l) the preservation of Causes of Action; (m) the dissolution of each Debtor; and (n) the closing of certain of the chapter 11 cases.

### (vi)    Voting Power of Equity Securities—Section 1123(a)(6).

24.    The Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code. Article IV.E of the Plan provides that the New Organizational Documents will comply with section 1123(a)(6) of the Bankruptcy Code.  The New Organizational Documents prohibit the issuance of non-voting securities to the extent prohibited by 1123(a)(6) of the Bankruptcy Code and provide for an appropriate distribution of voting power among the classes of securities possessing voting power.

### (vii)    Directors and Officers—Section 1123(a)(7).

25.    The Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code. Article IV.E of the Plan sets forth the structure of the New Board, which shall consist of five members including the Chief Executive Officer of New Sheridan and other members to be selected by the Required Consenting Secured Lenders.

12

(viii)   **Impairment / Unimpairment of Classes—Section 1123(b)(1).**

26.     The Plan is consistent with section 1123(b)(1) of the Bankruptcy Code.  Article III

of the Plan impairs or leaves unimpaired each Class of Claims and Interests.

(ix)   **Assumption—Section 1123(b)(2).**

27.     The Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.  Article V

of the Plan provides for the assumption of the Debtors' Executory Contracts and Unexpired Leases,

and the payment of Cures, if any, related thereto, not previously assumed, assumed and assigned,

or rejected during these chapter 11 cases under section 365 of the Bankruptcy Code.   The

assumption of Executory Contracts and Unexpired Leases may include the assignment of certain

such contracts to Affiliates.

(x)   **Settlement, Releases, Exculpation, Injunction, and Preservation of Claims and Causes of Action—Section 1123(b)(3).**

28.     The Plan is consistent with section 1123(b)(3) of the Bankruptcy Code.   In

accordance with Bankruptcy Rule 9019, and in consideration of the distributions, settlements, and

other benefits provided under the Plan, except as stated otherwise in the Plan, the provisions of the

Plan constitute a good-faith compromise of all Claims, Interests, and controversies relating to the

contractual, subordination, and other legal rights that a holder of a Claim or Interest may have with

respect to any Allowed Claim or Interest, or any distribution to be made on account of such

Allowed Claim or Interest.  The compromise and settlement of such Claims and Interests embodied

in the Plan and reinstatement and unimpairment of other Classes identified in the Plan are in the

best interests of the Debtors, the Estates, and all holders of Claims and Interests, and are fair,

equitable, and reasonable.

29.     Article IX.C of the Plan describes certain releases granted by the Debtors

(the "Debtors' Releases").  The Debtors have satisfied the business judgment standard with respect

13

to the propriety of the Debtors' Releases. The Debtors' Releases are a necessary and integral element of the Plan, and are fair, reasonable, and in the best interests of the Debtors, the Estates, and holders of Claims and Interests. Also, the Debtors' Releases are: (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtors' Release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtors' Releases. The Debtors' Releases for the Debtors' officers, members, managers, and Governing Bodies are appropriate because the Debtors' officers, members, managers, and Governing Bodies share an identity of interest with the Debtors, supported the Plan and these chapter 11 cases, and actively participated in meetings, negotiations, and implementation during these chapter 11 cases, and have provided other valuable consideration to the Debtors to facilitate the Debtors' reorganization.

30.     Article IX.D of the Plan describes certain releases granted by the Releasing Parties (the "Third-Party Release"). The Third-Party Release provides finality for the Debtors, the Reorganized Debtors, and the Released Parties regarding the parties' respective obligations under the Plan and with respect to the Reorganized Debtors. The Confirmation Hearing Notice sent to holders of Claims and Interests and published in the *New York Times* and the *Houston Chronicle* on September 23, 2019, and the ballots sent to all holders of Claims and Interests entitled to vote on the Plan, in each case, unambiguously stated that the Plan contains the Third-Party Release. Such release is a necessary and integral element of the Plan, and is fair, equitable, reasonable, and

in the best interests of the Debtors, the Estates, and all holders of Claims and Interests. Also, the Third-Party Release is: (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release. Pursuant to the Plan, a schedule of all Entities that elected to opt out of the releases contained in Article IX.D of the Plan is attached hereto as **Exhibit B**.

31.     The investment committee of Sheridan Production Partners Manager, LLC, with respect to the Debtors, and the Sheridan II Special Committee are "Governing Bodies" within the meaning of the Plan and this Confirmation Order. The releases of the Debtors' officers, members, managers, and Governing Bodies are an integral component of the compromises and settlements contained in the Plan. The Debtors' officers, members, managers, and Governing Bodies: (a) made a substantial and valuable contribution to the Debtors' restructuring and the estates; (b) invested significant time and effort to make the restructuring a success and preserve the value of the Debtors' estates in a challenging environment; (c) attended numerous investment committee and special committee meetings related to the restructuring; (d) met frequently and directed the restructuring negotiations that led to the RSA and the Plan; and (e) are entitled to indemnification from the Debtors under state law, organizational documents, and agreements. Litigation by the Debtors against the Debtors' officers, members, managers, and Governing Bodies would be a distraction to the Debtors' business and restructuring and would decrease rather than increase the value of the estates.

32.     Manager and the Manager Affiliates also made substantial contributions to the restructuring process by supporting the Debtors' efforts to pursue and obtain confirmation of the Plan and consenting to the restriction of distributions of Management Fees (as defined in the limited partnership agreements) to Sheridan SMG, LLC and Warburg Pincus, LLC.  Further, to consummate the Restructuring Transactions set forth in the Plan, Manager agreed to enter into a new management agreement or a customary transition services agreement with New Sheridan. The Manager Affiliates also caused certain of their affiliates to waive their ratable share of the recovery set forth in Article III.B with respect to Class 5(a), Class 5(b), and Class 5(c) Claims, for the benefit of the other holders of such Claims.  The releases of the Debtors' officers, members, managers, Governing Bodies, Manager, and Manager Affiliates contained in the Plan have the consent of the Debtors and the Releasing Parties and are in the best interests of the estates.

33.     The releases of the Agents and Consenting Stakeholders are integral components of the compromises and settlements contained in the Plan. The Agents and Consenting Stakeholders: (a) negotiated a restructuring support agreement, (b) supported the Debtors' businesses through consensual debtor-in-possession financing; and (c) invested significant time and effort to make the restructuring a success and preserve the value of the Debtors' estates in a challenging environment. The releases of the Agents and the Consenting Stakeholders contained in the Plan have the consent of the Debtors and the Releasing Parties and are in the best interests of the estates.

34.     The exculpation, described in Article IX.E of the Plan (the "Exculpation"), is appropriate under applicable law because it was proposed in good faith, was formulated following extensive good-faith, arm's-length negotiations with key constituents, and is appropriately limited in scope.  Without limiting anything in the Exculpation, each Exculpated Party has participated in

16

these chapter 11 cases in good faith and is appropriately released and exculpated from any obligation, Cause of Action, or liability for any prepetition or postpetition act taken or omitted to be taken in connection with, relating to, or arising out of the Debtors' restructuring efforts, the RSA, these chapter 11 cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement or the Plan or any contract, instrument, release, or other agreement or document created or entered into, in connection with, or pursuant to the RSA, the Disclosure Statement or the Plan, the filing of these chapter 11 cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan.  The Exculpation, including its carve-out for actual fraud, willful misconduct, and gross negligence, is consistent with established practice in this jurisdiction and others.

35.    The injunction provision set forth in Article IX.F of the Plan is necessary to implement, preserve, and enforce the Debtors' discharge, the Debtor Releases, the Third-Party Release, and the Exculpation, and is narrowly tailored to achieve this purpose.

36.    Article IV.E of the Plan appropriately provides that the Reorganized Debtors will retain, and may enforce, all rights to commence and pursue, as appropriate, any and all Causes of Action except for Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code.  The provisions regarding the preservation of Causes of Action in the Plan, including the Plan Supplement, are appropriate, fair, equitable, and reasonable, and are in the best interests of the Debtors, the Estates, and holders of Claims and Interests.

37.     The release and discharge of all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates described in Article IX.B of the Plan (the "Lien Release") is necessary to implement the Plan.  The provisions of the Lien Release are appropriate, fair, equitable, and reasonable and are in the best interests of the Debtors, the Estates, and holders of Claims and Interests.

### (xi)     Additional Plan Provisions—Section 1123(b)(6).

38.     The other discretionary provisions of the Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1123(b)(6) of the Bankruptcy Code.

### M.     Debtor Compliance with the Bankruptcy Code—Section 1129(a)(2).

39.     The Debtors have complied with the applicable provisions of the Bankruptcy Code and, thus, satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.  Specifically, each Debtor:

   a.   is an eligible debtor under section 109, and a proper proponent of the Plan under section 1121(a), of the Bankruptcy Code;

   b.   has complied with applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of the Court; and

   c.   complied with the applicable provisions of the Bankruptcy Code, including sections 1125 and 1126, the Bankruptcy Rules, the Bankruptcy Local Rules, any applicable nonbankruptcy law, rule and regulation, the Scheduling Order, and all other applicable law, in transmitting the Solicitation Packages, and related documents and notices, and in soliciting and tabulating the votes on the Plan.

### N.     Plan Proposed in Good Faith—Section 1129(a)(3).

40.     The Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code. The Debtors have proposed the Plan in good faith and not by any means forbidden by law.  In so determining, the Court has examined the totality of the circumstances surrounding the filing of

these chapter 11 cases, the Plan, the RSA, the process leading to Confirmation, including the overwhelming support of holders of Claims for the Plan, and the transactions to be implemented pursuant thereto.  These chapter 11 cases were filed, and the Plan was proposed, with the legitimate purpose of allowing the Debtors to implement the Restructuring Transactions, reorganize, and emerge from bankruptcy with a capital and organizational structure that will allow them to conduct their businesses and satisfy their obligations with sufficient liquidity and capital resources.

**O.     Payment for Services or Costs and Expenses—Section 1129(a)(4).**

41.     The procedures set forth in the Plan for the Court's review and ultimate determination of the fees and expenses to be paid by the Debtors in connection with these chapter 11 cases, or in connection with the Plan and incident to these chapter 11 cases, satisfy the objectives of, and are in compliance with, section 1129(a)(4) of the Bankruptcy Code.

**P.     Directors, Officers, and Insiders—Section 1129(a)(5).**

42.     Article IV.E of the Plan sets forth the structure of the New Board, which shall consist of five members including the Chief Executive Officer of New Sheridan and other members selected by the Required Consenting Secured Lenders.  The members of the New Board and the officers of each of the Reorganized Debtors will be disclosed on or before the Effective Date.  Accordingly, the Debtors have satisfied the requirements of section 1129(a)(5) of the Bankruptcy Code.

**Q.     No Rate Changes—Section 1129(a)(6).**

43.     Section 1129(a)(6) of the Bankruptcy Code is not applicable to these chapter 11 cases.

**R.     Best Interest of Creditors—Section 1129(a)(7).**

44.     The Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code. The Liquidation Analysis attached to the Disclosure Statement as Exhibit E and the Kopa

Declaration, and the other evidence related thereto in support of the Plan that was proffered or adduced at, prior to, or in connection with the Confirmation Hearing: (a) are reasonable, persuasive, credible, and accurate as of the dates such analysis or evidence was prepared, presented, or proffered; (b) utilize reasonable and appropriate methodologies and assumptions; (c) have not been controverted by other evidence; and (d) establish that holders of Allowed Claims and Interests in each Class will recover at least as much under the Plan on account of such Claim or Interest, as of the Effective Date, as such holder would receive if the Debtors were liquidated, on the Effective Date, under chapter 7 of the Bankruptcy Code.

**S.    Acceptance by Certain Classes—Section 1129(a)(8).**

45.    The Plan does not satisfy the requirements of section 1129(a)(8) of the Bankruptcy Code.  Classes 1, 2, and 6 constitute Unimpaired Classes, each of which is conclusively presumed to have accepted the Plan in accordance with section 1126(f) of the Bankruptcy Code.  The Voting Classes, Classes 3(a)-(c), 4(a)-(c), and 5(a)-(c) have voted to accept the Plan.  Holders of Intercompany Claims and Interests in Classes 7 and 8 are Unimpaired and conclusively presumed to have accepted the Plan (to the extent reinstated) or are Impaired and deemed to reject the Plan (to the extent cancelled), and, in either event, are not entitled to vote to accept or reject the Plan. However, holders of Interests in Class 9 receive no recovery on account of their Interests pursuant to the Plan and are deemed to have rejected the Plan.  Notwithstanding the foregoing, the Plan is confirmable because it satisfies sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.

**T.    Treatment of Claims Entitled to Priority Under Section 507(a) of the Bankruptcy Code—Section 1129(a)(9).**

46.    The treatment of Administrative Claims, DIP Claims, Professional Fee Claims, and Priority Tax Claims, under Article II of the Plan, and of Other Priority Claims under Article III of

the Plan, satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.

**U.     Acceptance by At Least One Impaired Class—Section 1129(a)(10).**

47.     The Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code. As evidenced by the Voting Report, the Classes 3(a)-(c), 4(a)-(c), and 5(a)-(c), each of which is impaired, voted to accept the Plan by the requisite numbers and amounts of Claims and Interests, determined without including any acceptance of the Plan by any insider (as that term is defined in section 101(31) of the Bankruptcy Code), specified under the Bankruptcy Code.

**V.     Feasibility—Section 1129(a)(11).**

48.     The Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code. The financial projections attached to the Disclosure Statement and the other evidence supporting Confirmation of the Plan proffered or adduced by the Debtors at, or prior to, or in the Declarations filed in connection with, the Confirmation Hearing:  (a) are reasonable, persuasive, credible, and accurate as of the dates such analysis or evidence was prepared, presented, or proffered; (b) utilize reasonable and appropriate methodologies and assumptions; (c) have not been controverted by other evidence; (d) establish that the Plan is feasible and Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Reorganized Debtors or any successor to the Reorganized Debtors under the Plan, except as provided in the Plan; and (e) establish that the Reorganized Debtors will have sufficient funds available to meet their obligations under the Plan.

**W.     Payment of Fees—Section 1129(a)(12).**

49.     The Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code. Article XIII.C of the Plan provides for the payment of all fees payable by the Debtors under 28 U.S.C. § 1930(a).

**X.      Continuation of Retiree Benefits—Section 1129(a)(13).**

50.      The Debtors do not have any remaining obligations to pay retiree benefits (as defined in section 1114 of the Bankruptcy Code).  Therefore, section 1129(a)(13) of the Bankruptcy Code is inapplicable to these chapter 11 cases or the Plan.

**Y.      Non-Applicability of Certain Sections—Sections 1129(a)(14), (15), and (16).**

51.      Sections 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code do not apply to these chapter 11 cases.  The Debtors owe no domestic support obligations, are not individuals, and are not nonprofit corporations.

**Z.      "Cram Down" Requirements—Section 1129(b).**

52.      The Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. Notwithstanding the fact that the deemed rejecting class has been deemed to reject the Plan, the Plan may be confirmed pursuant to section 1129(b)(1) of the Bankruptcy Code.  *First*, all of the requirements of section 1129(a) of the Bankruptcy Code other than section 1129(a)(8) have been met.  *Second*, the Plan is fair and equitable with respect to the deemed rejecting classes.  The Plan has been proposed in good faith, is reasonable and meets the requirements that (a) no holder of any Interest that is junior to such Class will receive or retain any property under the Plan on account of such junior Interest and (b) no holder of a Claim or Interest in a Class senior to such Class is receiving more than 100 percent on account of its Claim or Interest.  Accordingly, the Plan is fair and equitable to all holders of Interests in the deemed rejecting class.  *Third*, the Plan does not discriminate unfairly with respect to the deemed rejecting class because similarly situated creditors will receive substantially similar treatment on account of their Interests irrespective of Class. Section 1129(b) does not apply to the Sheridan II RBL Claims, the Sheridan II Term Loan Claims, or the Sheridan II Subordinated Term Loan Claims because the holders of such Claims have voted

to accept the Plan in sufficient number and in sufficient amount to constitute an accepting class under the Bankruptcy Code.

### AA.   Only One Plan—Section 1129(c).

53.     The Plan satisfies the requirements of section 1129(c) of the Bankruptcy Code.  The Plan is the only chapter 11 plan filed in each of these chapter 11 cases.

### BB.   Principal Purpose of the Plan—Section 1129(d).

54.     The Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.  The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.

### CC.   Good Faith Solicitation—Section 1125(e).

55.     The Debtors and their agents have solicited and tabulated votes on the Plan and have participated in the activities described in section 1125 of the Bankruptcy Code fairly, in good faith within the meaning of section 1125(e), and in a manner consistent with the applicable provisions of the Scheduling Order, the Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the Exculpation provisions set forth in Article IX.E of the Plan.

56.     The Debtors and their agents have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the offering, issuance, and distribution of recoveries under the Plan and therefore are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or distributions made pursuant to the Plan, so long as such distributions are made consistent with and pursuant to the Plan.

**DD.    Satisfaction of Confirmation Requirements.**

57.    Based on the foregoing, the Plan satisfies the requirements for Confirmation set forth in section 1129 of the Bankruptcy Code.

**EE.    Likelihood of Satisfaction of Conditions Precedent to the Effective Date.**

58.    Each of the conditions precedent to the Effective Date, as set forth in Article X.A of the Plan, has been or is reasonably likely to be satisfied or waived in accordance with Article X.B of the Plan.

**FF.    Implementation.**

59.    All documents and agreements necessary to implement the Plan, including those contained in the Plan Supplement, and all other relevant and necessary documents have been or will be negotiated in good faith and at arm's-length, are in the best interests of the Debtors, and shall, upon completion of documentation and execution, be valid, binding, and enforceable documents and agreements not in conflict with any federal, state, or local law.

**GG.    Disclosure of Facts.**

60.    The Debtors have disclosed all material facts regarding the Plan, including with respect to consummation of the Restructuring Transactions, and the fact that Sheridan will emerge from its chapter 11 case as a validly existing separate corporate entity, limited liability company, partnership, or other form, as applicable.

**HH.    Good Faith.**

61.    The Debtors have proposed the Plan in good faith, with the legitimate and honest purpose of maximizing the value of the Debtors' Estates for the benefit of their stakeholders.  The Plan accomplishes this goal.  Accordingly, the Debtors, the Released Parties, and the Exculpated Parties have been, are, and will continue to be acting in good faith within the meaning of section 1125(e) of the Bankruptcy Code if they proceed to:  (a) consummate the Plan, the Restructuring

Transactions, and the agreements, settlements, transactions, transfers, and other actions contemplated thereby, regardless of whether such agreements, settlements, transactions, transfers, and other actions are expressly authorized by this Confirmation Order; and (b) take any actions authorized and directed or contemplated by this Confirmation Order.

## ORDER

IT IS ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT:

62.    **Disclosure Statement.**  The Disclosure Statement is approved in all respects.

63.    **Confirmation of the Plan.**  The Plan is approved in its entirety and **CONFIRMED** under section 1129 of the Bankruptcy Code.  The terms of the Plan, including the Plan Supplement (including any supplements, amendments, or modifications thereof in accordance with this Confirmation Order and the Plan), are incorporated by reference into and are an integral part of this Confirmation Order.

64.    **Objections.**  All objections and all reservations of rights pertaining to Confirmation or approval of the Disclosure Statement that have not been withdrawn, waived, or settled are overruled on the merits.

65.    **Plan Modifications.**  Subsequent to filing the Plan on September 15, 2019, the Debtors made certain technical modifications to the Plan (the "Plan Modifications").  The Plan Modifications comply with the requirements under the RSA and do not materially adversely affect the treatment of any Claim or Interest under the Plan.  After giving effect to the Plan Modifications, the Plan continues to satisfy the requirements of sections 1122 and 1123 of the Bankruptcy Code. The filing with the Court on September 24, 2019 of the Plan Modifications and the disclosure of the Plan Modifications on the record at the Confirmation Hearing constitute due and sufficient notice thereof.  Accordingly, pursuant to section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, the Plan Modifications do not require additional disclosure under section 1125 of the

Bankruptcy Code or resolicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that holders of Claims or Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan.

66. **Deemed Acceptance of Plan.**  In accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all holders of Claims and Interests who voted to accept the Plan or who are conclusively presumed to accept the Plan are deemed to have accepted the Plan as modified by the Plan Modifications.  No holder of a Claim or Interest shall be permitted to change its vote as a consequence of the Plan Modifications.

67. **No Action Required.**  Under the provisions of the Delaware General Corporation Law, including section 303 thereof, and the comparable provisions of the Delaware Limited Liability Company Act, and the Texas Business Organizations Code, including section 101.606 thereof, and section 1142(b) of the Bankruptcy Code, no action of the respective directors, equity holders, managers, or members of the Debtors is required to authorize the Debtors to enter into, execute, deliver, file, adopt, amend, restate, consummate, or effectuate, as the case may be, the Plan, the Restructuring Transactions, and any contract, assignment, certificate, instrument, or other document to be executed, delivered, adopted, or amended in connection with the implementation of the Plan, including the Plan Supplement, and the RSA.

68. **Binding Effect.**  Upon the occurrence of the Effective Date, the terms of the Plan are immediately effective and enforceable and deemed binding on the Debtors, the Reorganized Debtors, and any and all holders of Claims or Interests (regardless of whether such holders of Claims or Interests have, or are deemed to have, accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in

the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

69.     **Vesting of Assets in the Reorganized Debtors.**  Pursuant to the restructuring transaction steps set forth in one or more exhibits to the Plan Supplement, all assets and all liabilities of the Debtors shall be transferred to and assumed by the Reorganized Debtors in accordance with the Plan.  Upon the dissolution of the Debtors in accordance with the transaction steps set forth in the Plan Supplement, references to the Reorganized Debtors, here and in the Plan, shall refer to New Sheridan and any of its direct or indirect subsidiaries.  Except as otherwise provided in the Plan, this Confirmation Order, or any agreement, instrument, or other document incorporated herein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances; *provided*, *however*, that any and all liens securing the DIP Claim, the Sheridan II RBL Claims, and the Sheridan II Term Loan Claims shall be retained by the applicable Agents and assigned to the Exit Agent to secure any and all obligations of the Reorganized Debtors under the Exit Facilities. On and after the Effective Date, except as otherwise provided in the Plan, this Confirmation Order, or any agreement, instrument, or other document incorporated herein, the Reorganized Debtors may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  After the Effective Date, a certified copy of this Confirmation Order may be filed with the appropriate clerk or recorded with the recorder of any federal, state, province, county, or local authority, whether foreign or domestic, to act to effectuate the transfer of all property in each Estate to New Sheridan,

vesting New Sheridan with all right, title, and interest of the Debtors to the property in each Estate, free and clear of all Liens, Claims, Interests, and other encumbrances of record.

70.     **Effectiveness of All Actions.**  All actions contemplated by the Plan, including all actions in connection with the RSA (including negotiation of Definitive Documents (as defined in the RSA)), the Plan Supplement, and the Plan, as the same may be modified from time to time prior to the Effective Date (including, without limitation, any restructuring transaction steps set forth in one or more exhibits to the Plan Supplement), are hereby effective and authorized to be taken on, prior to, or after the Effective Date, as applicable, under this Confirmation Order, without further application to, or order of the Court, or further action by the respective officers, directors, managers, members, or equity holders of the Debtors or the Reorganized Debtors and with the effect that such actions had been taken by the unanimous action, consent, approval and vote each of such officers, directors, managers, members, or equity holders.

71.     **Restructuring Transactions.**  The Debtors or Reorganized Debtors, as applicable, are authorized to enter into and effectuate the Restructuring Transactions, including the entry into and consummation of the transactions contemplated by the RSA, the Plan Supplement, and/or the Plan, as the same may be modified from time to time prior to the Effective Date (including, without limitation, any restructuring transaction steps set forth in one or more exhibits to the Plan Supplement, which authorization is subject to the terms and conditions of the RSA, the Plan Supplement, and the Plan (including, without limitation, all consent rights set forth therein)).  Any transfers of assets or equity interests effected or any obligations incurred through the Restructuring Transactions (including, without limitation, as and to the extent provided for or contemplated in the RSA, the Plan and/or the Plan Supplement (including all consent rights set forth therein)) are

hereby approved and shall not constitute fraudulent conveyances or fraudulent transfers or otherwise be subject to avoidance.

72. **Distributions.** The procedures governing distributions contained in Article VI of the Plan shall be, and hereby are, approved in their entirety.

73. **Claims Register.** Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to file an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest without any further notice to or action, order, or approval of the Court, and the Clerk is directed to adjust or expunge such Claims in the Claims Register, as applicable.

74. **Exit Facilities.** On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities, the terms of which will be set forth in the applicable documentation included in the Plan Supplement and which terms shall be in all respects consistent with the RSA and the Plan (including any consent rights set forth therein). Confirmation of the Plan shall be deemed (a) approval of the Exit Facilities (including the Exit Facility Documents and the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), subject to the terms and conditions of the RSA and the Plan (including any consent rights set forth therein) and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Court, and subject to the terms and conditions of the RSA and Plan (including any consent rights set forth therein) (i) execute and deliver those documents necessary or appropriate to obtain the Exit Facilities, (ii) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any

29

Person, subject to such modifications as the Debtors or the Reorganized Debtors may deem to be necessary to consummate the Exit Facilities, (iii) grant the Liens on and security interests to be granted in accordance with the Exit Facility Documents, and (iv) pay of all fees and expenses contemplated by the Exit Facility Documents.  On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility Documents, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Facility Documents, without the necessity of filing or recording any financing statement, assignment, pledge, notice of lien or any similar document or instrument or taking any action, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.

75.     **Compromise of Controversies.**  In consideration for the distributions and other benefits, including releases, provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims, Interests, and controversies resolved under the Plan and the entry of this Confirmation Order constitutes approval of such compromise and settlement under Bankruptcy Rule 9019.

76.     **Assumption and Assignment of Contracts and Leases.**  On the Effective Date, each Executory Contract and Unexpired Lease shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, under section 365 of the Bankruptcy Code and the payment of Cures, if any, shall be paid in accordance with Article V.C. of the Plan.  The assumption of Executory Contracts and Unexpired Leases hereunder may include

the assignment of certain of such contracts to Affiliates.  Each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the chapter 11 cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

77.     The provisions governing the treatment of Executory Contracts and Unexpired Leases set forth in Article V of the Plan (including the procedures regarding the resolution of any and all disputes concerning the assumption and assignment, as applicable, of such Executory Contracts and Unexpired Leases) shall be, and hereby are, approved in their entirety.

78.     The Debtors have served upon counterparties to the Executory Contracts and Unexpired Leases to be assumed by the Reorganized Debtors (the "Assumed Contracts") the relevant Cure.  The service of such notice was good, sufficient, and appropriate under the circumstances, and no further notice need be given in respect of establishing a Cure for the Assumed Contracts.  Each of the counterparties to the Assumed Contracts has had an opportunity to object to the Cure set forth in the notice and to the assumption of the applicable Assumed Contract.

79.     Nothing in this Confirmation Order or in any notice or any other document is or shall be deemed an admission by the Debtors that any Assumed Contract is an executory contract or unexpired lease under section 365 of the Bankruptcy Code.

80.     Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure pursuant to Article V.C of the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to this Confirmation Order, and for which any Cure has been fully paid pursuant to Article V.C of the Plan shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.  Notwithstanding the foregoing or any other provision of this Confirmation Order, the Plan, or the Notice of Proposed Assumption/Assignment, the Debtors shall pay (in addition to any applicable Cure) any amounts that may come due in the ordinary course of business under any assumed or assumed and assigned Executory Contract or Unexpired Lease between (a) the date of the Notice of Proposed Assumption/Assignment and (b) the Effective Date.

81.     **Indemnification.**  All indemnification provisions, consistent with applicable law, currently in place (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreement, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the

32

Effective Date on terms no less favorable to such current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors than the indemnification provisions in place prior to the Effective Date.

82.     All indemnification provisions for the Person's identified in the forgoing paragraph and for Manager and the Manager Affiliates (including the indemnification provisions in the Debtors' limited partnership agreements, the Contract Operating Agreement dated September 30, 2010, and the Amended and Restated Sheridan Omnibus Cash Management and Agency Agreement dated October 17, 2014) (collectively the "Applicable Contracts"), subject to the terms of the Plan, are assumed by and enforceable against the Reorganized Debtors, only to the extent valid, binding, and enforceable against the Debtors immediately prior to the Effective Date, and subject to the terms thereof and applicable law, and the Reorganized Debtors shall retain any and all rights of the Debtors (whether under contract, at law or in equity) with respect to the Indemnification Provisions. Subject to the terms of the Plan, on and after the Effective Date, the Reorganized Debtors shall assume and be responsible for payment of any liabilities, claims, or other obligations incurred by Manager or any Manager Affiliate, including, without limitation, "Fund Expenses" as defined in the limited partnership agreements, on account of or on behalf of the Debtors or the Reorganized Debtors, only to the extent such payment is provided for in the Indemnification Provisions or other applicable and binding agreements, including the Applicable Contracts, and provided that such Indemnification Provisions and other applicable and binding agreements, including the Applicable Contracts, are valid, binding, and enforceable against the Debtors immediately prior to the Effective Date, and subject to the terms of the Applicable Contracts or other such applicable and binding agreements and applicable law, and the

33

Reorganized Debtors shall retain any and all rights of the Debtors (whether under contract, at law or in equity) with regard to such liabilities, claims, or other obligations. This paragraph is intended for clarification purposes only and is not and shall not be construed as a modification of the Plan which in any way expands or increased any indemnification liabilities, claims, or other obligations of the Debtors or Reorganized Debtors as the case may be.

83. **Authorization to Consummate.** The Debtors are authorized to consummate the Plan, solely in accordance with the terms thereof (including any consent rights set forth or incorporated therein) after the entry of this Confirmation Order subject to satisfaction or waiver (by the required parties) of the conditions precedent to Consummation set forth in Article X of the Plan.

84. **Professional Compensation.** All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed no later than 45 days after the Effective Date. The Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Court. The Reorganized Debtors shall pay Professional Claims in Cash in the amount the Court Allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date. No funds in the Professional Fee Escrow Account shall be property of the Estates. Any funds remaining in the Professional Fee Escrow Account after all Allowed Professional Claims have been paid will be turned over to the Reorganized Debtors. From and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ

34

and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Court.

85.    **Reimbursement of Potential Purchaser Expenses.**  The Debtors are authorized to reimburse Crossing Rocks Energy LLC, as the Potential Purchaser, for its reasonable and documented out-of-pocket expenses incurred in connection with the previously contemplated Asset Sale Restructuring, subject to a cap of three hundred thousand dollars ($300,000) in the aggregate, including the reasonable and documented fees and expenses of Willkie Farr & Gallagher LLP and Ted W. Walters & Associates, LLC.

86.    **Release, Exculpation, Discharge, and Injunction Provisions.**  The following release, exculpation, discharge, and injunction provisions set forth in Article IX of the Plan are, subject to the occurrence of the Effective Date, approved and authorized in their entirety, and such provisions are effective and binding on all parties and Entities to the extent provided therein.

    **a.  Discharge of Claims and Termination of Interests.**

87.    **Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, this Confirmation Order, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or**

Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

> **b.  Releases by the Debtors.**

88.    Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtors, the

Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Company Party and another Company Party, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the DIP Credit Agreement, the Exit Facilities, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the RSA, the Disclosure Statement, the DIP Credit Agreement, or the Plan, the Plan Supplement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place

on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facility Documents, or any Claim or obligation arising under the Plan.

c.  **Releases by Holders of Claims and Interests.**

89.  **Except as otherwise expressly set forth in the Plan or this Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Company Party and another Company Party, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the DIP Credit Agreement, the Exit Facilities, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document**

(including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the RSA, the Disclosure Statement, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any party of any obligations related to customary banking products, banking services or other financial accommodations (except as may be expressly amended or modified by the Plan and the Exit Facility Credit Agreements, or any other financing document under and as defined therein) or (ii) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facility Documents, or any Claim or obligation arising under the Plan.

> d. **Exculpation.**

90.    Except as otherwise specifically provided in the Plan or this Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the

**formulation, preparation, dissemination, negotiation, filing, or termination of the RSA and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties and other parties set forth above have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distributions of consideration pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

**e. Injunction.**

91.     **Except as otherwise expressly provided in the Plan or this Confirmation Order or for obligations issued or required to be paid pursuant to the Plan or this Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.**

92.     **Compliance with Tax Requirements.**  In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

93.     **Documents, Mortgages, and Instruments.**  Each federal, state, commonwealth, local, foreign, or other governmental agency is authorized to accept any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement, or consummate the Plan, including the Restructuring Transactions and this Confirmation Order.

94.     **Continued Effect of Stays and Injunction.**  Unless otherwise provided in the Plan or this Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code or any order of the Court that is in existence on the Confirmation Date shall remain in full force and effect until the Effective Date.

95.     **Nonseverability of Plan Provisions Upon Confirmation.**  Each provision of the Plan is:  (a) valid and enforceable in accordance with its terms; (b) integral to the Plan and may not be deleted or modified without the Debtors' consent, *provided*, that any such deletion or

42

modification shall be subject to the terms of the RSA; and (c) nonseverable and mutually dependent.

96.     **Post-Confirmation Modifications.**    Without need for further order or authorization of the Court, the Debtors or the Reorganized Debtors, as applicable, are authorized and empowered, to make any and all modifications to any and all documents that are necessary to effectuate the Plan that do not materially modify the terms of such documents and are consistent with the Plan (subject in all respects to any applicable consents or consultation rights set forth therein or in the RSA).  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors and the Reorganized Debtors expressly reserve their respective rights to revoke or withdraw, or to alter, amend, or modify materially the Plan with respect to such Debtor, one or more times after Confirmation, and, to the extent necessary, may initiate proceedings in the Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or this Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan (subject in all respects to any applicable consents or consultation rights set forth therein).  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XI.A of the Plan.

97.     **Applicable Nonbankruptcy Law.**  The provisions of this Confirmation Order, the Plan and related documents, or any amendments or modifications thereto, shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

98.     **Waiver of Filings.**  Any requirement under section 521 of the Bankruptcy Code or Bankruptcy Rule 1007 obligating the Debtors to file any list, schedule, or statement with the Court

or the Office of the U.S. Trustee is permanently waived as to any such list, schedule, or statement not filed as of the Confirmation Date.

99.    **Waiver of Section 341 Meeting of Creditors or Equity Holders; Waiver of Schedules and Statements.**    Any requirement under section 341(e) for the U.S. Trustee to convene a meeting of creditors or equity holders is permanently waived as of the Confirmation Date.  Any requirement for the U.S. Trustee to hold the initial debtor interview is permanently waived as of the Confirmation Date.  Any requirement for the Debtors to files schedules of assets and liabilities and statements of financial affairs is permanently waived as of the Confirmation Date.

100.    **Governmental Approvals Not Required.**    This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state, federal, or other governmental authority with respect to the dissemination, implementation, or consummation of the Plan and the Disclosure Statement, any certifications, documents, instruments or agreements, and any amendments or modifications thereto, and any other acts referred to in, or contemplated by, the Plan and the Disclosure Statement.

101.    **Certain Governmental Matters.**  Notwithstanding any provision in the Plan, this Confirmation Order or other related Plan documents, nothing discharges or releases the Debtors, the Reorganized Debtors, or any non-debtor from any right, claim, liability or cause of action of the United States or any State, or impairs the ability of the United States or any State to pursue any claim, liability, right, defense, or cause of action against any Debtor, Reorganized Debtor or non-debtor. Contracts, purchase orders, agreements, leases, easements, rights of way, covenants, guaranties, indemnifications, operating rights agreements or other interests of, or with, the United States or any State shall be, subject to any applicable legal or equitable rights or defenses of the

Debtors or Reorganized Debtors under applicable non-bankruptcy law, paid, treated, determined and administered in the ordinary course of business as if the Debtors' bankruptcy cases were never filed and the Debtors and Reorganized Debtors shall comply with all applicable non-bankruptcy law. All claims, liabilities, rights, causes of action, or defenses of or to the United States or any State shall survive the Chapter 11 Cases as if they had not been commenced and be determined in the ordinary course of business, including in the manner and by the administrative or judicial tribunals in which such rights, defenses, claims, liabilities, or causes of action would have been resolved or adjudicated if the Chapter 11 Cases had not been commenced; *provided*, that nothing in the Plan, this Confirmation Order, or other related Plan documents shall alter any legal or equitable rights or defenses of the Debtors or the Reorganized Debtors under non-bankruptcy law with respect to any such claim, liability, or cause of action. Without limiting the foregoing, for the avoidance of doubt, nothing shall:  (i) require the United States or any State to file any proofs of claim or administrative expense claims in the Chapter 11 Cases for any right, claim, liability, defense, or cause of action; (ii) affect or impair the exercise of the United States' or any State's police and regulatory powers against the Debtors, the Reorganized Debtors, or any non-debtor; (iii) be interpreted to set cure amounts or to require the United States or any State to novate or otherwise consent to the transfer of any federal or state contracts, purchase orders, agreements, leases, covenants, guaranties, indemnifications, operating rights agreements or other interests; (iv) affect or impair the United States' or any State's rights and defenses of setoff and recoupment, or ability to assert setoff or recoupment against the Debtors or the Reorganized Debtors and such rights and defenses are expressly preserved; (v) constitute an approval or consent by the United States or any State without compliance with all applicable legal requirements and approvals under non-bankruptcy law; or (vi) relieve any party from compliance with all licenses and permits issued

45

by governmental units in accordance with non-bankruptcy law.  Notwithstanding the foregoing, any Interest held by a State in Class 9 will be treated in accordance with Article III.B of the Plan.

102.    For the avoidance of doubt and without limiting the foregoing, any assumption, assignment, and/or transfer of any interests in contracts, leases, covenants, operating rights agreements, rights-of-use and easement, and rights-of-way or other interests or agreements with the federal government or involving federal land or minerals (collectively, the "Federal Leases") will be ineffective absent the consent of the United States.  Nothing in the Plan, this Confirmation Order, or other related Plan documents shall be interpreted to set cure amounts or require the United States to novate, approve or consent to the assumption, sale, assignment and/or transfer of any interests in the Federal Leases except pursuant to existing regulatory requirements and applicable law.

103.    Moreover, nothing in the Plan, Confirmation Order, or other related Plan documents:  (a) shall be interpreted to release the Debtors from any reclamation, plugging and abandonment, or other operational requirement under applicable Federal law; (b) address or otherwise affect any decommissioning obligations and financial assurance requirements under the Federal Leases, as determined by the United States, that must be met by the Debtors or their successors and assigns on the Federal Leases going forward; or (c) to impair audit rights.  In addition, nothing in the Plan Documents nullify the United States' right to assert, against the Debtors and their estates, any decommissioning liability and/or claim arising from the Debtors' interest in any Federal Lease not assumed by the Debtors.

104.    Notwithstanding any provision to the contrary in the Plan, Confirmation Order, or other related Plan documents the United States will retain and have the right to audit and/or perform any compliance review and, if appropriate, collect from the Debtors and/or their

successor(s) and assign(s) any additional monies owed by the Debtors with respect to any assumed Federal Lease without those rights being adversely affected by these bankruptcy proceedings. The Debtors and their successors and assigns, will retain all defenses and/or rights, other than defenses and/or rights arising from these bankruptcy proceedings, to challenge any such determination: provided, however, that any such challenge, including any challenge associated with these bankruptcy cases, must be raised in the United States' administrative review process leading to a final agency determination by the Department of the Interior. The audit and/or compliance review period shall remain open for the full statute of limitations period established by the Federal Oil and Gas Royalty Simplification and Fairness Act of 1996, 30 U.S.C. § 1702, et seq.

105. **Provisions Regarding Certain Tax Authorities.** Notwithstanding anything to the contrary in the Plan or this Confirmation Order, the Debtors or Reorganized Debtors, as applicable, shall pay the Allowed Secured Tax Claims of the Texas Tax Authorities,[3] the Local Texas Tax Authorities,[4] and the Texas Ad Valorem Tax Authorities[5] (collectively, the "Tax Authorities") in the ordinary course of business. The tax liens, including statutory liens and privileges, if any, of the Tax Authorities, to the extent that the Tax Authorities are entitled to such liens, shall be expressly retained, in accordance with applicable state law with respect to taxes payable under applicable state law to the Tax Authorities in the ordinary course of business, until such time as

---

[3] For purposes of this Confirmation Order, the term "Texas Tax Authorities" shall refer to Midland Central Appraisal District Texas, the County of Milam, Texas, and Reeves Central Appraisal District, Texas.

[4] For purposes of this Confirmation Order, the term "Local Texas Tax Authorities" shall refer to Ector County Appraisal District, Texas, Elysian Fields Independent School District, Texas, Harris County, Texas, Loving County, Texas, Reeves County, Texas, Rusk County, Texas, Shelby County, Texas, Smith County, Texas, Tom Green County Appraisal District, Texas, and Ward County, Texas.

[5] For purposes of this Confirmation Order, the term "Texas Ad Valorem Tax Authorities" shall refer to Andrews County Tax Office, Texas, Andrews Independent School District, Texas, Gaines County Appraisal District, Texas, and Midland County, Texas.

such Allowed Secured Tax Claim is paid in full. To the extent the Tax Authorities' Allowed Secured Tax Claims are not timely paid by January 31, 2020, interest shall begin to accrue on the subject Allowed Secured Tax Claims at the applicable non-bankruptcy interest rate provided under state law.

106.   **Provisions Regarding Martin E. Shosid.**   Notwithstanding anything to the contrary in either the Plan or this Confirmation Order, the terms of this paragraph shall only apply to Martin E. Shosid and that certain Oil and Gas Lease, dated as of October 26, 2009 (the "Lease").   This Confirmation Order shall not be, and shall not be construed as, a determination of the cure amount or compensation, if any, required to satisfy the provisions of sections 365(b)(1)(A) and 365(b)(1)(B) of the Bankruptcy Code for the assumption of the Lease (the "Shosid Lease Cure Amount").   The Debtors or Reorganized Debtors, as applicable, and Mr. Shosid shall endeavor in good faith to reach agreement as to the Shosid Lease Cure Amount, if any, following the Effective Date.

107.   **Notices of Confirmation and Effective Date.**   The Reorganized Debtors shall serve notice of entry of this Confirmation Order in accordance with Bankruptcy Rules 2002 and 3020(c) on all holders of Claims and Interests and the Core Notice Parties within ten Business Days after the date of entry of this Confirmation Order.   As soon as reasonably practicable after the Effective Date, the Reorganized Debtors shall file notice of the Effective Date and shall serve a copy of the same on the above-referenced parties.   The above-referenced notices are adequate under the particular circumstances of these chapter 11 cases and no other or further notice is necessary.

108.   **Failure of Consummation.**   Notwithstanding the entry of this Confirmation Order, if the Effective Date does not occur, then: (a) the Plan will be null and void in all respects; (b) any

settlement or compromise embodied in the Plan, assumption of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan will be null and void in all respects; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims, Interests, or Causes of Action, (ii) prejudice in any manner the rights of any Debtor or any other Entity, or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

109.    **Substantial Consummation.**  On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127 of the Bankruptcy Code.

110.    **Waiver of Stay.**  For good cause shown, the stay of this Confirmation Order provided by any Bankruptcy Rule is waived, and this Confirmation Order shall be effective and enforceable immediately upon its entry by the Court.

111.    **References to and Omissions of Plan Provisions.**  References to articles, sections, and provisions of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan.  The failure to specifically include or to refer to any particular article, section, or provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Court that the Plan be confirmed in its entirety, except as expressly modified herein, and incorporated herein by this reference.

112.    **Plan Supplement.**  Notwithstanding anything to the contrary herein, (a) the Plan Supplement that has been filed as of the date of entry of this Confirmation Order includes certain documents that have not been determined to be acceptable to the Required Consenting Senior Secured Lenders or the Required Consenting Sheridan II Subordinated Term Lenders within the applicable consent rights required by the RSA and the Plan, (b) certain documents included in the

Plan Supplement remain subject to further negotiation and are subject to the consent rights set forth in the RSA and the Plan, and (c) as a requirement for satisfaction of the condition precedent in Article (X)(a)(3) of the Plan the Plan Supplement will be amended and supplemented with documents that meet the consent rights of the Required Consenting Senior Secured Lenders and the Required Consenting Sheridan II Subordinated Term Lenders set forth in the Plan and the RSA prior to the occurrence of the Effective Date and subject to the milestones in the RSA.

113.    **Headings.**  Headings utilized herein are for convenience and reference only, and do not constitute a part of the Plan or this Confirmation Order for any other purpose.

114.    **Effect of Conflict**.  This Confirmation Order supersedes any Court order issued prior to the Confirmation Date that may be inconsistent with this Confirmation Order.  If there is any inconsistency between the terms of the Plan (other than with respect to any consent rights set forth or incorporated therein) and the terms of this Confirmation Order, the terms of this Confirmation Order govern and control.

115.    **Final Order.**  This Confirmation Order is a Final Order and the period in which an appeal must be filed shall commence upon the entry hereof.

116.    **Retention of Jurisdiction.**  The Court may properly, and upon the Effective Date shall, to the full extent set forth in the Plan, retain jurisdiction over all matters arising out of, and related to, these chapter 11 cases, including the matters set forth in Article XII of the Plan and section 1142 of the Bankruptcy Code.

Signed: November 12, 2019

Marvin Isgur
United States Bankruptcy Judge

**Exhibit A**

**Plan**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| SHERIDAN HOLDING COMPANY II, LLC, *et al.*,[1] | § | Case No. 19-35198 (MI) |
| | § | |
| Debtors. | § | (Joint Administration Requested) |
| | § | |

**DEBTORS' JOINT PREPACKAGED PLAN OF REORGANIZATION**
**PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE (TECHNICAL MODIFICATIONS)**

---

**THIS CHAPTER 11 PLAN IS BEING SUBMITTED TO THE BANKRUPTCY COURT**
**FOR APPROVAL FOLLOWING SOLICITATION**

---

Matthew D. Cavenaugh (TX Bar No. 24062656)
**JACKSON WALKER LLP**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:          mcavenaugh@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

Joshua A. Sussberg P.C. (*pro hac vice* admission pending)
Steven N. Serajeddini (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          joshua.sussberg@kirkland.com
                steven.serajeddini@kirkland.com

-and-

Spencer A. Winters (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          spencer.winters@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal identification number, include:  Sheridan Holding Company II, LLC (7040); Sheridan Investment Partners II GP, LLC (8298); Sheridan Investment Partners II, L.P. (9405); Sheridan Production Partners II, LLC (8034); Sheridan Production Partners II-A, L.P. (8813); Sheridan Production Partners II-B, L.P. (9232); Sheridan Production Partners II-M, L.P. (9084); SPP II-B GP, LLC (8554); and SPP II-M GP, LLC (0488).  The location of the Debtors' service address is:  1360 Post Oak Blvd., Suite 2500, Houston, Texas 77056.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
GOVERNING LAW ........................................................................................................1
    A.    Defined Terms. ........................................................................................................1
    B.    Rules of Interpretation. ..........................................................................................15
    C.    Computation of Time. ............................................................................................16
    D.    Governing Law. .....................................................................................................16
    E.    Reference to Monetary Figures. ............................................................................16
    F.    Reference to the Debtors or the Reorganized Debtors. .........................................16
    G.    Controlling Document. ..........................................................................................16
    H.    Consent Rights ......................................................................................................16

ARTICLE II. ADMINISTRATIVE CLAIMS, PRIORITY CLAIMS, AND RESTRUCTURING
EXPENSES .....................................................................................................................17
    A.    Administrative Claims. .........................................................................................17
    B.    DIP Claims. ...........................................................................................................17
    C.    Professional Fee Claims. .......................................................................................17
    D.    Priority Tax Claims. ..............................................................................................18
    E.    Payment of Restructuring Expenses. ....................................................................18

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...................19
    A.    Classification of Claims and Interests. .................................................................19
    B.    Treatment of Claims and Interests. .......................................................................20
    C.    Special Provision Governing Unimpaired Claims. ...............................................25
    D.    Elimination of Vacant Classes ..............................................................................25
    E.    Voting Classes, Presumed Acceptance by Non-Voting Classes ...........................26
    F.    Intercompany Interests ..........................................................................................26
    G.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. ................26
    H.    Controversy Concerning Impairment. ...................................................................26
    I.    Subordinated Claims. ............................................................................................26
    J.    Subordination Agreements. ...................................................................................26

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ...........................................27
    A.    General Settlement of Claims and Interests. .........................................................27
    B.    Restructuring Transactions. ...................................................................................27
    C.    Cancellation of Existing Agreements and Interests. .............................................27
    D.    Section 1146 Exemption. ......................................................................................28
    E.    The Equitization Restructuring. ............................................................................28
    F.    The Asset Sale Restructuring. ...............................................................................32

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .............35
    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases. ...................35
    B.    Indemnification Obligations. .................................................................................35
    C.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ...................36
    D.    Insurance Policies. .................................................................................................36
    E.    Reservation of Rights. ...........................................................................................36
    F.    Nonoccurrence of Effective Date. ........................................................................37
    G.    Contracts and Leases Entered Into After the Petition Date. .................................37
    H.    Assumption and Assignment of Executory Contracts ..........................................37

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ................................................37
    A.    Timing and Calculation of Amounts to Be Distributed. .......................................37
    B.    Disbursing Agent. .................................................................................................38
    C.    Rights and Powers of Disbursing Agent. ..............................................................38

D.     Delivery of Distributions and Undeliverable or Unclaimed Distributions. ........................ 38
E.     Manner of Payment. ............................................................................................................ 39
F.     Compliance with Tax Requirements. ................................................................................. 39
G.     Allocations. ......................................................................................................................... 39
H.     No Postpetition Interest on Claims .................................................................................... 39
I.      Foreign Currency Exchange Rate. ..................................................................................... 39
J.      Setoffs and Recoupment. .................................................................................................... 40
K.     Claims Paid or Payable by Third Parties. .......................................................................... 40

ARTICLE VII. THE PLAN ADMINISTRATOR ................................................................................ 40
A.     The Plan Administrator. ...................................................................................................... 41
B.     Wind Down. ........................................................................................................................ 41
C.     Tax Returns. ........................................................................................................................ 42
D.     Dissolution of the Reorganized Debtors. ........................................................................... 42

ARTICLE VIII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND
                DISPUTED CLAIMS ................................................................................................... 42
A.     Disputed Claims Process. .................................................................................................... 42
B.     Allowance of Claims. .......................................................................................................... 43
C.     Claims Administration Responsibilities. ............................................................................ 43
D.     Adjustment to Claims or Interests without Objection. ....................................................... 43
E.     Disallowance of Claims or Interests. .................................................................................. 43

ARTICLE IX. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ........... 44
A.     Discharge of Claims and Termination of Interests. ............................................................ 44
**B.     Release of Liens.** ................................................................................................................. 44
**C.     Releases by the Debtors.** .................................................................................................... 44
**D.     Releases by Holders of Claims and Interests.** .................................................................. 45
**E.     Exculpation.** ....................................................................................................................... 46
**F.     Injunction.** .......................................................................................................................... 46
G.     Protections Against Discriminatory Treatment. ................................................................. 47
H.     Document Retention. .......................................................................................................... 47
I.      Reimbursement or Contribution. ........................................................................................ 47

ARTICLE X. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ...................... 47
A.     Conditions Precedent to the Effective Date. ...................................................................... 47
B.     Waiver of Conditions. ......................................................................................................... 48
C.     Effect of Failure of Conditions. .......................................................................................... 48

ARTICLE XI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN .................. 49
A.     Modification and Amendments. .......................................................................................... 49
B.     Effect of Confirmation on Modifications. .......................................................................... 49
C.     Revocation or Withdrawal of Plan. .................................................................................... 49

ARTICLE XII. RETENTION OF JURISDICTION ............................................................................. 49

ARTICLE XIII. MISCELLANEOUS PROVISONS ............................................................................ 51
A.     Immediate Binding Effect. .................................................................................................. 51
B.     Additional Documents. ....................................................................................................... 51
C.     Payment of Statutory Fees. ................................................................................................. 51
D.     Statutory Committee and Cessation of Fee and Expense Payment. ................................... 51
E.     Holders of Working and Similar Interests .......................................................................... 52
F.     Reservation of Rights. ......................................................................................................... 52
G.     Successors and Assigns. ...................................................................................................... 52
H.     Tax Elections. ...................................................................................................................... 52
I.      Notices. ................................................................................................................................ 52

| J. | Term of Injunctions or Stays. | 54 |
|---|---|---|
| K. | Entire Agreement. | 54 |
| L. | Exhibits. | 54 |
| M. | Nonseverability of Plan Provisions. | 54 |
| N. | Votes Solicited in Good Faith. | 54 |
| O. | Closing of Chapter 11 Cases. | 55 |
| P. | Waiver or Estoppel. | 55 |

## INTRODUCTION

The Debtors propose this Plan for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code.  Capitalized terms used herein and not otherwise defined have the meanings ascribed to such terms in Article I.A of this Plan.  Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code.  Holders of Claims against or Interests in the Debtors may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of this Plan, the Restructuring Transactions, and certain related matters.  The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

### ARTICLE I.
### DEFINED TERMS, RULES OF INTERPRETATION,
### COMPUTATION OF TIME, AND GOVERNING LAW

A.      *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1.      "*Ad Hoc Group*" means those certain funds or accounts managed, advised, or sub-advised by Pantheon Ventures (US) LP and HarbourVest Partners L.P. that hold Sheridan II Subordinated Term Loan Claims.

2.      "*Administrative Claim*" means a Claim for costs and expenses of administration of the Estates under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims in the Chapter 11 Cases; and (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930.

3.      "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code as if the reference Entity was a debtor in a case under the Bankruptcy Code.

4.      "*Agents*" means the DIP Agent, any administrative agent, collateral agent, or similar Entity under any of the Sheridan II RBL Credit Agreements, Sheridan II Term Loan Credit Agreements, and the Exit Facility Credit Agreements, including any successors thereto.

5.      "*Allowed*" means, as to a Claim or an Interest, a Claim or an Interest allowed under the Plan, under the Bankruptcy Code, or by a Final Order, as applicable.  For the avoidance of doubt, (a) there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan, and (b) the Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable nonbankruptcy law.

6.      "*Amended Hedging Agreement*" means that certain hedging agreement, as amended, restated, supplemented, or otherwise modified from time to time.

7.      "*Applicable Affiliate*" means SPP II Mgmt Investors, L.P., Warburg Pincus Co., and Peter Kagan Revocable Trust.

8.      "*Asset Purchase Agreement*" means one or more asset purchase agreements pursuant to which the Asset Sale is consummated.

1

9.      "*Asset Sale*" means the sale or sales of substantially all of the Debtors' assets under this Plan, the terms of which shall be reasonably acceptable to the Debtors and the Required Consenting Secured Lenders.

10.      "*Asset Sale Election Notice*" means a notice filed with the Plan Supplement indicating that the Debtors and the Required Consenting Secured Lenders have elected to pursue the Asset Sale.

11.      "*Asset Sale Restructuring*" means a restructuring under this Plan in accordance with Article IV.F hereof pursuant to which the Asset Sale is consummated, which shall occur if (i) the Debtors and Required Consenting Secured Lenders elect to pursue the Asset Sale, (ii) the Debtors file the Asset Sale Election Notice and (iii) an Asset Purchase Agreement acceptable to the Debtors, the Required Consenting Secured Lenders, and the Purchaser is entered into prior to the filing of the Plan Supplement and consummated on the Effective Date.

12.      "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

13.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532.

14.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas.

15.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

16.      "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

17.      "*Cash*" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

18.      "*Causes of Action*" means any claims, interests, damages, judgments, remedies, causes of action, controversies, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, indemnities, and guaranties of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise.  Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law preferential or fraudulent transfer or similar claim.

19.      "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

20.      "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

21.      "*Claims and Noticing Agent*" means Prime Clerk LLC, the claims, noticing, and solicitation agent retained by the Debtors in the Chapter 11 Cases by Bankruptcy Court order.

22.      "*Claims Register*" means the official register of Claims and Interests in the Debtors maintained by the Claims and Noticing Agent.

23.     "*Class*" means a class of Claims or Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

24.     "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

25.     "*Company Parties*" means Sheridan and each of its Affiliates that are or become parties to the RSA, solely in their capacity as such.

26.     "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

27.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

28.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court on confirmation of the Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

29.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

30.     "*Consenting Sheridan II Revolving Lenders*" means the Holders of Sheridan II RBL Claims that are or become parties to the RSA, solely in their capacity as such.

31.     "*Consenting Sheridan II Subordinated Term Lenders*" means the Holders of Sheridan II Subordinated Term Loan Claims that are or become parties to the RSA, solely in their capacity as such.

32.     "*Consenting Sheridan II Term Lenders*" means the Holders of Sheridan II Term Loan Claims that are or become parties to the RSA, solely in their capacity as such.

33.     "*Consenting Stakeholders*" means any party (other than the Company Parties) to the RSA, each solely in their capacity as such, including each: (a) Consenting Sheridan II Revolving Lender, (b) Consenting Sheridan II Term Lender, and (c) Consenting Sheridan II Subordinated Term Lender.

34.     "*Consummation*" means the occurrence of the Effective Date.

35.     "*Cure*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

36.     "*Debtor Release*" means the release set forth in Article IX.C of this Plan.

37.     "*Debtors*" means, collectively, each of the following:  Sheridan Holding Company II, LLC; Sheridan Investment Partners II GP, LLC; Sheridan Investment Partners II, L.P.; Sheridan Production Partners II, LLC; Sheridan Production Partners II-A, L.P.; Sheridan Production Partners II-B, L.P.; Sheridan Production Partners II-M, L.P.; SPP II-B GP, LLC; and SPP II-M GP, LLC.

38.     "*Definitive Documentation*" means the definitive documents and agreements governing the Restructuring Transactions (including any related orders, agreements, instruments, schedules, or exhibits) that are contemplated by and referenced in the Plan (as amended, modified, or supplemented from time to time), including the following: (a) the Plan (and all exhibits, ballots, solicitation procedures, and other documents and instruments related thereto); (b) the RSA (including the "Definitive Documents" as defined therein and not explicitly so defined herein); (c) any document or agreement comprising the Plan Supplement; (d) the Disclosure Statement; (e) the DIP Credit Agreement and the DIP Facility Documents; (f) the DIP Orders; (g) the Exit Facility Credit Agreements and the Exit

3

Facility Documents; (h) the New Organizational Documents; (i) the Confirmation Order; and (j) such other agreements and documentation desired or necessary to consummate and document the transactions contemplated by this Plan and the RSA.

39.     "*Description of Transaction Steps*" means the description of the steps to be carried out to effectuate the Restructuring Transactions in accordance with the Plan and as set forth in the Plan Supplement.

40.     "*Designated Individual*" means the "designated individual" within the meaning of Treasury Regulations Section 301.6223-1(b)(3).

41.     "*DIP Agent*" means Bank of America, N.A., in its capacity as administrative agent under the DIP Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Credit Agreement.

42.     "*DIP Claim*" means any Claim held by the DIP Lenders or the DIP Agent arising under or relating to the DIP Credit Agreement or the DIP Orders, including any and all fees, interests paid in kind, and accrued but unpaid interest and fees arising under the DIP Credit Agreement.

43.     "*DIP Credit Agreement*" means that certain debtor-in-possession credit agreement by and among the Debtors, the guarantors party thereto, the DIP Agent, and the DIP Lenders, as approved by the DIP Orders.

44.     "*DIP Facility*" means the debtor-in-possession credit facility entered into on the terms and conditions set forth in the DIP Facility Documents.

45.     "*DIP Facility Documents*" means any notes, certificates, agreements, security agreements, documents, or instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection with the DIP Credit Agreement.

46.     "*DIP Lenders*" means the lenders under the DIP Credit Agreement.

47.     "*DIP Orders*" means, collectively, the Interim DIP Order and the Final DIP Order.

48.     "*Disbursing Agent*" means, as applicable, the Reorganized Debtors or any Entity the Reorganized Debtors select to make or to facilitate distributions in accordance with the Plan, which Entity may include the Claims and Noticing Agent.

49.     "*Disclosure Statement*" means the *Disclosure Statement Relating to the Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, including all exhibits and schedules thereto, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law.

50.     "*Disputed*" means, as to a Claim or an Interest, a Claim or an Interest:  (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order, as applicable; and (c) with respect to which a party in interest has filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

51.     "*Distribution Participation Agreements*" means, collectively, each of the following, as amended, restated, supplemented, or otherwise modified from time to time:

        a.     that certain distribution participation agreement dated as of October 6, 2017 among Sheridan Investment Partners II, L.P., the participants party thereto, and solely for the purposes of section 3.5 of the agreement, Sheridan Investment Partners II GP, LLC;

        b.     that certain distribution participation agreement dated as of October 6, 2017 among Sheridan Production Partners II-A, L.P., the participants party thereto, and solely for the purposes of

section 3.5 of the agreement, Sheridan Production Partners II, LLC; and

    c.    that certain distribution participation agreement dated as of October 6, 2017 among Sheridan Production Partners II-M, L.P., the participants party thereto, and solely for the purposes of section 3.5 of the agreement, SPP II-M GP, LLC.

52.    "*Distribution Record Date*" means the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be the first day of the Confirmation Hearing or such other date agreed to by the Debtors, the Required Consenting Secured Lenders, and the Consenting Sheridan II Subordinated Term Lenders.

53.    "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent to the occurrence of the Effective Date set forth in Article X.A. of the Plan have been satisfied or waived in accordance with Article IX.B. of the Plan. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

54.    "*Employment Obligations*" means any existing obligations to employees to be assumed, reinstated, or honored, as applicable, in accordance with Article IV.E.10 of the Plan.

55.    "*Entity*" means any entity, as defined in section 101(15) of the Bankruptcy Code.

56.    "*Equitization Restructuring*" means the transactions and reorganization contemplated by, and pursuant to, this Plan in accordance with Article IV.E of this Plan, under which the New Common Stock is distributed, among other things, which shall occur on the Effective Date if the Asset Sale Restructuring does not occur.

57.    "*Equity Security*" means any equity security, as defined in section 101(16) of the Bankruptcy Code, in a Debtor.

58.    "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

59.    "*Exculpated Parties*" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) each Consenting Stakeholder; (c) any official committees appointed in the Chapter 11 Cases and each of their respective members; and (d) each current and former Affiliate of each Entity in clause (a) through the following clause (e); and (e) each Related Party of each Entity in clause (a) through this clause (e).

60.    "*Executory Contract*" means a contract to which one or more of the Debtors are a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

61.    "*Exit Agent*" means Bank of America, N.A., in its capacity as administrative agent under the Exit Facility Credit Agreements, its successors, assigns, or any replacement agent appointed pursuant to the terms of the Exit Facility Credit Agreements.

62.    "*Exit Facilities*" means, collectively, the First-Out/Second-Out Exit Facility and the Last-Out Exit Facility.

63.    "*Exit Facility Credit Agreements*" means, collectively, the First-Out/Second-Out Exit Facility Credit Agreement and the Last-Out Exit Facility Credit Agreement.

64.    "*Exit Facility Documents*" means the agreements memorializing the Exit Facilities including any amendments, modifications, supplements thereto, and together with any related notes, certificates, agreements, intercreditor agreements, security agreements, mortgages, deeds of trust, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection with the Exit Facilities.

65.     "*Exit Facility Lenders*" means those lenders party to the Exit Facility Credit Agreements.

66.     "*Exit Facility Term Sheet*" means the Exit Facility Term Sheet attached hereto as Exhibit A.

67.     "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date.

68.     "*File*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.  "Filed" and "Filing" shall have correlative meanings.

69.     "*Final DIP Order*" means the *Final Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b)*.

70.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

71.     "*First-Out/Second-Out Exit Facility Credit Agreement*" means that certain loan agreement memorializing the First-Out/Second-Out Exit Facility, which shall be entered into among one or more of the Reorganized Debtors, the Exit Agent, those Exit Facility Lenders which are DIP Lenders.

72.     "*First-Out/Second-Out Exit Facility*" means the new senior secured term loan facilities in the aggregate principal amount of $100,000,000 consisting of Tranche A and Tranche B that is consistent with the terms and conditions set forth in the Exit Facility Term Sheet and entered into on the Effective Date on the terms and conditions set forth in the Exit Facility Documents.

73.     "*General Unsecured Claim*" means any Claim that is not (a) an Administrative Claim, (b) a Professional Fee Claim, (c) a Secured Tax Claim, (d) an Other Secured Claim, (e) a Priority Tax Claim, (f) an Other Priority Claim, (g) a Sheridan II RBL Claim, (h) a Sheridan II Term Loan Claim, (i) a Sheridan II Subordinated Term Loan Claim, (j) an Intercompany Claim, or (k) a DIP Claim.

74.     "*Governing Body*" means, in each case in its capacity as such, the board of directors, board of managers, manager, general partner, investment committee, special committee, or such similar governing body of any of the Debtors or the Reorganized Debtors, as applicable.

75.     "*Governmental Unit*" means any governmental unit, as defined in section 101(27) of the Bankruptcy Code.

76.     "*Holder*" means an Entity holding a Claim or Interest.

77.     "*Impaired*" means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

78.     "*Incentive Stock*" means an amount of the New Common Stock, on a fully-diluted basis, reserved for (a) compensation under and as set forth in the Services Agreement (if any) or (b) otherwise for an employee incentive program determined by the New Board.

79.     "*Indemnification Provisions*" means each of the Debtors' indemnification provisions currently in place, whether in the respective Debtors' bylaws, certificates of incorporation, limited partnership agreements, other formation documents, board resolutions, or contracts, for the current and former members of any Governing Body,

directors, officers, managers, employees, attorneys, other professionals, and respective agents of, or acting on behalf of, the Debtors.

80. "*Intercompany Claim*" means any Claim against a Debtor held by another Debtor.

81. "*Intercompany Interest*" means an Interest in a Debtor held by another Debtor.

82. "*Interest*" means, collectively, (a) any Equity Security, or any other equity or ownership interest (including any such interest in a partnership, limited liability company, or other Entity), in any Debtor, (b) any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, including the Distribution Participation Agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor, and (c) any and all Claims that are otherwise determined by the Court to be an equity interest, including any Claim or debt that is recharacterized as an equity interest or subject to subordination as an equity interest pursuant to section 510(b) of the Bankruptcy Code.

83. "*Interest Holder Sale Recovery*" means, after the payment in full in Cash of all Administrative Claims and outstanding amounts under the DIP Facility, the Sheridan II RBL Claims, the Sheridan II Term Loan Claims, the Sheridan II Subordinated Term Loan Claims, and the Allowed General Unsecured Claims, the Sale Proceeds.

84. "*Interim DIP Order*" means the *Interim Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b) and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)*.

85. "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

86. "*Junior Stakeholder Equitization Recovery*" means Holders of Claims in Class 5(a), Class 5(b), and Class 5(c) shall receive 5 percent of the New Common Stock, subject to dilution by the Incentive Stock.

87. "*Junior Stakeholder Sale Recovery*" means Holders of Claims in Class 5(a), Class 5(b), and Class 5(c) shall receive (i) Cash equal to $9,000,000 and (ii) after the payment in full in Cash of all Administrative Claims and outstanding amounts under the DIP Facility, the Sheridan II RBL Claims, and the Sheridan II Term Loan Claims, the Sale Proceeds; *provided* that the sum of (i) and (ii) shall not exceed the Allowed amount of such Claims.

88. "*Last-Out Exit Facility Credit Agreement*" means that certain loan agreement memorializing the Last-Out Exit Facility, which shall be entered into among one or more of the Reorganized Debtors, the Exit Agent, and the Exit Facility Lenders.

89. "*Last-Out Exit Facility*" means the new senior secured term loan facility in the aggregate principal amount of $75,000,000 consisting of Tranche C that is consistent with the terms and conditions set forth in the Exit Facility Term Sheet and entered into on the Effective Date on the terms and conditions set forth in the Exit Facility Documents.

90. "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

91. "*Manager*" means Sheridan Production Partners Manager, LLC, a limited liability company organized under the Laws of Delaware.

92. "*Manager Affiliate*" means each of Sheridan ICM, LLC, Sheridan SMG, LLC, Sheridan Production Company, LLC, Sheridan Production Company II, LLC, Sheridan Production Operating Company, LLC, Warburg Pincus LLC, and WPS Production Partners II, LLC.

93.     "*New Board*" means the board of directors or the board of managers of New Sheridan.

94.     "*New Common Stock*" means new common stock of New Sheridan issued on the Effective Date.

95.     "*New D&O Tail Coverage*" means reasonably sufficient "tail" or "runoff" liability insurance policy coverage, acceptable to the Required Consenting Secured Lenders and the Debtors, that provides (x) coverage for the six-year period following the Effective Date for the benefit of the Reorganized Debtors and all current and former members of any Governing Body, directors, officers, managers, employees, attorneys, other professionals, and respective agents of, or acting on behalf of, the Debtors with coverage with an available aggregate limit of liability upon the Effective Date of no less than the aggregate limit of liability under the existing policies applicable to such Persons upon placement, or (y) such other coverage terms as are otherwise acceptable to the Debtors and the Required Consenting Secured Lenders.

96.     "*New Money DIP Claim*" means any Claim derived from or based upon the New Money DIP Loans.

97.     "*New Money DIP Loans*" means the $50,000,000 of new money term loans extended to the Debtors pursuant to the DIP Credit Agreement and the DIP Orders.

98.     "*New Organizational Documents*" means the documents providing for corporate governance of New Sheridan and the other Reorganized Debtors, including charters, bylaws, operating agreements, or other organizational documents or shareholders' agreements, as applicable, which shall be consistent with section 1123(a)(6) of the Bankruptcy Code (as applicable), which shall be consistent with the RSA (and subject to the consent, approval, and consultation rights set forth therein) and section 1123(a)(6) of the Bankruptcy Code (as applicable).

99.     "*New Sheridan*" means the newly formed corporation that will become the ultimate parent of the Reorganized Debtors on the Effective Date and the issuer of the New Common Stock under the Plan pursuant to the Equitization Restructuring.

100.    "*Notice of Proposed Assumption/Assignment*" shall mean a notice setting forth a schedule of Executory Contracts and Unexpired Leases and proposed Cure Amounts which shall be (i) in the event the Equitization Restructuring Occurs, assumed by the Reorganized Debtors under section 365 of the Bankruptcy Code or (ii) in the event the Asset Sale Restructuring occurs, assumed and assigned to Purchaser under section 365 of the Bankruptcy Code.

101.    "*Other Priority Claim*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

102.    "*Other Secured Claim*" means any Secured Claim against the Debtors other than a DIP Claim, a Sheridan II RBL Claim, or a Sheridan II Term Loan Claim.

103.    "*Partnership Representative*" means the "partnership representative" within the meaning of Section 6223 of the Internal Revenue Code of 1986, as amended.

104.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

105.    "*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

106.    "*Plan*" means this *Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, including the Plan Supplement, which is incorporated herein by reference.

107.    "*Plan Administrator*" means the person selected by the Debtors (with the consent of the Required Consenting Secured Lenders) to administer the Plan Administrator Assets if the Asset Sale Restructuring has occurred. All costs, liabilities, and expenses reasonably incurred by the Plan Administrator, and any personnel employed by the Plan Administrator in the performance of the Plan Administrator's duties, shall be paid from the Plan Administrator Assets, subject to and in accordance with the Wind-Down Budget.

108.    "*Plan Administrator Agreement*" means, if the Asset Sale Restructuring has occurred, that certain agreement entered into no later than the Effective Date setting forth, among other things, the Plan Administrator's rights, powers, obligations, and compensation, all of which shall be consistent with the applicable provisions of the Plan; and which shall be in form and substance satisfactory to the Debtors and the Required Consenting Secured Lenders.

109.    "*Plan Administrator Assets*" means, if the Asset Sale Restructuring has occurred, on the Effective Date, all assets of the Estates vested in the Reorganized Debtors to be administered by Plan Administrator, and, thereafter, all assets held from time to time by Reorganized Debtors to be administered by Plan Administrator.

110.    "*Plan Distribution*" means a payment or distribution to Holders of Allowed Claims, Allowed Interests, or other eligible Entities under and in accordance with the Plan.

111.    "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed by the Debtors, to the extent reasonably practicable, no later than seven (7) days before the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, including the following, as applicable: (a) the New Organizational Documents; (b) the identity and members of the New Board and any executive management for the Reorganized Debtors; (c) the Schedule of Retained Causes of Action; (d) the Exit Facility Documents; (e) the Description of Transaction Steps; (f) the Amended Hedging Agreement; (g) the form of the Services Agreement, if any; (h) the Asset Purchase Agreement, if any; (i) the identity of the Plan Administrator and the compensation of the Plan Administrator; (j) the Plan Administrator Agreement; (k) the Asset Sale Election Notice; (l) the Wind-Down Budget, if applicable; and (m) any additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.

112.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

113.    "*Pro Rata*" means, unless otherwise specified, the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

114.    "*Professional*" means an Entity: (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

115.    "*Professional Fee Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses of Professionals estimate they have incurred or will incur in rendering services to the Debtors as set forth in Article II.C of the Plan.

116.    "*Professional Fee Claim*" means a Claim by a professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

117.    "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Amount.

118.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

119.    "*Purchaser*" means the purchaser or purchasers under the Asset Purchase Agreement, together with their successors and permitted assigns.

120.    "*Push-Out Election*" means the election described in Article XIII.H of the Plan.

121. "*Push-Out Election Agreement*" means a binding agreement between Sheridan Investment Partners II, L.P., Sheridan Production Partners II-A, L.P., Sheridan Production Partners II-B, L.P., or Sheridan Production Partners II-M, L.P., as applicable, and such entity's Partnership Representative (and the Designated Individual, if any) with respect to its 2018 taxable year that requires the Partnership Representative (and the Designated Individual, if any) to timely make a Push-Out Election and take all actions necessary to effect such election, to the extent permitted by applicable Law, with respect to any U.S. federal income tax audit, examination, adjustment or proceeding relating to such entity by any taxing authority or any other tax-related administrative or judicial proceeding relating to such entity with respect to such entity's 2018 taxable year and all subsequent taxable years.

122. "*Reinstate*" means reinstate, reinstated, or reinstatement with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code. "Reinstated" and "Reinstatement" shall have correlative meanings.

123. "*Related Party*" means, each of, and in each case in its capacity as such, current and former directors, managers, officers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors. For the avoidance of doubt, the members of each Governing Body are Related Parties of the Debtors.

124. "*Released Party*" means, each of, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) each Consenting Stakeholder; (d) each Company Party; (e) each Sheridan II Revolving Lender; (f) each Sheridan II Term Lender; (g) each DIP Lender; (h) Manager; (i) each Manager Affiliate; (j) each Agent; (k) all Holders of Interests; (l) each Exit Facility Lender; (m) each current and former Affiliate of each Entity in clause (a) through the following clause (n); and (n) each Related Party of each Entity in clause (a) through this clause (n); *provided* that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases contained in Article IX.D of the Plan; or (y) timely files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in Article IX.D of the Plan that is not resolved before Confirmation; *provided, further*, that any such Entity shall be identified by name as a non-Released Party in the Confirmation Order.

125. "*Releasing Party*" means, each of, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) each Consenting Stakeholder; (d) each Company Party; (e) each Sheridan II Revolving Lender; (f) each Sheridan II Term Lender; (g) each Sheridan II Subordinated Term Lender; (h) Manager; (i) each Manager Affiliate; (j) each Agent; (k) all Holders of Claims; (l) all Holders of Interests; (m) each DIP Lender; (n) each Exit Facility Lender; (o) each current and former Affiliate of each Entity in clause (a) through the following clause (p); and (p) each Related Party of each Entity in clause (a) through this clause (p); *provided* that in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the releases contained in Article IX.D of the Plan; or (y) timely files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in Article IX.D of the Plan that is not resolved before Confirmation; *provided, further*, that any such Entity shall be identified by name as a non-Releasing Party in the Confirmation Order.

126. "*Reorganized Debtors*" means, collectively, a Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Effective Date. For purposes of this Plan, New Sheridan shall be deemed to be a Reorganized Debtor.

127. "*Required Consenting Secured Lenders*" means each of the Required Consenting Sheridan II Revolving Lenders and the Required Consenting Sheridan II Term Lenders.

128. "*Required Consenting Sheridan II Revolving Lenders*" means, as of the relevant date, Consenting Sheridan II Revolving Lenders holding greater than 50% of the aggregate outstanding principal amount of the Sheridan II RBL Claims that are held by all Consenting Stakeholders.

129.     "*Required Consenting Sheridan II Subordinated Term Lenders*" means, as of the relevant date Consenting Sheridan II Subordinated Term Lenders holding greater than 50% of the aggregate outstanding principal amount of the Sheridan II Subordinated Term Loan Claims that are held by all Consenting Stakeholders.

130.     "*Required Consenting Sheridan II Term Lenders*" means, as of the relevant date Consenting Sheridan II Term Lenders holding greater than 50% of the aggregate outstanding principal amount of the Sheridan II Term Loan Claims that are held by all Consenting Stakeholders.

131.     "*Restructuring Expenses*" means the reasonable and documented fees and expenses accrued since the inception of their respective engagements related to the implementation of the Restructuring Transactions and not previously paid by, or on behalf of, the Debtors of: (i) (a) Davis Polk & Wardwell LLP, as counsel to Bank of America, N.A. in its capacity as administrative agent and collateral agent under the Sheridan II Term Loan Credit Agreements, (b) any local counsel to Bank of America, N.A. in its capacity as administrative agent and collateral agent under the Sheridan II Term Loan Credit Agreements, and (c) Houlihan Lokey Capital, Inc., as financial advisor to Davis Polk & Wardwell LLP in connection with its representation of the Bank of America, N.A. in its capacity as administrative agent and collateral agent under the Sheridan II Term Loan Credit Agreements, (ii) (a) Vinson & Elkins LLP, as counsel to Bank of America, N.A. in its capacity as administrative agent and collateral agent under the Sheridan II RBL Credit Agreements, (b) any local counsel to Bank of America, N.A. in its capacity as administrative agent and collateral agent under the Sheridan II RBL Credit Agreements, and (c) Houlihan Lokey Capital, Inc., as financial advisor to Vinson & Elkins LLP in connection with its representation of the Bank of America, N.A. in its capacity as administrative agent and collateral agent under the Sheridan II RBL Credit Agreements, (iii) (a) Weil Gotshal & Manges, LLP, as counsel to the Ad Hoc Group and (b) PJT Partners LP, as investment banker to Weil Gotshal & Manges, LLP in connection with its representation of the Ad Hoc Group, in each case of (a) and (b) up to an aggregate amount not to exceed $2,000,000, and (iv) any consultants or other professionals retained by Davis Polk & Wardwell LLP, Vinson & Elkins LLP, and the Agents in connection with the Company Parties or the Restructuring Transactions with the consent of the Company Parties (not to be unreasonably withheld), in each case, in accordance with the engagement letters of such consultant or professional signed by the Company Parties, including, without limitation, any success, back-end, or restructuring fees contemplated therein (which such fees are deemed reasonable hereunder), and in each case, without further order of, or application to, the Bankruptcy Court by such consultant or professionals. Notwithstanding anything to the contrary in the Plan, no fees and expenses of the type specified in the foregoing clause (iii) shall be paid or required to be paid by the Debtors or the Reorganized Debtors in excess of the amount specified therein.

132.     "*Restructuring Transactions*" means the transactions described in Article IV.E and Article IV.F of the Plan.

133.     "*Roll-Up DIP Claim*" means any Claim derived from or based upon the Roll-Up DIP Loans.

134.     "*Roll-Up DIP Loans*" means the $50,000,000 of Sheridan II RBL Claims and Sheridan II Term Loan Claims rolled-up pursuant to the DIP Credit Agreement and the DIP Orders.

135.     "*RSA*" means that certain *Restructuring Support Agreement* by and among the Debtors and the other parties thereto, as may be amended, modified, or supplemented from time to time, in accordance with its terms.

136.     "*Sale Proceeds*" means the Cash and non-Cash consideration provided by an Entity in connection with any Asset Sale, net of expenses (including transaction costs, severance, hedge breakage, and other costs and expenses arising from the Asset Sale).

137.     "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time with the consent (such consent not to be unreasonably withheld) of the Required Consenting Secured Lenders and the Debtors.

138.     "*Schedules*" means, collectively, the schedules of assets and liabilities, Schedule of Retained Causes of Action, and statement of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the

official bankruptcy forms, and the Bankruptcy Rules, as they may be amended, modified, or supplemented from time to time.

139.    "*Secured Claim*" means a Claim: (a) secured by a valid, perfected and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

140.    "*Secured Lender Claim Amount*" means an amount equal to the sum of 100 percent of the aggregate Allowed Claims in Class 3(a), Class 3(b), Class 3(c), Class 4(a), Class 4(b), and Class 4(c).

141.    "*Secured Lender Common Stock Pool*" means 100 percent of the New Common Stock (less the New Common Stock issued on account of the Junior Stakeholder Equitization Recovery), subject to dilution by the Incentive Stock.

142.    "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

143.    "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

144.    "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

145.    "*Services Agreement*" means either a new management agreement (if any) or a customary transition services agreement (if any), in each case by and among New Sheridan and Manager, which shall be either (a) in a form included in the Plan Supplement and reasonably acceptable to Manager and the Required Consenting Secured Lenders or (b) if not included in the Plan Supplement, as reasonably agreed between Manager and the New Board.

146.    "*Sheridan*" means Sheridan Holding Company II, LLC.

147.    "*Sheridan II RBL Claims*" means any and all Claims arising under, derived from, or based upon the Sheridan II RBL Credit Agreements or any other agreement, instrument, or document executed at any time in connection therewith including, without limitation, all Obligations (as defined in the Sheridan II RBL Credit Agreements) under the Sheridan II RBL Credit Agreements.

148.    "*Sheridan II RBL Credit Agreements*" means, collectively, each of the following, as amended, restated, supplemented, or otherwise modified from time to time:

      a.   that certain amended and restated credit agreement dated as of February 26, 2013 among Sheridan Investment Partners II, L.P., as borrower, Bank of America, N.A., as administrative agent and collateral agent (together with any successor administrative or collateral agent), and the other lenders party thereto, as amended (the "*SIP II RBL Credit Agreement*," and any and all Claims arising under, derived from, or based upon the SIP II RBL Credit Agreement, the "*SIP II RBL Credit Agreement Claims*");

      b.   that certain amended and restated credit agreement dated as of February 26, 2013 among Sheridan Production Partners II-A, L.P., as borrower, Bank of America, N.A., as administrative agent and collateral agent (together with any successor administrative or collateral agent), and the other lenders party thereto, as amended (the "*SPP II-A RBL Credit Agreement*," and any and all Claims arising under, derived from, or based upon the SPP II-A RBL Credit Agreement, the "*SPP II-A RBL Credit Agreement Claims*"); and

      c.   that certain amended and restated credit agreement dated as of February 26, 2013 among Sheridan Production Partners II-M, L.P., as borrower, Bank of America, N.A., as administrative

agent and collateral agent (together with any successor administrative or collateral agent), and the other lenders party thereto, as amended (the "*SPP II-M RBL Credit Agreement*," and any and all Claims arising under, derived from, or based upon the SPP II-M RBL Credit Agreement, the "*SPP II-M RBL Credit Agreement Claims*").

149.    "*Sheridan II Revolving Lenders*" means those lenders under the Sheridan II RBL Credit Agreements.

150.    "*Sheridan II Special Committee*" means collectively, the special committees of disinterested directors of Sheridan Investment Partners II, L.P., Sheridan Production Partners II-A, L.P., Sheridan Production Partners II-B, L.P., and Sheridan Production Partners II-M, L.P.

151.    "*Sheridan II Subordinated Term Lenders*" means those lenders under the Sheridan II Subordinated Term Loan Credit Agreements.

152.    "*Sheridan II Subordinated Term Loan Claims*" means any and all Claims arising under, derived from, or based upon the Sheridan II Subordinated Term Loan Credit Agreements, or any other agreement, instrument, or document executed at any time in connection therewith including, without limitation, all Obligations (as defined in the Sheridan II Subordinated Term Loan Credit Agreements) under the Sheridan II Subordinated Term Loan Credit Agreements.

153.    "*Sheridan II Subordinated Term Loan Credit Agreements*" means, collectively, each of the following, as amended, restated, supplemented, or otherwise modified from time to time:

      a.    that certain subordinated unsecured term loan credit agreement dated as of October 6, 2017 among Sheridan Investment Partners II, L.P., as borrower, Wilmington Trust, N.A., as administrative agent (together with any successor administrative or collateral agent), and the other lenders party thereto (the "*SIP II Subordinated Term Loan Credit Agreement*," and any and all Claims arising under, derived from, or based upon the SIP II Subordinated Term Loan Credit Agreement, the "*SIP II Subordinated Term Loan Credit Agreement Claims*");

      b.    that certain subordinated unsecured term loan credit agreement dated as of October 6, 2017 among Sheridan Production Partners II-A, L.P., as borrower, Wilmington Trust, N.A., as administrative agent (together with any successor administrative or collateral agent), and the other lenders party thereto (the "*SPP II-A Subordinated Term Loan Credit Agreement*," and any and all Claims arising under, derived from, or based upon the SPP II-A Subordinated Term Loan Credit Agreement, the "*SPP II-A Subordinated Term Loan Credit Agreement Claims*"); and

      c.    that certain subordinated unsecured term loan credit agreement dated as of October 6, 2017 among Sheridan Production Partners II-M, L.P., as borrower, Wilmington Trust, N.A., as administrative agent (together with any successor administrative or collateral agent), and the other lenders party thereto (the "*SPP II-M Subordinated Term Loan Credit Agreement*," and any and all Claims arising under, derived from, or based upon the SPP II-M Subordinated Term Loan Credit Agreement, the "*SPP II-M Subordinated Term Loan Credit Agreement Claims*").

154.    "*Sheridan II Term Lenders*" means those lenders under the Sheridan II Term Loan Credit Agreements.

155.    "*Sheridan II Term Loan Claims*" means any and all Claims arising under, derived from, or based upon the Sheridan II Term Loan Credit Agreements or any other agreement, instrument, or document executed at any time in connection therewith including, without limitation, all Obligations (as defined in the Sheridan II Term Loan Credit Agreements) under the Sheridan II Term Loan Credit Agreements.

156. "*Sheridan II Term Loan Credit Agreements*" means, collectively, each of the following, as amended, restated, supplemented, or otherwise modified from time to time:

    a. that certain amended and restated senior secured term loan credit agreement dated as of December 16, 2013 among Sheridan Investment Partners II, L.P., as borrower, Bank of America, N.A., as administrative agent (together with any successor collateral agent), and the other lenders party thereto (the "*SIP II Term Loan Credit Agreement*," and any and all Claims arising under, derived from, or based upon the SIP II Term Loan Credit Agreement, the "*SIP II Term Loan Credit Agreement Claims*");

    b. that certain amended and restated senior secured term loan credit agreement dated as of December 16, 2013 among Sheridan Production Partners II-A, L.P., as borrower, Bank of America, N.A., as administrative agent (together with any successor collateral agent), and the other lenders party thereto (the "*SPP II-A Term Loan Credit Agreement*," and any and all Claims arising under, derived from, or based upon the SPP II-A Term Loan Credit Agreement, the "*SPP II-A Term Loan Credit Agreement Claims*"); and

    c. that certain amended and restated senior secured term loan credit agreement dated as of December 16, 2013 among Sheridan Production Partners II-M, L.P., as borrower, Bank of America, N.A., as administrative agent (together with any successor collateral agent), and the other lenders party thereto (the "*SPP II-M Term Loan Credit Agreement*," and any and all Claims arising under, derived from, or based upon the SPP II-M Term Loan Credit Agreement, the "*SPP II-M Term Loan Credit Agreement Claims*").

157. "*Subordination Agreements*" means, collectively, each of the following, as amended, restated, supplemented, or otherwise modified from time to time:

    a. that certain subordination agreement dated as of October 6, 2017 among Wilmington Trust, National Association, as administrative agent for the Sheridan II Subordinated Term Lenders (together with any successor administrative agent), Bank of America, N.A., as administrative agent for the Sheridan II Revolving Lenders (together with any successor administrative agent), Bank of America, N.A., as administrative agent for the Sheridan II Term Lenders (together with any successor administrative agent), and Bank of America, N.A., as collateral agent for the Sheridan II Revolving Lenders and the Sheridan II Term Lenders (together with any successor collateral agent), and acknowledged by Sheridan Investment Partners II, L.P.;

    b. that certain subordination agreement dated as of October 6, 2017 among Wilmington Trust, National Association, as administrative agent for the Sheridan II Subordinated Term Lenders (together with any successor administrative agent), Bank of America, N.A., as administrative agent for the Sheridan II Revolving Lenders (together with any successor administrative agent), Bank of America, N.A., as administrative agent for the Sheridan II Term Lenders (together with any successor administrative agent), and Bank of America, N.A., as collateral agent for the Sheridan II Revolving Lenders and the Sheridan II Term Lenders (together with any successor collateral agent), and acknowledged by Sheridan Production Partners II-A, L.P.; and

    c. that certain subordination agreement dated as of October 6, 2017 among Wilmington Trust, National Association, as administrative agent for the Sheridan II Subordinated Term Lenders (together with any successor administrative agent), Bank of America, N.A., as administrative agent for the Sheridan II Revolving Lenders (together with any successor administrative agent), Bank of America, N.A., as administrative agent for the Sheridan II Term Lenders (together with any successor administrative agent), and Bank of America, N.A., as collateral agent for the Sheridan II Revolving Lenders and the Sheridan II Term Lenders (together with any successor collateral agent), and acknowledged by Sheridan Production Partners II-M, L.P.

158. "*Third-Party Release*" means the release set forth in Article VIII.D of this Plan.

159.     "*Tranche A*" means a $50,000,000 first-out tranche of term loans under the First-Out/Second-Out Exit Facility Credit Agreement.

160.     "*Tranche B*" means a $50,000,000 second-out tranche of term loans under the First-Out/Second-Out Exit Facility Credit Agreement.

161.     "*Tranche C*" means a $75,000,000 last-out tranche of term loans under the Last-Out Exit Facility Credit Agreement.

162.     "*Unexpired Lease*" means a lease to which one or more of the Debtors are a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

163.     "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

164.     "*Wind Down*" means, if the Asset Sale Restructuring occurs, the wind down and dissolution of the Debtors' Estates following the Effective Date as set forth in Article VII.B hereof.

165.     "*Wind-Down Budget*" means a budget in form and substance reasonably acceptable to the Company Parties and acceptable to the Required Consenting Secured Lenders and as set forth in the Plan Supplement.

166.     "*Wind-Down Milestones*" means the deadlines, set forth in the Plan Supplement by which the Plan Administrator must complete certain aspects of the Wind Down.

B.     *Rules of Interpretation.*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; *provided* that nothing in this clause (2) shall affect any parties' consent rights over any of the Definitive Documents or any amendments thereto (as defined in the RSA); (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with the Plan or Confirmation Order, as applicable; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document created or entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) unless otherwise specified, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (10) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (11) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (12) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (13) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (14) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (15) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other

Entity; and (16) unless otherwise specified, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

C.      *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.      *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or the Reorganized Debtors, as applicable.

E.      *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in this Plan to the contrary, references in this Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document.*

In the event of an inconsistency between the Plan, and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

H.      *Consent Rights*

Notwithstanding anything herein to the contrary, any and all consent rights of the parties to the RSA set forth in the RSA with respect to the form and substance of this Plan, all exhibits to the Plan, and the Plan Supplement, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Section A hereof) and be fully enforceable as if stated in full herein.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, PRIORITY CLAIMS, AND RESTRUCTURING EXPENSES

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.      *Administrative Claims.*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

B.      *DIP Claims.*

On the Effective Date and if an Equitization Restructuring occurs, except to the extent that a Holder of an Allowed DIP Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each (a) Allowed New Money DIP Claim, each Holder thereof will receive its Pro Rata share of Tranche A of the First-Out/Second-Out Exit Facility, and (b) Allowed Roll-Up DIP Claim, each Holder thereof will receive its Pro Rata share of Tranche B of the First-Out/Second-Out Exit Facility.

On the Effective Date and if an Asset Sale Restructuring occurs, except to the extent that a Holder of an Allowed DIP Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each (a) Allowed New Money DIP Claim, each Holder thereof shall receive payment in full in cash of such Holder's Allowed New Money DIP Claim, and (b) Allowed Roll-Up DIP Claim, each Holder thereof shall receive payment in full in cash of such Holder's Allowed Roll-Up DIP Claim.

Unless and until Holders of Allowed DIP Claims receive, in an Equitization Restructuring, their Pro Rata share of Tranche A of the First-Out/Second-Out Exit Facility and Tranche B of the First-Out/Second-Out Exit Facility, or in an Asset Sale Restructuring, payment in full in Cash, then notwithstanding entry of the Confirmation Order and anything to the contrary in this Plan or the Confirmation Order, (i) none of the DIP Claims shall be discharged, satisfied or released or otherwise affected in whole or in part, and each of the DIP Claims shall remain outstanding, (ii) none of the Liens securing the DIP Claims shall be deemed to have been waived, released, satisfied or discharged, in whole or in part, and (iii) neither the DIP Credit Agreement nor any other agreement, instrument or document executed at any time in connection therewith shall be deemed terminated, discharged, satisfied or released or otherwise affected in whole or in part, and each such agreement, instrument and document shall remain in effect.

C.      *Professional Fee Claims.*

1.      <u>Final Fee Applications and Payment of Professional Fee Claims.</u>

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date.  The

Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date.

2.   Professional Fee Escrow Account.

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount, which shall be funded by the Reorganized Debtors. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed. When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

3.   Professional Fee Amount.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than two (2) Business Days before the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

4.   Post-Confirmation Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

D.   *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

E.   *Payment of Restructuring Expenses.*

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the RSA, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least two (2) Business Days before the anticipated Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses. On the Effective Date, final

18

invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors. In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay pre- and post-Effective Date, when due and payable in the ordinary course, Restructuring Expenses related to implementation, consummation, and defense of the Plan, whether incurred before, on, or after the Effective Date.

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

A.      *Classification of Claims and Interests.*

This Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims against and Interests in the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3(a) | SIP II RBL Credit Agreement Claims | Impaired | Entitled to Vote |
| Class 3(b) | SPP II-A RBL Credit Agreement Claims | Impaired | Entitled to Vote |
| Class 3(c) | SPP II-M RBL Credit Agreement Claims | Impaired | Entitled to Vote |
| Class 4(a) | SIP II Term Loan Credit Agreement Claims | Impaired | Entitled to Vote |
| Class 4(b) | SPP II-A Term Loan Credit Agreement Claims | Impaired | Entitled to Vote |
| Class 4(c) | SPP II-M Term Loan Credit Agreement Claims | Impaired | Entitled to Vote |
| Class 5(a) | SIP II Subordinated Term Loan Credit Agreement Claims | Impaired | Entitled to Vote |
| Class 5(b) | SPP II-A Subordinated Term Loan Credit Agreement Claims | Impaired | Entitled to Vote |
| Class 5(c) | SPP II-M Subordinated Term Loan Credit Agreement Claims | Impaired | Entitled to Vote |
| Class 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 6 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 7 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.     *Treatment of Claims and Interests.*

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

1.     <u>Class 1 - Other Secured Claims</u>

(a)     *Classification*:  Class 1 consists of any Other Secured Claims against any Debtor.

(b)     *Treatment*:  Each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor (subject to the reasonable consent of the Required Consenting Secured Lenders), and subject to any applicable intercreditor agreement:

(i)     payment in full in Cash of its Allowed Class 1 Claim;

(ii)     the collateral securing its Allowed Class 1 Claim;

(iii)     Reinstatement of its Allowed Class 1 Claim; or

(iv)     such other treatment rendering its Allowed Class 1 Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)     *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Allowed Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2.     <u>Class 2 - Other Priority Claims</u>

(a)     *Classification*:  Class 2 consists of any Other Priority Claims against any Debtor.

(b)     *Treatment*:  Each Holder of an Allowed Other Priority Claim shall receive Cash in an amount equal to such Allowed Class 2 Claim.

(c)     *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3.     <u>Class 3(a) - SIP II RBL Credit Agreement Claims</u>

(a)     *Classification*:  Class 3(a) consists of any SIP II RBL Credit Agreement Claims.

(b)     *Allowance*:  On the Effective Date, the SIP II RBL Credit Agreement Claims shall be Allowed in the aggregate principal amount of $55,418,345.61, plus accrued and unpaid interest on such principal amount through the Petition Date and any other amounts due and owing pursuant to the SIP II RBL Credit Agreement through and including the Effective Date, less the amount rolled up pursuant to the Roll-Up DIP Loans.

20

(c)     *Treatment*: On the Effective Date, each Holder of Allowed SIP II RBL Credit Agreement Claims shall receive, in full and final satisfaction of such Claims, its ratable share (measured by reference to the Secured Lender Claim Amount) of:

    (i)     if the Equitization Restructuring occurs, (A) Tranche C of the Last-Out Exit Facility and (B) the Secured Lender Common Stock Pool; or

    (ii)    if the Asset Sale Restructuring occurs, the Sale Proceeds up to the Allowed amount of such Claims, less the Junior Stakeholder Sale Recovery.

(d)     *Voting:* Class 3(a) is Impaired under the Plan and Holders of Allowed Claims in Class 3(a) are entitled to vote to accept or reject the Plan.

4.   Class 3(b) - SPP II-A RBL Credit Agreement Claims

(a)     *Classification*: Class 3(b) consists of any SPP II-A RBL Credit Agreement Claims.

(b)     *Allowance*: On the Effective Date, the SPP II-A RBL Credit Agreement Claims shall be Allowed in the aggregate principal amount of $7,709,122.44, plus accrued and unpaid interest on such principal amount through the Petition Date and any other amounts due and owing pursuant to the SPP II-A RBL Credit Agreement through and including the Effective Date, less the amount rolled up pursuant to the Roll-Up DIP Loans.

(c)     *Treatment*:   On the Effective Date, each Holder of Allowed SPP II-A RBL Credit Agreement Claims shall receive, in full and final satisfaction of such Claims, its ratable share (measured by reference to the Secured Lender Claim Amount) of:

    (i)     if the Equitization Restructuring occurs, (A) Tranche C of the Last-Out Exit Facility and (B) the Secured Lender Common Stock Pool; or

    (ii)    if the Asset Sale Restructuring occurs, the Sale Proceeds up to the Allowed amount of such Claims, less the Junior Stakeholder Sale Recovery.

(d)     *Voting:* Class 3(b) is Impaired under the Plan and Holders of Allowed Claims in Class 3(b) are entitled to vote to accept or reject the Plan.

5.   Class 3(c) - SPP II-M RBL Credit Agreement Claims

(a)     *Classification*: Class 3(c) consists of any SPP II-M RBL Credit Agreement Claims.

(b)     *Allowance*: On the Effective Date, the SPP II-M RBL Credit Agreement Claims shall be Allowed in the aggregate principal amount of $2,875,069.24, plus accrued and unpaid interest on such principal amount through the Petition Date and any other amounts due and owing pursuant to the SPP II-M RBL Credit Agreement through and including the Effective Date, less the amount rolled up pursuant to the Roll-Up DIP Loans.

(c)     *Treatment*:   On the Effective Date, each Holder of Allowed SPP II-M RBL Credit Agreement Claims shall receive, in full and final satisfaction of such Claims, its ratable share (measured by reference to the Secured Lender Claim Amount) of:

    (i)     if the Equitization Restructuring occurs, (A) Tranche C of the Last-Out Exit Facility and (B) the Secured Lender Common Stock Pool; or

    (ii)    if the Asset Sale Restructuring occurs, the Sale Proceeds up to the Allowed

amount of such Claims, less the Junior Stakeholder Sale Recovery.

    (d)    *Voting*: Class 3(c) is Impaired under the Plan and Holders of Allowed Claims in Class 3(c) are entitled to vote to accept or reject the Plan.

6.    <u>Class 4(a) - SIP II Term Loan Credit Agreement Claims</u>

    (a)    *Classification*: Class 4(a) consists of any SIP II Term Loan Credit Agreement Claims.

    (b)    *Allowance*: On the Effective Date, the SIP II Term Loan Credit Agreement Claims shall be Allowed in the aggregate principal amount of $456,036,949.73, plus accrued and unpaid interest on such principal amount through the Petition Date and any other amounts due and owing pursuant to the SIP II Term Loan Credit Agreement through and including the Effective Date, less the amount rolled up pursuant to the Roll-Up DIP Loans.

    (c)    *Treatment*: On the Effective Date, each Holder of Allowed SIP II Term Loan Credit Agreement Claims shall receive, in full and final satisfaction of such Claims, its ratable share (measured by reference to the Secured Lender Claim Amount) of:

        (i)    if the Equitization Restructuring occurs, (A) Tranche C of the Last-Out Exit Facility and (B) the Secured Lender Common Stock Pool; or

        (ii)    if the Asset Sale Restructuring occurs, the Sale Proceeds up to the Allowed amount of such Claims, less the Junior Stakeholder Sale Recovery.

    (d)    *Voting:* Class 4(a) is Impaired under the Plan and Holders of Allowed Claims in Class 4(a) are entitled to vote to accept or reject the Plan.

7.    <u>Class 4(b) - SPP II-A Term Loan Credit Agreement Claims</u>

    (a)    *Classification*: Class 4(b) consists of any SPP II-A Term Loan Credit Agreement Claims.

    (b)    *Allowance*: On the Effective Date, the SPP II-A Term Loan Credit Agreement Claims shall be Allowed in the aggregate principal amount of $63,438,010.99, plus accrued and unpaid interest on such principal amount through the Petition Date and any other amounts due and owing pursuant to the SPP II-A Term Loan Credit Agreement through and including the Effective Date, less the amount rolled up pursuant to the Roll-Up DIP Loans.

    (c)    *Treatment*: On the Effective Date, each Holder of Allowed SPP II-A Term Loan Credit Agreement Claims shall receive, in full and final satisfaction of such Claims, its ratable share (measured by reference to the Secured Lender Claim Amount) of:

        (i)    if the Equitization Restructuring occurs, (A) Tranche C of the Last-Out Exit Facility and (B) the Secured Lender Common Stock Pool; or

        (ii)    if the Asset Sale Restructuring occurs, on the Effective Date, the Sale Proceeds up to the Allowed amount of such Claims, less the Junior Stakeholder Sale Recovery.

    (d)    *Voting:* Class 4(b) is Impaired under the Plan and Holders of Allowed Claims in Class 4(b) are entitled to vote to accept or reject the Plan.

8.  Class 4(c) - SPP II-M Term Loan Credit Agreement Claims

    (a)    *Classification*:  Class 4(c) consists of any SPP II-M Term Loan Credit Agreement Claims.

    (b)    *Allowance*:  On the Effective Date, the SPP II-M Term Loan Credit Agreement Claims shall be Allowed in the aggregate principal amount of $23,658,912.80, plus accrued and unpaid interest on such principal amount through the Petition Date and any other amounts due and owing pursuant to the SPP II-M Term Loan Credit Agreement through and including the Effective Date, less the amount rolled up pursuant to the Roll-Up DIP Loans.

    (c)    *Treatment*:  On the Effective Date, each Holder of Allowed SPP II-M Term Loan Credit Agreement Claims shall receive, in full and final satisfaction of such Claims, its ratable share (measured by reference to the Secured Lender Claim Amount) of:

        (i)    if the Equitization Restructuring occurs, (A) Tranche C of the Last-Out Exit Facility and (B) the Secured Lender Common Stock Pool; or

        (ii)    if the Asset Sale Restructuring occurs, the Sale Proceeds up to the Allowed amount of such Claims, less the Junior Stakeholder Sale Recovery.

    (d)    *Voting:*  Class 4(c) is Impaired under the Plan and Holders of Allowed Claims in Class 4(c) are entitled to vote to accept or reject the Plan.

9.  Class 5(a) - SIP II Subordinated Term Loan Credit Agreement Claims

    (a)    *Classification*:  Class 5(a) consists of any SIP II Subordinated Term Loan Credit Agreement Claims.

    (b)    *Treatment*:  On the Effective Date, each Holder of Allowed SIP II Subordinated Term Loan Credit Agreement Claims shall receive, in full and final satisfaction of such Claims, its ratable share (measured by reference to the Allowed amount of Sheridan II Subordinated Term Loan Claims) of:

        (i)    if the Equitization Restructuring occurs, the Junior Stakeholder Equitization Recovery; or

        (ii)    if the Asset Sale Restructuring occurs, the Junior Stakeholder Sale Recovery;

        *provided, however*, that each Applicable Affiliate is conclusively deemed to have waived its ratable share of the recovery set forth herein for the benefit of the other Holders of Claims in Class 5(a).

    (c)    *Voting:*  Class 5(a) is Impaired under the Plan and Holders of Allowed Claims in Class 5(a) are entitled to vote to accept or reject the Plan.

10.  Class 5(b) - SPP II-A Subordinated Term Loan Credit Agreement Claims

    (a)    *Classification*:  Class 5(b) consists of any SPP II-A Subordinated Term Loan Credit Agreement Claims.

    (b)    *Treatment*:  On the Effective Date, each Holder of Allowed SPP II-A Subordinated Term Loan Credit Agreement Claims shall receive, in full and final satisfaction of such Claims,

its ratable share (measured by reference to the Allowed amount of Sheridan II Subordinated Term Loan Claims) of:

    (i)      if the Equitization Restructuring occurs, the Junior Stakeholder Equitization Recovery; or

    (ii)     if the Asset Sale Restructuring occurs, the Junior Stakeholder Sale Recovery;

*provided, however*, that each Applicable Affiliate is conclusively deemed to have waived its ratable share of the recovery set forth herein for the benefit of the other Holders of Claims in Class 5(b).

    (c)     *Voting:*  Class 5(b) is Impaired under the Plan and Holders of Allowed Claims in Class 5(b) are entitled to vote to accept or reject the Plan.

11.   Class 5(c) - SPP II-M Subordinated Term Loan Credit Agreement Claims

    (a)     *Classification*:  Class 5(c) consists of any SPP II-M Subordinated Term Loan Credit Agreement Claims.

    (b)     *Treatment*:  On the Effective Date, each Holder of Allowed SPP II-M Subordinated Term Loan Credit Agreement Claims shall receive, in full and final satisfaction of such Claims, its ratable share (measured by reference to the Allowed amount of Sheridan II Subordinated Term Loan Claims) of:

    (i)      if the Equitization Restructuring occurs, the Junior Stakeholder Equitization Recovery; or

    (ii)     if the Asset Sale Restructuring occurs, the Junior Stakeholder Sale Recovery;

*provided, however*, that each Applicable Affiliate is conclusively deemed to have waived its ratable share of the recovery set forth herein for the benefit of the other Holders of Claims in Class 5(c).

    (c)     *Voting:*  Class 5(c) is Impaired under the Plan and Holders of Allowed Claims in Class 5(c) are entitled to vote to accept or reject the Plan.

12.   Class 6 – General Unsecured Claims

    (a)     *Classification*:  Class 6 consists of all General Unsecured Claims.

    (b)     *Treatment*:  Each Holder of an Allowed General Unsecured Claim shall receive either: (i) Reinstatement of such Allowed General Unsecured Claim pursuant to section 1124 of the Bankruptcy Code; or (ii) payment in full in Cash on (a) the Effective Date, or (b) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claim.

    (c)     *Voting*:  Class 6 is Unimpaired under the Plan.  Holders of Claims in Class 6 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

13.   Class 7 - Intercompany Claims

    (a)     *Classification:*  Class 7 consists of all Intercompany Claims.

(b)    *Treatment:*  Intercompany Claims shall be, at the option of the Reorganized Debtors, either: (i) Reinstated; or (ii) cancelled and released without any distribution on account of such Claims.

(c)    *Voting:*  Class 7 is Unimpaired if the Class 7 Claims are Reinstated or Impaired if the Class 7 Claims are cancelled.  Holders of Class 7 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Class 7 Claims are not entitled to vote to accept or reject the Plan.

14.  Class 8 - Intercompany Interests

(a)    *Classification:*  Class 8 consists of all Intercompany Interests.

(b)    *Treatment:*  Intercompany Interests shall be, at the option of the Reorganized Debtors, either:  (a) Reinstated; or (b) cancelled and released without any distribution on account of such Interests.

(c)    *Voting*:  Class 8 is Unimpaired if the Class 8 Interests are Reinstated or Impaired if the Class 8 Interests are cancelled.  Holders of Class 8 Interests are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Class 8 Interests are not entitled to vote to accept or reject the Plan.

15.  Class 9 - Interests

(a)    *Classification:*  Class 9 consists of all Interests (other than Intercompany Interests).

(b)    *Treatment*:  If the Equitization Restructuring occurs, all Interests will be cancelled, released, and extinguished and will be of no further force or effect, and Holders of Interests will not receive any distribution on account of such Interests.

If the Asset Sale Restructuring occurs, on the Effective Date, each Holder of Interests shall receive, in full and final satisfaction of such Interests, its *Pro Rata* share of the Interest Holder Sale Recovery.

(c)    *Voting*:  Class 9 is Impaired under the Plan.  Holders of Interests in Class 9 are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claims, including, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

D.    *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.      *Voting Classes, Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

F.      *Intercompany Interests*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of the Holders of New Common Stock, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims.

G.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article XI of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H.      *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.      *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, and subject to the RSA, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

J.      *Subordination Agreements.*

Notwithstanding anything to the contrary in the Plan, (i) nothing in the Plan (unless specifically set forth herein) terminates, cancels, modifies, discharges or releases the Subordination Agreements, any rights of the non-Debtor parties thereto, or any Claims  of the non-Debtor parties thereunder (except as against the Debtor parties thereto in accordance with the treatment provisions of this Plan) and (ii) for the purposes of enforcement of any and all rights and Claims between the non-Debtor parties to the Subordination Agreements, the Sheridan II RBL Claims and the Sheridan II Term Loan Claims shall not be terminated, canceled, discharged, released, satisfied, or impaired by this Plan or any Restructuring Transaction contemplated herein.

Any distributions made pursuant to this Plan, including any proceeds related thereto, shall not be subject to the Subordination Agreements.  For the avoidance of doubt, any and all rights, claims, Causes of Action, payments, or distributions arising from, related to, or made on account of the New Common Stock shall not be subject to the Subordination Agreements.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.    *General Settlement of Claims and Interests.*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including (1) any challenge to the amount, validity, perfection (as applicable), enforceability, priority or extent of the DIP Claims, the Sheridan II RBL Claims, the Sheridan II Term Loan Claims, or the Sheridan II Subordinated Term Loan Claims, and (2) any claim to avoid, subordinate, or disallow any DIP Claims, Sheridan II RBL Claims, Sheridan II Term Loan Claims, or Sheridan II Subordinated Term Loan Claims, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise.  The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates.  Subject to Article VI hereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

B.    *Restructuring Transactions.*

On the Effective Date, the applicable Debtors or the Reorganized Debtors shall enter into any transaction and shall take any actions as may be necessary or appropriate to effectuate the Asset Sale Restructuring or the Equitization Restructuring, as applicable, including to establish New Sheridan and to transfer all of the assets of the Debtors to New Sheridan or a subsidiary thereof.  The applicable Debtors or the Reorganized Debtors will take any actions as may be necessary or advisable to effect a corporate restructuring of the overall corporate structure of the Debtors, to the extent provided herein, the Description of Transaction Steps, or in the Definitive Documentation, including the issuance of all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, one or more inter-company mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions.

The actions to implement the Restructuring Transactions may include, in accordance with the consent rights in the RSA:  (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (4) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan.

C.    *Cancellation of Existing Agreements and Interests.*

On the Effective Date, except with respect to the Exit Facilities or to the extent otherwise provided in the Plan or the Confirmation Order, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be cancelled and the obligations of the Debtors and any non-Debtor Affiliate thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect.  Holders of or parties to such cancelled instruments, securities, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to this Plan.  Notwithstanding the foregoing or anything to the contrary herein, any rights of the Agents to indemnification under the DIP Facility Documents, the Sheridan II RBL Credit

27

Agreements, and the Sheridan II Term Loan Credit Agreements shall remain binding and enforceable in accordance with the terms of such documents and shall not be subject to discharge, impairment, or release under the Plan or the Confirmation Order (in the Asset Sale Restructuring, any payments related to such indemnification obligations shall be made in a manner consistent with the Wind-Down Budget).

D.      *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan, including the Asset Sale, if applicable, or pursuant to:  (1) the issuance, reinstatement, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for any or all of the Exit Facilities; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

E.      *The Equitization Restructuring.*

If the Equitization Restructuring occurs, the following provisions shall govern.

1.      Reorganized Debtors.

On the Effective Date, the New Board shall be established, and each Reorganized Debtor shall adopt its New Organizational Documents.  The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan.

2.      Sources of Consideration for Plan Distributions.

(a)      Exit Facilities.

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities, the terms of which will be set forth in the Exit Facility Documents.  Confirmation of the Plan shall be deemed approval of the Exit Facilities, including the Exit Facilities, and the Exit Facility Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Reorganized Debtors to enter into and execute the Exit Facility Documents and such other documents as may be required to effectuate the treatment afforded by the Exit Facilities.  Execution of the Exit Facility Credit Agreements by the Exit Agent shall be deemed to bind all holders of Sheridan II RBL Claims and Sheridan II Term Loan Claims as if each such holder had executed the Exit Facility Credit Agreements with appropriate authorization.  The Last-Out Exit Facility shall constitute a refinancing of the obligations under the Sheridan II Term Loan Credit Agreements and the Sheridan II RBL Credit Agreements.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility Documents, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Facility Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

(b)      New Common Stock.

New Sheridan shall be authorized to issue a certain number of shares of New Common Stock pursuant to its New Organizational Documents.  On the Effective Date, the Debtors shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan.

All of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

3.      Corporate Existence.

Except as otherwise provided in the Plan, Sheridan shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which Sheridan is incorporated or formed and pursuant to the certificate of incorporation and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

4.      Vesting of Assets in the Reorganized Debtors.

Except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances; *provided*, *however*, that any and all liens securing the DIP Claim, the Sheridan II RBL Claims, and the Sheridan II Term Loan Claims shall be retained by the applicable Agents and assigned to the Exit Agent to secure any and all obligations of the Reorganized Debtors under the Exit Facilities. On and after the Effective Date, except as otherwise provided in the Plan the Confirmation Order, or any agreement, instrument, or other document incorporated herein, the Reorganized Debtors may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

5.      Corporate Action.

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including: (1) adoption or assumption, as applicable, of the Employment Obligations; (2) selection of

the directors, officers, or managers for the Reorganized Debtors; (3) the distribution of the New Common Stock; (4) implementation of the Restructuring Transactions; (5) entry into the Exit Facility Documents; (6) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (7) adoption of the New Organizational Documents; (8) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (9) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security Holders, directors, officers, or managers of the Debtors or the Reorganized Debtors, as applicable.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Common Stock, the New Organizational Documents, the Exit Facilities, the Exit Facility Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by this Article IV.E.5 shall be effective notwithstanding any requirements under non-bankruptcy law.

6.  New Organizational Documents.

On or immediately prior to the Effective Date, the New Organizational Documents shall be amended in a manner acceptable to the Debtors, as may be necessary to effectuate the transactions contemplated by the Plan.  Each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation.  The New Organizational Documents will prohibit the issuance of non-voting Equity Securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code.  For the avoidance of doubt, the New Organizational Documents shall be included as exhibits to the Plan Supplement.

7.  Directors and Officers of the Reorganized Debtors.

As of the Effective Date, the term of the current members of the Sheridan II Special Committee shall expire, and the members for the initial term of the New Board shall be appointed.  The New Board shall initially consist of 5 members, consisting of the Chief Executive Officer of New Sheridan and other members appointed by the Required Consenting Secured Lenders.  In subsequent terms, following the Effective Date, the members of the New Board shall be selected in accordance with the New Organizational Documents of the Reorganized Debtors.  The initial members of the New Board will be identified in the Plan Supplement, to the extent known at the time of filing.  Each such member and officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors.

8.  Effectuating Documents; Further Transactions.

On and after the Effective Date, the Reorganized Debtors and the New Board are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

9.  Certain Securities Law Matters.

The offering, issuance, and distribution of the New Common Stock, as contemplated by Article III of this Plan, shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities in accordance with, and pursuant to, section 1145 of the Bankruptcy Code.  Such New Common Stock will be freely tradable in the United States by the recipients thereof, subject to the provisions of section 1145(b)(1) of the Bankruptcy

Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, and compliance with applicable securities laws and any rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments and subject to any restrictions in the New Organizational Documents.

10. Employee Matters.

Unless otherwise provided herein, and subject to Article V of the Plan, the Reorganized Debtors shall: (a) assume all employment agreements, indemnification agreements, or other agreements with current and former members of any Governing Body, employees, officers, directors, or managers of the Debtors; or (b) enter into new agreements with such persons on terms and conditions acceptable to the Reorganized Debtors and such person. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

11. Preservation of Causes of Action.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article IX hereof, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article IX.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article IX of the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article IX of the Plan. The Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

12. Services Agreement.

On or prior to the Effective Date, New Sheridan shall enter into and adopt the Services Agreement (if any).

13. Dissolution of Certain Debtors.

To the extent there are no remaining Claims against a Debtor and such Debtor has no assets and no liabilities, each Debtor, other than Sheridan, shall be deemed dissolved in accordance with applicable law, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

31

14.   Closing the Chapter 11 Cases.

Upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases except for one of the Chapter 11 Cases as determined by the Reorganized Debtors and the Required Consenting Secured Lenders, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in such Chapter 11 Case.

F.      The Asset Sale Restructuring.

If the Asset Sale Restructuring occurs, the following provisions shall govern.

1.   Vesting of Assets in Reorganized Debtors.

Except as otherwise provided in the Plan, the Confirmation Order, the Asset Purchase Agreement, or any agreement, instrument, or other document incorporated herein or therein, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, the assets of the Debtors shall vest in the Reorganized Debtors for the purpose of liquidating the Estates, free and clear of all Liens, Claims, charges, or other encumbrances; *provided* that, after funding the Professional Fee Escrow Account, the collateral, or proceeds of sales of such collateral, of the Reorganized Debtors securing the DIP Claims, Sheridan II RBL Claims, and Sheridan II Term Loan Claims shall remain subject to the liens and claims of the DIP Lenders, Sheridan II Revolving Lenders and Sheridan II Term Lenders, as applicable, to the same extent as such liens and claims were enforceable against the Debtors and the Debtors' assets until such DIP Claims, Sheridan II RBL Claims, and Sheridan II Term Loan Claims are repaid in full pursuant to Article II.B.  On and after the Effective Date, except as otherwise provided for in the Plan, the DIP Orders, or the Asset Purchase Agreement, the Debtors and the Reorganized Debtors may operate their business and use, acquire, or dispose of property in accordance with the Wind-Down Budget, and compromise or settle any Claims, Interests, or Causes of Action.

2.   Sources of Consideration for Plan Distributions.

The Reorganized Debtors will fund distributions under the Plan with Cash on hand on the Effective Date and the revenues and proceeds of all assets of the Debtors, including proceeds from all Causes of Action not settled, released, discharged, enjoined, or exculpated under the Plan or otherwise on or prior to the Effective Date.

Notwithstanding anything to the contrary in the Plan or in the Asset Purchase Agreement, on the Effective Date, any Cause of Action not settled, released, discharged, enjoined, or exculpated under the Plan on or prior to the Effective Date shall vest in the Reorganized Debtors and shall be subject to administration by the Plan Administrator.

3.   Reorganized Debtors.

On and after the Effective Date, the Reorganized Debtors shall continue in existence for purposes of (a) winding down the Debtors' business and affairs as expeditiously as reasonably possible in accordance with the Wind-Down Budget and Wind-Down Milestones, (b) resolving Disputed Claims, (c) making distributions on account of Allowed Claims as provided hereunder, (d) funding distributions in accordance with the Wind-Down Budget, (e) enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action on the Retained Causes of Action List in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith, (f) filing appropriate tax returns, (g) complying with its continuing obligations under the Asset Purchase Agreement, if any, and the DIP Orders (as applicable), and (h) administering the Plan in an efficacious manner.  The Reorganized Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (i) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, DIP Orders (as applicable) and (iii) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

4.   Plan Administrator.

On and after the Effective Date, the Plan Administrator shall act for the Reorganized Debtors in the same fiduciary capacity as applicable to a board of managers, directors, officers, or other Governing Body, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).  On the Effective Date, the authority, power, and incumbency of the persons acting as managers, officers, directors, sale director, or Governing Body of the Reorganized Debtors shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed as the sole manager, sole director, sole manager, and sole officer of the Reorganized Debtors, and shall succeed to the powers of the Reorganized Debtors' managers, directors, officers, and other Governing Bodies.  From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Reorganized Debtors. The foregoing shall not limit the authority of the Reorganized Debtors or the Plan Administrator, as applicable, to continue the employment of any former manager or officer, including pursuant to any transition services agreement entered into on or after the Effective Date by and between the Reorganized Debtors and the Purchaser.  The Plan Administrator shall use commercially reasonable efforts to operate in a manner consistent with the Wind-Down Budget.

5.   Dissolution and Governing Bodies of the Debtors.

As of the Effective Date, the Sheridan II Special Committee shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, members, or Governing Bodies, and any remaining officers, directors, managers, or managing members of any Debtor shall be dismissed without any further action required on the part of any such Debtor, the equity holders of the Debtors, the officers, directors, managers, or Governing Body, as applicable, of the Debtors, or the members of any Debtor.  Subject in all respects to the terms of this Plan, the Debtors shall be dissolved as soon as practicable on or after the Effective Date, but in no event later than the closing of the Chapter 11 Cases.

As of the Effective Date, the Plan Administrator shall act as the sole officer, director, manager, and Governing Body, as applicable, of the Debtors with respect to its affairs.  Subject in all respects to the terms of this Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve any of the Debtors, and shall:  (a) file a certificate of dissolution for any of the Debtors, together with all other necessary corporate and company documents, to effect the dissolution of Sheridan under the applicable laws of its state of formation; and (b) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the Debtors or their Estates for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

The filing by the Plan Administrator of any of the Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of Manager or any of its Affiliates.

6.   Release of Liens.

Except as otherwise expressly provided herein or in the Confirmation Order, on the Effective Date, all Liens on any property of any Debtors or the Reorganized Debtors shall automatically terminate, all property subject to such Liens shall be automatically released, and all guarantees of any Debtors or the Reorganized Debtors shall be automatically discharged and released; *provided* that notwithstanding anything to the contrary set forth in this Plan, subject to the funding of the Professional Fee Escrow Account, (a) all Liens of the DIP Lenders, the Sheridan II Revolving Lenders, and the Sheridan II Term Lenders, on any property of any Debtors or the Reorganized Debtors shall remain valid, binding, and in full effect on and after the Effective Date, (b) all property of the Debtors and Reorganized Debtors shall remain subject to the Liens and claims of the DIP Lenders, the Sheridan II Revolving Lenders, and the Sheridan II Term Lenders and shall continue to secure all Obligations (as defined in the DIP Credit Agreement, the Sheridan II RBL Credit Agreements, or the Sheridan II Term Loan Credit Agreements, as applicable) owing to the DIP Lenders, the Sheridan II Revolving Lenders, and the Sheridan II Term Lenders, (c) all guarantees of any Debtors or the Reorganized Debtors in favor of the DIP Lenders, the Sheridan II Revolving Lenders, and the Sheridan II Term Lenders shall be reaffirmed and remain in full force and effect, and (d) the proceeds of sales of any

collateral of the Reorganized Debtors securing the DIP claims, Sheridan II RBL Claims, and Sheridan II Term Loan Claims shall remain subject to the liens and claims of the Sheridan II Revolving Lenders and Sheridan II Term Lenders, as applicable, to the same extent as such liens and claims were enforceable against the Debtors and the Debtors' assets, in each case of (a)-(d) until the DIP Lenders, Sheridan II Revolving Lenders, and Sheridan II Term Lenders receive their distributions or other treatment in accordance with Article II.B and Article III.B.

    7.   <u>Corporate Action.</u>

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects, including: (a) consummation of the Asset Sale; and (b) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan or deemed necessary or desirable by the Debtors before, on, or after the Effective Date involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan or corporate structure of the Debtors or Reorganized Debtors, shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors. Before, on, or after the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors. The authorizations and approvals contemplated by this Article IV.F shall be effective notwithstanding any requirements under non-bankruptcy law.

    8.   <u>Effectuating Documents; Further Transactions.</u>

Prior to the Effective Date, the Debtors are, and on and after the Effective Date, the Reorganized Debtors, the Plan Administrator, and the officers and members thereof are, authorized to and may issue, execute, deliver, file, or record to the extent not inconsistent with any provision of this Plan such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, notice, or consents, except for those expressly required pursuant to the Plan.

    9.   <u>Preservation of Causes of Action.</u>

Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Debtors shall convey to the Plan Administrator all rights to commence, prosecute, or settle, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, which shall vest in the Plan Administrator pursuant to the terms of the Plan. The Plan Administrator may enforce all rights to commence, prosecute, or settle, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and the Plan Administrator's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Plan Administrator may, in its reasonable business judgment, pursue such Causes of Action and may retain and compensate professionals in the analysis or pursuit of such Causes of Action to the extent the Plan Administrator deems appropriate, including on a contingency fee basis. No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Plan Administrator will not pursue any and all available Causes of Action against them. The Debtors and the Plan Administrator expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan; *provided* that the Reorganized Debtors, in consultation with the Plan Administrator after the Effective Date, may prosecute any such Cause of Action against any party only in connection with their objection to and resolution of any Claim asserted by such party. Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Plan Administrator expressly reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. The Plan Administrator shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release,

withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to, or action, order, or approval of, the Bankruptcy Court.

      10.   Closing the Chapter 11 Cases.

Upon the occurrence of the Effective Date, the Plan Administrator shall be permitted to close all of the Chapter 11 Cases except for one of the Chapter 11 Cases as determined by the Plan Administrator, the Reorganized Debtors, and the Required Consenting Secured Lenders, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of Sheridan.

When all Disputed Claims have become Allowed or Disallowed and all remaining Cash has been distributed in accordance with the Plan, the Plan Administrator shall seek authority from the Bankruptcy Court to close the Chapter 11 Case of Sheridan in accordance with the Bankruptcy Code and the Bankruptcy Rules.

# ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

Each Executory Contract and Unexpired Lease shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code.  The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates.  The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions and assignments.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

B.      *Indemnification Obligations.*

All Indemnification Provisions, consistent with applicable law, currently in place (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors than the indemnification provisions in place prior to the Effective Date.

On or before the Effective Date, the Reorganized Debtors shall and are authorized to procure the New D&O Tail Coverage, unless otherwise agreed between the Debtors and the Required Consenting Secured Lenders.  To the extent any Entity seeks payment under an Indemnification Provision from the Reorganized Debtors, such Entity and/or the Reorganized Debtors, as applicable, shall use commercially reasonable efforts to first or simultaneously pursue coverage under, and pursue claims from, the New D&O Tail Coverage (or any other available directors and officers insurance policy, runoff policy, excess DIC policy, management liability solutions policy, excess protect liability insurance, excess liability insurance, excess select insurance policy, or excess policy declarations in which the Reorganized Debtors have an interest or that provides or may provide coverage for the Reorganized Debtors, or any other available insurance policy or coverage of any kind in which the Reorganized Debtors have an interest or that

provides or may provide coverage for the Reorganized Debtors), to the extent applicable (without limiting or altering the entitlement to, or timing of, payment under such Indemnification Provision).

C.       *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

The Debtors or the Reorganized Debtors, as applicable, shall pay Cures, if any, on the Effective Date or as soon as reasonably practicable thereafter.  Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, and provided that the deadline set forth in Article V.H herein does not apply, all requests for payment of Cure that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date.  Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.  Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure; *provided* that nothing herein shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure.  The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.  In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan, provided that the deadline set forth in Article V.H herein does not apply to such objection, must be Filed with the Bankruptcy Court on or before 30 days after the Effective Date.  Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely filed.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure pursuant to this Article V.C shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Article V.C, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court**.

D.       *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan, on the Effective Date, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (2) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

E.       *Reservation of Rights.*

Nothing contained in the Plan or the Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors have any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have

36

thirty (30) days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under the Plan.

F.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

G.      *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors liable thereunder in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

H.      *Assumption and Assignment of Executory Contracts*

The Debtors may File the Notice of Proposed Assumption/Assignment and serve an individualized Notice of Proposed Assumption/Assignment to each scheduled counterparty by the date that is twenty-one (21) days before the deadline to object to Confirmation, or as soon as reasonably practicable thereafter. Any objection to the proposed assumption or assumption and assignment to the Purchaser or proposed Cure set forth in the Notice of Proposed Assumption/Assignment must be Filed with the Bankruptcy Court on or before the deadline to object to Confirmation. Notwithstanding Article V.A and Article V.C herein, any counterparty scheduled in the Notice of Proposed Assumption/Assignment who fails to object to the proposed assumption by the Reorganized Debtors or assumption and assignment to the Purchaser by the deadline to object to Confirmation shall be deemed, pursuant to Section 365 of the Bankruptcy Code, to have consented to the proposed assumption or assumption and assignment and to the proposed Cure as set forth in the Notice of Proposed Assumption/Assignment and to be forever barred from asserting any objection or claims against the Debtors, the Purchaser, or the property of any such parties relating to the assumption or assumption and assignment of such Executory Contract or Unexpired Lease, including asserting an additional Cure with respect to such Executory Contract or Unexpired Lease. At any time prior to the deadline to object to Confirmation, the Debtors may (a) designate an Executory Contract or Unexpired Lease scheduled on the Notice of Proposed Assumption/Assignment as an Executory Contract or Unexpired Lease that will not be assumed or assumed and assigned pursuant to this Article V.H, (b) add an Executory Contract or Unexpired Lease to the schedules contained in the Notice of Proposed Assumption/Assignment, or (c) modify the proposed Cure with regards to an Executory Contract or Unexpired Lease set forth in the Notice of Proposed Assumption/Assignment. The Debtors shall serve the Asset Sale Election Notice identifying the Purchaser on each scheduled counterparty to the Notice of Proposed Assumption/Assignment on the date the Asset Sale Election Notice is Filed with the Bankruptcy Court.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), each holder of an Allowed Claim or Allowed Interest (as applicable) shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests (as applicable) in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VIII

hereof.  Except as otherwise provided in the Plan, holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.      *Disbursing Agent.*

All distributions under the Plan shall be made by the Disbursing Agent on the Effective Date.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

C.      *Rights and Powers of Disbursing Agent.*

1.      Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.      Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

D.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.      Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.

2.      Delivery of Distributions in General.

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors; *provided further* that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.

3.      Minimum Distributions.

No fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest (as applicable) would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefore.  The total number of authorized shares of New Common Stock to be distributed to Holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding.

38

4.   Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder of Claims and Interests to such property or Interest in property shall be discharged and forever barred.

E.   *Manner of Payment.*

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

F.   *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

G.   *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

H.   *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims (other than the Sheridan II RBL Claims and Sheridan II Term Loan Claims) against the Debtors, and no Holder of a prepetition Claim (other than the Sheridan II RBL Claims and Sheridan II Term Loan Claims) against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

I.   *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal (National Edition)*, on the Effective Date.

*J.*        *Setoffs and Recoupment.*

Except as expressly provided in this Plan, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and Holder of Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable Holder. In no event shall any Holder of Claims against, or Interests in, the Debtors be entitled to recoup any such Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XIII.H of the Plan on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

*K.*        *Claims Paid or Payable by Third Parties.*

1.        Claims Paid by Third Parties.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

2.        Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.        Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**THE PLAN ADMINISTRATOR**

The following provisions shall apply only if an Asset Sale Restructuring occurs and a Plan Administrator is appointed.

A.     *The Plan Administrator.*

The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and wind down the business and affairs of the Debtors and the Reorganized Debtors, including:  (1) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Reorganized Debtor in accordance with the Wind-Down Milestones and Wind-Down Budget; (2) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan in accordance with the Wind-Down Budget; (3) making distributions as contemplated under the Plan; (4) establishing and maintaining bank accounts in the name of the Reorganized Debtors; (5) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (6) paying all reasonable fees, expenses, debts, charges, and liabilities of the Reorganized Debtors on and after the Effective Date; (7) administering and paying taxes of the Reorganized Debtors, including filing tax returns; (8) representing the interests of the Reorganized Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding, or audit; and (9) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan, in each case of the forgoing clauses, strictly in accordance with the Wind-Down Milestones and Wind-Down Budget.

The Plan Administrator may resign at any time upon 30 days' written notice delivered to the Bankruptcy Court; *provided* that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator in accordance with the Plan Administrator Agreement.  Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor (as set forth in the Plan Administrator Agreement) and all responsibilities of the predecessor Plan Administrator relating to the Reorganized Debtors in the Plan Administrator Agreement shall be terminated.

1.     Plan Administrator Rights and Powers.

The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan in accordance with the Wind-Down Milestones and Wind-Down Budget, and as otherwise provided in the Confirmation Order.  The Plan Administrator shall be the exclusive trustee of the assets of the Reorganized Debtors for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

2.     Compensation and Expenses of the Plan Administrator.

The Plan Administrator's post Effective Date compensation will be set forth in the Plan Supplement and paid out of the Wind-Down Budget and Plan Administrator Assets.

3.     Wind-Down Budget.

The Debtors shall include in the Plan Supplement a Wind-Down Budget.

B.     *Wind Down.*

On and after the Effective Date, the Plan Administrator will be authorized and directed to implement the Plan and any applicable orders of the Bankruptcy Court in accordance with the Wind-Down Milestones and Wind-Down Budget, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates in accordance with the Wind-Down Milestones and Wind-Down Budget.

As soon as practicable after the Effective Date, the Plan Administrator shall:  (1) cause the Debtors and the Reorganized Debtors, as applicable, to comply with, and abide by, the terms of the Asset Purchase Agreement and any other documents contemplated thereby; (2) to the extent applicable, file a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of their state of incorporation or formation (as applicable); and (3) take such other actions

41

in accordance with the Wind-Down Milestones and Wind-Down Budget as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan.  Any certificate of dissolution or equivalent document may be executed by the Plan Administrator without need for any action or approval by the shareholders, board of directors or managers, or Governing Body of any Debtor.  From and after the Effective Date, except with respect to the Reorganized Debtors as set forth herein, the Debtors (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have canceled pursuant to this Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.  Notwithstanding the Debtors' dissolution, the Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

C.      *Tax Returns.*

From and after the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors reflecting all tax consequences relating to the activities of the Reorganized Debtors as attributable to and for the account of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

D.      *Dissolution of the Reorganized Debtors.*

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Reorganized Debtors shall be deemed to be dissolved without any further action by the Reorganized Debtors, including the filing of any documents with the secretary of state for the state in which the Reorganized Debtors is formed or any other jurisdiction.  The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Reorganized Debtors in and withdraw the Reorganized Debtors from applicable state(s).

## ARTICLE VIII.
## PROCEDURES FOR RESOLVING CONTINGENT,
## UNLIQUIDATED, AND DISPUTED CLAIMS

A.      *Disputed Claims Process.*

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of all Allowed General Unsecured Claims under the Plan, except as required by the Plan, Holders of Claims need not File Proofs of Claim, and the Reorganized Debtors and the Holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced except that (unless expressly waived pursuant to the Plan) the Allowed amount of such Claims shall be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable.  All Proofs of Claim filed in these Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors.  Upon the Effective Date, all Proofs of Claim filed against the Debtors, regardless of the time of filing, and including Proofs of Claim filed after the Effective Date, shall be deemed withdrawn and expunged, other than as provided below.  Notwithstanding anything in this Plan to the contrary, disputes regarding the amount of any Cure pursuant to section 365 of the Bankruptcy Code and Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court.

42

For the avoidance of doubt, there is no requirement to File a Proof of Claim or Proof of Interest (or move the Bankruptcy Court for allowance) to be an Allowed Claim or Allowed Interest, as applicable, under the Plan. Notwithstanding the foregoing, Entities must File Cure objections as set forth in Article V..C or Article V.H, as applicable, of the Plan to the extent such Entity disputes the amount of the Cure paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty. **Except as otherwise provided herein, all Proofs of Claim filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

B.      *Allowance of Claims.*

After the Effective Date and subject to the terms of this Plan, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.  The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

C.      *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority:  (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest.

Any objections to Claims and Interests other than General Unsecured Claims shall be served and filed on or before the 180th day after the Effective Date or by such later date as ordered by the Bankruptcy Court.  All Claims and Interests other than General Unsecured Claims not objected to by the end of such 180-day period shall be deemed Allowed unless such period is extended upon approval of the Bankruptcy Court.

Notwithstanding the foregoing, the Debtors and Reorganized Debtors shall be entitled to dispute and/or otherwise object to any General Unsecured Claim in accordance with applicable nonbankruptcy law.  If the Debtors, or Reorganized Debtors dispute any General Unsecured Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced.  In any action or proceeding to determine the existence, validity, or amount of any General Unsecured Claim, any and all claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such General Unsecured Claim are preserved as if the Chapter 11 Cases had not been commenced.

D.      *Adjustment to Claims or Interests without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Disallowance of Claims or Interests.*

All Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if:  (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

**ARTICLE IX.**
**SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**

A.     *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

B.     *Release of Liens.*

**Except as otherwise provided in the Exit Facility Documents, the Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to reinstate in accordance with Article III.B.1 hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

C.     *Releases by the Debtors.*

**Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or**

44

Interest in, a Debtor or other Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Company Party and another Company Party, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the DIP Credit Agreement, the Exit Facilities, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the RSA, the Disclosure Statement, the DIP Credit Agreement, or the Plan, the Plan Supplement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facility Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

D.    *Releases by Holders of Claims and Interests.*

Except as otherwise expressly set forth in this Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Company Party and another Company Party, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the DIP Credit Agreement, the Exit Facilities, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the RSA, the Disclosure Statement, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of

Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any party of any obligations related to customary banking products, banking services or other financial accommodations (except as may be expressly amended or modified by the Plan and the Exit Facility Credit Agreements, or any other financing document under and as defined therein) or (ii) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facility Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

*E.     Exculpation.*

Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the RSA and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties and other parties set forth above have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

*F.     Injunction.*

Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:   (1) commencing or

continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

G.      *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

H.      *Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

I.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE X.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article X.B hereof:

1.      the Bankruptcy Court shall have entered the Confirmation Order;

2.      the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

3.   the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in a manner consistent in all material respects with the RSA and the Plan;

4.   all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date have been placed in the Professional Fee Escrow Account pending approval by the Bankruptcy Court;

5.   the RSA shall remain in full force and effect;

6.   in the event of the Asset Sale Restructuring, the conditions to effectiveness to the Asset Purchase Agreement shall have been satisfied;

7.   in the event of the Asset Sale Restructuring, the Asset Purchase Agreement shall have been executed and remains in full force and effect;

8.   in the event of the Equity Restructuring, entry into the Exit Facility Documents, and all conditions precedent to the consummation of such Exit Facility Documents shall have been waived or satisfied in accordance with their terms thereof and the closing of such Exit Facility Documents shall have occurred;

9.   in the event of the Equity Restructuring, the New Common Stock shall have been issued by New Sheridan;

10.   the Reorganized Debtors shall have procured or become insured under (i) the New D&O Tail Coverage acceptable to the Required Consenting Secured Lenders and the Debtors and (ii) one or more other director and officer's insurance policies acceptable to the Debtors and the Required Consenting Secured Lenders;

11.   to the extent invoiced, the payment in cash in full of all Restructuring Expenses;

12.   each of Sheridan Investment Partners II, L.P., Sheridan Production Partners II-A, L.P., Sheridan Production Partners II-B, L.P., and Sheridan Production Partners II-M, L.P. shall have entered into the Push-Out Election Agreement; and

13.   the Debtors shall have otherwise substantially consummated the applicable Restructuring Transaction, and all transactions contemplated herein, in a manner consistent in all respects with the RSA and the Plan.

B.   *Waiver of Conditions.*

The conditions to Confirmation and Consummation set forth in this Article X may be waived by the Debtors only with the prior written consent of the Required Consenting Secured Lenders (email shall suffice), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.  Sections 9 and 11 in Article X.A. may be waived by the Debtors only with the prior written consent of both the Required Consenting Secured Lenders and the Ad Hoc Group (email shall suffice), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

C.   *Effect of Failure of Conditions.*

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by the Debtors, Claims, or Interests; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity;

or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity.

# ARTICLE XI.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments.*

Except as otherwise specifically provided in the Plan and to the extent permitted by the RSA, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to those restrictions on modifications set forth in the Plan and the requirements of section 1127 of the Bankruptcy Code, Rule 3019 of the Federal Rules of Bankruptcy Procedure, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or, to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.      *Effect of Confirmation on Modifications.*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan.*

To the extent permitted by the RSA, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

# ARTICLE XII.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.          resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.          ensure that distributions to Holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of the Plan;

5.          adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.          adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.          enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8.          enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.          resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.          issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.          resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article IX hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, exculpations, and other provisions;

12.          resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.K hereof;

13.          enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.          determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan, the Plan Supplement, or the Disclosure Statement;

15.          enter an order concluding or closing the Chapter 11 Cases;

16.          adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.          consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

50

18.        determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.        hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.        hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.        hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions and releases granted in the Plan, including under Article IX hereof, regardless of whether such termination occurred prior to or after the Effective Date;

22.        enforce all orders previously entered by the Bankruptcy Court; and

23.        hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in this Article XII to the contrary, the Exit Facilities shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain any jurisdiction with respect thereto.

## ARTICLE XIII.
## MISCELLANEOUS PROVISONS

A.        *Immediate Binding Effect.*

Subject to Article X.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.        *Additional Documents.*

On or before the Effective Date, and consistent in all respects with the terms of the RSA, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of the Plan and the RSA.  The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.        *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors (or the Disbursing Agent on behalf of each of the Reorganized Debtors) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

D.        *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.  The

Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Effective Date.

E.       *Holders of Working and Similar Interests*

The legal and equitable rights, interests, defenses, and obligations of lessors under the Debtors' oil and gas leases and holders of certain other mineral interests related to the Debtors' oil and gas properties, owners of non-operating working interests in the Debtors' oil and gas properties, counterparties to the Debtors' joint operating agreements, and Holders of Claims related to joint-interest billings and other similar working interests shall not be impaired in any manner by the provisions of this Plan, and nothing in this Plan shall impair the related legal and equitable rights, interests, defenses, or obligations of the Debtors or the Reorganized Debtors.  To the extent applicable, such Claims or Interests shall be Reinstated pursuant to this Plan.

F.       *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

G.       *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

H.       *Tax Elections.*

With respect to any U.S. federal income tax audit, examination, adjustment or proceeding relating to Sheridan Investment Partners II, L.P., Sheridan Production Partners II-A, L.P., Sheridan Production Partners II-B, L.P., or Sheridan Production Partners II-M, L.P., as applicable, by any taxing authority or any other tax-related administrative or judicial proceeding relating to any such entity, such entity shall, and shall cause its designated Partnership Representative and its Designated Individual, if any, to, timely make an election under Section 6226 of the Internal Revenue Code of 1986, as amended, and take all actions necessary to effect such Push-Out Election, to the extent permitted by applicable Law. Without limiting the foregoing, prior to the Effective Date, each such entity shall have entered into the Push-Out Election Agreement.  Each such entity shall deliver notice to the Administrative Agent within ten (10) days of its entry into the Push-Out Election Agreement along with an executed copy of such Push-Out Election Agreement.  Unless each Lender (or the Administrative Agent on behalf of the Lenders) agrees otherwise, no such entity shall designate a partnership representative that is not the Partnership Representative or a designated individual that is not the Designated Individual for any taxable year (including following a termination of the designation of the Partnership Representative or the Designated Individual) unless, on or prior to the effective date of such designation, such entity has entered into an agreement that is substantially similar to the Push-Out Election Agreement with such Partnership Representative or Designated Individual, as the case may be, and shall deliver notice to the Administrative Agent  within ten (10) days of its entry into such an agreement along with an executed copy of such agreement.  The terms of this provision H shall survive the Effective Date.

I.       *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or

made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

1.  <u>if to the Debtors, to:</u>

> Sheridan Holding Company II, LLC
> 1360 Post Oak Blvd., Suite 2500
> Houston, Texas 77056
> Attention:  Cheryl S. Phillips, Vice President and General Counsel
> Email address:  cheryl.phillips@sheridanproduction.com

> with copies to:

> Kirkland & Ellis LLP
> 601 Lexington Avenue
> New York, New York 10022
> Facsimile:  (212) 446-4900
> Attention:  Joshua A. Sussberg, P.C. and Steven N. Serajeddini
> E-mail addresses:  joshua.sussberg@kirkland.com and steven.serajeddini@kirkland.com

> -and-

> Kirkland & Ellis LLP
> 300 North LaSalle
> Chicago, Illinois 60654
> Facsimile:  (312) 862-2200
> Attention:  Spencer A. Winters
> E-mail address:  spencer.winters@kirkland.com

2.  <u>if to a Consenting Sheridan II Revolving Lender, to:</u>

> Vinson & Elkins LLP
> 2001 Ross Avenue
> Suite 3900
> Houston, Texas 75201
> Attention.:  William L. Wallander and Erec R. Winandy
> E-mail addresses:  bwallander@velaw.com and ewinandy@velaw.com

3.  <u>if to a Consenting Sheridan II Term Lender, to:</u>

> Davis Polk & Wardwell LLP
> 450 Lexington Avenue,
> New York, New York 10017
> Attention:  Damian S. Schaible, Nathaniel Sokol, and Stephen D. Piraino
> E-mail addresses:  damian.schaible@davispolk.com, nathaniel.sokol@davispolk.com, and stephen.piraino@davispolk.com

4.  <u>if to a member of the Ad Hoc Group:</u>

> Weil Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York 10153
> Attn:  Matthew S. Barr, Esq., and Gabriel Morgan, Esq.
> Telephone:  (212) 310-8000
> Facsimile:  (212) 310-8007

After the Effective Date, the Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

J.      *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

K.      *Entire Agreement.*

Except as otherwise indicated, and without limiting the effectiveness of the RSA, the Plan (including, for the avoidance of doubt, the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

L.      *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at http://cases.primeclerk.com/SheridanII or the Bankruptcy Court's website at www.txs.uscourts.gov/bankruptcy.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

M.      *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent, *provided*, that any such deletion or modification must be consistent with the RSA; and (3) nonseverable and mutually dependent.

N.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on

the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

O.      *Closing of Chapter 11 Cases.*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

P.      *Waiver or Estoppel.*

Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

*[Remainder of page intentionally left blank]*

Dated: September 24, 2019

SHERIDAN HOLDING COMPANY II, LLC
SHERIDAN INVESTMENT PARTNERS II GP, LLC
SHERIDAN INVESTMENT PARTNERS II, L.P.
SHERIDAN PRODUCTION PARTNERS II, LLC
SHERIDAN PRODUCTION PARTNERS II-A, L.P.
SHERIDAN PRODUCTION PARTNERS II-B, L.P.
SHERIDAN PRODUCTION PARTNERS II-M, L.P.
SPP II-B GP, LLC
SPP II-M GP, LLC

/s/ Lisa A. Stewart

Lisa A. Stewart
Executive Chairman, President, Chief Investment
Officer, and Chief Executive Officer
Sheridan Holding Company II, LLC
Sheridan Investment Partners II GP, LLC
Sheridan Production Partners II, LLC
SPP II-B GP, LLC
SPP II-M GP, LLC

**Exhibit A to the Plan**

**Exit Facility Term Sheet**

**Exit Facility Term Sheet**

| | |
|---|---|
| **Size/Tranches** | $175 million, consisting of three tranches:<br><br>• $50 million first-out term loans (the "**First-Out New Term Loans**");<br><br>• $50 million second-out term loans (the "**Second-Out New Term Loans**" and, together with the First-Out New Term Loans, the "**Priority-Out New Term Loans**");<br><br>• $75 million last-out term loans (the "**Last-Out New Term Loans**" and, collectively with the Priority-Out New Term Loans, the "**Exit Term Loans**").<br><br>Payment waterfall shall reflect the first-out, second-out and last-out nature of the tranches. |
| **Security** | A first priority security interest on current collateral under the existing credit documents (currently 95% of proved PV-9) and previously unencumbered assets (subject to customary exceptions to be agreed).<br><br>The Last-Out New Term Loans shall be documented in a separate credit agreement and subject to an intercreditor agreement with the Priority-Out New Term Loans. |
| **Maturity** | 3 years from the Effective Date. |
| **Rate** | First-Out New Term Loans:  L + 700<br><br>Second-Out New Term Loans:  L + 700<br><br>Last-Out New Term Loans:  L + 700 |
| **Fees** | 50 bps upfront fee payable on the aggregate principal amount of each tranche.<br><br>Customary arranger and customary agency fees to be mutually agreed. |
| **Amortization** | Amortization of 1.0% annually with the remaining balance due at maturity. |
| **Mandatory Prepayments** | TBD (to include asset sale proceeds and excess cash flow sweep), subject to the payment waterfall described above. |
| **Negative Covenants** | Usual and customary negative covenants. |
| **Financial Covenants** | Total Leverage:<br><br>| **Fiscal Quarter** | **Covenant Level** |<br>|---|---|<br>| 03/31/20 | 4.00x |<br>| 06/30/20 | 3.85x |<br>| 09/30/20 | 3.50x |<br>| 12/31/20 | 3.25x | |

| | |
|---|---|
| 03/31/21 | 3.15x |
| 06/30/21 | 3.15x |
| 09/30/21 | 3.15x |
| 12/31/21 | 2.90x |
| 03/31/22 | 2.90x |
| 06/30/22 | 2.65x |
| 09/30/22 | 2.65x |
| 12/31/22 | 2.65x |

Cash Interest Coverage:

| **Fiscal Quarter** | **Covenant Level** |
|---|---|
| 03/31/20 | 2.50x |
| 06/30/20 | 2.50x |
| 09/30/20 | 2.75x |
| 12/31/20 | 3.00x |
| 03/31/21 | 3.10x |
| 06/30/21 | 3.35x |
| 09/30/21 | 3.60x |
| 12/31/21 | 3.60x |
| 03/31/22 | 4.00x |
| 06/30/22 | 4.25x |
| 09/30/22 | 4.25x |
| 12/31/22 | 4.25x |

Current Ratio: 1.00:1.00

- For the avoidance of doubt, the parties agree that any fees or expenses incurred in connection with seeking or obtaining a rating of the First-Out New Term Loans shall be added back to the definition of "EBITDAX" (or such similar term in the definitive documentation).
- Until the Priority-Out New Term Loans are repaid in full in cash, (x) the financial covenants shall be solely for the benefit of the Priority-Out New Term Loans and (y) a breach of the financial covenants shall only result in an event of default under the credit agreement governing the Last-Out New Term Loans upon the acceleration of the Priority-Out New Term Loans in connection therewith.

| **Hedging Requirements** | None. |
|---|---|
| **Disclosure & Reporting** | Requirement for customary and usual information reporting, including, without limitation, semiannual reserve reports (x) prepared by a third party in respect of the semiannual period ending on June 30 and (y) audited by a third party in respect of the semiannual period ending on December 31. The first report shall be provided for the semiannual period ending on December 31, 2019. |
| **Assignments** | Assignments of First-Out New Term Loans and Second-Out New Term Loans shall be required to include a proportional amount of Second-Out New Term Loans (in the case of assignments of First-Out New Term Loans) and First-Out New Term Loans (in the case of assignments of Second-Out New Term Loans). |

**<u>Exhibit B</u>**

**Opt Out Schedule**

| Entity Name |
| --- |
| BP |
| CARMEN M SIMS |
| CHRISTOPHER R WILKINSON |
| DEBRA TISDALE |
| DICK MORTON |
| ELIZABETH LEFFEN COLE |
| FORREST WALTON EDWARDS |
| GENERAL MILLS TRUST GROUP |
| GEORGE HOUSE II |
| HARRY JOE LOOK |
| HOWARD L CHRISTMAN |
| JERRY WALLACE GARTH |
| JKL CO A PARTNERSHIP |
| JOHN ARTHUR NELSON |
| KATHARINE RILEY TEMPS |
| LAREE E PEREZ |
| LEILA MCCONNELL GADBOIS |
| LINDA JEANNINE SAUER |
| LOIS BLACK BOOTH |
| LYNDAKA INVESTMENTS LTD |
| MARJORY ROTH |
| MARTHA S PRICE |
| MARTIN E SHOSID |
| MILDRED F JAMES |
| MOLLY T KLEIN |
| OREGON PUBLIC EMPLOYEES RETIREMENT FUND |
| PAMELA A ROGERS |
| JOHN DOE AT DOCKET NO. 144 |
| RICK ANGERHOFER |
| ROBERT CASEY WRIGHT |
| SHARON K SEAY |
| SONJA ROSE KLEIN |
| SUDHENDU DASGUPTA |
| THE WILLIAM K WARREN FOUNDATION |
| TRUSTEES OF THE TUFTS COLLEGE |
| TUFTS COLLEGE |
| VEIRS FAMILY PARTNERSHIP, LP |
| VICKI SCHRODER |